# United States District Court
## Northern District of Illinois – CM/ECF LIVE, Ver 4.2 (Chicago)
## CIVIL DOCKET FOR CASE #: 1:02–cv–06998
### *Internal Use Only*

| | |
|---|---|
| USA v. Johnson | Date Filed: 09/30/2002 |
| Assigned to: Honorable William J. Hibbler | Date Terminated: 03/11/2003 |
| Demand: $0 | Jury Demand: None |
| Case in other court:  11–01326 | Nature of Suit: 510 Prisoner: Vacate Sentence |
| 11–01443 | Jurisdiction: U.S. Government Defendant |
| ND IL, :96–CR–00379 | |

Cause: 28:2255 Remedies on motion attacking sentence

**Plaintiff**

| | | |
|---|---|---|
| **United States of America** | represented by | **David E. Bindi** |
| | | United States Attorney's Office (NDIL) |
| | | 219 South Dearborn Street |
| | | Suite 500 |
| | | Chicago, IL 60604 |
| | | (312) 353–5300 |
| | | Email: david.bindi@usdoj.gov |
| | | *ATTORNEY TO BE NOTICED* |

V.

**Defendant**

| | | |
|---|---|---|
| **Darryl Lamont Johnson** | represented by | **Terence H. Campbell** |
| | | Cotsirilos, Tighe &Streicker |
| | | 33 North Dearborn Street |
| | | Suite 600 |
| | | Chicago, IL 60602 |
| | | (312) 263–0345 |
| | | Email: tcwolfram@aol.com |
| | | *LEAD ATTORNEY* |
| | | *ATTORNEY TO BE NOTICED* |
| | | |
| | | **Lorinda Meier Youngcourt** |
| | | Lorinda Meier Youngcourt |
| | | Attorney at Law |
| | | P.O. Box 206 |
| | | Huron, IN 47437 |
| | | (812)849–9852 |
| | | Email: lmyoungcourt@incrimlaw.org |
| | | *ATTORNEY TO BE NOTICED* |

| Date Filed | # | Page | Docket Text |
|---|---|---|---|
| | | | |

| | | | |
|---|---|---|---|
| 09/30/2002 | 1 | 5 | MOTION by defendant to vacate conviction and sentence and for new trial pursuant to 28 USC Section 2255 and Rule 33 of the Federal Rules of Criminal Procedure; Civil cover sheet (Documents 1–1 through 1–2) (Forwarded copy of motion to U.S. Attorney's Office) (hp) Modified on 10/01/2002 (Entered: 10/01/2002) |
| 09/30/2002 | 2 | 24 | ATTORNEY APPEARANCE for defendant by Terence H. Campbell and Lorinda Meier Youngcourt. (hp) (Entered: 10/01/2002) |
| 09/30/2002 | 3 | 25 | MOTION by defendant for leave to file oversized brief ; Notice (hp) (Entered: 10/01/2002) |
| 09/30/2002 | 4 | 30 | INITIAL MEMORANDUM by defendant in support motion [1–1] (One volume) (hp) (Entered: 10/01/2002) |
| 10/01/2002 | 5 | 32 | MINUTE ORDER of 10/1/02 by Hon. Suzanne B. Conlon : Defendant Darry Johnson's motion to vacate conviction and sentence and for new trial pursuant to 28 U.S.C. Section 2255 and Rule 33 of the Federal Rules of Criminal Procedure is taken under advisement. The government shall repond by 12/2/02; any reply shall be filed by 12/16/02. Defendant's motion to file an 18–page brief is granted [3–1]. The motions will not be heard on 10/8/02 as noticed. Mailed notices by judge's staff (cem) (Entered: 10/02/2002) |
| 11/14/2002 | 6 | 33 | MOTION by Government for extension of time to answer Section 2255 motion ; Affidavit of David Bindi; Notice (rmm) (Entered: 11/22/2002) |
| 11/21/2002 | 7 | 38 | EX PARTE MOTION by defendant for interim payment of attorney's fees ; Notice (rmm) (Entered: 11/22/2002) |
| 11/21/2002 | 8 | 42 | MINUTE ORDER of 11/21/02 by Hon. Suzanne B. Conlon: Government's unopposed motion for extension of time to answer Section 2255 motion is granted [6–1]. Government's response to petition [1–1] is extended to 1/31/03; any reply shall be filed by 2/14/03. No further extensions. Notices mailed by judge's staff (rmm) (Entered: 11/22/2002) |
| 01/31/2003 | 9 | 43 | RESPONSE by plaintiff to the motion to vacate judgment pursuant to 28 U.S.C. Section 2255 [1–1]; Notice. (cem) (Entered: 02/03/2003) |
| 02/03/2003 | 10 | 97 | MOTION by defendant for leave to conduct discovery ; Notice. (cem) (Entered: 02/07/2003) |
| 02/06/2003 | 11 | 116 | MINUTE ORDER of 2/6/03 by Hon. Suzanne B. Conlon : Defendant's motion for leave to conduct discovery [10–1] is taken under advisement. Government to respond by 2/14/03. Mailed notices by judge's staff (cem) (Entered: 02/07/2003) |
| 02/06/2003 | 12 | 117 | AGREED MOTION by defendant for short extension of time to file reply brief in support of his initial memorandum in support of his Section 2255 motion ; Notice. (cem) (Entered: 02/11/2003) |
| 02/11/2003 | 13 | 121 | MINUTE ORDER of 2/11/03 by Hon. Suzanne B. Conlon : Defendant's agreed motion for extension of time to file reply is granted [12–1]. Defendant's reply in support of his Section 2255 motion is extended to 2/28/03. No further extensions. Mailed notices by judge's staff (cem) (Entered: 02/12/2003) |
| 02/14/2003 | 14 | 122 | RESPONSE by plaintiff to the motion for leave to conduct discovery [10–1]; Notice. (cem) (Entered: 02/18/2003) |

| 02/24/2003 | 15 | 131 | AGREED MOTION by defendant for short extension of time to file reply brief in support of his initial memorandum in support of his Section 2255 ; Notice. (cem) (Entered: 03/04/2003) |
| --- | --- | --- | --- |
| 02/27/2003 | 16 | 135 | MINUTE ORDER of 2/27/03 by Hon. Suzanne B. Conlon : Defendant's agreed motion for extension of time to file reply is granted [15–1]. Defendant's reply in support of his Section 2255 motion is extended to 3/3/03. Final extension. Mailed notices by judge's staff (cem) (Entered: 03/04/2003) |
| 03/03/2003 | 17 | 136 | MOTION by defendant for leave to file brief oversized brief in support of his motion for relief under Section 2255 ; Notice. (cem) (Entered: 03/07/2003) |
| 03/06/2003 | 18 | 141 | MINUTE ORDER of 3/6/03 by Hon. Suzanne B. Conlon : Defendant's motion for leave to file oversized reply brief in support of his Section 2255 motion is granted [17–1]. Mailed notice (cem) (Entered: 03/07/2003) |
| 03/06/2003 | 19 | 142 | INITIAL REPLY by defendant in support of his motion to vacate conviction and sentence and for new trial pursuant to 28 U.S.C. Section 2255 [1–1] (Attachments); Notice. (cem) (Entered: 03/07/2003) |
| 03/11/2003 | 20 | 193 | MINUTE ORDER of 3/11/03 by Hon. Suzanne B. Conlon : Petitioner's motion to vacate conviction and sentence and for new trial pursuant to 28 U.S.C. Section 2255 and Rule 33 of the Federal Rules of Criminal Procedure [1–1] and petitioner's motion for leave to conduct discovery [10–1] are denied with prejudice as to grounds I–V and VII–VIII and without prejudice as to grounds VI. Entered Memorandum Opinion and Order. Terminating case . Mailed notices by judge's staff (cem) (Entered: 03/12/2003) |
| 03/11/2003 | 21 | 213 | ENTERED JUDGMENT (cem) (Entered: 03/12/2003) |
| 03/24/2003 | 22 | 214 | MOTION by petitioner for appointment and funding of expert (Attachments). (cem) (Entered: 03/28/2003) |
| 03/24/2003 | 23 | 226 | MOTION by petitioner to alter, amend and make clarifying findings concerning the 3/11/03 judgment in favor of the respondent , or alternative to stay the judgment ; Notice. (cem) (Entered: 03/28/2003) |
| 03/27/2003 | 24 | 233 | MINUTE ORDER of 3/27/03 by Hon. Suzanne B. Conlon : Petitioner's motion for appointment and funding of expert [22–1] and motion to alter, amend and make clarifying findings concerning the 3/11/03 judgment in favor of the respondent [23–1], or alternatively to stay the judgment [23–2] are taken under advisement. Mailed notice (cem) (Entered: 03/28/2003) |
| 03/31/2003 | 25 | 234 | MINUTE ORDER of 3/31/03 by Hon. Suzanne B. Conlon : Petitioner's motion to alter, amend and make clarifying findings concerning the 3/11/03 judgment [23–1] is denied. His alternative motion to stay the judgment [23–2] is granted. The judgment entered 3/11/03 is stayed pending resolution of petitioner's mental retardation claim. Mailed notices by judge's staff (cem) (Entered: 03/31/2003) |
| 03/31/2003 | 26 | 235 | MINUTE ORDER of 3/31/03 by Hon. Suzanne B. Conlon : Petitioner's motion for appointment of Dennis R. Olvera, Ph.D., a licensed psychologist, to evaluate petitioner's adaptive functioning [22–1] is granted. Dr. Olvera's fees and costs shall not exceed $5,000. Requests for payment must be submitted on appropriate court forms with the required substantiation. Mailed notices by judge's staff (cem) (Entered: 03/31/2003) |

| 11/05/2007 | 27 | 236 | MOTION by Plaintiff United States of America for reconsideration *To Reconsider* (Bindi, David) (Entered: 11/05/2007) |
|---|---|---|---|
| 11/06/2007 | 32 | 334 | MINUTE entry before Judge Suzanne B. Conlon : United States' motion to reconsider basis for rejecting ineffective assistance claim and for entry of judgment 27 is taken under advisement. Defendant shall respond by January 7, 2008. The motion will not be heard on November 13, 2007 as noticed.Mailed notice (rbf, ) (Entered: 11/15/2007) |
| 11/08/2007 | 28 | 240 | *Motion to Reconsider* NOTICE of Motion by David E. Bindi for presentment of before Honorable Suzanne B. Conlon on 11/13/2007 at 09:00 AM. (Bindi, David) (Entered: 11/08/2007) |
| 11/13/2007 | 29 | 241 | RESPONSE by Darryl Lamont Johnson to MOTION by Plaintiff United States of America for reconsideration *To Reconsider 27 in Light of Massaro v. United States* (Campbell, Terence) (Entered: 11/13/2007) |
| 11/13/2007 | 30 | 320 | MOTION by Defendant Darryl Lamont Johnson for discovery – *Renewed Based on Massaro v. United States* (Campbell, Terence) (Entered: 11/13/2007) |
| 11/13/2007 | 31 | 327 | MEMORANDUM by Darryl Lamont Johnson in support of motion for discovery 30 – *Renewed in Light of Massaro v. United States* (Campbell, Terence) (Entered: 11/13/2007) |
| 01/14/2008 | 34 | 336 | MINUTE entry before Judge Suzanne B. Conlon :The government's unopposed motion to reconsider the basis for rejecting defendant's ineffective assistance of counsel claim 27 is granted. A hearing is set on this issue as well as defendant's most recent motion for leave to conduct discovery 30 on January 30, 2008 at 01:30 pm. Mailed notice (gmr, ) (Entered: 01/17/2008) |
| 01/16/2008 | 33 | 335 | ATTORNEY Appearance for Defendant Darryl Lamont Johnson by Terence H. Campbell (Campbell, Terence) (Entered: 01/16/2008) |
| 01/24/2008 | 35 | 337 | MOTION by Defendant Darryl Lamont Johnson to continue *Hearing Date Due to Counsel's Trial Schedule* (Campbell, Terence) (Entered: 01/24/2008) |
| 01/24/2008 | 36 | 340 | *AGREED* NOTICE of Motion by Terence H. Campbell for presentment of motion to continue 35 before Honorable Suzanne B. Conlon on 1/29/2008 at 09:00 AM. (Campbell, Terence) (Entered: 01/24/2008) |
| 01/29/2008 | 37 | 341 | MINUTE entry before Judge Suzanne B. Conlon : Agreed motion 35 to reset January 30, 2008 hearing due to counsel's trial schedule is granted. Hearing is reset on February 29, 2008 @ 1:30 p.m. Notices mailed by Judicial staff. notice (wyh, ) (Entered: 02/01/2008) |
| 02/05/2008 | 38 | 342 | MINUTE entry before Judge Suzanne B. Conlon :Set hearing. On the court's own motion, the motion hearing set on February 29, 2008 at 1:30 p.m. is reset to February 29, 2008 at 9:00 a.m. Notices mailed by Judicial staff. (wyh, ) (Entered: 02/08/2008) |

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

§2255 Case No. **02C 6998**

UNITED STATES OF AMERICA,

    Plaintiff - Appellee - Respondent,

vs.

DARRYL JOHNSON, BOP#06710-424
Terre Haute Federal Penitentiary; USP

    Defendant - Appellant - Petitioner.

)
)
)
)
)
)
)
)
)
)
)
)

**DOCKETED**
OCT 01 2002

**JUDGE CONLON**
**MAGISTRATE JUDGE**
**GERALDINE SOAT BROWN**

Trial Case No. 96 CR 379-1

Hon. Suzanne B. Conlon

**DEATH SENTENCE IMPOSED**

## DARRYL LAMONT JOHNSON'S MOTION TO VACATE CONVICTION AND SENTENCE AND FOR NEW TRIAL PURSUANT TO 28 U.S.C. §2255 AND RULE 33 OF THE FEDERAL RULES OF CRIMINAL PROCEDURE

1.     Johnson is attacking his convictions and sentences of death entered against him in the District Court, Northern District of Illinois, Eastern Division located in Chicago, Illinois.

2.     Judgment was initially entered against Johnson on July 27, 1998 [R294].[1] An amended judgment was entered against Johnson on January 29, 1999 [R338].

3.     The judgment against Johnson sentences him as follows:

    a.     Concurrent sentences of death on counts 5 and 7 [R294]. There currently is no execution date scheduled.

    b.     Life without the possibility of release on counts 2, 3, 4, 6, 8 [R338].

    c.     Twenty (20) years on counts 9, 10, 11, 12, 13, 14, 20, 23, 25, and 38 [R338].

    d.     Forty (40) years on counts 15 and 49 [R338].

---

[1] Items in the District Court record are designated as "R__." Citations to both the trial transcript and the transcript of the ensuing penalty hearing are designated as "Tr. __." Citations to transcripts of other proceedings are designated as "Tr. __/__/__ [date], at __." Items attached as exhibits to Johnson's Initial Memorandum in Support are designated as "Ex.__."

1-1

e. Four (4) years on counts 28, 29, 30, 31, 32, 33, 34, 35, 36, 37, 39, 40, 41, 42, 43, 44, 45, 46, and 47 [R338].

f. Five (5) years on count 51 to run consecutively [R338].

4. Johnson was indicted on the following charges:

a. Count 1 - Distribution of Schedule I and II narcotics. 21 U.S.C. §841.

b. Count 2 - Engaging in Continuing Criminal Enterprise. 21 U.S.C. §848(c).

c. Count 3 - Use of person under 18 in Count 1. 21 U.S.C. §861(a)(1).

d. Count 4 - Use of person under 18 in Count 1 to avoid detection. 21 U.S.C. §861(a)(2).

e. Count 5 - Use of firearm to commit Murder 18 U.S.C. §924.

f. Count 6 - Murder in furtherance of Continuing Criminal Enterprise. 21 U.S.C. §848(e)(1)(A).

g. Count 7 - Murder of a person assisting in federal criminal investigation. 18 U.S.C. §1121(a)(2).

h. Count 8 - Murder in furtherance of Continuing Criminal Enterprise. 21 U.S.C. §848(e)(1)(A).

i. Counts 9-14, 17, 22, 24-27, 38 - Distribution of Schedule II Narcotic. 21 U.S.C. §841(a)(1) and 18 U.S.C. §2.

j. Counts 15, 18-20, 23, 48-49 - Possession with Intent to Distribute. 21 U.S.C. §841(a)(1) and 18 U.S.C. §2.

k. Counts 16, 28-37, 39-47 - Use of Communication Facility to Distribute. 21 U.S.C. §843(b) and 18 U.S.C. §2.

l. Count 21 - Attempted Possession with Intent to Distribute. 21 U.S.C. §§846 and 18 U.S.C. §2.

m. Count 50 - False Statement to Purchase Firearms. 18 U.S.C. §§2 and 924(a)(1)(a) and 2.

n. Count 51 - Use of a Firearm 18 U.S.C. §§924(c) and 2.

5. Johnson pled not guilty to all the above charges.

2

6.      Johnson had a jury trial, and was convicted on 39 counts (as set forth in para. 3 above), the remainder having been dismissed by the government.

7.      Johnson did not testify at his trial or at his penalty phase hearing.

8.      Johnson appealed his convictions and sentences.

9.      Johnson's convictions and sentences were affirmed by the 7th Circuit Court of Appeals on August 3, 2000. *United States v. Johnson*, 223 F.3d 665 (7th Cir. 2000). Certiorari was denied by the United States Supreme Court on October 1, 2001.

10-11.  Johnson has not filed any petitions, applications or motions with respect to this judgment in any federal court other than his direct appeal.

12.     Johnson states the following grounds for relief from his convictions and sentences:

**I.      Ineffective Assistance of Counsel**:  Johnson was denied his constitutional right to the effective assistance of counsel as guaranteed by the Sixth Amendment to the United States Constitution.  *Strickland v. Washington*, 466 U.S. 668 (1984) based on counsel's failure to research and investigate the relevant facts and law, and counsel's failure to subject the government's evidence during the penalty phase regarding potential conditions of confinement and future dangerousness to meaningful adversarial testing.

      a.      During Johnson's penalty phase hearing, the central issue in dispute between the parties was Johnson's alleged "future dangerousness" and the potential conditions of confinement which could be imposed and implemented by the Bureau of Prisons ("BOP") in order to eliminate any such future danger.  In support of its position that Johnson could be housed in a manner that would virtually eliminate the potential for future acts of violence, the defense called Dr. Mark Cunningham to testify about BOP facilities and to opine about conditions of confinement which could be imposed against Darryl Johnson.

      b.      In rebuttal, the government countered this evidence with the testimony of Warden John Vanyur, an official with the United States BOP.  Vanyur testified that the BOP could not possibly house any inmate in this manner, and that Johnson would inevitably have access to a telephone, mail correspondence, and visitors.  *E.g.*, Tr.

3

2474-78. Vanyur further testified that Johnson would ultimately be housed in an open population environment. *Id.* Moreover, Vanyur testified through hearsay that the BOP's inability to control violence was proven just recently when a white racist inmate at ADX Florence, through coded phone messages to a third party, ordered the murders of two African-American inmates at Lewisburg Federal Prison. Tr. 2478-81. Vanyur's testimony (as well as that of certain other government witnesses) is discussed in detail below in the sections addressing claims based on that testimony.

c.      During closing arguments, both sides focused heavily on the issue of future dangerousness and whether it was possible to house Johnson in a manner that would save his life but not endanger society. *See* Tr. 2609-12, 2644-48.

d.      Johnson's counsel failed to investigate and present evidence which directly impeached, contradicted or explained testimony proffered by the government from Warden Vanyur relating to the BOP's policies, practices, and regulations -- all of which went to the central issue at Johnson's penalty phase hearing:   future dangerousness.

e.      Because of this failure to investigate and research, defense counsel was left powerless to effectively cross-examine Warden Vanyur regarding his unequivocal assertions that it was neither possible nor permissible under BOP policies and regulations to house Darryl Johnson under the strict conditions of confinement suggested by the defense for any lengthy period of time, and that Johnson would inevitably be housed in an open population prison with virtually unlimited access to telephones, correspondence and other communications with others. Specifically, defense counsel failed to cross-examine Warden Vanyur (a) with respect to 28 CFR 501.3 which specifically allows for the imposition of strict conditions of confinement; (b) with respect to the conditions of confinement which the BOP was then administering on inmate Luis Felipe; (c) with respect to the conditions of confinement which the BOP had administered on certain inmates pursuant to court order under 18 U.S.C. 3582(d); (d) with respect to other inmates such as Thomas Silverstein and Clayton Fountain who each had been held (and

continue to be held today) by the BOP under extremely strict conditions of confinement for indefinite periods of time (well more than a decade at the time of Johnson's penalty phase hearing). (*See* Ex. B, Affidavit of attorney Jeffrey Urdangen).

f.   Even the government has now taken the position that Johnson's counsel could easily have discovered and used this information had they only exercised due diligence. As the government expressly stated before the Supreme Court, "counsel could readily have discovered Section 501.3 in the Code of Federal Regulations and Section 3582(d) in the United States Code. * * * Due diligence required petitioner to inform himself of legal authority relevant to that testimony, and nothing precluded him from raising Section 501.3 or Section 3582(d) in cross-examination of Warden Vanyur, surrebuttal testimony, or by requesting an instruction from the jury." (Ex. A, Govt. Opp. to cert. at 26; *see also, id.* at 23-24, 18-19).

g.   Defense counsel's failures allowed Vanyur's testimony – which the government has finally conceded was "incomplete" and may have left the jury with a "mistaken impression" about the conditions of confinement available to be imposed on Darryl Johnson by the BOP (Ex. A, Govt. Opp. to cert. at 14, 20, 21, 28-29) – to stand unrebutted and unchallenged in any meaningful way.

h.   Notably, the admissions of the government before the Supreme Court with respect to Vanyur's testimony stand in stark contrast to the position taken by the government in this Court and before the Seventh Circuit, in which the government argued forcefully that Vanyur's testimony was entirely accurate and not misleading. Counsel's ineffectiveness on this matter was crucially important as Vanyur's testimony on these issues formed the heart of the government's argument regarding Johnson's "future dangerousness" which, in turn, was the centerpiece of the government's argument as to why the jury must sentence Johnson to death rather than life without the possibility of parole.

i.   Also because of their failure to research and investigate the issue of conditions of confinement, defense counsel failed to request proper jury instructions based on

5

28 C.F.R. 501.3, 18 U.S.C. §3582(d), and/or the BOP policies and practices at the time of Johnson's penalty phase hearing.

j.     The prejudice to Johnson from defense counsel's failures (as described above) are manifest under the law. *See* Johnson's Initial Memorandum of Law in Support. In order to show prejudice under *Strickland*, the defendant is not required to show certainty that the outcome would have been different, nor even by a preponderance of the evidence: "a defendant need not show that counsel's deficient conduct more likely than not altered the outcome of the trial." *Strickland*, 466 U.S. at 693; *see also Williams v. Taylor*, 529 U.S. 362, 405-06 (2000) (O'Connor, J., concurring) (state court rejection of ineffectiveness claim on grounds that prisoner failed to establish by "a preponderance of the evidence" that the outcome would have differed would be contrary to clearly established precedent). Rather, defendant's burden is merely to show that "there is a *reasonable probability* that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Williams*, 529 U.S. at 392 (emphasis added). Here, that showing is easily made.

k.     The "reasonable probability" is especially apparent in a death penalty case where a non-death verdict would have resulted had the defense been able to "convince only one of twelve jurors to refuse to go along with a death sentence." *Emerson v. Gramley*, 91 F.3d 898, 907 (7th Cir. 1996).

l.     Moreover, since Johnson's trial and sentencing, the prejudice has been further confirmed by, among others, the case of Anthony Ayeni Jones in which a gang leader (Jones) who had ordered murders over the phone, including one while he was in federal prison, was sentenced to life without the possibility of parole after his jury – unlike Darryl Johnson's jury – heard correct and complete information regarding the BOP's ability, policies and existing practices regarding housing of inmates under strict conditions of confinement when appropriate. Jones' jury rejected the death penalty despite unanimously finding beyond a reasonable doubt (as also occurred in Johnson's case) that Jones was a "future danger" to commit serious acts of violence. Because Johnson's counsel was ineffective and that

6

ineffectiveness was prejudicial to him, Johnson is entitled to a new sentencing hearing.[2]

m.  Johnson was further denied his constitutional right to the effective assistance of counsel in the guilt and penalty phases because counsel failed to investigate and present the testimony of Scott J. Arthur who could have refuted the government's assertions that Johnson had ordered Roger Stewart to threaten a possible government witness.

  i.  Stewart testified that he, Johnson, Scott Arthur, and Lakeisha Hayes had a conversation in the visiting room at the Metropolitan Correctional Center in 1996. During the conversation, Johnson told Stewart to send someone over to threaten "Taco" or his mother in case Taco might be cooperating [Tr. 1062-63] and to threaten Lance Cleaton not to cooperate [Tr. 1063].

  ii.  Based upon this testimony, the government argued the non-statutory aggravating circumstance of future dangerousness [Tr. 2592] stating that "as long as the defendant has the ability to convey his orders to his followers, either on the street or in prison with him, nobody is safe; no witness, no witness's family, anybody who stands in his way, they are not safe. It doesn't matter where he is locked up." [Tr. 2593]

  iii.  Had Scott Arthur been called as a witness, he would have testified that the conversation that Roger Stewart described in his testimony never occurred, thus drawing into question Stewart's veracity not only on this point, but on the whole of his testimony. (Ex. L).

  iv.  Scott Arthur could have refuted the government's assertions that Johnson ordered the murders of Darryl "Blunt" Johnson and Charles "Jello" Banks because they were providing information about the Gangster Disciples to the government.

---

[2] All of the matters relating to Warden Vanyur's testimony are discussed in further detail in Johnson's Initial Memorandum of Law in Support of this motion which is being filed contemporaneously with this motion.

7

v. Travis Stephen's testified that Scott Arthur had been told by another attorney that Charles Banks was a "snitch." [Tr. 1230] According to Stephens, Arthur passed this information to Johnson and Johnson then ordered that Banks be killed [Tr. 1230].

vi. William Showers testified that Scott Arthur told Johnson that Blunt Johnson was cooperating with police which resulted in Johnson ordering Blunt Johnson's murder [Tr. 1458-59].

vii. Stephen's and Shower's testimony allowed the government to argue that although Johnson was not present during the killings of Blunt Johnson or Charles Banks, he was responsible for them as he had ordered them in order to protect the Gangster Disciples drug business and Johnson's own income [Tr. 1610-11, 2582].

viii. Had Scott Arthur been called as a witness, he would have testified that he did not have knowledge that Blunt Johnson or Charles Banks were cooperating with the government nor did he tell Johnson that Blunt Johnson or Banks were cooperating. (Ex. L). Arthur's testimony would have discredited Stephen's and Shower's testimony.

ix. Trial counsel never contacted Scott Arthur concerning this case in either his capacity as Johnson's original attorney, his attorney on prior criminal charges, or as a witness in this case. (Ex. B, Urdangen Affidavit). Counsel's failure to investigate Arthur's possible testimony was below prevailing professional norms of reasonably competent counsel.

n. Johnson was further denied his constitutional right to the effective assistance of counsel in the penalty phase when counsel failed to present the testimony of Cheryl Fletcher.

i. The government alleged the statutory aggravator, in relation to the murder of Charles "Jello" Banks, that Johnson had previously been convicted of the voluntary manslaughter of Jesse Simpson. During the penalty phase, the government presented the testimony of Archie Rudd [Tr. 1846-62]. Rudd claimed to have watched Johnson, through a bathroom door, twice

8

shoot the unarmed Jesse Simpson during an argument between Simpson and Reginald Fletcher [Tr. 1850]. Rudd claimed to have exited the bathroom and checked on Simpson after Johnson and Fletcher fled the scene, finding Simpson still alive [Tr.1851]. Rudd further testified, that as he prepared to call 911 for Simpson, he heard Johnson and Fletcher return. Rudd ran back to his bathroom hiding spot and watched Johnson and Fletcher drag Simpson out of the house. He then heard another gunshot [Tr. 1851].

ii.    Cheryl Fletcher was also present at the time of the altercation between Simpson, Johnson and Reginald Fletcher. Had she been called to testify at the penalty phase in the instant case, she would have testified that Johnson shot Simpson in the defense of Reginald Fletcher. Simpson had a knife in his hand and was attempting to stab Reginald Fletcher in the back at the moment that Johnson shot Simpson.

iii.    Counsel's failure to present the testimony of Cheryl Fletcher to rebut the testimony of Archie Rudd was below the prevailing professional norms of reasonably competent counsel and was prejudicial to Johnson.

**II.**    **Violation of Brady v. Maryland**: Johnson was denied his constitutional right to be provided evidence which impeaches a government witness in violation of the Fifth Amendment to the United States Constitution. *See Brady v. Maryland*, 373 U.S. 83 (1963).

a.    In short, the BOP and/or the Department of Justice were in possession of information and documents which were clearly material and impeaching of Warden Vanyur's testimony, yet none of that information was turned over to the defense. Specifically, (a) the BOP and/or the Department of Justice was, at the time of Johnson's penalty-phase hearing and for months prior thereto, housing Luis Felipe under the strict conditions of confinement that Warden Vanyur testified were impossible to impose or carry out for any indefinite period of time; (b) the BOP and/or the Department of Justice was, at the time of Johnson's penalty-phase hearing and for years prior thereto, housing Thomas Silverstein

9

under the strict conditions of confinement that Warden Vanyur testified were impossible to impose or carry out for any indefinite period of time; and (c) the BOP and/or the Department of Justice was, at the time of Johnson's penalty-phase hearing and for years prior thereto, housing Clayton Fountain under the strict conditions of confinement that Warden Vanyur testified were impossible to impose or carry out for any indefinite period of time. (There may well be other instances of such confinements being imposed which, likewise, were not turned over to the defense. This is a subject of requested discovery pursuant to this petition.) Because none of this material information was turned over to the defense, Johnson is entitled to a new sentencing hearing.

**III.    Violation of the Eighth Amendment**: Johnson's death sentence was achieved, in material part, through the use of Warden Vanyur's testimony – testimony which, as noted above, the government now concedes was "incomplete" and may have left the jury with a "mistaken impression" about the possible conditions of confinement which were available to the BOP in Johnson's case. (Ex. A, Govt. Opp. to *cert.* at 14, 20, 21, 28-29). Because "incomplete" and potentially misleading testimony was presented to and relied on by the jury which determined his fate, Johnson's sentence of death violates the Eighth Amendment to the United States Constitution. *Johnson v. Mississippi*, 486 U.S. 578 (1988).

**IV.    The FDPA Is Unconstitutional Because of Relaxed Evidentiary Standards at the Sentencing Hearing**: Johnson's sentences of death must be vacated because the FDPA is unconstitutional in that it allows for relaxed evidentiary rules during the penalty phase of a capital trial.

     a.    The holding of *Ring v. Arizona*[3], that death eligibility factors "operate as the functional equivalent of an element of a greater offense," mandates "recognition that the fundamental rights of confrontation and cross-examination and an evidentiary standard consistent with the adversarial nature of the proceeding must

---

[3]122 S.Ct. 2428, citing, *Apprendi v. New Jersey*, 530 U.S. 466, 494, n. 9.

10

be afforded in the death-eligibility determination." *United States v. Fell*, No. 2:01-CR-12-01, slip op. p. 39 (D. Vt. Sept. 24, 2002).

b.    An abundance of inflammatory hearsay evidence, which could not be confronted or cross examined, was introduced by the government during Johnson's penalty phase from Warden Vanyur and Craig Trout, the Chief of Intelligence for the BOP. This testimony included: (a) Hearsay relating to "drop-calling" [Tr. 2478-79]; (b) Triple hearsay claiming that a double murder was ordered by an inmate at the SuperMax ADX prison to occur in another prison across the country in Lewisburg, Pennsylvania[4] [Tr. 2479-80]; (c) Triple hearsay regarding the manner in which the purported message from the ADX inmate to the Lewisburg killers was communicated; [Tr. 2478-79]; (d) Pure speculation that litigation would likely show that certain conditions of confinement were unconstitutional [Tr. 2483]; (d) Hearsay testimony about an unnamed "notorious drug offender" who, by using telephones and "other means" of communication was able to continue to operate his drug activities, including arranging a large drug shipment from South America to Washington D.C., "and in some cases, even introduced in the institution." [Tr. 2535]; (e) Hearsay testimony that Jeff Fort, a former El Rukn leader, was able to use the phones and speak in code to order his gang in Chicago "to obtain LAW rockets to conduct a violent attack on federal government buildings here in the Chicago area as a subcontractor, if you will, on contract for the government of Libya and specifically from Moammar Khadafy." [Tr. 2536]; and (f) Pure speculation that many gang leaders in their 40s and 50s incarcerated in the BOP continue to order violence to be committed by others from their jail cell [Tr. 2549].

---

[4] In the post-sentencing proceedings, Vanyur admitted in an affidavit and during testimony that this testimony about the Lewisburg murders was not based on any first-hand knowledge, but solely on some informal discussions he had with two BOP officials who, in turn, had gotten their information from an unidentified Confidential Informant. R263, Vanyur Aff. at ¶4; Tr. 7/27/98 at 30-34, 41-42.

11

c.    The hearsay testimony adduced by the government during the penalty phase was not limited solely to the BOP personnel.  In addition, the government presented (a) Hearsay testimony from Germain Haslett concerning beatings ordered by Johnson [Tr. 1805]; (b) Double hearsay testimony of Roger Stewart concerning statements of unnamed woman at beauty shop made to "Mendel" concerning the McDonald's shooting [Tr. 1887]; (c) Double hearsay testimony of Stewart concerning statements allegedly made by Johnson to Quan Ray about the killing of "Angel" [Tr. 1889]; (d) Hearsay testimony of Stewart concerning Johnson ordering Mendel to shot himself in the leg [Tr. 1899]; (e) Hearsay testimony of Stewart concerning "Hub's" statement that Johnson ordered violation of "Mike J" [Tr. 1907]; (f) Hearsay testimony of Stewart concerning Junior's glass eye resulting from a violation [Tr. 1910-11]; (g) Hearsay testimony of Stewart concerning threats made by Mike J towards an unnamed woman [Tr. 1914]; (h) Hearsay testimony of Delano Finch concerning statements made by Johnson to "Little Fool" outside of Finch's presence [Tr. 1941-42]; (i) Double hearsay testimony of Finch concerning Mike J telling Johnson what Mendel had told Mike J outside of the presence of Finch [Tr. 1943-44]; (j) Hearsay testimony of Finch concerning conversation between Johnson and Dion outside of Finch's presence [Tr. 1956]; and (k) Hearsay testimony of Finch concerning alleged conversation between Johnson and Richie about "knocking" someone in Stewart's family and Lance Cleaton outside of Finch's presence [Tr. 1960].

d.    All of this hearsay evidence was extremely powerful and prejudicial, in particular because by its nature it could not be challenged or confronted effectively.  Admission of this hearsay testimony violates Johnson's constitutional rights pursuant to *Ring* and he must be afforded a new sentencing hearing.


V.    **Violation of the Fifth Amendment's Indictment Clause**:  Johnson's sentences of death violate the Indictment Clause of the Fifth Amendment to the United States Constitution, because the indictment does not contain all of the facts (statutory aggravators) which increased the

12

possible maximum punishment for Johnson's charges to the death penalty. *Ring.v. Arizona*, 122 S.Ct. 2428 (2002).

**VI.** **Violation of the Eighth Amendment**: If Johnson is executed it will violate Johnson's protection to be free from cruel and unusual punishment guaranteed under the Eighth Amendment to the United States Constitution as it is possible that Johnson is mentally retarded as defined under the recent Supreme Court decision in *Atkins v. Virginia*, 122 S. Ct. 2242 (2002). Based on the standards enunciated in *Atkins*, Johnson has not been fully evaluated with respect to this issue.[5] We hereby request the resources to conduct such an evaluation in light of *Atkins*.

**VII.** **Race Disparity in Federal Capital Prosecutions**: Johnson's selection by the Attorney General for capital prosecution constitutes a violation of Johnson's due process rights because federal capital cases – all of which are decided upon by the Attorney General – are brought disproportionately against minorities.

    a.    The objective statistical evidence relating to federal capital prosecutions, which is still compiling, makes out a credible showing of racial discrimination in that similarly situated individuals of a different race were not selected for capital prosecution by the Attorney General. *E.g.*, Ex. K to Initial Memo. A number of disturbing facts and issues are raised by, among others, the evidence contained in The Federal Death Penalty System: Supplementary Data, Analysis and Revised Protocols for Capital Case Review (June 6, 2001) (U.S. Dep't of Justice) (hereafter "Ashcroft Report") relating to racial disparity in the federal death penalty prosecutions.

    b.    The composition of the federal death row is now 75% minority (including 67% African American) and 25% white, and based on recent government statistics the

---

[5] Johnson's IQ was evaluated pre-trial. The results of the evaluation placed him within the range of mildly mentally retarded when the standard deviation is taken into consideration. To the best of counsel's knowledge, Johnson's adaptive skills were not evaluated. Mental retardation is evidenced by a significant sub-average IQ and significant limitations in adaptive functioning. American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 41 (4th ed. 2000). Counsel continues to investigate this claim.

composition of those reviewed by the Department of Justice for federal capital prosecution is 78% minority and 17% white. (Ashcroft Report at 13). These statistics reveal a population more disproportionately minority than that of defendants on state death rows, or the group of defendants convicted of drug-related homicides. (*See* U.S. Department of Justice Bureau of Justice Statistics, Homicide Trends in the U.S.: Trends by Race, available at www.ojp.usdoj.gov/bjs/homicide/race.htm). To date, there is no valid race-neutral explanation for these extreme disparities.

c.  There is no explanation in the Ashcroft Report or elsewhere as to why the death penalty is not generally sought against white defendants in mob and racketeering related homicides. A partial list of such non-minority offenders against whom the death penalty was not sought is attached as an exhibit to Johnson's Initial Memorandum. (Ex. K).

d.  There is also insufficient information currently regarding what death penalty eligible defendants are offered plea agreements to life without parole and those who are not. Here, Johnson's counsel repeatedly requested that the government discuss resolving his case by way of a plea agreement, but the government refused to offer any plea agreement which did not involve the death penalty.

e.  Based on the evidence that is currently available and which supports the conclusion that similarly situated non-minority individuals are not selected for capital prosecution by the Attorney General nearly as often as minority individuals, Johnson is entitled to, and hereby requests, further discovery on this issue.

**VIII. <u>Potential Extra-Record Information or Considerations by Jurors</u>:** Johnson further seeks discovery and relief from his sentence based upon the fact that extra-record information, mis-information and/or considerations may have infected the penalty phase jurors. *See Owen v. Duckworth*, 727 F.2d 643 (7th Cir. 1984) (per curium) (assumptions by three jurors that one juror had received a threatening phone call from the defendant or his friend was not harmless). While Johnson's counsel is cognizant of the fact that the Court has denied Johnson's motion with

14

respect to seeking further information in support of this claim, we raise the matter again formally in this petition to ensure that it is not waived. Johnson has set forth his position and basis for relief in his recent pleadings before this Court (*see* "Petitioner's Motion to Allow Counsel To Contact Jurors" and "Darryl Johnson's Reply to The Government's Objection To Motion to Allow Counsel To Contact Jurors") which are hereby adopted and incorporated into this Motion as though fully set forth herein.

In addition, Johnson has requested the juror questionnaires, and the government has no objection to those questionnaires being provided to counsel. This discovery is necessary to further pursue this or related claims.

13. The grounds listed paragraph 12 have not been presented before for the following reasons:

    a. As to the ineffective assistance of counsel claims, the Seventh Circuit has consistently held that those claims are generally not appropriately brought until this type of post-conviction petition under 18 U.S.C. §2255. *E.g.*, *United States v. Godwin*, 202 F.3d 969, 973 (7th Cir.2000) (ineffective assistance of counsel claim is best raised on a motion for habeas corpus, and not on direct appeal, because typically such claims are very unlikely to find any factual support in the trial record); *United States v. Johnson-Wilder*, 29 F.3d 1100, 1104 (7th Cir.1994) (same); *United States v. Boyles*, 57 F.3d 535, 550 (7th Cir.1995) (ineffective assistance claim properly brought on collateral review because on direct appeal "typically, there has been no chance to develop and include in the record evidence relating to the ineffectiveness claim."). The evidence supporting Johnson's ineffective assistance claims was only available, discovered and/or developed during research and investigation (which is still ongoing) after Johnson's conviction and sentence were entered. Accordingly, these claims are properly brought in this petition.

    b. As to the claims based on *Brady v. Maryland* and its progeny, the evidence supporting that claim was not known to Johnson until investigation (which is still

ongoing) after his conviction and sentence were entered. Accordingly, those claims are properly brought in this petition.

c.     As to the claim that Johnson's death sentence violates the Eighth Amendment because it is based on materially incomplete or inaccurate information, the evidence supporting this claim (as is the case with the ineffective assistance claim) was not available or discovered until after Johnson's trial. Accordingly, this claim is properly brought in this petition. *E.g., Johnson v. Mississippi*, 486 U.S. 578 (1988) (Eighth Amendment claim based on materially inaccurate information being presented to the sentencer in death penalty case was properly brought in post-conviction proceedings).

d.     As to Johnson's claim that the FDPA is unconstitutional, the claim is based upon *Ring*, which was not decided until June 24, 2002. As set forth in Johnson's Initial Memorandum of Law in Support of this motion, the FDPA is unconstitutional in light of *Ring* based upon the relaxed evidentiary standards provided for at the penalty phase hearing under the FDPA, 18 U.S.C. §3593(c), because aggravating factors, pursuant to *Ring*, are elements of the greater capital offense. This claim is properly brought now because *Ring* was decided on June 24, 2002, four-and-a-half years after Johnson's initial death sentence was returned by the jury, and more than nine months after *certiorari* was denied by the Supreme Court on Johnson's direct appeal. As set forth in Johnson's Initial Memorandum of Law in Support of this motion, *Ring* must be applied retroactively to Johnson's case, and is appropriately raised in this petition.

e.     A claim that the FDPA was unconstitutional because it violated the indictment clause of the Fifth Amendment was raised pre-trial in Johnson's Motion to Bar the Death Penalty filed July 16, 1997 [R. 133]. The claim was not argued in the direct appeal because at the time of the direct appeal, there was a lack of precedent for the argument, and due to the page limitation imposed by the 7th Circuit Court of Appeals on Johnson's brief. The claim is properly brought now because *Ring* was decided on June 24, 2002, four-and-a-half years after Johnson's initial death sentence was returned by the jury, and more than nine months after *certiorari* was

denied by the Supreme Court on Johnson's direct appeal. As set forth in Johnson's Initial Memorandum of Law in Support of this motion, *Ring* must be applied retroactively to Johnson's case, and is appropriately raised in this petition.

f. As to Johnson's claim based on *Atkins v. Virginia*, 122 S. Ct. 2242, the claim is properly pursued now because *Atkins*, which was decided on June 20, 2002, announced that it is unconstitutional under the Eighth Amendment to the Constitution to execute a mentally retarded individual. Based on the standards enunciated in *Atkins*, Johnson has not been fully evaluated with respect to this issue (*see* fn. 3 above) and we request the resources to conduct such an evaluation in light of *Atkins* at this time.

g. As to Johnson's claim of racial discrimination in the decisions of the Attorney General in seeking the federal death penalty, the information and statistical evidence supporting this claim has only developed and become significant over the time since Johnson's sentencing.

h. Johnson's potential claim for discovery based on potential extra-record influences on jurors is appropriately brought here because the evidence supporting such a claim could not have been discovered previously.

14. A fuller explanation of certain of these claims and their legal and factual bases under this petition are set forth in the accompanying Initial Memorandum of Law In Support of this motion. In addition, the investigation as to each of the claims made in this petition is continuing, and Johnson is requesting certain discovery with respect to these claims. *See* Rule 6 of the Federal Rules governing Section 2255 Proceedings (allowing for discovery under the Rules of Civil Procedure and/or the Rules of Criminal Procedure after the filing of a petition under Section 2255).

15. Johnson does not have any petition or appeal now pending in any court as to the judgment under attack.

16. Johnson has been represented by the following attorneys:

a. Scott J. Arthur, 14315 108th Avenue, Orland Park, IL 60467, at arraignment and plea.

17

b.  Cynthia Giacchetti, 53 West Jackson Boulevard, Suite 1515, Chicago, IL 60604, at trial and sentencing.

c.  Jeffrey Urdangen, 53 West Jackson Boulevard, Suite 1515, Chicago, IL 60604, at trial, sentencing, and post-trial proceedings.

d.  Thomas McQueen, Jenner & Block, One IBM Plaza, Suite 4400, Chicago, IL 60611, in post-trial proceedings.

e.  Lawrence C. Marshall, Northwestern University School of Law Legal Clinic, 357 East Chicago Avenue, Chicago, IL 60611, in post-trial proceedings and on direct appeal.

f.  Terence H. Campbell, Cotsirilos, Tighe & Streicker, Ltd., 33 North Dearborn Street, Suite 600, Chicago, IL 60602, on direct appeal and in the instant post-conviction proceedings.

g.  Lorinda Meier Youngcourt, P.O. Box 206, Huron, IN 47437-0206, in the instant post-conviction proceedings.

17.  Johnson was sentenced to more than one count of an indictment in the same court at approximately the same time.

18.  Johnson has no other sentence to serve after completion of the judgment under attack.

WHEREFORE, Johnson prays that the Court grant him any and all relief to which he may be entitled in this proceeding.

Respectfully submitted,

Terence H. Campbell

Lorinda Meier Youngcourt

COUNSEL FOR DARRYL JOHNSON

18

Civil Cover Sheet

Case 1:02-cv-06998 Document 1 Filed 09/30/02 Page 19 of 19 PageID 19
Case: 11-1326 Document: 8-2 Filed: 03/04/2011 Pages: 342 Page 1 of 1



## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

# Civil Cover Sheet

02 SEP 30

This automated JS-44 conforms generally to the manual JS-44 approved by the Judicial Conference of the United States in September 1974. The data is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. The information contained herein neither replaces nor supplements the filing and service of pleadings or other papers as required by law. This form is authorized for use only in the Northern District of Illinois.

**DOCKETED** OCT 0 1 2002

| | |
|---|---|
| **Plaintiff(s): United States of America** | **Defendant(s):Darryl Lamont Johnson** |
| County of Residence: | County of Residence: 88888 |
| Plaintiff's Atty: David Bindi<br>219 S. Dearborn, 5th Floor<br>Chicago, IL 60604<br>312 353-5300 | Defendant's Atty: Terence H. Campbell<br>33 N. Dearborn, Suite 600<br>Chicago, IL 60602<br>312 263-0345 |

II. Basis of Jurisdiction:    **2. U.S. Gov't Defendant**

III. Citizenship of Principal
Parties (Diversity Cases Only)
                Plaintiff:- **N/A**
                Defendant:- **N/A**

**02C 6998**

**JUDGE CONLON**

IV. Origin :        **1. Original Proceeding**

**MAGISTRATE JUDGE GERALDINE SOAT BROWN**

V. Nature of Suit:        **510 Motions to Vacate Sentence**

VI.Cause of Action:        **28 U.S.C. 2255 and Rule 33 of the Federal Criminal Rules -- Motion to Vacate or Set Aside Conviction and/or Sentence of Death.**

VII. Requested in Complaint
                Class Action:
                Dollar Demand:
                Jury Demand:

VIII. This case **IS NOT** a refiling of a previously dismissed case.

Signature:

Date: 9/30/02

If any of this information is incorrect, please go back to the Civil Cover Sheet Input form using the *Back* button in your browser and change it. Once correct, print this form, sign and date it and submit it with your new civil action. **Note: You may need to adjust the font size in your browser display to make the form print properly.**        Revised: 06/28/00

Conlon 96 CR 379-1
Brown

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

**DOCKETED**

OCT 0 1 2002

In the Matter of

United States of America

v.

Darryl Lamont Johnson

FILED

02 SEP 30 PM 4: 17

U.S. DISTRICT COURT

Case Number: **02C 6998**

Hon. Judge Suzanne B. Conlon

APPEARANCES ARE HEREBY FILED BY THE UNDERSIGNED AS ATTORNEY(S) FOR:

Defendant Darryl Lamont Johnson

MAGISTRATE JUDGE
GERALDINE SOAT BROWN

| (A) | | (B) | |
|---|---|---|---|
| SIGNATURE | | SIGNATURE _Lorinda M. Youngcourt /ttc_ | |
| NAME Terence H. Campbell | | NAME Lorinda Meier Youngcourt | |
| FIRM Cotsirilos, Tighe & Streicker | | FIRM Lorinda Meier Youngcourt, Attorney at Law | |
| STREET ADDRESS 33 N. Dearborn, Suite 600 | | STREET ADDRESS P.O. Box 206 | |
| CITY/STATE/ZIP Chicago, IL 60602 | | CITY/STATE/ZIP Huron, IN 47437 | |
| TELEPHONE NUMBER 312 263-0345 | FAX NUMBER 312 263-4670 | TELEPHONE NUMBER 812 849-9852 | FAX NUMBER 812849-0162 |
| E-MAIL ADDRESS | | E-MAIL ADDRESS | |
| IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) 6195680 | | IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) | |
| MEMBER OF TRIAL BAR? YES ☒ NO ☐ | | MEMBER OF TRIAL BAR? YES ☐ NO ☐ | |
| TRIAL ATTORNEY? YES ☒ NO ☐ | | TRIAL ATTORNEY? YES ☒ NO ☐ | |
| | | DESIGNATED AS LOCAL COUNSEL? YES ☐ NO ☒ | |
| (C) | | (D) | |
| SIGNATURE | | SIGNATURE | |
| NAME | | NAME | |
| FIRM | | FIRM | |
| STREET ADDRESS | | STREET ADDRESS | |
| CITY/STATE/ZIP | | CITY/STATE/ZIP | |
| TELEPHONE NUMBER | FAX NUMBER | TELEPHONE NUMBER | FAX NUMBER |
| E-MAIL ADDRESS | | E-MAIL ADDRESS | |
| IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) | | IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) | |
| MEMBER OF TRIAL BAR? YES ☐ NO ☐ | | MEMBER OF TRIAL BAR? YES ☐ NO ☐ | |
| TRIAL ATTORNEY? YES ☐ NO ☐ | | TRIAL ATTORNEY? YES ☐ NO ☐ | |
| DESIGNATED AS LOCAL COUNSEL? YES ☐ NO ☐ | | DESIGNATED AS LOCAL COUNSEL? YES ☐ NO ☐ | |

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

§2255 Case No. _____

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | **02C 6998** |
| Plaintiff - Appellee - Respondent, | ) | No. 96 CR 379-1   *JUDGE CONLON* |
| | ) | |
| vs. | ) | Hon. Suzanne B. Conlon |
| | ) | MAGISTRATE JUDGE |
| DARRYL JOHNSON, | ) | GERALDINE SOAT BROWN |
| | ) | **Death Sentence Imposed**   **DOCKETED** |
| Defendant - Appellant - Petitioner. | ) | OCT 0 1 2002 |

## DEFENDANT'S MOTION FOR LEAVE TO FILE OVERSIZED BRIEF

Defendant Darryl Johnson, by his attorneys, Terence H. Campbell and Lorinda Meier

Youngcourt, respectfully requests leave of this Court to file an oversized brief in support of his

motion for relief under §2255. In support of this motion, Johnson states as follows:

1.      Darryl Johnson was convicted of a drug conspiracy and two capital murders and

sentenced to death on the murder convictions. The trial in this case took place in the Fall of 1997.

Johnson's convictions and sentences were affirmed by the Seventh Circuit Court of Appeals on

August 3, 2000. *U.S. v. Johnson*, 223 F.3d 665 (7th Cir. 2000). On October 1, 2001, Johnson's

petition for writ of *certiorari* was denied. *Johnson v. U.S.*, ___ U.S. ___, 112 S.Ct. 71, 151 L. Ed.

2d 37 (2001). Johnson is currently housed at the United States Penitentiary in Terre Haute, Indiana.

2.      Johnson's §2255 petition is being filed on September 30, 2002. Along with the filing

of the petition, Johnson is also filing Johnson's Initial Memorandum of Law in Support of this

petition.

3. There are a number of grounds for relief raised in the §2255 motion, several of which are briefed in the initial memorandum. These issues are substantial, require a detailed recitation of the factual background, and involve complex and detailed analysis of the law (including the Federal Death Penalty Act) and its relation to the facts of this case. Indeed, this Court previously noted that "it would be an understatement to say this case is complex. It is definitely a complex case involving many issues." (Transcript of July 27, 1998 at 117).

4. In making this request, we note that the Supreme Court has recognized that, "The penalty of death differs from all other forms of criminal punishment, not in degree but in kind. It is unique in its total irrevocability." *Furman v. Georgia*, 408 U.S. 238, 306 (1972) (Stewart, J., concurring). This "qualitative difference between death and other penalties calls for a greater degree of reliability when the death sentence is imposed." *Lockett v. Ohio*, 438 U.S. 586, 604 (1978). Because of the need for "heightened reliability" in the imposition of death sentences, meaningful appellate review is a *sine qua non* of any constitutional capital sentencing scheme. *See, e.g., Gregg v. Georgia*, 428 U.S. 153, 206 (1976) (opinion of Stewart, Powell, and Stevens, JJ.) ("The provision for appellate review * * * serves as a check against the random or arbitrary imposition of the death penalty.") Moreover, a court's "duty to search for constitutional error with painstaking care is never more exacting than it is in a capital case." *Burger v. Kemp*, 483 U.S. 776, 785 (1987).

5. The memorandum filed in support of the §2255 motion is 75 pages and covers five separate issues. This length is necessary to adequately brief the many complex capital issues arising out of the lengthy trial, sentencing and direct appellate proceedings involved in this case.

WHEREFORE, Johnson respectfully requests leave to file an oversized Initial Memorandum

in Support of his motion under §2255.

Respectfully submitted,

An attorney for Defendant Darryl Johnson

Terence H. Campbell
Cotsirilos, Tighe & Streicker, Ltd.
33 North Dearborn Street, Suite 600
Chicago, Illinois 60602
(312) 263-0345

Lorinda Meier Youngcourt
Post Office Box 206
Huron, IN 47437-0206
(812)849-9852

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

FILED-EOA

02 SEP 30 PM 1: 17

U.S. DISTRICT COURT

§2255 Case No. _____ **02C 6998**

JUDGE CONLON

UNITED STATES OF AMERICA,                     )
                                              )
    Plaintiff - Appellee - Respondent,        )      No. 96 CR 379-1
                                              )
vs.                                           )      Hon. Suzanne B. Conlon
                                              )
                                              )             MAGISTRATE JUDGE
DARRYL JOHNSON,                               )          GERALDINE SOAT BROWN
                                              )      **Death Sentence Imposed**
    Defendant - Appellant - Petitioner.       )


### NOTICE OF MOTION and FILING

DOCKETED

OCT 01 2002

TO:    David Bindi
        Assistant United States Attorney
        219 South Dearborn Street, Suite 500
        Chicago, Illinois 60604

PLEASE TAKE NOTICE that on Tuesday, October 8, 2002, at 9:00 a.m., we shall appear before the Honorable Suzanne B. Conlon, United States District Judge, in the courtroom usually occupied by her at 219 South Dearborn Street, Chicago, Illinois, and present (1) Defendant's Motion To Vacate Conviction and Sentence And For New Trial Pursuant to 28 U.S.C. §2255 and Rule 33 of The Federal Rules of Criminal Procedure; (2) Defendant's Motion For Leave To File Oversized Brief; and (3) Defendant's Initial Memorandum In Support of His Motion To Vacate Conviction and Sentence And For New Trial Pursuant to 28 U.S.C. §2255 and Rule 33, copies of which accompany this Notice and are hereby served upon you.

Attorney for defendant

Terence H. Campbell
Cotsirilos, Tighe & Streicker, Ltd.
33 North Dearborn Street, Suite 600
Chicago, Illinois 60602
(312) 263-0345

3

## CERTIFICATE OF SERVICE

Terence H. Campbell, an attorney, hereby certifies that he caused copies of (1) Defendant's Motion To Vacate Conviction and Sentence And For New Trial Pursuant to 28 U.S.C. §2255 and Rule 33 of The Federal Rules of Criminal Procedure; (2) Defendant's Motion For Leave To File Oversized Brief; and (3) Defendant's Initial Memorandum In Support of His Motion To Vacate Conviction and Sentence And For New Trial Pursuant to 28 U.S.C. §2255 and Rule 33, to be served upon David Bindi, Assistant United States Attorney, 219 South Dearborn Street, Suite 500, Chicago, Illinois 60604, by messenger delivery, on this 30th day of September, 2002.

Terence H. Campbell

-2-

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

§2255 Case No. _____

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff - Appellee - Respondent, | ) | No. 96 CR 379-1 |
| vs. | ) | Hon. Suzanne B. Conlon |
| DARRYL JOHNSON, | ) | |
| Defendant - Appellant - Petitioner. | ) | Death Sentence Imposed |

JUDGE CONLON

MAGISTRATE JUDGE
GERALDINE SOAT BROWN

**FILED**

SEP 3 2002

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

**02C 6998**

SEP 3 0 2002
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

DOCKETED
OCT 0 1 2002

**DARRYL LAMONT JOHNSON'S INITIAL MEMORANDUM IN SUPPORT
OF HIS MOTION TO VACATE CONVICTION AND SENTENCE
AND FOR NEW TRIAL PURSUANT TO 28 U.S.C. §2255 AND RULE 33
OF THE FEDERAL RULES OF CRIMINAL PROCEDURE**

Respectfully submitted by:

Terence H. Campbell
Cotsirilos, Tighe & Streicker, Ltd.
33 North Dearborn Street, Suite 600
Chicago, Illinois  60602
(312) 263-0345

Counsel for Darryl Lamont Johnson

Lorinda Meier Youngcourt
Post Office Box 206
Huron, IN 47437-0206
(812) 849-9852

Counsel for Darryl Lamont Johnson

# *See Case File for Exhibits*

Case 1:02-cv-06998   Document 4    Filed 09/30/02   Page 2 of 2   PageID 27
Case: 11-1326     Document: 8-2        Filed: 03/04/2011     Pages: 342

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Suzanne B. Conlon | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 96 CR 379 - 1 | **DATE** | 10/1/2002 |
| **CASE TITLE** | UNITED STATES OF AMERICA vs. DARRYL JOHNSON | | |

*02 CV 6998*

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)   ☐ Local Rule 41.1   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]   Defendant Darryl Johnson's motion to vacate conviction and sentence and for new trial pursuant to 28 U.S.C. §2255 and Rule 33 of the Federal Rules of Criminal Procedure is taken under advisement. The government shall respond by December 2, 2002; any reply shall be filed by December 16, 2002. Defendant's motion to file an 18-page brief is granted. The motions will not be heard on October 8, 2002 as noticed.

*Suzanne B. Conlon*

(11) ☐ [For further detail see order (on reverse side of/attached to) the original minute order.]

| | | | |
|---|---|---|---|
| | No notices required, advised in open court. | | **Document Number** |
| | No notices required. | | |
| ✓ | Notices mailed by judge's staff. | number of notices | |
| | Notified counsel by telephone. | **OCT 02 2002** | |
| | Docketing to mail notices. | date docketed | **5** |
| | Mail AO 450 form. | | |
| | Copy to judge/magistrate judge. | 10/1/2002 | |
| CB | courtroom deputy's initials | date mailed notice | |
| | | CB | |
| | | mailing deputy initials | |

Date/time received in central Clerk's Office

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 02 C 6998 |
| v. | ) | Judge Suzanne B. Conlon |
| | ) | |
| DARRYL JOHNSON | ) | |

## NOTICE OF MOTION

TO:   Terrence H. Campbell                    Lorinda Meier Youngcourt
Cotairilos, Stephenson, Tighe & Streicker   P.O. Box 206
33 N. Dearborn Street                       Huron, Indiana 47437
Suite 600
Chicago, IL 60602

PLEASE TAKE NOTICE that on Thursday, November 21, 2002 at 9:00 a.m., or as soon thereafter as counsel may be heard, I will appear before Judge Suzanne B. Conlon, in the courtroom usually occupied by her in Courtroom 2325 at the United States Courthouse, 219 South Dearborn Street, Chicago, Illinois or before such other judge who may be sitting in her place and stead, and then and there present the attached **GOVERNMENT'S MOTION FOR EXTENSION OF TIME TO ANSWER § 2255 MOTION**, at which time and place you may appear if you see fit.

Very truly yours,

PATRICK J. FITZGERALD
United States Attorney

By:                             

DAVID E. BINDI
Assistant United States Attorney
219 S. Dearborn St., 5th Floor
Chicago, Illinois 60604
(312) 886-7643

## CERTIFICATE OF SERVICE

I, David E. Bindi, an Assistant United States Attorney, state that on the 14th day of November, 2002, I caused a copy of Notice of Motion and Government's Motion For Extension of Time to Answer § 2255 Motion, to be mailed to the above named individuals.

DAVID E. BINDI
Assistant United States Attorney



UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 02 C 6998 |
| v. | ) | Judge Suzanne B. Conlon |
| | ) | |
| DARRYL JOHNSON | ) | |

**F I L E D**

NOV 1 4 2002

## GOVERNMENT'S MOTION FOR EXTENSION
## OF TIME TO ANSWER § 2255 MOTION

The UNITED STATES OF AMERICA, by its attorney, PATRICK J. FITZGERALD,

United States Attorney for the Northern District of Illinois, moves this Court to grant a 60-

day extension of time, from December 2, 2002, to and including January 31, 2003, within

which to answer defendant's motion to vacate his conviction and sentence pursuant to 28

U.S.C. § 2255. In support of its motion, the government submits the attached affidavit of

counsel.

Respectfully Submitted,

PATRICK J. FITZGERALD
United States Attorney

By: _____
DAVID E. BINDI
Assistant U.S. Attorney
219 S. Dearborn Street
9th Floor
Chicago, Illinois 60604
(312) 886-7643



## AFFIDAVIT

David Bindi, being first duly sworn upon oath, deposes and states as follows:

1. Affiant is the Assistant U.S. Attorney who, having briefed and argued this case on direct appeal, is primarily responsible for preparing the government's answer to defendant's § 2255 motion.

2. On October 1, 2002, this Court ordered the government to file its response to defendant's § 2255 motion by December 2, 2002. Affiant has spoken to Terrence Campbell, one of defendant's attorneys, and Mr. Campbell stated that he had no objection to the government's request for a 60-day extension of time.

3. Affiant has not been able to begin preparation of the response, and will not, with due diligence, be able to file the response by December 2, 2002, due to his responsibilities for other litigation pending in the Court of Appeals:

   (a)   *United States v. Robinson*, 02-2331, brief filed October 3, 2002;

   (b)   *United States v. Irwin*, 01-3800, oral argument October 31, 2002;

   (c)   *United States v. Wallace*, 02-2037, brief filed November 8, 2002;

   (d)   *United States v. Rogers*, 02-3035, brief due November 22, 2002;

   (e)   *United States v. Funches, et al.*, 02-2999, reply brief due November 22, 2002;

   (f)   *United States v. Lowe*, 00-4214, answer to petition for rehearing and suggestion for rehearing en banc due November 27, 2002;

   (f)   *United States v. Hendershot, et al.*, 01-3248, oral argument December 4, 2002;

   (g)   *United States v. Dote*, 02-1410, oral argument December 4, 2002;

(h)     *United States v. Genova, et al.*, brief due December 20, 2002, after one extension granted.

4. Work on the *Wallace* brief, and review of the record in the *Genova* case, a lengthy and complex public corruption trial, consumed the bulk of affiant's time in October and the first half of November. The three defendants in *Genova* have filed briefs totaling 110 pages, raising 14 separate issues, and completing the government's brief in time to be filed on December 20 will consume most of affiant's time between now and then. A 50-day extension of time was granted in *Genova*, and approval of a second extension is unlikely. The *Rogers* case is a single-issue appeal with a short record, and getting more than a short extension in that case is also unlikely. The *Funches* case is a government appeal from the granting of a motion to suppress evidence, which, if upheld, would probably require dismissal of the indictment. Two of the three defendants in that case remain in custody pending appeal, and it is unlikely that an extension to file the reply brief would be granted.

5. A shorter extension of time in this case would not be practical. The § 2255 motion raises several issues, and is supported by a 77-page memorandum. It will take considerable time to analyze the claims, formulate responses, and draft the responsive pleading.

6. Time is not of the essence for defendant. The claims he raises mostly concern the death sentence. Based on a preliminary review of his pleadings, it appears that defendant is challenging his convictions only with regard to the capital counts. He does not challenge his conviction on Counts 2, 3, and 4, on which he was sentenced to life.

2

7. This motion is made in good faith, in order to ensure adequate representation of the government's interests, and not for purposes of delay.

David E. Bindi

Subscribed and sworn before me
this 14th day of November, 2002

NOTARY PUBLIC

"OFFICIAL SEAL"
KAREN LYNN SIMA
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 4/4/2005

3

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No.  02 C 6998 |
| | ) | |
| DARRYL JOHNSON, | ) | Hon. Suzanne B. Conlon |
| | ) | |
| Defendant. | ) | |

### NOTICE OF FILING OF *EX PARTE* MOTION

PLEASE TAKE NOTICE that on Thursday, November 21, 2002, we filed with the Clerk of

the United States District Court for the Northern District of Illinois, Eastern Division, the attached

*Ex Parte* Motion For Interim Payment of Attorney's Fees, a copy of which accompanies this Notice.

Respectfully submitted,

_____
Attorney for defendant

Terence H. Campbell
Cotsirilos, Tighe & Streicker, Ltd.
33 North Dearborn Street, Suite 600
Chicago, Illinois  60602
(312) 263-0345

UNITED STATES DISTRICT COURT
NORTHER DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Respondent,<br><br>v.<br><br>DARRYL JOHNSON,<br>Petitioner. | The Honorable Suzanne B. Conlon<br><br>Case No. 02 C 6998<br><br>**PETITIONER UNDER A SENTENCE OF DEATH** |

### *EX PARTE* MOTION FOR INTERIM PAYMENT OF ATTORNEY'S FEES

The appointed counsel for Darryl Johnson, attorneys Terence H. Campbell and Lorinda Meier Youngcourt, respectfully request this Court to approve interim payment of attorneys' fees and expenses in this capital petition under 18 U.S.C. §2255. In support of this request, counsel for Johnson state as follows:

1.  Attorney Terence Campbell was appointed to represent Defendant Darryl Johnson on his direct appeal. Attorney Campbell has continued to represent Johnson at all times in relation to the currently pending §2255 petition.

2.  On June 4, 2002, this Court granted substitution of counsel for Petitioner Johnson, appointing counsel Lorinda Meier Youngcourt to represent Johnson in his §2255 action as co-counsel with Terence H. Campbell. The order was entered *nunc pro tunc* to February 10, 2002.

3.  Counsel researched and prepared Johnson's habeas petition under 18 U.S.C. §2255 and supporting memorandum of law which were filed before this Court on September 30, 2002.

4. Counsel expended extensive professional time in investigating, researching and preparing Johnson's petition. The total amount of professional time expended by counsel, along with interim expenses, is set forth a CJA-30 Form which is being submitted to the Court directly, along with a copy of this motion.

5. The professional time spent by counsel up to this point has been reasonable and necessary in light of the factual and legal research expended in preparing the written petition and initial memorandum in support of Johnson's §2255 claims, as well as the gravity of the case.

6. Payment of interim attorneys' fees and expenses is permissible and encouraged under the Criminal Justice Act[1] if it is anticipated that the appointed attorney will experience a hardship while undertaking the representation without compensation for a substantial period of time due to the expected length and complexity of the case.

7. Counsel Youngcourt is a solo practitioner. Counsel Campbell is an associate in a small law firm. Awaiting payment of attorneys' fees and expenses until the issuance of final judgment will exact an economic hardship upon both Youngcourt's and Campbell's private practices.

---

[1]Chapter II, Part A(2.30)(B).

WHEREFORE, counsel respectfully request this Court to enter an order authorizing

interim payment of attorneys' fees and expenses in this capital proceeding under 18 U.S.C.

§2255, and for all other relief which the Court deems just and proper.

Respectfully submitted,

Terence H. Campbell
Cotsirilos, Tighe & Striecker, Ltd.
33 North Dearborn Street, Suite 600
Chicago, IL 60602
(312) 263-0345

Lorinda Meier Youngcourt
P.O. Box 206
Huron, IN 47437-0206
(812)849-9852

COUNSEL FOR DARRYL JOHNSON

Minute Order Form (06/97)

Case 1:02-cv-06998   Document 8   Filed 11/21/02   Page 1 of 1   PageID 38
Case: 11-1326   Document: 8-2   Filed: 03/04/2011   Pages: 342

## United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Suzanne B. Conlon | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 6998 (96 CR 379) | **DATE** | 11/21/2002 |
| **CASE TITLE** | UNITED STATES OF AMERICA vs. DARRYL JOHNSON | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ■ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to] ☐ FRCP4(m)   ☐ Local Rule 41.1   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]   Government's unopposed motion for extension of time to answer §2255 motion is granted. Government's response is extended to January 31, 2003; any reply shall be filed by February 14, 2003. NO FURTHER EXTENSIONS.

*Suzanne B. Conlon*

(11) ☐ [For further detail see order (on reverse side of/attached to) the original minute order.]

| | |
|---|---|
| | No notices required, advised in open court. |
| | No notices required. |
| ✓ | Notices mailed by judge's staff. |
| | Notified counsel by telephone. |
| | Docketing to mail notices. |
| | Mail AO 450 form. |
| | Copy to judge/magistrate judge. |

CB   courtroom deputy's initials

number of notices

NOV 22 2002
date docketed

docketing deputy initials

11/21/2002
date mailed notice

CB
mailing deputy initials

U.S. DISTRICT COURT
CLERK

02 NOV 21 PM 3: 09

FILED-FD-10

Date/time received in central Clerk's Office

Document Number

8

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

**DOCKET**

FEB 0 3 2003

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No.    02 C 6998 |
| v. | ) | Honorable Suzanne B. Conlon |
| | ) | |
| DARRYL JOHNSON | ) | |

NOTICE OF FILING

TO:    Terrence Campbell, Esq.              Lorinda Meier Youngcourt
       Cotsirilos, Tighe & Streicker, Ltd.   P.O. Box 206
       33 North Dearborn Street              Huron, Indiana 47437-0206
       Suite 600
       Chicago, Illinois 60602

PLEASE TAKE NOTICE that on Friday, January 31, 2003, the undersigned filed with the Clerk of this Court, GOVERNMENT'S RESPONSE TO THE MOTION TO VACATE JUDGMENT PURSUANT TO 28 U.S.C. § 2255, service of which is being made upon you.

Respectfully submitted,

PATRICK J. FITZGERALD
United States Attorney

By:    _____
       DAVID E. BINDI
       Assistant United States Attorney
       219 S. Dearborn St., Room 500
       Chicago, Illinois 60604
       (312) 886-7643

**CERTIFICATE OF SERVICE**

I, David E. Bindi, an Assistant United States Attorney, state that on the 31st day of January, 2003, I caused a copy of Notice of Filing and Government's Response to the Motion to Vacate Judgment Pursuant to 28 U.S.C. § 2255, to be mailed to the above named individuals.

_____
DAVID E. BINDI
Assistant United States Attorney

Case 1:02-cv-06998 Document 9 Filed 01/31/03 Page 2 of 54 PageID 40
Case: 11-1326 Document: 8-2 Filed: 03/04/2011 Pages: 342

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA    )
    )
vs.    )  No. 02 C 6998
    )  Judge Suzanne B. Conlon
DARRYL JOHNSON    )

## GOVERNMENT'S RESPONSE TO THE MOTION TO VACATE JUDGMENT PURSUANT TO 28 U.S.C. § 2255

Respectfully Submitted,

PATRICK J. FITZGERALD,
United States Attorney

By:                    

DAVID E. BINDI
Assistant U.S. Attorney
219 South Dearborn Street
5th Floor
Chicago, Illinois 60604
(312) 886-7643

## TABLE OF CONTENTS

                                                                                    **Page**

Introduction.................................................................................................... 1

I. Defendant Received Effective Assistance of Counsel at the Penalty Phase, and
Was Not Prejudiced by Counsel's Failure to Cross-examine Warden Vanyur
Regarding the Restrictions That Can Be Imposed on Inmate Communications
Pursuant to 28 CFR 501.3 and 18 U.S.C. § 3582(d)............................................... 2

    A.  Background....................................................................................... 2

    B.  Analysis........................................................................................... 8

        1. Procedural Default........................................................................ 8

        2. Merits......................................................................................... 9

            a.  Performance....................................................................... 10

            b.  Prejudice........................................................................... 14

II. The Prosecution Team Did Not Withhold Material Exculpatory Evidence,
Because the Evidence Cited Was Not in the Possession of the Prosecution
Team, and There Is No Reasonable Probability That, Had the Evidence Been
Made Available to the Defense, the Outcome of the Sentencing Hearing Would
Have Been Different.................................................................................... 23

    A.  Background....................................................................................... 23

    B.  Analysis........................................................................................... 23

        1. Procedural Default........................................................................ 23

        2. The Prosecution Team Did Not Suppress Evidence........................... 23

        3. Materiality.................................................................................. 25

III.  The Sentence Does Not Violate the Eighth Amendment Because It was Not
Based on Materially False, or Inaccurate Information............................................ 25

IV.  *Ring V. Arizona*, 122 S.Ct. 2428 (2002), Requires That the Aggravating
Factors Making a Defendant Eligible for a Death Sentence Be Found by the
Jury Beyond a Reasonable Doubt, and That Was Done Here.  *Ring* Does Not
Require That the Findings Be Made in a Proceeding in Which the Rules of
Evidence Are Applied, and So 18 U.S.C. § 3593(c), Which Permits
Evidence to Be Introduced at a Capital Sentencing Hearing Not Subject to
the Rules of Evidence, Does Not Render the Federal Death Penalty Act
Unconstitutional............................................................................................... 27

        A.  Background..................................................................................... 27

        B.  Analysis......................................................................................... 29

            1.  *Teague* Bars Retroactive Application of *Ring*............................. 29

            2.  *Teague* Bars Extending *Ring*..................................................... 34

            3.  *Ring* and the Rules of Evidence................................................. 35

V.  Defendant Has Failed to Show That He Was Prejudiced by the Failure of the
Indictment to Allege the Statutory Aggravating Factors That Rendered Him
Eligible for the Death Penalty.......................................................................... 36

VI.  Claims Not Briefed by Defendant.................................................................. 38

        A.  Ineffective Assistance....................................................................... 39

        B.  Mental Retardation........................................................................... 44

        C.  Race Disparity................................................................................ 45

        D.  Extra-Record Information Before the Jury............................................. 45

Conclusion........................................................................................................ 46

## TABLE OF AUTHORITIES

**Cases**                          **Page(s)**

*Apprendi v. New Jersey*, 530 U.S. 466 (2000)............ 28, 29, 30, 31, 32, 33, 34, 35, 36, 37

*Atkins v. Virginia*, 122 S.Ct. 2242 (2002)....................................... 37, 44

*Bailey v. United States*, 516 U.S. 137 (1995)....................... 31

*Bousley v. United States*, 523 U.S. 614 (1998)....................... 31

*Brady v. Maryland*, 373 U.S. 83 (1963)....................... 15, 23, 25

*California v. Ramos*, 463 U.S. 992 (1983)....................... 17

*Caspari v. Bohlen*, 510 U.S. 383 (1994)....................... 30

*Coleman v. Thompson*, 501 U.S. 722 (1991)....................... 9

*Curtis v. United States*, 294 F.3d 841 (7th Cir.),
    *cert. denied*, 123 S.Ct. 451 (2002)....................... 31, 32

*Galbraith v. United States*, 2002 WL 31835532 (7th Cir. 2002)....................... 8

*Garrot v. United States*, 238 F.3d 903 (7th Cir.),
    *cert. denied*, 532 U.S. 1072 (2001)....................... 28, 37

*Graham v. Collins*, 506 U.S. 461 (1993)....................... 30, 32

*Guinan v. United States*, 6 F.3d 468 (7th Cir. 1993)....................... 8

*Johnson v. Mississippi*, 486 U.S. 578 (1988)....................... 25, 26, 27

*Jones v. United States*, 526 U.S. 227 (1998)....................... 32

*Kelly v. South Carolina*, 122 S.Ct. 726 (2002)....................... 17

*Kyles v. Whitley*, 514 U.S. 419 (1995)....................... 24

*Lambrix v. Singletary*, 520 U.S. 518 (1997)............................................... 30, 32, 33

*Massaro v. United States*, 27 Fed. Appx. 26 (2d Cir. 2001),
    *cert. granted*, 123 S.Ct. 31 (2002)................................................. 8

*Massaro v. United States*, No. 01-1559 (Gov't Br.)................................................. 8

*McCleese v. United States*, 75 F.3d 1174 (7th Cir. 1996)........................................ 8

*McClesky v. Kemp*, 481 U.S. 279 (1987)................................................. 45

*O'Dell v. Netherland*, 521 U.S. 151 (1997)................................................. 32, 33

*Penry v. Lynaugh*, 492 U.S. 303 (1989)................................................. 33, 44

*Ring v. Arizona*, 122 S.Ct. 2428 (2002)...................... 27, 28, 29, 30, 31, 32, 33, 34, 35, 36

*Saffle v. Parks*, 494 U.S. 484 (1990)................................................. 29, 32

*Sawyer v. Smith*, 497 U.S. 227 (1990)................................................. 32

*Simmons v. South Carolina*, 512 U.S. 154 (1994)................................................. 17

*Stoia v. United States*, 22 F.3d 766 (7th Cir. 1994)................................................. 1

*Strickland v. Washington*, 466 U.S. 668 (1984)...................... 9, 11, 12, 14, 15, 21, 25, 39

*Strickler v. Greene*, 527 U.S. 263 (1999)................................................. 15, 25

*Teague v. Lane*, 489 U.S. 288 (1989)...................... 29, 31, 32, 33, 34, 35, 44

*Tyler v. Cain*, 121 S.Ct. 2478 (2001)................................................. 34

*United States v. Barkett*, 530 F.2d 189 (1st Cir. 1976)................................................. 24

*United States v. Cotton*, 122 S.Ct.1781 (2002)................................................. 37, 38

*United States v. Felipe*, 1997 WL 220302
    (S.D.N.Y. April 29, 1997)...................... 6, 9, 10, 12, 13, 16, 17, 18, 21, 22, 26

*United States v. Felipe*, 148 F.3d 101 (2d Cir.),
   *cert. denied*, 119 S.Ct. 246 (1998)...................................................... 6, 13

*United States v. Fell*, App.I................................................................ 36

*United States v. Fountain*, 768 F.2d 790,
   modified, 777 F.2d 345 (7th Cir. 1985) (per curiam)........................ 22

*United States v. Fountain*, 642 F.2d 1083 (7th Cir. 1981)..................... 22

*United States v. Frady*, 456 U.S. 152 (1982)................... 8, 9, 23, 26, 28, 37

*United States v. Johnson*, 223 F.3d 665 (7th Cir. 2000),
   *cert. denied*, 534 U.S. 829 (2001).................................................. 6, 13, 28

*United States v. Kattar*, 840 F.2d 118 (8th Cir. 1988)......................... 24

*United States v. Lindsay*, 157 F.3d 532 (7th Cir. 1998)........................ 10

*United States v. Meyer*, 234 F.3d 319 (7th Cir. 2000),
   *cert. denied*, 533 U.S. 915 (2001)................................................... 10

*United States v. Morris*, 293 F.3d 1010 (7th Cir.),
   *cert. denied*, 123 S.Ct. 428 (2002)................................................. 36

*United States v. Morris*, 80 F.3d 1151 (7th Cir.),
   *cert. denied*, 513 U.S. 868 (1996).................................................. 24

*United States v. Ruzzano*, 247 F.3d 688 (7th Cir. 2001)....................... 10

*United States v. Shukri*, 207 F.3d 412 (7th Cir. 2000)......................... 10

*United States v. Silverstein*, 732 F.2d 1338 (7th Cir. 1984)................... 22

*United States v. Watson*, 189 F.3d 578 (7th Cir. 1999)......................... 28

*Valenzuela v. United States*, 261 F.3d 694 (7th Cir. 2001)................... 10

*Walton v. Arizona*, 497 U.S. 639 (1990)........................................ 30, 32

*Williams v. New York*, 337 U.S. 241 (1949)................................................................ 34, 36


**Statutes and Rules**

18 U.S.C. § 924 (c)........................................................................................... 31

18 U.S.C. § 3582(d).................................................... 2, 6, 7, 8, 9, 12, 13, 21, 23

18 U.S.C. § 3591(a)(2)................................................................................ 26, 37

18 U.S.C. § 3592............................................................................................. 38

18 U.S.C. § 3593(c)................................................................................ 27, 28, 38

18 U.S.C. §§ 3593(d)...................................................................................... 38

28 U.S.C. § 2255.............................................................................................. 1

Fed.R.Crim.P. 33............................................................................................. 1


**Federal Register and Code of Federal Regulations**

28 C.F.R. § 501.3.................................................................... 2, 7, 8, 9, 12

28 C.F.R. § 541.......................................................................................... 5, 13

28 CFR § 541.41...................................................................................... 13, 20, 26

49 F.R. 32990........................................................................................... 20, 21

61 F.R. 25120-21.............................................................................................. 7

62 F.R. 33730-32.............................................................................................. 7

66 F.R. 55062-66.............................................................................................. 7

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

**DOCKETED**

FEB 0 3 2003

**FILED**

JAN 3 1 2003

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| vs. | ) | No.  02 C 6998 |
| | ) | Judge Suzanne B. Conlon |
| DARRYL JOHNSON | ) | |

## GOVERNMENT'S RESPONSE TO THE MOTION TO VACATE JUDGMENT PURSUANT TO 28 U.S.C. § 2255

The UNITED STATES OF AMERICA, by its attorney, PATRICK J. FITZGERALD,

United States Attorney for the Northern District of Illinois, responds to defendant's motion

to vacate judgment pursuant to 28 U.S.C. § 2255[1] as follows:

**Introduction**

Defendant raises several issues pertaining to his capital sentencing hearing, and one

issue pertaining to his convictions on the counts on which he was sentenced to death.  He

does not challenge his convictions or sentences on any other counts.  The government

submits that defendant is not entitled to an evidentiary hearing on any of his claims, because

he has not alleged new facts which, if proven, would entitle him to relief. *Stoia v. United*

*States*, 22 F.3d 766, 768 (7th Cir. 1994).  None of defendant's claims has merit, and the

motion should be denied.

---

[1]Defendant also invokes Fed.R.Crim.P. 33, and asks that he be granted a new trial.  Motion at 1; Mem. at 3.  A Rule 33 motion must be made within 7 days of the verdict – or within 3 years if based on newly discovered evidence – but the verdict in this case was returned on November 4, 1997 (Tr. 1748-50), and the motion was filed on September 30, 2002.  Rule 33 does not apply in this proceeding.



**I.     Defendant Received Effective Assistance of Counsel at the Penalty Phase, and Was Not Prejudiced by Counsel's Failure to Cross-examine Warden Vanyur Regarding the Restrictions That Can Be Imposed on Inmate Communications Pursuant to 28 CFR 501.3 and 18 U.S.C. § 3582(d).**

**A.     Background**

At the penalty phase, the government presented evidence regarding discipline ("violations") of gang members ordered by defendant, and instances involving gang-related shootings and murders in which he had a role. Tr.1788-1812, 1881-1890, 1897-1918, 1927-1961. Evidence was also presented regarding the 1983 homicide in which defendant shot and killed Jesse Simpson, and was convicted of voluntary manslaughter. Tr.1847-53, 1975. An MCC officer testified about defendant's threat to "get" Quan Ray, while they were in custody awaiting trial. Tr.1863-70. Delano Finch testified that defendant suspected Ray, and Roger Stewart, of cooperating with the government, and that defendant gave orders to have someone in Stewart's family murdered.  Tr.1956-61.  Finally, Blunt Johnson's aunt and mother testified regarding the impact of his murder on the family.  Tr.1833-42, 1980-88.

Defendant presented testimony about the deprivations of his childhood, and his relationships with his mother, siblings, children and other relatives. Tr.2019-56, 2068-94, 2180-2203, 2227-42, 2337-42, 2364-2421. A neuropsychologist testified about defendant's low neurocognitive function and his IQ of 74.  Tr.2099-2123.   An expert in child development testified about the damaging effects on a child of witnessing violence both in the community and at home.  Tr.2343-58.

On the issue of future dangerousness, an alleged non-statutory aggravating factor,

2

defendant called Dr. Mark Cunningham, an expert in clinical and forensic psychology who testified regarding risk assessment. Tr.2248-57. Dr. Cunningham testified about the use of actuarial techniques to quantify the likelihood of future dangerousness (Tr.2265-82), but the main thrust of his testimony concerned the custodial options available to the Bureau of Prisons (BOP), and in preparation for this, he had visited the federal super maximum security prison, ADX Florence, in Florence, Colorado, and been given a tour by the security chief. Tr.2263-64.

ADX Florence has a capacity of 490 inmates. Tr.2290. It is the most restrictive prison in the BOP, and the most restrictive setting there is the control unit. Tr.2286. An inmate confined in the control unit is kept in a single cell 23 hours per day, and has no contact with other inmates. *Id.* Dr. Cunningham acknowledged that ADX Florence is intended to house the inmates who have been the most uncontrollable in other prisons, and that the idea is to cycle them through. Tr.2287. Those in need of the most intensive custody are sent to the control unit, after which they are released to a highly restrictive general population unit where they interact with other inmates, then to an intermediate unit, and finally to a pre-transfer unit from which they are sent out to other BOP institutions. *Id.* The cycle takes at least three years, but Dr. Cunningham testified that, "conceivably," someone could be placed in the control unit permanently. *Id.*

In rebuttal, the government called John Vanyur, the warden at FCI Butner, a low security BOP institution, who spent two years as an assistant warden at ADX Florence from

3

1994 to 1996. Tr.2462-63. Vanyur testified that the capacity of ADX Florence is 484, and there are 68 beds in the control unit. Tr.2464, 2484. According to Vanyur, over 90% of the inmates at ADX Florence were transferred from other prisons, while the rest – Dr. Cunningham put the figure at 3.1% (Tr.2331) – are direct commitments from the sentencing court. Tr.2466. Those that come straight from court are inmates who have been involved in highly complex crimes, and generally fit into three categories: high-ranking organized crime figures, international and domestic terrorists, and high-ranking drug cartel members. Tr.2467-68. While Vanyur was there, no gang leaders were directly committed to ADX Florence. Tr.2468.

Vanyur testified that the BOP has a classification and designation system for determining what type of institution and level of security – minimum, low, medium, high or maximum – an inmate should be sent to from the sentencing court, and the system calculates a point total based on the offense record and behavior while incarcerated. Tr.2470-71. Being a gang leader or a convicted murderer does not automatically place an inmate at ADX Florence, the only maximum security facility in the BOP, much less in the control unit. Tr.2471-72. It does not even result automatically in placement in high security. Tr.2472. There are 520 murderers in less than high security institutions, and nine at Butner, a low security prison. Tr.2472-73. Vanyur testified that based on defendant's history and his crime, defendant would probably be placed in a high security prison in the general population. Tr.2474-75.

4

Vanyur testified that inmates are sent to the ADX Florence control unit only for conduct in other prisons, and federal regulations, specifically 28 CFR 541, prohibit assignment to the control unit based solely on offenses committed in the community. Tr.2484-85. Assignment to the control unit is for a determinate period, four to six years usually being the longest, and inmates are never placed there on permanent status. Tr.2485. Inmates are allowed one 15-minute phone call and up to five non-contact visits per month. *Id.* Even in these conditions, an inmate can initiate violence, and Vanyur cited the example of a leader of the Aryan Brotherhood who, while confined in the control unit, used a code word in a communication with someone on the outside to give an order that murders be committed at a BOP prison in Lewisberg, Pennsylvania. Tr.2479-80. The order was relayed, and two black inmates at Lewisberg were murdered. *Id.*

Defendant argued in closing, based on Dr. Cunningham's testimony, that the government had it in its power to house defendant for the rest of his life in an ultra-secure setting, like the control unit at ADX Florence, in order to prevent him from being a danger to anyone, and he pointed out that if the government chose not to do so, it could only mean that the government did not consider defendant to be a real threat. Tr.2610-12. The government's argument, both opening and rebuttal, was primarily devoted to the second point made in Vanyur's testimony, *i.e.*, that no conditions of confinement can make for perfect security. Tr.2593, 2648, 2594.

In the post-trial proceedings and on direct appeal, defendant argued that he was

5

entitled to a new sentencing hearing because Vanyur's testimony was false. He pointed out that 18 U.S.C. § 3582(d), about which Vanyur did not testify, authorizes a district court to include in a sentencing order a provision that an organized crime or drug defendant not communicate with a specified person if there is probable cause to believe that such communication would be for the purpose of allowing the defendant to continue participating in the affairs of an illegal enterprise. He also pointed out that § 3582(d) had been invoked by a district court in New York, in *United States v. Felipe*, 1997 WL 220302 (S.D.N.Y. April 29, 1997), to, at least temporarily, have the defendant in that case held incommunicado from the entire world, with the exception of his attorneys and a few family members. This decision was upheld by the Second Circuit, *United States v. Felipe*, 148 F.3d 101 (2d Cir.), *cert. denied*, 119 S.Ct. 246 (1998), but by the time the Seventh Circuit decided this case, those restrictions had already been significantly relaxed. *United States v. Johnson*, 223 F.3d 665, 673 (7th Cir. 2000). Defendant also alleged that he was entitled to a new sentencing hearing because the *Felipe* case and § 3582(d) constituted newly discovered evidence, and that he failed to discover and present it to rebut Vanyur's testimony because he was taken by surprise by the testimony.

Both this Court and the Seventh Circuit held that Vanyur's testimony was not false, that he accurately conveyed both the BOP policies and the regulatory scheme governing the BOP as prohibiting confinement in a control unit, and deprivation of communication privileges, indefinitely and without possibility of reconsideration. 223 F.3d at 671-674.

6

However, in its response to defendant's petition for writ of certiorari, the government admitted that Vanyur's testimony was "incomplete" (App.A at 20), because Vanyur made no mention of § 3582(d) or the district court's order in *Felipe*, nor did he mention 28 C.F.R. § 501.3(a), which authorizes the BOP to impose "special administrative measures," or SAMs. Section 501.3(a) provides that the Attorney General, or the head of a law enforcement or intelligence agency at the direction of the Attorney General, may order the BOP Director to authorize a warden to house an inmate in administrative detention and limit his communication privileges "as is reasonably necessary to protect persons against the risk of acts of violence or terrorism." At the time of defendant's sentencing hearing, SAMs could only be imposed in 120-day increments, after which the risk assessment would have to be reevaluated (§ 501.3(c)), and an inmate subjected to SAMs could appeal the restrictions through the BOP Administrative Remedy Program (§ 501.3(d), renumbered in the current version as subsection (e)), but there was no outer limit on the number of extensions of the restrictions.[2]

Defendant now claims that trial counsel rendered ineffective assistance because, having resolved to defend against the future dangerousness aggravating factor by presenting evidence regarding the restrictive conditions of confinement that were possible, they failed

---

[2]Section 501.3 was added to the Code of Federal Regulations as an interim rule in May 1996. 61 F.R. 25120-21. It became a final rule on May 20, 1997. 62 F.R. 33730-32. It was modified on October 31, 2001 to permit the imposition of SAMs for up to one year, and for subsequent extensions of up to one year. 66 F.R. 55062-66. It was also modified to allow monitoring of attorney-client communications. *Id.*

7

to do research and discover the unpublished (but available on Westlaw) district court decision in *Felipe*, § 3582(d), and § 501.3(a).

## B. Analysis

### 1. Procedural Default

Claims which could have been raised on direct appeal, but were not, are procedurally defaulted, and relief on collateral review is not available unless the defendant can show both cause for the default and actual prejudice. *United States v. Frady*, 456 U.S. 152, 170 (1982). This includes claims of ineffective assistance of counsel that are based on facts and evidence of record at the time of direct appeal, and when there is new counsel representing the defendant on direct appeal. *Galbraith v. United States*, 2002 WL 31835532 (7th Cir. 2002); *McCleese v. United States*, 75 F.3d 1174, 1178 (7th Cir. 1996); *Guinan v. United States*, 6 F.3d 468, 471 (7th Cir. 1993).[3] The Seventh Circuit generally discourages raising ineffective assistance claims on direct appeal, because the record is typically incomplete for purposes of addressing such a claim, *Galbraith*, but all of the facts now alleged in support of this claim were matters of record when the direct appeal was taken. New counsel participated in the post-trial proceedings, and handled the direct appeal, and it was known

---

[3]Page references to the *Galbraith* opinion were not available on Westlaw at the time of filing. Whether procedural default applies to claims of ineffective assistance of counsel is an issue pending before the Supreme Court. *Massaro v. United States*, 27 Fed. Appx. 26 (2d Cir. 2001), *cert. granted*, 123 S.Ct. 31 (2002). The Solicitor General has taken the position that it should, and that the approach taken by the Seventh Circuit – requiring such claims to be raised on direct appeal when the claim is grounded solely in the trial record and the defendant has new counsel on appeal – is sound. *Massaro v. United States*, No. 01-1559 (Gov't Br. at 15-20).

then that trial counsel was unaware at the time of sentencing of the *Felipe* case and §

3582(d) – one of the allegations in support of the new trial motion was that this constituted

newly discovered evidence. R.254. Like *Felipe* and § 3582(d), the SAM regulation, §

501.3, was a matter of public record and readily discoverable. Nothing prevented defendant

from asserting in the post-trial proceedings and on direct appeal that trial counsel rendered

ineffective assistance by failing to research and discover the *Felipe* case, the statute and the

regulation.

The "cause and prejudice" standard requires defendant to show not only that "some

objective factor external to the defense" impeded his efforts to raise the issue as required,

*Coleman v. Thompson*, 501 U.S. 722, 753 (1991), but also that the error he alleges "worked

to his *actual* and substantial disadvantage, infecting his entire trial with error." *Frady*, 456

U.S. at 170 (emphasis in original). This is a more difficult standard to meet than the plain

error standard applicable to forfeited claims on direct review. *Id.* at 164-166. Cause for the

default has not been shown, and, as developed below, defendant was not prejudiced.

### 2. Merits

In order to establish ineffective assistance of counsel, defendant bears the burden of

demonstrating that the performance of trial counsel fell below an objective standard of

reasonableness, and that he was prejudiced in the sense that, but for the alleged errors, there

is a reasonable probability that the outcome of the proceeding would have been different.

*Strickland v. Washington*, 466 U.S. 668, 687-688, 694 (1984). The inquiry under the

9

performance component of this test is "highly deferential" to counsel. *Id.* at 689. Counsel is presumed to have made reasonable strategic judgments, and "there is a strong presumption that any decisions by counsel fall within a wide range of reasonable trial strategies." *Valenzuela v. United States*, 261 F.3d 694, 698-699 (7th Cir. 2001), quoting *United States v. Lindsay*, 157 F.3d 532, 535 (7th Cir. 1998). Strategic decisions are not second-guessed on review. *United States v. Ruzzano*, 247 F.3d 688, 696 (7th Cir. 2001); *United States v. Meyer*, 234 F.3d 319, 324-325 (7th Cir. 2000); *United States v. Shukri*, 207 F.3d 412, 418 (7th Cir. 2000). Under the prejudice component, petitioner must show that counsel's alleged errors were so serious, and so tainted the entire trial, that the proceeding was fundamentally unfair and the verdict unreliable. *Valenzuela*, 261 F.3d at 699; *Ruzzano*, 247 F.3d at 697.

### a. Performance

In his affidavit, one of defendant's trial attorneys, Jeffrey Urdangen, states that he was unaware of the *Felipe* case, the statute and the regulation at the time of the sentencing hearing, and that if he had known, he would have sought an instruction informing the jury about the permissible procedures for dealing with dangerous inmates. App.B. He also states that in his view, future dangerousness was the central issue at the penalty phase. That Urdangen would have done things differently had he done more research and been more informed, however, does not necessarily establish deficient performance. The Sixth Amendment guarantees the right to effective assistance, not perfection, and the benchmark

10

for effective assistance is "assistance [that] was reasonable considering all of the circumstances." *Strickland*, 466 U.S. at 688.

The circumstances here included overwhelming evidence that defendant was on the "board of directors" (Tr.821-824, 973) of a large, vicious and violent criminal organization; that he had personally ordered numerous murders and beatings (Tr. 1788-1812, 1881-90, 1897-1918, 1927-61); and that even from prison, he gave orders to kill to avenge himself on those he held responsible for his predicament. Tr.1956-61. The defense at sentencing established that defendant was raised in a violent household, in neighborhoods plagued by gang violence and drug dealing. Tr.2019-56. An expert in child development testified that children, and especially boys, raised in such environments are profoundly affected, and that there is a strong correlation between such childhood experiences and a tendency to violence as an adult. Tr.2343-56. Despite this upbringing, and his own poor performance in school, defendant, according to several friends and family members, touted the benefits of education among the young people in his life, and warned them away from gangs and drugs. Tr.2042-56, 2071-76, 2205-06, 2027-42. The defense also presented testimony from a neuropsychologist who tested defendant, and found that defendant had an IQ of 76, and exhibited abnormal neurocognitive function. Tr.2099-2123. Some family members testified that defendant told them he felt trapped in the gang environment, because he could not leave it alive. Tr.2191, 2202. Evidence was also presented regarding the dominance of gangs, and the prevalence of violence, in the state prison where defendant served a sentence for

11

manslaughter (Tr.2209-18), and how the experience hardened defendant. Tr.2046-48, 2072.

Sixteen witnesses, in addition to Dr. Cunningham, testified for the defense at the sentencing hearing, and trial counsel pursued several appropriate avenues of defense. The defense on the issue of future dangerousness was a theoretical one – Dr. Cunningham, after describing the facilities at the ADX Florence control unit, testified that, "conceivably," defendant could be sent directly to the control unit and remain there the rest of his life. Tr.2287. In keeping with that strategy, as well as in response to Vanyur's testimony, Urdangen argued that the government had the means to prevent defendant from being a future danger, and that if the government chose not to use those means, it could only reflect the belief that defendant was not as dangerous as the prosecutors would have the jury believe. Tr.2610-12. This argument crystallized the whole point to the defense on the issue of future dangerousness, and is the same argument that would have been made had the jury also known about *Felipe*, § 3582(d), and SAMs. Counsel's performance fulfilled the role of counsel envisioned by the Sixth Amendment, because the government's case was "subjected to adversarial testing," *Strickland*, 466 U.S. at 685, and there was no "breakdown in the adversarial process that our system counts on to produce just results." *Id.* at 697.

Defendant states that "there is no dispute" that § 3582(d) confers authority on district courts to order potentially dangerous defendants held incommunicado, as was done, temporarily, in the *Felipe* case (Mem.14), but the government in this case has never taken a position on that question, and this Court, even after the Second Circuit affirmed the district

12

court in *Felipe*, was skeptical. R.255, 270. The Seventh Circuit, too, thought the Second Circuit "stretched the statute," and found it "doubtful whether the statute authorizes indefinite confinement in the control unit." 223 F.3d at 674. *Felipe* remains the only case to have read § 3582(d) as expansively as it did, and even then, neither the district court nor the Second Circuit purported to make the restrictions permanent. *Felipe*, 148 F.3d at 111. The restrictions were subject to periodic review, and had been relaxed twice by the time of the Second Circuit's decision. *Id.*

Defendant argues that counsel were unprepared for Vanyur's testimony, and for cross-examination, because they failed to seek discovery (a summary of his testimony and copies of any materials he consulted in preparation for his testimony), and failed to request a continuance so they could do more research. Mem.27-30. It is difficult to see how the absence of a discovery request could have made any difference, since defendant does not allege that the ingredients missing from his sentencing hearing – information about *Felipe*, § 3582(d) and SAMs – were known to Vanyur at the time. The granting of a continuance would have been unlikely, unless counsel could have explained what he was going to spend the time looking for. Defendant also faults counsel for failing to object when Vanyur was allowed to testify regarding 28 C.F.R. § 541 (Mem.21-22), because, as the Court of Appeals pointed out on direct appeal, witnesses are supposed to testify about facts, not law. 223 F.3d at 671. Again, it is difficult to see how defendant was harmed. Had this testimony been barred, the government could have offered an instruction, so the information would have

13

come before the jury anyway, and defendant does not claim that Vanyur's testimony about § 541 was inaccurate.

Defendant argues that deficient performance can be established based even on a single error by counsel, depending on the nature of the error. Mem.31-32. On the other hand, *Strickland* itself offers an example of a case where virtually no defense was presented at a capital sentencing hearing, other than the defendant's acceptance of responsibility for his actions, yet the Court found neither deficient performance nor prejudice, because the mitigating evidence that could have been presented carried some risks, and "would barely have altered the sentencing profile presented to the sentencing judge." 466 U.S. at 699-700. There was a downside to the mitigating evidence counsel did not discover in this case. It would have blunted the impact of the argument made, based on Dr. Cunningham's testimony, that an inmate could "conceivably" (Tr.2287) be placed in a control unit for life. Further, a great deal of mitigating evidence was presented, counsel confronted the government's case in aggravation on several fronts, and there was meaningful adversarial testing of the government's case.

### b.    Prejudice

Defendant bears the burden of affirmatively establishing prejudice. *Strickland*, 466 U.S. at 693. It is not enough that an error by counsel "had some conceivable effect on the outcome of the proceeding," or "impaired the presentation of the defense." *Id.* (internal quotes omitted). On the other hand, it is not required that defendant show by a

14

preponderance that the error altered the outcome. *Id.* The standard requires defendant to show that there is a "reasonable probability," sufficient to undermine confidence in the outcome, that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. The same standard applies in the *Brady v. Maryland*, 373 U.S. 83 (1963), context when evaluating the materiality of favorable evidence not disclosed by the prosecution. *Compare Strickland*, 466 U.S. at 694, with *Strickler v. Greene*, 527 U.S. 263, 280 (1999). Applying this standard in the *Brady* context, the Supreme Court has said that the test is "whether the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Strickler*, 527 U.S. at 290.

Defendant attempts to emphasize the importance that information regarding the *Felipe* case, the statute and the regulation would have had in response to Vanyur's testimony by repeatedly mischaracterizing Vanyur's testimony. In various formulations, he characterizes Vanyur's testimony as having informed the jury that it was not possible, under BOP policy and regulations, to house defendant for an extended period of time under restrictive conditions of confinement that would cut off his ability to communicate. Mem.2, 7-8, 8-9, 14, 16, 16, 15-16, 35, 38, 47. This Court has already found that this is not what Vanyur said (R.255, 270), and in rejecting the claim that Vanyur's testimony was false, the Seventh Circuit did likewise. 223 F.3d at 672.

Vanyur's testimony came in response to Dr. Cunningham's assertion that a potentially

dangerous defendant could "conceivably" be placed in a control unit like the one at ADX Florence once and for all, for the rest of his life, (Tr.2287), and defense counsel argued this in closing. Tr.2610-12. The gist of Vanyur's testimony was that in practice, control units and communications restrictions are temporary deprivations, used for disciplinary and security purposes, and that inmates cannot be housed for life, without reconsideration, under such conditions. Tr.2464-70, 2484-85. The SAMs regulation authorizes restrictive conditions that may continue for a very long time, but only in 120-day increments, and not even defendant maintains that the *Felipe* case and the statute authorize district courts to impose sentences of life imprisonment in a control unit without possibility of removal from that unit. Indeed, as the Seventh Circuit pointed out on direct appeal, district courts do not have this power. 223 F.3d at 672-673.

It is important to remember that this is what counsel wanted the jury to believe, that defendant could be placed in the most restrictive setting for life, with no opportunity for any actor in the system to spring him back into a setting where he could freely communicate with other Gangster Disciples in and out of prison, because only that would do to take away the stigma of future dangerousness. It is widely recognized that for defendants facing the death penalty, it is crucial to have the jury informed that the alternative sentence is life, *without parole*, if in fact that is the case. This information is such a powerful response to the claim of future dangerousness that due process requires that juries be told, and it is not good enough simply to tell a jury that the alternative is life, leaving it to ponder whether the

16

defendant will one day be parole-eligible. *Kelly v. South Carolina*, 122 S.Ct. 726, 728-729 (2002); *Simmons v. South Carolina*, 512 U.S. 154, 168 (1994). The strength of the life-without-parole response to a claim of future dangerousness is, in its turn, diluted when the jury is instructed that a state's chief executive has the power to commute a sentence of life without parole, and reduce it to a parole-eligible sentence. *California v. Ramos*, 463 U.S. 992, 1002-03 (1983).

In defendant's case, it was obvious that putting him behind bars, even for life and even without parole, would do next to nothing to curb the particular kind of danger he posed, as a high-ranking member of a violent criminal organization. Allowed to communicate with anyone other than his jailers and his lawyers, he could continue to participate in the affairs of the organization and order others to commit acts of violence. To counter this, counsel wanted the jury to know that the BOP had a facility like the control unit at ADX Florence, and they wanted to be able to argue, as they did (Tr.2610-12), that (1), in Dr. Cunningham's words, an inmate such as defendant could "conceivably" (Tr.2287) be housed for life, without possibility of removal, in such a unit; and (2), that it was the government's choice whether to do so. A choice not to do so would mean that the danger argued by the prosecutors was not present. Had counsel discovered the *Felipe* case, the statute and the SAMs regulation prior to the sentencing hearing, the argument would have to have been that pursuant to *Felipe* and the statute, the Court could order conditions of confinement that cut defendant off from the outside world, subject to reconsideration and

17

relaxation whenever defendant decided to file a motion for relief; or that the Attorney General could authorize the BOP to implement SAMs, subject to reconsideration every four months. This is a far cry from life in a control unit without possibility of removal, and only an incremental improvement on the theoretical argument based on Dr. Cunningham's testimony.

Not only do the statute and the SAMs only incrementally enhance Dr. Cunningham's testimony about future dangerousness, those measures do not alter the fact, about which Vanyur testified (Tr.2479-80), and which the Seventh Circuit recognized, 223 F.3d at 672-673 – but is conspicuously absent from defendant's memorandum – that no conditions of confinement can make a prison totally secure. Even with contact and communications restrictions, inmates find ways to communicate. Tr.2487 (describing how inmates in control units send notes through the plumbing system and signal through windows in sign language). The government's closing argument emphasized that no prison can be made perfectly secure. Tr.2593-94, 2598, 2647-48. Thus, there does not exist a reasonable probability that, had the jury been informed about the *Felipe* case, the statute and the regulation, any juror would have reached a different conclusion regarding future dangerousness and voted against the death penalty.

Even if the information had been presented, and given the jury pause about future dangerousness, there does not exist a reasonable probability that the outcome would have been different, because the aggravating evidence was overwhelming. As the government

noted in closing argument (Tr.2576), the jury heard detailed testimony about not only defendant's murders of Charles Banks and Blunt Johnson, it also heard about several other acts of violence ordered by defendant, including the murder of another board member, G Sharpe (Tr.1944-56); a shooting in a McDonald's parking lot that left two people dead (Tr.1881-87); the shooting of a truck driver who interrupted defendant's security convoy at an intersection with four-way stop signs (Tr.1891-93); and the murder of a rival gang member. Tr.1888-90. The jury also heard testimony about several severe beatings ordered by defendant (Tr.1793, 1812, 1897-1916), as well as the fact that he had been convicted of manslaughter in the shooting death of Jesse Simpson. Tr.1847-53, 1975.

The jury found unanimously and beyond a reasonable doubt two statutory aggravating factors with respect to the Blunt Johnson murder that had nothing to do with future dangerousnes – that defendant caused the killing after substantial planning and premeditation, and that he caused the killing in the course of a continuing criminal enterprise that involved the distribution of drugs to persons under age 21. App.C. The jury also found, unanimously and beyond a reasonable doubt, two non-statutory aggravating factors, other than future dangerousness – that defendant ordered the murder to obstruct justice by preventing the victim from testifying, and that defendant caused permanent harm to the victim's family. *Id.* In connection with the Banks murder, the jury found the same two statutory aggravating factors that were found in connection with the Johnson murder, plus a third – that defendant had a previous conviction for voluntary manslaughter using a

19

firearm. *Id.* Using the preponderance standard on mitigating factors, the jury did not unanimously find any of them. *Id.* Only 5 of 24 mitigating factors were found by more than half the jury on the Johnson murder, and only one of 25 by more than half the jury on the Banks murder. On this record, defendant cannot show that the missing evidence casts the case in such a different light that the verdict is unreliable.

Defendant argues that prejudice is shown because, armed with the missing information, counsel's cross-examination of Vanyur would have been devastating, and would have caused the jury to doubt Vanyur's credibility and give more credence to Dr. Cunningham. Mem.35-39. This is obviously wrong. It is undisputed that Vanyur was unaware of the *Felipe* case, the statute and the SAMs regulation when he testified, and although the jury may have felt that he should have known about the SAMs regulation, Vanyur was never presented as an expert on the federal criminal code, or on recent unpublished district court orders. Further, the new information would not have provided "independent corroboration for the accuracy of Dr. Cunningham's testimony for the defense" (Mem.38), it would have completely undercut the whole point of that testimony, which was that, "conceivably," defendant could be housed in a control unit for life. Tr.2287.[4]

-----

[4]One of the hypothetical questions defendant says could have been asked concerns 49 F.R. 32990, which includes an interpretation of 28 CFR § 541.41, the regulation about which Vanyur testified and which prohibits placement in a control unit based solely on the crime of conviction. Mem.37. Defendant claims that Vanyur could have been cross-examined about his knowledge of § 541 with this passage from the Federal Register: "there may be an occasion where an inmate recommended for federal custody requires placement in a control unit." *Id.* Defendant apparently contends that this means an inmate can be sent to a control unit straight from the sentencing court (continued...)

20

Defendant also argues that the government's concession in its brief in opposition to the certiorari petition -- that § 3582(d) and the SAMs regulation were relevant, and that without them, "the jury may have held the mistaken impression that no legal authority existed to limit [defendant's] communications and contacts while in prison in order to curtail his future dangerousness" (App.A at 21) – amounts to a concession on the prejudice prong of the *Strickland* test. Mem.40-41. This too is obviously wrong. The government's concession in the Supreme Court is no more than a concession that there was "some conceivable effect on the outcome of the proceeding," *Strickland*, 466 U.S. at 693, which is not enough to meet the test for prejudice, since "[v]irtually every act or omission of counsel" has some conceivable effect on the outcome. *Id.*

Defendant next argues that a non-death verdict in another case, before another jury that heard evidence about the *Felipe* case, the statute and the regulation, demonstrates that he was prejudiced. Mem.41-44. Once again, this is obviously wrong. Nothing useful can be extrapolated from what another jury did in another case. This is tantamount to arguing that no jury in the future will ever agree to a sentence of death based in part on future

---

[4](...continued)

based solely on the crime of conviction, but he is wrong, and he has quoted the Federal Register out of context. The quoted passage comes in a discussion about inmates being sent to the control unit at Marion Penitentiary from the Marion general population; from another federal prison; or from state prisons. The problem of the reliability of information regarding the state prisoner transfers, and whether such information could form the basis for control unit designation without a full-fledged hearing, was the topic of the discussion. The BOP's response to this concern was that its own administrative remedies would suffice. 49 F.R.32990. This passage in the Federal Register does not authorize direct commitment to a control unit based solely on the crime of conviction.

21

dangerousness if it is told about *Felipe*, the statute and the regulation, even if it also told that none of those measures are foolproof.

Finally, defendant argues that errors are magnified at a capital sentencing hearing because it only takes one juror to vote against the death penalty for a non-death verdict to be returned. He notes that a number of mitigating factors were found, albeit by only a few jurors, but he ignores that on the Johnson murder, the jury found two statutory and two non-statutory aggravating factors, other than future dangerousness, and on the Banks murder, the jury found three statutory aggravating factors as well as future dangerousness. Given defendant's blood-soaked history, and the impossibility of making any prison totally secure, prejudice has not been shown.[5]

---

[5]In addition to the *Felipe* case, defendant refers to BOP inmates Thomas Silverstein and Clayton Fountain, who he says have been in solitary confinement since the mid-1980s. Mem.19 n.11, 36, 46, 49-50. Silverstein's affidavit is submitted at App.H. Deficient performance in not discovering information about these inmates is not shown, because defendant does not specify how counsel could have discovered them, considering all the other preparations for trial and the sentencing hearing. Nor is prejudice shown, since it appears that, at least with Sliverstein, his communications are not significantly restricted. He is allowed visitors who knew him before he went to prison, and he is allowed four phone calls per month. App.H, ¶9. Silverstein and Fountain, members of the Aryan Brotherhood already serving life sentences for murder, were convicted of multiple murders in the control unit of the federal penitentiary at Marion. *United States v. Fountain*, 768 F.2d 790, modified, 777 F.2d 345 (7th Cir. 1985) (per curiam); *United States v. Silverstein*, 732 F.2d 1338 (7th Cir. 1984); *United States v. Fountain*, 642 F.2d 1083 (7th Cir. 1981). As of 1985, both were confined in separate prisons in what the Seventh Circuit described as "'personalized' cells" 768 F.2d at 794. However, their cases make clear that their solitary confinement is based on crimes committed, repeatedly, while in prison. Information about these two men and their conditions of confinement does not support a finding of prejudice in this case, because they were not ordered held incommunicado at all, and the restrictive conditions under which they live is based on conduct while in prison.

22

**II.   The Prosecution Team Did Not Withhold Material Exculpatory Evidence, Because the Evidence Cited Was Not in the Possession of the Prosecution Team, and There Is No Reasonable Probability That, Had the Evidence Been Made Available to the Defense, the Outcome of the Sentencing Hearing Would Have Been Different.**

**A.   Background**

Defendant claims that the government suppressed material exculpatory information that could have been used at the sentencing hearing, in violation of *Brady v. Maryland*, 373 U.S. 83 (1963), and it progeny.   Allegedly suppressed was information about (1) the conditions of confinement in which the BOP held Luis Felipe, Thomas Silverstein and Clayton Fountain at the time of the sentencing hearing; and (2) the position taken by the U.S. Attorney's Office for the Southern District of New York, both in that district court and in the Second Circuit, regarding the scope of 18 U.S.C. § 3582(d).   Mem.49-50.

**B.   Analysis**

**1.   Procedural Default**

This claim, or at least the part that deals with Felipe and § 3582(d), is procedurally defaulted, because the underlying facts were known during the post-trial phase, but it was not raised on direct appeal. *United States v. Frady*, 456 U.S. 152, 170 (1982).   Defendant has not shown cause for the default, and there is no prejudice.

**2.   The Prosecution Team Did Not Suppress Evidence**

The rule of *Brady*, is that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt

to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. Here, the "prosecution" did not "suppress" the information at issue, since the prosecution team in this case was unaware of it until after the sentencing hearing. 4/28/98Tr.8-15.

Defendant argues that knowledge of the information possessed by anyone in the Department of Justice, including all U.S. Attorneys offices and the BOP, is imputed to the prosecution team in any federal criminal case. Mem.53-54. However, the cases he cites for this proposition, *United States v. Kattar*, 840 F.2d 118 (8th Cir. 1988), and *United States v. Barkett*, 530 F.2d 189 (1st Cir. 1976), predate *Kyles v. Whitley*, 514 U.S. 419 (1995), in which the Supreme Court held that prosecutors have a duty to discover and disclose exculpatory information in the possession of the police department that investigated the crime. *Id.* at 437. The Seventh Circuit, applying *Kyles*, has held that knowledge is imputed under the *Brady* rule if it lies within an agency that is "part of the team that investigated this case or participated in its prosecution." *United States v. Morris*, 80 F.3d 1151, 1169 (7th Cir. 1996). Neither the BOP, nor the U.S. Attorney for the Southern District of New York, were part of the prosecution team that investigated this case, nor did they participate in the prosecution. No one from the U.S. Attorney's office for the Southern District of New York had anything to do with this case, and John Vanyur and Craig Trout testified as rebuttal witnesses at the penalty phase. Their testimony concerned BOP policies and procedures, inmate demographics, and security concerns and problems. They had no professional interest in the outcome, as would a member of the team that participated in the investigation or

24

prosecution of the case. Thus, the prosecutor did not "suppress" the information at issue as required under *Brady* because the information was not in the possession of the prosecution team.

### 3.   Materiality

As defendant points out, the test for materiality in analyzing a *Brady* claim is the same as the test for prejudice in analyzing an ineffective assistance claim. Mem.50. *Compare Strickland v. Washington*, 466 U.S. 668, 694 (1984) ("the appropriate test for prejudice [in the ineffective assistance context] finds its roots in the test for materiality of exculpatory information not disclosed to the defense . . . . The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different") with *Strickler v. Greene*, 527 U.S. 263, 280 (1999) (undisclosed evidence is material "if there is a reasonable probability that, had the undisclosed evidence been disclosed to the defense, the result of the proceeding would have been different." – internal quotes omitted). For the reasons stated in Part I.B.2.b. above, the allegedly suppressed information was not material.

## III.   The Sentence Does Not Violate the Eighth Amendment Because it Was Not Based on Materially False, or Inaccurate Information.

Defendant argues, primarily in reliance on *Johnson v. Mississippi*, 486 U.S. 578 (1988), that his death sentence violates the Eighth Amendment because it was imposed by a jury that was given "materially false or inaccurate information." Mem.54. He claims that Warden Vanyur's testimony was materially false or inaccurate for the reasons stated in his

25

first two arguments. Mem.56.

This claim is procedurally defaulted because it is based on facts known to defendant at the time of direct appeal, but it was not raised on direct appeal. *United States v. Frady*, 456 U.S. 152, 170 (1982). Defendant did raise on direct appeal a claim that he was entitled to a new sentencing hearing because Vanyur's testimony was false or misleading, and because he was either unfairly taken by surprise by the testimony and was unprepared to refute it, or because of newly discovered evidence. The Seventh Circuit rejected that claim, finding that "the warden's testimony, though it did not track the regulations exactly, was not false. The impression that he conveyed of practice and policy was correct." 223 F.3d at 672. The Seventh Circuit made this finding fully aware not only of the *Felipe* case and 18 U.S.C. § 3582(d), but also of 28 C.F.R. 541.41 and the *Silverstein* and *Fountain* cases. *Id.* at 671-674. To the extent that an Eighth Amendment analysis would differ from the analysis applied on direct appeal – review of the denial of a motion for a new sentencing hearing based either on false testimony that defendant could not have been prepared to rebut, or on newly discovered evidence – defendant has not shown cause for defaulting the Eighth Amendment argument.

On the merits, Vanyur's testimony was not materially false or inaccurate, as this Court and the Seventh Circuit have already held.

In any event, there is no prejudice. *Johnson* held that a death sentence imposed by a jury that was given "materially inaccurate" information violates the Eighth Amendment.

486 U.S. at 590. The materially inaccurate information in *Johnson* concerned a statutory aggravating factor pressed vigorously by the prosecution – that the defendant had previously been convicted of a felony involving the use or threat of violence against another. *Id.* at 581. The defendant had previously been convicted of such a crime, in New York, but while his capital case was being reviewed by the Mississippi courts, a New York court reversed his prior conviction. *Id.* at 581-582. The Supreme Court held that use of the prior conviction at sentencing was prejudicial, because that conviction "provided no legitimate support" for the sentence. *Id.* at 586.

Defendant does not argue that the standard for prejudice for this claim is any more lenient than the one applicable to his first two arguments, and he contends that he was prejudiced for the reasons stated in his first two arguments. Mem.56. For the reasons already stated in this answer, defendant was not prejudiced.

**IV.** ***Ring V. Arizona*, 122 S.Ct. 2428 (2002), Requires That the Aggravating Factors Making a Defendant Eligible for a Death Sentence Be Found by the Jury Beyond a Reasonable Doubt, and That Was Done Here. *Ring* Does Not Require That the Findings Be Made in a Proceeding in Which the Rules of Evidence Are Applied, and So 18 U.S.C. § 3593(c), Which Permits Evidence to Be Introduced at a Capital Sentencing Hearing Not Subject to the Rules of Evidence, Does Not Render the Federal Death Penalty Act Unconstitutional.**

**A.    Background**

Pursuant to 18 U.S.C. § 3593(c), evidence may be introduced at a capital sentencing hearing without regard to the Federal Rules of Evidence, although information may be excluded if its probative value is outweighed by the potential for unfair prejudice. As

27

defendant correctly points out (Mem. 58-62), the government presented a considerable amount of evidence at the sentencing hearing that was hearsay. Defendant did not object at the time, nor did he argue on direct appeal that § 3593(c) rendered the FDPA unconstitutional.[6] He now contends, in reliance on the principles set forth in *Apprendi v. New Jersey*, 530 U.S. 466 (2000), that § 3593(c) violates the Fifth Amendment due process clause, and the Sixth Amendment confrontation clause, because the findings that permitted a sentence of death were made at a hearing in which the Rules of Evidence did not apply. Mem.62-72. This argument was not raised at trial or on direct appeal. Defendant's claim is therefore procedurally defaulted, and he has not demonstrated cause and prejudice. *United States v. Frady*, 456 U.S. 152, 170 (1982).

Defendant claims that he could not have raised this argument until now, because it depends heavily on *Ring v. Arizona*, 122 S.Ct. 2428 (2002), which had not been decided until after his direct appeal. Motion at 10-12, 16. The novelty of a legal rule does not excuse the failure to raise it on direct appeal, nor does it constitute cause for the default. *Garrot v. United States*, 238 F.3d 903, 905 (7th Cir. 2001). Further, as developed below, defendant's reliance on *Ring* is misplaced, for several reasons.

First, *Ring* is a new rule of procedure which was not dictated by prior precedent, and

---

[6]Defendant did make a perfunctory argument (Br.44-45) that Vanyur's testimony about the Lewisberg murders should have been excluded as hearsay, and that the Confrontation Clause applies at capital sentencing hearings, but the argument was undeveloped. On appeal, undeveloped arguments are waived. *United States v. Watson*, 189 F.3d 578, 594 (7th Cir. 1999). The Seventh Circuit noted defendant's complaint about the Lewisberg testimony being hearsay, but dismissed it by citing § 3593(c), and did not address the Confrontation Clause assertion. 223 F.3d at 674.

28

under the doctrine of *Teague v. Lane*, 489 U.S. 288 (1989), defendant cannot rely on it in this collateral attack. Second, a finding that the logic of *Ring* extends to make unconstitutional the provision of § 3593(c) that suspends the Rules of Evidence at capital sentencing hearings would itself be a new procedural rule not dictated by prior precedent. Under *Teague*, new procedural rules cannot be advocated or adopted on collateral review. Third, *Ring*, applying *Apprendi*, holds only that the facts which raise the statutory maximum penalty to death must be made by the jury beyond a reasonable doubt, which was done here. *Ring* says nothing about application of the Rules of Evidence at the sentencing hearing.

**B.      Analysis**

**1.      *Teague* Bars Retroactive Application of *Ring***

*Teague* holds that "new constitutional rules of criminal procedure will not be applicable to those cases which have become final before the new rules are announced," 489 U.S. at 310, with two exceptions: rules that place private conduct beyond the power of government to proscribe; and rules that require the observance of procedures so necessary to fundamental fairness that they are "implicit in the concept of ordered liberty," and are on a par with the right to counsel. *Id.* at 308-313; *Saffle v. Parks*, 494 U.S. 484, 495 (1990).

Application of the *Teague* doctrine requires this Court to first determine when defendant's convictions became final, and then to survey the legal landscape as of that date to determine whether a court considering defendant's claim based on *Ring* and *Apprendi* at that time would have been compelled by existing precedent to conclude that the rule

29

defendant seeks was required by the Constitution. *Caspari v. Bohlen*, 510 U.S. 383, 390 (1994); *Graham v. Collins*, 506 U.S. 461, 468 (1993); *Parks*, 494 U.S. at 488.

Defendant's conviction became final when the Supreme Court denied certiorari, on October 1, 2001. *See Lambrix v. Singletary*, 520 U.S. 518, 527 (1997). Although *Apprendi* had been decided the year before, on June 26, 2000, *Ring* was not decided until June 24, 2002, and, as of the date defendant's convictions became final, *Ring* was certainly not compelled by *Apprendi*. *Apprendi* held that the Fifth Amendment due process clause and the Sixth Amendment right to trial by jury require that any fact which raises the statutory maximum penalty for an offense is a fact which must be submitted to the jury, and found beyond a reasonable doubt. 530 U.S. at 483. In the course of the opinion, there is mention of *Walton v. Arizona*, 497 U.S. 639 (1990). 530 U.S. at 496-497. In *Walton*, the Court rejected a Sixth Amendment challenge to the Arizona death penalty scheme, in which the jury determines guilt on first-degree murder charges, but the judge, sitting alone, determines the presence or absence of the aggravating factors which raise the statutory maximum penalty from life in prison to death. 497 U.S. at 649. The Court held that such factors are not "element[s] of the offense of capital murder." *Id.* The *Apprendi* majority believed that its decision in that case and the decision in *Walton* were not inconsistent. 530 U.S. at 496-497. In *Ring*, the Court concluded otherwise, overruled *Walton*, and held that where an aggravating factor must be found to sentence a defendant to death, the finding must be made by the jury. 122 S.Ct. at 2443. The result in *Ring* was not dictated by *Apprendi*, because

30

*Apprendi* approved the case *Ring* later overruled. *Ring* is therefore a new rule within the meaning of *Teague*.

Defendant argues that *Ring* announced a substantive rule, not a procedural one, and is therefore fully retroactive. Mem.65-68. He is wrong. A substantive rule is presumptively retroactive, but substantive rules are those which change the legal significance of a fact, as opposed to rules affecting the procedures by which facts are found. *Bousley v. United States*, 523 U.S. 614, 619-621 (1998). *Bousley* held that the decision in *Bailey v. United States*, 516 U.S. 137 (1995), announced a substantive rule, because *Bailey* changed the legal significance of passive "use" of a firearm during and in relation to a crime of violence or a drug trafficking offense for purposes of applying 18 U.S.C. § 924 (c). The courts of appeal had construed passive "use" to support liability under § 924(c), but the Supreme Court disagreed, and held that the "use" must be active. Otherwise, the offense was not proven. Neither *Apprendi* nor *Ring* fit the definition of substantive rules. *Apprendi* did not change the legal significance of a fact, it only reallocated responsibility for finding particular facts, *i.e.*, those which increase the statutory maximum penalty for an offense. *Ring* was decided simply by applying *Apprendi*. The Seventh Circuit has concluded that *Apprendi* announced a procedural rule, and does not apply retroactively to cases on collateral review. *Curtis v. United States*, 294 F.3d 841, 842-844 (7th Cir. 2002) (finding that as of the date of decision, June 19, 2002, five courts of appeal had reached the same conclusion, and none had found otherwise). *See also, Apprendi*, 530 U.S. at 475 ("[t]he substantive basis for New Jersey's

31

enhancement is thus not at issue; the adequacy of New Jersey's procedure is.").

Defendant dismisses *Curtis* in a footnote, arguing that deciding drug quantity is not comparable to deciding whether to impose the death penalty. Mem.67-68 n.40. He cites no authority for the proposition that whether a new rule is substantive or procedural depends on the nature of the matter being decided, and the Supreme Court has often found that new rules pertaining to death penalty cases are procedural rules, not to be applied retroactively. *E.g., O'Dell v. Netherland*, 521 U.S. 151 (1997); *Lambrix v. Singletary*, 520 U.S. 518 (1997); *Graham v. Collins*, 506 U.S. 461 (1993); *Sawyer v. Smith*, 497 U.S. 227 (1990); *Saffle v. Parks*, 494 U.S. 484 (1990).

Defendant also argues that *Ring* is not new, because it was foreshadowed by *Jones v. United States*, 526 U.S. 227 (1998), and *Apprendi*, and that *Jones* is the case that announced the new rule in this line. Mem.67-68. This is untenable. First, as noted above, every court of appeals to have decided the question of the retroactivity of *Apprendi*, including the Seventh Circuit, has held that *Apprendi* announced a new rule of procedure, and does not apply retroactively. Second, also noted above, the Supreme Court's decision in *Walton*, which upheld the Arizona capital sentencing scheme, was found in *Apprendi* to be consistent with the rule *Apprendi* announced. *Ring* retracted that, and overruled *Walton*. A rule is "new," within the meaning of *Teague*, unless it was "*dictated* by precedent existing at the time the defendant's conviction became final." *Teague*, 489 U.S. at 301 (emphasis in original). Dictated means dictated. It is not enough that a line of precedent reasonably leads

32

to the rule, *O'Dell v. Netherland*, 521 U.S. 151, 165-166 (1997), or that the rule was announced by a unanimous Court in a per curiam opinion without oral argument. *Lambrix v. Singletary*, 520 U.S. 518, 538 (1997). Dictated means that the rule was "*compelled*" by precedent, *O'Dell*, 521 U.S. at 164 (emphasis in original), such that "*no other* interpretation was reasonable." *Lambrix*, 520 U.S. at 538 (emphasis in original). In light of *Walton*, and after *Apprendi*, *Ring* was not dictated by any precedent existing when defendant's convictions became final.

Finally, defendant argues that *Ring* fits both exceptions to the general rule of *Teague* that new constitutional rules of procedure are not retroactive. The first exception – rules that place private conduct beyond the power of government to proscribe – is obviously inapplicable. That exception is reserved for rules which place certain conduct beyond the power of the government to criminalize, or which place a certain class of people (*e.g.*, the mentally retarded) beyond the power of the government to punish in particular ways (*e.g.*, by death). *Penry v. Lynaugh*, 492 U.S. 303, 330 (1989). Defendant tries to fit his case into this mold by arguing that *Ring* prohibits punishing by death a defendant whose jury did not find the death-qualifying facts following a procedure governed by the Rules of Evidence (Mem.69), but *Ring* says nothing about such findings being made at a hearing where the Rules of Evidence apply. Further, the sentencing hearing does not qualify as the private conduct described in *Teague*. That conduct (or the defendant's mental condition) precedes and is separate from the prosecution at which the new procedural rule was applied.

33

The second exception is reserved for watershed rules of criminal procedure so essential to fundamental fairness that they must be considered "implicit in the concept of ordered liberty." *Teague*, 489 U.S at 307 (internal quotes omitted). The Court added that "we believe it unlikely that many such components of basic due process have yet to emerge," and in the thirteen years since the decision, the Supreme Court has not found any. Defendant's argument that this exception applies is nothing more than a rehash of his misconception that *Ring* necessarily implies that death-qualifying facts must be found at a proceeding in which the Rules of Evidence are applied. Mem.69-72. The rule of *Ring*, like that of *Apprendi*, does not alter judicial understanding of "the bedrock procedural elements essential to the fairness of a proceeding." *Tyler v. Cain*, 121 S.Ct. 2478, 2484 (2001) (internal quotes omitted).

### 2.   *Teague* Bars Extending *Ring*

Defendant is not asking this Court for a straightforward application of *Ring* to the facts of his case. He is asking that *Ring* be extended. *Ring* requires that the jury determine beyond a reasonable doubt the statutory aggravating factors that qualify a defendant for the death penalty, and that was done here. *Ring* says nothing about what evidentiary standards must apply at the hearing where this finding is made, and nothing in the opinion compels the conclusion that the Rules of Evidence must apply. Defendant's proposed extension of *Ring* would require this Court to, in effect, overrule *Williams v. New York*, 337 U.S. 241 (1949), which held that it is permissible, even desirable, to consider a broad range of information,

34

not subject to the rules of evidence, at a capital sentencing hearing. Adoption of defendant's

arguments based on *Ring* and *Apprendi* would entail overruling, or at least ignoring

*Williams*, and the adoption of a new constitutional rule of criminal procedure in a case on

collateral review, a rule that does not fit within either *Teague* exception. *Teague* precludes

that result. 489 U.S. at 311.

### 3.    *Ring* and the Rules of Evidence

*Ring* holds that it is the jury that must find the facts that operate to raise the statutory

maximum penalty to death, but it does not say anything about what information can be

considered in reaching the determination.  Defendant points out that *Ring* says of the

aggravating factors that make a defendant death-eligible that they "'operate as the functional

equivalent of an element of a greater offense.'" Mem.63, quoting *Ring*, 122 S.Ct. at 2443,

quoting *Apprendi*, 530 U.S. at 494, n.19.  He argues that it follows from this that proof of

such factors must be subjected to the constitutional protections governing trials, including

the right to exclude hearsay and confront adverse witnesses.  Mem.63.  The mistake here,

of course, is that the argument recasts the quoted passage to make it say that the aggravating

factors *are* elements of a greater offense. The Court's opinion in *Apprendi* carefully avoided

labeling facts which serve to increase the statutory maximum penalty for an offense as

elements of a greater offense, making clear that the important thing was not the label applied

to such facts, but the effect they have on sentencing options.  530 U.S. at 494.  *Ring* and

*Apprendi* do not necessarily lead to the conclusion that the FDPA is unconstitutional

35

because capital sentencing hearings are not subject to the Rules of Evidence.

In *United States v. Fell*, App.I, a district court found the FDPA unconstitutional, in light of *Ring* and *Apprendi*, because the death-eligibility findings the FDPA requires are made at a hearing at which the Rules of Evidence do not apply. App.I at 20-26. Defendant argues that *Fell* is persuasive, but *Fell* glosses over the fact (App.I at24) that more than 50 years ago, in *Williams v. New York*, 337 U.S. 241, 246-247 (1949), the Supreme Court expressly held that it was permissible, and indeed desirable, to consider a broad range of information, not subject to the rules of evidence, in determining whether to impose a sentence of death. The judge in *Fell* has thus taken it upon himself to overturn a decision of the Supreme Court based on his guess that, if confronted with the issue now, in light of *Ring* and *Apprendi*, that is what the Supreme Court would do. This is not a prerogative of inferior courts in our system, *United States v. Morris*, 293 F.3d 1010, 1012 (7th Cir. 2002), and, as argued above, it would obviously create a new procedural rule not dictated by prior precedent. *Teague* precludes doing that on collateral review.

## V. Defendant Has Failed to Show That He Was Prejudiced by the Failure of the Indictment to Allege the Statutory Aggravating Factors That Rendered Him Eligible for the Death Penalty.

Defendant's argument that the failure of the indictment to allege all of the statutory aggravating factors on which the government relied at sentencing, and which made him eligible for the death sentence, violates the Fifth Amendment indictment clause, is premised on *Ring v. Arizona*, 122 S.Ct. 2428 (2002), and hence, ultimately on the principle of

36

*Apprendi v. New Jersey*, 530 U.S. 466 (2000). As argued above, in Parts IV.B.3 and 4, *Teague v. Lane* bars any reliance on *Ring*, or any extension of its precise holding in this collateral attack.

Further, the argument was not raised on direct appeal, and is therefore procedurally defaulted. *United States v. Frady*, 456 U.S. 152, 170 (1982). The novelty of a legal rule does not excuse the failure to raise it on direct appeal, nor does it constitute cause for the default. *Garrot v. United States*, 238 F.3d 903, 905 (7th Cir. 2001).

The indictment in this case did not set forth the statutory aggravating factors relied on by the government at sentencing, nor did it set forth the mental culpability factor required by 18 U.S.C. § 3591(a)(2). Since the Fifth Amendment requires the government, before felony charges can be brought, to present its case before a grand jury, this was "error." *United States v. Cotton*, 122 S.Ct.1781, 1785 (2002). In *Cotton*, the Court found that the failure of an indictment to allege drug quantity, as required by *Apprendi v. New Jersey*, 530 U.S. 466 (2000), was error, but did not amount to plain error, because the evidence of drug quantity was overwhelming. 122 S.Ct. at 1786-87.

Here, although the indictment did not separately set forth the mental culpability requirement of § 3591(a)(2), that requirement is only that, with respect to the murders, defendant acted intentionally. However, three of the four murder counts -- Counts 6-8 (R.1 at 14-16) – alleged that defendant acted "intentionally," and the fourth, Count 5, alleged that he acted "with malice aforethought . . . willfully, deliberately, maliciously, and with

37

premeditation." R.1 at 13. Thus, the petit jury found beyond a reasonable doubt that defendant committed the murders either intentionally, or with an even more culpable mental state. Defendant was therefore not prejudiced by the fact that the grand jury did not get a chance to determine whether there was probable cause to believe that he acted with the requisite mental state. *See Cotton*, 122 S.Ct. at 1286-87.

The government is also required to prove at sentencing, beyond a reasonable doubt, the existence of at least one of the statutory aggravating factors listed in 18 U.S.C. § 3592 before a sentence of death can be imposed. 18 U.S.C. §§ 3593(c) and (d). These aggravating factors were not presented to the grand jury or charged in the indictment either, and this, too, was error, according to *Cotton*. Again, however, defendant was given notice prior to trial of the aggravating factors the government would rely on at sentencing (R.32), and the petit jury found the statutory aggravating factors beyond a reasonable doubt, so the error was not prejudicial. *Cotton*, 122 S.Ct. at 1286-87.

## VI. Claims Not Briefed by Defendant.

The motion raises four claims that were not briefed in defendant's memorandum. First, defendant claims that trial defense counsel were ineffective in presenting the defense to the murder counts, and in failing to call a witness at sentencing to rebut the government's evidence regarding defendant's prior manslaughter conviction and the evidence that defendant ordered retaliation against a government witness. Motion at 7-9. Second, he claims that "it is possible that Johnson is mentally retarded," and that executing him would

38

violate the Eighth amendment as construed in *Atkins v. Virginia*, 122 S.Ct. 2242 (2002). Motion at 13. Third, he claims that the death penalty is visited disproportionately on minorities, and asks for further discovery to flesh out this claim (although he does not specify what discovery he seeks). Motion at 13-14. Fourth, he claims that the jurors may have been exposed to extra-record information. Motion at 14-15.

With regard to the ineffective assistance claim, the government maintains that, even assuming the truth of the facts alleged in support of it, the prejudice component of *Strickland v. Washington*, 466 U.S. 668 (1984), cannot be established. An evidentiary hearing on this claim is therefore not required. Since the claim has not been briefed by defendant, the government reserves the right to assert additional defenses should defendant submit any argument beyond that contained in the motion.

The other three claims cannot support relief on the basis of the existing record. Defendant states that he is continuing to investigate, and he seeks discovery, but he has not made any specific discovery requests.

## A.    Ineffective Assistance

Defendant claims that counsel were ineffective for failing to call Scott Arthur. Motion at 7-8.

Arthur was defendant's lawyer prior to his indictment in this case. Tr.997-998. When Blunt Johnson, along with Jamie Pugh and Scott Davis were arrested with a kilogram of crack on April 21, 1994 (Tr.1184-87), which belonged to defendant (Tr.995-998), defendant

39

told Roger Stewart that he, defendant, would have his lawyer, Arthur, look into the situation. Tr.997-998.

In the spring of 1995, as the case against Blunt Johnson, Pugh and Davis was nearing trial (Tr.1161), defendant had a conversation with William Showers about whether Showers thought Blunt Johnson was cooperating with the authorities. Tr.1455-57. Showers said he thought Blunt Johnson was young, under pressure, and likely to do what he could to save himself. Tr.1457. Later, defendant told Showers to get Pugh and Davis and meet him at Scott Arthur's law office, because Arthur had information from another lawyer that Blunt Johnson was cooperating. Tr.1458-59. After the meeting at Arthur's office, Pugh told Showers that defendant was going to have Blunt Johnson killed. Tr.1159.

Kent Brody was representing Blunt Johnson, and Pugh and Davis were represented by Arthur. Tr.1153-54. Brody explored with Blunt Johnson the possibility of negotiating for a reduced sentence in exchange for cooperation and testimony. Tr.1161-62. He also discussed this with Arthur, who in turn told Brody that his clients' defense was going to be that it was Blunt Johnson's crack and they knew nothing about it. Tr.1159-64. Brody filed a severance motion, and on April 14, 1995, when the motion was heard, he discussed with the prosecutor the possibility of having his client give a statement and offer cooperation. Tr.1166-67. The prosecutor expressed interest, and over the course of subsequent phone calls, a date was set in early May 1995 for Blunt Johnson to give a proffer. Tr.1167.

Blunt Johnson was killed before his proffer. Tr.1168. Some time before the murder,

defendant sent Roger Stewart to find Anthony Copeland, a regent, whom he wanted to commit the murder. Tr.999-1000. Copeland and Stewart met with defendant, and defendant asked Copeland if he would kill Blunt Johnson. Tr.1001. Copeland said he would. *Id.* Stewart told Jamie Pugh to work with Copeland, to find a way to lure Blunt Johnson to a location of Copeland's choosing. *Id.* Pugh botched an attempt to set up Blunt Johnson for Copeland to kill, Copeland wanted Pugh off the team, and when Stewart reported this to defendant, defendant said he did not care how the murder was committed or by whom, only that it be done. Tr.1001-04. On May 7, 1995, Travis Stephen, a cooperating witness, saw Copeland shoot Blunt Johnson in the head. Tr.1208-13.

The obvious implication from the testimony is that Brody told Arthur that Blunt Johnson was going to cooperate, and that Arthur relayed this information to defendant, leading to the murder of Blunt Johnson. The affidavit of Scott Arthur has been submitted (App.L), and he attests that defendant's lawyers never contacted him. Jeff Urdangen says the same thing in his affidavit. App.B. However, calling Arthur to refute the evidence that defendant ordered the Blunt Johnson murder, as defendant says should have been done (Motion at 7, ¶ m.iv), would have been useless, because, contrary to defendant's assertions (Motion at 8, ¶ m.viii), Arthur does not deny that he told defendant about Blunt Johnson's plans to cooperate. This is a telling omission, since Arthur does deny that he tipped defendant off about Charles Banks' cooperation, and that defendant ordered retaliation against a witness during a meeting in the MCC attended by Arthur. App.L.

41

Regarding the Banks murder, defendant alleges that counsel were ineffective for failing to call Arthur, who could have refuted the testimony of government witnesses who stated that Arthur told defendant Banks was cooperating.  Motion at 7-8.  The only testimony that Arthur had anything to do with providing information to defendant on Banks came from Travis Stephens, who said only that in about February 1995, Quan Ray told him that Ray believed Banks was a snitch, because Ray learned that defendant had gotten information from defendant's lawyer that Banks was a snitch.  Tr.1229-30.  However, the arrest of Banks that precipitated his cooperation was in 1992 (Tr.611, 1028-30), and defendant suspected Banks of cooperating as early as the spring of 1994.  Tr.1030-32.  Before the end of 1994, defendant told Roger Stewart that he wanted Quan Ray to kill Banks.  *Id.*  Calling Scott Arthur to say that he never knew Banks was cooperating, and did not tell defendant that Banks was cooperating, would not have advanced the defense, because it was obvious that defendant had worked out on his own what Banks was doing.

Roger Stewart also testified that after the return of the federal indictment, a conversation took place in the visitor's room of the MCC at which he was present, along with defendant, Scott Arthur, and defendant's girlfriend, Lakeisha Hayes.  Tr.1061-63.  Defendant told Stewart that he wanted Stewart to arrange to have threats conveyed to the family members of two Gangster Disciples defendant thought might cooperate.  *Id.*  In his affidavit, Arthur denies that defendant said these things.  App.L.  Defendant claims that Arthur's testimony would have negatively impacted the government's case for future

42

dangerousness, and discredited Stewart. As far as the government's case for future dangerousness went, this incident was a drop in the bucket, compared to the murders and beatings that actually occurred on defendant's orders.

Finally, defendant claims that counsel should have called Cheryl Fetcher at the sentencing hearing, to give an alternative account of the homicide of Jesse Simpson, for which defendant was convicted of voluntary manslaughter. Fletcher would have testified that defendant acted in self-defense, as reflected in the copy of her testimony from the state court trial. App.J. This, according to defendant, would have countered the government's evidence on a statutory aggravating factor – that defendant had previously been convicted of a felony involving the use of a firearm against another. Fletcher would have been useless, because the aggravating factor is that defendant was convicted (App.C), and that was proved by admission of the certified copy of conviction. Tr.1975. The government presented a witness to the shooting whose account was different from Fletcher's (Tr.1847-53), but the witness was called only to establish what the certified copy of conviction did not. The certified copy established that defendant had been convicted of a felony. Tr.1975. The witness established that the felony involved the use of a firearm against another. Tr.1850. Fletcher could not have cast doubt on the fact that defendant had been convicted of a felony, and, like the government's witness, she would have testified that defendant shot the victim. App.J. at 37.

43

## B.      Mental Retardation

Defendant alleges that he may qualify as mentally retarded within the meaning of *Atkins v. Virginia*, 122 S.Ct. 2242 (2002), in which case, the Eighth Amendment would preclude capital punishment.[7] Motion at 13. He requests resources for evaluation. *Id.* At this time the government points out only that it is unlikely defendant would fall into the class contemplated by *Atkins*. *Atkins* concluded that the mentally retarded should not be subject to the death penalty since, "because of their disabilities in the areas or reasoning, judgment, and control of their impulses . . . they do not act with the level of moral culpability that characterizes the most serious adult criminal conduct." 122 S.Ct. at 2244. The Court also described the characteristics of what it meant by mental retardation sufficient to preclude capital punishment:

> . . . clinical definitions of mental retardation require not only subaverage intellectual functioning, but also significant limitations in adaptive skills such as communication, self-care, and self-direction that became manifest before age 18. Mentally retarded persons frequently know the difference between right and wrong and are competent to stand trial. Because of their impairments, however, by definition they have diminished capacities to understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand the reactions of others. There is no evidence that they are more likely to engage in criminal conduct than others, but there is abundant evidence that they often act on impulse rather than pursuant to a premeditated plan, and that in group settings they are followers rather than leaders.

---

[7]It seems likely that *Atkins* would apply retroactively to cases on collateral review, under the *Teague* doctrine, since it excludes a class of defendants from eligibility for the death penalty. *Penry v. Lynaugh*, 492 U.S. 302, 329-330 (1989). It is, therefore, either a substantive rule, or a procedural rule that qualifies under the first *Teague* exception (a new rule excluding a class of defendants from eligibility for certain kinds of punishment). *Id.*

122 S.Ct. at 2250. This is certainly no description of defendant. The decisions to have Blunt Johnson and Charles Banks killed were anything but impulsive, and the jury found beyond a reasonable doubt that both murders resulted from substantial planning and premeditation. App.C. In a group setting, defendant was a member of the board of directors of the Gangster Disciples.

## C.     Race Disparity

Defendant alleges that the Attorney General's selection of him for capital prosecution violated his right to due process because federal capital prosecutions are disproportionately brought against minorities. Motion at 13-14. Some statistics are cited (*id.*), and a summary chart has been submitted. App.K. To establish a constitutional violation, however, defendant must show that any disparate impact is caused by discriminatory intent. *McClesky v. Kemp*, 481 U.S. 279, 297 (1987). Defendant seeks further discovery, but does not specify what he wants to discover. Motion at 14.

## D.     Extra-Record Information Before the Jury

As defendant acknowledges, he has already taken one shot at coming up with evidence that improper influences contaminated the jury, and he missed. Motion at 14-15. He makes no new allegations in his motion, but seeks to keep the issue alive should anything more come to light through examination of the jury questionnaires.

## CONCLUSION

For the foregoing reasons, the government respectfully requests that this Court deny

defendant's § 2255 motion.

Respectfully Submitted,

PATRICK J. FITZGERALD,
United States Attorney

By:   <u>David E. Bindi</u>
DAVID E. BINDI
Assistant U.S. Attorney
219 South Dearborn Street
5th Floor
Chicago, Illinois 60604
(312) 886-7643

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA,                    )
                                             )
        Plaintiff - Appellee - Respondent,   )        No. 02 C 6998
                                             )
vs.                                          )        Hon. Suzanne B. Conlon
                                             )
DARRYL JOHNSON,                              )
                                             )        Death Sentence Imposed
        Defendant - Appellant - Petitioner.  )

## NOTICE OF MOTION

TO:    David Bindi
       Assistant United States Attorney
       219 South Dearborn Street, Suite 500
       Chicago, Illinois  60604

PLEASE TAKE NOTICE that on Thursday, February 6, 2003, at 9:00 a.m., we shall appear before the Honorable Suzanne B. Conlon, United States District Judge, in the courtroom usually occupied by her at 219 South Dearborn Street, Chicago, Illinois, and present Petitioner's Motion for Leave to Conduct Discovery, a copy of which accompanies this Notice and is hereby served upon you. You are invited to attend.

                                    Respectfully submitted,

                                    _____
                                    Attorney for defendant

                                    Terence H. Campbell
                                    Cotsirilos, Tighe & Streicker, Ltd.
                                    33 North Dearborn Street, Suite 600
                                    Chicago, Illinois  60602
                                    (312) 263-0345

## CERTIFICATE OF SERVICE

Terence H. Campbell, an attorney, hereby certifies that he caused a copy of present Petitioner's Motion for Leave to Conduct Discovery, along with the accompanying Notice of Motion, to be served upon David Bindi, Assistant United States Attorney, 219 South Dearborn Street, Suite 500, Chicago, Illinois 60604, by messenger delivery, on this 3rd day of February, 2003.

Terence H. Campbell

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff - Appellee - Respondent, | ) | No. 02 C 6998 |
| | ) | |
| vs. | ) | Hon. Suzanne B. Conlon |
| | ) | |
| DARRYL JOHNSON, | ) | |
| | ) | Death Sentence Imposed |
| Defendant - Appellant - Petitioner. | ) | |

## MOTION FOR LEAVE TO CONDUCT DISCOVERY

Defendant Darryl Lamont Johnson, by his attorneys, Terence H. Campbell of Cotsirilos, Tighe & Streicker, and Lorinda Meier Youngcourt, respectfully moves the Court to grant him leave to conduct discovery, as set forth in detail below. The request for discovery is authorized by Rule 6 of the Rules Governing Section 2255 Proceedings For the United States District Courts ("Habeas Rule 6"). Moreover, the requested discovery is essential to guarantee him a full and fair opportunity to present the claims alleged in his September 2002 motion under 28 U.S.C. §2255, to amend that motion, as well as to ensure that this Court reviews and resolves his claims for relief in light of a fully developed factual record. In support of this motion, Johnson states as follows:

## GOVERNING LAW

1.  Rule 6 of the *Rules Governing Section 2255 Proceedings for the United States District Courts* ("Habeas Rule 6"), grants the Court the specific and express authority to order discovery in §2255 proceedings. Specifically, Habeas Rule 6 provides:

> A party may invoke the processes of discovery available under the Federal Rules of Criminal Procedure or the Federal Rules of Criminal Procedure or elsewhere in the usages and principles of law if, and to the extent that, the judge in the exercise of his discretion and for good cause shown grants leave to do so, but not otherwise.



Habeas Rule 6(a).

2. Habeas Rule 6(a) incorporates the Supreme Court's directive that a federal habeas corpus petitioner is "entitled to careful consideration and plenary processing of [his claims,) including full opportunity for presentation of the relevant facts." *Harris v. Nelson,* 394 U.S. 286, 298 *(1969); see also Blackledge v. Allison*, 431 U.S. 63, 82-83 (1977); *see also* Rules Governing Section 2254 Cases in the United States District Courts, Advisory Committee Note to Rule 6 (West 2000) ("Subdivision (a) is consistent with *Harris v. Nelson*").

4. In order to meet the Rule 6(a) requirement for discovery, a petitioner must (1) make a colorable claim showing that the underlying facts, if proven, constitute a constitutional violation; and (2) show "good cause" for the discovery. *Henderson v. Walls,* 296 F.3d 541, 553 (7th Cir. 2002). "A party may invoke discovery . . . to the extent that the judge in exercise of his discretion and for good cause shown grants leave to do so, but not otherwise." *United States v. Balistrieri*, 606 F.2d 216 (7th Cir. 1979).

4. Accordingly, this Court may grant the petitioner leave to conduct discovery when "good cause" is shown. Good cause is established "where specific allegations before the court show *reason to believe* that the petitioner may, if the facts are fully developed, be able to demonstrate that he is entitled to relief." *Bracy v. Gramley,* 520 U.S. 899. 908-909 (1997) (emphasis added).[1]

5. Moreover, a petitioner who has (1) made specific allegations warranting relief, (2) demonstrated why the requested information is essential to the adequate factual development of his

---

[1] By contrast, the Supreme Court has indicated that such good cause would be absent if the petitioner's allegations are patently frivolous *(i.e..* the product of "fantasy which has its basis in the paranoia of prison rather than fact.") *Harris.* 394 U.S. at 300; *see also* Advisory Committee Note to Habeas Rule 6 (same, quoting *Harris*).

claims, and (3) demonstrated that the requested information is likely in the hands of the party from whom discovery is sought and cannot be obtained through other means, has established "good cause" under *Bracy* and Habeas Rule 6. *See, e.g., Murphy v. Johnson*, 205 F.3d 809, 813-814 (5th Cir. 2000) ("where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he [is] entitled to relief, it is the *duty* of the courts to provide the necessary facilities and procedures for an adequate inquiry") (internal quotation marks omitted; citation omitted; emphasis added); *see also East v. Scott*, 55 F.3d 996 (5th Cir. 1995) (although a "district court generally has discretion to grant or deny discovery requests under Rule 6, a court's blanket denial of discovery is an abuse of discretion if discovery is indispensable to a fair, rounded, development of the material facts") (internal quotation marks omitted).[2]

6.      The information sought by Petitioner herein is "indispensable" to the "fair, rounded development of the material facts," which in turn is essential to the full consideration and accurate resolution of the claims for relief in Mr. Johnson's §2255 motion.  Accordingly, Petitioner respectfully requests that the Court grant this motion for discovery as set forth herein.

---

[2] *See Coleman v. Zant*, 708 F.2d 541(11th Cir. 1983) (quoting *Townsend v. Sam*, 372 U.S. 293, 322 (1963)) (same); *Gaitan Campanioni v. Thornburgh*, 777 F. Supp. 1355, 1356 (E.D. Tex. 1991) (noting that the courts should not hesitate to order discovery "where it will help illuminate the issues underlying the applicant's claim").

3

## DISCOVERY REQUESTED

7.      Based on the issues raised in Mr. Johnson's petition pursuant to §2255 which was filed with the Court on September 30, 2002, Mr. Johnson respectfully requests the Court order and direct the government to produce the following discovery to Petitioner's counsel, which is relevant and material to the following issues[3]:

### a. INEFFECTIVE ASSISTANCE AND *BRADY* CLAIMS AS TO FUTURE DANGEROUSNESS

In his first ground for relief, Petitioner alleges that his counsel provided ineffective assistance at his sentencing hearing by failing to properly investigate the law and facts relevant to the central issue at Mr. Johnson's death penalty hearing:  future dangerousness.  In support of this claim, Petitioner demonstrated that trial counsel was entirely unaware of the various legal provisions, BOP policies, regulations and practices governing the conditions of confinement which may be imposed on federal inmates.  These provisions expressly allow for the imposition of conditions of confinement which Warden Vanyur (the government's expert) testified were impossible to impose and illegal to administer.  In addition, Petitioner has demonstrated that the BOP does in fact – and did at the time of Darryl Johnson's sentencing hearing  impose exactly the types of conditions of confinement on individual prisoners whenever it is deemed necessary, and that it has done so for years, notwithstanding Warden Vanyur's testimony to the contrary.  *See* Petitioner's Initial Memo in Support at 3-45.

---

[3] The relevance of the discovery requested is described briefly below, and is further made clear from the claims contained in Petitioner's §2255 motion and his Initial Memorandum in Support of that motion.  That Motion and Initial Memorandum are adopted and incorporated as part of this motion as though fully set forth herein.

4

These various legal, regulatory and policy provisions, along with the established and ongoing practices of the BOP, both alone and in combination, make patent that the testimony of the government's rebuttal expert, Warden John Vanyur, was inaccurate and gave a wholly misleading impression to the jury that sentenced Darryl Johnson as to what the potential conditions of confinement could be were he sentenced to life without parole, rather than to death. Indeed, the government has now expressly conceded this point. Thus, in its brief before the Supreme Court, the Solicitor General admitted that the testimony of Warden Vanyur was "incomplete" and may well have "left the jury with a mistaken impression" of BOP policy and practices relating to the conditions of confinement which could be imposed on Darryl Johnson. *See* Ex. A to Petitioner's Initial Memo in Support, Govt. Opp. to *cert.* at 14, 20, 21, 28-29.

As his counsel was unaware of these legal, regulatory and policy provisions, as well as the ongoing practices of the BOP in housing certain inmates under strict conditions of confinement, defense counsel neither presented evidence on these critical matters, nor cross-examined the government's expert, Warden Vanyur, about the multiple misleading, incomplete and inaccurate statements he made with respect to BOP facilities, abilities and practices.[4] *See* Initial Memo in Support at 3-45. These failures of counsel on the central issue at Petitioner's sentencing was clearly material and prejudicial, for it left the jury with "incomplete" information and likely a "mistaken impression" on the central issue at Petitioner's sentencing. The prejudice is made even more manifest when one considers other cases in which accurate information has been given to juries

---

[4] Indeed, counsel is informed that the BOP has built so-called "super-cells" at ADX (and potentially elsewhere) which provide the BOP with the ability to impose even stricter conditions of confinement than in the regular control unit cells. This new cell-block is called "C-Unit, D-Range" and is the subject of certain of Petitioner's discovery requests below.

5

deciding a defendant's fate under similar conditions. *See United States v. Anthony Jones*, discussed in Petitioner's Initial Memo in Support at 41-45.

Undersigned counsel believes that the information sought by way of the discovery requested below will demonstrate the inaccuracy and incompleteness of Warden Vanyur's testimony and may reveal additional relevant evidence in support of Petitioner's claims. The requested discovery will also demonstrate the extent of the inaccuracies in Warden Vanyur's testimony and will further establish the prejudice of his counsel's ineffective assistance. Finally, the information requested is available only from the Bureau of Prisons and the Department of Justice.

In his second ground for relief, Petitioner alleges that the information relating to the various inmates who were, at the time of Petitioner's sentencing hearing, being held under exactly the type of strict conditions of confinement by the BOP that Warden Vanyur testified were impossible and illegal. Some of these inmates had been held continuously under such conditions for years prior to Petitioner's sentencing and are, to counsel's knowledge, still being held under those conditions to this day. Warden Vanyur's testimony, therefore, was not only "incomplete," but it omitted material information, and that information, which was in the hands of the government, was never turned over to the defense. *See* Petitioner's Initial Memo in Support at 48-54. Petitioner now knows about several separate cases in which the strict conditions of confinement Warden Vanyur testified were impossible to impose have, in fact, been imposed. Because none of this undoubtedly relevant and material information in the possession of the government was ever turned over to the defense, Petitioner's rights under *Brady v. Maryland* were violated. *Id.* Counsel believes that the requested discovery below will provide further information relevant to this claim in the form of other potential *Brady* material which was not turned over to the defense in this case.

6

Through discovery, Petitioner seeks to demonstrate the validity of his claims based on

ineffective assistance at the penalty-phase trial and based on *Brady v. Maryland*. Each of the items

of information requested here are relevant to Petitioner's claims, and are essential to establish those

claims and the grounds for relief described in Petitioner's §2255 motion and Initial Memo in

Support. Accordingly, in support of these claims, Petitioner respectfully request the following

discovery from the government:

1.   Disciplinary records, reports or other documentation from the Bureau of Prison's ("BOP") ADX facility on all inmates housed in the control unit for the period from 1995 through the present;

2.   Documents or information relating to "C Unit, D Range" at ADX (the so-called super cells at ADX), including any documents or information relating to the intended purpose and function of these cells; they type(s) of inmates who are intended to be housed in these cells; the amount of contact (if any) between prisoners housed in these cells and BOP staff; and the use (if any) of these cells since their construction;

3.   Documents or information identifying all inmates in the federal prison system who have restrictions on their phone calls in addition to those imposed on all BOP prisoners at the particular facility where the inmate is housed – (*e.g.* no phone calls except to attorneys or approved family contacts). For each such inmate, documents or information identifying their crime of conviction, the facts of their cases, their sentence, BOP facility (or facilities) in which they have been and are housed, case number, court of conviction, year of conviction and sentence, the authority pursuant to which the restriction was imposed (*e.g.* by the Court, by the BOP, etc.), and the dates during which the restriction has been imposed;

4.   Documents or information identifying all inmates in the federal prison system who have restrictions on their mail in addition to those imposed on all BOP prisoners at the particular facility where the inmate is housed -- (*e.g.* must be approved, pre-read, sent to the DOJ or the prosecutor's office, etc. before it can either be sent from, or received by, the inmate). For each such inmate, documents or

7

information identifying their crime of conviction, the facts of their cases, their sentence, BOP facility (or facilities) in which they have been and are housed, case number, court of conviction, year of conviction and sentence, the authority pursuant to which the restriction was imposed (*e.g.* by the Court, by the BOP, etc.), and the dates during which the restriction has been imposed;

5.  Documents or information identifying all inmates in the federal prison system have restrictions on visitors in addition to those imposed on all BOP prisoners at the particular facility where the inmate is housed - (*e.g.* no one but court-approved family members, attorneys, etc.). For each such inmate, documents or information identifying their crime of conviction, the facts of their cases, their sentence, BOP facility (or facilities) in which they have been and are housed, case number, court of conviction, year of conviction and sentence, the authority pursuant to which the restriction was imposed (*e.g.* by the Court, by the BOP, etc.), and the dates during which the restriction has been imposed;

6.  Any briefs, memos, opinion papers, or policy statements from the Department of Justice ("DOJ") and/or the BOP relating to allowable conditions of confinement in capital cases where the death penalty is not imposed;

7.  Identify all cases in which the DOJ or any U.S. Attorney's Office has asked that strict conditions of confinement be imposed against a defendant pursuant to 18 U.S.C. §3582(d) and/or 28 CFR 501.3, the factual and legal bases upon which such request was made in each case, the Court in which it was made, and the date(s) on which each such request was made;

8.  Identify all cases in which the BOP has carried out the strict conditions of confinement imposed against a defendant pursuant to 18 U.S.C. §3582(d), 28 CFR 501.3, or any other authority, the factual and legal bases upon which such conditions were imposed, and the dates during which such conditions have been imposed in each such case;

9.  Any documents or information relating to any periodic or other review of the conditions of confinement being imposed on BOP inmates Clayton Fountain and/or Thomas Silverstein, including the timing of any such reviews, the considerations taken into account by

8

the government in those reviews, and the decisions made by the government pursuant to those reviews;

10. Any documents or information relating to the decision to house BOP inmates Clayton Fountain and/or Thomas Silverstein in the conditions of confinement under which they are currently confined and have been confined for more than a decade;

11. Any documents or information relating to any BOP employees (current or former), or any other government employees or agents (current or former) who have testified at federal capital penalty phase trials regarding the potential conditions of confinement which may be imposed against a defendant (including, but not limited to, the testimony of any such witness);

12. Any documents or information in the possession of the government which are inconsistent with the testimony of Warden John Vanyur given at Darryl Johnson's penalty-phase trial (*United States v. Darryl Johnson*, 96 CR 379 (N.D. Ill.));

13. Any documents or information created or authored by the government relating to any assessment, description, analysis or comment on the substance of the testimony given by Warden Vanyur in Darryl Johnson's case (*United States v. Darryl Johnson*, 96 CR 379 (N.D. Ill.));

14. Any documents or information relating to any decision by the government not to call Warden Vanyur to testify at any capital trial after his testimony at Darryl Johnson's penalty-phase trial;

15. Any documents or information relating to any testimony given by Warden Vanyur (other than in Darryl Johnson's case) with respect to possible or allowable conditions of confinement in any BOP facility, including, but not limited to, the date(s) and substance of any such testimony;

16. Any documents or information evidencing any charges that were filed relating to the Lewisburg murders about which Warden Vanyur testified at Darryl Johnson's penalty-phase trial;

17. Any documents or information proving or evidencing that members of the Aryan Brotherhood housed at ADX Florence were or were not

9

responsible for the Lewisburg Prison murders about which Warden Vanyur testified at Darryl Johnson's penalty-phase trial;

18.  Any and all disciplinary records maintained or possessed by the BOP concerning the conduct of Darryl Johnson during his current period of incarceration;

19.  Any documents relating to the government's decision to seek the death penalty against Darryl Johnson.

### b. **RULES OF EVIDENCE AT CAPITAL SENTENCING TRIALS AND THE MANDATES OF THE INDICTMENT CLAUSE**

In his fourth claim for relief, Petitioner alleges that the Federal Death Penalty Act ("FDPA") is unconstitutional because of the relaxed evidentiary rules mandated by the FDPA during the penalty-phase trial. *See* Petitioner's Initial Memo in Support at 56-72. In his fifth claim for relief, Petitioner alleges that his death sentence was imposed in violation of the Fifth Amendment's Indictment Clause because the indictment does not contain all of the facts which increased the possible maximum punishment for Johnson from life without parole to death. *Id.* at 72-76. Indeed, since the time of Petitioner's trial, the Supreme Court has ruled that any element which increases the maximum punishment is an element of the offense. *See, Ring v. Arizona*, 122 S.Ct. 2428 (2002) *Harris v. United States*, 122 S.Ct. 2406 (2002). According to the Supreme Court's decision in *Jones v. New Jersey*, the Fifth and Sixth Amendments mandate that all elements of a crime must be "charged in the indictment, submitted to a jury, and proven beyond a reasonable doubt." 526 U.S. 227, 252 (1998). Since these decisions, it is undersigned counsel's belief that the government has reindicted some or all of the federal capital cases in recognition of the fact that the Supreme Court's decisions mandate indictment of all facts which increase the potential punishment from life without parole to death. The information requested below is relevant to Petitioner's claims to demonstrate

10

not only the government's understanding of the legal mandates of *Jones, Ring,* etc., but also to provide potential admissions by the government of its recognition of these mandates. *See, e.g., United States v. Burnside,* 824 F.Supp. 1215, 1270 (N.D. Ill. 1993) (Holderman, J.) (government's statement regarding potential impact of evidence constitutes admission of prejudice); *see generally,* Fed.R.Evid. 801(d)(2). The requested information is essential to establish those claims and the grounds for relief described in Petitioner's §2255 motion and Initial Memo in Support. Accordingly, in support of these claims, Petitioner respectfully request the following discovery from the government:

1. Any briefs, memos, opinion papers, or policy statements from DOJ regarding the requirements of the Indictment Clause of the Fifth Amendment in capital cases pursuant to *Ring v. Arizona, 122 S.Ct. 2428 (2002);*

2. A list and description of any capital cases which the government re-indicted after the Supreme Court's decision in *Ring,* and a description of why the case was re-indicted;

3. Any briefs, memos, opinion papers, or policy statements from DOJ regarding the requirements of the Federal Rules of Evidence at capital sentencing proceedings pursuant to *Ring v. Arizona, 122 S.Ct. 2428 (2002).*

c. **JURY QUESTIONNAIRES**

1. Petitioner's counsel is informed by the U.S. District Court Clerk's Office that the Clerk's Office does have possession of the juror questionnaires from Darryl Johnson's case. Counsel has further been informed that the Clerk's Office requires an Order from the Court to release them to counsel. Petitioner's counsel respectfully requests such an Order be issued by the Court. These documents are relevant to the claims raised in section VIII of Petitioner's §2255 Motion.

### d. **MENTAL RETARDATION / PSYCHOLOGICAL EVALUATION**

In his sixth ground for relief, Petitioner alleges that his execution may violate Johnson's protection to be free from cruel and unusual punishment under the Eighth Amendment as it is possible that Johnson is mentally retarded. *See also, Atkins v. Virginia,* 122 S.Ct. 2242 (2002). In addition to the Eighth Amendment, 18 U.S.C. §3596(c) specifically prohibits a sentence of death from being carried out on a person who is mentally retarded.

Prior to trial in the underlying case, Johnson was evaluated by a psychologist who determined that his IQ was approximately 74, which, as noted in Petitioner's §2255 Motion placed him within the range of mental retardation when the standard deviation is taken into consideration. It appears, however, that Johnson was never given all the tests necessary to evaluate whether or not he is mentally retarded under prevailing norms. For instance, Johnson's adaptive skills were never tested, though this is required in order to make a determination of mental retardation. *See, e.g.,* American Psychiatric Association, Diagnostic and Statistical manual of Mental disorders 41 (4th ed. 2000). Moreover, the testing which was done on Johnson pre-trial was deficient in several respects. For instance, Johnson was given an out-dated test, despite the fact that a newer version was publicly available at the time of his testing. In addition, the test was not administered by the doctor who evaluated its results, but by an assistant. Each of these flaws were exposed during the cross-examination of the defense psychologist, Dr. Gelbort, and casts doubt on the validity of even the partial testing that was done by Dr. Gelbort, as well as counsel's effectiveness in investigating and/or presenting such evidence.

The requested information is essential to establish his claim regarding possible mental retardation under prevailing standards and the grounds for relief described in Petitioner's §2255

12

motion and Initial Memo in Support. Accordingly, in support of his claims, Petitioner respectfully

request the following discovery from the government:

1.  Any briefs, memos, opinion papers, or policy statements from the government regarding the requirements of *Atkins v. Virginia*, 122 S.Ct. 2242 (2002), the definition of mental retardation, the standards for evaluation or assessment of mental retardation or other mental deficiency post-*Atkins*, and/or the procedures necessary to comply with *Atkins* in capital prosecutions;

2.  Any and all briefs, memos or position papers in possession of the Government which reflects the Government's position on what constitutes mental retardation or the appropriate definition for mental retardation;

3.  Any evidence in its possession which suggests petitioner is mentally retarded;

4.  The names of any persons the government consulted or interviewed regarding the existence (or not) of petitioner's mental retardation or diminished psychological or adaptive functioning, and any documents relating thereto;

5.  Any and all briefs, memos or position papers in possession of the Government which reflect the Government's position on the procedures to be employed in establishing mental retardation, the lack of direction in 18 U.S.C. §3596, and/or the validity of 18 U.S.C. §3596.

In addition, Petitioner requests that the Court approve funding for the defense to retain a

psychiatric and/or psychological expert to evaluate the testing done by Dr. Gelbort and his staff, and

to conduct any additional testing which is necessary to evaluate Petitioner's mental capacity and

possible mental retardation.

### e. **RACE DISCRIMINATION IN THE FEDERAL DEATH PENALTY**

In his seventh ground for relief, Petitioner alleges that the federal capital sentencing scheme

is administered in a racially discriminatory manner. In support of this claim, Petitioner has cited

13

government statistics and studies relating to the disproportionate imposition of the federal death

penalty on racial minorities. Petitioner believes that additional evidence exists to demonstrate that

the government's prosecution of capital offenses is racially discriminatory. Thus, through discovery,

Petitioner seeks to demonstrate the racially discriminatory effect of the Justice Department's and the

Attorney General's procedures regarding the determination whether to seek the death penalty, as well

as the knowledge and awareness of the Justice Department of the racially discriminatory effect of

their procedures. This evidence is essential to establish the claim for relief described in section VII

of Petitioner's §2255 motion. Accordingly, in support of this claim, Petitioner respectfully request

the following discovery from the government:

1. Any briefs, memos, opinion papers, analyses, or policy statements in the possession of the government relating to Attorney General Ashcroft's Report from June, 2001, entitled <u>The Federal Death Penalty System: Supplementary Data, Analysis and Revised Protocols for Capital Case Review</u> (which evaluated race disparity issues in the federal death penalty system);

2. Any briefs, memos, opinion papers, analyses, or policy statements regarding the issue of racial disparity in federal capital prosecutions for the period from 1992 through the present;

3. Any DOJ or prosecution briefs, memos, opinion papers, analyses, or policy statements regarding plea negotiations in capital cases for the period 1992 through the present;

4. Case information for each "death penalty eligible" case evaluated by the Attorney General under the FDPA. Petitioner specifically does not request "work product" but instead public information for all such cases, including names, locations, descriptions of the alleged offense, gender and race of the alleged offender, name, race, gender and age of all victims, and resolution of the case;

5. The names and identifying information, including name, race, gender and age of all alleged offenders and the name, race, gender and age of

14

all alleged victims, for all cases referred to the committee of Senior Attorneys in the Justice Department for prosecution as a death penalty offense;

6. A description of all matters relied upon by the committee of Senior Attorneys in the Justice Department in its recommendation whether to prosecute the cases before it as a death penalty offense, including but not limited to Darryl Johnson's case;

7. The names and identifying information of all cases, including name, race, gender and age of all alleged offenders and the name, race, gender and age of all alleged victims, referred to the Attorney General for prosecution as a death penalty offense;

8. A description of all matters relied upon by the Attorney General in his or her decision whether to prosecute a case as a death penalty offense;

9. Any information in the possession of the Government relating to the investigation of racially discriminatory practices in: the decision to seek the death penalty, the evaluation of offenses eligible for death penalty, the prosecution of a death eligible offense, or plea bargaining practices relating to death eligible offenses;

10. Any documents relating to the government's decision to seek the death penalty against Darryl Johnson.

## f. **GRAND JURY TRANSCRIPTS**

1. "Rule 6(e) of the Federal Rules of Criminal Procedure provides that matters occurring before the grand jury may be disclosed 'when so directed by a court . . . in connection with a judicial proceedings.'" *United States v. Campbell*, 294 F.3d 824, 827 (7th Cir. 2002). Disclosure is available when the material is directly related to pending litigation, and the party requesting the information demonstrates a "compelling" need. *Id.* Johnson requests a complete copy of the grand jury transcripts leading to his indictment in this matter for the purpose of determining whether the grand jury refused to indict him on any of the facts supporting the threshold culpability factors or statutory aggravating factors alleged by the government in its Notice of Intent to Seek the Death Penalty.

15

### g. **DEPOSITIONS AND FURTHER DISCOVERY**

1.     Petitioner's counsel believes it is likely that further discovery will be necessary, including depositions of certain persons, once a review of any discovery ordered by the Court pursuant to this initial motion is received and reviewed, and counsel intends to seek any such additional discovery as appropriate.

8.     All of the information requested above is relevant, necessary and essential to the adequate factual development of Petitioner's claims as set forth in his §2255 motion. (*See* fn.3 above.) Moreover, the information requested through discovery is certainly in the possession of the government (*i.e.* the party from whom discovery is sought) and cannot be obtained through other means. Finally, Petitioner has shown good cause for his requests because the "specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is entitled to relief." *Bracy,* 520 U.S. at 908-909. Accordingly, because a federal habeas corpus petitioner is "entitled to careful consideration and plenary processing of [his claims,] including full opportunity for presentation of the relevant facts" (*Harris,* 394 U.S. at 298; *Blackledge* , 431 U.S. at 82-83), Petitioner is entitled to the discovery requested by this motion.

WHEREFORE, for the foregoing reasons, Petitioner Darryl Lamont Johnson respectfully requests that the Court enter an Order authorizing him to conduct discovery related to the claims contained in his §2255 motion, and directing the discovery requested herein be produced by the government.

16

Respectfully submitted,

Terence H. Campbell
Cotsirilos, Tighe & Streicker, Ltd.
33 North Dearborn Street, Suite 600
Chicago, Illinois  60602
(312) 263-0345

Counsel for Darryl Lamont Johnson

Lorinda Meier Youngcourt
1773 Huron Williams Road
Mitchell, Indiana  47446
(812) 849-9852

Counsel for Darryl Lamont Johnson

17

Minute Order Form (06/97)

Case 1:02-cv-06998 Document 11 Filed 02/06/03 Page 1 of 1 PageID 112
Case: 11-1326 Document: 8-2 Filed: 03/04/2011 Pages: 342

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Suzanne B. Conlon | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 6998 | **DATE** | 2/6/2003 |
| **CASE TITLE** | UNITED STATES OF AMERICA vs. DARRYL JOHNSON | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ■ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Defendant's motion for leave to conduct discovery is taken under advisement. Government to respond by March 14, 2003.

(11) ☐ [For further detail see order (on reverse side of/attached to) the original minute order.]

| | No notices required, advised in open court. | | | | Document Number |
|---|---|---|---|---|---|
| | No notices required. | | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | | FEB 07 2003 | |
| | Notified counsel by telephone. | | | date docketed | 11 |
| | Docketing to mail notices. | | | | |
| | Mail AO 450 form. | | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | | 2/6/2003 | |
| CB | courtroom deputy's initials | | | date mailed notice | |
| | | Date/time received in central Clerk's Office | | CB | |
| | | | | mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA,                )
                                         )
        Plaintiff - Appellee - Respondent, )      No. 02 C 6998
                                         )
vs.                                      )        Hon. Suzanne B. Conlon
                                         )
DARRYL JOHNSON,                          )
                                         )        Death Sentence Imposed
        Defendant - Appellant - Petitioner. )

**DOCKETED**

FEB 1 1 2003

## NOTICE OF MOTION

TO:     David Bindi
        Assistant United States Attorney
        219 South Dearborn Street, Suite 500
        Chicago, Illinois  60604

        PLEASE TAKE NOTICE that on Tuesday, February 11, 2003, at 9:00 a.m., we shall appear before the Honorable Suzanne B. Conlon, United States District Judge, in the courtroom usually occupied by her at 219 South Dearborn Street, Chicago, Illinois, and present the Agreed Motion for Short Extension of Time to File Reply, a copy of which accompanies this Notice and is hereby served upon you.  You are invited to attend.

                                Respectfully submitted,

                                _____
                                Attorney for defendant

                                Terence H. Campbell
                                Cotsirilos, Tighe & Streicker, Ltd.
                                33 North Dearborn Street, Suite 600
                                Chicago, Illinois  60602
                                (312) 263-0345

## CERTIFICATE OF SERVICE

Terence H. Campbell, an attorney, hereby certifies that he caused a copy of present the

Agreed Motion for Short Extension of Time to File Reply, to be served upon David Bindi, Assistant

United States Attorney, 219 South Dearborn Street, Suite 500, Chicago, Illinois 60604, by messenger

delivery, on this 6th day of February, 2003.

_____
Terence H. Campbell

DOCKETED

FEB 1 1 2003

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff - Appellee - Respondent, | ) | No. 02 C 6998 |
| | ) | |
| vs. | ) | Hon. Suzanne B. Conlon |
| | ) | |
| DARRYL JOHNSON, | ) | |
| | ) | Death Sentence Imposed |
| Defendant - Appellant - Petitioner. | ) | |

FILED

FEB - 6 2003

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

## AGREED MOTION FOR SHORT EXTENSION OF TIME TO FILE REPLY

Defendant Darryl Johnson, by his attorneys, Terence H. Campbell and Lorinda Meier

Youngcourt, respectfully requests leave of this Court for a short extension of time to file Defendant's

Reply brief in support of his Initial Memorandum in Support of his §2255 motion. In support of this

motion, Defendant states as follows:

1.      Darryl Johnson was convicted of a drug conspiracy and two capital murders and

sentenced to death on the murder convictions. The trial in this case took place in the Fall of 1997.

Johnson's convictions and sentences were affirmed by the Seventh Circuit Court of Appeals on

August 3, 2000. *U.S. v. Johnson*, 223 F.3d 665 (7th Cir. 2000). On October 1, 2001, Johnson's

petition for writ of *certiorari* was denied. *Johnson v. U.S.*, ___ U.S. ___, 112 S.Ct. 71, 151 L. Ed.

2d 37 (2001). Johnson is currently housed at the United States Penitentiary in Terre Haute, Indiana.

2.      Johnson's §2255 was filed on September 30, 2002 and raised several independent

grounds for relief.[1]  Along with the motion, Defendant filed an Initial Memorandum in Support of

the §2255 motion discussing certain of the grounds for relief which were susceptible to preliminary

---

[1] The initial memorandum filed in support of the §2255 motion was 75 pages in length
and set forth Defendant's pre-discovery position on five separate issues.



briefing.   Defendant made clear that all issues were also to be the subject of further discovery

requests pursuant to Habeas Rule 6.  (Defendant has now filed his initial motion for discovery and

that motion has been taken under advisement by the Court while briefed by the parties.)

3.   On January 31, 2003, the government filed its response to the Initial Memorandum.

The government's response is 46 pages long and covers several of the complex and substantive

issues raised by Defendant in his §2255 motion.

4.   Currently, Defendant's reply brief is due on February 14, 2003.  Because of the

complexity and number of issues being briefed in these initial submissions, as well as defense

counsel's schedule, Defendant's counsel respectfully requests that they be given two additional

weeks -- *i.e.* until February 28, 2003 -- to file their reply on the Initial Memorandum.

5.   Undersigned counsel has spoken with Assistant U.S. Attorney David Bindi who is

handling this matter for the government, and the government has no objection to this short extension.

This short extension will not prejudice any party and is not requested for any improper purpose.

WHEREFORE, Johnson respectfully requests this Court to grant a two week extension of

time, until February 28, 2003, for Defendant to file his Reply in support of his Initial Memorandum

in Support of his §2255 motion.

Respectfully submitted,

An attorney for Defendant Darryl Johnson

Terence H. Campbell                                   Lorinda Meier Youngcourt
Cotsirilos, Tighe & Streicker, Ltd.                   Post Office Box 206
33 North Dearborn Street, Suite 600                   Huron, Indiana  47437-0206
Chicago, Illinois  60602                              (812)849-9852
(312) 263-0345

2

Minute Order Form (06/97)

Case: 1:02-cv-06998   Document 13   Filed 02/11/03   Page 1 of 1   PageID 117
Case: 11-1326   Document: 8-2   Filed: 03/04/2011   Pages: 342

## United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Suzanne B. Conlon | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 6998 | **DATE** | 2/11/2003 |
| **CASE TITLE** | UNITED STATES OF AMERICA vs. DARRYL JOHNSON | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1)  ■  Filed motion of [ use listing in "Motion" box above.]

(2)  ☐  Brief in support of motion due _____.

(3)  ☐  Answer brief to motion due_____. Reply to answer brief due_____.

(4)  ☐  Ruling/Hearing on _____ set for _____ at _____.

(5)  ☐  Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6)  ☐  Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7)  ☐  Trial[set for/re-set for] on _____ at _____.

(8)  ☐  [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9)  ☐  This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
         ☐ FRCP4(m)   ☐ Local Rule 41.1   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).

(10)  ■  [Other docket entry]   Defendant's agreed motion for short extension of time to file reply is granted. Defendant's reply in support of his §2255 motion is extended to February 28, 2003.  NO FURTHER EXTENSIONS.

Suzanne B. Conlon

(11)  ☐  [For further detail see order (on reverse side of/attached to) the original minute order.]

| | | | | Document Number |
|---|---|---|---|---|
| | No notices required, advised in open court. | | | |
| | No notices required. | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | FEB 12 2003 | 13 |
| | Notified counsel by telephone. | | date docketed | |
| | Docketing to mail notices. | | | |
| | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | 2/11/2003 | |
| CB | courtroom deputy's initials | | date mailed notice | |
| | | Date/time received in central Clerk's Office | CB mailing deputy initials | |

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DOCKETED

FEB 1 8 2003

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 02 C 6998 **FILED** |
| v. | ) | Honorable Suzanne B. Conlon |
| | ) | |
| DARRYL JOHNSON | ) | FEB 1 4 2003 |

**FILED**

FEB 1 4 2003

*WC*

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

<u>NOTICE OF FILING</u>

TO: Terrence Campbell, Esq.          Lorinda Meier Youngcourt
    Cotsirilos, Tighe & Streicker, Ltd.   P.O. Box 206
    33 North Dearborn Street          Huron, Indiana 47437-0206
    Suite 600
    Chicago, Illinois 60602

PLEASE TAKE NOTICE that on Friday, February 14, 2003, the undersigned filed with the Clerk of this Court, **GOVERNMENT'S RESPONSE TO THE MOTION FOR LEAVE TO CONDUCT DISCOVERY,** service of which is being made upon you.

Respectfully submitted,

PATRICK J. FITZGERALD
United States Attorney

By: _____
    DAVID E. BINDI
    Assistant United States Attorney
    219 S. Dearborn St., Room 500
    Chicago, Illinois 60604
    (312) 886-7643

<u>CERTIFICATE OF SERVICE</u>

I, David E. Bindi, an Assistant United States Attorney, state that on the 14th day of February 2003, I caused a copy of Notice of Filing and Government's Response to the Motion for Leave to Conduct Discovery, to be mailed to the above named individuals.

_____
DAVID E. BINDI
Assistant United States Attorney



DOCKETED

FEB 1 8 2003

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

FILED

FEB 1 4 2003

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

UNITED STATES OF AMERICA          )
                                  )
vs.                               )   No.  02 C 6998
                                  )   Judge Suzanne B. Conlon
DARRYL JOHNSON                    )

### GOVERNMENT'S RESPONSE TO THE MOTION
### FOR LEAVE TO CONDUCT DISCOVERY

The UNITED STATES OF AMERICA, by its attorney, PATRICK J. FITZGERALD, United States Attorney for the Northern District of Illinois, responds to defendant's motion for leave to conduct discovery as follows:

Rule 6(a) of the Rules Governing Section 2255 Proceedings authorizes this Court, in the exercise of its discretion, to permit discovery to proceed under the Federal Rules of Criminal or Civil Procedure, if defendant shows "good cause" for his request, "but not otherwise." "Good cause" is established only if defendant shows that the information sought is essential to an adequate factual development of the claims raised. *Bracy v. Gramley*, 520 U.S. 899, 908-909 (1997); *Henderson v. Walls*, 296 F.3d 541, 553-554 (7th Cir. 2002). The government objects to defendant's motion, because he has not shown good cause.

### 1.    Ineffective Assistance and *Brady* Claims

Defendant seeks information from the Bureau of Prisons (BOP), the Department of Justice (DOJ) and any and all U.S. Attorney's offices that he contends is essential to a full development of the prejudice and materiality components of his ineffective assistance and *Brady* claims. Motion at 7-10. It would be inappropriate for this Court to order such

discovery prior to finding that defendant has established the deficient performance component of the ineffective assistance claim, and prior to finding that the prosecution team suppressed any evidence. Even then, none of the information sought is essential to development of defendant's claims.

In order for any of the information sought by defendant to be relevant to the prejudice and materiality components of his claims, he would have to allege that trial counsel performed deficiently in failing to demand and acquire the information and present it to the jury, and that the information was suppressed by the prosecution team, and therefore kept from the jury. If the information was not something that was going to be presented to the jury, it has no bearing on whether defendant was prejudiced, and it is certainly not material in the *Brady* sense. Defendant does not allege that trial counsels' performance was constitutionally deficient for failure to obtain all that he now seeks, and any such contention would be frivolous. It is exceedingly doubtful that this Court would have delayed the sentencing hearing for the time it would have taken to amass the information defendant now seeks. Defendant has not even limited his request to information in existence at the time of the sentencing hearing, in November 1997.

As argued in the government's response to the § 2255 motion, the theory of defense on the issue of future dangerousness was that the BOP had at its disposal facilities designed to house inmates in highly restrictive conditions, drastically limiting their ability to communicate with anyone, and that if defendant was really as dangerous as the prosecutors

2

asserted, defendant could, theoretically, be housed under such conditions for life.   The gist of Warden Vanyur's rebuttal testimony was that, as a practical matter, sending defendant from the sentencing court straight to a control unit such as the one at ADX Florence was improbable, that control units are not intended for permanent placement, and that, in any event, no prison can be made 100% secure.   The argument in response to this rebuttal testimony was that it was possible to secure defendant in solitary confinement for life. Defendant has not alleged that the defense strategy was itself an incompetent strategy, but only that counsel failed to discover useful information – the existence of 18 U.S.C. § 3582(d), the SAMs regulations, and the *Felipe* case – that could have bolstered the defense. § 2255 Motion at 4-7.   An essential element of defendant's claim that counsel performed deficiently is that § 3582(d), the SAMs regulations, and the *Felipe* case were readily discoverable.   *Id.* at 5, ¶ f.   The information he now seeks is not material that reasonably competent counsel could have gathered at the time of the sentencing hearing, and it was not information possessed by the prosecution team.   It is therefore not relevant to defendant's claims, and he has not shown good cause to conduct this discovery.

It should also be noted that the Seventh Circuit commented that this entire line of defense to the future dangerousness aggravating factor should not have been allowed in the first place, because it is not relevant to a mitigating factor. *United States v. Johnson*, 223 F.3d 665, 674-675 (7th Cir. 2000).

In paragraphs 12-15, defendant seeks information specifically related to Warden

3

Vanyur. Paragraph 12 seeks information inconsistent with Vanyur's testimony in this case. The U.S. Attorney's office is not aware of any such information, other than what is already known to defendant. Paragraphs 13 and 14 seek documents or information related to a description or assessment of Vanyur's testimony, and decisions whether to call Vanyur as a witness in a capital case after defendant's. This is not relevant to any issue raised in this case, and internal DOJ memoranda not routinely disclosed constitute work product, and executive deliberative materials, and are not discoverable. *FTC v. Grolier, Inc.*, 462 U.S. 19, 26-28 (1983); *King v. IRS*, 684 F.2d 517, 519 (7th Cir. 1982). Paragraph 15 seeks information regarding testimony given by Vanyur in any case, other than defendant's, concerning allowable conditions of confinement at any BOP facility. Any such testimony post-dating defendant's trial is irrelevant, because it could not have been presented to the jury. As for anything predating defendant's trial, that information is accessible to defendant by contacting Vanyur.

## 2.    Discovery Related to *Ring v. Arizona*

Defendant seeks any briefs, memos or opinion papers generated by DOJ pertaining to *Ring v. Arizona*, 122 S.Ct.2482 (2002), the applicability of the Rules of Evidence at capital sentencing hearings in the wake of *Ring*, and information about DOJ practices in capital cases following *Ring*. This should be denied, since *Ring* announced a new procedural rule, and does not apply to defendant under the doctrine of *Teague v. Lane*, 489 U.S. 288 (1989). Also, good cause is not shown, because defendant has not demonstrated

4

the relevance of the information he seeks to the development of any of his claims. Further, work product is not discoverable.

### 3.  Jury Questionnaires

Defendant seeks access to the jury questionnaires. This should be denied, because defendant's only claim regarding the jury is that jurors may have been exposed to extra-record information during the penalty phase of the trial. The questionnaires were filled out before the trial started, so there is not going to be anything in them to support defendant's claim.

### 4.  Mental Retardation

The U.S. Attorney's office is not in possession of any information suggesting defendant is mentally retarded, other than what was presented at the sentencing hearing, and has not consulted or interviewed anyone regarding defendant's mental state. We are unaware whether defendant has undergone any mental health evaluation or treatment while in federal custody. Any such information is already known to defendant.

Defendant also seeks disclosure of any briefs, memos or opinion papers generated by the government regarding what constitutes mental retardation for purposes of applying *Atkins v. Virginia*, 122 S.Ct. 2242 (2002), and any briefs, memos or opinion papers about how to go about proving mental retardation. This should be denied. Work product is not discoverable, and what government employees have written about *Atkins* is not essential to defendant for purposes of developing his claim, or relevant to the disposition of the claim.

Defendant also seeks resources for further evaluation. The government takes no position on how this Court should exercise its discretion regarding this request.

## 5. Race Discrimination

Defendant seeks briefs, memos, opinion papers, analyses, policy statements, and case information regarding federal death penalty cases, and any and all information regarding the decision to seek the death penalty in his case. This should be denied. Work product is not discoverable, and statistical analysis of the range of death penalty cases will not support this claim. Defendant must show discriminatory intent in his case. *McClesky v. Kemp*, 481 U.S. 279, 297 (1987). However, there is a presumption that public officials have properly discharged their official duties, and discovery under Rule 6(a) is not warranted in the absence of any evidence to rebut the presumption. *Bracy*, 520 U.S. at 908-909. Allegations, standing alone, with no preliminary showing that further discovery may lead to evidence of a constitutional violation, fail to satisfy the "good cause" requirement of Rule 6(a). *Henderson*, 296 F.3d at 553-554. The bar to obtaining discovery into the process of prosecutorial decision-making is high. *United States v. Armstrong*, 517 U.S.456, 464-471 (1996).

## 6. Grand Jury Transcripts

Defendant seeks disclosure of transcripts of all the proceedings before the grand jury that returned the indictment in his case, "for the purpose of determining whether the grand jury refused to indict him on any of the facts supporting the threshold culpability factors or

6

statutory aggravating factors alleged by the government in its Notice of Intent to Seek the Death Penalty." Motion at 15. Grand jury proceedings are secret, Fed.R.Crim.P. 6(e)(2), and disclosure of matters occurring before a grand jury is warranted only upon a showing of "compelling necessity." *United States v. Proctor & Gamble*, 356 U.S. 677, 682 (1958). There is no compelling necessity, because defendant has not shown that what he is looking for may be found in the grand jury transcripts. The indictment is what it is, and the grand jury indicted defendant on four counts that qualified him for the death penalty. The trial jury, but not the grand jury, was required to find the existence of at least one statutory aggravating factor. 18 U.S.C. § 3593(e).

### 7. Depositions and Further Discovery

The government's position is that defendant has failed to show good cause to initiate discovery under Rule 6(a), and that depositions and additional discovery are not warranted.

For the foregoing reasons, the government respectfully requests that this Court deny

defendant's motion for leave to conduct discovery.

Respectfully Submitted,

PATRICK J. FITZGERALD,
United States Attorney

By:   DAVID E. BINDI
Assistant U.S. Attorney
219 South Dearborn Street
5th Floor
Chicago, Illinois 60604
(312) 886-7643

8

DOCKETED

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MAR 0 4 2003

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff - Appellee - Respondent, | ) No. 02 C 6998 |
| | ) |
| vs. | ) Hon. Suzanne B. Conlon |
| | ) |
| DARRYL JOHNSON, | ) |
| | ) Death Sentence Imposed |
| Defendant - Appellant - Petitioner. | ) |

**NOTICE OF MOTION**

TO:   David Bindi
      Assistant United States Attorney
      219 South Dearborn Street, Suite 500
      Chicago, Illinois  60604

PLEASE TAKE NOTICE that on Thursday, February 27, 2003, at 9:00 a.m., we shall appear before the Honorable Suzanne B. Conlon, United States District Judge, in the courtroom usually occupied by her at 219 South Dearborn Street, Chicago, Illinois, and present the Agreed Motion for Short Extension of Time to File Reply, a copy of which accompanies this Notice and is hereby served upon you.  You are invited to attend.

Respectfully submitted,

Attorney for defendant

Terence H. Campbell
Cotsirilos, Tighe & Streicker, Ltd.
33 North Dearborn Street, Suite 600
Chicago, Illinois  60602
(312) 263-0345

**CERTIFICATE OF SERVICE**

Terence H. Campbell, an attorney, hereby certifies that he caused a copy of present the

Agreed Motion for Short Extension of Time to File Reply, to be served upon David Bindi, Assistant

United States Attorney, 219 South Dearborn Street, Suite 500, Chicago, Illinois 60604, by facsimile

delivery, on this 24th day of February, 2003.

Terence H. Campbell

DOCKETED

MAR 0 4 2003

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA,          )
                                   )
        Plaintiff - Appellee - Respondent,   )      No. 02 C 6998
                                   )
vs.                                )      Hon. Suzanne B. Conlon
                                   )
DARRYL JOHNSON,                    )
                                   )      Death Sentence Imposed
        Defendant - Appellant - Petitioner.   )

**AGREED MOTION FOR SHORT EXTENSION OF TIME TO FILE REPLY**

Defendant Darryl Johnson, by his attorney, Terence H. Campbell of Cotsirilos, Tighe &

Streicker, respectfully requests leave of this Court for a short extension of time to file Defendant's

Reply brief in support of his Initial Memorandum in Support of his §2255 motion. In support of this

motion, Defendant states as follows:

1.      A family member of undersigned counsel's passed away this weekend, and counsel

will be out of town attending the funeral services and related family gatherings for the next couple

days, and therefore unable to work on the reply as he had intended.

2.      Currently, Defendant's reply brief on his initial §2255 filings is due on Friday

February 28, 2003. Because of the events described in the preceding paragraph, undersigned counsel

respectfully requests that he be granted one additional business day -- *i.e.* until Monday March 3,

2003 -- to file the reply brief.

3.      Undersigned counsel has spoken with Assistant U.S. Attorney David Bindi who is

handling this matter for the government, and the government has no objection to this one-day

extension. This one-day extension will not prejudice any party and is not requested for any improper

purpose.

WHEREFORE, Johnson respectfully requests this Court to grant an extension of time, until

March 3, 2003, for Defendant to file his Reply in support of his Initial Memorandum in Support of

his §2255 motion.

Respectfully submitted,

_____
An attorney for Defendant Darryl Johnson

Terence H. Campbell
Cotsirilos, Tighe & Streicker, Ltd.
33 North Dearborn Street, Suite 600
Chicago, Illinois  60602
(312) 263-0345

Lorinda Meier Youngcourt
Post Office Box 206
Huron, Indiana  47437-0206
(812)849-9852

2

Minute Order Form (06/97)

## United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Suzanne B. Conlon | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 6998 | **DATE** | 2/27/2003 |
| **CASE TITLE** | UNITED STATES OF AMERICA vs. DARRYL JOHNSON | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ■ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to] ☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]  Defendant's agreed motion for extension of time to file reply is granted. Defendant's reply in support of his §2255 motion is extended to March 3, 2003. FINAL EXTENSION.

*Suzanne B. Conlon*

(11) ☐ [For further detail see order (on reverse side of/attached to) the original minute order.]

| | | | |
|---|---|---|---|
| | No notices required, advised in open court. | | **Document Number** |
| | No notices required. | number of notices | |
| ✓ | Notices mailed by judge's staff. | MAR 04 2003 | |
| | Notified counsel by telephone. | date docketed | 16 |
| | Docketing to mail notices. | docketing deputy initials | |
| | Mail AO 450 form. | | |
| | Copy to judge/magistrate judge. | 2/27/2003 | |
| | | date mailed notice | |
| CB | courtroom deputy's initials | CB | |
| | Date/time received in central Clerk's Office | mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

**FILED**

MAR X 3 2003

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

UNITED STATES OF AMERICA,                    )
                                             )
    Plaintiff - Appellee - Respondent,   )     No. 02 C 6998
                                             )
vs.                                          )     Hon. Suzanne B. Conlon
                                             )
DARRYL JOHNSON,                              )
                                             )     Death Sentence Imposed
    Defendant - Appellant - Petitioner.  )

**DOCKETED**

MAR 0 7 2003

## NOTICE OF MOTION

TO:    David Bindi
       Assistant United States Attorney
       219 South Dearborn Street, Suite 500
       Chicago, Illinois  60604

    PLEASE TAKE NOTICE that on Thursday, March 6, 2003,  at 9:00 a.m., we shall appear before the Honorable Suzanne B. Conlon, United States District Judge, in the courtroom usually occupied by her at 219 South Dearborn Street, Chicago, Illinois, and present Defendant's Motion For Leave To File Oversized Brief, a copy of which accompanies this Notice and is hereby served upon you.

                                Respectfully submitted,

                                Attorney for defendant

                                Terence H. Campbell
                                Cotsirilos, Tighe & Streicker, Ltd.
                                33 North Dearborn Street, Suite 600
                                Chicago, Illinois  60602
                                (312) 263-0345

17

## CERTIFICATE OF SERVICE

Terence H. Campbell, an attorney, hereby certifies that he caused a copy of Defendant's

Motion For Leave To File Oversized Brief to be served upon David Bindi, Assistant United States

Attorney, 219 South Dearborn Street, Suite 500, Chicago, Illinois 60604, by messenger delivery,

on this 3rd day of March, 2003.

Terence H. Campbell

FILED

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MAR X 8 2003

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

UNITED STATES OF AMERICA,  )
                           )
    Plaintiff - Appellee - Respondent,  )   No. 02 C 6998
                           )
vs.                        )   Hon. Suzanne B. Conlon
                           )
DARRYL JOHNSON,            )
                           )   Death Sentence Imposed
    Defendant - Appellant - Petitioner.  )

DOCKETED

MAR 0 7 2003

## DEFENDANT'S MOTION FOR LEAVE TO FILE OVERSIZED BRIEF

Defendant Darryl Johnson, by his attorneys, Terence H. Campbell and Lorinda Meier Youngcourt, respectfully requests leave of this Court to file an oversized reply brief in support of his motion for relief under §2255. In support of this motion, Johnson states as follows:

1.     Darryl Johnson was convicted of a drug conspiracy and two capital murders and sentenced to death on the murder convictions. The trial in this case took place in the Fall of 1997. Johnson's convictions and sentences were affirmed by the Seventh Circuit Court of Appeals on August 3, 2000. *United States v. Johnson*, 223 F.3d 665 (7th Cir. 2000). On October 1, 2001, Johnson's petition for writ of *certiorari* was denied. *Johnson v. United States*, ___ U.S. ___, 112 S.Ct. 71 (2001). Johnson is currently housed at the United States Penitentiary in Terre Haute, Indiana.

2.     Johnson's filed his §2255 motion and an Initial Memorandum in Support on September 30, 2002. Due to the multiple and complex nature of his claims for relief, and with leave of Court, Johnson's Initial Memorandum was 77 pages long.

3.     The government's response brief was 46 pages long, and addressed several of the substantive issues briefed by Johnson in his Initial Memorandum.

17

4.     As was the case with the opening brief, Petitioner's reply brief requires substantial discussion of the factual background, and involves a detailed analysis of the law.  As this Court noted long ago, "it would be an understatement to say this case is complex.  It is definitely a complex case involving many issues." (Transcript of July 27, 1998 at 117).

5.     In making this request, we note that the Supreme Court has recognized that, "The penalty of death differs from all other forms of criminal punishment, not in degree but in kind.  It is unique in its total irrevocability." *Furman v. Georgia*, 408 U.S. 238, 306 (1972) (Stewart, J., concurring).  This "qualitative difference between death and other penalties calls for a greater degree of reliability when the death sentence is imposed." *Lockett v. Ohio,* 438 U.S. 586, 604 (1978).  Because of the need for "heightened reliability" in the imposition of death sentences, meaningful appellate review is a *sine qua non* of any constitutional capital sentencing scheme (*e.g., Gregg v. Georgia*, 428 U.S. 153, 206 (1976) (opinion of Stewart, Powell, and Stevens, JJ.)), and a court's "duty to search for constitutional error with painstaking care is never more exacting than it is in a capital case." *Burger v. Kemp*, 483 U.S. 776, 785 (1987).

6.     Petitioner's Reply brief, which is being filed contemporaneously with this motion, is 40 pages in length -- roughly half the length of his Initial Memorandum.  This length is necessary to adequately brief the many complex capital issues arising out of the lengthy trial, sentencing and direct appellate proceedings involved in this case.

WHEREFORE, Johnson respectfully requests leave to file an oversized Reply brief in support of his motion under §2255.

2

Respectfully submitted,

An attorney for Defendant Darryl Johnson

Terence H. Campbell
Cotsirilos, Tighe & Streicker, Ltd.
33 North Dearborn Street, Suite 600
Chicago, Illinois 60602
(312) 263-0345

Lorinda Meier Youngcourt
Post Office Box 206
Huron, IN 47437-0206
(812)849-9852

3

Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Suzanne B. Conlon | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 6998 (96 CR 379-1) DATE | | 3/6/2003 |
| **CASE TITLE** | UNITED STATES OF AMERICA vs. DARRYL JOHNSON | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ■ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2). *reply*

(10) ■ [Other docket entry] Defendant's motion for leave to file oversized brief in support of his §2255 motion is granted.

*Suzanne B. Conlon*

(11) ☐ [For further detail see order (on reverse side of/attached to) the original minute order.]

| | No notices required, advised in open court. | | | | Document Number |
|---|---|---|---|---|---|
| | No notices required. | | | number of notices | |
| | Notices mailed by judge's staff. | | | MAR 07 2003 | |
| | Notified counsel by telephone. | | | date docketed | |
| ✓ | Docketing to mail notices. | | | | 18 |
| | Mail AO 450 form. | | U.S. DISTRICT COURT CLERK | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | | | |
| CB | courtroom deputy's initials | 03 MAR -6 PM 2:30 | | date mailed notice | |
| | | Date/time received in central Clerk's Office | | mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff - Appellee - Respondent, | ) | No. 02 C 6998 |
| | ) | |
| | ) | Hon. Suzanne B. Conlon |
| vs. | ) | |
| | ) | |
| DARRYL JOHNSON, | ) | |
| | ) | Death Sentence Imposed MAR 0 7 2003 |
| Defendant - Appellant - Petitioner. | ) | |

**NOTICE OF FILING**

PLEASE TAKE NOTICE that on Monday, March 3, 2003, we filed with the Clerk of the

United States District Court for the Northern District of Illinois, Eastern Division, Petitioner's initial

Reply in support of his Motion to Vacate Conviction and Sentence And For New Trial Pursuant to

28 U.S.C. §2255, a copy of which accompanies this Notice.

Respectfully submitted,

Attorney for defendant

Terence H. Campbell
Cotsirilos, Tighe & Streicker, Ltd.
33 North Dearborn Street, Suite 600
Chicago, Illinois 60602
(312) 263-0345

## <u>CERTIFICATE OF SERVICE</u>

Terence H. Campbell, an attorney, hereby certifies that he caused a copy of Petitioner's

Initial Reply in support of his Motion to Vacate Conviction and Sentence And For New Trial

Pursuant to 28 U.S.C. §2255. to be served upon David Bindi, Assistant U.S. Attorney, 219 South

Dearborn Street, Suite 500, Chicago, Illinois 60604, by messenger delivery, on this 3rd day of

March, 2003.

Terence H. Campbell

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

FILED
MAR X 8 2003
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff - Appellee - Respondent, | ) | No. 02 C 6998 |
| | ) | |
| vs. | ) | Hon. Suzanne B. Conlon |
| | ) | |
| DARRYL JOHNSON, | ) | |
| | ) | Death Sentence Imposed |
| Defendant - Appellant - Petitioner. | ) | |

DOCKETED
MAR 0 7 2003

## DARRYL LAMONT JOHNSON'S INITIAL REPLY IN SUPPORT OF HIS MOTION TO VACATE CONVICTION AND SENTENCE AND FOR NEW TRIAL PURSUANT TO 28 U.S.C. §2255

Respectfully submitted by:

Terence H. Campbell
Cotsirilos, Tighe & Streicker, Ltd.
33 North Dearborn Street, Suite 600
Chicago, Illinois 60602
(312) 263-0345

Counsel for Darryl Lamont Johnson

Lorinda Meier Youngcourt
Post Office Box 206
Huron, IN 47437-0206
(812) 849-9852

Counsel for Darryl Lamont Johnson



**TABLE OF CONTENTS**

**Page**

I.   DEFENSE COUNSEL RENDERED INEFFECTIVE ASSISTANCE .............1

  A.   There Was No Procedural Default of Petitioner's Ineffective
       Assistance Claim .......................................2

  B.   Petitioner Has Established That His Counsel Rendered Ineffective
       Assistance, And That Their Ineffectiveness Was Prejudicial to
       Him; Accordingly, He Must Be Granted A New Penalty-Phase Trial ........6

       1.   Petitioner Has Accurately Described Warden
            Vanyur's Testimony ......................................6

       2.   Defense Counsel Was Clearly Ineffective In Failing to
            Discover and Present the Governing Law, Relevant
            BOP Regulations, and Factual Precedents ......................10

       3.   Warden Vanyur's Testimony Was Admittedly "Incomplete"
            and Misleading, And Defense Counsel Rendered
            Ineffective Assistance By Failing to Expose The Multiple
            Material Flaws In That Testimony ...........................13

       4.   The Government Admits Several Key Facts Supporting
            Petitioner's Ineffective Assistance of Counsel Claim ..............15

       5.   Defense Counsel Was Ineffective In Failing To Ask For
            Or Obtain Discovery and/or A Continuance In Order To
            Research Issues Pertaining to Warden Vanyur's Testimony .........17

       6.   The Government Fails to Even Address Petitioner's Claim
            Based On Their Failure To Investigate And Research .............20

  C.   It Is Now Clear That The BOP Routinely Imposes The Strict
       Conditions Of Confinement On Inmates For As Long As
       Is Deemed Necessary .......................................21

  D.   Conclusion Regarding Petitioner's Ineffective Assistance Claim ...........23

II   PETITIONER IS ENTITLED TO A NEW SENTENCING HEARING
     UNDER *BRADY* ..............................................24

  A.   There Is No Procedural Default of Petitioner's *Brady* Claim ..............24

**Page**

B.   The Government's Denial Of Warden Vanyur's Role With
The Government In Johnson's Case Is Without Merit . . . . . . . . . . . . . . . . . . . 26

     1.   The Government Is Responsible For *Brady* Evidence
Known to Its Expert Witness From the BOP, Warden
Vanyur, Who Testified For the Prosecution . . . . . . . . . . . . . . . . . . 26

     2.   The Suppressed Evidence Was Material . . . . . . . . . . . . . . . . . . . . . 29

III.   JOHNSON'S DEATH SENTENCE VIOLATES THE 5TH AMENDMENT
DUE PROCESS CLAUSE AND THE 6TH AMENDMENT GUARANTEES
OF CONFRONTATION AND CROSS-EXAMINATION BECAUSE
18 U.S.C. §3593 ALLOWED ADMISSION AND CONSIDERATION BY
THE JURY OF HEARSAY INFORMATION AT SENTENCING . . . . . . . . . . . . . . 33

A.   The *Ring* Claim is Not Procedurally Defaulted . . . . . . . . . . . . . . . . . . . . . 34

     1.   Cause . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

     2.   Prejudice . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

B.   *Teague* Does Not Bar Application of *Ring* to Johnson's Case . . . . . . . . . . . . 35

C.   *Williams* Need Not be Overturned in Order For Johnson to Prevail . . . . . . . . 37

D.   Johnson's Death Sentence Should Be Vacated . . . . . . . . . . . . . . . . . . . . . . 39

IV.   REPLY TO "ISSUES NOT BRIEFED" SECTION OF
GOVERNMENT'S RESPONSE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

A.   Ineffective Assistance of Counsel ~ Failure to Call
Certain Witnesses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

B.   Mental Retardation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

C.   Race Disparity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

D.   Extra-Judicial Information Before the Jury . . . . . . . . . . . . . . . . . . . . . . . . . 40

V.   CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

## TABLE OF AUTHORITIES

**Page**

CASES:

*Apprendi v. New Jersey*, 530 U.S. 466 (2000) ................................. 34, 35, 36

*Astor Chauff. Lim. V. Runnfeldt Inv.*, 910 F.2d 1540 (7th Cir. 1990) .................... 16

*Atkins v. Virginia*, 122 S.Ct. 2242 (2002) ............................... 40

*Brady v. Maryland*, 373 U.S. 83 (1963) ............................... *passim*

*Bousely v. United States*, 523 U.S. 614 (1998) ........................... 34

*Brecht v. Abrahamson*, 507 U.S. 619 (1993) ........................... 33

*Brewer v. Aiken*, 935 F. 2d 850 (7th Cir. 1991) ........................... 9

*California v. Trombetta*, 467 U.S. 479 (1984) ........................... 10

*Chambers v. Mississippi*, 410 U.S. 284 (1973) ........................... 10

*Crivens v. Roth*, 172 F.3d 991 (7th Cir. 1999) ........................... 26

*Dixon v. Snyder*, 266 F.3d 693 (7th Cir. 2001) ........................... 20

*Edwards v. Aetna Life Ins. Co.*, 690 F.2d 595 (6th Cir. 1982) ........................ 16

*Emerson v. Gramley*, 91 F.3d 898 (7th Cir. 1996) ........................... 12, 20

*Galbraith v. United States*, 313 F.3d 1001 (7th Cir. 2002) ........................... 4, 5

*Gardner v. Florida*, 430 U.S. 349 (1977) ........................... 37, 38

*Guinan v. United States*, 6 F.3d 468 (7th Cir. 1993) ........................... 4

*Hill v. Lockhart*, 28 F.3d 832 (8th Cir. 1994) ........................... 10

*Kyles v. Whitley*, 514 U.S. 419 (1995) ........................... *passim*

*Lambrix v. Singletary*, 520 U.S. 518 (1997) ........................... 34

**Page**

*Lowery v. Stovall*, 92 F.3d 219 (4th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*McCleese v. United States*, 75 F.3d 1174 (7th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . 3, 4

*McClesky v. Kemp*, 481 U.S. 279 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*Murray v. Carrier*, 477 U.S. 478 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Nix v. Whiteside*, 475 U.S. 157 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Pavel v. Hollins*, 261 F.3d 210 (2nd Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Reed v. Ross*, 468 U.S. 1 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34, 35

*Ring v. Arizona*, __ U.S. __, 122 S.Ct. 2428 (2002) . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Ryan Operations v. Santiam-Midwest Lumber, Inc.*, 81 F.3d 353 (3rd Cir. 1996) . . . . . . . . . . 17

*Schneider v. Estelle*, 552 F.2d 593 (5th Cir. 1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Smith v. Murray*, 477 U.S. 527 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Strickland v. Washington*, 466 U.S. 668 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Teague v. Lane*, 489 U.S. 288 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34, 35

*United States v. Andrews*, 824 F.Supp. 1273 (N.D. Ill.1993) . . . . . . . . . . . . . . . . . . . . . 27

*United States v. Auten*, 632 F.2d 478 (5th Cir. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . 28

*United States v. Bagley*, 473 U.S. 667 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 32

*United States v. Bond*, 1 F.3d 631 (7th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 5

*United States v. Burnside*, 824 F.Supp. 1215 (N.D. Ill. 1993) . . . . . . . . . . . . . . . . . . . . 16

*United States v. Cronic*, 466 U.S. 648 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*United States v. Cuffie*, 80 F.3d 514 (D.C. Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . 32

*United States v. Davenport*, 986 F.2d 1047 (7th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . 2, 3

**Page**

*United States v. Deutsch*, 475 F.2d 55 (5th Cir. 1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*United States v. Luis Felipe*, S16-94CR395 (S.D.N.Y.) . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*United States v. Foley*, 871 F.2d 235 (1st Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*United States v. Gilliam*, 255 F.3d 428 (7th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*United States v. Anthony Jones*, Crim. Case No. WMN-96-0458 and
WMN-97-0355 (Dist. Md. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 23, 34, 35, 36

*United States v. Mejia-Mesa*, 152 F.3d 925 (9th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . 26

*United States v. O'Connor*, 64 F.3d 355 (8th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . 32

*United States v. Owens*, 54 F.3d 271 (6th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*United States v. Patterson*, 213 F.Supp.2d 900 (E.D. Ill 2002) . . . . . . . . . . . . . . . . . . . . . . . . 36

*United States v. Ray*, 238 F.3d 828 (7th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*United States v. Peter Rollack*, No. 97 CR 1293 (S.D.N.Y.) (MGC) . . . . . . . . . . . . . . . . . 22, 23

*United States v. Rosner*, 516 F.2d 269 (2nd Cir. 1975) . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*United States v. Smith*, 77 F.3d 511 (D.C. Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . 31, 32

*United States v. Taglia*, 922 F.2d 413 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4

*United States v. Torres-Ramirez*, 213 F.3d 978 (7th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . 15, 20

*United States v. Watson*, 189 F.3d 578 (7th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*United States v. Williamson*, 183 F.3d 458 (5th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . 12, 20

*United States v. Wood*, 57 F.3d 733 (9th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*United States v. Yousef*, 93 CR 180 (S.D.N.Y.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Walker v. NationsBank of Florida*, 53 F.3d 1548 (11th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . 38

**Page**

*Walton v. Arizona*, 497 U.S. 639 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35, 36

*Washington v. Smith*, 219 F.3d 620 (7th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 20

*Williams v. New York*, 337 U.S. 241 (1949) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34, 37, 38

*Williams v. Taylor*, 529 U.S. 362 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

**STATUTES AND RULES:**

18 U.S.C. §2119(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

18 U.S.C. §3582(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

18 U.S.C. §3593 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

28 U.S.C. §2255 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

28 CFR §501.3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 5, 11, 12

28 CFR §541 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**OTHER AUTHORITIES:**

*United States Department of Justice Manuel*, Title 9, §9-10.000 . . . . . . . . . . . . . . . . . . . . . . . 27

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

**FILED**

MAR 0 6 2003

UNITED STATES OF AMERICA,                     )

      Plaintiff - Appellee - Respondent,     )

vs.                                           )

DARRYL JOHNSON,                               )

      Defendant - Appellant - Petitioner.    )

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

No. 02 C 6998

Hon. Suzanne B. Conlon

Death Sentence Imposed

**DOCKETED**

MAR 0 7 2003

### PETITIONER'S INITIAL REPLY IN SUPPORT OF HIS MOTION TO VACATE CONVICTION AND SENTENCE AND FOR NEW TRIAL PURSUANT TO 28 U.S.C. §2255

Defendant Darryl Lamont Johnson, by his attorneys, Terence H. Campbell of Cotsirilos, Tighe & Streicker, and Lorinda Meier Youngcourt, respectfully submits this Initial Reply in support of his Motion to Vacate Conviction and Sentence And For New Trial Pursuant to 28 U.S.C. §2255.

## I. DEFENSE COUNSEL RENDERED INEFFECTIVE ASSISTANCE

In his Initial Memorandum in Support of his §2255 Motion, Petitioner laid out in some detail the failures and omissions of trial counsel relating to their performance at his penalty-phase trial, all of which directly impacted the central issue at Johnson's penalty phase hearing:   future dangerousness.  These failures include, *inter alia*, (1) that counsel failed to investigate and present evidence relating to the BOP's policies, practices, and regulations (including 28 CFR 501.3 and 28 CFR 541); (2) that counsel failed to research and present the controlling law regarding allowable strict conditions of confinement which could be -- and were being -- imposed on federal inmates (including 18 U.S.C. §3582(d)); (3) that counsel failed to discover the factually similar precedent of *United States v. Luis Felipe,* S16-94CR395 (S.D.N.Y.), in which the court ordered, and the BOP imposed, exactly the strict conditions of confinement which were disclaimed by Warden Vanyur;

(4) that counsel failed to request a continuance to research and investigate these matters when it was presented with the testimony of Warden Vanyur as a government rebuttal expert; (5) that counsel failed even to ask for or obtain production of materials relating to Vanyur's testimony which could have been used -- and effectively so -- to impeach Vanyur; and (6) that because of their various failures and omissions, counsel left the testimony of Warden Vanyur utterly unchallenged in any meaningful way – testimony which the government now concedes was "incomplete" and "may have left the jury with a mistaken impression" as to the BOP's legal authority and actual practices. *See* Govt. Opp. to *cert.* at 14, 20, 21, 28-29 (attached as Ex. A to Initial Memo). Johnson cited extensive caselaw in support of his claim that these failures – both alone and, perhaps more importantly, in concert -- constitute ineffective assistance under *Strickland v. Washington*, 466 U.S. 668 (1984) and its progeny. *See* Initial Memo at 1-47. As set forth herein, the government's retort to this claim is both superficial and wholly without merit.

## A. There Was No Procedural Default of Petitioner's Ineffective Assistance Claim

The government's first response to Johnson's claim of ineffective assistance is not one on the merits, but one which, quite tellingly, seeks to avoid the merits altogether. Thus, the government first claims that Johnson's ineffective assistance claim is somehow procedurally barred because it was not raised on direct appeal. Govt. Resp. at 8-9. The government's argument is an absolute non-starter.

First, the Seventh Circuit has repeatedly made clear that claims of ineffective assistance of counsel are properly brought for the first time in a §2255 motion. *E.g., United States v. Bond*, 1 F.3d 631, 634-36 (7th Cir. 1993); *United States v. Davenport*, 986 F.2d 1047, 1050 (7th Cir. 1993); *United States v. Taglia*, 922 F.2d 413 (1991). As the Seventh Circuit stated in *Bond*, "raising the

2

[ineffective assistance of counsel] issue on direct appeal presents its own perils because the argument must rest solely on the trial court record, which often offers little insight into counsel's decision-making process." 1 F.3d at 635 (citing cases).

> Thus, as we observed in *United States v. Davenport*, 986 F.2d 1047, 1050 (7th Cir. 1993), "a defendant who presents an ineffective-assistance claim for the first time on direct appeal has little to gain and everything to lose." Ineffective assistance claims almost always fail on direct appeal because we grant every indulgence "to the possibility that a seeming lapse or error by defense counsel was in fact a tactical move, flawed only in hindsight." In order to overcome this presumption of effective assistance, a criminal defendant often must supplement the record with extrinsic evidence that illuminates the attorney's errors. ... *For that reason, a defendant who must supplement the trial record to support his ineffectiveness claim "will be well advised to wait till the postconviction stage <u>and will be safe in doing so</u>."*

*Bond*, 1 F.3d at 635 (emphasis added; internal citations omitted).

Even the cases cited by the government completely undermine the government's claim of procedural default in response to Johnson's claim. In *McCleese v. United States*, the Court stated that "[t]his circuit, as well as many of our sister circuits, has held that most claims of ineffective assistance of trial counsel are properly raised for the first time in a §2255 motion rather than on direct appeal." 75 F.3d 1174, 1178 (7th Cir. 1996)(collecting cases).

> [T]he justification for allowing claims of ineffective assistance of counsel to be raised for the first time in §2255 motions is that, in order to be successful, such claims generally require that the record be supplemented with 'extrinsic evidence that illuminates the attorney's errors.' [*Bond*,] 1 F.3d at 635. A §2255 proceeding offers defendant the opportunity to supplement the record with additional evidence. If we required defendants to raise all such claims on direct appeal, we would be limited to only the trial record.

*McCleese*, 75 F.3d at 1178. As the Seventh Circuit explained in *Guinan*, "*Taglia*, requires the defendant to decide at the time of briefing his direct appeal whether he wants to base a claim of

3

ineffective assistance of counsel entirely on the trial record, with no extrinsic evidence -- from possible witnesses, from the trial lawyer, from other lawyers, from whomever -- designed to show that a competent trial lawyer would have behaved differently." 6 F.3d 468, 471-72 (7th Cir. 1993), *citing Taglia, supra.*[1] Indeed, Judge Easterbrook compellingly argues in his concurring opinion in *Guinan*, "[an ineffective assistance] claim *always is preserved* for later resolution [in a §2255 motion], because new evidence is always necessary if the defendant is to have a glimmer of success." *Guinan*, 6 F.3d at 474 (J. Easterbrook concurring) (emphasis added).

The cases make clear that procedural default can only plausibly be argued -- and even then usually to no avail -- "where a defendant offers no extrinsic evidence to support his claim of ineffective assistance of counsel." *McCleese*, 75 F.3d at 1178. That, clearly, is not the case here. In large part, it is the knowledge, investigation, and thought processes of defense counsel that are at issue in Johnson's ineffective assistance claims. *None of those things are revealed in the trial record.* Thus, there was no evidence in the trial record as to what factual investigation defense counsel did or did not do. There was no evidence in the trial record as to why defense counsel did not cross examine Warden Vanyur as to the strict conditions of confinement which were being imposed on BOP inmates at the time of Darryl Johnson's penalty-phase trial. There is no evidence in the trial record as to why defense counsel did not submit a jury instruction based on 18 U.S.C. §3582(d) or 28 CFR §501.3. There is no evidence in the trial record about what legal research

---

[1] Similarly, in the other cases cited by the government, the Seventh Circuit held that the petitioner's ineffective assistance claim was, indeed, properly presented for the first time in his §2255 motion because it "involve[d] evidence outside the record." *Galbraith v. United States*, 313 F.3d 1001, 1007 (7th Cir. 2002). *See also, United States v. Gilliam*, 255 F.3d 428, 437 (7th Cir. 2001) (noting that limitation to the record on direct appeal "almost invariably dooms" ineffective assistance of counsel claims).

4

defense counsel did with respect to the allowable conditions of confinement which may be imposed under federal law. All of these are facts which must be developed through discovery and an evidentiary hearing in this proceeding – and properly so. *Bond*, 1 F.3d at 634-36; *Guinan*, 6 F.3d at 471.

Indeed, significant extrinsic evidence in support of Johnson's claim has already been provided in this §2255 petition. We have submitted and relied on the affidavit of attorney Jeffrey Urdangen, which was not in the record on direct appeal. We have submitted the admissions contained in the government's opposition to *certiorari* in Johnson's case, none of which were in the record on direct appeal (and many of which contradict the position taken by the government before this court in the post-trial proceedings and before the Seventh Circuit on appeal). We have submitted the affidavit of BOP inmate Thomas Silverstein, which was not in the record on direct appeal. We have relied on facts of the BOP's confinement of various federal prisoners, which facts were not in the record on direct appeal. And the list of extrinsic evidence offered in support of the instant motion goes on. This, alone, satisfies the cause and prejudice standard required to raise an ineffective assistance claim in his §2255 motion.[2] *See Galbraith*, 313 F.3d at 1008 (where defendant offers some extrinsic evidence in support of his ineffective assistance claim, cause and prejudice is established for not raising issue on direct appeal).

Moreover, Johnson seeks discovery in order to obtain additional extrinsic evidence which will support his claim for relief. *See,* Petitioner's Initial Motion for Discovery. For instance, Petitioner seeks information through discovery regarding any other federal prisoners who are being

---

[2] In addition, the court is certainly entitled to hear this claim because "the district court's refusal to consider the issue on procedural grounds would lead to a fundamental miscarriage of justice." *Bond*, 1 F.3d at 634, (*citing, Smith v. Murray*, 477 U.S. 527, 537-538 (1986)).

or have been held under the strict conditions of confinement that Warden Vanyur testified were impossible to implement and maintain for any extended length of time.[3]  *Id.*  Likewise, Petitioner has requested information from the government regarding the "super-cells" at BOP's ADX facility which, on information and belief, were constructed specifically to impose and administer the strict conditions of confinement that Warden Vanyur testified were not possible.  *Id.*  This is but a sampling of the discoverable, extrinsic evidence which would further establish Petitioner's claim for relief.

In sum, the government's procedural default argument has not a leg to stand on, but its primacy in the government's brief highlights the extent to which the government wishes to avoid the merits of Johnson's substantive arguments on this issue.

### B. Petitioner Has Established That His Counsel Rendered Ineffective Assistance, And That Their Ineffectiveness Was Prejudicial to Him; <u>Accordingly, He Must Be Granted A New Penalty-Phase Trial</u>

1.      <u>Petitioner Has Accurately Described Warden Vanyur's Testimony</u>.

The government claims that Petitioner "repeatedly mischaracteriz[es] ... [Warden] Vanyur's testimony as having informed the jury that it was not possible, under BOP policy and regulations, to house a defendant for an extended period of time under restrictive conditions of confinement that

---

[3] Johnson is now aware of several additional cases in which the BOP – *an agency of the Department of Justice which prosecuted this case* – has housed, and continues to house, certain prisoners under the type of strict conditions of confinement that Warden Vanyur testified were impossible.  Indeed, some of those prisoners, on information and belief, have been housed at ADX Florence since its inception – another fact which casts grave doubt on the reliability of Warden Vanyur's testimony since he was the Assistant Warden at ADX Florence for some time in the mid-1990s.  For all these reasons, it is absolutely imperative that Johnson be afforded the opportunity to depose Warden Vanyur pursuant to Habeas Rule 6 to create a record of the facts in this matter.  Indeed, it appears that the government has no objection to that since it offers in its response to our discovery requests that the defense should feel free to contact Warden Vanyur.  *See*, Govt Resp. to Discovery Mot. at 4.

6

would cut off his ability to communicate." Govt. Resp. at 15. Because the government has accused

us of mischaracterizing some of Vanyur's testimony, we will quote some significant portions of his

testimony verbatim.

Warden Vanyur informed the jury unambiguously that the BOP cannot hold any prisoner

*indefinitely* in segregation without access to telephone or correspondence privileges. According to

Vanyur, segregated detention–which is carried out in special housing units–is only available as a

*temporary* option:

> Every prison has what is called a special housing unit, including my prison. It's
> a jail within a prison. And inmates can be in that jail within a prison for two
> reasons: they are either in disciplinary segregation, and that means they
> committed an infraction inside the prison, they've gone through a discipline
> hearing officer and they've received so many days of segregation. If you want
> to use the Hollywood term "the hole," they go into the hole for thirty days,
> whatever it may be. So they are at disciplinary status for a temporary period.

> The other status * * * is what is called administrative detention. And we place
> inmates temporarily into this jail within a prison, whether they are pending an
> investigation of a charge, whether they are pending a transfer or we think they
> need to be reclassified to a higher level, we'll lock them up in this temporary
> holding facility inside the prison until we sort out the investigation of a transfer.

> But in either case, administrative detention or administrative segregation, those
> are both temporary holding patterns, those are not permanent statuses for
> inmates.

Tr. 2482-2483.

To drive home the point that an inmate cannot be housed indefinitely under these types of

strict conditions of confinement, the prosecutor asked Vanyur why "isn't it an option for you simply

to place the defendant in administrative detention or segregation for the rest of his life?" Tr. 2483.

Warden Vanyur's responded unequivocally about what the BOP could not do:

> When you are in this special housing unit, you don't have the same access as the
> rest of the inmate population to programs, educational opportunities, and so

7

> forth. There is definitely a degree of deprivation inside there. *And so it is not permissible, by the Bureau of Prisons policy, to keep an inmate in that status indefinitely.*

Tr. 2483 (emphasis added).

Warden Vanyur testified that these same rules apply to the Control Unit at ADX Florence, where "[i]nmates are never placed * * * on a permanent status." Tr. 2485. Vanyur then described the progression of an inmate through the non-control-unit facilities at ADX Florence and explained that even an inmate at ADX Florence would ultimately have "a lot of contact with inmates" and "frequent and constant contact with staff unrestrained." Tr. 2489-90.

This testimony made it clear that segregation was only a temporary option and that, regardless of initial placement, Johnson (and any other inmate) eventually would have to be housed in an open-population environment. With respect to the conditions that pertain in an open-population prison, Vanyur testified as follows:

> [I]n open population penitentiary, you have constant contact, unrestrained with other staff and inmates. You have a job that you are assigned to, whether it's in a factory or food service; you are out working typically during the day; you have education programs and access to the libraries and so forth; you are out and about in large recreation areas; you have movement unrestrained to and from the dining hall; there is virtually unlimited access to telephones and a great deal of open visiting contact.

Tr. 2472.

When the prosecutor asked Warden Vanyur to further describe the phone privileges of a person in a penitentiary, Vanyur testified that:

> [T]he inmate would have a great deal of open contact visiting with his family, probably in excess of twelve visits a month. He would have as many phone calls as he could pay for or get someone to accept them as collect charges, so he would have virtually unlimited phone access if he had the time to make the phone calls. And he would have unlimited correspondence privileges.

8

Tr. 2477. Indeed, Warden Vanyur testified that even in the Control Unit at ADX Florence, "you have one fifteen-minute phone call per month" as well as "five visits per month" and "virtually unlimited correspondence with the outside world." Tr. 2485. According to Warden Vanyur, the *only* way to restrict these privileges is to catch an inmate in the act of violating the rules regarding these privileges:

> The only time we would limit his telephone access or his visiting privileges is if the inmate actually tried to violate the rules in the process of a visit or in the process of a phone call. In other words, if we picked up, through phone monitoring, that he was trying to make a drug deal over the phone, we would give that inmate an incident report and begin to restrict his telephone privileges.

Tr. 2478.

It is difficult to understand how the government can continue to claim that Vanyur's testimony was entirely accurate -- particularly in light of the admissions made in its Opposition to Johnson's petition for *certiorari*, (as detailed in Johnson's Initial Memorandum). The facts and law are now undisputed: *there are* inmates in the BOP who are being housed *indefinitely* under the *very conditions* that Warden Vanyur testified are unattainable (*e.g.* Luis Felipe, Ramzi Yousef, Anthony Jones, Peter Rollack, Clayton Fountain, and Thomas Silverstein (*see* discussion below)); those strict conditions of confinement are *expressly allowed under the BOP regulations* (*e.g.*, 28 CFR 501.3) and the Untied States Code (18 U.S.C. §3582(d)); and the imposition of these strict conditions of confinement can be renewed for *as long as the BOP deems it necessary.* 28 CFR 501.3; 66 F.R. 55062-66 (SAMs may be imposed for up to one year, and for unlimited one-year extensions if deemed appropriate). Defense counsel's failure to bring out these factual and legal matters was ineffective in the extreme. *See generally, Brewer v. Aiken*, 935 F.2d 850 (7th Cir. 1991) (the penalty phase of a capital trial is often the stage where counsel can do his client the most good); *Hill v.*

9

*Lockhart*, 28 F.3d 832 (8th Cir. 1994) (ordering new penalty-phase hearing based on inadequate presentation by counsel at death penalty sentencing hearing).

### 2. Defense Counsel Was Clearly Ineffective In Failing to Discover and Present the Governing Law, Relevant BOP Regulations, and Factual Precedents

Remarkably, when it finally addresses the merits, the government argues that when all is said and done, Petitioner's ineffective assistance claim amounts to "only that counsel failed to discover useful information -- the existence of 18 U.S.C. §3582(d), the SAMs regulations, and the *Felipe* case -- that could have bolstered the defense," (Govt. Resp. to Discovery Mot. at 3), and claims that even without these ingredients (*i.e.* the relevant facts and law), defense counsel was fully effective in every way. *E.g.*, Govt. Resp. at 14, 20. Yes, it is true, in support of the ineffective assistance claim Johnson alleges that defense counsel failed to research, discover or present the governing statutory, regulatory, and legal authority. Counsel likewise failed to investigate, discover or present material facts regarding the BOP's actual practices and policies at the time. Had counsel done so and presented the evidence and law, it would have been clear to all that the defense position on conditions of confinement was not "theoretical" at all (*e.g.*, Govt. Resp. at 3, 12, 14, 16, 17, 18, 20), but was, and remains, the law and the actual practice and policy of the BOP. Contrary to the government's suggestion, counsel's failure to discover and present the governing law, operative BOP regulations, and factual precedents -- all of which were crucial to any fair presentation of the defense -- is anything but trivial. *See generally*, *Davis v. Alaska*, 415 U.S. 308 (1974) (right to present impeaching information in confronting and cross-examining witnesses guaranteed by 6th Amendment); *Chambers v. Mississipi*, 410 U.S. 284 (1973) (same); *California v. Trombetta*, 467 U.S. 479, 485 (1984) (defendant has right to "present a complete defense").

Next, though it does not dispute counsel's failures, the government claims that they are "not

10

relevant" to Petitioner's ineffective assistance claim. *See* Govt. Resp. to Discovery Mot. at 3. This contention is nothing short of frivolous. Nothing could be more relevant or material to a determination of Petitioner's claims than counsel's failure to bring out the BOP's *actual* (not "theoretical") practices of imposing strict conditions of confinement for extended periods of time, and the *actual* (not "theoretical") legal and regulatory authority expressly authorizing it. After all, refuting the government's claim of future dangerousness was the centerpiece of the defense chosen by counsel. *See*, Urdangen Affidavit, Ex. B to Initial Memo. And we now know the choice not to raise these authorities and precedents at trial (whether through cross-examination, direct-examination, jury instructions, or all of the above) was no tactical or strategic decision. Quite the opposite, Petitioner's trial counsel, Mr. Urdangen, has recently testified:

> 6. There was no tactical or strategic decision by me not to elicit testimony from Dr. Cunningham on direct examination, or from Warden Vanyur on cross-examination about the BOP regulation contained in 28 C.F.R. 501.3, or about the conditions of confinement which could be and had in fact been imposed by federal courts under 18 U.S.C. §3582(d), or about the Luis Felipe case. Quite the opposite, had I known about the conditions of confinement and terms thereof which are permitted and/or had been imposed under 28 C.F.R. 501.3 and/or 18 U.S.C. §3582(d), or about the conditions of confinement imposed and implemented on Luis Felipe, for an indefinite period of time, I would have elicited that information from Dr. Cunningham (or another witness with knowledge) during his testimony and forcefully cross-examined Warden Vanyur with those readily provable facts because that information was crucially important to support our argument that the BOP had both the power, ability and practices in place to house Darryl Johnson for an indefinite period of time in a manner which would virtually eliminate any future dangerousness of Darryl Johnson.

(Urdangen Affidavit, Ex. B to Initial Memo at ¶6).

The government next claims that regardless of the admitted inaccuracies in Vanyur's

testimony and the failure of defense counsel to present the relevant regulations and practices of the

BOP, the Petitioner was not prejudiced because the "same argument [was] made" by defense counsel

in any event. Govt. Resp. at 12. Counsel made the argument, but without benefit of the relevant

facts and controlling law which would have shown the proposed confinement to be unequivocally

possible and, likewise, would have shown Warden Vanyur's testimony to be terribly misleading.

By allowing Warden Vanyur's testimony to go uncontested, Dr. Cunningham's, and more

importantly defense counsel's credibility was significantly damaged. An argument without factual

or legal support is really no argument at all. Indeed, the failure to present relevant facts and

controlling law on the central disputed issue when those facts and law were readily available to

counsel had they only sought them out is the essence of prejudicial ineffectiveness.[4] *E.g.,*

---

[4] The government's position is ever-elusive. In its Opposition to *cert.*, the government all but said defense counsel was ineffective in failing to acquire and use the admittedly relevant materials that could have severely impeached Warden Vanyur. *See* Govt. Opp. to cert. at 26 ("*[Petitioner's] counsel could readily have discovered Section 501.3 in the Code of Federal Regulations and Section 3582(d) in the United States Code").* Indeed, the government explicitly stated:

> Johnson's counsel "injected the BOP's capacity to confine inmates into the proceedings by presenting the testimony of [Dr. Cunningham]. *Due diligence [i.e. effective assistance of counsel] required petitioner to inform himself of legal authority relevant to that testimony, and nothing precluded him from raising Section 501.3 or Section 3582(d) in cross-examination of Warden Vanyur, surrebuttal testimony, or by requesting an instruction from the jury.*

(Govt. Opp. to *cert.* at 26, Ex. A to Initial Memo) (emphasis added). *See also,* "Govt. Resp. to Defendant's Memorandum Concerning U.S. v. Felipe" (R.283 at 7) (government claimed no error because defense counsel could have presented the relevant evidence, but didn't).

Now, when Petitioner argues that the admitted failure of his counsel to properly investigate, request discovery, and introduce material evidence on the central issue at the penalty-phase trial, the government claims that none of this information could possibly have made a difference. *E.g.,* Govt. Resp. at 21. The government cannot have it all ways.

12

*Washington v. Smith*, 219 F.3d 620, 632-33 (7th Cir. 2000); *United States v. Williamson*, 183 F.3d 458, 462-63 (5th Cir. 1999); *see also*, Initial Memo at 22-26 (collecting and discussing cases). This prejudice is particularly apparent in the context of a capital sentencing hearing where a non-death verdict would be mandated had the defense been able to "convince only one of twelve jurors to refuse to go along with a death sentence." *Emerson v. Gramley*, 91 F.3d 898, 907 (7th Cir. 1996); 18 U.S.C. §3593(e) (requiring unanimous vote of jury to impose death sentence). *See also*, *Strickland*, 466 U.S. at 706 ("counsel's general duty to investigate * * * takes on supreme importance to a defendant in the context of developing mitigating evidence to present to a judge or jury considering the sentence of death; claims of ineffective assistance in the performance of that duty should therefore be considered with commensurate care.") (Brennan, J., concurring in part and dissenting in part).

> 3.      Warden Vanyur's Testimony Was Admittedly "Incomplete" and Misleading, And Defense Counsel Rendered Ineffective Assistance By <u>Failing to Expose The Multiple Material Flaws In That Testimony</u>

The government repeatedly characterizes Dr. Cunningham's testimony and the defense's argument to the jury as purely "theoretical" and that the conditions of confinement he described were, at best, "conceivable," but certainly not a description of the true ability or practices of the BOP and Department of Justice. Govt. Resp. at 3, 12, 14, 16, 17, 18, 20. In so doing, however, the government highlights precisely the merits of Petitioner's claims -- *i.e.* the grave misimpression created by the testimony of Warden Vanyur and Cunningham, the resultant failure of the defense to capably present its primary defense, and the undoubtable prejudice and materiality of these errors. *See*, Initial Memo at 38-39.

In truth, as we now know, it was neither "theoretical" nor merely "conceivable" that the BOP

could impose the strict conditions of confinement suggested by Dr. Cunningham. Quite the opposite, it was both a *reality* and an *established practice* of the BOP *at the time of Petitioner's penalty-phase trial*. Thus, the government's constant reference to the "theoretical" nature of Dr. Cunningham's testimony underscores exactly the problem with counsel's performance: Darryl Johnson's jury was told that these conditions were, at best, theoretical possibilities by the defense, and then the government closed the door completely by having Warden Vanyur testify that it was an absolute impossibility under the BOP's policy and practices, and federal regulations and law. The defense argument was entirely destroyed – and not by a full exposition of the relevant facts, but by inaccurate and materially incomplete testimony from Warden Vanyur which the defense never challenged.[5] *See* Govt. Opp. to *cert.* at 14, 20, 21, 28-29 (attached as Ex. A to Initial Memo). And it was Warden Vanyur's testimony which was the focus of the government's argument to the jury at the penalty phase. Accordingly, there can be little doubt as to the materiality of, and prejudice from, the inaccuracies and "incompleteness" of Vanyur's testimony.

Likewise, the government continually mischaracterizes Petitioner's argument by claiming that the defense wanted to show that Johnson "could 'conceivably' be placed in a control unit like the one at ADX Florence *once and for all, for the rest of his life*," "*without reconsideration*," and "*without possibility of removal from that unit [ever]*." Govt. Resp. at 16 (emphasis added); *see also,*

_____

[5] The government also contends that "[t]here was a downside to the mitigating evidence counsel did not discover in this case [*i.e.* about the BOP regulations, statutes, and practices of the BOP that allow for strict conditions of confinement]. It would have blunted the impact of the argument made, based on Dr. Cunningham's testimony, that an inmate could "conceivably" be placed in a control unit for life." Govt. Br. at 14 (internal transcript cite omitted). We are at a complete loss to understand what conceivable downside presentation of these facts and law could have had to the defense, and the government, perhaps understandably, does not explain its theory on that point.

14

*id.* at 12, 17, 18, 20. As the government well knows, this was not, and is not, Petitioner's argument. Rather, Petitioner's position is that the BOP has both the legal ability and prison facilities to house inmates under strict conditions of confinement *for as long as necessary* in order to protect against any reasonable possibility of future danger. *E.g.,* Petitioner's Initial Memo at 14-20. The government ignores Petitioner's true argument -- likely because it is undeniably true under the legal authority, BOP practice, and even according to the government's own admissions – and instead puts up a strawman that has never been posited by Petitioner. This strategy by the government is entirely unhelpful to the disposition of Petitioner's claim. As the Seventh Circuit recently reminded the government, ignoring defendant's argument "does not make [it] go away." *United States v. Torres-Ramirez*, 213 F.3d 978, 982 (7th Cir. 2000).

4.     The Government Admits Several Key Facts Supporting Petitioner's Ineffective Assistance of Counsel Claim

Despite its best efforts at obfuscation, the government admits, as it must, several key facts which command relief in the form of a new sentencing hearing. First, the government admits that the position taken by the government before the Supreme Court in this case was absolutely contrary to the position taken by the government before this Court and the Seventh Circuit. Thus, the government admits that in its response to Johnson's petition for *certiorari*, the government – for the first time – conceded "that §3582(d) and the SAMs regulation were relevant, and that without them, 'the jury may have held the mistaken impression that no legal authority existed to limit [defendant's] communications and contacts while in prison in order to curtail his future dangerousness.'" Govt. Resp. at 21. What it is forced to concede with its right hand, though, the government quickly tries to take back with its left. Thus, notwithstanding the unequivocal concession in the government's *certiorari* brief, it now claims that its "concession in the Supreme Court is no more than a

15

concession that there was 'some conceivable effect on the outcome of the proceeding." Govt. Resp. at 21. This argument is entirely specious.[6]

The government's concessions before the Supreme Court were clear and they are undoubtedly material admissions in support of Petitioner's ineffective assistance claim. *E.g., United States v. Burnside*, 824 F.Supp. 1215, 1270 (N.D. Ill. 1993) (J. Holderman) (government's statement regarding potential impact of evidence constitutes admission of prejudice). No doubt they are contrary to the position espoused to this Court previously as well as in the government's current Response, but that, again, highlights the problem. Once again, the government cannot have it both ways; it cannot blow hot and cold on the same facts in the same case as the winds of its self-interest change. *See generally United States v. Owens*, 54 F.3d 271, 275 (6th Cir. 1995) (government may be estopped from playing "fast and loose with the courts" by taking inconsistent positions). It cannot at one point say that the undiscovered facts and law were "relevant" and counsel's failure to discover and present them likely left the jury with a "mistaken impression" in an effort to defeat one claim, and then turn around and say these failures and omissions by counsel were irrelevant the next when expedient to its immediate needs. *See generally, Astor Chauff. Lim. v. Runnfeldt Inv.*, 910 F.2d 1540, 1547-48 (7th Cir. 1990) (judicial estoppel "precludes parties from abandoning positions taken in earlier litigation" on the grounds "that it is an offense against the judicial system to take inconsistent positions in two different proceedings"); *Lowery v. Stovall*, 92 F.3d 219, 233 (4th Cir. 1996) ("judicial estoppel precludes a party from adopting a position that is inconsistent with a stance taken in prior litigation."); *Edwards v. Aetna Life Ins. Co.*, 690 F.2d 595, 598-99 (6th Cir. 1982);

---

[6] In addition, it is undeveloped and therefore waived. *See United States v. Watson*, 189 F.3d 578, 594 (7th Cir. 1999).

16

*Ryan Operations v. Santiam-Midwest Lumber, Inc.*, 81 F.3d 353, 361-62 (3d Cir. 1996) (a central concern of the doctrine is "to prevent parties from playing fast and loose with the courts by taking inconsistent positions … as a means of obtaining unfair advantage").

The government also concedes that "The SAMs regulation authorizes restrictive conditions that may continue for a very long time." Govt. Resp. at 16. Indeed, while SAMs can only be imposed for a specified period of time, the government concedes that "there was [and is] no outer limit on the number of extensions of the [SAMs] restrictions." Govt. Resp. at 7. Thus, the government admits that these strict conditions of confinement can be imposed *indefinitely* and for as long as is deemed necessary by the BOP and the Department of Justice. This is precisely what the defense tried to argue, but which Warden Vanyur, in the name of the government, expressly disavowed. Because defense counsel failed to discover and present the relevant law, regulatory authority, and BOP practices, it's argument on this point was rendered impotent. Given that there is no dispute that the issue of "future dangerousness" and the government's ability to house Petitioner under strict conditions of confinement for as long as necessary to eliminate that risk was the central issue at the penalty trial[7], there can be no doubt that counsel's failures satisfy *Strickland's* prejudice requirement.

5.      Defense Counsel Was Ineffective In Failing to Ask For Or Obtain Discovery and/or A Continuance In Order to Research Issues <u>Pertaining to Warden Vanyur's Testimony</u>

The government also brushes off Petitioner's claim that defense counsel were ineffective, in part, because they failed to seek discovery regarding Warden Vanyur or a continuance to research

---

[7] One need only review the closing arguments at the penalty-phase trial to discern that future dangerousness and the BOP's ability to house Johnson under strict conditions of confinement were the central issues presented to the jury and argued by the parties.

17

his testimony after he was identified as a government rebuttal expert just hours before his testimony. Says the government, "It is difficult to see how the absence of a discovery request could have made any difference, since defendant does not allege that the ingredients missing from his sentencing hearing – information about *Felipe*, §3582(d) and SAM's – were known to Vanyur at the time. The granting of a continuance would have been unlikely, unless counsel could have explained what he was going to spend the time looking for." Govt. Resp. at 13. Once again, the government's terse response utterly misses the mark.

First, it is clearly apparent from Petitioner's motion and Initial Memorandum that we allege and believe Warden Vanyur did, in fact, have knowledge about the conditions of confinement that were then being imposed by his BOP. At a minimum, he should have had such knowledge given his position and the scope of his testimony in this case. We even set forth an example of the cross-examination which could (and should) have been done by defense counsel on Warden Vanyur to expose the multiple flaws in his testimony. *See,* Initial Memo at 35-37. This cross-examination would have been devastating both to Vanyur's credibility and to the government's primary argument to the jury on the need for a death verdict. Indeed, it is apparent that Vanyur was the Associate Warden at the BOP's ADX facility when precisely the strict conditions of confinement suggested by the defense were, in fact, then being imposed on an ongoing basis on various prisoners under Vanyur's direct control. Certainly, there can be no doubt that a high-ranking warden in the BOP has not only heard of "Special Administrative Measures" ("SAMs"), but has been directly involved in imposing and overseeing SAMs on any number of occasions.[8] Lest there be any doubt, Petitioner

---

[8] The government claims that "It is undisputed that Vanyur was unaware of the *Felipe* case, the statute and the SAMs regulation when he testified." Govt. Resp. at 20. This is absolutely incorrect. Those points are not only disputed, they are the topic of certain of

18

is certainly claiming, on information and belief, that Warden Vanyur knew at all relevant times about SAMs and the conditions of confinement imposed on prisoners under his direct control while he was Associate Warden at ADX Florence and at other times. We further allege on information and belief that Warden Vanyur knew at all relevant times about the conditions of confinement imposed on various federal prisoners at other institutions.[9] Obviously, these are all patently material factual matters which must be developed and made part of the record in this proceeding through the deposition of Warden Vanyur. This is particularly necessary since it appears that the government is claiming that Warden Vanyur – a man with 18 years of experience with the BOP at the time of his testimony in 1997 – did not know about the BOP's authority to impose SAMs, or about its practices with respect to imposing strict conditions of confinement on various prisoners for indefinite periods of time. If the government is right, Warden Vanyur was horribly uninformed about the central aspects of his testimony – that itself would be cause for a new sentencing hearing given the role Warden Vanyur's testimony played here. Petitioner must be afforded the right to gather these facts which are central to his claims for relief.

As for the government's contention that "a continuance would have been unlikely, unless counsel could have explained what he was going to spend the time looking for" (Govt. Resp. at 13),

---

Petitioner's discovery requests, including his request that we be permitted to depose Warden Vanyur pursuant to Habeas Rule 6.

[9] The government's statement that "defendant does not claim that Vanyur's testimony about §541 was inaccurate" (Govt. Resp. at 14) is simply wrong. On page 14 of his Initial Memorandum, Petitioner states, "In addition, section 541.41(b)(2) -- a portion of the section 541 which was specifically discussed by Warden Vanyur in his testimony (Tr. 2484) -- allows for placement in a control unit if a defendant 'expressed threats to the life or well-being of other persons" regardless of whether such threat occurred in or outside of prison.'" Again, we not only claim that Warden Vanyur's testimony was inaccurate and should have been impeached by defense counsel, but that is an undeniable fact in light of the plain language of §541.41(b)(2).

19

the self-evident answer is that counsel should have been looking for (1) information about BOP regulations governing allowable conditions of confinement; (2) information about SAM's, including their ability to be re-imposed indefinitely ; (3) information about other inmates on whom the BOP had imposed strict conditions of confinement, including Luis Felipe; (4) information about the law governing the BOP's ability to house inmates under strict conditions of confinement; (5) information about prisoners who had been held under strict conditions of confinement at institutions where Warden Vanyur was working. In short, counsel should have requested a continuance in order to seek out the readily available exculpatory, impeaching, and mitigating evidence that is laid out in detail in Defendant's Initial Memorandum, as well as that information which is now sought by way of Petitioner's pending discovery motion. Certainly, this is only reasonable where Vanyur's testimony took defense counsel by surprise and, on its face, eviscerated the defense's central argument.

> 6.     The Government Fails to Even Address Petitioner's Claim Based On Their Failure to Investigate And Research

Petitioner also detailed his position with respect to counsel's failure to investigate the relevant facts and law necessary to properly represent him at his penalty-phase trial. *See*, Initial Memo at 22-27 (discussing, *inter alia, Williams v. Taylor*, 529 U.S. 362 (2000); *Washington, supra*, 219 F.3d 620; *Williamson, supra*, 183 F.3d 458; *Dixon v. Snyder*, 266 F.3d 693 (7th Cir. 2001); *Emerson v. Gramley*, 91 F.3d 898 (7th Cir. 1996), *Pavel v. Hollins*, 261 F.3d 210 (2d Cir. 2001); and a host of other cases on point). *The government does not address even one of these cases*, or make any attempt to respond to the argument put forward by Petitioner in his opening brief on this issue. As noted above, however, ignoring defendant's argument "does not make [it] go away." *Torres-Ramirez*, 213 F.3d at 982. Once again, the government's silence on an issue in the face of

20

overwhelming legal and factual support speaks volumes.

### C. It Is Now Clear That The BOP Routinely Imposes The Strict Conditions of Confinement On Inmates For As Long As Is Deemed Necessary

Finally, the government claims that "*Felipe* remains the only case to have read §3582(d) as expansively as it did." Govt. Resp. at 13. This, too, is simply wrong.[10] As detailed in Petitioner's Initial Memorandum, the court in *United States v. Anthony Jones* also specifically utilized §3582(d) – *at the government's urging* – to impose precisely the same strict conditions of confinement on the defendant. Crim. Case No. WMN-96-0458 and WMN-97-0355 (Dist. Md. 1998). The Order in *Jones* imposed the following conditions:

1. That the inmate shall have no contact with other inmates;

2. That the inmate shall have no telephone privileges other than the right to telephone his attorneys, William Brennan, Esp. and Harry Trainer, Esq., at times and under conditions to be set by the Bureau of Prisons;

3. That the inmate shall have no visiting privileges, other than the right to have visits with his attorneys William Brennan, Esq. and Harry Trainor, Esq. and supervised visits with his mother, Ruth Jones, to the extent approved by the

---

[10] As to whether "§3582(d) confers authority on district courts to order potentially dangerous defendants held incommunicado as was done [in *Felipe*], the government contends that "the government in this case has never taken a position on that question." Govt. Resp. at 12. Again, the government is mistaken. In its response to Johnson's petition for *certiorari* in this case, the government stated,

> A federal statute, 18 U.S.C. 3582(d), authorizes a court to order similar restrictions in certain circumstances. Section 3582(d) provides, in relevant part, that, in sentencing a defendant for certain racketeering and drug offenses, a court may include as part of the sentence an order "that requires that the defendant not associate or communicate with a specified person * * * ."

(Govt. Opp. to *cert.* at 19, Ex. A to Initial Memo). No matter how much it wants to, the government cannot escape its admissions made before the Supreme Court – admissions which run contrary to several of the positions adamantly taken previously before this Court.

21

Bureau of Prisons, and under conditions and at a frequency to be determined by the Bureau of Prisons;

4. That the inmate shall have the right to send and receive mail, but only on the condition that his ingoing and outgoing mail is reviewed by Bureau of Prisons personnel;

\* \* \*

*See*, Exhibit A, Sentencing Order in Anthony Jones' case.[11]

Similarly, in *United States v. Peter Rollack*, Case No. 97 CR 1293 (S.D.N.Y.) (MGC), the court entered a sentencing order pursuant to a plea agreement with, *inter alia*, the following conditions of confinement specified:

> ... (2) that the defendant be prohibited from communicating with any co-defendants or with any member of [his gang], the racketeering enterprise charged in the Indictment; (3) that the defendant may correspond with and receive visits from his attorneys; (4) that the defendant may correspond with and receive visits from those family members and significant others approved by the Court and BOP, with the understanding that this [U.S. Attorney's] Office will be given notice of any family members or significant others the defendant seeks to have placed on his visiting list and will have the right to file objections with the Court if it deems appropriate ("approved visitors"); (5) that the defendant not be permitted to correspond with or receive visits from anyone not set forth in paragraphs (3) and (4) above; (6) that the defendants's correspondence and visits with approved visitors will be subject to monitoring; ...

*See*, Exhibit B, Sentencing Order in Rollack case. Rollack was also sent directly to a "special housing unit" (*i.e.* a control unit) from his sentencing for a minimum of 18 months, after which his housing designation could be reviewed by the BOP. *Id.*

---

[11] The Order also provides that the restrictions imposed be reviewed or amended "for good cause shown." Ex. A. This is consistent with the position taken by Petitioner throughout this litigation that the conditions could be imposed for as long as was deemed necessary by the Court and/or the BOP.

22

Likewise, in *United States v. Yousef*, 93 CR 180 (S.D.N.Y.), the district court also sentenced the defendant directly to "the administrative detention facility at [ADX] Florence" with his attorneys as his only allowed visitors. *See* Exhibit C, portion of Yousef sentencing transcript. The court explicitly indicated that it intended the conditions to be permanent.[12] *Id.*

In sum, the government's claim that the court in *Felipe* stands alone in imposing these types of strict conditions is demonstrably inaccurate. *And, notably, the BOP has willingly and faithfully imposed and implemented these conditions of confinement whenever asked to do so, and for as long as it has deemed necessary.* Through discovery, Petitioner has good reason to believe that additional cases where these types of strict conditions of confinement have been imposed and implemented will be discovered, further demonstrating the inaccuracy of the position strenuously argued by the government to this Court in this case.

**D.    Conclusion Regarding Petitioner's Ineffective Assistance Claim**

Based on all of the above, as well as the information and argument contained in Petitioner's Initial Memorandum, there can be no doubt that a valid claim of ineffective assistance has been established here, and that that ineffectiveness was prejudicial to Petitioner, both in their individual

---

[12] While the government is quick to point out that the conditions of confinement ordered by the court in *Felipe* have since been modified, it never talks about the *Anthony Jones* case or the *Yousef* case or the *Rollack* case where those same types of strict conditions of confinement are being imposed on the defendants. In any event, the fact that the strict conditions of confinement are subject to periodic review takes nothing away from Petitioner's argument. As discussed above, it was never the defense's position, as the government now contends, that the strict conditions had to be imposed once and for all without any chance of modification at some future date. Rather, the defense's position was that these strict conditions of confinement could be imposed on Petitioner for *as long as the BOP or the Department of Justice determined they were necessary.* Whether subject to review at a later date by the government or the Court is entirely irrelevant to the issue raised.

23

effect and their cumulative impact on the penalty-phase trial.[13]   By pointing out these several

material failures by Petitioner's counsel, the government suggests that we are asking for "perfection"

from counsel.  Govt. Resp. at 10.  Not so.  We ask not for perfection, but only that counsel perform

adequate legal and factual research so they can present their chosen defense in a way that constitutes

"meaningful adversarial testing" of the government's case, particularly in the context of the death

penalty case.  *E.g.*, *United States v. Cronic*, 466 U.S. 648, 656 (1984); *Strickland v. Washington*, 466

U.S. 668 (1984).  Nothing more is sought here; nothing less is demanded by the Constitution.

## II.  PETITIONER IS ENTITLED TO A NEW SENTENCING HEARING UNDER *BRADY*

### A.   There Is No Procedural Default of Petitioner's *Brady* Claim

The government first makes a half-hearted claim that Petitioner procedurally defaulted just

a portion of his *Brady* claim, only with respect to two particular pieces of evidence.  Govt. Resp. at

23 ("This claim, or at least the part that deals with *Felipe* and §3582(d), is procedurally defaulted,

because the underlying facts were known during the post-trial phase, but it was not raised on direct

appeal.").  This claim, even as limited to §3582(d) and *Felipe*, is incorrect.

The evidence regarding §3582(d) and *Felipe* is but a small portion of the *Brady* claim made

by Petitioner.  In addition, Petitioner has now presented the Court with evidence about several other

---

[13] Petitioner has claimed that counsel was ineffective, and has supported that claim with
new factual evidence.  The government disputes these facts and their import to Petitioner's
claims.  Petitioner has also sought discovery in order to obtain the relevant facts which support
his claims, but the government objects to that, as well.  If the Court determines that Petitioner
has not yet made his claim for ineffective assistance based on these initial briefs, it can only be
due to the asserted factual disputes between the parties, and those factual disputes can only be
resolved after discovery and an evidentiary hearing.  Accordingly, if Petitioner's motion is not
granted based on these initial pleadings, it is respectfully requested that the Court grant
Petitioner leave to conduct the requested discovery pursuant to Habeas Rule 6.  *See*, Petitioner's
Motion for Discovery.

24

pieces of Brady evidence which were material to the issues at sentencing. Those additional pieces include, among others, the information about the conditions of confinement of Thomas Silverstein and Clayton Fountain, and the BOP regulation and practices pursuant to 28 CFR 501.3 which was in full force at the time of Johnson's sentencing trial. As *Kyles* makes clear, an analysis of *Bagley* materiality requires that the *"suppressed evidence [be] considered collectively, not item-by-item."* *Kyles*, 514 U.S. at 436 (emphasis added).

There is no dispute that the information about inmates Silverstein and Fountain, as well as the information about the then ongoing practices of the BOP in administering SAMs was not known to counsel at the time of Johnson's direct appeal, and it places the *Brady* claim in a much stronger context.[14] In addition to these matters, undersigned counsel is informed and believes that there are several other federal inmates who, *at the time of Warden Vanyur's testimony*, were being housed by the BOP under strict conditions of confinement for indefinite periods of time (*i.e.* in excess of 12-15 years), including BOP inmates Barry Mills; Norman Matthews, Adolph Reynoso and T.D. Bingham.[15] Counsel is further informed and believes that at least some of these inmates were housed at ADX Florence, Warden Vanyur's former facility. Further *Brady* evidence is also likely to be developed through the discovery requested by Petitioner. There is no procedural default of any part of Petitioner's *Brady* claim. *See generally, Murray v. Carrier*, 477 U.S. 478, 488 (1986) ("[A] showing that the factual or legal basis for a claim was not reasonably available to counsel, ... or that 'some interference by officials' ... made compliance impracticable, would constitute cause under this

---

[14] Trial counsel did make a general *Brady* request pre-trial.

[15] Counsel is in the process of developing this evidence, and has sought discovery related to it. *See*, Petitioner's Motion for Discovery.

standard." (citations omitted)); *Crivens v. Roth*, 172 F.3d 991, 995-96 (7th Cir. 1999) (petitioner's Brady claim based on state's failure to produce impeachment material was not procedurally defaulted where counsel did not know of the evidence because state did not produce it); *Stano v. Dugger*, 901 F.2d 898 (11th Cir. 1990) (remanding for evidentiary hearing on *Brady* claim where impeachment evidence not turned over). *See also*, *United States v. Mejia-Mesa*, 153 F.3d 925 (9th Cir. 1998) (remanding for evidentiary hearing to determine facts related to *Brady* claim).

**B.    The Government's Denial Of Warden Vanyur's Role With The Government In Johnson's Case Is Without Merit**

The government's primary response to Petitioner's *Brady* claims is that "the 'prosecution' did not 'suppress' the information at issue, since the prosecution team in this case was unaware of it until after the sentencing hearing." Govt. Resp. at 24.[16] Thus, as its first line of defense, the government denies any relationship to the BOP and the BOP's role in Johnson's prosecution. The facts and law, however, make clear that the government's position is untenable.

1.    The Government Is Responsible For *Brady* Evidence Known to Its Expert Witness From the BOP, Warden Vanyur, Who Testified For the Prosecution

First, as the government admits, "John Vanyur and Craig Trout testified as rebuttal witnesses [for the prosecution] at the penalty phase." Govt. Resp. at 24. Indeed, Vanyur was an expert witness working on behalf of the prosecution team. He was in court for the testimony of the defense expert, Dr. Cunningham (*see* Tr. at 2467), and presumably advising the prosecutors with respect to their cross-examination of Cunningham. He was called by the prosecution to give expert testimony on behalf of the government in aid of seeking the death penalty against Johnson. The government's

---

[16] The government does not contest that the information cited by Petitioner was relevant and not provided to the defense (though it does challenge the materiality of the information).

claim that Vanyur, on behalf of the BOP, did not "participate in the prosecution" strains credulity. Govt. Resp. at 24. Warden Vanyur most certainly participated in the prosecution here at the direction and on behalf of the government. The government cannot now disclaim its own witnesses who testified against Johnson in their official capacity as agents of the government.

Indeed, in *United States v. Andrews*, this Court held the prosecution team responsible for exculpatory and impeachment information known to the Bureau of Prisons, despite protestations from the government.

> The government specifically disclaims any accountability for favorable information and records "possessed only by BOP (the Bureau of Prisons, WITSEC (the Department of Justice's Witness Security Program) and cooperating witnesses at the time of trial." *The government contentions are unsound as a matter of fact and law.*

824 F.Supp. 1273, 1289 (N.D. Ill. 1993) (J. Conlon) (internal citations omitted; emphasis added). This Court found that the prosecutors who worked closely with BOP personnel in the course of the prosecution were charged with the knowledge of those BOP personnel for purposes of their *Brady* obligations (*id.* (citing authorities)), and that the prosecution's failure to disclose the impeaching material "deprived defense counsel of the opportunity to independently investigate and fully develop a defense to these serious charges." *Id.* at 1290.

Second, the government's attempt to tightly define the "prosecution team" in this case as excluding essentially anyone who was not in the courtroom – and even some who were, like Warden Vanyur – is simply not supportable. As the Supreme Court in *Kyles* stated, "the individual prosecutor has a duty to learn of any favorable evidence known to the others *acting on the government's behalf in the case.*" *Kyles*, 514 U.S. 437 (emphasis added). As described above, Warden Vanyur was certainly "acting on the government's behalf" in Petitioner's case. And holding

27

the government responsible for the knowledge of a government agent who actually testifies as a witness for the prosecution is nothing new. *See, e.g., Schneider v. Estelle*, 552 F.2d 593 (5th Cir. 1977); *United States v. Rosner*, 516 F.2d 269 (2d Cir. 1975); *United States v. Deutsch*, 475 F.2d 55, 57 (5th Cir. 1973).

Similarly, in *United States v. Wood*, the court found a *Brady* violation in the government's failure to disclose exculpatory material contained in FDA reports because the FDA was charged with administering the statute at issue and consulted with the prosecutor during the prosecution. 57 F.3d 733, 737 (9th Cir. 1995). Here the same result must enure. It was the BOP that was (and is) charged with administering the statutes and BOP regulations at issue. It was the BOP, through Warden Vanyur, that consulted with the prosecutor during the prosecution. Indeed, Warden Vanyur not only consulted with the prosecution, he testified on its behalf. Under these circumstances, it would be a perverse result to find that the government cannot be charged with the knowledge of the BOP in this case, under these facts, as to these issues.[17] *See generally, United States v. Auten*, 632 F.2d 478 (5th Cir. 1980) ("If disclosure were excused in instances where the prosecution has not sought out information readily available to it, we would be inviting and placing a premium on conduct unworthy of representatives of the United States Government. This we decline to do.").

Moreover, the government's attempt here to dissociate itself from the BOP is further undercut by the very structure of the Department of Justice (of which the BOP is a part), and the substantive procedural requirements of the DOJ in federal death penalty cases. As a starting point, *the BOP is an agency of the Department of Justice. See,* Exhibit D, Organizational Chart from the

---

[17] To the extent that there is any doubt about the status of Warden Vanyur as an agent of the prosecution, an evidentiary hearing is required to resolve any such dispute. *Stano,* 901 F.2d at 903.

28

DOJ website. According to the DOJ's own document, the BOP is under the direct supervision of the Attorney General. *Id.* And the Attorney General has a specific and substantive role in federal death penalty cases. Pursuant to Title 9, §9-10.000 *et seq.* of the United States Department of Justice Manual, the federal death penalty may only be sought upon the written approval of the head of the Department of Justice, the Attorney General of the United States. That is, the Attorney General has the sole ultimate responsibility for deciding which cases to prosecute as death penalty cases, and this policy has been defended on the basis that it ensures uniform application and prosecution of the federal death penalty because prosecutorial decisions are made by a person with knowledge of, and responsibility for all such prosecutions (*i.e.* the Attorney General).[18] Thus, there is a defining difference between the run-of-the-mill criminal case and that in which the federal death penalty is sought in terms of the personal involvement of the Attorney General and his staff in death penalty prosecutions. The Department of Justice is, indeed, part of the prosecutorial team in every federal death penalty case, and the knowledge of the Department of Justice, therefore, is imputed to the prosecutors in each death penalty case.

### 2.   The Suppressed Evidence Was Material

Likewise, there can be little doubt as to the materiality of the suppressed evidence in this

---

[18] The Attorney General's central role in each federal death penalty case has received much attention in recent months, as the Attorney General has exercised his plenary authority, despite, in some cases, contrary recommendations from local prosecutors. The Justice Department defends this policy on the basis that the Attorney General and the other people "involved in the death penalty review process at Main Justice have the benefit of seeing the landscape of these cases nationwide, thereby ensuring consistency in U.S. Attorney districts across the country." *See* Exhibit E, February 6, 2003 article from the Houston Chronicle, quoting Attorney General Ashcroft's spokeswoman, Barbara Comstock. Similarly, the DOJ touts the fact that there are "multiple levels of review" conducted at the Justice Department headquarters "to provide consistency" in the prosecution of federal death penalty cases. *See* Exhibit F, February 6, 2003 article from the Chicago Tribune, quoting Ms. Comstock.

29

case. Here, as in *Kyles*, disclosure of the suppressed evidence "would have resulted in a markedly weaker case for the prosecution and a markedly stronger one for the defense. To begin with, the value of two [] witnesses would have been substantially reduced or destroyed." 514 U.S. at 441. And, as in *Kyles*, "[t]he likely damage is best understood by taking the work of the prosecutor [during closing arguments]." *Id.* at 444. As discussed above, there is no dispute that Johnson's alleged future dangerousness and the BOP's ability to control it were the central issues at Johnson's penalty phase trial. *See* Tr. 2609-12, 2644-48. The prosecutor focused on this issue throughout his closing argument to the jury in which he implored them to return a verdict of death because "No prison system can stop him" (Tr. 2648); "No one is safe as long as the defendant, Darryl Lamont Johnson, is allowed to live." (Tr. 2598), and "[a]s long as the defendant has the ability to convey his orders to his followers, either on the street or in prison with him, *nobody is safe; no witness, no witness's family, anybody who stands in his way, they are not safe*. It doesn't matter where he is locked up. * * * [T]here is no way to completely shut somebody off in prison with communicating with somebody on the outside." (Tr. 2593-94 (emphasis added)). This was the centerpiece of the government's argument, and it was based almost entirely on the testimony of Warden John Vanyur -- testimony which only well after-the fact did the government admit was "incomplete" and potentially misleading. *See*, Govt. Opp. to *cert.* at 14, 20, 21, 28-29 (attached as Ex. A to Initial Memo).

The government does not dispute that, pursuant to *United States v. Bagley*, 473 U.S. 667 (1985) and *Kyles v. Whitley*, 514 U.S. 419 (1995), "regardless of a request [by the defense], favorable evidence is material, and constitutional error results from its suppression by the government, 'if there is a reasonable probability that, had the evidence been disclosed to the defense,

30

the result of the proceeding would have been different.'" *Kyles*, 514 U.S. at 433-34 (citations omitted). Nor does the government contest that "a showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal." *Kyles*, 514 U.S. at 434, citing, *inter alia, Bagley*, 473 U.S. at 682; *Strickland*, 466 U.S. at 693 ("[W]e believe that a defendant need not show that counsel's deficient conduct more likely than not altered the outcome of the case"); *Nix v. Whiteside*, 475 U.S. 157, 175 (1986) ("[A] defendant need not establish that the attorney's deficient performance more likely than not altered the outcome in order to establish prejudice under *Strickland*").[19]

The government does, however, ignore and attempt to circumvent the more important holding that, "*A defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict. The possibility of an acquittal on a criminal charge does not imply an insufficient evidentiary basis to convict.*" *Kyles*, 514 U.S. at 434-35 (emphasis added). Thus, rather than addressing the fact that admittedly relevant material was not produced to the defense regarding the BOP's authority and ongoing practices, the government repeatedly misdirects the Court by arguing that it doesn't matter because there was a lot of evidence offered by the government at trial which showed the defendant was guilty of the crimes charged and other bad conduct. *See* Govt. Resp. at 18-20. As *Kyles* makes clear, the government's reliance on other evidence is misplaced in this context. 514 U.S. at 434-35.

Indeed, as Petitioner pointed out in his Initial Memorandum, the focus of the inquiry is not on what the overall strength of the prosecution's case was; rather

---

[19] While the government pays lip service to this well-established legal standard, there can be no mistake that the thrust of the government's argument runs just the opposite.

31

> [the] focus is on the 'potential impact that the undisclosed
> evidence might have had on the fairness of the proceedings'
> rather than on the overall strength of the government's case.

*United States v. Cuffie*, 80 F.3d 514, 517 (D.C. Cir. 1996), quoting *United States v. Smith*, 77 F.3d 511, 515 (D.C. Cir. 1996). Where it is impeachment evidence that was not presented to the jury, the inquiry is "not the ways defense counsel was able to impeach [the witness], but to the ways in which the witness' testimony was allowed to stand unchallenged." *Smith*, 77 F.3d at 515 ("the amount of additional evidence indicating guilt is not dispositive of our inquiry. Instead, we must decide whether the undisclosed information could have substantially affected the efforts of defense counsel to impeach the witness, thereby calling into question the fairness of the ultimate verdict."); *see also*, *United States v. O'Connor*, 64 F.3d 355, 359 (8th Cir. 1995).

Finally, the government incorporates by reference its argument as to the "prejudice" prong of its response to Petitioner's ineffective assistance claim as its response to the "materiality" prong of the *Brady* claim. (As Petitioner pointed out in his Initial Memorandum, the legal standards for those two tests are essentially identical. *See*, Initial Memo at 50, citing *Bagley*, 473 U.S. at 682.) There is one caveat, however. In its ineffective assistance argument which it adopts, the government, in part, argues that any error was harmless. *See*, Govt. Resp. at 18 ("Even if the information had been presented, and given the jury pause about future dangerousness, there does not exist a reasonable probability that the outcome would have been different, because the aggravating evidence was overwhelming."). Harmless error analysis, however, is not appropriate in the *Brady* context. As the Supreme Court clarified in *Kyles*, there are four aspects to the materiality prong:

1. A showing of materiality does not require proof that disclosure would have resulted in acquittal;

2. It is not a sufficiency of the evidence test;

32

3.      There is no need for harmless error review upon a finding of error; and

4.      The court will consider collectively all suppressed evidence.[20]

*Kyles*, 514 U.S. at 434-37.  Thus, the government's harmless error response -- *i.e.* that there was

much evidence establishing that Johnson was guilty of the crimes charged and other bad conduct --

has no force whatsoever in the context of our *Brady* claim.  "Once there has been *Bagley* error as

claimed in this case, it cannot subsequently be found harmless under *Brecht [v. Abrahamson*, 507

U.S. 619 (1993)]." *Kyles*, 514 U.S. at 436.

The government's argument fails at each level of scrutiny.  In the end, there can be no

dispute that material evidence which was favorable to the defense on the *central issue* at his penalty-

phase trial was withheld in violation of *Brady* and its progeny.  Petitioner is entitled to a new

sentencing hearing.

## III.   JOHNSON'S DEATH SENTENCE VIOLATES THE 5th AMENDEMENT DUE PROCESS CLAUSE AND THE 6th AMENDMENT GUARANTEES OF CONFRONTATION AND CROSS-EXAMINATION BECAUSE 18 U.S.C. §3593 ALLOWED ADMISSION AND CONSIDERATION BY THE JURY OF HEARSAY INFORMATION AT SENTENCING

As set out in Johnson's Memorandum in Support (Initial memo at 56-62), and conceded by

the Government in its Response (Govt. Resp at 28) the Government relied heavily upon hearsay

evidence to obtain Johnson's death sentence.  Johnson asserts that the relaxed evidentiary standard

set out in 18 U.S.C. §3593(c) which allowed for the use of hearsay evidence in penalty phase of his

capital trial violates the Sixth Amendment, given (a) the Supreme Court's concern for heightened

reliability and procedural safeguards in capital cases, and (b) its holding in *Ring* that facts such as

---

[20] As discussed above, this is yet another reason that the government's procedural default argument fails – *i.e.* because all *Brady* evidence must be considered "collectively" in making the materiality determination.

33

the FDPA's death eligibility factors are the "functional equivalent of the elements of a greater offense." *Ring v. Arizona*, __ U.S. __ 122 S.Ct. 2428, 2443 (2002).

In response to this argument, the Government asserts that Johnson has procedurally defaulted the claim, that *Teague v. Lane* bars the application of *Ring* to Johnson's case and that *Ring* should not be used by this Court to overturn *Williams v. New York*, 337 U.S. 241 (1949). None of these responses have merit.

## A. The *Ring* claim is not procedurally defaulted.

The Government argues that Johnson has procedurally defaulted this claim by not raising it in his direct appeal. Govt. Resp. at 28. The controlling precedent on this issue is *Bousely v. United States*, 523 U.S. 614 (1998), which holds that a defendant may still receive review of a procedurally defaulted claim if he can demonstrate either "cause" and "prejudice" or "actual innocence." *Id* at 622. "A claim that is 'so novel that its legal basis is not reasonably available to counsel' may constitute cause for procedural default." *Id., citing, Reed v. Ross*, 468 U.S. 1, 16 (1984).

### 1. Cause

*Jones* was decided on March 24, 1999. Johnson's Brief of Appellant was filed on October 15, 1999. *Apprendi* was decided on June 26, 2000. The 7th Circuit entered their opinion affirming Johnson's convictions and sentence on August 3, 2000. Johnson's case became final on October 1, 2001, when his *Certiorari* Petition was denied. *Lambrix v. Singletary*, 520 U.S. 518 (1997). *Ring* was not decided until June 24, 2002.

At the time that Johnson filed his direct appeal through the Supreme Court's denial of his *Certiorari* Petition, *Walton v. Arizona* was still good law. While it was certainly drawn into

34

question by various Justices in both *Jones* and *Apprendi*, it had not been overruled. In fact, in both *Jones* and *Apprendi*, the majority made every attempt to distinguish capital case law from the in both cases. Johnson's appellate counsel could not be expected to raise this claim so long as *Walton* was still the law. *Reed*, 468 U.S. 1, 16, n11 ("in *Hurtado v. California*, this Court held that indictment by a grand jury is not essential to due process under the Fourteenth Amendment. Surely, we should not encourage criminal counsel . . . to argue the contrary in every possible case, even if there were a possibility that some day *Hurtado* may be overruled."

## 2. Prejudice

There can be no doubt that Johnson was be prejudiced by the extensive amount of hearsay evidence which was introduced against him before the jury during the penalty phase of his case. In fact, the Government concedes that it "presented a considerable amount of evidence at the sentencing hearing that was hearsay." Govt. Resp. at 28. As set out in our Initial Memorandum the government's penalty phase theory in support of a death sentence was that as long as Johnson could "convey his orders to his followers, either on the street or in prison with him, nobody is safe." Initial Memo. at 58. This theory was supported almost completely by hearsay evidence. Initial Memo. 58-62. Without this evidence the Government's case would have been significantly weaker.

## B. *Teague* Does Not Bar Application of *Ring* to Johnson's Case

The Government asserts that *Ring* is a new rule and therefore not applicable to Johnson pursuant to *Teague*. This argument is based upon the Government's assertion that *"Apprendi* approved the case [*Walton v. Arizona*] *Ring* later overruled." Govt. Resp. at 31. This assertion misrepresents the *Apprendi* majority's discussion of *Walton*.

In both *Apprendi* and *Jones*, the majority stated that the capital case of *Walton v. Arizona*

35

was not controlling in resolving the issue before the Court.  In *Apprendi*, Justice Stevens, the

majority author, wrote,

> Finally, I need not in this case address the implications of the rule that I have stated
> for the Court's decision in *Walton v. Arizona*. * * * Whether the distinction between
> capital offenses and all others, or some other distinction, is sufficient to put the
> former outside the rule that I have stated is a question for another day.

*Id.* 530 U.S. at 474.  The majority author of *Jones*, Justice Souter, wrote,

> Nor is the question resolved by a series of three cases dealing with factfinding in
> capital sentencing. . .
>
> *Walton* dealt with an argument only slightly less expansive than the one in
> *Spaziano*, that every finding underlying a sentencing determination must be made by
> a jury. . . There, the Court described statutory specifications of aggravating
> circumstances in capital sentencing as "standards to guide the . . . choice between the
> alternative verdicts of death and life imprisonment."  We are frank to say that we
> emphasize this careful reading of *Walton's* rationale because the question implicated
> by the Government's position on the meaning of §2119(2) is too significant to be
> decided without being squarely faced.

*Jones*, 526 U.S. at 250-251.

Contrary to the government's assertions, neither case voiced "approval" for the Court's

earlier *Walton* decision.  In fact, in both *Jones* and *Apprendi* several Justices foreshadowed the

overruling of *Walton*. *Apprendi*, 530 U.S. at 523 (Scalia, J., concurring) (Whether *Apprendi* holding

affects capital jurisprudence is a question left for another day); *Id.* at 538 (O'Connor, J., dissenting)

("if the Court does not intend to overrule *Walton*, one would be hard pressed to tell from the opinion

it issues today."); *Id.* at 565 (Breyer, J., dissenting) (Majority's rule creates uncertainty for state

death penalty statutes which provide for judicial findings of aggravation and mitigation.); *Jones*, 526

U.S. at 253 (Scalia, J., concurring) (If *Walton* departed from this principle it should be reconsidered

in due course.); *Id.* at 272 (Kennedy, J., dissenting) (Re-examination of our capital jurisprudence

in this area can be expected).

36

The Government infers that *Jones, Apprendi*, and *Ring* came out of nowhere by stating that "The result in *Ring* was not dictated by *Apprendi*. . ."[21] (Response p. 30). This completely overlooks the statements set out above by various Justices of the Court. *See also, United States v. Patterson*, 213 F.Supp.2d 900, 912 (E.D. Ill 2002).

## C. *Williams* Need Not Be Overturned in Order For Johnson to Prevail

The Government asserts that *Teague* bars extending *Ring* to the facts of Johnson's case, claiming that Johnson's argument would require the Court to overrule *Williams v. New York*, 337 U.S. 241 (1949). *Williams* held that the Due Process clause did not render a sentence void when a trial judge considered "additional out-of-court information" to assist him in determining whether to impose a death sentence. *Id.* at 252. Again, the government is incorrect.

*Williams* was decided solely within the context of the 14th Amendment. *Id.* at 245 (Appellant urges that sentencing scheme which allows a sentencing judge to consider evidence not disclosed violates the 14th Amendment guarantees of notice and cross examination.) *Ring*, by contrast, is based upon the 6th Amendment jury trial right. *Ring*, 122 S.Ct. 2428, 2432. ("This case concerns the Sixth Amendment right to jury trial in capital prosecutions.")

The defendant in *Gardner v. Florida* was sentenced to death, based in part, upon the sentencing judge's review and consideration of a pre-sentence investigation report, which was not disclosed to the defendant. 430 U.S. 349 (1977). From portions of this undisclosed report, the judge found an aggravating circumstance and determined no mitigating circumstances existed. The judge sentenced Gardner to death.

In addressing *Williams*, the *Gardner* court noted that in 1949, when *Williams* was decided,

---

[21]*But see*, "*Ring* was decided simply by applying *Apprendi*." (Response p. 31).

37

the Court did not recognize any constitutional difference between a capital and a non-capital case. *Gardner*, 430 U.S. at 357, *citing, Williams*, 337 U.S. at 251-252. The Court further recognized that since the 1949 *Williams* decision a majority of the Justices had expressly recognized that "death is a different kind of punishment. . ." requiring "that the sentencing process, as well as the trial itself, must satisfy the requirements of the due process clause." *Gardner*, 430 U.S. at 357-358.

Further, *Williams* dealt specifically with judicial findings. *Williams*, 337 U.S. at 242 ("The jury recommended life imprisonment, but the trial judge imposed a sentence of death.") As stated by the Court, "The question relates to the rules of evidence applicable to the manner in which a *judge* may obtain information to guide him in the imposition of sentence upon an already convicted defendant." *Id.* at 244 (emphasis added). *See generally, United States v. Foley*, 871 F.2d 235, 239-40 (1st Cir. 1989) (it is "a basic tenet[] of a bench trial that despite the admission of irrelevant evidence and what for a jury would be prejudicial evidence, it is presumed that a trial judge will consider only admissible evidence in making his/her findings"); *Walker v. NationsBank of Florida*, 53 F.3d 1548, 1554 (11th Cir. 1994) (differentiating potential prejudice between bench trial and jury trial because Judge, as opposed to jury, is better able to assign proper weight to potentially inadmissable evidence).

The issue presented by Johnson relates to the rules of evidence applicable to the manner in which *the jury* obtains information to determine the existence of "an aggravating circumstance necessary for imposition of the death penalty." *Ring*, 122 S.Ct. at 2443. Given the Court's intervening decision in *Gardner* and the difference between judicial findings and jury findings, the Government's argument concerning *Williams* is without merit.

38

### D. Johnson's Death Sentence Should Be Vacated.

For all the reasons set out above, as well as those set out in the Petition and Memorandum in Support, Johnson's death sentence should be vacated as it rests upon hearsay evidence in violation of the Fifth and Sixth Amendments of the United States Constitution.

## IV. REPLY TO "ISSUES NOT BRIEFED" SECTION OF GOVERNMENT'S RESPONSE

As pointed out by the Government, there are four issues which Johnson did not brief is in Initial Memorandum of Law: (1) Ineffective Assistance of Counsel as pertains to the failure to call certain witnesses, (2) Mental Retardation, (3) Race Disparity, and (4) Extra-Record Information Before the Jury. As pertains each of these issues, Johnson is continuing to gather the facts necessary to support the claims. *See,* Petitioner's Motion for Discovery.

### A. Ineffective Assistance of Counsel ~ Failure to Call Certain Witnesses

In its Response, the Government attempts to assert that the failure of Scott Arthur to deny in his affidavit "that he told defendant about Blunt Johnson's plans to cooperate" (Response p. 41) means that Arthur is admitting to having provided Johnson information about Blunt's cooperation with the Government. Contrary to the government's suggestion, the absence of a denial in Arthur's affidavit is not proof of a fact. Counsel believes if given the opportunity to testify at a hearing in this matter, Arthur will deny having supplied information to Johnson that Blunt Johnson was cooperating with the Government.

Johnson's notes that the Government has addressed this claim on the merits arguing facts and their implications without raising any procedural bars. Johnson asserts that a hearing on this issue is necessary in order for the Court to hear the evidence and make the necessary credibility findings for resolution of the issue.

39

## B. Mental Retardation

Johnson has requested funds for a mental health expert in order to more fully develop this claim. *See*, Petitioner's Motion for Discovery 13. In response to the request for funds, the Government takes no position. Govt. Resp. to Pet. Disc. Mtn. at 5.

Johnson agrees with the Government's assessment that *Atkins v. Virginia*, 122 S.Ct. 2242 (2002), would apply retroactively to Johnson's case (Govt. Resp. at 44, n7), and, accordingly, the testing requested is absolutely necessary.

## C. Race Disparity

Johnson has requested discovery from the Government in order to support this claim. *See*, Petitioner's Motion for Discovery at 13-15. In order to prevail on this claim, Johnson will need to "prove that the decision-makers in *his* case acted with discriminatory purpose." *McClesky v. Kemp*, 481 U.S. 279, 292 (1987). The only way for Johnson to make this showing is for the Government to be ordered to provide the requested discovery.

## D. Extra-Judicial Information Before the Jury

It remains Johnson's position that he is entitled for his attorneys to have access to the juror questionnaires, prepared by counsel and the court and filled out by the jurors who sat at his trial, as they are a part of the record of proceedings. *See, United States v. Ray*, 238 F.3d 828, 836 (7th Cir. 2001) (Court expresses disappointment in questionnaire not being included in record of proceedings.) As noted in Petitioner's Motion for Discovery, the Clerk's Office has indicated to counsel that it has possession of the juror questionnaires, but cannot release copies to counsel absent an order from the Court. We respectfully request that the Court issue such an order.

40

## V. **CONCLUSION**

For all the reasons set forth herein, as well as those contained in Petitioner's Initial Memorandum in Support, Johnson respectfully requests that his Motion pursuant to §2255 be granted. Petitioner further requests that his Motion for Discovery be granted so that his claims may be fully developed.[22]

Respectfully submitted,

Terence H. Campbell
Cotsirilos, Tighe & Streicker, Ltd.
33 North Dearborn Street, Suite 600
Chicago, Illinois  60602
(312) 263-0345

Counsel for Darryl Lamont Johnson

Lorinda Meier Youngcourt
1773 Huron Williams Road
Mitchell, Indiana  47446
(812) 849-9852

Counsel for Darryl Lamont Johnson

---

[22] Johnson intends to file a short separate reply specifically directed to his Motion for Discovery in the near future.

41

# SEE CASE FILE FOR EXHIBITS

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Suzanne B. Conlon | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 6998 (96 CR 379-1) | **DATE** | 3/11/2003 |
| **CASE TITLE** | UNITED STATES vs. DARRYL JOHNSON | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due _____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)   ☐ Local Rule 41.1   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Petitioner's motion to vacate conviction and sentence and for new trial pursuant to 28 U.S.C. § 2255 and Rule 33 of the Federal Rules of Criminal Procedure [1-1] and petitioner's motion for leave to conduct discovery [10-1] are denied with prejudice as to Grounds I-V and VII-VIII and without prejudice as to Ground VI. ENTER MEMORANDUM OPINION AND ORDER.

*Suzanne B. Conlon*

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | | **Document Number** |
| | No notices required. | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | MAR 12 2003 | 20 |
| | Notified counsel by telephone. | | date docketed | |
| | Docketing to mail notices. | | *[signature]* | |
| | Mail AO 450 form. | U.S. DISTRICT COURT | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | 3/11/2003 | |
| CB | courtroom deputy's initials | 03 MAR 11 PM 1:48 | date mailed notice | |
| | | FILED | PW | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DOCKETED

MAR 1 2 2003

UNITED STATES OF AMERICA,                )
                                         )
    Plaintiff - Appellee - Respondent,    )    No. 02 C 6998
                                         )
    v.                                   )    Suzanne B. Conlon, Judge
                                         )
DARRYL JOHNSON,                          )
                                         )
    Defendant - Appellant - Petitioner.   )

## MEMORANDUM OPINION AND ORDER

Darryl Johnson ("Johnson") was convicted of ordering the murder of a person assisting in federal criminal investigation and ordering the murder of that person and another in furtherance of a continuing criminal enterprise. Johnson was sentenced to death. The Seventh Circuit affirmed Johnson's conviction and sentence. *United States v. Johnson*, 223 F.3d 665 (7th Cir. 2000). The Supreme Court denied Johnson's petition for writ of *certiorari*. *Johnson v. United States*, 122 S. Ct. 71 (2001). Johnson filed a timely petition to vacate, set aside or correct his sentence pursuant to 28 U.S.C. § 2255 ("§ 2255") and Fed. R. Crim. P. 33.

In his petition, Johnson claims he was denied effective assistance of counsel, in violation of the Sixth Amendment (Ground I); the government failed to disclose evidence that impeaches a government witness, in violation of the Fifth Amendment (Ground II); the jury relied on incomplete and potentially misleading testimony in sentencing him to death, in violation of the Eighth Amendment (Ground III); the relaxed evidentiary standards allowed by Federal Death Penalty Act of 1994 ("FDPA") during the penalty phase of a capital trial violates the Sixth Amendment (Ground IV); the indictment does not contain all statutory aggravators, in violation of the Fifth Amendment (Ground V); his execution will violate his right to be free from cruel and unusual punishment guaranteed by the Eight Amendment because he may be mentally retarded (Ground VI); his selection for capital prosecution violates his due process rights guaranteed by the Fifth Amendment because

1



federal capital cases are brought disproportionately against minorities (Ground VII); and the jurors may have considered information outside the record in sentencing him to death (Ground VIII). Johnson moves for leave to conduct discovery in connection with his § 2255 petition pursuant to Habeas Rule 6(a).

## BACKGROUND

Johnson was charged in a fifty-one count indictment alleging that he conspired to sell drugs through the Gangster Disciples street gang and ordered the murders of two fellow gang members, Charles Banks and Darryl "Blunt" Johnson. The government sought the death penalty for the two murders by filing a post-indictment Notice of Intent to Seek the Death Penalty under the FDPA. The government dismissed eight counts prior to trial. On November 4, 1997, a jury convicted Johnson on the 43 remaining counts, including the two murder charges.

At Johnson's sentencing hearing, the parties presented evidence on the non-statutory aggravating factor of future dangerousness. The government presented evidence that Johnson was involved in numerous violent crimes, including the discipline of fellow gang members. In addition to the murders of "Blunt" Johnson and Banks, the jury heard testimony about the murder of another fellow gang member, Gregory "G" Sharpe (Tr. 1944-56), a shooting in a McDonald's parking lot that left two people dead (Tr. 1880-87), the shooting of a truck driver who interrupted Johnson's security convoy at an intersection (Tr. 1891-95), the murder of a rival gang member (Tr. 1888-90) and several severe beatings Johnson ordered. (Tr. 1800-1805, 1896-1916). The government offered evidence that Johnson was convicted of manslaughter for shooting and killing Jesse Simpson in 1983. Tr. 1847-53, 1975. A Metropolitan Correctional Center officer testified that Johnson threatened to "get" fellow gang member and co-defendant Quan Ray while they were in custody awaiting trial. Tr. 1863-72.

In response, Johnson called Dr. Mark Cunningham to testify about the custodial options available to the Bureau of Prisons ("BOP"), including the control unit in the federal maximum security prison in Florence, Colorado ("ADX Florence"). Tr. 2282-87. Cunningham testified that

Johnson could be permanently sentenced to the control unit in ADX Florence, where inmates are confined one to a cell for 23 hours per day without any contact with other inmates. Tr. 2284-95. According to Cunningham, monitoring by the BOP ensures that gang members like Johnson would "simply have no opportunity to carry out gang-related activities." Tr. 2289. Cunningham opined that there was an "extraordinarily low" likelihood that Johnson would be a danger to others if he were confined to the control unit in ADX Florence. Tr. 2306-07.

In rebuttal, the government presented the testimony of John Vanyur, a former assistant warden at ADX Florence. Vanyur testified that ADX Florence, with a capacity of only 484 inmates, has a well-defined "mission" as a place to house inmates who cannot function in an open prison environment. Tr. 2464. Approximately 90% of the inmates at ADX Florence were transferred from other BOP facilities because of serious misconduct during their incarceration, while 9% are assigned to ADX Florence from the sentencing court. Tr. 2466-67, 2499. Inmates directly assigned to ADX Florence are typically high-ranking organized crime figures, international and domestic terrorists, and high-ranking drug cartel members. Tr. 2468. The authority to place an inmate in a specific institution rests solely with the BOP. *Id.* Vanyur testified that the BOP regulatory scheme prohibits assignment and indefinite confinement in a control unit based on offenses committed in the community. Tr. 2483-85.

During his testimony, Vanyur provided examples of how ADX Florence inmates communicate with each other and the outside world. Tr. 2478-79. For example, inmates send notes through the plumbing system, yell through the vents, learn sign language, use encryption systems, such as an ancient alphabet, in inmate correspondence, use codewords to communicate messages outside the facility, and use "drop-calling." *Id.* To illustrate drop-calling, Vanyur recounted an incident where intelligence had shown that the leader of the Aryan Brotherhood, who was incarcerated at ADX Florence, successfully ordered the murders of two African-American inmates in Lewisburg, Pennsylvania. *Id.* at 2479-80. The Aryan Brotherhood leader made a "drop" communication ordering the murders to an individual in California by speaking in code. *Id.*

3

Inmates in the control unit are allowed one 15 minute telephone call, up to five non-contact visits per month, and virtually unlimited correspondence with the outside world. Tr. 2485. According to Vanyur, Johnson would likely be placed in the open population at a high security penitentiary, rather than ADX Florence. Tr. 2474-75, 2496-97. In an open population setting, an inmate "would have as many phone calls as he could pay for or get someone to accept them as collect charges, so he would have virtually unlimited phone access if he has the time to make the phone calls. And he would have unlimited correspondence privileges." Tr. 2477. After more than 13 hours of deliberation, the jury returned two death sentences against Johnson.

## DISCUSSION

### I.     Discovery Motion

Johnson filed his motion for leave to conduct discovery on February 3, 2003, over four months after he filed his § 2255 petition. Indeed, Johnson did not file his discovery motion until after the government filed its response to his § 2255 petition. Johnson does not provide any explanation for the delay. Nor does the government object. Therefore, the court will consider Johnson's tardy discovery motion under Habeas Rule 6(a).

> Rule 6(a) provides in relevant part:
>
> A party shall be entitled to invoke the processes of discovery available under the Federal Rules of Criminal Procedure or the Federal Rules of Civil Procedure or elsewhere in the usages and principles of law if, and to the extent that, the judge in the exercise of his discretion and for good cause shown grants leave to do so, but not otherwise.

28 U.S.C.A. § 2255 Rule 6(a). In order to meet this standard, Johnson must: (1) make a colorable claim showing that the underlying facts, if proven, constitute a constitutional violation; and (2) show good cause for the discovery. *Harris v. Nelson*, 394 U.S. 286, 298-300 (1969). Good cause exists "where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief." *Bracy v. Gramley*, 520 U.S. 899, 908-9 (1997). In order to determine whether Johnson has shown good cause for the requested discovery, the court must first evaluate the merits of his underlying claims.

4

## II.   Habeas Petition

Collateral relief under § 2255 is available to a petitioner who shows "an error of law that is jurisdictional, constitutional, or is a fundamental defect which inherently results in a complete miscarriage of justice." *Oliver v. United States*, 961 F.2d 1339, 1341 (7th Cir. 1995). Section 2255 relief is neither a recapitulation of, nor a substitute for, direct appeal. *Belford v. United States*, 975 F.2d 310, 313 (7th Cir. 1992), *overruled on other grounds, Castellanos v. United States*, 26 F.3d 717, 719, 20 (7th Cir. 1994).

## A.   Ineffective Assistance of Counsel (Ground I)

Johnson claims the lawyers who represented him before this court were ineffective during the guilt and penalty phases of his trial. Johnson did not raise an ineffective assistance of counsel claim on direct appeal. Ineffective assistance of counsel may be raised for the first time in a § 2255 motion only if: (1) trial and appellate counsel were the same; or (2) the defendant needed time to develop additional extrinsic evidence to support his ineffective assistance claim. *Guinan v. United States*, 6 F.3d 468, 471-72 (7th Cir. 1993). Different counsel represented Johnson at trial and on direct appeal. Therefore, Johnson must establish that evidence outside the trial record is necessary to support his ineffective assistance of counsel claim. *McCleese v. United States*, 75 F.3d 1174, 1179 (7th Cir. 1996).

## 1.   Sentencing - Failure to Investigate

The bulk of Johnson's § 2225 petition is dedicated to his claim that he "was deprived of the effective assistance of counsel in investigating, researching, preparing for, and confronting through the adversarial process the testimony of Warden Vanyur. . ." Memorandum at 6. Specifically, Johnson argues his counsel failed to obtain evidence that the BOP imposed the strict confinement conditions advocated by the defense on other federal inmates prior to his sentencing hearing and that BOP policies in place at the time of sentencing, including 18 U.S.C. § 3582(d) and 28 C.F.R. § 501.3, allowed these strict confinement conditions. In response, the government argues Johnson's

5

claim is procedurally defaulted because this evidence was a matter of public record known to Johnson at the time of his direct appeal.

### a.   **Procedural Default**

An ineffective assistance of counsel claim "apparent from the trial record or from evidence that is a matter of public record" must be raised on direct review. *Bond v. United States*, 1 F.3d 631, 636 (7th Cir. 1993), *citing United States v. Taglia*, 922 F.2d 413, 418 (7th Cir. 1991). In his petition, Johnson repeats the arguments made in his post-sentencing briefs before this court. *See* defendant's reply to government's response regarding Count II of the motion to vacate the jury's death-penalty phase verdicts [254-1], defendant's statement regarding the need for a hearing on Count II of the motion to vacate the jury's death-penalty phase verdicts [258-1], defendant's memorandum with regard to *United States v. Felipe* [280-1], defendant's reply memorandum concerning *United States v. Felipe* [285-1] and defendant's motion to append two documents to his reply memorandum concerning *United States v. Felipe* [289-1]. Indeed, Johnson relies on the same cases in his petition as he did in his post-sentencing motions. *Compare Id.*, *citing United States v. Felipe*, S16-94CR395 (S.D.N.Y.), *aff'd* 148 F.3d 101 (2d Cir. 1998), *United States v. Yousef*, S16 94 CR 395 (S.D.N.Y.) and *United States v. Jones*, No. WMN-96-0-458 (D. Md.) with memorandum at 17-19. The Seventh Circuit considered and rejected Johnson's arguments on direct appeal. *Johnson*, 223 F.3d at 673-74. Although Johnson cites additional cases in which the BOP imposed strict confinement conditions on other federal inmates, these cases are cumulative of grounds Johnson presented to this court and to the appellate court.

Moreover, the affidavit of trial counsel Jeffrey Urdangen offers nothing new. Petition at Ex. A. Contrary to Johnson's position, the record establishes that trial counsel's failure to present this evidence during the sentencing hearing was not a tactical decision. Indeed, defense counsel informed this court that he did not learn of this evidence until after sentencing. *See* defendant's unopposed motion for a fourteen day extension of the deadline to file his reply memorandum [248-1]("Since March 6th, counsel have been made aware of [f]ederal proceedings in other jurisdictions which tend

to undermine the position on future dangerousness which the government in this case advanced not only in the penalty phase, but in their responsive pleadings recently filed with this Court"). *See also* *Johnson*, 223 F.3d at 672 ("defendant calls the warden's testimony 'false' and argues that since it came in on rebuttal he didn't have a chance to meet it and so was unfairly surprised"). Under these circumstances, Johnson's claim regarding the ineffectiveness of his trial counsel in failing to present this evidence during sentencing should have been raised on direct appeal.

In order to overcome procedural default, Johnson must show: (1) both good cause for his failure to raise the claims on direct appeal and actual prejudice from the failure to raise those claims; or (2) a fundamental miscarriage of justice resulting from the district court's refusal to consider the claims. *McCleese*, 75 F.3d at 1177-78. The cause and prejudice standard is more rigorous than the plain error standard used on direct review. *United States v. Frady*, 456 U.S. 152, 170 (1982). Johnson claims he can show both good cause and actual prejudice for his failure to raise his ineffective assistance claims on direct appeal. Alternatively, he claims a fundamental miscarriage of justice would result from the court's refusal to consider his claims.

**(1)     Cause and Prejudice**

Johnson first argues he has shown good cause because additional discovery is necessary to establish his ineffective assistance of counsel claim. Specifically, he seeks information regarding other federal prisoners who have been held under the strict conditions of confinement advocated by the defense during sentencing. *See* discovery motion at 7-9. Good cause requires a showing of some external objective impediment to Johnson's presentation of his claim, such as unavailability of the factual or legal bases for a claim, or interference by state officials. *Murray v. Carrier*, 477 U.S. 478, 485-87 (1986). Johnson was aware of the factual and legal basis for his ineffective assistance of counsel claim prior to his direct appeal. The discovery Johnson requested is cumulative of the information presented to this court and the appellate court regarding the confinement conditions of Felipe, Yousef and Jones. Therefore, Johnson fails to show good cause for the default.

Nor can Johnson show he was prejudiced by his counsel's failure to raise his ineffective assistance of counsel claim on direct appeal. Prejudice depends on the merits of Johnson's ineffective assistance claim. *Belford*, 975 F.2d at 314. *See also Freeman v. Lane*, 962 F.2d 1252, 1259 (7th Cir. 1992). To show prejudice, a defendant must prove "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland v. Washington*, 466 U.S. 668, 694 (1984). In other words, Johnson must show that if his appellate counsel had raised the claims on direct appeal, there was a reasonable probability that the claims would have been successful. *McCleese*, 75 F.3d at 1179. If counsel's actions did not prejudice Johnson, the court need not address counsel's performance. *Gray-Bey v. United States*, 156 F.3d 733, 742 (7th Cir. 1998).

**b.      Merits**

The jury unanimously sentenced Johnson to death for the killing of "Blunt" Johnson and Banks, finding beyond a reasonable doubt that the aggravating factors sufficiently outweighed all mitigating factors presented by the defense. *See* Special Findings [201, 204]. The jury unanimously rejected the defense's proposed finding that Johnson "will not be a serious and continuing danger to society because the government has the power to imprison him for the rest of his life in a maximum security federal prison designed to control and monitor his behavior." *See* Special Findings [202, 203]. Instead, the jury unanimously found that Johnson "would commit serious acts of violence in the future which would be a continuing and serious threat to society." *Id.* Not one of the errors Johnson advances "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Strickler v. Green*, 527 U.S. 263, 290 (1999), quoting *Kyles v. Whitley*, 514 U.S. 419, 435 (1995).

Johnson claims he was prejudiced by his counsel's failure to investigate the law and facts necessary to subject the government's case on future dangerousness to meaningful adversarial testing. Even if Johnson's counsel impeached Vanyur's testimony by presenting additional law and

8

facts on the BOP's policies and practices, the jury might still have concluded that Johnson "would commit serious acts of violence in the future which would be a continuing and serious threat to society." *See Special Findings* [202, 203]. Indeed,

> [w]e know from cases in this court involving murders by prisoners in the control units of federal prisons, that such units cannot be made totally secure. And we know that anyone who has access to a telephone or is permitted to receive visitors may be able to transmit a lethal message in code. We also know that nothing in federal law authorizes a judge to sentence a prisoner to life in the control unit. Quite apart from the fact that 'a sentencing court has no authority to order that a convicted defendant be confined in a particular facility, must less placed in a particular treatment program,' a prison control unit is an internal disciplinary mechanism that is not intended or designed for lifetime commitment. The Bureau of Prisons could not, therefore, commit a prisoner to the control unit for life, refusing to consider circumstances that might render his joining the open population of the prison harmless, such as extreme old age or the dissolution of the gang with which he had been affiliated.

*Johnson*, 223 F.3d at 672-73 (internal citations omitted). As Vanyur testified, prisoners have developed ingenious ways to communicate both inside and outside the prison system. Tr. 2478-79. Even inmates in the control unit are allowed one 15 minute telephone call, up to five non-contact visits per month and virtually unlimited correspondence with the outside world. Tr. 2485. Although under § 3582(d), the court may order a defendant not to associate or communicate with a specified person other than his attorney, the court may enter such an order only upon a showing of probable cause to believe that association or communication is for the purpose of enabling him to participate in an illegal enterprise. Pursuant to 28 C.F.R. § 501.3(a), the Attorney General may order the BOP director to authorize a warden to house an inmate in administrative detention and limit his communications privileges "as is reasonably necessary to protect persons against the risk of act of violence or terrorism." At the time of Johnson's sentencing hearing, these "special administrative measures" or SAMs were required to be reevaluated every 120 days. Even with this additional information, the jury could have reasonably concluded there was no guarantee that the government could prevent Johnson from committing serious acts of violence in the future.

The government's concession before the Supreme Court does not change this result. *See* Memorandum, Ex. A. at 21. In opposition to Johnson's petition for *certiorari*, the government

9

acknowledged that Vanyur's testimony may have left the jury with "the mistaken impression that no legal authority existed to limit petitioner's communications and contacts while in prison in order to curtail his future dangerousness." *Id.* at 27. The concession does nothing for Johnson's case because as the government later points out in its opposition brief, Johnson "cannot establish that the jury 'probably' would not sentence him to death at a new sentencing hearing if it was informed" about the relevant law. Indeed, the record provides strong support for the conclusion that Johnson would have been sentenced to death even if defense counsel impeached Vanyur with the BOP's policies and practices. *See Strickler*, 527 U.S. at 294 (court may look to other support in the record for conviction and sentence).

The jury unanimously and beyond a reasonable doubt found statutory and non-statutory factors other than future dangerousness. The jury found two statutory aggravating factors with respect to the Blunt Johnson murder. Namely, Johnson caused the killing after substantial planning and premeditation and in the course of a continuing criminal enterprise that involved the distribution of drugs to persons under age 21. The jury found the same two statutory aggravating factors in connection with Banks' murder, plus the statutory aggravating factor related to Johnson's previous conviction for voluntary manslaughter using a firearm. In addition, the jury found two non-statutory aggravating factors regarding the Blunt Johnson murder: (1) Johnson ordered the murder to obstruct justice by preventing the victim from testifying; and (2) Johnson caused harm to the victim's family. The jury did not unanimously find any of the mitigating factors by a preponderance of the evidence. Based on this record, Johnson fails to establish there is a reasonable probability the outcome would have been different but for his counsel's alleged errors. Therefore, Johnson fails to establish the cause and prejudice necessary to excuse his procedural default, as well as the required prejudice necessary to establish his ineffective assistance of counsel claim. Johnson's failure to establish a colorable claim based on his proposed facts dooms his request for additional discovery.

10

**(2)    Fundamental Miscarriage of Justice**

A federal court may review a defaulted claim only if a fundamental miscarriage of justice is involved. This occurs where "a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Murray*, 477 U.S. at 485-86. The Seventh Circuit previously rejected Johnson's arguments against imposition of the death penalty. *Johnson*, 223 F.3d at 671-74. Thus, no fundamental miscarriage of justice will result by application of the procedural default rule. Accordingly, Johnson's ineffective assistance of counsel claims are procedurally defaulted.

**2.    Trial and Sentencing - Failure to Call Certain Witnesses**

Johnson claims his lawyers were ineffective for failing to call Cheryl Fletcher during sentencing to rebut the testimony of Archie Rudd regarding the circumstances leading up to Johnson's manslaughter conviction. Petition at 8-9. However, Johnson fails to provide any extrinsic evidence to support his version of Fletcher's proposed testimony. Nor does he move for additional discovery on this claim. Johnson apparently abandons this claim by failing to address it on reply. Under these circumstances, Johnson's ineffective assistance of counsel claim based on Fletcher's proposed testimony is procedurally defaulted.

Johnson next claims his lawyers were ineffective for failing to call his former lawyer, Scott Arthur, during the guilt and penalty phases of his trial. Petition at 7-8. In support of his claim, Johnson offers the affidavits of Arthur and Urdangen. Memorandum at Ex. A and B. The government does not dispute that Johnson may raise this claim for the first time in his § 2255 motion. Therefore, Johnson's ineffective assistance of counsel claim based on Arthur's proposed testimony is considered on the merits.

Johnson fails to explain how Arthur's testimony "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Strickler*, 527 U.S. at 290. According to Johnson, Arthur's testimony was needed to refute the government's assertions that he ordered the murders of Blunt Johnson and Banks and ordered Roger Stewart to threaten a possible government witness. As the government points out, Arthur's claim that he did not tell Johnson that

11

Banks was cooperating with the government does not refute the government's evidence that Johnson suspected Banks of cooperating and told Stewart that he wanted Quan Ray to kill him. Response at 42, *citing* Tr. 1030-32. Johnson fails to respond to this argument on reply. Nor does Johnson respond to the government's argument that Roger Stewarts' testimony regarding Johnson's order to threaten a possible government witness was a "drop in the bucket" on future dangerousness compared to the testimony elicited regarding the murders and beatings that actually occurred on Johnson's orders.

Finally, Arthur does not deny in his affidavit that he told Johnson about Blunt Johnson's plans to cooperate. In reply, Johnson claims an evidentiary hearing is necessary because counsel "believes if given the opportunity to testify at a hearing in this matter, Arthur will deny having supplied information to Johnson that Blunt Johnson was cooperating with the government." Reply at 39. Counsel's unsupported belief is not enough to require an evidentiary hearing. *Aleman v. United States*, 878 F.2d 1009, 1012 (7th Cir. 1989)("Mere unsupported allegations cannot sustain a petitioner's request for a hearing"). Therefore, Johnson's claims based on counsel's failure to call Scott Arthur at trial or sentencing fail on the merits.

## B.   *Brady* Violation (Ground II)

Johnson claims the government failed to turn over evidence regarding BOP practices at the time of his sentencing hearing in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). Johnson did not raise this issue on direct appeal. A *Brady* violation may only be raised for the first time in a collateral proceeding where support for the claim was not discovered prior to direct appeal. *See Strickler*, 527 U.S. at 280-82. Johnson was aware of the BOP practices applied to Felipe, Yousef and Jones prior to his appeal. Evidence that the BOP applied the same policies and practices to other federal inmates is cumulative of information already in Johnson's possession at the time of his direct appeal. As discussed in relation to his ineffective assistance of counsel claim, Johnson has not demonstrated cause for or prejudice from failing to raise the claim earlier.

12

Even if Johnson's claim survived a procedural default, he fails to establish a *Brady* violation. Under *Brady* and its progeny, the prosecution has an affirmative duty to disclose evidence that is both favorable to the defense and material to either guilt or punishment. *Kyles*, 514 U.S. 419, 432-34 (1995). In order to establish a *Brady* violation, Johnson must show: (1) the government suppressed evidence; (2) the evidence was favorable to his defense; and (3) the evidence was material to an issue at trial. *United States v. Grintjes*, 237 F.3d 876, 880 (7th Cir. 2001). The government does not contest Johnson's contention that evidence relating to BOP practices was favorable to the defense. Rather, the government argues Johnson cannot establish either the first or third element of a *Brady* violation.

To establish that the government suppressed evidence, Johnson must demonstrate: (1) the government failed to disclose known evidence before it was too late for him to make use of the evidence; and (2) the evidence was not otherwise available to him through the exercise of reasonable diligence. *Collier v. Davis*, 301 F.3d 843, 850 (7th Cir. 2002). The court need not determine whether the government knew of the BOP's practices at the time of the sentencing hearing, through Vanyur or otherwise, because Johnson could have discovered the evidence through reasonable diligence. *United States v. Earnest*, 129 F.3d 906, 910 (7th Cir. 1997). For example, counsel could have discovered the circumstances surrounding Felipe's confinement conditions, including the district court's reliance on § 3582(d) in sentencing, through simple electronic research. A defense lawyer's failure to conduct research does not qualify as "suppression" for purposes of *Brady*.

In addition, Johnson fails to demonstrate the information was material to an issue at trial. Evidence is material under *Brady* "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985). The materiality standard under *Brady* is the same as the prejudice standard for an ineffective assistance of counsel claim under *Strickland*. *See Id.* at 694 (the standard of materiality applicable to withheld impeachment evidence was adapted from the formulation of prejudice in *Strickland v. Washington*, 466 U.S. 668, 694 (1984)). For the same reasons Johnson

13

failed to establish prejudice for his ineffective assistance of counsel claim, he fails to establish materiality for his *Brady* claim. Johnson's failure to establish a colorable *Brady* claim precludes discovery on this issue.

## C.   Eighth Amendment Violation Based on Inaccurate Testimony (Ground III)

Johnson claims his death sentence was based on materially incomplete, false and/or inaccurate information in violation of the Eighth Amendment. In making this argument, Johnson once again takes issue with Vanyur's testimony. In response, the government argues Johnson's Eighth Amendment claim is procedurally defaulted. Johnson fails to address the government's procedural default argument in his reply.

Johnson fails to establish cause for failing to raise his Eighth Amendment argument earlier. Indeed, Johnson argued on direct appeal that Vanyur's testimony was false or misleading. The Seventh Circuit rejected the premise of Johnson's Eighth Amendment claim, finding that "the warden's testimony, though it did not track the regulations exactly, was not false. The impression conveyed of practice and policy was correct." *Johnson*, 223 F.3d at 672. Based on the Seventh Circuit's decision, Johnson cannot establish prejudice.

## D.   Fifth and Sixth Amendment Violations (Grounds IV and V)

Pursuant to 18 U.S.C. § 3593(c) of the FDPA, evidence may be introduced at a capital sentencing hearing without regard to the Federal Rules of Evidence, except that information may be excluded if its probative value is outweighed by the danger of creating unfair prejudice, confusing the issues or misleading the jury. Johnson claims § 3593(c) violates the Fifth Amendment due process clause and the Sixth Amendment confrontation clause by allowing the use of hearsay evidence in the penalty phase of a capital trial. Johnson further argues that the indictment fails to allege all of the statutory aggravating factors relied on by the government at sentencing, in violation of the Fifth Amendment indictment clause. Johnson did not make these arguments on direct appeal. The government contends Johnson's claims are procedurally defaulted and fail on the merits. The

14

court need not reach the government's procedural default argument, because Johnson's claims fail on the merits.

Johnson's Fifth and Sixth Amendment claims are premised on the Supreme Court's recent decision in *Ring v. Arizona*, 122 S.Ct. 2428 (2002). In *Ring*, the Supreme Court held that facts increasing the statutory maximum punishment in a capital case must be proved beyond a reasonable doubt. *Id.* at 2448, *citing Apprendi v. New Jersey*, 530 U.S. 466, 494 n. 19 (1990). Both parties' arguments center on whether *Teague v. Lane*, 489 U.S. 288 (1989), bars the retroactive application of *Ring* to Johnson's case. Under *Teague*, developments in the law occurring after Johnson's sentence became final apply on collateral review only in rare circumstances. In their arguments, neither party cites the Seventh Circuit's recent decisions in *Trueblood v. Davis*, 301 F.3d 784, 788 (7th Cir. 2002) and *Szabo v. Walls*, 313 F.3d 392, 398-99 (7th Cir. 2002). In *Trueblood*, the Seventh Circuit accepted the parties' agreement that *Ring* could not be considered on collateral review because the Supreme Court had not yet held *Ring* to be retroactive. *Trueblood*, 301 F.3d at 788, *citing Tyler v. Cain*, 533 U.S. 656, 662-64 (2001). Less than four months later, the Seventh Circuit held that *Ring* does not apply retroactively on collateral review:

> Unfortunately for [petitioner], however, in order to apply *Apprendi* to capital sentencing, *Ring* first had to overrule *Walton v. Arizona*, 497 U.S. 639, 110S.Ct. 3047, 111 L.Ed.2d 211 (1990). Given *Teague*, it is *Walton* and not *Ring* that governs [petitioner's] claims on collateral attack. *See Curtis v. United States*, 294 F.3d 841 (7th Cir. 2002)(*Apprendi* does not apply retroactively on collateral attack).

*Szabo*, 313 F.3d at 399. *See also Ring*, 122 S.Ct. 2428, 2449 (O'Connor, J., dissenting)(noting that decision would not benefit the majority of prisoners already on death row because they would be barred from raising the issue retroactively on federal collateral review). At the time of Johnson's sentencing, the government was entitled to proceed as it did. *Id.* at 399, *citing Walton v. Arizona*, 497 U.S. 639 (1990) and *Williams v. New York*, 337 U.S. 241 (1949). Therefore, Johnson's Fifth and Sixth Amendment claims based on *Ring* lack merit.

15

## F.     Eighth Amendment Violation Based on Mental Retardation (Ground VI)

Johnson claims his execution violates the Eighth Amendment because he may be mentally retarded. *See Atkins v. Virginia*, 122 S.Ct. 2242 (2002)(Eighth Amendment precludes capital punishment of mentally retarded defendants). The government concedes that *Atkins* applies retroactively on collateral review because it excludes a class of defendants from eligibility for the death penalty. Response at 44, n. 7, *citing Penry v. Lynaugh*, 492 U.S. 302, 329-330 (1989). At sentencing, Johnson offered evidence that he is more likely a member of the brain impaired or dysfunctional population than the normal population. Tr. at 2122. Several tests performed on him rated all aspects of his intelligence quotient ("IQ") and problem-solving skills at the upper end of the mentally deficient or defective range. *Id.* at 2120-22. Johnson scored 79 for his verbal IQ, 74 for his performance IQ, and 76 for his overall IQ. *Id.* For problem-solving, Johnson's scores ranged from the bottom 2 to 3% of the population to the bottom 10% of the population. *Id.* at 2121-22. However, "clinical definitions of mental retardation require not only subaverage intellectual functioning, but also significant limitations in adaptive skills such as communication, self-care, and self-direction that became manifest before age 18." *Atkins*, 122 S.Ct. at 2250. Johnson's adaptive skills were never tested. Discovery motion at 12. With this additional evidence, Johnson may be able to state a colorable Eighth Amendment claim based on mental retardation.

For the most part, Johnson's discovery requests are not designed to obtain evidence necessary to support his Eighth Amendment claim. Johnson first requests government documents regarding its position on mental retardation in general. Discovery motion at 13, items 1, 2 and 5. Johnson does not explain how this information would establish his own mental deficiency under *Atkins*. Johnson next requests the government's evidence regarding his own mental deficiency. *Id.*, items 3 and 4. The government denies having such information. Response to discovery motion at 5. Finally, Johnson requests that the court "approve funding for the defense" to retain psychiatric and/or psychological experts to evaluate Johnson's previous testing and to conduct any additional testing that may be necessary. Discovery motion at 13; Reply at 40. Surprisingly, the government takes no

16

position on Johnson's generalized request for funds. Response to discovery motion at 6. Neither party provides a legal basis for the court to approve an unspecified amount of money for unhampered use by the defense. To the contrary, Rule 35(a) provides:

> When the mental or physical condition of a party or of a person in the custody or under the legal control of a party, is in controversy, the court in which the action is pending may order the party to submit to a physical or mental examination by a suitably licensed or certified examiner or to produce for examination the person in the party's custody or legal control. **The order may be made only on motion for good cause shown and upon notice to the person to be examined and to all parties and shall specify the time, place, manner, conditions, and scope of the examination and the person or persons by whom it is to be made.**

[Emphasis added.] Johnson's motion for discovery does not comply with the requirements of Rule 35(a). Therefore, Johnson's tardy discovery motion is denied without prejudice to his right to bring an appropriate Rule 35(a) motion. The § 2255 motion is denied as to Ground VI without prejudice, subject to renewal if a report issued pursuant to Rule 35(b) supports his claim under *Atkins*.

### G.  Fifth Amendment Violation based on Race Disparity (Ground VII)

Johnson claims the federal capital sentencing scheme is administered in a racially discriminatory manner. In order to prove an equal protection violation under the Fifth Amendment, Johnson must prove that the federal prosecutorial policy "had a discriminatory effect and that it was motivated by a discriminatory purpose." *Wayte v. United States*, 470 U.S. 598, 608 (1985). The government does not contest Johnson's showing of a discriminatory effect through evidence that the government could have sought the death penalty for other similarly situated defendants, but did not. *See* Memorandum at Ex. K. *See also United States v. Armstrong*, 517 U.S. 456, 468-69 (1996). Rather, the government claims Johnson cannot establish that his selection for death penalty prosecution was motivated by a discriminatory purpose.

Johnson has not demonstrated that the government acted with a discriminatory purpose when it selected him for death penalty prosecution. Johnson offers only statistics to demonstrate that the government intentionally discriminated against him. However, "statistics may not be the sole proof of a constitutional violation." *Chavez v. Illinois State Police*, 251 F.3d 612, 647-48 (7th Cir. 2001).

17

*See also McClesky v. Kemp*, 481 U.S. 279, 293 n. 12 (1987)(only in "rare cases [has] a statistical pattern of discriminatory impact demonstrated a constitutional violation . . . "). Johnson does not offer any additional evidence supporting a constitutional violation. Under these circumstances, Johnson is not entitled to discovery on his equal protection claim. *Armstrong*, 517 U.S. at 468-69.

## F. Juror Information (Ground VIII)

Johnson claims that extra-record information, misinformation and/or considerations may have infected the penalty phase jurors. The court previously denied Johnson's request to contact jurors, as well as his motion to review confidential juror questionnaires. *See* Minute Orders dated August 22 and September 27, 2002 entered in Case No. 96 CR 379. To date, Johnson has not provided evidence of any improper outside contact with the jury or identified any constitutional violation that could be proven through the use of the juror questionnaires. Under these circumstances, Johnson is not entitled to discovery. *See U.S. ex rel. Blankenship v. Circuit Court of Cook County*, 59 F. Supp. 2d 736, 739 (N.D. Ill. 1999), *quoting Calderon v. U.S. Dist. Court for the Northern Dist. Of California*, 98 F.3d 1102, 1106 (9th Cir. 1996)("A habeas petition may not use discovery for 'fishing expeditions to investigate mere speculation'").

## III. Motion for New Trial

Johnson's petition is based in part on Fed. R. Crim. P. 33. As the government points out, a motion for new trial based on newly discovered evidence must be made within three years of the verdict. Fed. R. Crim. P. 33. The verdict in this case was returned on November 4, 1997, but Johnson's petition was not filed until September 30, 2002. Johnson abandoned this basis for his petition by failing to address the issue in his reply. Johnson's petition is denied to the extent it is based on Fed. R. Crim. P. 33.

18

## CONCLUSION

Johnson's § 2255 petition is denied with prejudice as to Grounds I-V and VII-VIII. As to

Ground VI, Johnson's petition is denied without prejudice to his right to bring an appropriate Rule

35(a) motion.


March 11, 2003                                          ENTER:

                                                       Suzanne B. Conlon
                                                       United States District Judge


                                                   19

AO 450 (Rev. 5/85) Judgment in a Civil Case

# United States District Court
## Northern District of Illinois
### Eastern Division

DOCKETED

MAR 1 2 2003

UNITED STATES

v.

DARRYL JOHNSON

**JUDGMENT IN A CIVIL CASE**

Case Number: 02 C 6998

☐    Jury Verdict. This action came before the Court for a trial by jury. The issues have been tried and the jury rendered its verdict.

■    Decision by Court. This action came to trial or hearing before the Court. The issues have been tried or heard and a decision has been rendered.

IT IS HEREBY ORDERED AND ADJUDGED that the §2255 petition is denied with prejudice as to Grounds I-V and VII-VIII and without prejudice as to Ground VI.

Michael W. Dobbins, Clerk of Court

Date: 3/11/2003

Christopher Burton, Deputy Clerk

FILED

MAR 2 4 2003

MICHAEL W. ...
CLERK, U.S. ...

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff - Appellee - Respondent, | ) | No. 02 C 6998 |
| | ) | |
| vs. | ) | Hon. Suzanne B. Conlon |
| | ) | |
| DARRYL JOHNSON, | ) | |
| | ) | **Death Sentence Imposed** |
| Defendant - Appellant - Petitioner. | ) | |

**DOCKETED**

MAR 2 8 2003

## PETITIONER'S MOTION FOR APPONTMENT AND FUNDING OF EXPERT

Defendant Darryl Johnson, by his attorneys, Terence H. Campbell of Cotsirilos, Tighe & Streicker, and Lorinda Meier Youngcourt, moves the Court, pursuant to 21 U.S.C. §848(q) and/or Federal Rule of Civil Procedure 35(b), for funds to retain a psychologist with expertise in the area of mental retardation. In support of this motion, Defendant states as follows:

1.       Johnson alleged in his Motion to Vacate Judgment Pursuant to 28 U.S.C. §2255 [hereinafter "habeas petition"], in paragraph VI that his execution would violate his 8th Amendment right to be free from cruel and unusual punishment as set out in *Atkins v. Virginia*, 122 S.Ct. 2242 (2002). Johnson inartfully requested funds to retain an expert in order to investigate and provide the necessary evidence to support this claim. *See, Habeas Petition* at 13.

2.       The government concedes that *Atkins* applies retroactively on collateral review. Gov't Resp to Habeas Petition at 44, n7.

3.       The government has no objection to the Court ordering that funds be made available to Johnson for the purpose of retaining an expert. *See, Gov't Resp to Disc, p. 6.*

4.       21 U.S.C. §848(q)(4)(B)(9) provides, in pertinent part:

(B) In any post conviction proceeding under section 2254 or 2255 of
title 28, United States Code, seeking to vacate or set aside a death



sentence, any defendant who is or becomes financially unable to obtain adequate representation or investigative, expert, or other reasonably necessary services shall be entitled to the appointment of one or more attorneys and the furnishing of such other services in accordance with paragraphs (5), (6), (7), (8), and (9).

* * *

(9) Upon a finding that investigative, expert, or other services are reasonably necessary for the representation of the defendant, whether in connection with issues relating to guilt or the sentence, the court may authorize the defendant's attorneys to obtain such services on behalf of the defendant and, if so authorized, shall order the payment of fees and expenses therefor under paragraph (10). No *ex parte* proceeding, communication, or request may be considered pursuant to this section unless a proper showing is made concerning the need for confidentiality. Any such proceeding, communication, or request shall be transcribed and made a part of the record available for appellate review.

21 U.S.C. §848(q)(4)(B)(9); *see also*, Fed.R.Civ.Pr. 35(b).

5.     Johnson has previously been found to be indigent by this Court, and remains indigent to this day.  He is represented by appointed counsel.

6.     The American Association of Mental Retardation defines mental retardation as,

> [S]ubstantial limitations in present functioning. . . characterized by significantly subaverage intellectual functioning, existing concurrently with related limitations in two or more of the following applicable adaptive skill areas: communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure, and work. Mental retardation manifests before age 18.

Mental Retardation: Definition, Classification, and Systems of Supports, 5 (9th ed. 1992), *cited in*,

*Atkins v. Virginia*, 122 S. Ct. at 2245, n3.

7.     According to the American Psychiatric Association,

> The essential feature of Mental Retardation is significantly subaverage general intellectual functioning (Criterion A) that is accompanied by significant limitations in adaptive

functioning in at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety (Criterion B). The onset must occur before age 18 years (Criterion C).

American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, 41 (4th ed. 2000), *cited in, Atkins v. Virginia,* 122 S.Ct. at 2245, n3.

8.     A person with an IQ level of "50-55 to approximately 70" is classified as mildly mentally retarded.  Diagnostic and Statistical Manual, 42.

9.     The uncontradicted evidence during the penalty phase of trial was that Johnson had an performance IQ of 74. *See* Tr. at 2120-2122.  Johnson's adaptive functioning, however, was not evaluated by any experts who provided penalty phase testimony in Johnson's case. *See* March 11, 2003 Memorandum Opinion and Order at 16.

10.     According to the Diagnostic and Statistical Manual, "there is a measurement error of approximately five points in assessing IQ . . . Thus it is possible to diagnose Mental Retardation in individuals with IQs between 70 and 75 who exhibit significant deficits in adaptive behavior." *Id.* at 41-42.

11.     As this Court pointed out in its Memorandum Opinion and Order, if Johnson were able to marshal evidence of significant limitations in adaptive skills, "Johnson may be able to state a colorable Eighth Amendment claim based on mental retardation." Opinion at 16.

12.     Undersigned counsel wish to retain Dennis Olvera, Ph.D., an expert in mental retardation to evaluate Johnson. *A copy of Olvera's Circulum Vitae is attached hereto and incorporated herein by reference as Petitioner's Exhibit A.*

13.     Dr. Olvera has agreed to perform an evaluation on Johnson at the rate of one hundred dollars ($100.00) per hour for all time spent conducting interviews, testing, and document review.

He will charge fifty dollars ($50.00) per hour for his travel time. Dr. Olvera estimates that the evaluation can be completed for approximately five thousand dollars ($5,000.00) in fees. Dr. Olvera is available to begin working on Johnson's matter as of April 1, 2003 and believes that he can complete the evaluation by May 31, 2003, assuming the Court agrees to fund his work by April 1, 2003.

14.    Dr. Olvera is located in Carmel, Indiana, approximately, 100 miles and less than a two hour drive to the federal prison in Terre Haute.

15.    Dr. Olvera's fees are in compliance with 21 U.S.C. §848(q)(10)(B)[1].

WHEREFORE, Johnson respectfully requests this Court to enter an order (1) finding that the expert services of Dennis Olvera, Ph.D. are reasonably necessary for representation of Johnson; (2) authorize undersigned counsel to retain the services of Dr. Olvera for the purposes described herein and in Johnson's §2255 habeas petition; and (3) when appropriate, enter an order for payment of Dr. Olvera's fees and expenses.

Respectfully submitted,

_An attorney for Defendant Darryl Johnson_

Terence H. Campbell
Cotsirilos, Tighe & Streicker, Ltd.
33 North Dearborn Street, Suite 600
Chicago, Illinois 60602
(312) 263-0345

Lorinda Meier Youngcourt
Post Office Box 206
Huron, Indiana 47437-0206
(812)849-9852

---

[1] 21 U.S.C. § 848(q)(10)(B) provides that "fees and expenses paid for investigative, expert, and other reasonably necessary services authorized under paragraph (9) shall not exceed $7,500 in any case" unless payment in excess is certified by the Court.

# EXHIBIT A

# VITA

## DENNIS R. OLVERA, Ph.D.
## LICENSED PSYCHOLOGIST

### P.O. BOX 40
### CARMEL, INDIANA 46082-0040
### (317) 581-8846
### FAX: (317) 843-0267
### e-mail: denol@earthlink.net

## CURRENT POSITION

Operate a privately owned psychology services firm offering a broad range of client assessment and treatment services. Provide management and psychology consultation to a variety of public and private health care agencies. Major areas of consulting activity have included developmental disabilities, treatment of dually diagnosed (MI/MR) individuals, autism, management of severe behavior problems, evaluation of attention deficit hyperactivity disorders, disability determination, program evaluation and treatment systems planning. Consultation has been provided in public and community residential settings, in day program settings, and in public schools. Through participation on special review teams and individually, consultation has been provided to state mental health and developmental disabilities agencies in Indiana, Illinois, Minnesota, Missouri, Alabama and Florida. Services have been provided as an expert witness in litigation and due process hearings for jurisdictions in Illinois and Indiana. (August 1985 - present.)

## PAST EMPLOYMENT

**ASSISTANT SUPERINTENDENT** - New Castle State Hospital, P.O. Box 34 New Castle, Indiana 47362. Managed design and implementation of the total program of care for children and adult residents of a 300-bed developmental disabilities facility. Worked with representatives of various groups such as universities, external social service agencies and governmental units in diverse areas including research, provision of crisis intervention services, admissions, discharges and follow-along, network planning and services funding (June 1983 - August 1985).

**DIRECTOR OF EVALUATION** - Illinois Department of Mental Health and Developmental Disabilities, Region II Office, Chicago, Illinois. Managed a research project to determine mental health needs of the Chicago area population and equitability of funding.  Produced the regional proposal for developmental disabilities Tifle XIX (Medicaid) Waiver services. Project evaluator for two large deinstitutionalization projects for the mentally ill, having a combined funding level of $3.75 million. Managed development and maintenance of clinical and fiscal analysis and information systems (April 1982- June 1983).

**DIRECTOR EVALUATION AND TRAINING** - Region II Developmental Disabilities Administrative Office, Tinley Park, Illinois. Planned and managed an inservice training system for staff of three 400-bed facilities and ten field services offices. Developed and clinically managed a $1 million service program for behaviorally disordered developmentally disabled persons living in community settings. Managed the implementation of computer systems for client referral and tracking, client assessment, drug distribution, and drug prescription monitoring (September 1977- April 1982).

Exhibit A-1

**UNIT ADMINISTRATOR** - W.A. Howe Developmental Center, Tinley Park, Illinois. Managed one, sometimes two, 80-bed units for developmentally disabled adults, staffed by a professional team and approximately 100 direct-care workers. Management position preceded by 15 months as the unit psychologist (February 1975 - September 1977).

**CHIEF PSYCHOLOGIST** - Waukegan Developmental Center, Waukegan, Illinois. Developed admission screening instrument and the curriculum for inservice training in behavior management and resident care (September 1974- February 1975).

**RESEARCH SCIENTIST** - Behavior Research Laboratory, Anna State Hospital, Anna Illinois. Worked with a nationally prominent human behavior researcher to con-duct a program of social psychology investigation and co-authored journal and textbook articles (August 1972 - August 1974).

**UNIT DIRECTOR** - Illinois Security Hospital (now Chester Mental Health Center), Chester, Illinois. Managed a 40-bed unit of mentally ill, security-risk law offenders staffed by approximately 20 direct-care workers professional and nursing staff. Preceded by 14 months as a counselor at the same facility (August 1969 - December 1971).

## LICENSURE AND ORGANIZATION MEMBERSHIP

Licensed Psychologist, Indiana State Board of Examiners in Psychology. Granted *1985*. License #20010514. Health Service Provider in Psychology.

Registered Clinical Psychologist, Illinois Department of Professional Regulation. Granted 1976. Certificate #071-002105.

Member, American Psychological Association since 1975, #1285-2471M. Div. *25,* Behavior Analysis; Div. 33, Mental Retardation; Div. 42, Independent Practice.

Member, Indiana Psychological Association, since 1986.

Member, American Association on Mental Retardation, since 1999.

Member, Association for Behavior Analysis since, 1989.

Diplomate, American Board of Forensic Examiners since 1997. Fellow, 1998.

## EDUCATION

> **B.A.** Sociology, 1%9, Southern Illinois University at Carbondale
> **M .S.** Behavior Modification, 1973, Southern Illinois University at Carbondale
> **Ph.D.** Educational Psychology, 1975, Southern Illinois University at Carbondale

## PUBLICATIONS

Olvera, D. R., Dever, R. B. and Earnest, M.A. Mental retardation and sentences for murder: Comparison of two recent court cases. Mental Retardation, 2000, 38(3), 228-233.

Silverstein, B.J.; Olvera, D.R.; and Schalock, R. Allocating direct care-resources for treatment of maladaptive behavior: the Staff Intensity Scale, Mental Retardation, 1987, 25(2),91-100.

Exhibit A-2

Buckley, P and Olvera, D.R. Using Census data to assess mental health service needs in a large metropolitan area. American Psychological Association, JSAS, January 1983.

Olvera, D.R. (Executive Producer and Content Contributor) Aggression management training series. Winner of a Certificate of Creative Excellence, U.S. Industrial Film Festival, 1981. University of Illinois, 1983. ERIC EC 162903.

Olvera, D.R. (Editor, chapter author and content contributor). Human rights assurance procedures: readings for human rights and behavior management. Institute for Program Development, Tinley Park, Illinois: Region II Developmental Disabilities, 1981.

Olvera, D.R. Program evaluation through utilization review in a residential retardation facility. American Psychological Association, JSAS Catalog of Selected Documents in Psychology. November 1979.

Hake, D.E and Olvera, D.R. Cooperation, competition and related social phenomena. In Brigham, TA. and Catania, A.C (Eds.) Handbook of Applied Behavior Analysis:      Social and Instructional Processes. New York: Irvington Publishers, 1978.

Olvera, D.R. and Hake, D.F Producing a change from competition to sharing: effects of large and adjusting response requirements. Journal of the Experimental Analysis of Behavior, 1976, 26, 316 329.

Hake, D.E; Olvera, D.R. and Bell, J.C. Switching from competition to sharing or cooperation at large response requirements: competition requires more responding. Journal of the Experimental Analysis of Behavior, 1975, 24, 343 - 354.

Hake, D.F and Olvera, D.R. The measurement of sharing and cooperation as equity effects and some relationships between them. Journal of the Experimental Analysis of Behavior, 1975, 23, 63-79.

Olvera, D.R. The effects of large fixed-ratio and adjusting-ratio schedules on competitive responding Unpublished doctoral dissertation. Southern Illinois University, Carbondale, Illinois, August 1974.

Olvera, D.R. Enabling cooperative responses: cooperative responses that allow reinforcer delivery but do not affect the distribution of reinforcers. Unpublished thesis. Southern Illinois University, Carbondale, Illinois, May 1973.

## WORKSHOPS AND PAPERS PRESENTED

Olvera, D.R. and Earnest, M. Mental retardation -- Assessment of adaptive behavior. Presented at Death Penalty Defense in Indiana, Indiana Public Defender Council, Indianapolis, Indiana, September 2001.

Olvera, D.R. and Deer, J. Dually diagnosed (MR/MI) individuals: prevalence in central Indiana and services system response. Presented at meeting of staff psychologists of Community North Hospital, Indianapolis, IN, August 2000.

Earnest, M., Olvera, D.R. and Dever, R. B. Mental Retardation. Presented at Defending Death Penalty Cases, Indiana Public Defender Council, Indianapolis, Indiana, September 1998.

Exhibit A-3

Olvera, D.R. Psychometric testing for mental retardation. Presented to staff of the Marion County Public Defender Agency, Indianapolis, Indiana, March 1993.

Ellis, J. and Olvera, D.R. Intelligence and adaptive behavior assessment of persons with mental retardation. Presented at the Death Penalty Defense Seminar of the Indiana Public Defender Council, Indianapolis, Indiana, September 1996.

Olvera, D.R.  Behavior management for mentally retarded head trauma patients. Presented to staff of St. Vincent Hospital Neuro- Rehabilitation Center, Indianapolis, Indiana, April 1991.

Olvera, D. R. Use of edible reinforcers in behavior management programs. Presented to Dietitians in Developmental and Psychological Disorders Practice Group of the Indiana Dietetic Association, Muncie, Indiana, November 1990.

Bryan, M.B., Collins, J.S., Hobbs, J.A. and Olvera, D.R. A blueprint for OBRA Nursing Home Reform from a system already under construction, Presented at the Annual Meeting of the American Association on Mental Retardation, Chicago, Illinois, May 1989.

Olvera, D.R. Plenary session: Indiana scales of behavioral development. Presented at the 1986 Regional Conference of the American Association for Mental Deficiency, Ft.Wayne, Indiana, October 1986.

Olvera, D.R. and Bock, W.H. Statistical properties of the Indiana scales of behavioral development and companion assessments. Presented at the Annual Conference of the Indiana Association of Rehabilitation Facilities, Indianapolis, Indiana, September 1986.

Collins, J.; Olvera, D.R. and Swaim, N. Update: assessment of developmentally disabled in nursing homes as required by PL 28-85. Presented at the Fourth Annual Governor's Conference on Mental Health, Indianapolis, Indiana, December 1985.

Olvera, D.R. and Meunier, G.  Motivating employees. Workshop presented at the Annual Conference of the Indiana Health Care Association, French Lick, Indiana, May 1985

Olvera, D.R. Relationships among psychotropic medications, behavior problem severity and program restrictiveness. Presented at the First Annual Governor's Conference on Long-Term Care, Chicago, Illinois, March 1985.

Whiteman, T.; Morton, M.; Olvera, D.R. and Ryan, D.  Residential alternatives.  Presented at the 23rd Annual Governor's Conference on the Handicapped, Indianapolis, Indiana, October 1984.

Olvera, D.R.; Ward, R. and Meunier, G. The facility-wide programming system. Presented at the Sixth Annual Conference of the Indiana Chapter of the American Association on Mental Deficiency, French Lick, Indiana, October 1984.

Silverstein, B. and Olvera, D.R. A scale of maladaptive behaviors as a function of demand on personnel resources. Presented at the 108th Annual Meeting of the American Association on Mental Deficiency, Minneapolis, Minnesota, May 1984.

Exhibit A-4

Olvera, D.R. Monitoring drug prescriptions for behavior control and medical treatment: The Drug Intake, Management and Evaluation System. Presented at: Association for Behavior Analysis Conference, Milwaukee, Wisconsin, May, 1982.; Chicago Association for Behavior Analysis Conference, Chicago, Illinois, October 1981.

Olvera, D.R. Development and use of the Illinois Client Information System. Presented at Malcolm X College Title XX Training Workshop, Chicago, Illinois, June 1981.

Olvera, D.R. Screening long-term care populations through use of the Wide-Range Client Assessment. Presented at: Elgin Mental Health Center, Elgin, Illinois, February 1981; IDMHDD Program Evaluation and Research Council, Chicago, Illinois, December 1980.

Olvera, D.R. The aggression management training series. Presented at: Quinco Consulting Center Conference, Jasper, Indiana, July 1986, Lincoln Developmental Center Behavioral Programming Symposium, Lincoln, Illinois, May 1982; National Association of Superintendents of Public Residential Facilities for the Mentally Retarded, Mid-Winter Conference, Reno, Nevada, February 1982; Manteno Mental Health Center Manteno, Illinois, February 1982; Andrew McFarland Mental Health Center, Springfield, Illinois, February 1982; Developmental Disabilities Regional Coordinators Conference, Springfield, Illinois, February 1982; American Association on Mental Deficiency, Illinois State Chapter Conference, Peoria, Illinois, November 1981; Illinois Association of Rehabilitation Facilities Conference, Decatur, Illinois, October 1981. Course presented multiple times subsequently in public and private agencies across Illinois and Indiana.

Olvera, D.R. and Lehmann, J. Developmental disabilities human rights assurance procedures: a workshop. Presented at: Lake County Society for Human Development, Gurnee, Illinois, June 1981; Lincoln Developmental Center Behavioral Programming Symposium, Lincoln, Illinois, May 1981; Warren G. Murray Developmental Center, Centralia, Illinois, April 1981; Lincoln Developmental Center, Lincoln, Illinois, March 1981; Annual Convention of the Illinois Chapter of the American Association on Mental Deficiency, Springfield, Illinois, November 1980; Human Rights Task Force (Subregion 5) Conference, Chicago, Illinois, October 1980.

Olvera, D.R. Residential services evaluation: an overview- Presented at the Convention of the Illinois Association for Retarded Citizens, Springfield, Illinois, June 1980.

Olvera, D.R. Perspective on human rights and behavior management. Author sponsored workshop featuring Burton Blatt, Paul R. Friedman and local professionals, Alsip, Illinois, April 1980.

Olvera, D.R. Maladaptive behavior among skilled nursing facility residents. Presented at the Illinois Chapter Convention of the American Association on Mental Deficiency, Springfield, Illinois, November 1978.

Olvera, D.R. Program evaluation through utilization review. Presented at the 86th Annual Convention of the American Psychological Association, Toronto, Ontario, September 1978.

Olvera, D. R. and Hake, D.E Fixed-ratio size and adjustments affect human competitive responding. Presented at the 83rd Annual Conference of the American Psychological Association, Chicago, Illinois, September 1975.

Exhibit A-5

## SPECIALIZED TRAINING RECEIVED

Clinical Supervision Skills in Behavioral Health.   Presented by Jane M. Campbell, Ph.D., NCC, ACS.  Cross Country University, Columbus, OH, June 2001.

Legal Issues of Mental Health Treatment in Indiana.  Presented by Robert A. Anderson, JD, David Elliott Jose, JD, Phyllis J. Garrison, JD, Katherine Gerber Gregory, JD and Patricia Huber Strachan, JD.   Lorman Education Services, Indianapolis, January 2001.

Using a Person-centered Planning Strategy to Develop Goals for People with Behavioral Challenges.   Presented by Kurt A. Freeman and Cynthia M. Anderson. Association for Behavior Analysis, International, Chicago, May 1999.

The Analysis and Treatment of Habit Disorders with Simplified Habit Reversal Procedures. Presented by Raymond G. Miltenberger, Ph.D., Association for Behavior Analysis, International, Chicago, May 1999.

Prevention of Severe Problem Behaviors in Individuals with Developmental Disabilities. Presented by Christine E. Reeve, Ph.D. Association for Behavior Analysis, International, Chicago, May 1999.

Assessing Malingering and Deception. Presented by Randy Otto, Ph.D. American Academy of Forensic Psychology, St. Louis, November 1998.

Psychopharmacology: Basic Mechanisms and Applied Interventions. Lynda Dykstra, Ph.D., Chris-Ellyn Johanson, Ph.D., John R. Hughes, Ph.D., G. Alan Marlatt, Ph.D. and Bernard Weiss, Ph.D., American Psychological Association, May 1998.

Introduction to and Interpretation of the New Leiter-R. Presented by David H. Madsen, Ph.D., Indiana Association of School Psychologists, Indianapolis, October 1997.

Psychopharmacology: Better Living through Chemistry. Nick J. Piazza, Ph.D., LPCC, American Healthcare Institute, Indianapolis, September 1997.

Systemic, Nonlinear, Constructional Approaches to Behavior Change in Educational, Organizational and Clinical Settings. Presented by Paul T. Andronis, Joe Layng and Kent R. Johnson, Association for Behavior Analysis, International, Chicago, May 1997.

Sleep and its Disorders among Persons with Developmental Disabilities. Presented by V. Mark Durand and Eileen Mapstone, Association for Behavior Analysis, International, Chicago, May 1997.

No-Nonsense Guide to Group Home Management. Presented by Shirley O'Brien, Vicki Pommier, Roger Zhuang, Doris Duan and Jose Martinez-Diaz, Association for Behavior Analysis, International, Chicago, May 1997.

Psychotherapy in the Age of Accountability. Presented by Lynn D. Johnson, Ph.D., Indiana Psychological Association, Indianapolis, July 1996.

MMPI, MMPI-II & MMPI-A In Court: A Practical Guide for Expert Witnesses and Attorneys, Kenneth S. Pope, James N. Cuther and Joyce Seelen, American Psychological Association, June 1996.

Working with Anxious and Impulsive Children. Presented by Philip C. Kendall. Indiana Psychological Association, Indianapolis, November 1995.

Introduction to Standard Celeration Charting. Presented by Ogden R. Lindsley. Association for Behavior Analysis, International, Washington, D.C., May 1995.

Beyond Consequences: How to Use Stimulus Control Procedures in Applied Settings. Presented by Michael J. Cameron. Association for Behavior Analysis, International, Washington, D.C., May 1995.

Introduction to Clinical Hypnosis. American Psychological Association. April 1995

Advanced Workshop in Clinical Neuropsychology. Presented by Reitan Laboratory. Chicago, July 1994.

Basic Workshop in Clinical Neuropsychology. Presented by Reitan Laboratory. Phoenix, June 1993.

Essential Psychopharmacology. Presented by Harvard Medical School Continuing Education Program. Falmouth, Massachusetts, July 1991.

Exhibit A-7

**DOCKETED**

MAR 2 8 2003

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff - Appellee - Respondent, | ) | No. 02 C 6998 |
| | ) | |
| vs. | ) | Hon. Suzanne B. Conlon |
| | ) | |
| DARRYL JOHNSON, | ) | |
| | ) | **Death Sentence Imposed** |
| Defendant - Appellant - Petitioner. | ) | |

**NOTICE OF MOTION**

**FILED**

MAR 2 4 2003

MICHAEL W. [DOBBINS]
CLERK, U.S. DISTRICT COURT

TO:    David Bindi
       Assistant United States Attorney
       219 South Dearborn Street, Suite 500
       Chicago, Illinois  60604

PLEASE TAKE NOTICE that on Thursday, March 27, 2003, at 9:00 a.m., we shall appear before the Honorable Suzanne B. Conlon, United States District Judge, in the courtroom usually occupied by her at 219 South Dearborn Street, Chicago, Illinois, and present (1) Petitioner's Motion For Appointment and Funding of Expert; and (2) Petitioner's Motion To Alter, Amend, or Make Clarifying Findings Concerning the March 11, 2002 Judgment in Favor of the Respondent, Or Alternatively to Stay the Judgment, copies of which accompany this Notice and are hereby served upon you.

Respectfully submitted,

Attorney for defendant

Terence H. Campbell
Cotsirilos, Tighe & Streicker, Ltd.
33 North Dearborn Street, Suite 600
Chicago, Illinois  60602
(312) 263-0345



## CERTIFICATE OF SERVICE

Terence H. Campbell, an attorney, hereby certifies that he caused copies of (1) Petitioner's Motion For Appointment and Funding of Expert; and (2) Petitioner's Motion To Alter, Amend, or Make Clarifying Findings Concerning the March 11, 2002 Judgment in Favor of the Respondent, Or Alternatively to Stay the Judgment, to be served upon David Bindi, Assistant United States Attorney, 219 South Dearborn Street, Suite 500, Chicago, Illinois 60604, by messenger delivery, on this 24th day of March, 2003.

Terence H. Campbell

UNITED STATES DISTRICT COURT
NORTHER DISTRICT OF ILLINOIS
EASTERN DIVISION

**FILED** MAR 2 8 2003

MAR 2 4 2003

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff - Appellee - Respondent, | ) | No. 02 C 6998 |
| | ) | |
| vs. | ) | Hon. Suzanne B. Conlon |
| | ) | |
| DARRYL JOHNSON, | ) | |
| | ) | Death Sentence Imposed |
| Defendant - Appellant - Petitioner. | ) | |

### PETITIONER'S MOTION TO ALTER, AMEND AND MAKE CLARIFYING FINDINGS CONCERNING THE MARCH 11, 2003 JUDGMENT IN FAVOR OF THE RESPONDENT, OR ALTERNATIVELY TO STAY THE JUDGEMENT

Petitioner, Darryl Johnson, by his counsel, Terence H. Campbell and Lorinda Meier Youngcourt, respectfully moves the Court pursuant to Federal Rules of Civil Procedure 52(b) and 59(e) to alter, amend, or make clarifying findings concerning the finality and/or appealability of its March 11, 2003 judgment in favor of the Respondent, the United States. Alternatively, Petitioner respectfully moves this Court to stay the judgment until all claims raised in Petitioner's §2255 motion are finally resolved. In support of this motion, Petitioner states as follows:

1.     On March 11, 2003, this Court entered a judgment denying Petitioner's Motion to Vacate Conviction and Sentence and for New Trial Pursuant to 28 U.S.C. §2255 and Rule 33 of the Federal Rules of Criminal Procedure. In its March 11, 2003 ruling, this Court denied all of Johnson's claims with prejudice, except for the mental retardation claim, which it denied "without

-1-

prejudice, subject to renewal if a report issued pursuant to Rule 35(b)[1] supports his claim under *Atkins [v. Virginia]* ." March 11, 2002 Memorandum Opinion and Order at 17.

2. Contemporaneously with this motion, Johnson has filed a Motion for Appointment and Funding of Expert pursuant to 21 U.S.C. §848(q) and Rule 35(b). The expert which Johnson wishes to retain, Dr. Dennis Olvera, has indicated that he believes he can have his evaluation of Johnson completed by May 31, 2003 (assuming Court approval of his appointment), and Johnson believes he would be in a position to file an amended §2255 motion with the Court on his mental retardation claim within two weeks after receipt of Dr. Olvera's report if such an amended motion is supported by the evidence.

3. As it stands, the Court's March 11, 2003 judgment disposes of *some* of Johnson's claims (*i.e.* dismissing with prejudice the ineffective assistance claims, *Brady* violations, *Ring* claims, Eighth Amendment claim, hearsay at sentencing claim, race discrimination claim, juror claim, and denial of discovery), *but not all* of Johnson's claims (*i.e.* the mental retardation claim, which was denied without prejudice). *See* Memorandum Opinion and Order.

4. The general rule is that an appeal may be taken only upon a final judgment disposing of the entire case. 28 U.S.C. §1291 ("The courts of appeals ... shall have jurisdiction of appeals from all *final decisions* of the district courts of the United States ...") (emphasis added). The primary purpose of the final judgment rule is to preclude piecemeal appeals, which promotes efficiency both for the judiciary and for the litigants. *See, e.g., Richardson-Merrell, Inc. v. Koller*, 472 U.S. 424, 430 (1985) (final judgment rule prevents "piecemeal appellate review of trial court decisions which do not terminate the litigation").

---

[1] Johnson respectfully submits that 21 U.S.C. §848(q) also specifically applies to Johnson's application for funding of an expert with respect to his §2255 motion.

5.  If an order finally disposes of one or more, but fewer than all of the claims in an action, the order is only appealable if the District Court makes the express determination and direction for entry of judgment as required under Federal Rule of Civil Procedure 54(b). Rule 54(b) states in relevant part:

> When more than one claim for relief is presented in an action, whether as a claim, counterclaim, cross-claim, or third-party claim, or when multiple parties are involved, the court may direct the entry of a final judgment as to one or more but fewer than all of the claims or parties only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment. In the absence of such determination and direction, any order or other form of decision, however designated, which adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties shall not terminate the action as to any of the claims or parties, and the order or other form of decision is subject to revisions at any time before the entry of judgment adjudicating all the claims and the rights and liabilities of all the parties.

Fed.R.Civ.Pr. 54(b).

6.  In the instant case, Johnson's §2255 motion remains open subject to the submission of an amended motion on the mental retardation claim pending further evidentiary submissions (*see* Memorandum Opinion and Order at 16-17), and the order does not include the language of Rule 54(b). In similar circumstances, the Seventh Circuit has held that no final and appealable order exists. For instance, in *Phifer v. Warden, U.S. Penitentiary, Terre Haute*, the Court held that where further action by the district court is contemplated on any claim remaining in a habeas case, an order disposing of other claims, however titled, is not final. 53 F.3d 859, 862-63 (7th Cir. 1995) (citing cases). Here, additional proceedings before the district court are clearly contemplated with respect to Johnson's mental retardation claim. Similarly, in *Principal Mutual Life Ins. Co. v. Cincinnati TV 64 Ltd. Partnership*, 845 F.2d 674, 676 (7th Cir. 1988), the Court held that there was no final judgment where, as here, it appeared that the action could be reinstated by an amended complaint.

-3-

The reasoning of these cases applies equally here, and the Court should amend its order to specifically indicate that no final judgment exists, pending determination of the mental retardation claim.

7.      Petitioner's request makes sense not only because it will allow the Appellate Court to review this case at one time, rather than in multiple piecemeal appeals, but also because future events may obviate the need for an appeal at all. Indeed, the resolution of the mental retardation claim might moot the other potential appellate issues altogether. *See generally, Stringfellow v. Concerned Neighbors In Action*, 480 U.S. 370, 380 (1987) (review of issues that may become moot or irrelevant would burden appellate courts); *Cheng v. Comm'r Internal Revenue Service*, 878 F.2d 306, 310 & n.5 (9th Cir. 1989) ("final disposition in the trial court, by way of settlement or ultimately acceptable judgment, may preclude any appeal at all.").

8.      In short, if Johnson is required to pursue his appeal on the issues denied with prejudice, before first completing litigation of the mental retardation claim before this Court, it will result in the piecemeal litigation of Johnson's §2255 petition, and the undoubtable inefficiencies and additional costs -- both to the parties and to the courts -- which accompany such a process.

9.      Federal Rule of Civil Procedure 59 provides in pertinent part:

> On a motion for a new trial in an action tried without a jury, the court may open the judgment if one has been entered, take additional testimony, amend findings of fact and conclusions of law or make new findings and conclusions, and direct the entry of a new judgment.

To the extent necessary, if any, Johnson requests the Court to enter an order re-opening his case to allow for the granting of his motion for funds and the filing of an amendment to his original §2255 motion in the event the expert is able to provide evidence that Johnson is mentally retarded.

10.  Alternatively, Petitioner respectfully requests that this Court enter an order staying the judgment on Johnson's claims which were denied "with prejudice" pending a final determination on the remaining mental retardation claim.

WHEREFORE, for the reasons set forth above, Petitioner respectfully requests that this Court:

1.  alter, amend or clarify its order of March 11, 2003 to indicate that it is *not* a "final judgment" (and therefore not appealable) because it does not dispose of all the claims;

2.  re-open the case pending a final resolution of Petitioner's mental retardation claim; or

3.  stay the judgment entered by the Court on March 11, 2003 pending a final resolution of Petitioner's mental retardation claim.

Petitioner also respectfully requests this Court to grant any other relief it deems appropriate.

Respectfully submitted,

An attorney for Defendant Darryl Johnson

Terence H. Campbell
Cotsirilos, Tighe & Streicker, Ltd.
33 North Dearborn Street, Suite 600
Chicago, Illinois 60602
(312) 263-0345

Lorinda Meier Youngcourt
Post Office Box 206
Huron, Indiana 47437-0206
(812)849-9852

Minute Order Form (06/97)

Case 1:02-cv-06998   Document 24   Filed 03/27/03   Page 1 of 1   PageID 229
Case: 11-1326   Document: 8-2   Filed: 03/04/2011   Pages: 342

**United States District Court, Northern District of Illinois**

| Name of Assigned Judge or Magistrate Judge | Suzanne B. Conlon | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 6998 (96 CR 371) | **DATE** | 3/27/2003 |
| **CASE TITLE** | UNITED STATES OF AMERICA vs. DARRYL JOHNSON | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ■ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to] ☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Petitioner's motion for appointment and funding of expert and motion to alter, amend and make clarifying findings concerning the March 11, 2003 judgment in favor of the respondent, or alternatively to stay the judgment are taken under advisement.

*Suzanne B. Conlon*

(11) ☐ [For further detail see order (on reverse side of/attached to) the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | | **Document Number** |
| | No notices required. | | number of notices | |
| | Notices mailed by judge's staff. | | MAR 28 2003 | |
| | Notified counsel by telephone. | | date docketed | |
| ✓ | Docketing to mail notices. | | docketing deputy initials | 24 |
| | Mail AO 450 form. | | | |
| | Copy to judge/magistrate judge. | U.S. DISTRICT COURT | | |
| CB | courtroom deputy's initials | 03 MAR 27 PM 4: 32 | date mailed notice | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

## United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Suzanne B. Conlon | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 6998 (96 CR 379-1) | **DATE** | 3/31/2003 |
| **CASE TITLE** | UNITED STATES vs. DARRYL JOHNSON | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due _____.

(4) ☐ Ruling/Hearing on ____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]  Petitioner's motion to alter, amend and make clarifying findings concerning the March 11, 2003 judgment [23-1] is denied.  His alternative motion to stay the judgment [23-2] is granted.  The judgment entered March 11, 2003 is stayed pending resolution of petitioner's mental retardation claim.

*Suzanne B. Conlon*

(11) ☐ [For further detail see order (on reverse side of/attached to) the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | | **Document Number** |
| | No notices required. | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | | |
| | Notified counsel by telephone. | MAR 3 1 2003 | date docketed | 25 |
| | Docketing to mail notices. | | | |
| | Mail AO 450 form. | U.S. DISTRICT COURT | docketing deputy initials | |
| | Copy to judge/magistrate judge. | CLERK | | |
| CB | courtroom deputy's initials | 03 MAR 31 PM 12: 05 | 3/31/2003 date mailed notice | |
| | | Date/time received in central Clerk's Office | PW mailing deputy initials | |

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Suzanne B. Conlon | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 6998(96CR379-1) | **DATE** | 3/31/2003 |
| **CASE TITLE** | UNITED STATES vs. DARRYL JOHNSON | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due _____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)   ☐ Local Rule 41.1   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]   Petitioner's motion for appointment of Dennis R. Olvera, Ph.D., a licensed psychologist, to evaluate petitioner's adaptive functioning [22-1] is granted. Dr. Olvera's fees and costs shall not exceed $5,000. Requests for payment must be submitted on appropriate court forms with the required substantiation.

*Suzanne B. Conlon*

(11) ☐ [For further detail see order (on reverse side of/attached to) the original minute order.]

| | | |
|---|---|---|
| | No notices required, advised in open court. | |
| | No notices required. | |
| ✓ | Notices mailed by judge's staff. | |
| | Notified counsel by telephone. | |
| | Docketing to mail notices. | |
| | Mail AO 450 form. | |
| | Copy to judge/magistrate judge. | |

U.S. DISTRICT COURT

03 MAR 31 PH 12:05

Date/time received in central Clerk's Office

number of notices

MAR 3 1 2003
date-docketed

docketing deputy initials

3/31/2003
date mailed notice

PW
mailing deputy initials

Document Number

26

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA )
)
vs. ) No. 02 C 6998
) Judge Suzanne B. Conlon
DARRYL JOHNSON )

**MOTION TO RECONSIDER BASIS FOR REJECTING
INEFFECTIVE ASSISTANCE CLAIM AND FOR ENTRY OF JUDGMENT**

The UNITED STATES OF AMERICA, by its attorney, PATRICK J. FITZGERALD, United States Attorney for the Northern District of Illinois, moves this Court to reconsider its basis for rejecting Johnson's claim of ineffective assistance of counsel, and for entry of final judgment. In support of this motion, the government states as follows:

1. On March 11, 2003, this Court entered a Memorandum Opinion and Order rejecting all of the claims raised in Johnson's motion pursuant to 28 U.S.C. § 2255, save one. Judgment was stayed to allow Johnson an opportunity to gather support for his claim that he is mentally retarded, and therefore ineligible for a sentence of death under the Eighth Amendment as construed in *Atkins v. Virginia*, 536 U.S. 304 (2002). It is the government's belief that at this point, Johnson and his counsel have decided not to pursue this claim.

2. Johnson raised a claim of ineffective assistance of counsel at the sentencing phase, for failure to investigate and develop information regarding the Bureau of Prisons' Special Administrative Measures for dealing with dangerous inmates, for use in cross-examining Warden Vanyur. The government argued in the alternative that (a) the claim was procedurally defaulted because the record supporting it was complete at the time of direct

appeal, and that the cause and prejudice tests for procedurally defaulted claims, see *United States v. Frady*, 456 U.S. 152, 170 (1982), applied; and (b) that even under the less stringent prejudice test for non-defaulted claims, see *Strickland v. Washington*, 466 U.S. 668, 694 (1984), the claim should be rejected.  Gov.Resp. 8-22.

3.  This Court agreed that the claim was procedurally defaulted, and applied the *Frady* cause and prejudice tests (Mem.Op. 5-8), but the Court also considered the claim on the merits, which could be read as an application of the *Strickland* prejudice test in the alternative.  Mem.Op. 8-10.

4.  On April 23, 2003, a little more than a month after this Court issued its Memorandum Opinion and Order, the Supreme Court decided *Massaro v. United States*, 538 U.S. 500 (2003).  *Massaro* held that ineffective assistance claims are not procedurally defaulted, even if the record was complete at the time of direct appeal and the claim could have been raised then.  *Id*. at 504 ("We hold that an ineffective-assistance-of-counsel claim may be brought in a collateral proceeding under § 2255 whether or not the petitioner could have raised the claim on direct appeal.").

5.  It is appropriate in light of *Massaro* that this Court reconsider its treatment of the ineffective assistance claim by applying the *Strickland* prejudice test, to the extent it has not already done so.

6.  The government has nothing to add to the arguments presented in its response to the § 2255 motion, and submits that for the reasons stated in the response, and this Court's

Memorandum Opinion and Order, Johnson was not prejudiced, within the meaning of *Strickland*, by the alleged deficiencies of trial counsel.  Johnson has already fully briefed the question of prejudice under the *Strickland* standard.  Mem. 21-31; Reply 6-24.  He denied that the claim was procedurally defaulted (Reply 2-6), and never addressed the *Frady* prejudice standard.

7.  Following reconsideration in light of *Massaro*, this Court should reject the ineffective assistance claim and enter final judgment.

Respectfully Submitted,

PATRICK J. FITZGERALD,
United States Attorney

By:    /s/ David E. Bindi
DAVID E. BINDI
Assistant U.S. Attorney
219 South Dearborn Street
5th Floor
Chicago, Illinois 60604
(312) 886-7643

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA      )
                              )
      vs.                     )      No.  02 C 6998
                              )      Judge Suzanne B. Conlon
DARRYL JOHNSON                )

**NOTICE OF MOTION**

To:   Terrence Campbell                    Lorinda Meier Youngcourt
      Cotsirilos, Tighe & Streicker, Ltd.   P.O. Box 206
      33 North Dearborn Street              Huron, Indiana 47437-0206
      Suite 600
      Chicago, Illinois 60602

      PLEASE TAKE NOTICE that on Tuesday, November 13, 2007, at 9:00 a.m., I shall appear before the Honorable Suzanne B. Conlon, United States District Court, in the courtroom usually occupied by her at 219 South Dearborn Street, Chicago, Illinois, and present the government's Motion to Reconsider Basis for Rejecting Ineffective Assistance Claim and for Entry of Judgment, service of which is made upon you.

                              Respectfully Submitted,

                              PATRICK J. FITZGERALD,
                              United States Attorney


                        By:      /s/ David E. Bindi
                              DAVID E. BINDI
                              Assistant U.S. Attorney
                              219 South Dearborn Street
                              5th Floor
                              Chicago, Illinois 60604
                              (312) 886-7643

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| vs. | ) | No.  02 C 6998 |
| | ) | Judge Suzanne B. Conlon |
| DARRYL JOHNSON | ) | |

## NOTICE OF MOTION

To:   Terrence Campbell                    Lorinda Meier Youngcourt
      Cotsirilos, Tighe & Streicker, Ltd.   P.O. Box 206
      33 North Dearborn Street              Huron, Indiana 47437-0206
      Suite 600
      Chicago, Illinois 60602

        PLEASE TAKE NOTICE that on Tuesday, November 13, 2007, at 9:00 a.m., I shall appear before the Honorable Suzanne B. Conlon, United States District Court, in the courtroom usually occupied by her at 219 South Dearborn Street, Chicago, Illinois, and present the government's Motion to Reconsider Basis for Rejecting Ineffective Assistance Claim and for Entry of Judgment, service of which is made upon you.

                                Respectfully Submitted,

                                PATRICK J. FITZGERALD,
                                United States Attorney


                        By:     /s/ David E. Bindi
                                DAVID E. BINDI
                                Assistant U.S. Attorney
                                219 South Dearborn Street
                                5th Floor
                                Chicago, Illinois 60604
                                (312) 886-7643

UNITED STATES DISTRICT COURT
NORTHER DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>    Respondent-Appellee-Plaintiff, | No. 02 CV 6998 |
| v. | The Honorable Suzanne B. Conlon |
| DARRYL JOHNSON,<br>    Petitioner-Appellant-Defendant. | Death Sentence Imposed |

**PETITIONER'S RESPONSE TO GOVERNMENT'S
MOTION TO RECONSIDER THE COURT'S MARCH 11, 2003 OPINION
AND ORDER IN LIGHT OF THE SUPREME COURT'S RULINGS
IN *MASSARO v. UNITED STATES*, *WIGGINS v. SMITH*, AND *ROMPILLA v. BEARD***

Petitioner Darryl Johnson, by his counsel, Terence H. Campbell and Lorinda Meier Youngcourt, respectfully submit this response to the Government's Motion to Reconsider the Court's March 11, 2003 ruling in light of the Supreme Court's subsequent decision in *Massaro v. United States*, 538 U.S. 500 (2003).

Petitioner Johnson also hereby moves the Court pursuant to the United States Supreme Court's decisions in *Wiggins v. Smith*, 539 U.S. 510 (2003) and *Rompilla v. Beard*, 545 U.S. 374 (2005), to reconsider and set aside its March 11, 2003 judgment in favor of the United States on Johnson's ineffective assistance of counsel claims.

**I.    BACKGROUND**

After exhausting his direct appeal, Johnson filed a Motion to Vacate Conviction and Sentence and for New Trial Pursuant to 28 U.S.C. §2255 and Rule 33 of the Federal Rule of Criminal Procedure (hereinafter referred to as "§ 2255 petition").  Johnson's first claim of error was a claim that his trial counsel provided ineffective assistance based on a number of demonstrated failures at

1

Johnson's penalty-phase hearing. (*See* §2255 Petition, Claim I; Init. § 2255 Memo in Support at pp. 3-48; Reply Mem. at pp. 6-24).

On March 11, 2003, this Court entered a judgment denying most of the claims raised in Johnson's § 2255 petition, including his claim of ineffective assistance of counsel with respect to his penalty-phase hearing. The Court held that Johnson had procedurally defaulted that claim by failing to raise it on his direct appeal based on certain Seventh Circuit caselaw which indicated that "[a]n ineffective assistance of counsel claim 'apparent from the trial record or from evidence that is a matter of public record' must be raised on direct review." (March 11, 2003 Order at 6, citing *Bond v. United States*, 1 F.3d 631, 636 (7th Cir. 1993); *United States v. Taglia*, 922 F.2d 413, 418 (7th Cir. 1991); *see also*, March 11, 2003 Order at 5, citing *Guinan v. United States*, 6 F.3d 468, 471-72 (7th Cir. 1993)). Based on this caselaw, the Court held that "Johnson's claim regarding the ineffectiveness of his trial counsel in failing to present this evidence [discrediting Warden Vanyur's testimony regarding the potential conditions of confinement] during sentencing should have been raised on direct appeal." (March 11, 2003 Order at 7).[1] The Court concluded, therefore, that Johnson had procedurally defaulted his ineffective assistance of counsel claims arising out of his counsel's failure to investigate and present certain evidence at his sentencing. The Court further held that because of Johnson's failure to raise those issues on direct appeal, those issues could only be addressed in Johnson's § 2255 petition if Johnson could overcome the strenuous "cause and prejudice" standard announced in *United States v. Frady*, 456 U.S. 152, 170 (1982) applicable to issues which have been procedurally defaulted. (March 11, 2003 Order at 7, 10) (noting that the

---

[1] Johnson had argued that there was no procedural default of his ineffective assistance claim. *See*, Johnson's Initial Reply in Support of his § 2255 Petition at pp. 1-6.

2

"cause and prejudice standard is more rigorous than the plain error standard used on direct review,"

citing *Frady*, 456 U.S. at 170).  Based on its finding of procedural default, the Court further

concluded that Johnson had not pled a "colorable claim," and, therefore, also rejected Johnson's

request for discovery under Habeas Rule 6.  (*See*, March 11, 2003 Order at 10).

## II.   ARGUMENT

### A.   The Supreme Court's Decision in *Massaro* Requires The Court to Reconsider Its Ruling Denying Johnson's Ineffective Assistance of Counsel Claims

On April 23, 2003 – after the issuance of this Court's March 11, 2003 Order discussed above

– the United States Supreme Court decided *Massaro v. United States*, 538 U.S. 500 (April 23, 2003),

which expressly overruled the Seventh Circuit precedent on which this Court relied in finding that

Johnson had procedurally defaulted his ineffective assistance of counsel claim:   "We hold that an

ineffective-assistance-of-counsel claim may be brought in a collateral proceeding under § 2255,

*whether or not the petitioner could have raised the claim on direct appeal*."  *Massaro*, 538 U.S. at

504 (emphasis added).  The Supreme Court explained that subjecting ineffective assistance claims

to the *Frady* "cause and prejudice" rule "creates inefficiencies for courts and counsel, both on direct

appeal and in the collateral proceeding."  *Id.* at 505-07.

Accordingly, based on the Supreme Court's *Massaro* decision, it is necessary that the Court

reconsider its March 11, 2003 ruling and address the merits of Johnson's ineffective assistance

claims under the standards set out in *Strickland v. Washington*, 466 U.S. 668 (1984), *United States*

*v. Cronic*, 466 U.S. 648 (1984)*, Strickler v. Greene*, 527 U.S. 263 (1999), *Williams v. Taylor*, 529

U.S. 362 (2000), and their progeny, and not under the considerably heightened "cause and prejudice"

3

test of the procedural default doctrine.[2]  As was discussed in Johnson's prior submissions, *Strickland*,

*Cronic*, *Strickler*, *Williams*, and their progeny – as well as the more recent Supreme Court

discussions in *Wiggins v. Smith* and *Rompilla v. Beard* (discussed below) – require only that

Petitioner establish a "***reasonable probability***" that the outcome of the sentencing hearing may have

been different. (*See, e.g.,* Init. § 2255 Memo in Support at 6, 33-35, 45).  And, notably, the Supreme

Court has made clear that a "reasonable probability" is a *lesser* burden than a preponderance

standard. *Strickland* at 693 ("a defendant need not show that counsel's deficient conduct more likely

than not altered the outcome of the trial."); *see also Williams,* 529 U.S. at 405-06 (2000) (O'Connor,

J., concurring) (state court rejection of ineffectiveness claim on grounds that prisoner failed to

establish by "a preponderance of the evidence" that the outcome would have differed would be

contrary to clearly established precedent).  Moreover, the Supreme Court's decision in *Cronic*, 466

U.S. 648 holds that where defense counsel "fails to subject the prosecution's case to meaningful

adversarial testing, then there has been a denial of Sixth Amendment rights that makes the adversary

process itself presumptively unreliable" – and therefore, *no additional showing of prejudice is*

*required*.  Cronic, 466 U.S. at 659.  Clearly, the lack of meaningful adversarial testing has been

established as to the evidence offered by Vanyur which was, even according to the government,

---

[2] Although the Court briefly addressed the "merits" of Johnson's ineffective assistance of
counsel claim on pages 8-10 of its March 11, 2003 Order, it did so solely in the context of its
procedural default "cause and prejudice" analysis, which is an extremely strict standard. *E.g.*,
*United States v. Frady*, 456 U.S. 152.  Moreover, the Seventh Circuit has noted, "there remains
some debate as to whether 'prejudice' under *Strickland* and 'prejudice' under the cause and
prejudice standard are identical." *Belford v. United States*, 975 F.2d 310, 314 (7th Cir. 1992);
*Freeman v. Lane*, 962 F.2d 1252, 1259 n.5 (7th Cir. 1992) (noting the debate).  We submit that
the caselaw, including the recent Supreme Court decisions in *Wiggins* and *Rompilla* (discussed
herein), make clear that standards under *Cronic*, *Strickland* and their progeny are and markedly
different from the cause and prejudice standard of *Frady*.

incomplete and quite possibly misled the jury on the critical issue of "future dangerousness."  (*See*, *e.g.*, Init. § 2255 Memo in Support at 4, 21-22, 31-32 (discussing *Cronic* in argument on ineffective assistance claim at pp. 3-48)).

We respectfully submit that a "reasonable probability" of a different result is certainly established by the factual assertions and legal authority already of record in this § 2255 proceeding – and could be further established through the requested discovery – based on trial counsel's ineffective assistance.  This is particularly so in light of the fact that ***the death penalty would have been avoided had the defense been able to "convince only one of twelve jurors to refuse to go along with ta death sentence.***"[3]  *Emerson v. Gramley*, 91 F.3d 898, 907 (7th Cir. 1996) (emphasis added).  *See also*, 18 U.S.C. § 3593(e) (requiring unanimous vote of jury to impose death sentence); *Strickland*, 466 U.S. at 706 ("counsel's general duty to investigate * * * takes on supreme importance to a defendant in the context of developing mitigating evidence to present to a judge or jury considering the sentence of death; claims of ineffective assistance in the performance of that duty should therefore be considered with commensurate care.") (Brennan, J., concurring in part and dissenting in part); *California v. Ramos*, 463 U.S. 992, 1009 (1983) (stressing need that capital juries receive only "accurate information for its deliberation in selecting an appropriate sentence").[4] .

---

[3] The bases for Petitioner's ineffective assistance of counsel claims are set forth in some detail in his Habeas Petition and supporting memoranda.  *See* Initial Mem. in Support at 3-48; Reply Mem. at 6-24.

[4] As Justice Stewart wrote for a plurality of the Court:

> [T]he penalty of death is qualitatively different from a sentence of imprisonment, however long.  Death, in its finality, differs more from life imprisonment than a 100-year prison term differs from one of only a year or two.  Because of that qualitative difference, there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case.

B.    The Court Should Consider Recent Supreme Court Decisions In *Wiggins v. Smith* and *Rompilla v. Beard* Which Further Illuminate the Standards To Be Applied To Johnson's Ineffective Assistance Of Counsel Claim

In addressing the merits of Johnson's ineffective assistance claims as required by *Massaro*, we respectfully suggest that the Court should by guided by two Supreme Court decisions which were issued after this Court's initial ruling in March 2003:  *Wiggins v. Smith*, 539 U.S. 510 (June 26, 2003), and *Rompilla v. Beard*, 545 U.S. 374 (2005).  Both *Wiggins* and *Rompilla* further support the relief requested by Johnson in this Court.

As the Court is aware, the central issue at the penalty phase of Johnson's trial was the issue of "future dangerousness" and, more particularly, the facilities, authority, and practices of the BOP that could eliminate the possibility of Johnson posing a future danger to anyone.  This issue was the subject of significant testimony, and was the centerpiece of the arguments to the jury, both for the prosecution and the defense.

A significant aspect of Petitioner's ineffective assistance claim is that trial counsel did not adequately research the law or relevant facts in mitigation on this issue, and as a result, defense counsel utterly failed to confront the government's evidence during the penalty phase of his trial, nor did they put on evidence showing the falsity of the government witness's testimony in mitigation. For example, Johnson's trial counsel did not research, put on no evidence, offered no jury instructions, and failed to inform either the trial court or the jury about (a) the BOP regulations contained in 28 C.F.R. § 501.3, regarding the BOP's authority to impose strict conditions of confinement; (b) the conditions of confinement specifically allowed to be imposed under 18 U.S.C. § 3582(d); or (c) the actual BOP practices where inmates had been – *and were being* – incarcerated

*Woodson v. North Carolina*, 428 U.S. 280, 305 (1976).

under precisely the conditions of confinement that Warden Vanyur claimed were impossible. (Init. § 2255 Mem. in Support, Ex. B, ¶3). Both the BOP regulations contained in § 501.3 and § 541.41(b)(2), and the statutory authority conferred by § 3582(d) make clear that the sentencing court and the BOP each have the independent authority to order and impose, for as long as necessary, precisely the strict conditions of confinement that Warden Vanyur testified could not possibly occur.

Moreover, there was evidence available to defense counsel that not only did the BOP and the courts have this authority, but such strict conditions of confinement were, in fact, being imposed and carried out on other inmates by Warden Vanyur's BOP at the very same time he testified unequivocally to Darryl Johnson's jury that those conditions were impossible to impose or carry out. And earlier in 1997, prior to Johnson's trial, the government had forcefully argued to the Second Circuit that both the court and BOP had the express authority, under those same BOP regulations and statutory provisions cited above, to impose precisely the strict conditions of confinement that were disavowed by Vanyur. (Ex. A hereto at 36-45, Govt. Br. in *United States v. Felipe*, Case No. 97-1155). None of this, however was brought to the attention of the Court or the jury. Indeed, Johnson's trial counsel did virtually nothing to confront Warden Vanyur's inaccurate and misleading testimony on this central issue of future dangerousness. Trial counsel's failure to investigate was then compounded by the fact that they allowed the government's BOP "expert," Warden Vanyur, offer, without objection, improper (and inaccurate) legal opinion testimony regarding the BOP's power and authority to impose and maintain these strict conditions of confinement for as long as necessary – an error that was specifically noted by the Seventh Circuit in Johnson's direct appeal. *United States v. Johnson*, 223 F.3d 665, 671 (7th Cir. 2000) ("To the extent that these policies are prescribed or codified in statutes or regulations, as distinct from being informal policies, this

testimony was improper ...  Witnesses testify about fact, not law. When a legal proposition is relevant to the jury's consideration, the proper procedure is for the judge to instruct the jury on the proposition.").

Quite notably, the government shares the opinion that Johnson's counsel failed to subject the prosecution's future dangerousness case to meaningful adversarial testing.  Thus, the government, in opposing Johnson's Petition for *Certiorari* on direct appeal, essentially conceded that defense counsel's failure to properly investigate and cross-examine Warden Vanyur as to the possible conditions of confinement was both ineffective and prejudicial.  As the government stated,

> *[T]he existence of Section 501.3 and Section 3582(d) was relevant information for the jury*.  Without that information, the jury may have held the *mistaken impression* that no legal authority existed to limit [Johnson's] communications and contacts while in prison in order to curtail his future dangerousness.

(Init. §2255 Mem. in Support, Ex. A, Govt. Opp. to *cert*. at 21) (emphasis added).[5]  *See also*, *id.* at 14 (similar).  The government claimed, however, that no relief was warranted on direct appeal because "*petitioner could have discovered it and presented it to the jury.*"  *Id.* (emphasis added); *see also*, *id*., Ex. A, Govt. Opp. to *cert*. at 26 ("Petitioner cannot make that necessary showing because *his counsel could readily have discovered Section 501.3 in the Code of Federal Regulations and Section 3582(d) in the United States Code.*") (emphasis added).

In  that same brief, the government continued along this line stating:

> Johnson's counsel "injected the BOP's capacity to confine inmates into the proceedings by presenting the testimony of [Dr. Cunningham].  *Due diligence [i.e. effective assistance of counsel] required petitioner to inform himself of legal*

---

[5] In fact, it is well beyond a mere possibility; it is a near metaphysical certainty that the jury held this "mistaken impression" which utterly destroyed the heart of the defense's case at the penalty phase where the one and only issue was a decision between life in prison without any chance of release, or death.

> *authority relevant to that testimony, and nothing precluded him from raising Section 501.3 or Section 3582(d) in cross-examination of Warden Vanyur, surrebuttal testimony, or by requesting an instruction from the jury.*

(*Id*., Ex. A, Govt. Opp. to *cert*. at 26) (emphasis added). These admissions by the government concede that the first prong of *Strickland* is satisfied.

Likewise, in that same brief before the Supreme Court, the government also set out the case that defense counsel's errors were prejudicial to Johnson. Significantly, the government acknowledged to the Supreme Court the impact and import that Warden Vanyur's faulty and now discredited testimony played during the government's closing argument to the jury at the penalty phase:

> The government did briefly contend in its rebuttal argument that, pursuant to BOP regulations, [Johnson] would not be sent directly to the control unit at ADX Florence but rather to an open population maximum-security penitentiary. Tr. 2645-2466, 2648. ***Those remarks (to which petitioner did not object) could have left the impression that, absent the death penalty, there was no legal authority to limit the defendant's communications. As we have acknowledged, there is in fact such authority * * ****

(Init. § 2255 Memo in Support, Ex. A, Govt. Opp. to *cert*. at 28-29) (emphasis added). All of this shows that even the government recognizes that Johnson's trial counsel failed in their duty to provide effective assistance of counsel at the penalty phase of Johnson's trial.

The importance of adequate research and investigation of mitigation evidence by defense counsel in preparation for capital sentencing hearings – indeed the constitutional requirement for such research and investigation – has now been further emphasized and explained by the Supreme Court's decisions in *Wiggins v. Smith*, 539 U.S. 510 (June 26, 2003) and *Rompilla v. Beard*, 545

U.S. 374 (2005), both of which granted habeas relief based on trial counsel's inadequate research and investigation into mitigation.[6]

In *Wiggins*, the Supreme Court held that defense counsel rendered constitutionally ineffective assistance under *Strickland* by failing to properly research and present evidence in mitigation in that capital case. On the issue of "prejudice," the Court found that, ***"[h]ad the jury been able to place [the evidence omitted by defense counsel] on the mitigating side of the scale, there is a reasonable probability that at least one juror would have struck a different balance."*** *Wiggins*, 539 U.S. at 537 (emphasis added, citation omitted). In finding counsel's performance constitutionally deficient, the Court relied, in part, on the facts that "[t]he ABA Guidelines provide that investigations into mitigating evidence 'should comprise efforts to discover *all reasonably available* mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor,'" and that counsel had failed to live up to those standards. *Id.* at 524 (emphasis in original), citing ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 11.4.1(C), p. 93 (1989). And importantly, the Court noted that in making this determination of potential prejudice, the Court must "evaluate the totality of the evidence – 'both that adduced at trial, *and the evidence adduced in the habeas proceeding[s]*.'" *Wiggins*, 539 U.S. at 536, citing *Williams v. Taylor*, 529 U.S. at 397-98 (emphasis added by *Wiggins* Court). In Johnson's case, precisely the same analysis demands relief.

---

[6] Indeed, in both *Wiggins* and *Rompilla*, the Supreme Court found prejudicial ineffective assistance even under the stricter standard of review applicable to §2254 actions.

10

Notably, the issue of whether trial counsel's decision not to present and argue the omitted evidence was a "tactical decision" was hotly debated in *Wiggins*.  *In Johnson's case, there is no such debate*.  As Johnson's trial counsel has stated under oath:

> "There was no tactical or strategic decision by me not to elicit testimony ... about the BOP regulation contained in 28 C.F.R. 501.3, or about the conditions of confinement which could be and had in fact been imposed by federal courts under 18 U.S.C. Sec. 3582(d), or about the Luis Felipe case. Quite the opposite, had I known about the conditions of confinement and terms thereof which are permitted and/or had been imposed under 28 C.F.R. 501.3 and/or 18 U.S.C. Sec. 3582(d), or about the conditions of confinement imposed and implemented on Luis Felipe, for an indefinite period of time, I would have elicited that information ... because that information was crucially important to support our argument that the BOP had both the power, ability and practices in place to house Darryl Johnson for an indefinite period of time in a manner that would virtually eliminate any future dangerousness of Darryl Johnson."

(Init. § 2255 Memo in Support, Ex. B, Urdangen Affidavit, para. 6).  In light of the facts now of record, Mr. Urdangen's affidavit, and the standards set forth in *Wiggins* – including under the various ABA standards referenced in the *Wiggins* decision – there can be no doubt now that the performance of Johnson's counsel on this aspect of the case fell below *Strickland*'s "objective standard of reasonableness," *Strickland*, 466 U.S. at 688.

In *Rompilla v. Beard*, the Supreme Court similarly held that trial counsel's failure to examine readily available public records that contained either mitigating evidence and/or evidence that would rebut aggravating evidence offered by the prosecution constituted ineffective assistance requiring relief on habeas (*i.e.* § 2254).  Specifically, in *Rompilla*, trial counsel failed to review a readily and publicly available file on the defendant's prior conviction, portions of which the prosecution presented in aggravation in seeking the death penalty.  *Rompilla*, 545 U.S. 374.  In the instant case, Johnson's trial counsel failed to review and research readily and publicly available BOP regulations,

11

caselaw, statutory authority, and publicly available information on actual BOP practices relating to the primary contested issue at the penalty phase. Had they done that simple research, it would have shown plainly and unequivocally that the BOP had – and had exercised on multiple occasions – the authority to do exactly what government witness Warden John Vanyur declared to the jury it could not, would not, and did not do.

One need only substitute the phrase "BOP regulations, statutes, caselaw, and publicly-available information about BOP practices" for the word "transcript" or "file on the prior conviction" in the relevant portion of the *Rompilla* decision to see the striking similarity in counsel's failure here.

> With every effort to view the facts as a defense lawyer would have done at the time, it is difficult to see how counsel could have failed to realize that without examining the readily available [BOP regulations, statutes, caselaw, and publicly-available information about BOP practices] they were seriously compromising their opportunity to respond to a case for aggravation. The prosecution was going to use the dramatic facts of a similar prior offense, and Rompilla's counsel had a duty to make all reasonable efforts to learn what they could about the offense. Reasonable efforts certainly included obtaining the Commonwealth's own readily available [BOP regulations, statutes, caselaw, and publicly-available information about BOP practices] to learn what the Commonwealth knew about the [BOP regulations, statutes, caselaw, and publicly-available information about BOP practices], to discovery any mitigating evidence the Commonwealth would downplay and to anticipate the details of the aggravating evidence the Commonwealth would emphasize. Without making reasonable efforts to review the [BOP regulations, statutes, caselaw, and publicly-available information about BOP practices], defense counsel could have had no hope of knowing whether the prosecution was quoting selectively from the [BOP regulations, statutes, caselaw, and publicly-available information about BOP practices] ... Without making efforts to learn the details and rebut the relevance of the [Commonwealth's evidence in aggravation], a convincing argument [by the defense] was certainly beyond any hope.

*Rompilla*, 545 U.S. at 385-86 (with bracketed phrase substituted for emphasis). *See also*, *Crisp v. Duckworth*, 743 F.2d 580, 583 (7th Cir. 1984) ("Effective representation hinges on adequate

investigation and pretrial preparation."); *United States v. Williamson,* 183 F.3d 458, 462-63 (5th Cir. 1999) ("[A] reasonable attorney has an obligation to research relevant facts and law.").

Later in its *Rompilla* opinion, the Court continued:  "It flouts prudence to deny that a defense lawyer should try to look at a file he knows the prosecution will cull for aggravating evidence, let alone when the file is sitting in the trial courthouse, open for the asking."  *Id*. at 389.  Precisely the same analysis applies here where Johnson's counsel admittedly failed to conduct any research regarding the applicable BOP regulations, statutes, caselaw, and publicly-available information about BOP practices which were absolutely critical to a fair and effective presentation of the defense's mitigation case, as well as to directly rebut the government's case in aggravation.

In discussing its holding, the *Rompilla* Court stated:

> The notion that defense counsel must obtain information that the State has and will use against the defendant is not simply a matter of common sense.  As the District Court points out, the American Bar Association Standards for Criminal Justice in circulation at the time of Rompilla's trial describes the obligation in terms no one could misunderstand in the circumstances of a case like this one:
>
> > "It is the duty of the lawyer to conduct a prompt investigation of the circumstances of the case and to explore all avenues leading to facts relevant to the merits of the case and the penalty in the event of conviction.  The investigation should always include efforts to secure information in the possession of the prosecution and law enforcement authorities.  The duty to investigate exists regardless of the accused's admissions or statements to the lawyer of facts constituting guilt or the accused's stated desire to plead guilty."

*Rompilla*, 545 U.S. at 387, citing 1 ABA Standards for Criminal Justice 4-4.1 (2d ed. 1982 Supp.). The Court noted that "we long have referred to these ABA Standards as 'guides to determining what is reasonable," in finding counsel's performance constitutionally ineffective.  *Id*. at 387, quoting *Wiggins*, 539 U.S. at 524.

13

Albeit without any intent, Johnson's trial counsel failed to live up to the standards required to render effective assistance at Johnson's penalty phase. Just as relief was given to Rompilla based on his counsel's failures, it is required here.

C.     If The Petition for Relief Is Not Granted On The Current Record, Discovery Should be Granted So That A Full Factual Record Can Be Developed

We respectfully submit that Johnson's ineffective assistance claim is manifest in the current evidence of record. If the Court deems that claim not proven by the current record, his claim is certainly colorable and, at a minimum, deserving of the opportunity for further factual development through discovery and a hearing. Indeed, the *Massaro* decision is also relevant to Johnson's request for discovery under Habeas Rule 6. Thus, the Supreme Court noted that "*[w]ithout additional factual development,* moreover, an appellate court may not be able to ascertain whether the alleged error was prejudicial." *Massaro*, 538 U.S. at 505. The Court specifically noted the importance of allowing discovery on such claims, stating, "[The district court is] the forum best suited to developing the facts necessary to determining the adequacy of representation during an entire trial. The court may take testimony from witnesses for the defendant and the prosecution and from the counsel alleged to have rendered the deficient performance. *Massaro*, 538 U.S. at 505-06, citing *United States v. Griffin*, 699 F.2d 1102, 1109 (In a § 2255 proceeding, the defendant "has a full opportunity to prove facts establishing ineffectiveness of counsel, the government has a full opportunity to present evidence to the contrary, the district court hears spoken words we can see only in print and see expressions we will never see, and a factual record bearing precisely on the issue is created"); other citations omitted. (Petitioner is filing a Renewed Motion for Discovery along with this Response brief, and the discovery issue is more fully discussed in that filing.)

14

Accordingly, based on the Supreme Court's recent decision in *Massaro*, if Johnson's § 2255 Petition is not granted on the current evidence, Petitioner also respectfully requests that his motion for discovery relating to his claim of ineffective assistance of counsel be reconsidered and granted, in whole or in part. *See Massaro*, 538 U.S. at 505-06.

## <u>CONCLUSION</u>

For all the reasons set forth above, Petitioner Darryl Lamont Johnson respectfully requests that the Court (1) set aside its judgment in favor of the government denying Johnson's § 2255 petition; and (2) grant Johnson's § 2255 petition based on a finding of ineffective assistance of counsel. Alternatively, Johnson respectfully requests that the Court (1) set aside the judgment in favor of the government denying Johnson's petition; (2) grant Johnson's motion for discovery on his ineffective assistance of counsel claims; (3) hold an evidentiary hearing on Johnson's ineffective assistance of counsel claims; and (4) grant Johnson's § 2255 petition.

Respectfully submitted,

/s/ Terence H. Campbell
An attorney for Defendant Darryl Johnson

Terence H. Campbell
Cotsirilos, Tighe & Streicker, Ltd.
33 North Dearborn Street, Suite 600
Chicago, Illinois  60602
(312) 263-0345

Lorinda Meier Youngcourt
Post Office Box 206
Huron, IN 47437-0206
(812)849-9852

# CERTIFICATE OF SERVICE

Terence H. Campbell, an attorney, hereby certifies that in accordance with hereby certifies

that in accordance with Fed.R.Crim.P. 49, LR 5.5, and the General Order on Electronic Case Filing

(ECF), the following document:

1.      Petitioner's Response to Government's Motion to Reconsider The Court's March 11,
        2003 Opinion and Order in Light of The Supreme Court's Rulings in *Massaro v.
        United States*, *Wiggins v. Smith*, and *Rompilla v. Beard*

was served pursuant to the District Court's ECF system as to ECF filers, including the United States

Attorney's Office.


                                        /s/  Terence H. Campbell
                                        Terence H. Campbell

# EXHIBIT A

97-1186

97-1155(L),

<u>To</u> <u>be</u> <u>Argued</u> <u>by</u>:
ALEXANDRA A.E. SHAPIRO

========================================================

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

Docket Nos. 97-1155(L) & 97-1186

--------

UNITED STATES OF AMERICA,

<u>Appellee</u>,

-v.-

LUIS FELIPE, also known as King Blood, also known as
Inka, and ZULMA ANDINO, also known as Queen Zulma,

<u>Defendants-Appellants</u>,

JOSE MELENDEZ, also known as King Epic; JOSE GABRIEL,
also known as King Teardrop; JOSE CRUZ, also known as
King Blaze; FRANSISCO SOTO, also known as King
Assassin; SAMUEL SANTIAGO, also known as King Sammy;
MICHAEL ANTONIO SANCHEZ, also known as King Bishop;
MILTON SOTO, also known as King Tee; LUIS TOLEDO, also
known as King Zer; MARIO QUINONES, also known as King
Bosco; NELSON TORRES, also known as King Nell; MICHAEL
IRIZARRY, also known as King Riot; RAYMOND MALDONADO,
also known as King Chino; CARMELO GARCIA, also known as
King Mello; REYNALDO PEREZ, also known as King Lil Rey;
JOSE TORRES, also known as King Chino; ALI FARES, also
known as King Tattoo; ELQUIADES MORALES, also known as
King Apollo; FIDEL AYALA-MERCADO, also known as King
Ito; ULYSSES CAMPOS, also known as King Puti; FELIX
CORDERO, also known as King Bear; DANIEL NAVARRO, also
known as King Scarface; GILBERTO RIVERA, also known as
King Cano; RICHARD RIVERA, also known as King Oreo;
WILSON CORTEZ, also known as King Chino; CARLOS DONIS,
also known as King Mousey; ANGEL FELICIANO, also known
as King Angel, also known as King A; ALBERTO FIGUEROA,
also known as King Drac; FRANSISCO TORRES, also known
as King Bollo; ROBERTO PUENTE, also known as King
Manole; MICHAEL GONZALEZ, also known as King Wolfie;
ANTONIO DELESTRE, also known as King Tone; SAMMY
FONSECA, also known as King Green Eyes and RICHARD
ACEVEDO, also known as King Richie,

--------

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

---

BRIEF FOR THE UNITED STATES OF AMERICA

---

MARY JO WHITE,
United States Attorney for the
Southern District of New York,
Attorney for the United States
of America.

ALEXANDRA A.E. SHAPIRO,
ROBERT E. RICE,
    Assistant United States Attorneys,
          Of Counsel.

===============================================================

## TABLE OF CONTENTS

PAGE

Preliminary Statement  .....................................    2

Statement Of Facts  .......................................

    A.    The Government's Case  ...........................

        1.    An Overview Of ALKQN And
            Felipe's Role In That Organization  ........

        2.    The Murder Of William Cartegena And
            The Attempted Murder Of Margie Carderon  ...

        3.    The Attempted Murder Of Rafael Gonzalez
            And The Murder Of Victor Hirschman  ........

        4.    The Murder Of Ismael Rios And The
            Attempted Murder Of Ronnie Gonzalez  .......

        5.    The Conspiracy To Murder Pedro Rosario  ....

    B.    The Defense Case  ................................

    C.    Andino's Conviction  ............................

        1.    Andino's Offense Conduct  ..................

            a.    The Murder Of Islander Navaez  ........

            b.    The Assault Upon Annette Martinez  ....

        2.    Andino's Guilty Plea  ......................

ARGUMENT:

POINT I--The District Court Properly Denied Felipe's
    Motion To Suppress His Prison Correspondence  ........

    A.    Relevant Facts  .................................

        1.    The Interception Of Felipe's Attica
            Correspondence  ............................

        2.    The District Court's Denial Of Felipe's
            Motion To Suppress His Attica

ıı

Correspondence  ...............................

B.    Discussion  .......................................

    1.    Felipe's First Amendment Claim
       Is Meritless  .................................

    2.    The United States Postal Service
       Regulations Governing "Mail Covers"
       Do Not Provide Any Basis To Suppress
       Felipe's Attica Correspondence  .............

POINT II--The District Court Properly Sentenced Felipe  ...

A.    Relevant Facts  ...................................

    1.    The Sentencing Proceeding  .................

    2.    The District Court's Order Denying
       Felipe's Rule 35 Motion  ..................

B.    Discussion  .......................................

    1.    The Court Was Authorized Under 18 U.S.C. §
       3582(d) To Impose The Special Conditions
       Of Confinement  ............................

    2.    The Special Conditions Are Sufficiently
       Specific To Satisfy The "Specified
       Person" Language Of 18 U.S.C. § 3582(d)  ...

    3.    The Special Conditions Of Confinement
       Are Constitutional  ........................

    4.    Felipe Was Not Improperly Denied
       Notice Or A Hearing  .......................

POINT III--The District Court Properly Sentenced Andino  ..

A.    Relevant Facts  ...................................

B.    Discussion  .......................................

    1.    Andino Has Waived Her Right To Appeal
       Her Sentence  ..............................

    2.    The District Court Was Authorized To Impose
    Consecutive Sentences For Each Count  ......

iii

3.   The District Court's Refusal To Downwardly
     Depart Is Not Reviewable On Appeal   ........

CONCLUSION   ...............................................

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

Docket Nos. 97-1155(L) & 97-1186

- - - - - - - -

UNITED STATES OF AMERICA,

Appellee,

-v.-

LUIS FELIPE, also known
as King Blood, also known
as Inka, and ZULMA
ANDINO, also known as
Queen Zulma,

Defendants-Appellants,

JOSE MELENDEZ, also known as King Epic; JOSE GABRIEL,
also known as King Teardrop; JOSE CRUZ, also known as
King Blaze; FRANSISCO SOTO, also known as King
Assassin; SAMUEL SANTIAGO, also known as King Sammy;
MICHAEL ANTONIO SANCHEZ, also known as King Bishop;
MILTON SOTO, also known as King Tee; LUIS TOLEDO, also
known as King Zer; MARIO QUINONES, also known as King
Bosco; NELSON TORRES, also known as King Nell; MICHAEL
IRIZARRY, also known as King Riot; RAYMOND MALDONADO,
also known as King Chino; CARMELO GARCIA, also known as
King Mello; REYNALDO PEREZ, also known as King Lil Rey;
JOSE TORRES, also known as King Chino; ALI FARES, also
known as King Tattoo; ELQUIADES MORALES, also known as
King Apollo; FIDEL AYALA-MERCADO, also known as King
Ito; ULYSSES CAMPOS, also known as King Puti; FELIX
CORDERO, also known as King Bear; DANIEL NAVARRO, also
known as King Scarface; GILBERTO RIVERA, also known as
King Cano; RICHARD RIVERA, also known as King Oreo;
WILSON CORTEZ, also known as King Chino; CARLOS DONIS,
also known as King Mousey; ANGEL FELICIANO, also known
as King Angel, also known as King A; ALBERTO FIGUEROA,
also known as King Drac; FRANSISCO TORRES, also known
as King Bollo; ROBERTO PUENTE, also known as King
Manole; MICHAEL GONZALEZ, also known as King Wolfie;
ANTONIO DELESTRE, also known as King Tone; SAMMY
FONSECA, also known as King Green Eyes and RICHARD
ACEVEDO, also known as King Richie,

Defendants.

- - - - - - - -

2

**BRIEF FOR THE UNITED STATES OF AMERICA**

- - - - - - - -

**Preliminary Statement**

Luis Felipe, a/k/a "King Blood," a/k/a "Inka," appeals from a judgment of conviction entered on February 14, 1997, in the United States District Court for the Southern District of New York, following a five-week trial before the Honorable John S. Martin, United States District Judge, and a jury, and from an order entered by Judge Martin on April 29, 1997, denying his motion to modify his sentence. Zulma Andino, a/k/a "Queen Zulma," appeals from a judgment of conviction entered on March 12, 1997, in the United States District Court for the Southern District of New York, following her guilty plea before Judge Martin.

Indictment S16 94 Cr. 395 (JSM) (the "Indictment") was filed on March 13, 1996, in 68 counts. The Indictment charged Felipe, Andino and 16 co-defendants -- Jose Gabriel, a/k/a "King Teardrop," Samuel Santiago, a/k/a "King Sammy," Ulysses Campos, a/k/a "King Puti," Felix Cordero, a/k/a "King Bear," Daniel Navarro, a/k/a "King Scarface," Gilberto Rivera, a/k/a "King Cano," Richard Rivera, a/k/a "King Oreo," Wilson Cortez, a/k/a "King Chino," Carlos Donis, a/k/a "King Mousey," Alberto Figueroa, a/k/a "King Drac," Fransisco Torres, a/k/a "King Bollo," Roberto Puente, a/k/a "King Manole," Michael Gonzalez, a/k/a "King Wolfie," Antonio Delestre, a/k/a "King Tone," Sammy Fonseca, a/k/a "King Green Eyes," and Richard Acevedo, a/k/a

3

"King Richie" -- with various racketeering crimes in connection with their membership in and association with the Almighty Latin King Queen Nation ("the Latin Kings" or "ALKQN").[*]

Count One charged Felipe with participating in the conduct of the affairs of a racketeering enterprise -- the Latin Kings -- in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c).  Count One detailed seven racketeering acts committed by Felipe, involving murder, attempted murder and conspiracy to commit murder.  Count Two charged Felipe with conspiring to conduct and participate in the affairs of the racketeering enterprise described in Count One, in violation of 18 U.S.C. § 1962(d).  Counts Three and Four charged Felipe with conspiracy to murder and murder,

---

[*]  Indictment S16 94 Cr. 395 superseded S7 94 Cr. 395, which was filed on June 28, 1995, and unsealed on July 6, 1995, and charged Felipe, Andino, and 28 co-defendants in 80 counts, as well as the original indictment, 94 Cr. 395, which was unsealed on June 21, 1994, and charged Felipe, Andino, and 18 co-defendants in 33 counts.  Prior to trial, all of Felipe's co-defendants pleaded guilty except for Sammy Fonseca, who was severed from Felipe and pleaded guilty after Felipe was convicted.  Indictment S16 94 Cr. 395 named Felipe in 23 counts and 10 racketeering acts; however, the Government elected to try Felipe on only 18 counts and 7 racketeering acts.  At trial, a redacted version of Indictment S16 94 Cr. 395 was submitted to the jury.  The redacted indictment included only the crimes and predicate acts on which Felipe was to be tried, excluded the charges against his co-defendants, and renumbered the 18 counts and 7 racketeering acts consecutively.  Unless otherwise specified, references in this brief to the Indictment relate to the redacted superseding Indictment S16 94 Cr. 395, with respect to Felipe, and to the unredacted superseding Indictment S16 94 Cr. 395, with respect to Andino.  Both the redacted Indictment and the unredacted Indictment are included in the appellants' appendix.

4

respectively, in connection with the murder of William Cartegena, a/k/a "King Lil Man," in violation of 18 U.S.C. §§ 1959(a)(5), 1959(a)(1) and 2.  Counts Five and Six charged Felipe with conspiracy to murder and attempted murder, respectively, in connection with the attempted murder of Margie Carderon, a/k/a "Queen Margie," in violation of 18 U.S.C. §§ 1959(a)(5) and 2.  Counts Seven and Eight charged Felipe with conspiracy to murder and attempted murder, respectively, in connection with the attempted murder of Rafael Gonzalez, a/k/a "King Mousey," in violation of 18 U.S.C. §§ 1959(a)(5) and 2.  Count Nine charged Felipe with participating in the murder of Victor Hirschman, in violation of 18 U.S.C. §§ 1959(a)(1) and 2.  Counts 10, 11 and 12 charged Felipe with conspiracy to murder, murder, and attempted murder, respectively, in connection with the murder of Ismael Rios, a/k/a "King J.R." and the attempted murder of Ronnie Gonzalez, a/k/a "King Ronnie," in violation of 18 U.S.C. §§ 1959(a)(5), 1959(a)(1), and 2.  Count 13 charged Felipe with conspiracy to murder Pedro Rosario, a/k/a "Pete Rock," in violation of 18 U.S.C. §§ 1959(a)(5) and 2.  Counts 14 through 18 charged Felipe with using and carrying firearms during and in relation to the murders of William Cartegena, Victor Hirschman, and Ismael Rios, and the attempted murders of Rafael Gonzalez and Ronnie Gonzalez, in violation of 18 U.S.C. §§ 924(c) and 2.

Count 23 charged Andino with conspiracy to murder Islander Navaez, a/k/a "King Lex," in violation of 18 U.S.C. §§ 1959(a)(5) and 2.  Count 34 charged Andino with conspiring to

5

commit assault, resulting in serious injury, upon Annette

Martinez, in violation of 18 U.S.C. §§ 1959(a)(6) and 2.  Count

57 charged Andino with using and carrying a firearm during and in

relation to the conspiracy to murder Islander Navaez, in

violation of 18 U.S.C. §§ 924(c) and 2.

On October 10, 1996, pursuant to a written plea

agreement, Andino pleaded guilty to Counts 23, 34, and 57 of

Indictment S16 94 Cr. 395.  On October 22, 1996, trial commenced

against Felipe.  The trial concluded on November 19, 1996, when

Felipe was convicted on the 18 counts in which he was named and

all seven racketeering acts charged in Count One.

On February 14, 1997, Judge Martin sentenced Felipe to

life imprisonment and a consecutive term of 45 years'

imprisonment, to be followed by a five-year term of supervised

release.  Judge Martin also imposed mandatory special assessments

totalling $900.[*]

On March 7, 1997, Judge Martin sentenced Andino to a

term of 18 years' imprisonment, to be followed by a three-year

term of supervised release.  Judge Martin also imposed mandatory

special assessments totalling $150.

Felipe and Andino are serving their sentences.

**Statement Of Facts**

**A.    The Government's Case**

---

[*]    On April 29, 1997, Judge Martin denied Felipe's motion to
modify his sentence with respect to certain special conditions of
confinement imposed in connection with the sentence.

6

The evidence at trial amply demonstrated that from May 1993 until his federal arrest on June 21, 1994, Felipe was the leader of the New York State Chapter of the Latin Kings, a racketeering enterprise whose members and associates engaged in acts of violence, including murder, as well as armed robbery and narcotics trafficking.  In that time period, Felipe conducted and participated in the Latin Kings' racketeering activity from a prison cell at the Attica Correctional Facility in Attica, New York ("Attica"), where he was imprisoned on state charges. Felipe's racketeering activity included three murders, three attempted murders and an additional conspiracy to murder.  Felipe committed these crimes by directing his fellow Latin Kings to carry out the murders.  Felipe communicated his murder orders to other Latin Kings during prison visits and through written correspondence.

The proof establishing the existence of the racketeering enterprise, Felipe's role in that enterprise, and his participation in the murders and other violent crimes included the testimony of two former Latin Kings: Alex Figueroa, a/k/a "King Sombra," who worked closely with Felipe, visited him at Attica numerous times, corresponded with him, and held a statewide leadership position in the ALKQN; and Nelson Torres, a/k/a "King Nell," a leader in the Brooklyn chapter of the Latin Kings, who carried out and attempted to carry out several of Felipe's murder orders and was a close associate of Jose Gabriel. Figueroa and Torres explained Felipe's role in the enterprise,

7

and testified, pursuant to cooperation agreements with the Government, about the various crimes that they had committed with other Latin Kings on orders from Felipe.

The accomplice testimony of Figueroa and Torres was corroborated in substantial detail by numerous other witnesses. These witnesses included a former Latin Queen (a female member of the organization), Margie Carderon, a/k/a "Queen Margie," whom Felipe had targeted for execution, as well as law enforcement officers who responded to crime scenes and executed search warrants at locations controlled by Latin King members, and forensic experts. In addition, the Government introduced physical evidence, including, inter alia, more than 60 letters written by or to Felipe while he was incarcerated at Attica, records from Attica documenting the visits by various ALKQN members to Felipe, the guns used to kill Victor Hirschman and Ismael Rios, the guns used during the attempted murders of Rafael Gonzalez and Ronnie Gonzalez, Latin King literature seized from various locations, and photographs of armed Latin Kings seized from various locations, including Felipe's cell.

1. An Overview Of ALKQN And Felipe's Role In That Organization

According to its own printed history, the national organization of the Latin Kings was founded in approximately 1945, in Chicago, Illinois. Felipe founded the New York State Chapter of the Latin Kings in 1986, while he was incarcerated at the Collins Correctional Facility in Helmuth, New York

8

("Collins"). Felipe wrote a manifesto, a constitution and a set of lessons -- or rules -- that Latin King members were to follow. (GX131, GX133-34).* Felipe later created a set of lessons for Latin Queens to follow as well. (GX291). Over time, membership in the New York State Chapter grew, both within the prison system and on the streets of New York City, eventually numbering in the thousands. (Felipe PSR ¶ 21).

Under Felipe's leadership, a Latin King member's failure to adhere to the provisions of the constitution, manifesto, or lessons, or to obey any other Latin King rules, frequently led to disciplinary proceedings against him or her. Members who violated the enterprise's commandments were frequently given physical punishments, including a "B.O.S." -- a "Beating on Sight" -- or a "T.O.S." -- a "Termination on Sight" or assassination. (Tr. 208, 528-29).

Felipe designated a five-pointed crown as the ALKQN symbol and structured the ALKQN around that symbol. Felipe declared himself the leader of the Latin Kings, and gave himself various titles, including Godfather, or "Inka," and First Supreme Crown. Felipe created a statewide leadership structure with positions for four leaders working directly under Felipe: the Second Supreme Crown (the Prince or Vice President), the Third

---

* "GX" refers to the Government's exhibits at trial; "Tr." refers to the trial transcript; "[Name] Br." refers to the named appellant's brief on appeal; "[Name] PSR" refers to the Presentence Report for the named appellant; "A." refers to the appendix to appellants' briefs on appeal; and "SA" refers to the Government's Supplemental Appendix.

9

Supreme Crown (the Warlord), the Fourth Supreme Crown (the Treasurer) and the Fifth Supreme Crown (the Adviser).  In the time period relevant to the Indictment, Jose Gabriel, a/k/a "King Teardrop," was Felipe's Second Supreme Crown, Jose Melendez, a/k/a "King Epic" was Felipe's Third Supreme Crown, and Alex Figueroa was Felipe's Fourth Supreme Crown.  (Tr. 525-31, 575-76; GX120, GX328R).

The Latin Kings in New York State were divided into different divisions, whose members and leaders were supervised by Felipe and the statewide leaders working under him.  Each division or chapter held its own weekly meetings, and the Latin Kings in New York City held periodic "universal" meetings of all Latin Kings and Queens from the different parts of the state.  At various times, each borough of New York City had its own chapter, which was controlled by five leaders with positions analogous to the statewide positions -- First Crown, Second Crown, Third Crown, Fourth Crown, and Fifth Crown.  Similarly, within the prison system, the Latin Kings were divided into divisions and presided over by five leaders with titles identical to those of the New York City divisions.  In the time period relevant to the Indictment, Jose Cruz, a/k/a "King Blaze," was Felipe's hand-picked "Supreme Crown Representative" of all the prisons within Riker's.  (Tr. 172, 532, 534; GX120).

2.   **The Murder Of William Cartegena And**
     **The Attempted Murder Of Margie Carderon**

In the spring of 1993, William Cartegena, a/k/a "King

10

Lil Man," a Latin King, became a close associate of Felipe and they wrote several letters to each other.  (GX301R-04R, GX306R). In or about June 1993, Felipe named Cartegena his Fourth Supreme Crown (Treasurer).  (Tr. 201; GX 220A).  In the spring of 1993, Felipe also ordered Cartegena to murder Rafael Gonzalez, a/k/a "King Mousey," whom Felipe viewed as a threat to his power over the Latin Kings.[*]  (Tr. 208-09, 550-52, 1143; SA 7-11).

In that same time period, Jose Gabriel also corresponded with Felipe.  By July 1993, Felipe had appointed Gabriel as his Second Supreme Crown.  Over time, a dispute for power arose between Cartegena and Gabriel.  (Tr. 220, 548; GX301R; SA 1-2).  On July 17, 1993, Gabriel went to visit Felipe at Attica to discuss, among other things, his problems with Cartegena.  During their visit, Felipe stated that he was unhappy with Cartegena because Cartegena had failed to murder King Mousey and because Cartegena had allegedly stolen money from the ALKQN treasury.  Felipe ordered Gabriel to strip Cartegena of his leadership position and have him murdered.  Felipe also ordered Gabriel to murder Margie Carderon, Cartegena's girlfriend, because she knew too much about Latin King criminal activities. (Tr. 555-57, 1094-96; GX124).

Gabriel notified Melendez and Figueroa about Felipe's orders to murder Cartegena and Carderon.  (Tr. 556).  Melendez and Figueroa decided, however, that they did not want to kill

---

[*] Felipe's motive for killing King Mousey is discussed more fully _infra_ at p..

11

Cartegena until they had an opportunity to speak with Felipe directly and confirm his orders. In the mean time, they held Cartegena and Carderon under armed guard in an apartment in the Bronx for approximately one week. (Tr. 276-78, 557-58).

On July 25, 1993, Melendez and Figueroa brought Cartegena with them to visit Felipe at Attica. Felipe met first with Melendez and Figueroa, and confirmed his orders to strip Cartegena of his position and then kill him. Felipe also instructed Melendez and Figueroa to kill Carderon. (Tr. 275, 559-62; GX124). Felipe further advised Melendez that Cartegena would be given an opportunity to re-pay the money he had stolen, and that they should wait until he had repaid that money before killing him. Felipe subsequently met separately with Cartegena, relieved him of his position and instructed him to re-pay the stolen money. (Tr. 279, 561-63, 1096-97).

After Melendez, Figueroa and Cartegena returned to New York City, Cartegena stopped attending Latin King meetings, cut off contact with other Latin Kings and checked himself into the psychiatric ward of Woodhull Hospital. Carderon, who had by then separated from Cartegena, also stopped going to ALKQN meetings. (Tr. 281, 584-85). In August 1993, during visits by Melendez, Figueroa and Gabriel, and in letters to Figueroa and Gabriel, Felipe reaffirmed his orders to kill Cartegena and Carderon. (Tr. 572-73; SA 3-4). He also promoted Figueroa to Fourth Supreme Crown and Melendez to Third Supreme Crown. (Tr. 575-76, 1097-98; GX328R).

12

On September 5, 1993, Cartegena agreed to meet with Melendez, Figueroa and other Latin Kings at Melendez's former apartment at 1392 Boston Road, Bronx, New York, ostensibly to resolve their differences.  In accordance with a pre-arranged plan, however, when Cartegena arrived at 1392 Boston Road, in the Bronx, he was taken at gunpoint by two Latin Kings to Melendez's old apartment.  Once there, Cartegena was stripped of his clothing and tied up.  Several other Latin Kings, including Melendez and Figueroa, subsequently arrived at the apartment. Fransisco Soto, a/k/a "King Assassin," assisted by Melendez and Figueroa, then choked Cartegena to death.  Cartegena's body was placed in a bathtub, where Melendez and several other Latin Kings attempted to dismember it, severing Cartegena's head, his hands, and his Latin King tattoo from his body.  The police discovered the body two days later, after another group of Latin Kings attempted to set it on fire to destroy the evidence.  (Tr. 587-605, 358-66, 1104-05; GX105-06).

Within days of Cartegena's death, and pursuant to Felipe's instructions, Gabriel dispatched a group of Latin Kings from the Brooklyn chapter to kill Carderon.  On four consecutive nights in early September 1993, Nelson Torres, Daniel Delgado, a/k/a "King Dusty," and two or three other Latin Kings went to Carderon's residence at 209 Harrison Avenue, Brooklyn, New York, to kill her.  On each night, they brought two firearms to shoot Carderon but were unable to gain entrance to her apartment. Finally, on the fourth night -- September 11, 1993 -- Delgado

13

suggested that they burn the building.  While the other Latin
Kings waited outside as lookouts, Delgado entered Carderon's
apartment building, poured gasoline under her apartment door and
in the hallways, and lit a match.  Carderon, who was home at the
time, escaped the fire without injury.  Two of her neighbors in
the building, however, suffered severe burns.  (Tr. 85-88, 116-
20, 289-90, 1105-17).

### 3.   The Attempted Murder Of Rafael Gonzalez And The Murder Of Victor Hirschman

As set forth supra, Felipe ordered Cartegena's
assassination because of, among other things, Cartegena's failure
to carry out Felipe's order to kill Rafael Gonzalez, a/k/a "King
Mousey."  Felipe viewed Mousey as a threat to his power over the
ALKQN because Mousey had written and circulated his own set of
Latin King lessons and had been holding himself out as the
Godfather of the Latin Kings, thereby establishing a substantial
following.  (Tr. 552, 1143).  Beginning as early as May 1993,
Felipe wrote numerous letters to Cartegena and other Latin Kings
insisting that Mousey must be killed.  (SA 7-11).  After Felipe
stripped Cartegena and ordered the other Latin Kings to kill him,
he instructed Gabriel to take care of Mousey's murder.  (Tr.
1098).

On October 10, 1993, Gabriel, Melendez and Figueroa
visited Felipe at Attica, and Felipe insisted that Mousey must be
killed.  (Tr. 617, GX124).  A few days later, as a follow-up to
that discussion, Felipe sent Mousey's real name and address to

14

Gabriel and Melendez.  (GX336R, 337R).  Felipe also sent Figueroa several addresses where Mousey was believed to be living.  (Tr. 643).  On an evening in late October 1993, Melendez, Figueroa and approximately 6 other Latin Kings from the Bronx went to Brooklyn, where they met up with Gabriel, Torres and several other Latin Kings from Brooklyn.  Approximately 10 of the Latin Kings then left in three separate cars, and drove around for several hours looking for Mousey in order to kill him.  They could not locate Mousey and thus were unable to carry out Felipe's order.  (Tr. 642-44, 1151, 1154-55).

On October 30, 1993, Figueroa attended a Latin King meeting in Brooklyn, and brought several guns with him.  (Tr. 650).  In the course of that meeting, Gabriel stated that he had information that later that night, King Mousey would be at one of the addresses that he had obtained from Felipe.  Gabriel and Torres subsequently selected five Latin Kings from Brooklyn to kill King Mousey that evening, and Figueroa and others provided them with various weapons for the "mission."  The weapons including a sawed-off Mossberg shotgun, and .32, .38, .45 and .9 millimeter calibre guns.  (Tr. 1159-60, 650-53).

Osvaldo LaTorre, a/k/a "King Ozzie," one of the five Latin Kings chosen to kill King Mousey, drove four other Latin Kings -- Gilberto Rivera, a/k/a Richard Rivera, Carmello Garcia, a/k/a "King Mello," and Mario Quinones, a/k/a "King Bosco" -- to 120 Humboldt Street in Brooklyn, New York, where all but LaTorre entered the building to look for King Mousey.  A Halloween party

15

was in progress, and King Mousey and Victor Hirschman, King Mousey's brother-in-law, were in attendance.  After the four Latin Kings entered the party, Rivera shot and killed Hirschman, and Garcia fired shots at King Mousey, who sustained serious injuries and was hospitalized, but ultimately survived.  (Tr. 655-58, 1161-64; GX166, GX177-80).

### 4.   The Murder Of Ismael Rios And The Attempted Murder Of Ronnie Gonzalez

Ismael Rios, a/k/a "King J.R.," and Ronnie Gonzalez, a/k/a "King Ronnie," Latin Kings from Brooklyn, were closely allied.  In the summer of 1993, Rios and Gonzalez got into a dispute with Gabriel, and refused to follow his orders.  They also attempted to recruit other Latin Kings, including Torres, away from Gabriel, and told people that Gabriel could not have a leadership position because he had been kicked out of the Latin Kings while incarcerated at the Franklin Correctional Facility. (Tr. 1170-75, 617-18).  Rios and Gonzalez also began to associate with King Mousey's group of Latin Kings in the Bushwick area of Brooklyn.  (Tr. 617-19; SA 12).

Gabriel wrote Felipe about his problems with Rios, and in September 1993, during visits with Figueroa and Gabriel, Felipe issued T.O.S. orders against Rios and Gonzalez.  (Tr. 617-19, 1175; SA 12-13).  The T.O.S. orders were not carried out right away because of Felipe's continued focus on killing King Mousey.  Over time, tension arose between Gabriel's faction of Brooklyn Latin Kings and Figueroa's and Melendez's faction of

16

Bronx Latin Kings.  Felipe had also become frustrated with Gabriel, principally because of his inability to kill King Mousey.  (Tr. 663-65).  Thus, in mid-November 1993, Felipe issued an order stripping Gabriel of his position, and that order was carried out at a Latin King universal meeting on December 12, 1993.  Felipe still intended to have Rios and Gonzalez killed. In order to deceive them into thinking that their dispute with Felipe's Supreme Crowns had ended, however, Felipe gave Rios and Gonzalez crown positions after Gabriel was stripped of his. (Tr. 665-70, 1176-81).

Felipe, Melendez and Figueroa only permitted Rios and Gonzalez to retain leadership positions in the Brooklyn chapter for a short time.  On January 20, 1994, Melendez and Figueroa lured Rios and Gonzalez to a Latin King's apartment at 2324 Morris Avenue, in the Bronx, purportedly for a meeting of all the Crowns and Supreme Crowns.  In accordance with a pre-arranged plan, a Latin King and two Latin Queens left the apartment and pretended to get into a dispute with members of a rival gang known as Unity.  Melendez then sent Rios, Gonzalez and several other Latin Kings, including Ali Fares, a/k/a "King Tattoo," and Sammy Santiago, a/k/a "King Sammy" out of the apartment, allegedly to retaliate against the Unity members.  When they went outside, however, Fares immediately gunned Rios down with a Tec-9 semi-automatic gun.  Santiago, armed with a .25 calibre semi-automatic, attempted to kill Gonzalez, who ran away and escaped unharmed.  (Tr. 680-86, 1182-86; GX196, GX198).

17

### 5.   The Conspiracy To Murder Pedro Rosario

After he assumed the statewide Fourth Supreme Crown position, Figueroa maintained regular contact with Jose Cruz, Felipe's Supreme Crown Representative at Riker's.  Cruz informed Figueroa that Pedro Rosario, a/k/a "Pete Rock," an inmate at Riker's, was considered an enemy of the ALKQN because he had slashed several Latin Kings at that jail.  During one of his visits to Attica, Figueroa discussed Pete Rock with Felipe.  According to Felipe, several Latin Kings from Riker's had written to him about this problem, and Felipe directed Figueroa to "put the green light on him," *i.e.*, inform Latin Kings at Riker's that Rosario should be terminated on sight.  (Tr. 675-76).

In January 1994, Cruz wrote to Felipe, reporting that Pete Rock had cut a Latin King and that the Latin Kings had put a "green light" on Pete Rock.  (SA 14).  In a letter dated February 1, 1994, Felipe wrote to Cruz that he was "real proud" of the way Cruz handled the situation with Pete Rock.  On that same day, several Latin Kings attacked Pete Rock and slashed his face with a razor while they were in the cell block at the Bronx County courthouse.  (Tr. 720-22, 729-30, 1342-46; GX380-81).  In a subsequent letter to Felipe, Cruz reported the slashing of Pete Rock and assured Felipe that although Pete Rock had gone "into hiding," he would ultimately be "decapitated."  (SA 14).  On February 16, 1994, Felipe wrote a letter to Cruz expressing his pleasure about the slashing, stating "I'm glad about Pete Rock what I plesent [sic] and lovely surprise."  (SA 15).  In a letter

18

to Felipe dated February 22, 1994, Cruz wrote that he had decided that since Pete Rock had already been slashed in the face, and had begged for mercy, he issued an order taking the green light off of Pete Rock. (SA 16). Felipe marked that order "VOID," wrote "Overruled By King Blood" on the bottom of the letter and returned it to Cruz. (GX362R). In a letter dated February 27, 1994, Felipe explained that Pete Rock "must be T.O.S." because he had attacked Latin Kings and it was important that "[w]ho ever try to challenge our Nation in any kind of way or fashion must feel the Almighty Wrath." (SA 16).

**B.   The Defense Case**

Felipe did not present any evidence.

**C.   Andino's Conviction**

**1.   Andino's Offense Conduct**

**a.   The Murder Of Islander Navaez**

In or about late 1993, Andino became the First Supreme Crown, or Godmother, or "Luna," i.e., the leader, of the Latin Queens, and as such, had authority to order Latin Kings to carry out Felipe's orders to murder people. In the fall of 1993, Felipe ordered his underlings to murder Islander Navaez, a/k/a "King Lex," a Latin King who allegedly had violated ALKQN rules by cooperating with prison authorities and by warning another Latin King that he had been targeted for assassination. (Tr. 633-35). In December 1993, upon his release from prison, Navaez visited Andino and informed her that he was going to a pool hall in Brooklyn, New York. As soon as Navaez left her house, Andino

19

contacted Figueroa and verified that a T.O.S. order had been issued against Navaez.  Andino then contacted another Latin King, known as "King Jose Green Eyes," directed him to murder Navaez, and informed him that Navaez was on his way to the pool hall. King Jose Green Eyes carried out Andino's order by shooting Navaez to death with a .9 millimeter semi-automatic pistol.  (Tr. 672-75; Andino PSR ¶¶ 44-47).

### b.   The Assault Upon Annette Martinez

In 1994, Andino learned that a woman named Annette Martinez was falsely claiming to be a high-ranking leader of the Latin Queens.  Based upon that information, Andino ordered that Martinez be B.O.S.'d, i.e., beaten on sight.  On or about May 7, 1994, at Andino's direction, a large group of Latin Queens, accompanied by several armed Latin Kings, travelled to the lower East Side of Manhattan to carry out Andino's order to assault Martinez.  Andino and several other Latin Queens kicked and punched Martinez, causing serious injuries.  During the assault, one of the Latin Kings fired shots at a male friend of Martinez who was present.  (Andino PSR ¶¶ 48-51).

### 2.   Andino's Guilty Plea

On October 10, 1996, following a careful and thorough proceeding pursuant to Rule 11 of the Federal Rules Of Criminal Procedure ("Fed. R. Crim. P."), the sufficiency of which is not challenged on appeal, Andino pleaded guilty pursuant to a written agreement.  (A. 265-92).  In her plea agreement, which she and her attorney executed on the day of her guilty plea, Andino

20

agreed to plead guilty to Counts 23, 34 and 57 of the Indictment. (A. 256-61). Those charges carried a combined statutory maximum sentence of 18 years' imprisonment, substantially less than the term of life imprisonment Andino would have faced had she proceeded to trial and been convicted on all count.

## A R G U M E N T

### POINT I

**The District Court Properly Denied Felipe's Motion To Suppress His Prison Correspondence**

Felipe contends that the District Court erred in denying his motion to suppress his Attica correspondence. He argues that the Attica officials lacked reasonable cause to intercept that correspondence, and that they intercepted it without complying with New York State and federal Postal Service regulations. (Felipe Br. 15-34). These claims are meritless.

**A.   Relevant Facts**

**1.   The Interception Of Felipe's Attica Correspondence**

From May 1993 through June 1994, Steven Kruppner, an Attica official, conducted a "mail watch" on Felipe, pursuant to which Felipe's incoming and outgoing correspondence was intercepted and copied. Sixty-five such letters were introduced at trial. (GX301R-GX365R).

The mail watch was initiated and renewed periodically in accordance with procedures set forth in regulations promulgated by the New York State Department of Correctional

21

Services ("DOC").˙  (Tr. 370; A. 154-66).  Felipe's claim on appeal that the mail watch was initiated and renewed without sufficient cause, (Felipe Br. 15, et seq.), is baseless.

The officials at Attica initiated the mail watch in May 1993 because DOC officials had learned, as a result of Felipe's violation of several prison rules, that he was the leader of the Latin Kings.  DOC had previously learned of the Latin Kings in 1988 and had deemed that organization an unauthorized prison gang because its members engaged in acts of violence and other illegal behavior within the prison system.  (A. 103 & n.2).

In or about 1991, DOC officials learned that an unidentified inmate known as "King Blood" was the founder and leader of the New York State chapter of the Latin Kings, and that King Blood had written manifestos to recruit inmates at various prison facilities to join the Latin Kings.  The manifestos were frequently distributed by means of unauthorized inmate-to-inmate correspondence or third-party correspondence.˙˙  In this same period, the members of Latin Kings in the prison system had increased, in part due to King Blood's recruiting efforts.  (A. 104).

---

˙  The DOC regulations, entitled DOC Directive 4422, are reproduced in the Appendix.  (A. 108-15).

˙˙  "Third party" correspondence, sometimes referred to as "kiting letters," occurs when an inmate corresponds with someone with whom the inmate is not permitted to correspond under DOC rules, such as an inmate at another correctional facility, by sending the correspondence via a third party.  (A. 102 & n.1˙.

22

In April 1993, while incarcerated at Collins, Felipe was disciplined for violations of three different prison regulations. (A. 106). Officials at Collins determined that Felipe had attempted to send "kited" letters to an inmate at another facility with whom he was not authorized to correspond. In one letter, Felipe said that he would send a Latin Kings manifesto to the inmate via the inmate's mother. Felipe also said that an unidentified individual whom he believed had "betray[ed] the Latin Kings 'deserve[d] to die.'" (A. 105). Felipe included with another letter a Latin Kings recruiting manifesto, which referred to a "war" with Muslims at Collins in 1987, "war meetings" and the creation of an illegal inmate organization. Felipe's letters also indicated that he was King Blood. (A. 104-05, 116-52).

In May 1993, following an administrative hearing, dents, Felipe was transferred to Attica, a maximum security facility. (A. 106). On May 19, 1993, as a result of Felipe's prior violations of prisons rules and DOC's knowledge that he was the leader of the Latin Kings, DOC concluded that Felipe posed a security threat within the prison system. (A. 106). DOC officials therefore requested a "mail watch" on Felipe, pursuant to New York State's regulations governing correspondence by inmates incarcerated in the State's correctional facilities. (A. 106, 167). On May 20, 1993, the Acting Superintendent of Attica authorized a mail watch on Felipe, which was renewed every 60

23

days while Felipe was incarcerated at Attica.   (A. 154-66).

### 2.    The District Court's Denial Of Felipe's Motion To Suppress His Attica Correspondence

Before trial Felipe moved to suppress his Attica correspondence, arguing that surveillance and interception of that correspondence was unconstitutional, and violated New York State and federal postal regulations.  The District Court denied the motion, concluding that surveillance and interception of Felipe's mail did not violate the Constitution because DOC had "'reasonable cause for suspicion,'" and that Felipe's claim that "prison officials did not comply fully with their own regulations" did not entitle him to suppression of the mail.   (A.

---

*    For examples of letters DOC officials relied upon to renew the mail watch, see, e.g., GX309R ("if I was in New York "Mousey" will be terminated by now . . . I want him terminated my style"); GX323R ("make that bitch little man feel it for you and me 'slow burn'"); GX350R ("do you remember J.R. 'R.I.P.' well he flip on teardrop and teardrop was running scare until I take care of business for him. . . also little man R.I.P. he stole some money from the treasure box claiming that it was for my lawyer I never see a penny but as you see he is no problem paid with his life").

**   The Government submitted affidavits establishing that DOC officials in Albany reviewed Felipe's Attica mail on a regular basis; that they requested each renewal of the mail watch based on information gathered from Felipe's mail as well as other sources; and that this information indicated that Felipe appeared to be involved, through the Latin Kings, in illegal activities that threatened the security of the prison and included violent crimes outside the prison system. (A. 106-7; SA 18).
Felipe's claims that DOC officials did not recognize "during the year of surveillance in question [that his letters] depict[ed] incipient criminal activity, or unlawful activity" and that his mail "merely went into storage," (Felipe Br. 15-16, 26), is baseless.  Felipe presented no evidence to support these claims or to refute the Government's evidence to the contrary.

24

254) (quoting United States v. Workman, 80 F.3d 688, 699 (2d Cir.), cert. denied, 117 S. Ct. 373 (1996)).  The District Court also rejected Felipe's claim that the mail watch violated United States Post Office regulations governing "mail covers," see 39 C.F.R. § 233.3, reasoning that "nothing in this regulation . . . suggests that it would apply to the actions of prison officials undertaken to address matters of prison security," or requires "the extreme remedy of suppression, even if there was a technical violation of the Post Office regulations."  (A. 254).

**B.    Discussion**

**1.    Felipe's First Amendment Claim Is Meritless**

Relying principally on DOC's alleged reliance on written orders that "set forth no factual basis" for the mail watch, and the duration of the mail watch, Felipe argues that his correspondence should have been suppressed because DOC violated his First Amendment rights.  (Felipe Br. 18-20, 23-29) (emphasis original).  These arguments are of no avail.

It is well-settled that "[l]awful imprisonment necessarily makes unavailable many rights and privileges of the ordinary citizen, a 'retraction justified by the considerations underlying our penal system.'"  Wolff v. McDonnell, 418 U.S. 539, 555 (1974) (quoting Price v. Johnston, 334 U.S. 266, 285 (1948)); see also Sandin v. Conner, 115 S. Ct. 2293, 2301 (1995); Hudson v. Palmer, 468 U.S. 517, 524 (1984) ("[i]mprisonment carries with it a circumscription or loss of many significant rights").  Further, although "a prisoner is not wholly stripped of

25

constitutional protections when he is imprisoned for crime,"
Wolff v. McDonnell, 418 U.S. at 555, "[t]he fact of confinement
as well as the legitimate goals and policies of the penal
institution limits these retained constitutional rights."   Bell
v. Wolfish, 441 U.S. 520, 546 (1979).

The standard for determining whether prison officials
have violated an inmate's constitutional rights is whether their
actions are "reasonably related to legitimate penological
interests."   Turner v. Safley, 482 U.S. 78, 89 (1987); Thornburgh
v. Abbott, 490 U.S. 401, 409 (1989); Purnell v. Lord, 952 F.2d
679, 682 (2d Cir. 1992); Fromer v. Scully, 874 F.2d 69, 72 (2d
Cir. 1989).   Applying Turner v. Safley, this Court has made clear
that interception of a defendant's prison correspondence does not
violate the First Amendment if prison officials had "good cause"
to inspect the defendant's mail.   United States v. Workman, 80
F.3d at 699.

The defendant in Workman, like Felipe, argued that
letters he had written to co-conspirators while in prison should
have been suppressed because the monitoring of his prison mail
violated the First and Fourth Amendments.   This Court rejected
that claim, holding that prison officials may monitor an inmate's
mail if they have reasonable cause to suspect that the inmate is
engaging in illegal activities.   Workman, 80 F.3d at 699 (no
First Amendment violation because prison officials had "good
cause" to inspect defendant's mail, based upon monitored
telephone conversations in which he discussed on-going drug deals

26

and contract murders).˙

The District Court correctly denied Felipe's motion to suppress his Attica correspondence because the Attica officials had reasonable cause to inspect his mail. As set forth _supra_, the mail watch was initially authorized only after DOC officials had learned that Felipe was the leader of the Latin Kings, a disruptive and violent prison gang, that he was actively engaged in encouraging attacks on other inmates and recruiting inmates to join the Latin Kings, and that he was violating prison regulations. The renewals of the mail watch were authorized because DOC learned from Felipe's correspondence and other sources that he was involved, through the Latin Kings, in illegal activities that threatened the security of the prison system, and that he was ordering Latin Kings outside the prison system to commit acts of violence, including murder.

Felipe does not seriously dispute that the facts discussed above constitute reasonable cause to search his mail. Instead, he contends that suppression is warranted because DOC failed to comply with its regulations governing inmate mail, which require that authorization for inspection of an inmate's outgoing mail "set forth specific facts forming the basis for the

---

˙ To the extent Felipe relies on _Procunier_ v. _Martinez_, 416 U.S. 396 (1974), (_see_ Felipe Br. 18, 28), his reliance is misplaced. As this Court observed in _Workman_, the touchstone for assessing prisoners' constitutional claims is _Turner_ v. _Safley_, a Supreme Court case that "is considerably more deferential to restraints imposed by prison officials on inmate rights than the standard of _Procunier_ v. _Martinez_." _Workman_, 80 F.3d at 698.

27

action."   (Felipe Br. 19-20). This claim is baseless.

Even assuming that the written authorizations for Attica's mail watch on Felipe were not in technical compliance with DOC's regulation, the Government would not be precluded from introducing Felipe's letters at trial because his constitutional rights were not violated.  In Workman, this Court rejected the claim of a defendant who, like Felipe, argued that he was entitled to suppression because "the Superintendent of the prison failed in his written authorization of the mail surveillance to 'set forth specific facts forming the basis for the action.'" Workman, 80 F.3d at 699 n.7.  In so doing, this Court held that such a "technical violation of the prison's regulations" does not constitute grounds for suppression:

> Where, as here, there is sufficient basis for the decision to institute a mail watch, the Constitution does not in our view require suppression of the evidence gathered during the surveillance merely because the relevant supervising official, when approving the mail watch, failed to restate in writing the facts underlying the decision.

Id.; cf. Purnell v. Lord, 952 F.2d at 683-84 (DOC correspondence regulations, i.e., Directive 4422, do not create due process liberty interest in inmate correspondence).*

Felipe contends that "the position taken by [this

---

* In any event, it is well settled that "where evidence seized by state officers is subsequently offered in a federal criminal proceeding, the seizure need not satisfy state law requirements." Workman, 80 F.3d at 694; see, e.g., United States v. Smith, 9 F.3d 1007, 1014 (2d Cir. 1993); United States v. Rowell, 903 F.2d 899, 901-02 (2d Cir. 1990).

28

Court] in the Workman case . . . is indefensible and is not supportable in legal theory or by any convincing body of authority." (Felipe Br. 24). Felipe's apparent suggestion that this Court discard Workman fails, however, because "'prior opinions of a panel of this [C]ourt are binding . . . in the absence of a change in the law by higher authority or [an] . . . in banc proceeding (or its equivalent).'" United States v. Jackson, 59 F.3d 1421, 1423-24 (2d Cir. 1995) (quoting United States v. Moore, 949 F.2d 68, 71 (2d Cir. 1991), cert. denied, 503 U.S. 988 (1992)), cert. denied, 116 S. Ct. 1428 (1996).

Felipe's claims that the duration of the mail watch was unduly lengthy and was extended despite DOC officials' failure to read Felipe's letters, (Felipe Br. 26-28), are specious. Felipe did not dispute below the facts established by the Government regarding the basis for continued inspection of his mail. He now claims for the first time on appeal, however, that there was an insufficient basis for DOC to renew the mail watch; that his letters "were routinely copied; but . . . not read for content"; and that "[t]he copied letters wound up in an Albany office of [DOC] and were apparently not reviewed until it was discovered much later on by federal authorities that a cache of possibly vital, but unculled, information was in State storage." (Felipe Br. 26). As demonstrated supra, Felipe's belated claim finds no support in the record and is belied by the evidence presented

29

below.  (See supra [ ]).    2.    **The United States Postal Service Regulations Governing "Mail Covers" Do Not Provide Any Basis To Suppress Felipe's Attica Correspondence**

Felipe also argues that his letters should have been suppressed based on the DOC's putative failure to comply with United States Postal Service regulations governing "mail covers." See 39 C.F.R. § 233.3.  Felipe claims that the DOC was required to obtain written authorization from the Postal Service to inspect Felipe's mail, and that DOC's failure to do so entitled him to suppression of the letters.  (Felipe Br. 29-34).  This claim is meritless.

At the outset, the factual contention on which Felipe's claim rests is simply wrong.  The United States Postal Service regulation requiring law enforcement agencies to request authorization in writing from the Postal Service for a "mail

---

* Furthermore, Felipe's suggestion that a hearing was needed "to determine the factual basis for the 60-day renewals," (Felipe Br. 27), is completely specious.  The Government submitted an affidavit and other supporting documents establishing the basis for Attica's initial decision to inspect Felipe's mail, as well as each of the subsequent renewals of that decision.  (E.g., A. 106-07).  By contrast, Felipe did not submit an affidavit based on personal knowledge demonstrating that there was an issue of material fact in dispute as to the basis for the 60-day renewals.  Accordingly, his moving papers in the District Court were deficient as a matter of law.  See, e.g., United States v. Gillette, 383 F.2d 843, 848-49 (2d Cir. 1967) (to raise a factual issue warranting a suppression hearing, a defendant must, at a minimum, present that issue through an affidavit of an individual who has personal knowledge of the relevant facts).  Similarly, Felipe's argument that a hearing was necessary to establish whether he was aware of the DOC regulations authorizing inspection of inmate mail, (Felipe Br. 28-29), is equally specious.  He failed to file an affidavit on that issue as well, and in any event, he cites no authority entitling him to relief on that basis.

30

cover" does not apply to the DOC's inspection of inmates' mail. Indeed, the United States Postal Service Manual makes it abundantly clear that DOC is entitled to deliver mail to inmates in accordance with DOC's internal rules and regulations:

> Mail addressed to patients or inmates at institutions is delivered to the institution's authorities who, in turn, deliver the mail to the addressee under the institution's rules and regulations.

United States Postal Service, Postal Operations Manual § 615.1 (Aug. 1, 1996).*

In any event, even assuming that the United States Postal Service regulations governing mail covers applies to correctional facilities' handling of inmate mail, and that DOC failed to comply with those regulations, Felipe would not be entitled to suppression of his Attica letters. Suppression is not a remedy for violations of agency regulations that do not raise constitutional questions. See United States v. Caceres, 440 U.S. 741, 743-44 (1979); United States v. Choate, 619 F.2d 21, 23 (9th Cir.) (rejecting defendant's claim for suppression based upon evidence gathered pursuant to mail cover; "where violation of an agency regulation does not raise a constitutional question and defendant 'cannot reasonably contend that he relied on the regulation, or that its breach had any effect on his conduct," he may not in a criminal prosecution 'seek judicial enforcement of the agency regulation by means of the exclusionary

---

\* The Postal Operations Manual is incorporated into the Code of Federal Regulations. See 38 C.F.R. § 211.2(a)(3).

31

rule.'"), cert. denied, 449 U.S. 951 (1980).

In United States v. Caceres, the Government introduced into evidence tape recordings of the defendant's conversations with an Internal Revenue Service ("IRS") agent, two of which had been made without prior approval of the Department of Justice, as required by IRS regulations. The Supreme Court rejected the defendant's claim that the tape recordings should be suppressed on that basis, holding that the Government's violation of the IRS regulations did not entitle the defendant to such relief because "the violations of agency regulations [in the case] do not raise any constitutional questions." Caceres, 440 U.S. at 752. The Court reasoned that

> we are dealing with a criminal prosecution in which respondent seeks judicial enforcement of the agency regulations by means of the exclusionary rule. That rule has primarily rested on the judgment that the importance of deterring police conduct that may invade the constitutional rights of individuals throughout the community outweighs the importance of securing the conviction of the specific defendant on trial. In view of our conclusion that none of respondent's constitutional rights has been violated here, either by the actual recording or by the agency violation of its own regulations, our precedents enforcing the exclusionary rule to deter constitutional violations provide no support for the rule's application in this case.

---

* Cf. United States v. Piervinanzi, 23 F.3d 670, 682 (2d Cir. 1994) (United States Attorney's Manual guidelines "provide no substantive rights to criminal defendants"), cert. denied, 513 U.S. 904 (1994); United States v. Valencia, 609 F.2d 603, 636 n.28 (2d Cir. 1979) (the Government's failure to comply with regulations that are "not required by either the Constitution or statute" does not violate due process), cert. denied, 446 U.S. 940 (1980).

32

Id. at 754.  Similarly, Felipe's constitutional rights were not
violated in any way.  See supra pp. 23-28.  Under Caceres,
therefore, any violation by DOC of the United States Postal
Service regulations do not entitle him to suppression of the
letters.

POINT II

The District Court Properly Sentenced Felipe.

Felipe also challenges the District Court's decision at
sentencing to impose special conditions of confinement limiting
his ability to communicate with other inmates, ALKQN members and
non-family members.  Felipe's argues that the District Court
lacked authority to impose these special conditions and that they
were unconstitutional.  (Felipe Br. 35-50).

As demonstrated below, this claim is without merit.  In
light of the extensive trial evidence of Felipe's ability to
order murders while he in solitary confinement at Attica, the
District Court's imposition of special conditions of confinement
on Felipe was a proper exercise of its statutory authority. In
addition, the special conditions imposed by the District Court
are fully consistent with well-settled constitutional standards.

**A.    Relevant Facts**

**1.    The Sentencing Proceeding**

On February 14, 1997, after sentencing Felipe to a term
of life imprisonment, the District Court imposed "special
conditions of confinement," requiring that Felipe: (1) be
confined without contact with other prisoners; (2) not be

33

permitted "to communicate in any fashion with any other defendant in this case or any member of the Latin King/Queen Nation"; (3) correspond with and receive visits from no one except his attorney and close family members approved by the District Court with notice to the United States Attorney's Office, and that correspondence and visits with everyone except his attorney be monitored; and (4) not be permitted telephone contact with anyone. (A. 459).·

The District Court imposed the special conditions after finding that Felipe had

> orchestrated a number of murders and attempted murders from jail. He did it by using his correspondence, his visiting privileges and his contact with other prisoners to facilitate his communications of his orders to murder. He also used codes to attempt to frustrate the attempts of prisons [sic] officials to monitor his conversation. It appears to me that unless Mr. Felipe's ability to communicate with the outside world is severely restricted, other people will be murdered on his orders.

(A. 426-27). The District Court also found that

> this case presents unusual circumstances and raises unique concerns.
>
> While in prison, this defendant used the privileges he had to correspond with those outside the prison and to receive visits from friends and family, to maintain his control over the criminal activities of the Latin Kings and to cause the murder of a number of people. Unless those privileges are severely restricted in the future, there is every reason to believe that the defendant will again abuse these privileges for illegal purposes.

---

· The District Court subsequently modified its order to permit Felipe to make telephone calls to his attorney. (A. 558).

34

.   .   .

> The record in this case clearly establishes
> that there is a great danger that this defendant
> will attempt to by human contact that he is
> permitted in prison, will attempt to orchestrate
> additional murders.  Thus, the conditions of
> confinement must be such that he has limited
> contact with other individuals and that he has no
> unmonitored contact with anyone but his attorney.

(A. 447-48).*

### 2.  The District Court's Order Denying Felipe's Rule 35 Motion

On March 6, 1997, Felipe moved for an order "pursuant to Rule 35 of the Federal Rules of Criminal Procedure" to vacate and set aside the sentence, and to be resentenced without imposition of any special conditions of confinement.  On April 29, 1997, the District Court issued a written opinion denying Felipe's Rule 35 motion.  (A. 542-55).

In its opinion, the District Court noted that the special conditions were not imposed "for the purpose of punishing the defendant," but rather "because the record of the defendant's trial before this Court established that this defendant, while in state prison, used his contacts with other prisoners and visitors

---

\* The District Court did not conduct a hearing before imposing the special conditions of confinement, finding that it was unnecessary because the "record of the proceedings in this case" provided the basis for imposing the special conditions.  (A. 449).  The District Court did, however, afford Felipe and his counsel an opportunity to comment on the proposed special conditions before ordering that they be imposed.  (A. 430, 442).  The District Court also granted Felipe additional time to file a written submission addressing the special conditions of confinement.  (A. 449, 542).

35

and his correspondence to orchestrate at least three murders. This record persuaded the Court that, unless serious restrictions were placed on the defendant in prison, he would again order murders from prison."   (A. 543).

The District Court held that the special conditions satisfy the constitutional requirement, set forth in Turner v. Safley, 482 U.S. at 89, that "a 'valid, rational connection' [exist] between the prison regulation and the legitimate governmental interest put forward to justify it."   Noting that the Felipe was convicted of ordering three murders from jail and that PSR indicated that he had ordered five additional murders from jail, Judge Martin found that "[t]he record of the trial in this case . . . demonstrates that this defendant is a cold blooded murderer who orders the murder of anyone who somehow incurs his wrath," and that "the risk is that the defendant will order additional murders from jail and, in the Court's view, that real and substantial risk fully justifies the restrictions imposed."   (A. 544-45).   The District Court also held that it was imposing the special conditions pursuant to its statutory authority under 18 U.S.C. § 3582(d), and its inherent authority to enter an order designed "to prevent a defendant from carrying out additional crimes while serving a prison sentence it has imposed."   (A. 547).

B.   Discussion

1.   The Court Was Authorized Under 18 U.S.C. § 3582(d) To Impose The Special Conditions Of Confinement

36

Felipe argues that District Court lacked authority to impose the special conditions of confinement because the "control and management of federal penal institutions is vested <u>solely</u> in the Attorney General and the Bureau of Prisons." (Felipe Br. 38 (emphasis original)). Because the record established that Felipe repeatedly used his communications privileges while incarcerated at Attica to commit murder and other violent crimes, the District Court's imposition of the special conditions of confinement was a proper exercise of its statutory authority to limit the right of a defendant convicted of racketeering to associate with certain people.

The place and conditions of a prisoner's confinement are ordinarily determined by the Attorney General through the Bureau of Prisons ("BOP"). <u>See</u>, <u>e.g.</u>, 18 U.S.C. § 3621; <u>United States</u> v. <u>Williams</u>, 65 F.3d 301, 307 (2d Cir. 1995); <u>United States</u> v. <u>Huss</u>, 520 F.2d 598, 602 (2d Cir. 1975). "[W]here specific statutory authority exists," however, the sentencing court may impose special conditions of confinement. <u>United States</u> v. <u>Huss</u>, 520 F.2d at 602.[*]

In this case, "specific statutory authority" exists for the District Court's imposition of the special conditions of confinement. Indeed, Congress expressly authorized federal district courts to limit the associational rights of a defendant

---

[*] Notably, the BOP has not asserted any objection to the District Court's order regarding Felipe's special conditions of confinement. (A. 545).

37

-- like Felipe -- who has been convicted of racketeering

offenses.  See United States v. Sotelo, 94 F.3d 1037, 1040 (7th

Cir. 1996) (district courts may restrict communications of

inmates convicted of racketeering or narcotics crimes pursuant to

18 U.S.C. § 3582(d)).  18 U.S.C. § 3582(d) provides, in pertinent

part, that

> [t]he court, in imposing a sentence to a term of
> imprisonment upon a defendant convicted of a [RICO
> offense], or at any time thereafter upon motion by
> the Director of the Bureau of Prisons or a United
> States attorney, may include as a part of the
> sentence an order that requires that the defendant
> not associate or communicate with a specified
> person, other than his attorney, upon a showing of
> probable cause to believe that association or
> communication with such person is for the purpose
> of enabling the defendant to control, manage,
> direct, finance, or otherwise participate in an
> illegal enterprise.

Id.  "The purpose of [18 U.S.C. § 3582(d)] is to prevent the

defendant from continuing his illegal activities from his place

of confinement."  S. Rep. No. 225, 98th Cong., 2d Sess. 121,

reprinted in 1984 U.S.C.C.A.N. 3304.

The record amply supports the District Court's

imposition of the restrictions on Felipe's ability to communicate

and associate with other inmates and other members of the Latin

Kings.  Indeed, as the District Court found, these restrictions

constitute "the only foolproof means of preventing [Felipe] from

ordering murders in the future."  (A. 446).

The evidence at trial demonstrated that Felipe used his

correspondence and visiting privileges to order other Latin Kings

to commit numerous murders and other acts of violence while he

38

was incarcerated at Attica.  The evidence also established that Felipe was able to control the illegal affairs of the Latin Kings, in part, by circumventing the prison's rules and by using secret codes to prevent prison officials from deciphering his orders to murder people.  In fact, Felipe's success in evading prison rules that were designed to frustrate inmate violence and gang activity led the officials at Attica to screen his correspondence.  (A. 104-06).  In short, the record easily establishes "probable cause to believe that [Felipe's] association or communication with [Latin Kings and other inmates was] . . for the purpose of enabling [Felipe] to control, manage, direct, finance, or otherwise participate in an illegal enterprise," i.e., the Latin Kings, thus justifying the District Court's imposition of the special conditions of confinement.  See 18 U.S.C. § 3582(d).[*]

---

[*]  Felipe contends that the trial evidence relates to events that occurred in 1993 and 1994, and therefore is too "stale" to establish probable cause.  (Felipe Br. 43).  He cites no authority, however, nor is the Government aware of any, for the proposition that probable cause, under 18 U.S.C. § 3582(d), is subject to the timing restrictions applicable in other circumstances where probable cause is required, i.e., the Fourth Amendment.  Indeed, because 18 U.S.C. § 3582(d) authorizes the district court to make the probable cause finding at the time of sentencing, it obviously contemplates that such a determination will be made based upon evidence relating to the defendant's past criminal activities.

Furthermore, Felipe's claim that he "has been transformed into a model prisoner" and has not directed the illegal, violent activities of the ALKQN since his June 1994 arrest, (Felipe Br. 36), is a conclusory assertion, unsupported by anything in the record.  In its argument below, the Government offered to present evidence establishing that Felipe continued to

(χοντινυεδ...)

39

2.   **The Special Conditions Are Sufficiently Specific
     To Satisfy The "Specified Person" Language Of
     18 U.S.C. § 3582(d)**

Apparently conceding that 18 U.S.C. § 3582(d) confers authority upon the District Court to limit his communications from prison, Felipe argues that the District Court's order exceeded the scope of any such authority under that provision. According to Felipe, the statute's reference to communications with a "specified person" requires "identification of the **particular person** with whom" he may not communicate.  (Felipe Br. 40 (emphasis original)).  Felipe's narrow construction of the statute, which is unsupported by any legal authority, ignores the plain meaning and purpose of 18 U.S.C. § 3582(d), and is inconsistent with case law interpreting an analogous statute.

---

(...χοντινυεδ)
order his followers to commit murders while he was a pre-trial detainee at the Metropolitan Correctional Center.  The District Court concluded, however, that there was no need for a hearing regarding Felipe's post-arrest conduct.  Rejecting Felipe's suggestion that the special conditions were unwarranted because he does not "pose[ ] a current threat to anyone" as based on "a far too narrow view of the evidence," the District Court explained:

> [A] defendant awaiting trial and possible conviction and sentence is unlikely to engage in criminal conduct during that period.  The relevant record to be considered is the record of the trial in this case which demonstrates that this defendant is a cold blooded murdered who orders the murder of anyone who somehow incurs his wrath.  There is no reason to believe that the defendant has undergone a spiritual transformation and poses no danger to anyone in the future.

(A. 544).

40

First, the District Court's order **does** specify the persons with whom Felipe is barred from communicating: other prisoners, his co-defendants, and members of ALKQN.  (A. 459).  Further, contrary to Felipe's interpretation, the statute nowhere states that the District Court must identify by name all of the "specified person[s]."  Indeed, such a cramped reading would defeat the purpose of the statute, *i.e.*, to prevent prisoners convicted of racketeering from having contact with other members of organized crime groups and gangs.  Because such groups are often large with constantly changing membership, it would be difficult -- if not impossible -- to identify by name all persons who are members of the group and are involved in criminal activities.  As the District Court explained:

> It makes no sense in a case such as this, where the proof established that the defendant controlled a large organization and used his prison contact to facilitate his crimes, to require the Court to list by name all those who this defendant might attempt to use to order additional murders. . . . The purpose of § 3582(d) 'is to prevent the defendant from continuing his illegal activities from his place of confinement. In this defendant's case the type of order entered by the Court is the only way 'to prevent [him] from continuing his illegal activities from his place of confinement.'"

(A. 546-47 (quoting S. Rep. No. 225, 98th Cong. 2d Sess. at 121, *reprinted in* 1984 U.S.C.C.A.N. at 3304)).

Second, although 18 U.S.C. § 3582(d) has not been interpreted in any reported case, courts interpreting a similar statute containing the "specified person" language have rejected a narrow interpretation of that language.  18 U.S.C. § 3582(d) is

41

similar to 18 U.S.C. § 3563(b)(6), which authorizes courts to impose a special condition of probation prohibiting a defendant from "associating unnecessarily with specified persons." Id. (emphasis added); see also 18 U.S.C. § 3583(d) (incorporating § 3563(b)(6) with respect to conditions of supervised release). Indeed, the drafters of 18 U.S.C. § 3582(d) noted its similarity to the statutes authorizing non-association with specified persons as conditions of probation or supervised release. See S. Rep. No. 225 at 121-22, reprinted in 1984 U.S.C.C.A.N. at 3304-05.

Courts commonly prohibit defendants, while on probation or supervised release, from associating with other convicted felons, and with members of particular organized crime or other groups. In the few reported cases involving challenges to such restrictions, the Courts of Appeals have upheld sentencing courts' imposition of such conditions, even though no particular prohibited person was specifically named. In United States v. Showalter, 933 F.2d 573, 574 (7th Cir. 1991), for example, the defendant, who had been convicted of a weapons offense, challenged the District Court's imposition of a term of supervised release prohibiting him from associating with "those who . . . participate in[] the organization known as `skinheads' or any neo-Nazi organization." The Seventh Circuit held that this condition was not too vague to satisfy the statute's "specified person" language, and rejected the defendant's argument that the prohibited persons must be "specified to some

42

greater . . . degree." Id. at 575.˙ See also Malone v. United States, 502 F.2d 554 (9th Cir. 1974) (upholding condition of probation prohibiting defendant from "participating in any American Irish Republican movement," belonging to any "Irish organizations, cultural or otherwise," belonging to or participating in "any Irish Catholic organizations or groups," and visiting Irish pubs, where crime stemmed from defendant's involvement in Irish Republican cause), cert. denied, 419 U.S. 1124 (1975); United States v. Romero, 676 F.2d 406, 407 (9th Cir. 1982) (upholding probation condition prohibiting defendant from associating with persons involved in narcotics trafficking); United States v. Albanese, 554 F.2d 543 (2d Cir. 1977) (probation condition requiring defendant to associate "only with law-abiding persons" neither unconstitutionally void for vagueness nor overbroad); Birzon v. King, 469 F.2d 1241, (2d Cir. 1972) (parole condition prohibiting defendant from associating with persons engaged in criminal activity not unconstitutionally void for vagueness).

3. **The Special Conditions Of Confinement Are Constitutional**

Felipe also attacks the constitutionality of the

---

˙ Felipe attempts to distinguish Showalter as "hinged expressly upon what was seen to be the inherent or historic power of the trial court to fashion conditions of 'probation.'" (Felipe Br. 41). This argument represents a misreading of Showalter, in which the Court of Appeals' holding was expressly based upon its interpretation of the federal statute authorizing limitations on defendant's communication with "specified persons" while on probation or supervised release. Showalter, 933 F.2d at 575 (citing 18 U.S.C. § 3563(b)(6)).

43

special conditions of confinement, arguing principally that these conditions violate the First Amendment. (Felipe Br. 41-43, 48-50). These arguments are meritless. The communications restrictions the Court has imposed on Felipe are consistent with well-settled principles of constitutional law.

The test for assessing a prisoner's First Amendment claim is considerably more deferential to state authority than are standards applied to an ordinary citizen's First Amendment claims. The test is whether the restrictions imposed on prisoners are "reasonably related to legitimate penological interests." Turner v. Safley, 482 U.S. at 89.

The District Court's order restricting Felipe's correspondence and visits easily satisfies the Turner v. Safley standard. The order was based upon Felipe's past criminal activity and was designed to prevent him from ordering others to commit murders in the future. As the District Court found, Felipe's past conduct

> clearly establishes that there is a great danger
> that this defendant will attempt by human contact
> that he is permitted in prison, . . . to
> orchestrate additional murders.

(A. 448). Accordingly, the basis for and purpose of the Court's order were "reasonably related to legitimate penological interests." Turner v. Safley, 482 U.S. at 89; see also Workman, 80 F.3d at 699 ("the investigation and prevention of ongoing illegal inmate activity constitute legitimate penological objectives") (citing Thornburgh v. Abbott, 490 U.S. at 411-12).

44

Indeed, BOP's own regulations recognize that the need to protect the public from dangerous inmates is a valid penological objective.  Those regulations authorize the director of the BOP, pursuant to the direction of the Attorney General, to "implement special administrative procedures that are reasonably necessary to protect persons against the risk of death or serious bodily injury," upon a finding that "there is a substantial risk that a prisoner's communications or contacts with persons could result in death or serious bodily injury to persons."  28 C.F.R. § 501.3(a).  Furthermore, BOP regulations specifically authorize precisely the types of restrictions that the Court imposed in this case:

> These special administrative measures ordinarily may include housing the inmate in administrative detention and/or limiting certain privileges, including, but not limited to, correspondence, visiting, interviews with representatives of the news media, and use of the telephone, as is reasonably necessary to protect persons against the risks of acts of violence or terrorism.

Id.*

Felipe further asserts that the Court's order

---

* Felipe's argument that the Turner standard applies only to administrators with expertise on penology and not to judges, (Felipe Br. 36-37), is unpersuasive.  In this case, "the need for the special conditions arises from the nature of the defendant's criminal activity which was proved at trial," and therefore "the Court is clearly in the best position to determine what conditions are necessary to protect the public from the defendant."  (A. 548).  Indeed, 18 U.S.C. § 3582(d) clearly reflects Congress's judgment that in RICO cases the Court may often be in a better position than BOP to recognize the need for special conditions of confinement.

45

prohibiting him from corresponding with anyone except "close family members" on a judicially-approved list is too sweeping because he has been barred from corresponding with "the press, broadcasting media and to governmental officials and the Courts." (Felipe Br. 48). As the District Court noted at sentencing, however, "this case presents unusual circumstances and raises unique concerns" justifying severe restrictions on Felipe's ability to communicate with the outside world. (A. 446-47). If Felipe were granted unrestricted rights to correspond with the media or with people other than close family members, he could easily abuse these rights and use these people, with or without their knowledge, to communicate with prohibited third party correspondents such as other Latin Kings.*

---

* Felipe also contends that the restrictions on his ability to communicate with others constitute an ex post facto increase in punishment, and that solitary confinement amounts to cruel and unusual punishment in violation of the Eighth Amendment. (Felipe Br. 42-43, 45-46). Both arguments are meritless. The Court's imposition of the special conditions of confinement cannot possibly be treated as ex post facto, because § 3582(d) was enacted in 1984, nearly 10 years before Felipe began committing the violent crimes of which he was convicted.
    Furthermore, the Court's order restricting Felipe from contact with other prisoners does not violate the Eighth Amendment. Contrary to Felipe's claim, the Court did not sentence him to solitary confinement for life. Rather, the Court specifically retained jurisdiction to consider any application by Felipe or BOP to modify any of the conditions. (A. 459; see A. 451 (Court will modify conditions "on any showing of the change of circumstances or that the passage of time indicates that Mr. Felipe does not pose a substantial threat to others")). See generally Sandin v. Connor, 115 S. Ct. 2293, 2301 (1995) (holding that inmate's discipline in segregated confinement does not create Due Process liberty interest because "disciplinary segregation, with insignificant exceptions, mirrored those

(χοντινυεδ...)

46

### 4. Felipe Was Not Improperly Denied Notice Or A Hearing

Felipe argues that he was denied proper notice and an opportunity for a "plenary" hearing on the applicability of 18 U.S.C. § 3582(d) and the imposition of special conditions of confinement. (Felipe Br. 43-45). This claim is specious.

First, at sentencing the District Court informed the parties of its intention to order special conditions of confinement and provided both Felipe and his attorney with an opportunity to be heard on the issue. (A. 430, 442). In fact, due to defense counsel's strenuous objections to the proposed conditions, the District Court decided not to limit Felipe's contacts with his attorney. (A. 432, 435). The District Court also provided defense counsel with additional time to make a further submission, and the defense took advantage of this opportunity by filing the Rule 35 motion, upon which the Court ruled after full briefing and oral argument. (A. 542).

Second, there was no need for an evidentiary hearing because the District Court's order was based upon evidence proven

---

(...χοντινυεδ)
conditions imposed upon inmates in administrative segregation and protective custody"); Hutto v. Finney, 437 U.S. 678, 686-87 (1978) (length of solitary confinement may be relevant to determining whether conditions are cruel and unusual; however, "[i]t is perfectly obvious that every decision to remove a particular inmate from the general prison population for an indeterminate period could not be characterized as cruel and unusual; "[i]f new conditions of confinement are not materially different from those affecting other prisoners, a transfer for the duration of a prisoner's sentence might be completely unobjectionable").

47

at the trial in this case.   Indeed, the Court declined to order a

hearing for this very reason:

> [T]he basis for the actions that I am taking is
> found in the record of the proceedings in this
> case.   It is the basis of the murders and
> attempted murders that were ordered in this case
> from jail that gives rise to the concern that
> suggests that this defendant must be severely
> limited in his contacts, so that other persons are
> not murdered.

(A. 449).*

Third, the procedures followed by the District Court

are not defective under Burns v. United States, 501 U.S. 129

(1991).   (Felipe Br. 45).   Burns did not address the discretion

of the sentencing judge to impose sentence and related conditions

within the applicable guidelines range.   Rather, Burns involved

an upward departure from the sentencing guidelines.   In Burns,

the Supreme Court held that district courts may not sua sponte

depart upward from the guidelines range without giving the

parties reasonable notice that it is contemplating such a ruling.

Id. at 138-39.   The District Court's order in this case was not

an upward departure; the District Court sentenced the defendant

---

\* "The district court is not required, by either the Due
Process Clause or the federal Sentencing Guidelines, to hold a
full-blown evidentiary hearing in resolving sentencing disputes."
United States v. Slevin, 106 F.3d 1086, 1091 (2d Cir. 1996)
(citing United States v. Olvera, 954 F.2d 788, 792 (2d Cir.),
cert. denied, 505 U.S. 1211 (1992); United States v. Prescott,
920 F.2d 139, 143-44 (2d Cir. 1990)).   As the Slevin court
explained, "[a]ll that is required is that the court 'afford the
defendant some opportunity to rebut the Government's
allegations.'"   106 F.3d at 1091 (quoting United States v. Eisen,
974 F.2d 246, 269 (2d Cir. 1992), cert. denied, 507 U.S. 1029
(1993)).

48

to terms of imprisonment within the Guidelines range.

Moreover, even if restrictive conditions of confinement were treated as an upward departure, sufficient notice was provided here. Burns does not require that the parties be notified of the Court's contemplation of a departure prior to the date of sentencing. See id. at 139 n.6 (declining to address the timing of what constitutes "reasonable notice" under Rule 32 of the Federal Rules of Criminal Procedure). Burns merely requires that the Court notify the parties of the specific ground on which it is contemplating a departure, in order to afford them with a meaningful opportunity "'to comment upon . . . matters relating to the appropriate sentence.'" Id. at 136 (quoting Rule 32(a)(1)). As noted above, the District Court informed the parties that it intended to impose certain special conditions of confinement; allowed both Felipe and his attorney to comment on this issue; modified its original proposal before imposing the final conditions; and afforded defense counsel an opportunity to submit written objections to the special conditions after the sentencing proceeding. Thus, Felipe was provided with sufficient notice and opportunity to be heard before the District Court imposed the special conditions of confinement.

## POINT III

### The District Court Properly Sentenced Andino

Andino attacks her sentence, claiming that the District Court lacked authority to impose a cumulative sentence of 18 years' imprisonment and that the District Court abused its

49

discretion by refusing to depart downwardly from the United States Sentencing Guidelines (the "Guidelines" or "U.S.S.G."). (Andino Br. 13-19). Andino's claims are frivolous. Indeed, Andino waived her right to appeal a sentence of 18 years' imprisonment in her plea agreement, and the District Court's refusal to depart downwardly is unreviewable on appeal.

A. **Relevant Facts**

Andino stipulated in her plea agreement that the her sentencing range under the Guidelines was "360 months' to life imprisonment, plus a consecutive sentence of 5 years' imprisonment." Andino also stipulated in her plea agreement that because "the statutory maximum term of incarceration for the offenses" to which she pleaded guilty was 18 years, her "stipulated Guidelines sentence is 18 years' imprisonment." (A. 258). While Andino reserved the right in her plea agreement to argue for a downward departure based on her epilepsy and related illnesses, pursuant to U.S.S.G. § 5H1.4, and the Government reserved the right to oppose such a motion, she explicitly waived her right to appeal "a sentence of 18 years' imprisonment." (A. 259).

At the sentencing proceeding on March 7, 1996, Andino moved for a downward departure, claiming that she had health problems related to epilepsy, asthma and liver ailments, as well as psychiatric problems and a difficult background. The Government opposed that motion. The District Court refused to exercise its discretion to depart from the Guidelines sentence of

50

18 years' imprisonment, reasoning that:

> I am not unsympathetic to the circumstances of
> Miss Andino's background and her current family
> circumstances.  But even were there to be a
> departure, the departure has to be in relation to
> the sentence that is available.  And we already
> indicate where there is a substantial departure
> from the guidelines.

> Also, if this were a case where we were
> talking about something other than murder, for
> example, if it were a case where the amount of
> time was set by the guidelines, it might be in my
> view appropriate to depart.

> But the fact is that this is conspiracy that
> resulted in murder.  And I think as to sentence
> that it would not be appropriate to impose any
> sentence less than that called for by the
> statutory provisions at issue here, which is a
> substantial departure from the guidelines.

(A. 476-77).

**B.    Discussion**

**1.    Andino Has Waived Her Right To Appeal Her Sentence**

As set forth _supra_, Andino stipulated in her plea agreement that she would not appeal "a sentence of 18 years' imprisonment."  (A. 259).  Because Andino was sentenced to 18 years' imprisonment, her sentencing claims are foreclosed by her plea agreement.  _See_, _e.g._, United States v. Maher, 108 F.2d 1513, 1531 (2d Cir. 1997) (where defendants sentenced within Guidelines range stipulated to in plea agreements and waived right to appeal sentences within such ranges, sentencing claims "not properly before [this Court] because they have been waived"); United States v. Salcido-Contreras, 990 F.2d 51, 53 (2d Cir.) ("[i]n no circumstance . . . may a defendant, who has

51

secured the benefits of a plea agreement and knowingly and voluntarily waived the right to appeal a certain sentence, then appeal the merits of a sentence conforming to the agreement"), cert. denied, 509 U.S. 931 (1993); accord United States v. Rivera, 971 F.2d 876, 896 (2d Cir. 1992).

### 2.   The District Court Was Authorized To Impose Consecutive Sentences For Each Count

Even assuming that Andino has not waived her right to appeal a sentence of 18 years, her claim that the District Court was not authorized to impose consecutive sentences for the three offenses to which she pleaded guilty is without merit.  (Andino Br. 13-16).

As noted supra, the Guidelines range for Andino's offenses was 360 months' to life imprisonment, plus a five-year mandatory consecutive term for violation of 18 U.S.C. § 924(c). This sentencing range was computed based upon a combined offense level of 42 and a Criminal History category of VI.  (A. 258; Andino PSR ¶ 156). Because the Guidelines range far exceeded the statutory maximum sentences for each of the three counts, the District Court was legally required to impose a sentence of 18 years, i.e., by imposing consecutive sentences for each count.

---

Andino knew full well that the Guidelines range exceeded the total statutory maximum sentence, as evidenced by her plea agreement and her statements during her plea allocution. At the plea, the District Court specifically advised her that under the plea agreement "[t]here is a maximum sentence of 18 years that is available and the guidelines exceeds that range," and asked her whether she understood that.  Andino responded, "Yes, your Honor."  (A. 285).

52

U.S.S.G. § 5G1.2(d) provides in pertinent part that "[i]f the sentence imposed on the count carrying the highest statutory maximum is less than the total punishment, then the sentence imposed on one or more of the other counts shall run consecutively, . . . to the extent necessary to produce a combined sentence equal to the total punishment."  The Commentary to U.S.S.G. § 5G1.2, in turn, defines "total punishment" as the "combined length of the sentences . . . determined by the adjusted combined offense level," i.e., the sentence arrived at by the District Court within the Guidelines range computed from the combined offense level and the defendant's criminal history. See, e.g., United States v. Loeb, 45 F.3d 719, 723 (2d Cir.), cert. denied, 115 S. Ct. 2017 (1995).  The Commentary also makes clear that consecutive sentences on all counts must be imposed if no count carries a statutory maximum as high as the applicable guidelines range:

> Usually, at least one of the counts will have a statutory maximum adequate to permit imposition of the total punishment as the sentence on that count.  The sentence on each of the other counts will then be set at the lesser of the total punishment and the applicable statutory maximum, and be made to run concurrently with all or part of the longest sentence.  If no count carries an adequate statutory maximum, consecutive sentences are to be imposed to the extent necessary to achieve the total punishment.

U.S.S.G. § 5G1.2 (Commentary) (emphasis added).  Accordingly, contrary to Andino's argument, the District Court was authorized to impose consecutive sentences on each of the three counts to which she pleaded guilty, because the total of the combined

53

statutory maximums -- 18 years -- was less than the minimum of her Guidelines range -- 360 months. See United States v. Loeb, 45 F.3d at 723 ("§ 5G1.2(d) allows the imposition of consecutive sentences as long as the total sentence remains within the total punishment range").

### 3. The District Court's Refusal To Downwardly Depart Is Not Reviewable On Appeal

Again assuming that Andino has not waived her right to appeal her sentence of 18 years, the District Court's failure to grant her downward departure motion is not cognizable on appeal. As this Court has repeatedly held, a sentencing court's decision not to grant a downward departure is an exercise of discretion that is ordinarily unreviewable on appeal. See, e.g., United States v. Brown, 98 F.3d 690, 692 (2d Cir. 1996); United v. Chabot, 70 F.3d 259, 260 (2nd Cir. 1995); United States v. Harris, 38 F.3d 95, 97 (2d Cir. 1994), cert. denied, 513 U.S. 1198 (1995). Such decisions are appealable only if "the guidelines were misapplied, the court misapprehended its authority or imposed an illegal sentence." United States v. Haynes, 985 F.2d 65, 68 (2d Cir. 1993); see also United States v. Obgondah, 16 F.3d 498, 499 (2d Cir. 1994) ("'if the refusal to depart downward is based on a district court's mistaken view that it lacks authority to depart, a defendant retains his right to appeal this denial'") (quoting United States v. Sharpsteen, 913 F.2d 59, 63 (2d Cir. 1990)); United States v. McGregor, 11 F.3d 1133, 1138 (2d Cir. 1993) (same).

54

Andino's sole argument with respect to the downward departure is that the District Court "abused its discretion in not downward departing from the term imposed." (Andino Br. 19). Andino does not suggest, much less establish, that the District Court misunderstood his authority to depart. In any event, the record makes clear that the District Court understood its authority to depart, but simply declined to exercise that authority in light of the facts and circumstances of the case. (A. 476–77). Accordingly, none of the exceptions apply and Andino's downward departure claim is unappealable.

## CONCLUSION

**The judgments of conviction should be affirmed.**

Dated:     New York, New York
           August 4, 1997

                              Respectfully submitted,

                              MARY JO WHITE,
                              United States Attorney for the
                              Southern District of New York,
                              Attorney for the United States
                                     of America.

ALEXANDRA A.E. SHAPIRO,
ROBERT E. RICE,
     Assistant United States Attorneys,
          Of Counsel.

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff - Appellee - Respondent, | ) | No. 02 C 6998 |
| | ) | |
| vs. | ) | Hon. Suzanne B. Conlon |
| | ) | |
| DARRYL JOHNSON, | ) | |
| | ) | Death Sentence Imposed |
| Defendant - Appellant - Petitioner. | ) | |

**PETITIONER'S RENEWED MOTION
IN LIGHT OF *MASSARO V. UNITED STATES*
FOR LEAVE TO CONDUCT DISCOVERY**

Defendant Darryl Lamont Johnson, by his attorneys, Terence H. Campbell of Cotsirilos, Tighe & Streicker, and Lorinda Meier Youngcourt, respectfully moves the Court to grant him leave to conduct discovery, as set forth in detail below. Discovery is authorized by Rule 6 of the Rules Governing Section 2255 Proceedings For the United States District Courts ("Habeas Rule 6"). Johnson urges this Court to reconsider his discovery motion and respectfully asserts this Court improperly denied him leave to conduct discovery in its Memorandum Opinion and Order by finding he had procedurally defaulted his ineffective assistance of counsel claim by failing to raise it in his direct appeal (Memorandum Opinion and Order, p. 6). In support of this motion, Johnson states as follows:

**PROCEDURAL HISTORY AND LAW**

1.      Johnson filed his Motion to Vacate Conviction and Sentence and for New Trial Purusant to 28 U.S.C. §2255 an Rule 33 of the Federal Rules of Criminal Procedure on October 1, 2002.

2.      Johnson filed his first Motion for Leave to Conduct Discovery on February 3, 2003.

3.     This Court denied Johnson's §2255 motion and his discovery motion on March 11, 2003, finding that Johnson had procedurally defaulted his ineffective assistance of counsel claim by failing to raise it on direct appeal.  (Memorandum Opinion and Order, p. 6-7).  Applying the cause and prejudice standard of *McCleese v. United States*, 75 F.3d 1174, 1177-78 (7th Cir. 1996), this Court ruled that Johnson had failed to show good cause for the default.  Specifically addressing the discovery motion, this Court stated,

> Johnson fails to establish the cause and prejudice necessary to excuse his procedural default, as well as the required prejudice necessary to establish his ineffective assistance of counsel claim.  Johnson's failure to establish a colorable claim based on his proposed facts dooms his request for additional discovery.

(Memorandum Opinion and Order, p 10).

4.     On April 23, 2003, the United States Supreme Court held "that an ineffective-assistance-of-counsel claim may be brought in a collateral proceeding under §2255, whether or not the petitioner could have raised the claim on direct appeal." *Massaro v. United States*, 538 U.S. 500, 509, 123 S.Ct. 1690, 1696 (2003).

5.     Given the United States Supreme Court's decision in *Massaro*, this Court's ruling that Johnson defaulted his ineffective-assistance-of-counsel claims was made in error and must be reconsidered.  Thus, Johnson's motion for discovery must also be reconsidered.

6.     As stated in *Massaro*, "a motion brought under §2255 is preferable to direct appeal for deciding claims of ineffective assistance." *Id*., 538 U.S. at 504.

7.     Discovery has been granted in capital §2255 proceedings.  *See United States v. Roane,* 378 F.3d 382, 389 (4th Cir. 2004) ("After discovery proceedings and an evidentiary hearing on Roane's remaining two claims, the court granted relief on his Sixth Amendment claim of

ineffective assistance of counsel ("IAC claim"), vacating Roane's convictions and sentences relating to the murder of Douglas Moody."); *Reeves v. United States*, 255 F.3d 389 (7th Cir. 2001), *en banc denied* (The Northern District Court of Illinois permitted discovery, held an evidentiary hearing, and heard oral arguments on Reeves' § 2255 petition).

8.   Only the government has access to the documents requested by this motion.  This motion is Mr. Johnson's "prudent effort to learn the facts."  *United States v. Fannon*, 435 F.2d 364, 367 (7th Cir. 1970).

9.   The information sought by Petitioner herein is necessary to a "full and fair opportunity to wage a collateral attack" upon those claims for relief in Mr. Johnson's §2255 motion. *O'Connor v. United States*, 133 F.3rd 548, 550 (7th Cir. 1998).  Accordingly, Petitioner respectfully requests that the Court grant this motion for discovery as set forth herein.

## DISCOVERY REQUESTED

10.  Mr. Johnson requests the Court reevaluate the denial of the following requested discovery items and order leave to conduct discovery based upon *Massaro v. United States* and on the issues raised in Mr. Johnson's petition pursuant to §2255 which was filed with the Court on September 30, 2002:

    a.   **INEFFECTIVE ASSISTANCE AS TO FUTURE DANGEROUSNESS**

        i.   Any briefs, memos, opinion papers, or policy statements from the Department of Justice ("DOJ") and/or the BOP authored before November 30, 1997 or addressing events prior to November 30, 1997, relating to allowable conditions of confinement in capital eligible cases where the death penalty was not imposed;

        ii.  Identify all cases in which prior to November 30, 1997, the DOJ or any U.S. Attorney's Office has asked that strict conditions of confinement be imposed against a defendant pursuant to 18 U.S.C. §3582(d) and/or 28 CFR 501.3, the

3

factual and legal bases upon which such request was made in each case, the Court in which it was made, and the date(s) on which each such request was made; Disciplinary records, reports or other documentation from the Bureau of Prison's ("BOP") ADX facility on all inmates housed in the control unit for the period from 1995 through November 30, 1997;

iii.   Identify all cases in which beginning prior to November 30, 1997, the BOP has carried out the strict conditions of confinement imposed against a defendant pursuant to 18 U.S.C. §3582(d), 28 CFR 501.3, or any other authority, the factual and legal bases upon which such conditions were imposed, and the dates during which such conditions have been imposed in each such case;

iv.   Any documents or information relating to any BOP employees (current or former), or any other government employees or agents (current or former) who testified at federal capital penalty phase trials regarding the potential conditions of confinement which may be imposed against a defendant (including, but not limited to, the testimony of any such witness);

v.   Any documents or information in the possession of the government which are inconsistent with the testimony of Warden John Vanyur given at Darryl Johnson's penalty-phase trial (*United States v. Darryl Johnson*, 96 CR 379 (N.D. Ill.));

vi.   Any documents or information relating to any periodic or other review of the conditions of confinement being imposed on BOP inmates Clayton Fountain and/or Thomas Silverstein, including the timing of any such reviews, the considerations taken into account by the government in those reviews, and the decisions made by the government pursuant to those reviews;

vii.   Any documents or information relating to the decision to house BOP inmates Clayton Fountain and/or Thomas Silverstein in the conditions of confinement under which they are currently confined and have been confined for more than a decade;

viii.   Documents or information pre-dating November 30, 1997, relating to "C Unit, D Range" at ADX (the so-called super cells at ADX), including any documents or information relating to the intended purpose and function of these cells; the type(s) of inmates who are intended to be housed in these cells; the amount of contact (if any) between prisoners housed in these cells and BOP staff; and the use (if any) of these cells since their construction;

ix.  Documents or information identifying all inmates in the federal prison system who prior to November 30, 1997, had restrictions in addition to those imposed on all BOP prisoners at the particular facility where the inmate is housed:

(1)  On their phone calls (*e.g.* no phone calls except to attorneys or approved family contacts);

(2)  On their mail (*e.g.* must be approved, pre-read, sent to the DOJ or the prosecutor's office, etc. before it can either be sent from, or received by, the inmate); and

(3)  On their visitors  (*e.g.* no one but court-approved family members, attorneys, etc.).

For each such inmate, documents or information identifying their crime of conviction, the facts of their cases, their sentence, BOP facility (or facilities) in which they have been and are housed, case number, court of conviction, year of conviction and sentence, the authority pursuant to which the restriction was imposed (*e.g.* by the Court, by the BOP, etc.), and the dates during which the restriction has been imposed

x.  Any documents or information created or authored by the government relating to any assessment, description, analysis or comment on the substance of the testimony given by Warden Vanyur in Darryl Johnson's case (*United States v. Darryl Johnson*, 96 CR 379 (N.D. Ill.));

xi.  Any documents or information relating to any decision by the government not to call Warden Vanyur to testify at any capital trial after his testimony at Darryl Johnson's penalty-phase trial;

xii.  Any documents or information relating to any testimony given by Warden Vanyur (other than in Darryl Johnson's case) with respect to possible or allowable conditions of confinement in any BOP facility, including, but not limited to, the date(s) and substance of any such testimony;

xiii.  Any documents or information evidencing any charges that were filed relating to the Lewisburg murders about which Warden Vanyur testified at Darryl Johnson's penalty-phase trial;

xiv.  Any documents or information proving or evidencing that members of the Aryan Brotherhood housed at ADX Florence were or were not responsible for the Lewisburg Prison murders about which Warden Vanyur testified at Darryl Johnson's penalty-phase trial;

WHEREFORE, for the foregoing reasons and those set out in Petitioner's Memorandum of

Law in Support of this motion, Darryl Lamont Johnson respectfully requests that the Court enter an

Order authorizing him to conduct discovery related to the claims contained in his §2255 motion, and

directing the discovery requested herein be produced by the government.

Respectfully submitted,


/s/ Terence H. Campbell                               /s/ Lorinda M. Youngcourt

Terence H. Campbell                                   Lorinda Meier Youngcourt
Cotsirilos, Tighe & Streicker, Ltd.                   1773 Huron Williams Road
33 North Dearborn Street, Suite 600                   Mitchell, Indiana  47446
Chicago, Illinois  60602                              (812) 849-9852
(312) 263-0345

Counsel for Darryl Lamont Johnson

**CERTIFICATE OF SERVICE**

Terence H. Campbell, an attorney, hereby certifies that in accordance with hereby certifies

that in accordance with Fed.R.Crim.P. 49, LR 5.5, and the General Order on Electronic Case Filing

(ECF), the following document:

1. Petitioner's Renewed Motion In Light of *Massaro v. United States* For Leave to
Conduct Discovery

was served pursuant to the District Court's ECF system as to ECF filers, including the United States

Attorney's Office.

/s/  Terence H. Campbell
Terence H. Campbell

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff - Appellee - Respondent, | ) | No. 02 C 6998 |
| | ) | |
| vs. | ) | Hon. Suzanne B. Conlon |
| | ) | |
| DARRYL JOHNSON, | ) | |
| | ) | Death Sentence Imposed |
| Defendant - Appellant - Petitioner. | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF PETITIONER'S
RENEWED MOTION IN LIGHT OF *MASSARO V. UNITED STATES*
FOR LEAVE TO CONDCUT DISCOVERY**

## I.      THE LAW GOVERNING POST-CONVICTION DISCOVERY

Rule 6 of the *Rules Governing Section 2255 Proceedings for the United States District*

*Courts* ("Habeas Rule 6"), grants a District Court the specific and express authority to order

discovery in §2255 proceedings.  Specifically, Habeas Rule 6 provides:

> A party may invoke the processes of discovery available under the Federal Rules
> of Criminal Procedure or the Federal Rules of Criminal Procedure or elsewhere in
> the usages and principles of law if, and to the extent that, the judge in the exercise
> of his discretion and for good cause shown grants leave to do so, but not
> otherwise.

Habeas Rule 6(a).

The United States Supreme Court addressed discovery under Habeas Rule 6 in *Bracy v.*

*Gramley,* 502 U.S. 899 (1997).  Bracy was convicted and sentenced to death in Illinois for a

triple murder.  After his sentencing, Bracy's trial judge was convicted of taking bribes from

defendant's in criminal cases.  In his habeas petition, Bracy alleged that although the judge was

not bribed in his case, "he 'fixed' other murder cases during and around the time of [Bracy's]

trial." *Id.* at 902. Bracy argued that the judge had an interest in his conviction "to deflect

suspicion that he was taking bribes in other cases." *Id.*

In reversing the Seventh Circuit Court of Appeals opinion affirming the district court's

denial of discovery, the Supreme Court first identified the "essential elements" of the claim. *Id.*

at 904, citing *United States v. Armstrong*, 517 U.S. 456 (1996). The Court found that the "Due

Process Claus clearly requires a "fair trial in a fair tribunal," before a judge with no actual bias

against the defendant or interest in the outcome of his particular case." *Id*. at 904-905, *quoting,*

*Withrow v. Larkin*, 421 U.S. 35, 46 (1975).

The Court addressed the Seventh Circuit's finding that Bracy's assertion that the trial

judge had an interest in the outcome of his case in an effort to deflect suspicion to be "quite

speculative" because the trial judge was just as likely to "be careful to appear to favor all

criminal defendants" *Id.* at 905.

> [D]ifficulties of proof aside, there is no question that, if it could be
> proved such compensatory, camouflaging bias on Maloney's part
> in petitioner's own case would violate the Due Process Clause of
> the Fourteenth Amendment.

*Id.* After a review of the evidence set forth in Bracy's habeas petition, the Supreme Court

concluded Bracy had shown "good cause" for discovery under Rule 6(a). Noting that "where

specific allegations before the court show reason to believe that the petitioner ***may, if the facts***

***are fully developed, be able to demonstrate that he is . . . entitled to relief,*** it is the duty of the

court to provide the necessary facilities and procedures for an adequate inquiry." *Id*. at 908-909

(emphasis added), *citing*, *Harris v. Nelson,* 394 U.S. 286, 300 (1969).

2

II.     **APPLICATION OF THESE PRINCIPALS SHOW THAT PETITIONER IS ENTITLED TO THE REQUESTED DISCOVERY**

In his *Renewed Motion for Discovery in Light of Massaro v. United States* (hereafter, *Motion*), Petitioner has requested discovery of only items related to his ineffective-assistance-of-counsel claim.  Johnson's ineffectiveness claim is based upon his trial counsel's failure to investigate and prepare for the presentation of evidence in support of the government's alleged future dangerousness aggravator.  This claim is fully set out in Petitioner's §2255 motion, the memorandum in support thereof, and *Petitioner's Response to Government's Motion to Reconsider the Court's March 11, 2003 Opinion and Order in Light of the Supreme Court's Ruling in Massaro v. United States, Wiggins v. Smith,, and Rompilla v. Beard*.

The Sixth Amendment right to the effective assistance of counsel clearly requires counsel in a capital case to investigate and prepare for the presentation of aggravating factors in justifying a death sentence.  *Wiggins v. Smith*, 539 U.S. 510, 521 (2003); *Williams v. Taylor*, 529 U.S. 362, 396 (2000); *Strickland v. Washington*, 466 U.S. 668, 688 (1984); *Canaan v. McBride*, 395 F.3rd 376, 384 (2005).  ABA Standards for Criminal Justice.  As set out in the motions listed above, Mr. Johnson's trial counsel did not meet the prevailing professional norms of reasonably competent counsel and but for their omissions their exists a reasonable probability that the outcome of Mr. Johnson's sentencing hearing would have been different.

It is not for this court to access the difficulty of proving the ineffectiveness claim.  *Bracy*, 502 U.S. at 905.  Rather, the court should look to the specific allegations and determine whether "the petitioner **may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief**."   *Id*. at 908-909 (emphasis added), *citing*, *Harris,* 394 U.S. at 300.

3

1.      **DOJ & BOP Materials on Allowable Conditions of Confinement and Requests of Special Conditions in Particular Cases**

These materials are requested in paragraphs 10(a)(1) and (2) of Mr. Johnson's renewed discovery motion. Mr. Johnson has reason to believe that these materials exist based on the Government's Brief in *United States v. Felipe*, Case No. 97-1155, *a copy of which is attached as Exhibit A to Petitioner's Response filed herein.* Had trial counsel obtained these materials, he could have used them to impeach the testimony of Warden Vanyur and show that in fact Mr. Johnson could be housed on strict conditions of confinement. These materials will assist the petitioner fully develop his claim and demonstrate that he is entitled to relief.

2.      **BOP Materials Concerning Inmates Housed under Additional Conditions of Confinement**

These materials are requested in paragraphs 10(a)(3), (6), (7), and (9) of Mr. Johnson's renewed motion for discovery. Mr. Johnson has reason to believe that these materials exist because of information previously presented to the Court regarding the conditions of confinement being imposed on various BOP inmates at the time of Darryl Johnson's trial, including as to Ramzi Yousef, Luis Felipe, Thomas Silverstein, and Clayton Fountain. Had trial counsel obtained these materials, he could have presented them as evidence in support of his mitigating circumstance that Mr. Johnson could be sentenced to life in prison without the possibility of parole and he would "not be a serious and continuing danger to society because the government has the power to imprison him for the rest of his life in a maximum security federal prison designed to control and monitor his behavior." (Findings of Intent as to the killing of Charles Banks, p. 4). These materials will assist the petitioner fully develop his claim and demonstrate that he is entitled to relief.

**3.      Materials concerning other testimony concerning conditions of confinement**

These materials are requested in paragraphs 10(a)(4), (5), (10), and (11) of Mr. Johnson's renewed motion for discovery. Had trial counsel obtained these materials they could have been used to impeach the testimony of Warden Vanyur and in support of Mr. Johnson's mitigating circumstances set out above.

**4.      Materials concerning Super Cells at ADX**

These materials are requested in paragraphs 10(a)(8) of Mr. Johnson's renewed motion for discovery.  Petitioner has reason to believe that these materials exist based on counsel's experience in obtaining similar documents concerning corrections facilities in other jurisdictions. Had trial counsel obtained these materials they could have been used to educate the jury on the BOP's options in housing Mr. Johnson.

**5.      Materials concerning Lewisburg Murders**

These materials are requested in paragraphs 10(a)(13) and (14) of Mr. Johnson's renewed motion for discovery.  Petition has reason to believe that these materials exist based on the post-trial evidentiary hearing held on July 27, 1998 and the hearings leading up to that evidentiary hearing.  Had trial counsel obtained these materials pre-trial they could have been used to significantly impeach the testimony of Warden Vanyur.

WHEREFORE, for the foregoing reasons, Petitioner Darryl Lamont Johnson respectfully requests that the Court enter an Order authorizing him to conduct discovery related to the claims contained in his §2255 motion, and directing the discovery requested herein be produced by the government.

Respectfully submitted,


/s/ Terence H. Campbell                              /s/ Lorinda M. Youngcourt

Terence H. Campbell                                 Lorinda Meier Youngcourt
Cotsirilos, Tighe & Streicker, Ltd.                 1773 Huron Williams Road
33 North Dearborn Street, Suite 600                 Mitchell, Indiana  47446
Chicago, Illinois  60602                            (812) 849-9852
(312) 263-0345

Counsel for Darryl Lamont Johnson

## <u>CERTIFICATE OF SERVICE</u>

Terence H. Campbell, an attorney, hereby certifies that in accordance with hereby

certifies that in accordance with Fed.R.Crim.P. 49, LR 5.5, and the General Order on Electronic

Case Filing (ECF), the following document:

1.    Memorandum of Law in Support of Petitioner's Renewed Motion In Light of
      *Massaro v. United States* For Leave to Conduct Discovery

was served pursuant to the District Court's ECF system as to ECF filers, including the United

States Attorney's Office.


                                        /s/  Terence H. Campbell
                                        Terence H. Campbell

Order Form (01/2005)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Suzanne B. Conlon | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 6998 | **DATE** | 11/6/2007 |
| **CASE TITLE** | UNITED STATES OF AMERICA vs. DARRYL JOHNSON | | |

**DOCKET ENTRY TEXT**

United States' motion to reconsider basis for rejecting ineffective assistance claim and for entry of judgment [27] is taken under advisement. Defendant shall respond by January 7, 2008. The motion will not be heard on November 13, 2007 as noticed.

*Suzanne B. Conlon*

Docketing to mail notices.

| | Courtroom Deputy Initials: | TP |
|---|---|---|

02C6998 UNITED STATES OF AMERICA vs. DARRYL JOHNSON

**U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS
ATTORNEY APPEARANCE FORM**

NOTE: In order to appear before this Court an attorney must either be a member in good standing of this Court's general bar or be granted leave to appear *pro hac vice* as provided for by Local Rules 83.12 through 83.14.

In the Matter of                                                                 Case Number:

AN APPEARANCE IS HEREBY FILED BY THE UNDERSIGNED AS ATTORNEY FOR:

| | |
|---|---|
| NAME (Type or print) | |
| SIGNATURE (Use electronic signature if the appearance form is filed electronically)  s/ | |
| FIRM | |
| STREET ADDRESS | |
| CITY/STATE/ZIP | |
| ID NUMBER (SEE ITEM 3 IN INSTRUCTIONS) | TELEPHONE NUMBER |

| | | |
|---|---|---|
| ARE YOU ACTING AS LEAD COUNSEL IN THIS CASE? | YES | NO |
| ARE YOU ACTING AS LOCAL COUNSEL IN THIS CASE? | YES | NO |
| ARE YOU A MEMBER OF THIS COURT'S TRIAL BAR? | YES | NO |
| IF THIS CASE REACHES TRIAL, WILL YOU ACT AS THE TRIAL ATTORNEY? | YES | NO |

IF THIS IS A CRIMINAL CASE, CHECK THE BOX BELOW THAT DESCRIBES YOUR STATUS.

RETAINED COUNSEL                APPOINTED COUNSEL

Case 1:02-cv-06998  Document 34  Filed 01/14/08  Page 1 of 1  PageID 331
Case: 11-1326  Document: 8-2  Filed: 03/04/2011  Pages: 342

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Suzanne B. Conlon | Sitting Judge if Other than Assigned Judge | .. |
|---|---|---|---|
| **CASE NUMBER** | 02 C 6998 (96 CR 379-1) | **DATE** | 1/14/2008 |
| **CASE TITLE** | UNITED STATES vs. DARRYL JOHNSON | | |

**DOCKET ENTRY TEXT**

The government's unopposed motion to reconsider the basis for rejecting defendant's ineffective assistance of counsel claim [27] is granted. A hearing is set on this issue as well as defendant's most recent motion for leave to conduct discovery [30] on January 30, 2008 at 1:30 pm.

*Suzanne B. Conlon*

Docketing to mail notices.

| | Courtroom Deputy Initials: | WH |
|---|---|---|

02C6998 UNITED STATES vs. DARRYL JOHNSON

UNITED STATES DISTRICT COURT
NORTHER DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA,
      Respondent-Appellee-Plaintiff,        No. 02 CV 6998

      v.                             The Honorable Suzanne B. Conlon

DARRYL JOHNSON,
      Petitioner-Appellant-Defendant.      Death Sentence Imposed

**AGREED MOTION TO RESET JANUARY 30, 2008
HEARING DATE DUE TO COUNSEL'S TRIAL SCHEDULE**

Petitioner Darryl Johnson, by his counsel, Terence H. Campbell and Lorinda Meier Youngcourt, respectfully submit this Agreed Motion to Reset the January 30, 2008 Hearing Date because defense counsel will be on trial in another case. In support of this Agreed Motion, Defendant states as follows:

1.      On January 14, 2008, this Court entered an Order setting this case for a hearing on January 30, 2008 at 1:30 p.m. on (a) the motion to reconsider the Court's ruling on Mr. Johnson's ineffective assistance of counsel claim, and (b) Johnson's renewed motion to conduct discovery.

2.      Darryl Johnson's lead counsel is Terence H. Campbell of the law firm of Cotsirilos, Tighe & Streicker in Chicago. Mr. Campbell is trying a criminal case, *United States v. Paul Van Eyl*, 02 CR 287, before the Hon. James B. Zagel beginning on January 22, 2008. That trial is expected to last until mid-February, and will, therefore, be ongoing on January 30, 2008.

3.      Because of defense counsel's trial schedule, we respectfully request that the Court reset the currently-schedule January 30, 2008 hearing date to any date convenient to the Court on or after February 21, 2008.

1

4.      Undersigned counsel has spoken with Assistant U.S. Attorney David Bindi about this motion, and the government has agreed to this request.

WHEREFORE, for the reasons stated herein, Petitioner respectfully requests that the January 30, 2008 be reset to any date convenient to the Court on or after February 21, 2008

Respectfully submitted,

/s/ Terence H. Campbell
An attorney for Defendant Darryl Johnson

Terence H. Campbell
Cotsirilos, Tighe & Streicker, Ltd.
33 North Dearborn Street, Suite 600
Chicago, Illinois  60602
(312) 263-0345

## CERTIFICATE OF SERVICE

Terence H. Campbell, an attorney, hereby certifies that in accordance with hereby certifies that in accordance with Fed.R.Crim.P. 49, LR 5.5, and the General Order on Electronic Case Filing (ECF), the following document:

1.      Agreed Motion to Reset January 30, 2008 Hearing Date Due to Counsel's Trial

       Schedule

was served pursuant to the District Court's ECF system as to ECF filers, including the United States Attorney's Office.

       /s/  Terence H. Campbell
       Terence H. Campbell

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff - Appellee - Respondent, | ) | No. 02 C 6998 |
| | ) | |
| vs. | ) | Hon. Suzanne B. Conlon |
| | ) | |
| DARRYL JOHNSON, | ) | |
| | ) | **Death Sentence Imposed** |
| Defendant - Appellant - Petitioner. | ) | |

**NOTICE OF MOTION**

TO:   David Bindi
      Assistant United States Attorney
      219 South Dearborn Street, Suite 500
      Chicago, Illinois  60604

      PLEASE TAKE NOTICE that on Tuesday, January 29, 2008,  at 9:00 a.m., we shall appear before the Honorable Suzanne B. Conlon, United States District Judge, in the courtroom usually occupied by her at 219 South Dearborn Street, Chicago, Illinois, and present our Agreed Motion to Reset Hearing Date Due to Counsel's Trial Schedule, a copy of which accompany this Notice and are hereby served upon you.

                              Respectfully submitted,


                              /s/ Terence H. Campbell
                              Attorney for defendant

                              Terence H. Campbell
                              Cotsirilos, Tighe & Streicker, Ltd.
                              33 North Dearborn Street, Suite 600
                              Chicago, Illinois  60602
                              (312) 263-0345

.Order Form (01/2005)

**United States District Court, Northern District of Illinois**

| Name of Assigned Judge or Magistrate Judge | Suzanne B. Conlon | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 6998 (96 CR 379) | **DATE** | 1/29/2008 |
| **CASE TITLE** | USA vs. DARRYL LAMONT JOHNSON | | |

**DOCKET ENTRY TEXT**

Agreed motion [35] to reset January 30, 2008 hearing due to counsel's trial schedule is granted. Hearing is reset on February 29, 2008 @ 1:30 p.m.

*Suzanne B. Conlon*

Notices mailed by Judicial staff.

| | Courtroom Deputy Initials: | WH |
|---|---|---|

02C6998 USA vs. JOHNSON                                                                                         Page 1 of 1

## United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Suzanne B. Conlon | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 6998 | **DATE** | 2/5/2008 |
| **CASE TITLE** | UNITED STATES OF AMERICA vs. DARRYL LAMONT JOHNSON | | |

**DOCKET ENTRY TEXT**

On the court's own motion, the motion hearing set on February 29, 2008 at 1:30 p.m. is reset to February 29, 2008 at 9:00 a.m.

*Suzanne B. Conlon*

Notices mailed by Judicial staff.

| | Courtroom Deputy Initials: | WH |
|---|---|---|