APPEAL, BROWN, TERMED

# United States District Court
# Northern District of Illinois – CM/ECF LIVE, Ver 4.2 (Chicago)
# CIVIL DOCKET FOR CASE #: 1:02–cv–06998
## *Internal Use Only*

| | |
|---|---|
| USA v. Johnson | Date Filed: 09/30/2002 |
| Assigned to: Honorable William J. Hibbler | Date Terminated: 03/11/2003 |
| Demand: $0 | Jury Demand: None |
| Case in other court:  11–01326 | Nature of Suit: 510 Prisoner: Vacate Sentence |
| 11–01443 | Jurisdiction: U.S. Government Defendant |
| ND IL, :96–CR–00379 | |

Cause: 28:2255 Remedies on motion attacking sentence

**Plaintiff**

| **United States of America** | represented by | **David E. Bindi** |
|---|---|---|
| | | United States Attorney's Office (NDIL) |
| | | 219 South Dearborn Street |
| | | Suite 500 |
| | | Chicago, IL 60604 |
| | | (312) 353–5300 |
| | | Email: david.bindi@usdoj.gov |
| | | *ATTORNEY TO BE NOTICED* |

V.

**Defendant**

| **Darryl Lamont Johnson** | represented by | **Terence H. Campbell** |
|---|---|---|
| | | Cotsirilos, Tighe &Streicker |
| | | 33 North Dearborn Street |
| | | Suite 600 |
| | | Chicago, IL 60602 |
| | | (312) 263–0345 |
| | | Email: tcwolfram@aol.com |
| | | *LEAD ATTORNEY* |
| | | *ATTORNEY TO BE NOTICED* |
| | | |
| | | **Lorinda Meier Youngcourt** |
| | | Lorinda Meier Youngcourt |
| | | Attorney at Law |
| | | P.O. Box 206 |
| | | Huron, IN 47437 |
| | | (812)849–9852 |
| | | Email: lmyoungcourt@incrimlaw.org |
| | | *ATTORNEY TO BE NOTICED* |

| Date Filed | # | Page | Docket Text |
|---|---|---|---|
| | | | |

| | | | |
|---|---|---|---|
| 02/28/2008 | 39 | 5 | SUPPLEMENT by Darryl Lamont Johnson to *Ineffective Assistance of Counsel Claim* (Attachments: # 1 Exhibit Jill Miller Affidavit# 2 Exhibit Exhibit A Attachments# 3 Exhibit Exhibits B–G)(Campbell, Terence) (Entered: 02/28/2008) |
| 02/28/2008 | 40 | 148 | NOTICE by Darryl Lamont Johnson re supplement 39 *in Support of Ineffective Assistance of Counsel Claim* (Campbell, Terence) (Entered: 02/28/2008) |
| 02/29/2008 | 41 | 149 | MINUTE entry before Judge Suzanne B. Conlon :Hearing held on defendant's motion to vacate his sentence pursuant to 28 U.S.C. Section 2255, and the government's motion to reconsider the basis for rejecting defendant's ineffective assistance claim. The government unopposed motion 27 is granted. The court vacates portions of its Memorandum Opinion and Order issued March 11, 2003 finding that defendant procedurally defaulted his ineffective assistance of counsel claim by not raising this issue on direct appeal. See Massaro v United States, 538 U.S. 500 (2003) (ineffective assistance of counsel claims may be raised in a collateral proceeding under Section 2255 even if not raised on direct appeal). The court therefore shall consider the ineffective assistance of counsel claim fully on the merits. Defendant's renewed motion for leave to conduct discovery 30 is held in abeyance. Notices mailed by Judicial staff. (wyh, ) (Entered: 03/05/2008) |
| 03/06/2008 | 42 | 150 | EXECUTIVE COMMITTEE ORDER: Case reassigned to Judge William J. Hibbler Signed by Judge Executive Committee on 3/6/08. (vmj, ) (Entered: 03/10/2008) |
| 03/12/2008 | 43 | 152 | RESPONSE by Plaintiff United States of America (Bindi, David) (Entered: 03/12/2008) |
| 05/20/2008 | 45 | 162 | MINUTE entry before the Honorable William J. Hibbler: Status hearing to set scheduling order set for 5/29/2008 at 09:30 AM. Mailed notice (jdh) (Entered: 05/22/2008) |
| 05/29/2008 | 46 | 163 | MINUTE entry before the Honorable William J. Hibbler: Status hearing reset to 6/3/2008 at 10:30 AM. Telephoned notice (jdh) (Entered: 06/03/2008) |
| 06/03/2008 | 48 | 164 | MINUTE entry before the Honorable William J. Hibbler: Status hearing held and continued to 8/26/08 at 10:30 am. At the next status, the government is to report on the state of Darryl Johnsons adjustment in the BOP, and turnover as discovery materials any instances of either special administrative measures under the BOP regulations or statutory provisions providing for extraordinary security measures for inmates that were requested or imposed at the time of Darryl Johnson's sentencing that involved restrictions continuously. Defendants' counsel to tender to the Court a complete set of all pleadings since the 2255 petition was filed. Parties to tender to the Court any missing transcript pages. Mailed notice (kj, ) (Entered: 06/17/2008) |
| 08/26/2008 | 49 | 165 | MINUTE entry before the Honorable William J. Hibbler:Status hearing held on 8/26/2008 and continued to 10/21/2008 at 10:00 a.m.Mailed notice (jlj, ) (Entered: 08/27/2008) |
| 09/25/2008 | 51 | 166 | MINUTE entry before the Honorable William J. Hibbler: Petitioner's ex parte motion for interim payment of fees is granted. Payment of interim attorneys' fees and expenses is appropriate under the Criminal Justice Act because, due to the length and complexity of this case, the appointed attorneys in this matter will experience a hardship in undertaking the representation without compensation for |

| | | | |
|---|---|---|---|
| | | | a substantial period of time. Telephoned notice (aac, ) (Entered: 09/29/2008) |
| 10/21/2008 | 52 | 167 | MINUTE entry before the Honorable William J. Hibbler: Status hearing held on 10/21/2008 and continued to 1/8/2009 at 10:00 AM. Defendant to file discovery request by 11/21/0–8. Government to respond by 12/5/08. Defendant to reply by 12/15/08. Ruling set for 1/8/09 at 10:00 a.m. Mailed notice (jdh) (Entered: 10/22/2008) |
| 11/24/2008 | 53 | 168 | MOTION by Defendant Darryl Lamont Johnson for discovery – *Renewed and Amended* (Campbell, Terence) (Entered: 11/24/2008) |
| 11/24/2008 | 54 | 204 | MOTION by Defendant Darryl Lamont JohnsonLeave to File Expert Funding Requests Ex Parte and Under Seal (Campbell, Terence) (Entered: 11/24/2008) |
| 11/26/2008 | 55 | 212 | MOTION by Defendant Darryl Lamont Johnson for leave to file *Motions Instanter* (Campbell, Terence) (Entered: 11/26/2008) |
| 11/26/2008 | 56 | 216 | NOTICE of Motion by Terence H. Campbell for presentment of motion for leave to file 55 before Honorable William J. Hibbler on 12/4/2008 at 09:30 AM. (Campbell, Terence) (Entered: 11/26/2008) |
| 12/03/2008 | 57 | 217 | MINUTE entry before the Honorable William J. Hibbler: Agreed Motion for leave to file his renewed discovery and for leave to seek expert funding ex parte funding motions instanter 54 55 is granted. The previously set briefing schedule to stand. Mailed notice (jdh) (Entered: 12/03/2008) |
| 12/05/2008 | 58 | 218 | MOTION by Plaintiff United States of America for extension of time (Bindi, David) (Entered: 12/05/2008) |
| 12/05/2008 | 59 | 220 | NOTICE of Motion by David E. Bindi for presentment of extension of time 58 before Honorable William J. Hibbler on 12/11/2008 at 09:30 AM. (Bindi, David) (Entered: 12/05/2008) |
| 12/10/2008 | 60 | 221 | MINUTE entry before the Honorable William J. Hibbler: Government's Agreed Motion for an extension of time to respond to petitioner's discovery and expert witness motions 58 is granted. Government to respond by 12/19/2008. Petitioner to reply by 1/8/2009. Ruling to reset to 2/4/09 at 10:00 a.m. Mailed notice (jdh) (Entered: 12/10/2008) |
| 12/19/2008 | 61 | 222 | RESPONSE by Plaintiff United States of America *to discovery motions* (Attachments: # 1 Appendix)(Bindi, David) (Entered: 12/19/2008) |
| 01/07/2009 | 62 | 252 | MOTION by Defendant Darryl Lamont Johnson for extension of time to file response/reply – *AGREED* (Campbell, Terence) (Entered: 01/07/2009) |
| 01/07/2009 | 63 | 256 | *AGREED* NOTICE of Motion by Terence H. Campbell for presentment of motion for extension of time to file response/reply 62 before Honorable William J. Hibbler on 1/13/2009 at 09:30 AM. (Campbell, Terence) (Entered: 01/07/2009) |
| 01/12/2009 | 64 | 257 | MINUTE entry before the Honorable William J. Hibbler: Defendant's Agreed Motion for short extension of time until 1/15/09 to file reply brief regarding MOTION by Defendant Darryl Lamont Johnson for discovery – *Renewed and Amended* 53 , MOTION by Defendant Darryl Lamont Johnson for discovery – *Renewed Based on Massaro v. United States* 30 62 is granted. Ruling on motion for discovery 53 , motion for discovery 30 before Honorable William J. Hibbler on 2/4/2009 at 10:00 AM. Mailed notice (jdh) (Entered: 01/12/2009) |

| 01/15/2009 | 65 | 258 | REPLY by Defendant Darryl Lamont Johnson to Response 61 , motion for discovery 53 (Campbell, Terence) (Entered: 01/15/2009) |

UNITED STATES DISTRICT COURT
NORTHER DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Respondent-Appellee-Plaintiff, | No. 02 CV 6998 |
| v. | The Honorable Suzanne B. Conlon |
| DARRYL JOHNSON,<br>Petitioner-Appellant-Defendant. | Death Sentence Imposed |

**PETITIONER'S SUPPLEMENTAL SUBMISSION
IN SUPPORT OF INEFFECTIVE ASSISTANCE OF COUNSEL CLAIM**

Petitioner Darryl Johnson, by his counsel, Terence H. Campbell and Lorinda Meier Youngcourt, respectfully makes this supplemental submission in support of his ineffective assistance of counsel claim.

**I.     Documents Attached**

Attached hereto are the following:

EXHIBIT A:   Affidavit of Jill Miller (with attachments);

EXHIBIT B:   Jill Miller *curriculum vita*;

EXHIBIT C:   Chronology of Events in Darryl Johnson's Family and Life - sent to Defense Counsel;

EXHIBIT D:   April 22, 1997 Memo from Jill Miller to Defense Counsel;

EXHIBIT E:   August 8, 1997 Preliminary Social History from Jill Miller - sent to Defense Counsel;

EXHIBIT F:   Jill Miller October 24, 1997 Memo to Defense Counsel re: Darryl

Johnson's Special Education history and interviews with his grade

school Special Education teacher and high school administrator;

EXHIBIT G:   Affidavit of Juliet Yackel.

## II.   <u>Discussion</u>

Ms. Miller's affidavit (Exhibit A) provides a detailed discussion of a raft of weighty

mitigation issues which were, alternatively, either unexplored, underdeveloped, not presented to the

jury in the penalty phase, or some combination thereof.  Similarly, Ms. Yackel's affidavit points out

further significant failings in the defense team's conduct of the mitigation investigation and

presentation.

Ms. Miller's affidavit, Ms. Yackel's affidavit, and the other documents submitted herewith

provide further compelling support Petitioner's claim for ineffective assistance of counsel.  Indeed,

a proper investigation and presentation of mitigating evidence is absolutely essential in capital cases

– a fact which has been emphatically re-emphasized by the Supreme Court in its recent decisions in

*Wiggins v. Smith*, 539 U.S. 510 (2003) and *Rompilla v. Beard*, 545 U.S. 374 (2005), both of which

emphasize the vital importance of both (a) a thorough mitigation investigation by the defense, and

(b) a proper presentation of mitigating evidence to the jury.  Thus, in *Wiggins*, the Supreme Court

held that defense counsel rendered constitutionally ineffective assistance under *Strickland* by failing

to properly research and present evidence in mitigation in that capital case.  On the issue of

"prejudice," the Court found that, ***"[h]ad the jury been able to place [the evidence omitted by***

***defense counsel] on the mitigating side of the scale, there is a reasonable probability that at least***

***one juror would have struck a different balance."***  539 U.S. at 537 (emphasis added, citation

2

omitted).  As set forth in the affidavits and other documents attached hereto, much of the mitigation evidence available in Darryl Johnson's case was never properly investigated, and a good deal of mitigating evidence that was available and in the hands of the defense team was never presented to the jury – and there was no strategic or tactical reason for failing to do so.

We respectfully submit that a review of these materials warrants relief under Petitioner's §2255 claim for ineffective assistance of counsel.  At a minimum, this evidence – combined with the other matters previously put before the Court with respect to trial counsel's ineffective assistance – requires an evidentiary hearing on these issues.  Thus, for the reasons set forth in this submission, as well as those in Petitioner's prior submissions to the Court, we respectfully request that the Court grant Petitioner's §2255 Petition and order a new sentencing hearing in this case.  Alternatively, we request that the Court enter an Order granting Petitioner an evidentiary hearing on his claims of ineffective assistance of trial counsel, and set a discovery schedule in advance of that hearing.

Respectfully submitted,

/s/ Terence H. Campbell
An attorney for Defendant Darryl Johnson

Terence H. Campbell
Cotsirilos, Tighe & Streicker, Ltd.
33 North Dearborn Street, Suite 600
Chicago, Illinois  60602
(312) 263-0345

Lorinda Meier Youngcourt
Post Office Box 206
Huron, IN 47437-0206
(812)849-9852

3

## <u>CERTIFICATE OF SERVICE</u>

Terence H. Campbell, an attorney, hereby certifies that in accordance with hereby certifies

that in accordance with Fed.R.Crim.P. 49, LR 5.5, and the General Order on Electronic Case Filing

(ECF), the following document:

1.    Petitioner's Supplemental Submission in Support of Ineffective Assistance of
      Counsel Claim

was served pursuant to the District Court's ECF system as to ECF filers, including the United States

Attorney's Office.

/s/  Terence H. Campbell
Terence H. Campbell

# EXHIBIT A

## AFFIDAVIT OF JILL MILLER

STATE OF WISCONSIN

COUNTY OF DATE

I, Jill Miller, after being duly sworn according to law, state as follows:

1.    I am a forensic social worker in private practice in Madison, Wisconsin. I have been in private practice since January, 1984.  I received my Bachelor's of Science degree, with a major in Social Work, from the University 0f Wisconsin- Madison in 1967, and my Masters of Science Social Work degree from the University of Wisconsin-Madison in 1971. I am a Licensed Clinical Social Worker in the State of Wisconsin, License No. 1662.  I have practiced as a social worker in legal settings for over thirty-five years.  I was on the faculty of the University of Wisconsin-Madison School of Social Work from 1973 to 1985.  Since 1986, my work has primarily involved preparation for the penalty phase of capital trials, review of the penalty phase of capital trials, and preparation for post-conviction proceedings in capital cases.

2.    Since 1986, I have worked on over one hundred twenty-five capital cases in which I have conducted extensive social history investigations, prepared social history reports, conducted psycho-social assessments, and assisted the attorneys in preparing for the penalty phase of trials or for post-conviction proceedings, including federal habeas corpus proceedings.  These cases have been at the trial and post-conviction levels, and in state, federal and military jurisdictions.  I have testified in capital proceedings thirty-six times.  I have worked on capital cases in thirty states, the District of Columbia, Puerto Rico, the U.S. Virgin Islands and Korea (military).

3.    I have done extensive training of attorneys, mitigation specialists, investigators and mental health professionals regarding the investigation, development and presentation of mitigation, and preparation for the penalty phase in capital cases at national, state and local programs.  A complete list of my training presentations is contained in my Resume.

4.    As a member of the Board of Directors and Defender Council of the National Legal Aid & Defender Association (NLADA), I participated in the

Case 1:02-cv-06998    Document 39-2    Filed 02/28/08    Page 3 of 15    PageID 345
Case: 11-1326    Document: 8-3    Filed: 03/04/2011    Pages: 278

Page 2 of  14

development and approval of "Standards for the Appointment and Performance of Counsel in Death Penalty Cases", adopted by NLADA in 1987, and adopted as guidelines by the American Bar Association in 1989.  I consulted on the updating and revision of the ABA's "Guidelines for the Appointment and Performance of Counsel in Capital Cases", adopted by the ABA in February, 2003.  I am the author of a law review article titled "The Defense Team in Capital Cases", published in the Hofstra Law Review, issue devoted to the 2003 ABA Guidelines; summer, 2003; Volume 31, No.4, page 1117.

5.    The role of the mitigation specialist at trial in a capital murder case is to assist counsel by: conducting an extensive and thorough social history investigation and psycho-social assessment; oversee the collection of all relevant records, including, but not limited to,  vital records, medical and school records, employment records, criminal history records, jail/prison records, probation/parole records; identifying factors in the client's background or circumstances that require expert evaluations; assisting in locating appropriate experts; providing background materials and social history information to experts, in order to enable them to perform competent and reliable evaluations; consulting with the attorney(s) regarding the development of the theory of the case and case strategy, thereby ensuring coordination of the strategy for the guilt-innocence phase with the strategy for the penalty phase; identifying potential penalty phase witnesses; assisting in preparing witnesses and exhibits; and working with the client and his or her family while the case is pending.   The mitigation specialist should investigate all noticed or potential aggravators in order to rebut, challenge, explain and/or mitigate aggravating evidence.   Development and presentation of mitigating evidence must take into account the nature and extent of aggravating evidence, and the weight that might be accorded it by the jury.  The mitigation specialist can also assist the defense team in understanding the client's functioning, and in communicating effectively with the client. The mitigation specialist may be a witness in the penalty phase hearing, and may offer testimony regarding the results of the social history investigation.

6.    I was initially contacted by Chicago attorneys Jeffrey Urdangen and Cynthia Giacchetti, and asked to act as the mitigation specialist in the capital case of United States v. Darryl Lamont Johnson, 96-CR 379, in September, 1996.  The indictment in this case had been filed on June 19, 1996.  The government filed notice of intent to seek the death penalty on October 1, 1996.  I did not begin work in earnest until December, 1996.

Case 1:02-cv-06998   Document 39-2   Filed 02/28/08   Page 4 of 15   PageID 346
Case: 11-1326      Document: 8-3         Filed: 03/04/2011      Pages: 278

The trial commenced on October 23, 1997.  Mr. Johnson was convicted of the capital murders, and the penalty phase commenced on November 6, 1997.  On November 17, 1997, the jury returned its verdicts, agreeing unanimously that Darryl Johnson be sentenced to death in both murders. Darryl Johnson was sentenced to death on July 27, 1998.

7.   At the inception of my involvement in this case, I reviewed materials, including charging and investigation documents and met with the team to formulate plans for the investigation.  At that time, the team consisted of the attorneys, investigator Mort Smith, and myself.  In the spring of 1997, Juliet Yackel, a young attorney working out of the offices of Urdangen and Giachetti, was retained to assist me in obtaining records, locating sources for interviews, doing research, and doing some interviews.  She was brought in due to the volume of work that needed to be done, time pressures and the difficulty in getting work completed by the investigator.

8.   Following initial meetings with the client and collateral sources in December, 1996, I developed a list of potential sources of information for the social history investigation, including persons to be interviewed, records and documents to be obtained, and research to be conducted. I communicated that information to counsel in a memo dated January 2, 1997 (see Attachment 1).  The understanding with counsel was that the investigator in the case would obtain records under my direction and would locate persons for me to interview for whom I didn't have contact information.  In spite of this, I had difficulty in reaching Mr. Smith, and had very little direct contact with him.  Requests in my memos were communicated to him by the attorneys.  There was no clear definition of roles, and delineation of responsibility for making sure that tasks were completed.  The attorneys failed to monitor and direct the social history investigation, and did not follow-up when assigned tasks were not completed.    I  further  recommended,  in  that  memo,  that  a neuropsychological evaluation be done, and suggested a specific expert. That expert was retained.   I also discussed other potential types of experts, and outlined preliminary mitigation themes.   I specifically mentioned the importance of information on gangs in Chicago and Vitiligo, a skin disorder that Darryl Johnson has, as well as research on Chicago schools. I also recommended investigation of the background of the victims in this case.

9.   In April, 1997, I conducted interviews, primarily with the client and family members, and also with a gang expert, in Chicago; and drafted

Case 1:02-cv-06998   Document 39-2   Filed 02/28/08   Page 5 of 15   PageID 347
Case: 11-1326   Document: 8-3        Filed: 03/04/2011   Pages: 278

Page 4 of  14

another memo to counsel listing additional sources of information, as well as recommendations for future work.  I discussed sources, including publications and experts, for information on gangs in Chicago.  I specifically mentioned the name of Luis Rodriguez, a gang expert.  I made very limited attempts to reach him, and did not adequately pursue this.  I received no direction from the attorneys regarding this effort.  I again noted the need for information on the victims, including the need to anticipate victim impact evidence.  I referred counsel to the January, 1997 memo to note records that were still needed, and had not yet been obtained.  The memo also provided names of several persons known to Darryl Johnson who had died by violent means, and whose deaths were traumatic for him.  The issue of traumatic loss, and its effects on Darryl Johnson, particularly the way in which exposure to violence and traumatic loss leads to a sense of futurelessness and fatalism was not adequately developed in this case.

10.   I continued to conduct interviews and review records through the summer.  Many records listed in my source memos of January and April had not been obtained, e.g. medical records of Dr. Morgan (who diagnosed Darryl with Vitiligo in August, 1991), other childhood medical records, pre-sentence investigation report from 1983 manslaughter case, probation/parole file, police reports on domestic violence incidents involving John, Sr. and Brenda Johnson, MCC records.  There appeared to be difficulty with the investigator in terms of his follow-through with requested tasks.  He was not responsive to my efforts to reach him.  I asked counsel to ascertain his progress on requested tasks, assuming that they had made requests to him pursuant to lists in my memos.  When I inquired of counsel as to the status of records requests, they appeared to be largely unaware of Mr. Smith's activities or progress.  At some point, Juliet Yackel began obtaining records that Mort Smith had not obtained, e.g. DOC records, school records, divorce records for Darryl Johnson's parents.  During the summer, I began verbalizing to counsel my concerns about the scheduled trial date and the ability to be ready by October, given the complicated nature of the case, the extent of investigation that needed to be done and the volume of discovery to be reviewed, particularly the tapes of the wiretaps.  I spoke to them several times regarding my belief that they should seek a continuance.  To my knowledge, this was not done.

11.   On July 29, 1997, I forwarded to counsel a detailed memo outlining the proposed penalty phase strategy.  It addressed the categories of mitigating evidence, and the information to present in each, and included

Case 1:02-cv-06998 Document 39-2 Filed 02/28/08 Page 6 of 15 PageID 348
Case: 11-1326 Document: 8-3 Filed: 03/04/2011 Pages: 278

Page 5 of 14

a detailed discussion of aggravating evidence that was likely to come in during the first phase of the trial (see Attachment 2). The memo noted that the Government appeared to intend to focus its case in aggravation on Darryl Johnson's purported future dangerousness, and much of the Government's penalty phase evidence was going to be used to establish that aggravator. It outlined, based on review of discovery, some of the facts likely to come in at trial/penalty through Government witnesses. There was specific discussion of available evidence in Department of Corrections records regarding Johnson's adjustment in prison and participation in programs, including work and educational programs, and the earning of meritorious good time, that should have been presented to counter some of the negative information that would be presented by the Government regarding some of his activities while incarcerated, particularly pre-trial.

12. From the beginning of my involvement in this case, I felt it would be important to explain Darryl Johnson's involvement in the Gangster Disciples and the drug economy. This involvement was a function of a number of vulnerabilities, including evidence of personal vulnerabilities (low cognitive functioning, developmental delays, ADHD, low self-esteem), family dynamics (father's alcoholism, witnessing violence towards his mother, poverty), and social/cultural vulnerabilities (poor quality of education, racism, social and economic marginalizing of African-American males, and exposure to community violence). Evidence in support of these themes was outlined in the July, 1997 memo. During the spring and summer, I researched the history of gangs in Chicago, and consulted Dwight Conquergood, an expert from Northwestern University. I met with Conquergood in April, and I arranged for a meeting with the attorneys and Mr. Conquergood in July. At these meetings, he provided additional information on reasons that adolescents and young adults become involved in gangs. He also provided us with names of other community experts on this topic. It was understood on the defense team that Conquergood would be a resource to the team, and would not be a testifying witness. I failed to fully pursue the names of other potential experts on gangs in Chicago, as I should have done. I received no direction from counsel following the July, 1997 meeting with Conquergood regarding this matter. Review of the penalty phase transcript reveals that this issue was not fully or adequately developed such that the jury might understand the reasons young African American men are drawn into gangs.

Case 1:02-cv-06998   Document 39-2   Filed 02/28/08   Page 7 of 15   PageID 349
Case: 11-1326   Document: 8-3   Filed: 03/04/2011   Pages: 278

Page 6 of  14

13.   Information about gangs in Chicago revealed that frequently recruitment of young men into gangs occurred in the Cook County Jail and in facilities of the Illinois Department of Corrections.  Darryl Johnson was not an active gang member, despite living in neighborhoods with intense pressures to join, until he went to prison at age twenty-one.  Interviews with family members and others indicated that Johnson may have been assaulted or had other negative experiences early on in his confinement, and that he joined the gang primarily for protection.  Andre Johnson and Letra Watson, both of whom testified, had information indicating that Darryl had been assaulted and/or needed protection at Menard (see Attachment 3 - testimony outlines). They were not asked about this during their testimony.  Brenda Johnson, Darryl's mother, knew that he was frightened in the jail, and said that he cried when she visited, begging her to get him out of the jail.  She was not asked about this during her testimony.   Legislative hearings had been held that documented the influence of gangs in the Cook County jail and Illinois prisons, including the fact that many young men joined the gangs for protection during the early period of their confinement.  The Department of Corrections was taking steps to reduce gang influence in the prisons. Transcripts of the hearings should have been obtained.   Persons, particularly professionals, who testified at the hearings regarding this problem could have been called to testify.  While the defense presented one former inmate at Menard who testified about this matter, this former inmate, a prior client of one of the attorneys, had not joined a gang while in prison.  This fact diminished the effect of his testimony.  Counsel gave no direction to myself or Ms. Yackel regarding pursuing other persons who could have testified.  This issue was not adequately developed such that the jury could give it weight.

14.   On September 8, 1997, approximately six weeks prior to the start of trial, I wrote a letter to counsel expressing my growing concern regarding our ability to be prepared to go to trial on October 23rd.  (See Attachment 4) After several conversations regarding this, I felt the need to put my concerns in writing.  In the letter, I listed the many tasks that needed to be completed prior to any penalty phase proceeding.  Among them were the need to: prepare the video of Darryl Johnson's daughters; obtain all records; research Vitiligo; research Robert Taylor Homes; conduct additional research on gang structure, operation and recruitment in Illinois jails and prisons; complete expert assessments and testing (PET scan had been recommended by neuropsychologist); completing all interviews (letter noted there were still many to do, and difficulty locating sources), and prepare to challenge and mitigate the aggravating

Case 1:02-cv-06998   Document 39-2   Filed 02/28/08   Page 8 of 15   PageID 350
Case: 11-1326      Document: 8-3           Filed: 03/04/2011      Pages: 278

Page 7 of  14

evidence, in particular the allegations of future dangerousness. Following the receipt of this letter by the attorneys, there was a distinct change in our working relationship. The attorneys appeared to be upset that I had put these concerns in writing, and communication between the attorneys and I deteriorated following my writing of the letter. The bulk of my time during September and October was spent on preparation of the video, conducting additional interviews, and drafting testimony outlines for witnesses. The attorneys did not respond to, or communicate with me regarding, the other tasks outlined in my letter, many of which were re-statements of things discussed in earlier communications. They provided little, if any, direction to me regarding my work, other than to ask me to do the video of Mr. Johnson's daughters, and to prepare outlines of testimony for potential penalty phase witnesses. I continued, with the assistance of Ms. Yackel, to locate persons to interview, and to conduct those interviews.

15.    I wrote another memo to counsel on October 3, 1997, outlining work that still needed to be done, and requesting assistance from the investigator in locating sources. (See Attachment 5)  Several of the persons listed, including family members of government witnesses in this case, had information about positive acts by Darryl Johnson.  I was able to locate both Angie Gaines and Cheryl Fletcher on my own, with Ms. Yackel's assistance. I contacted Morgan Park High School and ascertained that none of Darryl's teachers were still at the school at the time.  Several were retired, and may have still been in Chicago. No efforts were made to locate them. I did speak to an administrator who was able to interpret the high school transcript (see below). I provided that information to counsel in a memo, dated October 24, 1997 (after jury selection had commenced) to be provided to the neuropsychologist, Ms. Burford (elementary special education teacher) and Kathleen Kostelny. I received no response from the attorneys or the investigator regarding other requests to locate persons, as requested in the October 3rd memo, and no direction from counsel to attempt to reach retired teachers.  The October 3rd memo emphasized the need for records, including: the sentencing transcript, with actual imposition of sentence and reasons the Judge gave for imposing the minimum, from the manslaughter conviction; all DOC records; all MCC records; and the need for someone with expertise on the operation of gangs in Illinois jails and prisons. It also noted that there was information suggesting that Darryl Johnson had paid funeral expenses for Charles Banks. There is information on the wiretaps to support this, but that information was not provided to the jury. I received no response to the October 3rd memo.

Case 1:02-cv-06998   Document 39-2   Filed 02/28/08   Page 9 of 15   PageID 351
Case: 11-1326      Document: 8-3           Filed: 03/04/2011      Pages: 278

Page 8 of  14

16. It was clear, based on review of discovery provided by the government, that it was critical to challenge and rebut the allegation of future dangerousness to the extent possible. The prior conviction for voluntary manslaughter would be used to support this aggravator. Review of court documents and prison records indicated that Darryl Johnson received the minimum sentence for this offense. Based on that, I urged counsel on a number of occasions, to obtain the trial transcript, including the sentencing transcript, and to consider interviewing the sentencing judge regarding the reasons for giving the minimum sentence. Apparently, at some point, they did obtain the transcript. The transcript does not include the Judge's actual sentencing decision with comments supporting it. The judge was not interviewed, and did not testify.

17. I did locate and interview a key witness to this offense, Cheryl Fletcher. It was Fletcher's boyfriend, Jesse Simpson, who was killed. According to Fletcher, Johnson acted in defense of her and her brother in this incident. Simpson had been drinking and Fletcher suspected that he had shot heroin earlier in the evening. On the night of the shooting, Simpson and two of his friends were visiting Fletcher at her home, where she resided with her two children. Simpson and Fletcher began to argue, and he struck her. She called the police, who came to the home and spoke with her and Simpson, but did not ask Simpson to leave. Following this, Cheryl Fletcher, fearing Simpson would subject her to more abuse, phoned her mother and asked that she send her brother, Reginald (Reggie) Fletcher, over to her home. On his way to his sister's home, Fletcher encountered Darryl Johnson and told him about the situation. Johnson offered to accompany him. Jesse Simpson was in the home at the time that Reginald Fletcher and Darryl Johnson arrived. When the doorbell rang, Simpson told Cheryl Fletcher to get rid of whoever was there. She heard the squeak of a kitchen drawer and suspected that Simpson had a knife, which he did. She told her brother this. Reggie Fletcher went in and confronted Simpson. The two struggled and Simpson stabbed Fletcher in the face with the knife. They continued to struggle, and Simpson continued to try to stab Reggie in the back. At that point, after asking Simpson to stop several times, Darryl shot Simpson. The trial record indicates that Simpson still had the knife in his possession when he was shot. Cheryl Fletcher said that they then all panicked. Reggie Fletcher took Simpson's body outside. Darryl Johnson and Cheryl Fletcher grabbed Cheryl's children and drove to her mother's. One of Simpson's friends who was present called the police. Cheryl added that all three - she, Reggie and Darryl - were very upset and

Case 1:02-cv-06998   Document 39-2   Filed 02/28/08   Page 10 of 15   PageID 352
Case: 11-1326   Document: 8-3        Filed: 03/04/2011   Pages: 278

Page 9 of  14

remorseful about this incident.  Reggie Fletcher had to undergo cosmetic surgery to repair the cut to his face by Simpson.  Cheryl Fletcher's statements in this interview were consistent with her testimony at trial. At the sentencing hearing, Judge Robert Collins stated that he found the testimony of Archie Rudd not credible.  Rudd was a witness for the government in it's aggravation case against Darryl Johnson.  The Judge further found that: there was no question that the victim had been abusive to Cheryl Fletcher; there was no question that the victim had "a very lengthy knife"; and Darryl Johnson shot Jesse Simpson because he believed Simpson would kill Reggie Fletcher.  He further found that this belief was not reasonable, thereby making Darryl Johnson guilty of the lesser included offense of voluntary manslaughter.  He sentenced Johnson to four years in prison, the minimum sentence for this offense.

18.  Cheryl Fletcher was present outside the courtroom, and prepared to testify to these facts, during the penalty phase of the trial.  This testimony would have been very important, in light of testimony by Archie Rudd, a friend of Simpson's who was present at the time of the offense, during the government's case at penalty, and in light of the government's closing argument that Johnson shot Simpson in the back. The transcript, as cited above, indicated that the Judge did not believe Rudd's testimony to be credible.  Yet, the government called him to testify in this penalty phase.  Knowing that Johnson shot while Simpson and Reggie Fletcher were struggling, and Simpson was trying to stab Fletcher, would have cast a different light on this offense.  A detailed outline of potential testimony by Cheryl Fletcher was prepared for the attorneys.  The attorneys did not call Cheryl Fletcher to testify.  They never spoke with her prior to the day she arrived at court.  Rather, they merely introduced a copy of the transcript of the manslaughter trial without any real explanation of its relevance.  It did not contain the transcript of the actual imposition of sentence, with the Judge's reasons for giving the minimum.  Live testimony of a witness who was present, whose testimony was supported by the transcript and trial judge's comments, would have been much more compelling and persuasive to the jury.

19.  The mitigation case at penalty must be developed and presented in a manner that takes into consideration the extent of aggravating evidence, and the mitigation that might be necessary for a jury to determine that the aggravation does not outweigh the mitigation.  Mitigating evidence must be presented in a manner, and in sufficient detail, so that the jury understands the mitigating value and can give it appropriate weight.  It

Case 1:02-cv-06998   Document 39-2   Filed 02/28/08   Page 11 of 15   PageID 353
Case: 11-1326   Document: 8-3   Filed: 03/04/2011   Pages: 278

Page 10 of 14

was clear in this case that there would be a great deal of aggravating evidence put on by the government, particularly in support of the future dangerousness aggravator. In that regard, it was important to understand the effects on Darryl Johnson of witnessing the abuse of his mother, witnessing violence in the community, suffering traumatic losses, being a special education student, and needing protection in jail and prison, and the contributions these experiences made to his involvement in the gang and the drug economy. The Vitiligo that Darryl suffered from (an acquired skin disease characterized by unpigmented skin, for which there is no treatment) was mentioned, but not explained, including the effects it may have had on Darryl. It was also important that more be done to humanize Darryl Johnson, to show that he had positive qualities, and that he had performed many acts of kindness and generosity to others.

20. It not sufficient for a couple witnesses to briefly talk about the abuse that Brenda Johnson suffered at the hands of her husband, which was witnessed by her youngest child, Darryl Johnson. Several witnesses who could have provided detailed descriptions of specific incidents were not questioned about them (see testimony outlines). This is significant in that only two jurors found that Darryl had witnessed the abuse of his mother. More detailed stories of specific incidents, described by several different persons with direct knowledge, might have led to a different finding on this mitigator. Further, very little evidence was put on regarding the fact that Darryl's father was an alcoholic, and became more abusive when he had been drinking. No jurors found the mitigator related to John Johnson, Sr.'s alcoholism. The effects on Darryl of witnessing this were not adequately addressed. The links between what he witnessed as a child, and the feelings of helplessness and powerlessness it produces in a young boy who cannot protect his mother, were never linked to his motives for assisting his friend, whose sister was being abused by her boyfriend, and which led to his involvement in the manslaughter case. This shooting, and Darryl's subsequent incarceration, was a critical turning point in his life, and led to his involvement in the Gangster Disciples while in prison. The effects on Brenda Johnson's mental state (depression), and the extent to which it affected her parenting, were also not adequately presented. She actually sought mental health counseling for depression, and was prescribed medication for it, in the late 1960's; this information was not presented. Nor was sufficient evidence presented about Darryl's speech delay, learning problems, Attention Deficit Hyperactivity Disorder, low self-esteem and frustrations with his inability to learn. I interviewed an official from

Case 1:02-cv-06998   Document 39-2   Filed 02/28/08   Page 12 of 15   PageID 354
Case: 11-1326   Document: 8-3   Filed: 03/04/2011   Pages: 278

Page 11 of  14

Morgan Park High School who interpreted Darryl's high school transcript. He explained that the academic courses in which Darryl was enrolled were for students who had been in special education in elementary school.  They were for low-functioning students, and constituted the extent of special education offered at the high school at that time.  This testimony should have been presented, and would have supported the findings of Dr. Gelbort.  A memo detailing this information was provided to counsel.  They did not ask this official to testify.  These experiences may have contributed to Darryl Johnson's involvement with the Gangster Disciples.  A gang expert could have talked about how gangs provide protection, a sense of belonging and acceptance to young men like Darryl Johnson.

21. There were a great many specific stories of things that Darryl had done to help family members and others, including families of the victims and the informants/government witnesses,  that might have given the jury a more complete view of him, might have humanized him, and that were not presented (see Attachment 3 - testimony outlines).  A particular example is the care that Darryl Johnson gave to Richard Lofton, a friend who was paralyzed in the same shooting incident in which Darryl was shot. Richard Lofton was interviewed and substantiated this claim. Angie Gaines, Lofton's girlfriend at the time, and the sister of Darryl Johnson's girlfriend, Michelle Gaines, could also have provided this information, as could Michael Johnson, a friend of Darryl's (not related).  I did not make adequate efforts to locate and interview Angie Gaines.  Richard Lofton and Michael Johnson were reluctant to testify.  This is not unusual in these cases.  It is counsel's duty to meet with potential witnesses, establish a relationship of trust with them, and strive to overcome their reluctance.  This was not done.  Only two jurors found that Darryl would help family and friends in need.  Had additional testimony been presented in support of this mitigator, the findings might have been different.  A couple persons did testify about Darryl's efforts to encourage relatives and friends to stay in school, complete their education, and stay out of the street.   He also actually financed the educations of relatives.  Additional and detailed testimony regarding this might have led to jurors finding mitigator #15, that Darryl Johnson encouraged and assisted his family members and friends to pursue an education, which no jurors found in one case and only one juror found in the other.

22. No information about Darryl Johnson's participation in programs and work in prison was presented, nor was the fact that he was transferred to minimum security facilities and that he earned meritorious good time.

Case 1:02-cv-06998   Document 39-2   Filed 02/28/08   Page 13 of 15   PageID 355
Case: 11-1326     Document: 8-3        Filed: 03/04/2011     Pages: 278

Page 12 of  14

This would have countered, to some extent, the government's assertion that he would be dangerous in prison.  It is noteworthy that no jurors found that Darryl would not be a continuing danger to society while he was in prison.  Had the jury been presented with this type of information about how he actually functioned in prison, some jurors might have reached a different conclusion with regard to this aggravator.

23.    Very little was presented about Darryl Johnson's depression and hypervigilance in the period leading up to his arrest, or of his expressions to various family members and friends about his desire to get out of the gang and drug economy, his belief that he would be killed if he tried, and his feelings of fatalism (see Attachment 3 - testimony outlines).

24.    Not enough evidence was put before the jury about Darryl Johnson's relationship with his daughters, his care for them, and his desire to make sure that they had a better life than he did.  Michelle Gaines, Linda Quinn and Angie Gaines could have testified about this, but were not called. They, like Lofton and Michael Johnson, were reluctant, and counsel did not make adequate efforts to overcome this reluctance, and persuade them to testify.  No jurors found that Darryl Johnson actively participated in the care of his daughters in one case, and only one juror found it in the other.  Had more evidence been put on regarding this, through witnesses that did testify and weren't asked (Darryl's family members) or through Linda Quinn, Michelle Gaines and Angie Gaines, jurors might have reached a different conclusion about this mitigator.

25.    Kathleen Kostelny, who was retained as a teaching witness, presented compelling testimony about the effects on children of witnessing family and community violence, and the protective factors and risk factors that lead to children in the same family being affected differently.  Sufficient lay testimony to support her testimony, particularly the risk factors and lack of protective factors present in Darryl Johnson's life, was not presented, nor were the connections between her testimony and Darryl Johnson's early life clearly made in closing argument.

26.    Early on in my involvement in the case, counsel informed me that it was their plan to have me be present at counsel table during the penalty phase, rather than have me testify as to the results of my social history investigation.  Prior to the start of the penalty phase, I was informed that I would not be allowed to be at counsel table.  There was no discussion at the time of my being a witness, this despite the fact that there were several persons with important information that were reluctant to testify

Case 1:02-cv-06998   Document 39-2   Filed 02/28/08   Page 14 of 15   PageID 356
Case: 11-1326   Document: 8-3   Filed: 03/04/2011   Pages: 278

Page 13 of  14

(e.g. Michelle Gaines, Angie Gaines, Linda Quinn, Richard Lofton, Michael Johnson)and records that needed to be admitted and explained, e.g. high school transcript, correctional records, parents' divorce, etc.  At no time did counsel ask for my notes, or discuss in detail those persons whom I had interviewed who were not called to testify.  No efforts were made to persuade reluctant witnesses to testify.  Without knowing the substance of the information that could have been provided, and without actually meeting the potential witnesses, to assess what kind of witnesses they might be, what they could offer in testimony, and to address the concerns they had regarding testifying, counsel could not make a strategic decision not to call them.  I would have been willing to testify had I been asked. (see Wiggins v. Smith, in which the US Supreme Court noted that the social worker who conducted the mitigation investigation for the defense could have testified as to the results of the social history investigation).

27.  As a result of all of the problems cited in this affidavit, I felt that I was not able to fulfill the standard of practice for a mitigation specialist in this case.  Counsel did not adequately monitor and direct the social history investigation.  They did not request all results of my work including notes of all interviews.  They did not discuss potential witnesses, and any problems that might be resolved such that reluctant witnesses might be persuaded to testify. Communication among team members was strained during the two month preceding trial, and during trial.  There was not sufficient time, prior to trial, to complete all work, particularly obtaining all records, locating possible experts, and working with witnesses in advance of trial, such that reasonable strategy decisions could be made. Due to time constraints and the direction of counsel, following the writing of my letter to counsel in September, 1997, my time was focused on preparing the video, developing testimony outlines for witnesses, and conducting additional interviews, to the exclusion of other things listed in the letter and previous memos that had not been done.  The social history investigation and penalty phase strategy development should be completed sufficiently in advance of trial to enable counsel to coordinate guilt phase and penalty phase strategy.  This was not done.  It was clear that, given the nature and extent of aggravating evidence in this case, a very compelling and persuasive mitigation presentation, with detailed information provided by witnesses, and corroborated and documented through records, in support of the mitigators was necessary.  Had such a presentation been made, it is believed that at least one juror would have reached a different decision as to sentence.

_____
JILL MILLER, MSSW, LCSW

STATE OF WISCONSIN }
                  } ss.
COUNTY OF DANE    }

Signed and sworn to before me
this 27 day of February , 2008

_____
Notary Public, State of Wisconsin
My Commission Expires OCT 10, 2008
                              2010

# ATTACHMENT 1

# JILL MILLER, MSSW

Forensic Social Work Services

330 East Wilson Street, Suite 100
Madison, Wisconsin 53703
(608) 257-7990
FAX (608) 256-7909

## CONFIDENTIAL MEMORANDUM TO ATTORNEYS

**TO:**      Attorneys Jeffrey Urdangen & Cynthia Giacchetti
**RE:**      Darryl Lamont Johnson - Social History Investigation
**DATE:**    January 2, 1996

I have reviewed my file, including my interview notes from my December 18th trip, and have developed a list of persons to be interviewed, some of whom have to be located, and records to be obtained. In addition, there are certain topics that need to be researched. We need to discuss what research can be done in Chicago by a paralegal or legal assistant, and what research I can do from here, or on trips. I also have some recommendations regarding expert assessments that need to be done, or types of experts we might want to bring into the case. Certain themes are emerging, and will be discussed at the conclusion of this memo. I am enclosing copies of records provided to me by Brenda Smith. We should keep a master set of all records for the penalty phase at your office. I also enclose some materials from the Mack case (Miami) relating to cultural/community issues. I see similarities in Mack's and Darryl's cases, particularly the way in which we addressed the factors that drew Mack into the drug economy.

### Sources - Persons

[Note: For those names that have a phone number following them, nothing need be done. I will schedule those interviews myself. When I have information on who might know the location or phone number, I will so indicate. Mort needs to obtain an address and phone number for other persons.]

John Jonnson, father (he is critically ill with cirrhosis and needs to be interviewed soon. Kim Williams will know how to locate.)
Andre Johnson, brother, Ph. 708-339-4222
John Johnson, Jr., brother (ask Brenda)
Kimberly Williams, sister, Ph. 312-846-2947
Sharon Cresswell, sister, Ph. 312-283-5136
Benjamin Smith, step-father, Ph. 312-873-4442 (also Brenda's home number)
Minnie Livingston, paternal aunt (ask Brenda)
Michelle Gaines, girlfriend, Ph. 312-846-0983 (must go through her lawyer, which    I will do)
Lucky Johnson, daughter (through Brenda - I will handle)
Bianca Gaines, "step-daughter" (through Michelle's mother)
Kenya Morgan, ex-girlfriend (ask Brenda for leads)
Lakiesha Hayes, friend, Ph. 630-829-1140)
Letra Watson, ex-girlfriend
Carolyn Demerey, friend, Ph. 708-891-3397

Page 2

Donald Taylor, maternal uncle, in Miami (ask Brenda)
Shirley Dantzler, paternal cousin (try Kim or Minnie Livingston) ·
. Mrs. Burford, former special ed teacher at Esmond School (Brenda can help`
Mr. Weltz (or Welch), former basketball coach at Esmond (check with school)
Tommy Adams, engineer at YMCA (Brenda will help)
Richard Lofton, a friend who was shot and paralyzed (shot by Mike Edwards, the same man
   who shot Darryl)
Reginald Fletcher and his sister Sheryl (re: manslaughter charge)
Former probation/parole agents (need names from records`

### Records to be Obtained

All school records - check with Former Pupil Records and get everything, even if it's only an enrollment card; then go to each individual school and ask for anything they might have. He was in special education - see if those records are kept separately. Schools: Mary Terrell (located at Robert Taylor Homes), Douglas Elementary, Dumas Elementary, Esmond Elementary, Morgan Park High School. Also check on whether there are teachers at each school who were on staff when he attended, and who might remember him. Ms. Burford may have names.

All Department of Corrections records. I want everything, including assessment, programming, conduct, medical, clinical, work assignment, visitors lists, etc.

All Cook County Jail records, from all times arrested, and everything, including visitors lists, medical, conduct, etc.

MCC records - all.

Birth records. I know a search has been done, and we have been told they don't exist. Brenda reports a difficult pregnancy and birth. There are indications of neurological problems. Birth records are important, and we need to be very sure they have been destroyed, rather than put on microfiche or stored someplace. I can check on this if someone gets the phone number for medical records. Brenda received her pre-natal care at the clinic at Presbyterian St. Luke's. Check if they are available.

Childhood medical records. Physician was Dr. Beasley, who is deceased. His records may be stored somewhere, or may be with the doctor(s) who took over his practice.

Cook County Hospital. Darryl was reportedly evaluated there at age two.

Providence Hospital, treated in emergency room before 1970.

Roseland Hospital, ER medical records for head injury in about 1983.

Christ Hospital, medical records from being shot in 1990.

Page 3

Chicago Board of Health, records of seeing a social worker there while in grade school at Esmond (Brenda said it was located on Monterey, between Hale and Longwood)

Michael Reese Hospital, Brenda received mental health treatment there for about three months in 1969 - will need her release

Police incident reports re: domestic disturbance calls to home of Brenda and John Johnson. Brenda reportedly called police a number of times. Also do a criminal history check on John Johnson, Sr.

Need all police reports on Darryl's prior arrests (even when not convicted). Regarding the Manslaughter conviction, we need the police reports, the transcript, including sentencing transcript, and the presentence report.

Juvenile Court records, including any possible detention, social service, etc.

Probation/parole records. He recalls reporting to an office at Exchange and 79th Streets. We need everything, including any handwritten process recordings, and names of agents.

All tax returns

Manpower Service employment records, about 1981

YMCA employment records (Brenda can help)

Social Security itemized statement of earnings (I can tell Mort how to do this)

Criminal history check on Brenda's parents, John and Josie Taylor.

Robert Taylor Homes, any records on Darryl's family living there (1961-70); also, information on Robert Taylor Homes - conditions, etc.- during that period.

Records and reports regarding the shooting death of Wilbert Showers

Records and reports relating to the death of Richard Johnson, a friend of Darryl's who died while Darryl was incarcerated at Menard.

## Miscellaneous Thoughts

I have already suggested that we have a thorough neuropsychological evaluation done, and recommend Dr. Michael Gelbort. I feel that we should have this done as soon as possible, as it may shed some light on the reasons for Darryl's volatile temperament and conduct in the jail. I have spoken to Mike; he is available and interested. Please have him appointed soon. At some point I may also suggest bringing in Dr. James Garbarino and Dr. James Johnson. Garbarino is an expert on exposure to trauma, including violence, and trauma syndrome. Interviews to date suggest that Darryl was exposed to violence in his home and in his community, and suffered traumatic loss. Dr. Johnson has expertise on the experiences of urban

Page 4

black males, and factors contributing to their involvement in criminal activity. He works on the penalty phase presentation for one of the men accused of killing Michael Jordan's father. I believe that it will be very important to have a jury consultant to help in design of the questionnaire and jury selection. Robert Hirschorn did a great job in Miami. There is also another person who is skilled at dealing with racial issues in jury selection. I will obtain his name.

We need all the information we can get on the Gangster Disciples. Anything that you know of that has been written should be obtained (you mentioned a recent book). If there are any local experts on this gang we should obtain their names. We also need to research Vitiligo. It is an immune system problem exacerbated by stress, and progresses gradually. We will need data on the schools that Darryl attended, including per pupil expenditures, per cent of children below poverty level, test scores, availability of special education, condition of the physical plant, safety and security, etc. (for where this is leading, see Jonathon Kozol's Savage Inequalities, particularly the chapter on Chicago schools).

We will want to investigate the co-defendant in this case, the snitches, and the victims. Start with their criminal histories. Obtain the obituaries for the victims, and any newspaper accounts of the murders. We need to anticipate Quan Ray's penalty phase presentation. Darryl tells me that Quan is a Muslim. We will want information about Larry Hoover, as well. What is the evidence regarding Darryl and substantial resources derived from the enterprise? We will want to know the extent to which members of Darryl's family knew about his activities, had any link to his activities, or derived any benefit from his activities. I will deal with that in my interviews, but want to know anything that turns up in discovery.

Some of the factors or themes that are beginning to emerge include: family history of alcohol or drug dependence; family history of mental illness; exposure to abuse in his home (father beating mother); child of alcoholic; exposure to violence in the community, including being shot; possible unusual reaction to small amounts of alcohol (pathological intoxication); indications of neurological damage/disorder; possible Attention Deficit Hyperactivity Disorder; low cognitive functioning. Darryl was in EMH (Educable Mentally Handicapped) classes in grade school. If he is not retarded (75 or below IQ), he is almost certainly borderline. Gelbort will test him. We need this soon.

I feel we have a good start on this case, and have a sense of where we need to go and what we need to do. I hope to be able to get back to Chicago by the end of the month for two or three days. The more records I have before that time, the more productive I can be. Please send things to me as they are obtained. Call me if there are any questions regarding this memo. Mort can call if he has any questions or concerns.

# ATTACHMENT 2

**JILL MILLER, MSSW**
Forensic Social Work Services

330 East Wilson Street, Suite 100
Madison, Wisconsin 53703
(608) 257-7990
FAX (608) 256-7909

## CONFIDENTIAL MEMORANDUM TO ATTORNEYS

**TO:**    Attorneys Jeffrey Urdangen & Cynthia Giachetti
**RE:**    Darryl Johnson - Preliminary Penalty Phase Strategy
**DATE:**    July 29, 1997

The penalty phase strategy in this case encompasses both the mitigation and the challenges to, and mitigation of, the aggravation. This memo will lay out preliminary thoughts and suggestions for both, including a list of aggravating factors and aggravating information\evidence that will likely be introduced in the first part of the trial, and with which we must contend, even though it may not be specifically noticed. Much of it will go to the future dangerousness aggravator. A summary of the general evolution of gang involvement in the neighborhood, as well as Darryl's specific involvement, will also be provided, as will an organizational hierarchy of the Gangster Disciples. This information applies to Darryl and to many of the government's witnesses, whose paths have been similar to his. It will aid in addressing the issues of use of and sale to minors.

Mitigation strategy must be multi-focused and encompass several types of evidence, including: explaining the crime (Darryl's involvement in the drug economy, with its ensuing consequences, including acts of violence); positive acts/good guy evidence (e.g. good son, good father, specific helpful acts, including financing education of others, etc.); normalizing/humanizing ("he's not so different from you and me" stuff); Skipper evidence (of which we have very little - though we do have some); and crime-related (e.g. not actually causing the deaths, relative culpability). Later memos will include a list of potential penalty phase witnesses, and the information/evidence that can be provided by each, as well as thoughts on demonstrative evidence (e.g. family tree, records, photos, etc.).

### Explaining the Crime

The main focus of this evidence will be to present Darryl's vulnerabilities to becoming involved in the gang and the drug economy. This includes evidence of personal vulnerabilities (e.g. low cognitive functioning, developmental delays, ADHD, low self-esteem) and social/cultural vulnerabilities (e.g. poor quality of education, racism, the social and economic marginalizing of African-American males, etc.). It will also include his exposure to violence in his home and community, and the effects of it, as well as the sense of fatalism and futurelessness that young African-American males develop due to homicide and incarceration rates. A complicated mix of personal/family and cultural/social factors led to his involvement in the drug economy, and his rationalization of his life choices. A summary of the evidence/themes follows:


Page 2

1.      Early (pre-birth) family history - Hereditary/Genetic factors and factors affecting his parents (their functioning, including parenting): There is a family history of alcohol and drug abuse on both sides of the family. Brenda's parents were both drug addicts; her mother abused alcohol. Her father was a major drug dealer. Both parents were incarcerated. Her brother abused drugs. Though Brenda has not abused alcohol or drugs, she is a classic child of an alcoholic, and fits the role of super-responsible child. Marrying an alcoholic (and marrying young, while pregnant) are also child of alcoholic behaviors. John, Sr.'s mother abused alcohol, as did his maternal grandmother. John, Sr. and his sister Ruth (deceased) are/were alcoholic. John, Sr. was also a compulsive gambler. John, Jr. appears to be the only child of Brenda and John, Sr. to abuse alcohol. Others report a low tolerance for alcohol - Darryl, Kim and Andre. Each child in this family fits a role of child of alcoholic: Andre is super-responsible; Kim is a placater: Sharon was a caretaker early, then became immature and self-centered - she married a man who abused substances and was abusive towards her; John, Jr. is alcoholic; Darryl was emotionally dependent and immature for some time, with some acting out (also had problems with relationships of trust and intimacy), then became a caretaker.

John, Sr., the youngest of five children, was only two years old when his father died. He was reportedly spoiled, as the baby of the family. The family received welfare. He reportedly attended school only through the ninth grade (though he may have earned his GED in the Air Force). He did not abuse alcohol prior to being in the Air Force. Brenda has one brother, who lives in Miami, and with whom she has had little contact. Brenda's father physically abused her mother. He then left her mother and lived openly with another woman. Brenda's mother reportedly had a number of men in the home. Minnie Livingston believes that Brenda was accosted by men who stayed with her mother at various times. Brenda had little supervision or guidance. Brenda was out riding motorcycles with John, Sr., when she was twelve years old and he was fourteen or fifteen. She became pregnant at age thirteen. She gave birth to her first child at age fourteen, two days before her mother's death. She then went to live with John, Sr.'s family. She and John married shortly after Andre's birth. She had five children in eight years (by age twenty-two), plus three miscarriages, including a set of twins. It appears that John. Sr.'s abuse of alcohol and physical abuse of Brenda began while he was in the Air Force, and they were living on or near Andrews Air Force Base, Washington, D.C. (1956-61).

There is a family history of mental illness on Brenda's side of the family, and a family history of Attention Deficit Hyperactivity Disorder (not clear yet where this comes from). Brenda's Aunt Mabel, with whom she was very close, was in and out of mental hospitals (Tinley Park) a number of times. She reportedly suffered from "nervous breakdowns" (schizophrenia or depression?). Brenda's nephew (her brother's child) reportedly has schizophrenia. Brenda has been treated for depression. John, Sr. may have suffered from depression. There are multiple members of the family that appear to have ADHD (which is often hereditary), including Darryl, Lucky, Andre's son, Kim's son, Sharon, Sharon's

Page 3

daughter, Sharon's grandson, John, Jr., John's son (probably more, if we really look). This can have an hereditary basis. No one else seems to suffer from low cognitive functioning similar to Darryl so, review of prenatal and birth records is important for any clues.

2.  Birth: Darryl's birth appears to have been normal, with no anomalies apparent; birth weight of 7'6". Brenda was hospitalized, however, one month before his birth for false labor. The family moved to the newly opened Robert Taylor Homes in June, 1963, five months before Darryl's birth. By the time of his birth, Darryl's father had become an alcoholic and had been physically and verbally abusive towards Brenda for some time (appears to have begun while they lived in Washington, D.C.).

3.  Cognitive deficits/impairments: Darryl was diagnosed as a slow learner early, and placed in EMH (educable mentally handicapped) classes. Recent testing reveals a full scale IQ of 76 (mentally retarded is 70-75, with adaptive skills deficits). Developmental delay occurred in the area of speech; he did not talk until he was two years old. He was taken to Cook County Hospital for evaluation at that time (search for records is ongoing). Behavioral observations of family members and testing are indicative of probable Attention Deficit Hyperactivity Disorder (linked to impulsivity, poor judgement and risk-taking behaviors). This disorder appears to run in the family.

4.  Early family life - chaotic and violent: Darryl spent the first six years and three months of his life in the Robert Taylor Homes. The condition of the homes rapidly deteriorated. Large numbers of persons were confined to a small space. Physical condition and safety of buildings deteriorated. There were large numbers of children, including adolescents, with nothing to do. Poverty rate was high. Residents were almost totally African-American. Gang activity (Blackstone Rangers) was present, with pressure on young people to get involved. Uncle Clarence "Bill" Johnson opined that Taylor Homes were built for political and economic reasons, to keep minorities together in a small space. When Darryl was still a pre-schooler both parents were working second shift - Brenda at the Post Office and John, Sr. at Railway Express. Finances were still a problem for the large family. Darryl was looked after by his older siblings (Andre and Sharon), who were quite young themselves.

Ben Smith noted that during her pregnancy with Darryl, Brenda was in an abusive relationship with an alcoholic husband; she was under a great deal of stress and had four young children to care for during the pregnancy. Over the years, especially after she started working, John, Sr. became increasingly jealous, possessive and abusive. The older children enjoyed some pleasant times with their father, and were able to develop a relationship with him. Darryl's only memories of his father are of his mistreatment of his mother and his failure to support his family. He never had a positive relationship with his father. He witnessed a great deal of physical and verbal abuse of his mother by his father. The police were called to the home numerous times. There were a number of times that Brenda

Page 4

gathered the children and fled to a relative's home, usually Minnie Livingston's (John, Sr.'s sister).

In 1968, John, Sr. was laid off from his job at Railway Express. He never held a steady job after that time. He did not support his family. Brenda filed for divorce in 1968, but then reconciled with John. Brenda was robbed at gunpoint in Taylor Homes (there may have been two robberies). Shortly after that she and the family left Taylor Homes and moved back into John, Sr.'s mother's home on S. Prairie. Mrs. Johnson had died by this time, but family remained in the home. The death of Minnie Johnson was a loss for Darryl, who had been close to his grandmother. John, Sr. continued to be abusive towards Brenda. Family members, including Minnie and her daughter Shirley personally witnessed incidents.

Brenda left John and the home on S. Prairie in 1970. John, Sr. continued to harass her for years afterward. He would frequently phone her or would stand outside her home yelling at her and verbally demeaning her. Darryl would witness these incidents. Brenda had to work two jobs to try to support the family. They struggled financially. There were times there was nothing to eat in the house. Brenda would go to the grocer's and beg for food until payday (this continued even while they lived in Morgan Park). At times they ate ketchup or syrup sandwiches, or pancakes for dinner. Sometimes they would go to relative's or neighbor's for something to eat. Christmases and birthdays were difficult; they had very little. They had few clothes, which were often hand-me-downs, though Brenda kept the children neat and clean. Darryl was aware of the family's difficult circumstances and his father's failure to help the family. He was devoted to his mother - extremely attached to her - and did not like to see her struggle. His memories of her struggles were indelibly etched in his mind.

Darryl is described by all as an active and energetic youngster, but also a quiet child, who was a bit of a loner and extremely attached to his mother. Brenda reported that after she and John, Sr. divorced, Darryl stopped talking for a time. He wanted to be with his mother all the time, and was extremely demanding of her attention. Family described Darryl, as a child, as withdrawn and a loner.

5.   School - Special Education and Self-Esteem: Darryl started school at Mary Terrell at age four, in a pre-school class (1968). This was a time of great turmoil in his home (see divorce records). He was one of the slowest children in the class, and did not seem to communicate much. He did not mix well with other children. He attended Terrell for a year and a half; then transferred to Douglas School in 2-70. In the fall of 1970, he enrolled in the first grade at Dumas School (three schools in three years). In 1971, Brenda moved the family to Morgan Park. Darryl was enrolled in the second grade at Esmond School (4th School). This number of school changes is problematic for any child, but particularly for a low-functioning child with special needs, who is somewhat withdrawn, immature and dependent (and who has experienced the level of emotional turbulence in his home). We know that by this time

Page 5

he had been determined to be in need of EMH services (special education for educable mentally handicapped, e.g. mildly or borderline retarded). His second grade teacher, Edith Burford, took a special interest in him and gave him extra attention.

Darryl referred to himself as "slow", as did family members. It clearly bothered him to have this label attached to him. He was made fun of by other children at school because of this. Brenda recalled that Darryl would often cry about being teased and because he had such a hard time with schoolwork. She had to work long hours, and was attending school, so she was able to give him little help. Kim worked with Darryl to help him learn to read. At age twelve he was identified as a virtual non-reader. Brenda recalled that when he was little his father would "threaten and hound him" to be more like his siblings, who were good students. All of Darryl's siblings are cognitively competent. He felt he could never compete with them or be as good as they were at anything. Darryl did not like to go to school because of his low functioning and the teasing he received. He was easily frustrated in school and was distractible. He just gave up. Except for Ms. Burford, he could remember none of his teacher's names. He did not participate in organized activities at school. The neighborhoods in which the family lived, and, therefore, the schools, were segregated - primarily black. The quality of education in Chicago's inner city schools, especially for children with special needs, was poor at the time (need data/information on this). All family members report that Darryl's self-esteem was severely affected by his low functioning and by being identified as "slow"/EMH. Ben Smith noted that Darryl always questioned his worthiness and ability; he was always looking for approval.

Darryl's elementary school years, from second through eighth grades, were spent in the Morgan Park neighborhood. During that period the neighborhood changed rapidly from one that was integrated to one that was primarily black, due to white flight. Brenda worked, went to school, and was involved with Ben Smith. Though she was always a loving mother, she did not spend much time with Darryl. He was often in the care of older siblings or left to fend for himself. Sharon, who had looked after him much of the time, became pregnant at a young age (16 or 17, in 1975-or '76). His father was non-existent in his life; Darryl wanted nothing to do with him anyway. As he approached his teens, he was out in the streets and neighborhood more, and subject to the influence of the neighborhood gang, the Gangster Disciples. It appears he had few, if any, close friends. Darryl began truanting during high school. His performance was poor. He withdrew from Morgan Park High School (or just stopped attending) in the spring of 1980. He started spending time at Eileen Dean's house, on Esmond. He was using marijuana, and probably selling a little marijuana. At the time, marijuana was the thing in the neighborhood; cocaine did not come into the neighborhood until he returned from his first stint in prison.

In June, 1980, Darryl entered the alternative school at Central YMCA (which it appears he only attended until early 1981). By that time, he had hooked up with Ricky Johnson, the neighborhood drug dealer (marijuana). Darryl said that he idolized Johnson. The pressure

Page 6

to get into the gang (Gangster Disciples) in the neighborhood was "relentless."  It was not highly structured or organized at that time (see below).  Andre was able to avoid it because he was an honor student and bookworm, college bound.     John, Jr. flirted with the gang - was on the fringes - but was a talented athlete in school and an average student who went on to join the military.

6.      Darryl's need for acceptance and belonging, and to feel good about himself made him vulnerable to gang recruiters.  He was also a passive and easily led adolescent.  The center of the marijuana selling trade was at 111th Street and Vincennes.  As a teen, Darryl had little supervision, guidance or limits.  He drifted into the gang and the selling of marijuana.  His mother married in 1981, moving out of the house on Hermosa, and leaving Darryl, Sharon and Kim there.  Andre was in college and John, Jr. in the service.  Darryl was pretty much on his own.  Darryl's marijuana use was regular (daily) through the early 1980's, until his incarceration.  He had some occasional employment prior to his first incarceration, but his lack of education and skills, and his low functioning, combined with the fact of being African-American meant that only menial, low paying jobs were available to him.  Ben Smith noted that teens got drawn in by being offered a way to make quick money..."go to the corner and take this package to this man for $10...or stand on the corner and tell us if the police are coming...get $50 a day...take that home to Momma, who is living on food stamps...so he has sanction at home (and in the community)... making money to help out...gets hooked."

Darryl's involvement in the offense which led to his voluntary manslaughter conviction was a turning point.  At the time, he was a regular marijuana user and occasional drinker, and low-level seller of marijuana.  His low cognitive functioning and ADHD contributed to impulsivity and poor social judgement.  In the situation, he felt he was helping a friend and protecting the friend's sister.  He is described as extremely distraught upon learning that Jesse Simpson had died, and extremely concerned about Simpson's family.  He was also terrified of being incarcerated.  He was actually twenty-one years old (not nineteen, as previously thought) when he was incarcerated at Menard, though he functioned socially and emotionally at a lower level.  He was not well-prepared for the prison experience.  It is not yet clear what happened at Menard, though something did (possibly assault - I need to spend more time with him on this).

Two things did happen while Darryl was in prison that had an impact on him.  The first was the death of Ricky Johnson (I believe he was shot and killed).  Darryl said that Johnson had been trying to turn his life around at the time.  He was going to college and trying to find a way out of the drug economy.  He had a family and was "stepping away from the life."  He was turning away from violence.  He had been Darryl's mentor.  Darryl was extremely upset about his death.  He stopped using marijuana at that time, and did not abuse substances

Page 7

again. The second thing appears to be his recruitment into the serious and more organized drug dealing of the Gangster Disciples. They were extremely organized in the jails and prison system. There was a formal screening process when someone entered the prisons, and heavy distribution of literature. Darryl made the decision to become more involved in selling drugs when he left prison; it is while in Menard that he made this life choice.

Darryl's reasons for this career choice were his desire to gain respect (especially self-respect/self-esteem) and to earn money to take care of his family. Money would enable him to help his mother, whose financial struggles he had witnessed throughout his life, as well as others in his family (see below), and to feel successful (enhance his self-esteem). Stating, "I always had dreams...just because I'm slow doesn't mean I don't have dreams," Darryl said he knew of no other way to compete with his siblings or to make the kind of money, and have the material things, that symbolized success in America. Like most young people, he wanted the outward symbols of success in our society, e.g. car, clothes, jewelry. He said that in his community, and his circumstances, selling drugs was how a lot of people "got things...it was on every corner." Others noted that in Morgan Park many people in the neighborhood were connected to the drug economy. David (nephew) said it was a way of life for kids in the neighborhood, accepted as part of the culture of the neighborhood.

By this time he had several obstacles to legitimate opportunities: low cognitive functioning; being black (especially young, black male) in a racist society; no education, and no training or job skills; and being a convicted felon. In the world of the drug economy the fact of having spent time in prison, especially for having shot someone to protect a friend's sister, earned him automatic respect in the streets and neighborhood. John, Jr. noted that in this world he could be "be a big shot...the fact he couldn't read didn't matter." Ben Smith said that Darryl got "caught up trying to be somebody...brothers and sisters were accomplishing things...he wanted to compete...be as good...saw having money as a sign of making it...drug dealing as the easiest, quickest way to have money." Stacy Curtis, who met him shortly after he got out of prison in 1986, said that Darryl started selling cocaine as a low-level street dealer. He said he was just going to do it for a little while; he wanted to get some money together and start a business.

Darryl progressed in the drug economy over the years. When he came back into the neighborhood in 1986, cocaine/crack had become the main drug that was sold (previously it had been marijuana). It became known that he was selling, and making money. He earned respect in the neighborhood. Then others he knew would ask him to get some for them. Suppliers became willing to front him because he was known to pay his bills. He was then able to obtain larger amounts. He gradually became a coordinator; he had people selling under him. Curtis said these were generally people he knew, and were generally his same age (she did not know him to use juveniles). He was making more money, and spending more money. At first, he seemed to need to have the outward symbols of success. He dressed in flashy clothes, wore jewelry and drove a Mercedes. As he gained in confidence,

Page 8

he did not need these things as much. He did help his family financially. He also helped others (see below). By 1989, Darryl was a governor in Morgan Park. He remained in that position until he went to prison in 1992. When he came out, he was on the Board of Directors, where he remained until his arrest.

Over the years of his involvement in the drug economy, Darryl was exposed to violence. He was shot. A friend was shot and paralyzed in the same incident. He lost other friends to violent deaths (particularly the Showers). His early life had been violent, as well. Witnessing violence and suffering traumatic losses caused him to develop self-protective behaviors, including numbing of feelings. He said that, growing up, "violence (was) all around you...you have to turn off your emotions to survive." In his world, violence was dramatized, romanticized and justified. Compounding the problem is the sense of futurelessness and fatalism that young black men develop. Homicide rates and incarceration rates of young black males leads to a belief that they will be dead or in prison at a very young age. This facilitates rationalization of involvement in the drug economy where quick money can be made. I believe Darryl did not feel he would last long in the business - he knew he would be dead or in prison. Towards the end he evidenced increasing signs of stress and anxiety. The Vitiligo is an immune system disorder exacerbated by stress. His hair was falling out. He had a nervous stomach, and a rash. He had symptoms of depression and anxiety, including hypervigilance. The death of his cousin Salima in December, 1994 was a devastating loss for him. He talked about wanting to get out. While he may, at times, have not believed he could get out, he did make some plans. He even sent Michelle to Atlanta in early 1995 to look for a place for them to live (she has photos). He worried about having enough money to start a legitimate business. Michelle said he did not have that much money; they were often behind in the rent and other bills. He told Kim that he wanted to get out of the business, but that he feared for the safety of his family if he tried.

Evidence/testimony related to coping and resilience would be relevant in this part. Factors relating to the effects on him of trauma/exposure to chronic violence include: low cognitive functioning; young age at which he witnessed violence towards his mother; number of school changes; large family; periods of poverty; lack of father figure (accumulation of risk factors has a multiplier effect). Resilience would be enhanced by the stable, supportive and loving relationship he had with his mother and siblings, though he lacked time and attention from his mother due to her need to work and the fact that she attended school.

## Positive Qualities and Acts/Good Deeds

This category of evidence encompasses positive qualities that Darryl has exhibited and acts of kindness towards others. There are many examples of this. This is the "he is more than the worst thing he ever did" evidence. It demonstrates, in many ways, his true concern for his family and others, and an understanding of his own mistakes, including an awareness of the wrongfulness of

Page 9

what he was doing. Most people talk about the two Darryls - the one that is portrayed by the government, who is cold violent, and ruthless (though he would say that he worked to establish a persona in the streets, stating you have to establish yourself and earn respect, both in the streets and in jail, so that people will leave you alone, and not harass you) - and the one that his family and friends know, who is warm and caring, generous and loyal, friendly and affectionate. Some examples:

He was determined that his children not be exposed to what he was exposed to growing up (domestic violence). He was careful with Bianca and Lucky, making sure they were not exposed to this.

When Lucky was born, the delivery was by caesarean. Darryl was present for her birth. Michelle remained hospitalized for twelve days. Darryl took a bed at the hospital and remained with her. He did nighttime feedings, changed and bathed Lucky in the hospital (Michelle has photos).

He participated in all aspects of care for both daughters, feeding, changing, bathing, reading to them, taking them to the park, etc. He made sure they had good health care, as well as good educations.

He made sure that Bianca and Lucky went to good schools (private schools), and that they are receiving a good education.

He always treated Bianca as though she were his biological daughter, and treated her the same as Lucky. He is the only father Bianca has known. She calls him Daddy. Her biological father died in 1991.

He met Michelle when she was pregnant with Bianca. He was with Stacy Curtis at the time. Michelle's good friend had just died. She had no money. He bought her clothes to go to the funeral. Then he got her an apartment and furnished it with furniture and equipment for the baby, and food. He bought her maternity clothes. At this time, they were only friends, though they soon became involved.

As a teen, when he worked at the YMCA, other odd jobs, or even selling small amounts of marijuana, he would do things for his cousins and other children in the neighborhood, like buying everyone ice cream or soda.

He often brought children from the neighborhood home to eat, if they had nothing to eat. He helped an elderly lady (deceased) in the neighborhood, when they lived on Ellis, by doing errands and chores for her.

Page 10

He has helped family and relatives out financially, including giving them food, or money for clothes, furniture, or to send children to school. [We need to address this issue with Brenda and his siblings, and deal with the fact that they knew where the money was coming from]

When Richard Lofton was shot and paralyzed (while with Darryl, in Darryl's car - drive-by shooting), he brought Lofton home from the hospital to the apartment that he and Michelle shared, and personally cared for Lofton for months, including bathing, feeding, and carrying him.

He encouraged his nieces and nephew in school, constantly reminding them to stay in school and finish their education. He helped some of them with college expenses. He constantly stressed the importance of a good education.

He has always remained absolutely devoted to his mother, and respectful towards her. He has done things to help her over the years.

He wanted Lucky to have a safe, stable and normal upbringing, so he placed her in the care of his mother, though he spent a great deal of time with her. His greatest gift to his daughter has been the stable and loving home in which he chose to have her raised. He continues to encourage Lucky and Bianca in school and in their activities, including rewarding them for good report cards.

He encouraged his nephew David, an honor student, in his education. He kept him out of the gang. He helped him with college expenses. He bought him a car (used!) for getting back and forth from college. He told David that he regretted not finishing school and told him that being in the streets is no way to live. He has motivated David to do well and to achieve (he is a recent college graduate and a devout Muslim). He encouraged David in his faith. He has been a good listener, and someone David could talk to about problems. David said that Darryl even pushed other kids in the neighborhood to go to school, and rewarded them if they did.

He has been like a father to his niece Nicole. He has helped her financially. She is eighteen and has two young children. He encouraged her to stay in school, even when she had the babies. She did finish high school. He took care of Nicole one summer when her mother was working.

He was a good friend to Carolyn Demeray, and encouraged her to stay in school. She, too, is a single parent. He has read books and articles on child development and child rearing, and shared these materials with her.

Page 11

These are some of the things I have been told, so far. I'm sure there will be more as I continue my interviews. We have to show that the person described by the government is still capable of acts of kindness and can have positive qualities by providing very specific details.

## Humanizing Evidence

This is somewhat related to the information above, though it is basically evidence and information, apart from good deeds/qualities, that helps the jurors relate to him as a person, and see him as not so different from themselves. As long as they can separate him from themselves, and see him as some kind of demon, it is easier to kill him. It is harder to kill someone in whom you see some of yourself. Here, we will explain how he got his nickname. He was called "Poppa" or "Pops" shortly after his birth, by relatives, because he looked like an old man (it would be nice to find photos that bear this out). He played Little League for a while as a child, with the son of Eugene and Margaret Austin. They are good at explaining why their son did not get caught up in the gang. He was a gifted student who went to a special school. He had two parents who spent time with him, encouraged him in his activities, and provided supervision and guidance. Family photos will be used here.

## Prison Adjustment (Skipper)

His conduct records in prison, both state and federal, are not really bad. We do have the write-up for supposedly threatening Quan, though Quan denies he was threatened. If there was another threat, we need to see it. He did participate in programs, including educational programming, and had work assignments. He moved quickly to low-security facilities and received extra good time credits. This will be linked to the stuff we do on future dangerousness when we deal with challenging the aggravators (Mark Cunningham and I have talked at length about ways to address this and have some good ideas). Other factors that can be brought out here include his age (as he ages - matures - conduct/adjustment would be expected to improve), and his ties to conventional norms (stable and supportive family, commitment to daughters, belief in education, religion).

## Crime-Related Mitigation

Includes such things as the fact that he did not actually cause the deaths at issue; and that others are equally or more culpable (e.g. Anthony Copeland, Roger Steward, Richie Wash, and hopefully Quan Ray). We also need information on the victims - the fact that they were a part of the criminal enterprise. Anything about their criminal history, including acts of violence on their parts, would be helpful. This information must be brought out in the guilt phase, so it does not appear that

Page 12

we are trashing the victims. Information on the informants, especially those who had a role in the murders (e.g. Stewart and Copeland) will be helpful, as well.

## AGGRAVATING FACTORS/ADDITIONAL AGGRAVATION

### Noticed Aggravating Factors

I.    Count Five and Count Six - Murder/Intentional Killing of Darryl "Blunt" Johnson
      A. Threshold Culpability Factors

      1. Intentional Acts to Take Life or Use Lethal Force (death of Darryl "Blunt" Johnson)

      2. Intentional Acts in Reckless Disregard for Life (death of Darryl "Blunt" Johnson

      B. Statutory Aggravating Factors

      1. Procurement of Offense by Payment - alleges that he paid money to Anthony Copeland to shoot "Blunt" Johnson

      2. Substantial Planning and Premeditation (conversations with Roger Stewart, et. al. re problems caused by "Blunt" cooperating)

      3.    Continuing Criminal Enterprise Involving Drug Sales to Minors - alleges that the CCE involved the distribution of drugs to persons under the age of 21 (information as to Darryl's participation in, or knowledge of, sales to minors?)

      C. Non-Statutory Aggravating Factors

      1. Vileness of the Crime - Johnson ordered the murder in order to obstruct justice.

      2. Future Dangerousness - probability that Johnson would commit serious acts of violence in the future which would be a continuing and serious threat to society. Alleges numerous instances of violent criminal conduct including: (1) ordering the murder of Gregory Sharp; (2) threatening and ordering the beatings, shootings and /or murders of gang members for violating rules (some specific acts detailed below); (3) urging and ordering GD members to commit acts of violence against rival gang members, including drive-by shootings (see below); (4) planning to kill a witness against him while he was incarcerated at the MCC (presumably the "threat" against Quan); and (5) conviction for the voluntary manslaughter of Jesse Simpson in 1983.

Page 13

3. Victim Impact - impact upon the victim's family ("devastating!") [Obviously, we need all information possible on Darryl "Blunt" Johnson, including his criminal history, role in the gang, acts of violence, and his family]

II.     Counts Seven and Eight - Murder/Intentional Killing of Charles "Jello" Banks

A. Same as above

B. Statutory Aggravating Factors

1. Previous conviction of violent felony involving a firearm (the voluntary manslaughter conviction for the shooting of Jesse Simpson)

2. Procurement of Offense By Payment - paying Quan Ray with an automobile

3. Substantial Planning and Premeditation

4. Continuing Criminal Enterprise Involving Drug Sales to Minors

C. Non-Statutory Aggravating Factors

1. Future Dangerousness - same as above

2. As to Count Eight only - Vileness of the Crime - Johnson ordered this murder because he believed Banks was cooperating with federal authorities and to obstruct the effective enforcement of the law

[Notice: they do not allege victim impact on Banks]


**Other Aggravating Evidence/Information** : that will be used to support Future Dangerousness or that will be presented in the guilt phase (from statements and Grand Jury testimony)

-       Larry Hoover is the only person above Darryl "Pops" Johnson in the Gangster Disciples; Pops generally relayed his orders through Roger Stewart

-       The offense of involving minors in the distribution of drugs is aggravating (will be viewed as such by the jury)

Pugh Affidavit/testimony:

Page 14

- Pugh joined the Gangster Disciples at age 12 or 13; sold marijuana as a teen in Morgan Park; sold for Ronnie Showers (as did Richie Wash and Roger Stewart); Showers got his marijuana from Darryl

- At age sixteen he worked security for Darryl; the first time he did this he was paid $50; was seventeen when he sold (distributed/delivered) for Darryl

- Darryl directed the drug business from prison during 1992-93; he used Michelle Gaines (the mother of his children - thereby placing her at risk) and others to direct the business

- Pugh witnessed the violation of Delano "Trouble" Finch the day that Darryl got out of prison (5-11-93); Finch was given a "pumpkin head" for messing up the peace treaty with the Vice Lords - he lied to Shorty G; Mike J (Johnson) told Finch that Darryl said he was in violation; Finch accepted the violation; he ended up at the hospital

- Pugh was made to take a violation for not taking a gun charge (not taking the weight) for Big Rog (Roger Stewart), who had already been in jail/prison; the violation was a punch in the eye from Stewart after Darryl asked Pugh why he didn't take the weight

Finch Testimony/Affidavit:

- When Finch was a governor he violated members on orders from Darryl, e.g. Dre - Darryl ordered him violated for being responsible for getting a member murdered

- Finch was violated by Darryl when Darryl got out of prison because he had argued with Darryl while he was in prison; had to go to the hospital (medical records from St. Francis Hospital confirm that he was treated in the ER for head injuries from being assaulted on 5-11-93, the same day Darryl was paroled from Centralia)

- As a director Darryl had the power to name governors, assistant governors and regents, e.g. he made Finch governor of the south suburbs the night that Ronnie Showers was murdered; he took this job away from Finch when he got out of prison

- Darryl gave Nation Work to governors, etc.; the quality of the nation dope was poor and the price was high - $1200 (the cocaine had been "stepped on" several times - good cocaine was $800/oz.); he required members to sell a certain amount of Nation Dope

- BJ reported that Parks told his partner to kill BJ because Darryl thought BJ was cooperating (BJ was governor in Minnesota after Noonie Ward)

Page 15

- Finch heard a conversation between Darryl and Parks in which Darryl told Parks to get together with Herron (Harold Jackson) to eliminate a situation; Finch believed that Darryl wanted Herron killed; Herron was removed as regent

- Darryl had Finch's name on a list of people he thought were cooperating; Darryl saw Finch in the bullpen the day of Finch's proffer;  Darryl told Finch he saw Finch's family in court (which can be interpreted as a threat to harm Finch's family)

- Richie Wash told Finch that Darryl wanted Lance and someone in Roger Stewart's family killed because they could testify as to who killed Jello and Blunt

- Richie Wash told Finch that Quan Ray murdered Angel (nothing about an order from Darryl, though Quan was known as enforcer for Darryl)

- Finch heard Darryl say that he wanted Capone and Victor Thompson murdered; Darryl personally went looking for Capone

- Darryl sent Roger Stewart, Kevin Williams and Blue to shoot up Victor Thompson's mother's house; Darryl told Finch to send a couple guys with them; Darryl talked about shooting up and burning Thompson's mother's house

- Finch was present when Meechie and two of his guys told Darryl they had murdered Capone's brother, E-Man (presumably for Darryl)

- Eight Ball was murdered by Quan Ray and Mendell; Eight Ball worked as security under Victor Thompson; Darryl had Eight Ball killed so it would be easier to kill Thompson

- Richie Wash told Finch that Darryl had Stan murdered; Stan was one of Darryl's guys

- Finch heard Darryl tell Thael ( or Thel - Jathael Garrett) to kill E-Man, Victor Thompson's brother; he also heard Darryl tell Meechie to kill Kenny, Thompson's nephew; Darryl said if they didn't do it, Trouble (Finch) and Fool (Parks) would kill them (Thael and Meechie); Darryl gave them a week to do the murders; within a week E-Man was dead (Ricky G was, however, locked up for the murder; there was also a rumor that the opposition killed E-Man)

- In March, 1995, Finch's house was shop up; Darryl blamed it on Victor Thompson and Thompson blamed Darryl

- Murder of Gregory Sharp (G Sharp):  Sharp was a governor; Finch said that Darryl told him that the other governors were complaining about Sharp, alleging that he was mistreating members; Darryl said he was going to "holler at" G. Sharp; there was a meeting in the gym at the Boys Club during which Darryl and G Sharp had a heated discussion; a week before

Page 16

Sharp's murder Darryl said he was going to hit Sharp (though Finch could not recall the exact words); logistics were discussed; on the day of Sharps murder, several GDs met at a gas station; Darryl told K-Dog, Parks and Finch to kill G Sharp whenever they got the chance; later Sharp was in a car going down the Dan Ryan; Parks said "it's a go"; K-Dog and Heavy (not Roger Stewart, but a different Heavy) shot Sharp and Otis; Parks called Darryl and told him that they took care of it

Roger Stewart testimony/statement:

- Darryl had Michelle Gaines (the mother of his children) get guns and ammunition for the GDs; she picked up and delivered drugs and money, and picked up burn-out cellphones for Darryl

- Stewart implied that Darryl had Finch violated by Mendell and Mike J after Darryl got out of prison because he didn't like the way Finch handled the business in Morgan Park while he was away

- Darryl had Stewart violated for failing to go to the funeral of a GD drug dealer; Darryl had two other GDs violated for the same reason

- The GDs who worked security were usually fourteen or fifteen (though as old as twenty-five); security made sure the streets had lookouts; they had guns

- Darryl told Parks to have some GDs drive by and shoot up Victor Thompson's mother's house and burn the garage down; Parks had K-Dog and his crew do the drive-by shooting

- Darryl told Richie Wash to "stand strong, stand on his function...don't let anyone play you." Richie took the advice too seriously and shot someone (Stewart said Richie was talking crazy)

- Quan Ray would do violations and executions for Darryl; he was Darryl's enforcer

- Jamie Pugh did whatever Darryl ordered him to do

- Darryl ordered the murders of several people, including "Blunt"

- Murder of Angel:  Darryl thought Angel had something to do with the murder of Ronnie Showers; Angel was a rival coke dealer;  the day Angel was murdered Q asked Stewart for a gun;  later Q said he had murdered Angel;  Q did this murder to get back in Darryl's good graces;  Darryl bought Q a car

Page 17

-     Darryl would buy cars for GDs for their silence

Will Showers statement/testimony:

-     The death of Ron Showers:  that night Darryl was going, with Will Showers, to talk to Capone (a member of another gang); Darryl and Capone's nephew had words, and Darryl hit him; the nephew got a gun and fired it, but it didn't go off; Will Showers was given a gun and shots were exchanged - no one was hit; later Darryl wanted Will to go back and get Darryl's rental car; Ron Showers said he would go for the car; Showers left with Speedio and Bugaloo, and Will followed; Will heard gunshots; when he pulled up he saw a body lying in the street - it was Ron Showers, who had been shot by a rival gang (Darryl felt responsible for the death of Showers, who was a close friend)

-     A few days after Showers death, Michael Harris, Capone's brother, was killed; Will Showers was present at Finch's, with Darryl, Finch and Parks when Parks said to Will that he "got them" for his brother; while there is no statement that Darryl ordered this, Darryl did give Will some work after this, including picking money up from Darryl's workers and delivering drugs

Debriefing of Delano Finch:

-     Darryl was having problems with Victor Thompson, a GD governor; he wanted Thompson killed but was unable to do so; Darryl told Jathel Garrett (Thel/Thael) to kill E-Man, Thompson's brother - E-Man was killed; Darryl told Meechie to kill Kenny, Thompson's nephew - Kenny was not killed

-     Darryl told Dollar Bill (may be Lamar Rozier) to kill Mike Edwards, who had previously shot Darryl (need to get the circumstances of shooting, which Finch may have wrong); later Darryl said that Dollar Bill "took care of that"

-     Patrick White, a supplier of cocaine to the GD's and close associate of Darryl's, said that he had kilos of cocaine and money stolen from him by two GDs; Darryl wanted to find out who was responsible; two possible GDS who located and were taken to a residence to be interrogated by Darryl; the subjects were told they would be beaten if they didn't reveal the whereabouts of the cocaine and money; the subjects were stripped and beaten, including with a metal pipe; salt was poured on their wounds; hot curling irons were used to burn their chests; at some point Darryl left, then returned, stating that the two didn't know anything; they were released

-     Finch was present at times when Darryl ordered violations on numerous GDs; he heard about other violations ordered by Darryl; some beatings required hospitalizations.  Victims of violations/beatings included: Finch, Roger Stewart, James Yates, Dre, Blue, Sherman Moore,

Page 18

Andrew Howard, Torrence, William Edwards, Jathel Garrett, Patrick White, Victor Thompson, Mendel, Quan Ray, Jamie Pugh, Mickey Red, Charles Dorsey, Raynard McDowell, Lil Rob, Germaine Haslett, Meechie, and Dollar Bill

- Quan Ray, who was enforcer for Darryl, was involved in the murders of Gregory Sharp, Charles Banks, Angel and Eight-Ball

Other:

- There are transcripts of Grand Jury testimony by Roshawn Smith, age 16, Alonzo Butler, age 16, and Demetrius Banks, age 13, all regarding the murder of Charles "Jello" Banks. All say the were members of the GDs, but do not describe roles in the drug economy. They may be used, however, as evidence of use of minors

# ATTACHMENT 3

**ᴌL MILLER, MSSW**

orensic Social Work Services

330 East Wilson Street, Suite 100
Madison, Wisconsin 53703
(608) 257-7990
FAX (608) 256-7909

## CONFIDENTIAL MEMORANDUM TO ATTORNEYS

TO:     Attorneys Jeffrey Urdangen & Cynthia Giachetti
RE:     Darryl Johnson -  Penalty Phase Witnesses
        Outline of testimony
DATE:   October 15, 1997

This memo contains information obtained in interviews that will form the basis of testimony to be provided by each potential penalty phase witness. It is prepared in the order that it is suggested witnesses be called. Any potential problems with a particular witness will be noted. Addresses, phone numbers, and relationship to Darryl will be listed. I am still in the process of conducting collateral interviews. Additional witnesses, with outlines of their testimony will be furnished as these interviews are completed.

1.   **Andre Johnson, oldest brother**
     17124 Vollbrecht, South Holland, Ill.; Ph. 708-339-4222

     - DOB 5-10-55 (Brenda was fourteen years old at the time, and still not married to John Johnson; they married on 6-13-55)
     - Works as a telecommunications consultant, out of his home; previously worked for Ameritech; college graduate; married with three children
     - Andre manages the affairs of his father, who is seriously ill and generally not competent. John Sr. suffers from health problems related to chronic alcoholism, including cirrhosis, and lives in a nursing home. He recently had seizures and a stroke; he is not lucid most of the time.
     - John, Sr. was the youngest of five children born to Minnie Lou and William Johnson; William died in 1940 (one of the sons, Haven, was a Chicago police officer)
     - There is a history of alcoholism/alcohol abuse on the Johnson side of the family - Minnie Lou drank heavily; John Sr.'s sister Ruth died of alcoholism; Clarence "Bill" Johnson drank heavily at one time
     - The senior Johnson family had a house at 3150 S. Prairie - at times, Brenda lived there; later they all lived there for a while; they always spent time there, until after Minnie Lou died and Brenda divorced John
     - John Johnson, Sr. went to Wendall Phillips High School, where he was a basketball player; he did not finish high school, as Brenda became pregnant with Andre, and the two married
     - Andre described his father as having a charming, but combative personality; he said John Sr. was a sensitive and nervous man who used bravado to cover his insecurities; he grew up in a household where the adults smoked, drank, fought and flashed guns every night

Page 2

- John, Sr. entered the Air Force after he and Brenda married; he was stationed at Andrews Air Force Base outside Washington, D.C.; he earned his GED in the military
- John, Sr. did not abuse alcohol prior to entering the military
- Andre said that they were never very close to Brenda's family, except for her aunt Mabel Coleman; Mabel had mental health problems and was in mental hospitals at times; Andre thought her problems might have been alcohol-related; Brenda has one brother Donald Taylor, who lives in Miami and who has had little contact with the family; Donald has had drug problems and has a son who is a schizophrenic
- Brenda Taylor's parents were involved in the drug economy in Chicago; her father John Taylor was in prison for racketeering at the time of Andre's birth; her mother, Josie Taylor, died just two days after Andre was born; she had been ill for some time, so Brenda lived with the Johnson family during her pregnancy with Andre
- Brenda and Andre joined John Sr. in Washington, D.C. in November of 1956; while they lived there, Sharon and John, Jr. were born, both at Walter Reed Hospital; Sharon was born in 1958 and John, Jr. in 1961; Brenda also lost four children through miscarriage, including a set of twins
- John Sr.'s abuse of alcohol began while he was in the service in Washington, D.C.
- The family moved back to Chicago in the summer of 1961, after John, Sr. was discharged from the Air Force; they lived with John's family at 3150 S. Prairie; Andre, who had gone to kindergarten in Washington, was put in the second grade at Douglas Elementary School
- The Johnsons lived with John's family for two years, during which time Kim was born (12-07-61, just ten months after John, Jr.; both were premature births)
- Andre recalls that during the two years that they all lived with John's family on Prairie, other children and grandchildren were residing there, sometimes as many as seventeen children were in the house; he noted that every night the adults would sit around the table and drink - C & G Whisky; they would often argue; the children would just be around this activity
- In the summer of 1963, John, Sr., Brenda and the children moved into the newly constructed Robert Taylor Homes; they lived in Apartment 403 at 5266 S. State Street; at that same time, Minnie Livingston (John, Sr.'s sister) and her family moved into Henry Horner Homes
- While the family lived with the senior Johnsons, John Sr.'s sister Ruth's daughter, Shirley Dantzler, lived there, as well; she was raised by Minnie Lou Johnson; Shirley often took Andre to school; she remained close to Brenda and the children through the years
- When they first moved to Taylor Homes, the buildings were new and neat; the grass was green, and the hallways didn't smell; within a few years, the buildings deteriorated; the 16 story buildings soon became crowded; the gangs came in; it became difficult to go back and forth to school without being harassed by gang members (at that time, in that area, it was Blackstone Rangers)
- Andre recalled that he spent his life running from the gangs, trying to avoid fights; he was a bright student who did well in school and could use this to avoid gang involvement; yet, he recalls just "trying to survive"
- Noting that his father was still in the home at this time, and had become violent towards his mother, Andre said he was more afraid of his father than of the gangs

Page 3

- Darryl was born a few months after they moved into Taylor Homes, on November 11, 1963 (the youngest of Brenda's five children - Brenda was twenty-two years old at the time)
- John Johnson, Sr. worked for Railway Express, loading boxcars, after leaving the service; Andre said that he stole merchandise while on the job; he wore jewelry and flashy clothes, and was a ladies man; he slept with a lot of women, yet was jealous and possessive of Brenda
- During the time that the Johnsons lived in Robert Taylor Homes, Andre said that his "family fell apart"; his father's alcohol abuse became worse and he became abusive towards Brenda, whom Andre described as "extremely good-looking"
- Due to John Sr.'s alcoholic and abusive behavior, the police were frequently called to their apartment; John would be in and out of the house; his brother Haven, who was a police officer, would tell John not to touch Brenda
- Andre believes that his father was depressed, and that this contributed to his problems with alcohol; he said that it was hard for a black man to find the kind of employment in the 1960's that would support a large family; over the years his father's drinking became worse, and his violence at home became worse, as well
- John Sr. disciplined his children with spankings; he used belts, though Andre did not feel he was abusive; when they were punished it was for doing something wrong; if they got into the middle of a fight between the parents, they could get pushed or hit
- In the mid-1960's Brenda Johnson went to work on the second shift at the post office; Andre and Sharon had a lot of responsibility to watch the younger children (Andre is eight and a half years older than Darryl; Sharon is five years older); when both parents worked, the children were often left to fend for themselves; John Sr. became more jealous and abusive
- Andre reported that Darryl, as the youngest child, was exposed to the most violence in the home; the older children could leave the house; Andre remembers particular beatings that Darryl would have witnessed, in which Brenda's face was bruised and she lost some hearing
- At Taylor Homes, Darryl was exposed to shootings and gang-banging; their mother and father were robbed at gunpoint coming into the building; Brenda was robbed another time
- Andre described Darryl as "the sweetest little boy...giving...would share his cookies", willing to share anything he had with anyone who needed; he described Darryl as a hyperactive child, and noted that attention deficit hyperactivity disorder runs in the family
- Andre reported that both he and Sharon were intellectually bright; John, Jr. was relatively bright and a star athlete; both Darryl and Kim were "slow", though Kim functioned somewhat higher than Darryl
- John Sr. lost his job at Railway Express in 1968; Brenda was the sole support of the family; marital disputes and beatings escalated during the next two years, with the police called at various times, and John Sr. being arrested; they separated and reconciled
- In 1970, after reconciling, the Johnsons moved out of Taylor Homes and into the Johnson home at 3150 S. Prairie - this was a couple months after Minnie Johnson died (or possibly just before); Andre said that his father's abuse of his mother was not as bad when they lived there (other relatives lived there at the same time), but the drinking was bad; one time, during an argument, his father beat Shirley Dantzler

Page 4

- Sharon was the one child who would stand up to her father; one time she hit her father with a toaster
- The abuse did continue on Prairie, and the police were called there, as well; John Sr. would leave; then he would call or come around, begging Brenda to take him back; Andre ran away from home a couple times, to his aunt Ruth's, because of the abuse; he told his mother that if she didn't leave his father, he would not live with her
- Brenda finally left John Sr. for good; she took her children and moved to an apartment at 6509 S. Ellis (1970), in a building owned by Haven Johnson's first wife; they lived there for about a year; the children, including Darryl, transferred from Douglas Elementary School to Dumas; Brenda worked at the YMCA; Andre noted that S. Ellis was in the heart of the Blackstone Rangers area, and the gang pressure was intense
- There were times during Darryl's childhood when the family really struggled financially and there was nothing to eat in the house; Brenda would go to the grocer's and beg for food until payday; they had hand-me-down clothes from relatives; some days they had only grits to eat, or ketchup or syrup sandwiches
- Brenda purchased a subsidized home at 11449 S. Hermosa, in Morgan Park, in the summer of 1971; at the time, the neighborhood was racially mixed and generally safe; over time (within two or three years), the whites fled, and the gangs (primarily Gangster Disciples) moved in; Andre left as soon as he finished high school (1973), and went away to college
- The family continued to struggle; there was a little grocery store in Morgan Park owned by a white man named Jim; Brenda would go to Jim and get food on a promise to pay; they paid him when they could; sometimes they had to ask neighbors for food
- Christmases and birthdays were hard; usually there was no money for gifts
- Darryl never really had a relationship with his father; Andre and John did have some good times with their father; Brenda had to work long hours to support the family, so he didn't get much of her time and attention either; Andre, who had been somewhat of a role model, left the home when Darryl was only ten; John Jr. was out in the streets
- Up until the first time Darryl went to prison (1984, at age 21), Darryl was "a sweet little boy"; Andre said that Darryl met a lot of guys in the streets through his brother John Jr., who was a star athlete at school; Darryl was exposed to negative influences, including marijuana, through John; Andre admitted that both he and John Jr. smoked marijuana then
- Andre returned home from college in 1977, and lived at home on Hermosa for a year or so; he got a job with the phone company; Darryl was a teen then and just being drawn into the streets; Brenda was working at the Y, and was seeing Ben Smith; she wasn't home much
- Gangster Disciples was the gang in Morgan Park; Andre said that the pressure to get into gangs was "phenomenal...relentless"; threats were used; Darryl may have been involved, in an informal sense, at age seventeen or eighteen; it was not organized the way it was later; it was not into cocaine sales at the time
- For a youth, like Darryl, who was not doing well in school and not feeling good about himself, not getting attention at home, the gang represented a place to find a sense of belonging and acceptance

Page 5

- In 1981, Brenda married Ben Smith and moved to the house at 7714 S. Prairie; by that time Andre had married; Darryl was left in the house on Hermosa with his two sisters; Sharon had already had her son David and her daughter Nicole by that time (by Darry Pulse, a drug user who was abusive)

- After Darryl went to prison, and Andre realized the extent of gang pressure and involvement in the neighborhood, he persuaded his sisters to move out of the house on Hermosa, and his mother sold it

- It was after Darryl got in trouble the first time, and ended up at Menard that "the graduation" took place; when Darryl came home from Menard, he was different; he would never talk much about what happened, but Andre believes that he was accosted (he said that Darryl's clavicle was broken); Darryl began to work out in prison, and built his body up

- When Darryl came home from prison in 1986, he was a full-fledged Gangster Disciple; Andre remembers picking him up and driving him home; Darryl spoke to Andre about what he was going to do..."he felt someone in the family had to take a chance...to build some capital"; Darryl felt that this career choice would produce greater (and faster) monetary benefits for the family, even if he wasn't around to benefit from it himself..."it would be worth it for the kids behind him"; Darryl understood the risk that he could be shot/killed [Family members must admit on direct that they knew what Darryl was doing]

- Darryl was always good to family members and friends; he tried to do things for family - immediate and relatives; he bought things for them and helped with bills

- Darryl has an outgoing and infectious personality, which he gets from his father; he was always personable and well-liked

- Darryl remained estranged from his father over the years due to the beatings he saw his father give his mother; Darryl saw his father at Kim's house at Thanksgiving, 1994; they got along all right, but did not see each other again

- Darryl began losing friends to violence, which was traumatic for him; it began with the death of Rick Johnson in 1985; the deaths of Wilbert and Ronnie Showers were upsetting to him; Ronnie Showers was like a brother to him; Darryl was shot (1990)

- By early 1995, Darryl was evidencing increasing signs of stress; he realized he was in over his head, and there was no way out; he began intimating that he would probably be going to prison; his skin disorder worsened; his hair started falling out; he had a nervous stomach; he became hypervigilant

- Andre talked to Darryl about leaving the area with Michelle and his children; Darryl said that he couldn't do this because he would always be looking over his shoulder; he felt he'd be killed for trying to leave

- Andre sees Darryl as having been insecure about himself, particularly about his lack of education; Darryl would always say that if he had just stayed in school he could've succeeded legitimately; Andre feels that Darryl regrets the choices he has made; he always encouraged his nieces and nephews to stay in school

- The children in the family have been affected in different ways by their turbulent family life - Andre was smart and determined to get an education and be a professional; Sharon had babies very young and got involved in abusive relationships; John Jr. is an alcoholic and has ten

Page 6

children by several different women - he has trouble holding down a job (he was recently fired again); Kim has done generally all right, though she is the placater and mediator in the family - Andre repaired his relationship with his father, and has taken care of him in recent years; his father had been living in rooming houses and abusing alcohol; John Sr. is on Social Security disability and in a nursing home

- Andre has always felt that Darryl wished he could have the life that Andre has - a normal family life; Darryl never had that

- In the gang/drug crew, Darryl felt like "somebody"; he needed to feel like he was a person who could be looked up to; this was the only way he knew how to achieve that; Darryl was like two people - the man in the streets, and a warm and compassionate family man; he did a lot for family, friends and neighbors; he was always generous and giving (some examples)


2.    **Sharon Cresswell, older sister**
      7909 S. Eberlein, Phone 773-783-5136

DOB 9-17-58; five years older than Darryl; works at Michael Reese Hospital; has worked there for 16 years; mother of three (David, age 22, and Nicole, age 18, by Darry Pulse, and Sharita, age 12)

- Knew some things about Brenda's family and Brenda's childhood; Brenda's mother died when Brenda was a teen (shortly after Andre's birth); her mother was a drug user, and Brenda saw her mother buying drugs; Sharon described Josie Taylor as "fast"

- Brenda's father never worked at a regular job; he was a drug dealer; both parents were in prison at times

- They all got to know John Taylor, Brenda's father, over the years; he was a quiet and soft-spoken man

- As a young teen (as young as twelve), Brenda rode motorcycles with John Johnson; after her mother died, Gladys (the woman with whom John Taylor was involved) didn't want Brenda around; she stayed with the Johnsons

- Darryl's paternal grandmother, Minnie Johnson, who had been good to Brenda and the children, died in 1969; this was the first funeral Sharon attended; she remembers being scared

- There was a lot of alcohol abuse on John Johnson's side of the family; everyone drank except aunt Minnie (Livingston); the cousins drink too, including Minnie's children

- Darryl was hyperactive as a child; so was/is Sharon, as well as her daughter Sharita (ADHD seems to run in the family, Nicole's son is clearly ADHD; Andre has a son who may be, as well)

- Sharon remembers living in Robert Taylor Homes; they weren't so bad in the beginning; their apartment was nice

- Her father worked for Railway Express and her mother worked at the post office; they weren't too poor during the years both parents worked

Page 7

- She doesn't remember hearing shooting in the area, or being exposed to violence in the neighborhood; their mother kept the younger children in the apartment to protect them; she does remember that the Blackstone Rangers were in the area, including on the playground
- Sharon said that Brenda didn't let the children play outside much at Taylor Homes; Sharon was a good student and a bookworm, so occupied herself that way; they only went to the playground if Brenda took them
- Sharon vividly remembers her father's abuse of her mother; he would come in and hit her mother; throw things off the table; he was usually drunk; he would get in Brenda's face and call her names; when she brought his food to him, he would throw it
- Sharon said that her father pushed, slapped and hit Brenda; Darryl was very young during these years, and witnessed a lot of the violence
[I plan to re-interview Sharon and get more details of the abuse]
- The family moved from Taylor Homes when she was ten, in 1969; Sharon remembers that her grandfather (John Taylor) came and got them, with his gun in his hand, because Brenda had called him and told him that John Sr. had beat her
- They lived with Minnie Johnson for a while, then moved to 6509 S. Ellis, where they lived for one year; Darryl attended Dumas Elementary; he had attended Douglas Elementary when they lived with Minnie
- They struggled financially after John Sr. lost his job, and after he and Brenda separated; there were times when they didn't have food in the house; sometimes they ate pancakes for dinner
- They rarely saw their father after Brenda and John Sr. separated; neither she nor Darryl wanted to see him; they were bitter towards him because of his treatment of their mother; Darryl would say, "he's not my father"
- Her father never really worked regularly after losing his job at Railway Express; he said he would never pay child support, and he never did; he just drank
- Sharon considers the Morgan Park neighborhood as the place where they all really grew up; at first it was racially mixed and generally safe
- Within two or three years, Morgan Park changed; the whites moved out and more blacks moved in
- Sharon remembers Rick Johnson ("Pretty Rick"), whom Darryl met as a teen; Rick Johnson was several years older than Darryl; she recalled that Darryl was very upset when Rick was killed (while Darry was at Menard); she knew that Rick Johnson sold drugs
- Sharon knew that Darryl's friends in the neighborhood were selling marijuana when Darryl was a teen; she didn't think it was a gang thing
- When Brenda worked, Sharon had to take a lot of responsibility for the younger children; she described herself as having to be "the mother in the family...I did the cooking and cleaning"
- John Jr., who is two and a half years older than Darryl, liked to hang out in the streets, drink and play basketball; he used marijuana; he drew Darryl into the streets initially
- Darryl had learning problems in school

Page 8

- Sharon feels that Darryl was first drawn into selling drugs by guys in the neighborhood who offered him a way to make some money; he was also probably lured by the opportunity to be noticed and get attention (feel better about self); Sharon feels that Darryl was vulnerable
- As a teen, Darryl had summer jobs at the YMCA; when he had his earnings from this job, if he heard the ice cream truck on the street, he would take his money and buy ice cream for all the kids in the neighborhood
- Darryl has always had a good heart, and has been willing to do for others ..."he'll give you the shirt off his back"
- Darryl was really affected by being in prison, after the Simpson shooting; he seemed different when he came back; he was very quiet and had built a wall around himself; when she asked him what had happened, he just told that he couldn't tell her..."it would kill you"; he wouldn't talk about it

3.  **Minnie Livingston, paternal aunt**
    9015 S. Elizabeth, Phone 773-445-4350

Minnie is the older sister of John Johnson Sr.; she is four years older than John; their brother Clarence"Bill" Johnson is eight years older than John; brother Haven and sister Ruth are both deceased; Haven was a Chicago police captain; Minnie has seven children
- Minnie stated that the senior Johnson family was raised in the neighborhood of 31st and Prairie; they had a large home, and at various times the Johnson children (as adults) and their families lived there; Minnie lived there with her family during some of the same times that John, Brenda and the children lived there
- Minnie knew Brenda and her family when Brenda was a child; she desribed the Taylor home as "a drug family"; both parents used drugs; Minnie Johnson was not happy when John Sr. spent time at Brenda's because there was no supervision in the home
- Minnie Johnson went to the Taylor home to see for herself what the conditions were; they were bad; Brenda's mother was drinking or using drugs (her father was living with another woman, Gladys, when he wasn't in prison); Brenda had to take care of herself; Brenda's mother had men in the house and Minnie believes that Brenda was accosted by these men at times
- John Johnson Sr. grew up without a father; his father died when he was two years old; Minnie Johnson, who drank, raised her five children alone; though Minnie Johnson abused alcohol she is described fondly by her children and by Brenda
- When Brenda's mother was dying (while Brenda was pregnant with Andre) she asked the Johnsons to take care of Brenda; Brenda was still thirteen, and pregnant, when she went to live with the Johnsons; at that time, Minnie said, this situation was "a disgrace"
- After Andre was born, the Johnsons took John and Brenda to Iowa to get married; Minnie said that Brenda was a beautiful girl who had led a life of the streets; John Sr. took her on as a father and husband

Page 9

- John and Brenda lived with the Johnsons, on south Prairie, when they first married; John went into the service; Brenda and Andre joined him in Washington, D.C., where Sharon and John Jr. were born
- John Sr. had some problems while he was in the military; he started drinking and gambling; Brenda and John began to have marital problems; Minnie Johnson called and spoke to John's commanding officer and his chaplain; this happened after Brenda called Minnie Johnson about John beating her
- John Sr., Brenda and the children returned to Chicago from Washington when John Jr. was a baby (Brenda was pregnant with Kim); they lived with the Johnsons at 3150 S. Prairie; Minnie and her family were living there at that time, as well; Minnie had three sons then; her sister Ruth lived there with her daughter Shirley; Clarence "Bill" lived there, too, so the household was crowded
- At first, when they came back to Chicago, John Sr. worked in a drugstore; he continued to gamble and to drink; Minnie described him as headstrong and determined; he was into cards and dice; gambling was a bigger problem than the drinking at that time
- Just before Brenda and John moved to Robert Taylor Homes, Minnie and her family moved out of the house on Prairie; they lived in an apartment, then Henry Horner Homes
- Minnie felt that Brenda and John were too young when they married, then had so many children in such a short time; they didn't know how to take care of themselves, much less raise children
- Their problems really escalated when they lived at Taylor Homes
- When John Sr. lost his job at Railway Express his drinking got worse; Brenda was working at the Post Office; John became abusive towards Brenda; he would drink with his sister Ruth..."they were buddies"
- Darryl was born a few months after they moved to Taylor Homes; Minnie went to the hospital to pick him up when he and Brenda were discharged
- Minnie often had the Johnson children, including Darryl, with her, "because of John chasing Brenda"; Brenda would take them to Minnie's or send them there in a cab..."anything she could get to get them out"
- John Sr. would get angry with Minnie for taking up for Brenda; he would phone her and curse at her, or threaten to go to her home and get the children
- Sharon had to take on a lot of responsibility for watching the younger children when Brenda worked, especially after John and Brenda separated
- Brenda, John and the children moved from Taylor Homes to the Johnson home on Prairie in 1969; Minnie Johnson had been sick, and had observed how abusive her son was to Brenda; she saw her son John "dissipating his life...not being the son he should be"
- John Sr. continued to beat Brenda; Minnie recalled that one time, when her niece Shirley was trying to defend Brenda, John Sr. jumped on her (Shirley)
- Minnie recalled how Darryl got his nickname; when he was born her mother (Minnie Johnson) said that Darryl looked so old - just like an adult, so Minnie Johnson gave him the nicknames Poppa or Pops

Page 10

- When Brenda, John and the children lived at the Johnsons, after Minnie died, the situation was bad; John Sr. and Ruth were drinking a lot; he'd beat Brenda; Brenda and the children would go to stay at Minnie's, at Horner Homes; one day Minnie finally told Brenda to make a stand..."I wasn't going to take her in anymore"
- Minnie's son took Brenda to look for a place to stay; Minnie's sister-in-law (former wife of Haven) had a building at 65th and Ellis; Brenda got an apartment there
- They had a neighbor on Ellis named Mrs. Lackley, an older woman;  Darryl liked her and would do things for her; he did errands for her and would always see if she needed anything; Mrs. Lackley is deceased
- Minnie said that Darryl was a quiet child who was always crazy about his mother; he spent a lot of time by himself; he would be with Sharon after school, as Brenda was working
- Brenda and the children then moved to Morgan Park
- Brenda left her job at the Post Office; she went to work at the YMCA; at the time she didn't drive; she had to be able to drive to get the job; the YMCA provided a station wagon to Brenda to go out and see people; she called Minnie and asked what to do; Minnie told her to just get the car home somehow and they would show her how to drive
- Brenda then worked and went to school; she was trying to better herself so she could provide better for her family, but it took a lot of her time; she didn't have much time to spend with Darryl, her youngest child
- Darryl didn't have much of Brenda's time, but he was devoted to his mother; he wanted to take care of her so she wouldn't have to work so hard; Darryl adored his mother and was very close to her; his goal in life was to take care of her; that was his main concern
- Darryl was never close to his father
- In Morgan Park there was a lot of pressure on Darryl to get involve in the gang; he was alone a lot of the time; Sharon would come home to watch him (though she got involved with someone early and had two children in the mid to late 1970s); Andre and John were older, and out in the streets (Andre went away to college; later John Jr. went into the military); Darryl was alone a lot and lacked attention
- Ben Smith came into the picture pretty early, after Brenda started working at the YMCA; he worked there too; Brenda asked Minnie what she thought about Smith; Minnie could see that Smith was good to Brenda, and felt this was good for her and her family
- John Jr. has had problems with alcohol; he has a good heart
- Darryl was always hurt by the fact that all of his siblings were smarter than he was; they were better students..."it was heavy on him...his learning problems"; it bothered Darryl that he was "slow"
-  Minnie believes that her brother John might have been depressed, and that this could have contributed to his alcoholism; Minnie's husband drank too, but was always there for his family
- Minnie knew what Darryl was doing; she said that she didn't approve of his life, and "he never brought it to me"
- Darryl was close to Minnie's sons, Ron and Tony; Ron went to the same college that Andre did (Lakeland, in Wisconsin); her sons had what Darryl didn't - both a father and mother
- Darryl didn't feel good about himself; he longed for a normal family life

Page 11

- Towards the end, Darryl would go to Minnie's; he would lay on the floor and talk to her; he asked her to tell him about what things were like when he was a baby; he seemed depressed
- Darryl's cousin (Minnie's grandniece - Salima Dantzler) was killed in a car accident (December, 1994); Darryl was very upset about this [let Shirley Dantzler discuss this]
- She feels that Darryl got caught up in the gang and drugs in Morgan Park because he was left to fend for himself so much..."whoever took an interest in him at the time, he was vulnerable to...whoever could make him feel good about himself"; Brenda was gone much of the time when they lived in Morgan Park; she was working, going to school, and seeing Smith [I have been told that Darryl did a lot for Minnie and her family; I will talk to her more about this; she seemed reluctant to admit this in our first, and only, meeting]

4.  **Shirley Dantzler (Caldwell), cousin**
    12534 Deer Park, Alsip, Phone 708-489-0153

Shirley is the daughter of John Johnson Sr.'s sister Ruth.  Ruth was an alcoholic; she died in the summer of 1987.  Shirley was raised, much of the time, by her grandmother, Minnie Johnson.  Shirley was close to Brenda and her children; she babysat for the children when Brenda worked.  She lived in the senior Johnson household on S. Prairie when Brenda, John and the children lived there
- Alcoholism and alcohol abuse runs in the Johnson family; Minnie Johnson was an alcoholic; John Sr. saw a lot of alcohol abuse when he was growing up; their household always had a lot of people in it and was chaotic
- Shirley knew Brenda when she was pretty young, before she married John; Brenda's mother drank and her father was a drug dealer; her father left her mother for another woman
- When Brenda became pregnant with Andre, Minnie Johnson saw the situation in Brenda's home, and had her come to live with the Johnsons; Brenda's mother was dying at the time
- Shirley visited John, Brenda and the children in Washington D.C., when John was still in the military; she said, "Uncle John was going crazy...was abusing Brenda then...it was a bad situation...Grandma (Minnie Johnson) wanted to find out what was going on"; John was getting into trouble with his commanding officer
- When Darryl was born, Kim was just two years old and John Jr. was not yet three; Shirley would watch Kim so that Brenda could spend time with Darryl; Shirley was in high school and would go to Brenda's after school
- Darryl was a quiet child, an introvert
- Taylor Homes were new and nice when the Johnsons first moved in; they quickly deteriorated, within a couple years; Shirley was afraid to take the elevators (Johnsons lived on 4th floor); she didn't feel safe there, and would run to and from the bus stop
- The children were exposed to gangs and drugs at Taylor Homes; Andre was able to resist the gangs because he was so smart and such a good student; Brenda tried to keep her children safe at Taylor Homes

Page 12

- Darryl was in special education; this affected his self-image; he always felt like he was slow and had to prove himself
- Darryl struggled with a lot as a small child; he watched his father beating his mother; then his father was no longer in the home
- Shirley believes that Darryl felt he had no one to look up to, no father
- John Sr. was a good husband and father at first; then his alcohol abuse got worse; he chased women and was very mean to Brenda
- Shirley saw John Sr. beat Brenda; one time when she was trying to intervene, he jumped on her; she had a black eye; this happened when they lived on S. Prairie (1969-70)
- Shirley witnessed a lot of verbal and physical abuse of Brenda by John; Darryl witnessed it, too; she remembers it happening at Taylor Homes, where she said Darryl "witnessed a lot"
- John Sr. had a jealous streak; it didn't take much to set him off; he would be involved with other women and throw it in Brenda's face
- John hit Brenda with his fist; he pushed her; she'd try to fight back; the children would cry
- John would beat Brenda; then he would say he was sorry; later he would blame her for provoking him; Shirley saw bruises on Brenda at times
- Brenda finally left John Sr. for good; he lost his job and "got completely crazy"; Brenda was working at the Post Office and going to school; he became more jealous as he saw her becoming more independent; it got to the point that if she didn't leave him, she would have ended up scarred or seriously injured
- After Brenda left John, he would harass her; he would phone her and "say nasty things to her"; when she lived on Ellis, he would stand outside the house and yell at her; he would call her names and threaten her; he had a foul mouth; Darryl was home and heard this
- Darryl, as a child, always seemed to be in the background; he was a quiet and withdrawn child; when he was labeled a special ed child, that really affected him; he knew he was slow, but wanted to feel he could compete; all his siblings were smarter than him; he wanted to prove that he could achieve too
-  She was happy for them when Brenda got her house, and they moved to Morgan Park; the neighborhood was nice at first; it changed over time; gangs came in; you would see a lot of young black men just sitting around; a lot of gang recruitment went on; it was fairly normal for adolescent males and young men in the community to get involved in the gang; there was nothing for them to do; it gave them a sense of belonging and of being somebody; selling drugs was a way to make some money
- The gang recruiters picked people out with special needs; they might have sensed Darryl's vulnerabilities
- Darryl watched his mother struggle, trying to raise five children on very little money; he always wanted to take care of his family, provide for them; he wanted to give his mother some of the nice things in life
- There wasn't much in the way of jobs in the neighborhood, just a summer job program for low-income kids
- When Darryl went to prison the first time (1984), it was "his learning session"; he had gotten into trouble over protecting a woman; when he came home from prison, he was different,

Page 13

more determined; he wanted to be someone and have things; "they" (the gang) showed him an easier way to have material things

- His motivations for getting involved in the drug economy were to feel better about himself, and to help his family; he always felt that people didn't expect much of him because he was "slow"; he didn't want to be seen as dumb

- He kept his business away from his family and relatives; didn't bring it to her home

- He was always loving and protective of family and relatives; he always encouraged everyone to get an education

- Shirley had two daughters (one died); Darryl was close to them; he would always tell them to stay in school; he offered to help them get an education; Shirley told him she didn't want his money - he didn't have to buy their love

- Darryl knew that education was important; that you needed an education to "go in the right direction"; he always encouraged others in school

- Shirley's daughter Salima, with whom Darryl was very close, was killed in a car accident in December, 1994; she was twenty-four years old and a senior in college

- When he learned of Salima's death, Darryl came to stay with Shirley; he told her he loved her and would be there for her; he kept stopping by to check on how she was doing; he offered to pay for Salima's cremation expenses, saying, "I loved her...this is something I have to do"; he did; he told Shirley he would always be there for her

- Shirley saw Darryl with Lucki a couple times; he was a very loving father; when he was with Lucki, "it was like the sky lit up for him"; he felt the same about Bianca; he always treated her like she was his own; he is the only father she has ever known

- Towards the end, Shirley saw signs of stress, depression and anxiety in Darryl; at a family picnic, she noticed a sadness about his face..."he kept telling me he loved me and everything would be okay"; before her death, Darryl talked to Salima about wanting to start a new life; he wanted to start a legal business and have a normal family life; Shirley felt that Darryl wanted a normal life, "But he was just too far gone"

5.   **Edith Burford, former special education teacher**
     9905 S. Carpenter, Phone 773-239-2554

Edith Burford was Darryl's special education teacher at Esmond school from 1971 until 1975. She is now retired.

- At the time (1970's), children were placed in special education according to IQ tests, which the school system later stopped using.  Darryl was classified EMH (Educable Mentally Handicapped).

- Burford stated that to be placed in special education, the child was tested and examined by a psychologist.  Both IQ and achievement tests were used.  To be classified EMH, Darryl's IQ had to be below normal, probably in the 68-75 range.

- Darryl was placed in her room in second grade; she generally had twelve to fifteen students in her room

Page 14

- In her program, the students functioned at different levels; they were taught according to what they could do; her coursework was at the kindergarten to third grade levels; students were promoted within the classroom, but remained in her room until they were twelve years old, or were working at the third grade level
- She did not keep students after they turned twelve, regardless of the level at which they were working; when they turned twelve, they moved to Ms. Sneed's room; when they turned fifteen, they were graduated from the eighth grade, regardless of the level at which they were working
- Darryl's graduation from the eighth grade at Esmond does not mean he was able to do work at that level; it just means that he was fifteen years old
- Burford looked at the Morgan Park High School transcript and said that she couldn't tell from it whether Darryl was in special education; she noted that it appeared that he had failed on level I courses
- She had Darryl in her room from the time he was eight years old until he was twelve; they moved to the next year at that time even if it was in the middle of the school year (November)
- Burford said that she became close to Darryl; she was clearly fond of him; he would talk to her about problems he was having
- She described Darryl as a congenial, sweet and gentle boy who always behaved well in her class
- Darryl worked very hard on his schoolwork; he tried to do the work, but found it difficult; he struggled
- She would talk to Brenda on the phone about Darryl; Brenda would come to school to meet with her, to talk about how to help Darryl
- The children who were in special education were teased by the other students; they were called names, including "dummy"; Burford would try to encourage the students and help them to feel better about themselves
- Her room was referred to as "the Dummy Room"
- Her classroom was in the basement of the school for a while; then it was in a trailer in back of the school; they were clearly separated; the children felt separated, isolated and different; they felt this was because they were "dumb"
- Darryl wanted to feel good, be good and look good; she would tell him he was a fine young man, that he was worth something
- Darryl was crazy about his mother; he wanted to show her what he could do; he wanted to make her proud of him; he adored her
- Darryl responded well to Ms. Burford; he got along well with the other children in the class
- She thought that Darryl did finally manage to do work at the third grade level by the time he was twelve; she recalled that he couldn't read well
- Burford really tried to help her students feel good about themselves; she understood that self-esteem was a real issue for them; she tried to find out what their interests were or what they were good at, and encourage them in these areas, so they could experience success
- In the area of Morgan Park in which Darryl lived, there were gangs; in that neighborhood, with no father in the home, and a mother working long hours, it was easy for a youngster to

Page 15

get caught up in the gangs; a child who functioned at a low level and who didn't feel good about himself was vulnerable to the lure of the gang
- A boy needs a father in the home or a positive male role model
- Burford feels that the home circumstances can contribute to a child's learning problems; the youngest child in a large family can be more affected by the home situation, especially if that child feels neglected and doesn't get the attention he needs; a child can have performance problems in school for emotional reasons
- At the high school, the teachers didn't provide the individual attention that special needs students required in order to succeed; these students didn't get help with emotional problems either; it makes them more vulnerable to the lure of the gang; the gang is a place where they can be someone and make some money
- Darryl was a "delight", a pleasant boy; she wished she could have worked with him longer and had more influence on him

6.   **Dr. Michael Gelbort**

7.   **John Johnson, Jr., brother**
     4561 S. Wabash, no phone (can reach through Andre)

DOB 2-27-61. John Jr. recently lost his job at the nursing home in which his father resides; Andre said this was due to John's drinking. We may need to re-interview him, and see what shape he is in before making a final decision on his testifying. John Jr. has ten children by at least three different women (his problems are classic for the child of an alcoholic).
- John is the middle child (only ten months older than Kim). He finished high school and was in the military from 1983 to 1986. He has had a number of different jobs since he was discharged. He took care of his father before John Sr. went into the nursing home.
- John feels that he was able to avoid becoming involved in the gang because he was a good student and an athlete; then he went into the military
- Darryl was in EMH/special ed classes in school; this was embarassing for him; the other kids teased him and laughed at him; this was upsetting to Darryl; John tried to help Darryl read
- Darryl always had problems with attention, concentration and distractibility; John has a son who is the same way
- Brenda would have to leave for work early; John (or Sharon, or?) would have to get Darryl's breakfast and walk him to school; he liked to tag along with John a lot
- John felt that Darryl didn't like to go to high school because of his "slowness"; Darryl didn't like crowds; he wasn't a star athlete, like John; Darryl became frustrated with school; he gave up
- As Darryl became a teen, both Andre and John Jr. left the home; then his mother married Ben Smith and moved out; Darryl lost guidance; he left school and was out in the streets; he got caught up
- John has remained closer to his father than any of the children over the years; he did not seem to have the bitterness that Darryl had

Page 16

- When John got out of the service he went with his mother to visit Darryl at Menard; he noticed a change in Darryl; Darryl had met older men in prison who were in the Gangster Disciples; John believes that Darryl was recruited in prison
- Shortly after he got out of prison, in 1986, Darryl started spending a lot of time in Morgan Park; John knew what he was doing; Darryl was getting fronted some drugs; he started making some money, and it escalated from there
- Towards the end, Darryl seemed to be anxious and hypervigilant; he would always say that he wanted to leave; John said, "once you're in, you can't get out"
- John feels that the fact that Darryl was mentally slow had a big impact on him; he described Darryl as a follower who was easily swayed; Darryl hadn't gone far in school and couldn't read; in the gang, he "could be a big shot...and the fact that he couldn't read didn't matter"

[Note: John talked about the t-shirt shop; several others have mentioned it, as well. It was at 79th and Evans, and, though they did make gang shirts and caps, they did other things as well. John, as well as others, talked about working in the shop. Some said that Darryl wanted to give some young men jobs, so they could see a way out of the gang/drug economy. We haven't talked much about the t-shirt business and how to deal with it; maybe we need to.]

8. **Benjamin Smith, step-father**
   7714 S. Prairie, Phone 773-873-4442

Benjamin Smith was Brenda's employer at the YMCA, beginning in 1970. They became involved not long after she started working there. They were married in September, 1981, and moved to their present home. He has been involved in Darryl's life since Darryl was seven or eight years old. Smith taught in special education schools for the Chicago Public Schools, under a contract with a private school (Central YMCA, where Darryl attended) for twelve years; he worked at the YMCA for eighteen years
- Smith said that he met Brenda at the YMCA after she was separated from her husband; the family was living in the apartment on south Ellis at the time; she had five children, between the ages of eight and seventeen, when they met; Ben has children from his previous marriage
- When he and Brenda met, Brenda told him about her marriage and how abusive her husband had been towards her; he (John Sr.) did not provide financially for his family; Smith knows something of Brenda's childhood, which he said served to make her stronger, and able to cope with raising five children alone
- Darryl was a hyperactive child; he always had a lot of energy; he always "wanted to be a part of...equal to...with his brothers and sisters; Darryl would question his worthiness, his ability; he was looking for approval, confirmation; Smith remembers him saying, "did I do good...am I smart?"; Darryl felt he didn't measure up to his brothers and sisters
- Ben describes Brenda as "a very unusual person...very strong, very grounded in her spirituality...very well-organized"

Page 17

- Regarding Darryl being in special education, Smith said, "these kids get labeled...and told they can't do...and they don't...if you deal with them in a way that says they can, they will"; he feels Darryl had low self-esteem and never got the encouragement he needed
- Smith feels that early life, including pre-natal, experiences are critical; he notes that when Brenda was pregnant with Darryl, she was being "traumatized on a daily basis"
- As a young child, Darryl watched his father beat up his mother; he was traumatized by the violence
- Though Darryl was always a loving and generous person with family and others, he remained bitter towards his father; Darryl would not speak to his father; Smith said that Darryl's father was the only man that Darryl wouldn't help..."he'd help a man on the street, but not his father"
- Smith notes that in a family every child can be affected differently by the same experiences; all of the children in the Johnson family are different
- Darryl, as the youngest, was most traumatized by his early life experiences
- Taylor Homes were not as bad then as they are now, but they were overcrowded with nothing for the children to do..."people living on top of each other, like rats in a maze"
- Andre was smart; went to college; Sharon represented authority to Darryl because she had to care for him when Brenda wasn't around; Darryl "ran and scuffled" with John; John is not aggressive, and managed to be in the streets, but "skirt between the gangs"; John developed an alcohol problem; Darryl and Kim were always very close
- The most important thing a child needs is time from a parent; Darryl didn't have that; his father wasn't there and his mother couldn't be; when she was there, he only got 1/5 of her attention; Sharon fixed meals and watched Darryl; Darryl didn't like Sharon telling him what to do; he was pretty much fending for himself, without a lot of supervision
- As children get older, become teens, peers have a greater influence than parents; Darryl got caught up in trying to be somebody; his mother didn't have much time to spend with him; his brothers and sisters were accomplishing things; he wanted to compete; be as good; what better, quicker way to get money than to be a drug dealer; in our society, that is confirmed
- After Smith and Brenda married (1981), Darryl was pretty much on his own in the house on Hermosa (still seventeen years old)
- Was aware of what Darryl was involved in after he came back from prison (1986); he kept if from us as much as he could, to protect us; he got a reputation from going to jail, for shooting someone to protect his friend's sister
- The lure of the gangs is money and the chance to feel important; they take a kid and say, "go to the corner, and take this package to this man", for $10...or "stand on the corner and tell us if the police are coming... get $50 a day...you take that home to Momma, who is living on food stamps...has no money...so, has sanction at home...is making money to help out...gets hooked"
- There are thousands of young men in the same category as Darryl - young black men, with no education, training or skills...can't compete in the job market; they are drawn into the drug economy as a way to make money

Page 18

- Through the years, Darryl has always been very thoughtful, always concerned about other people; he's been giving - doing things for people; whenever they're in need (family, relatives, etc.), he will give or help; he gave his nieces and nephews whatever they needed, including financial support, gifts, etc.; e.g. he paid David's college tuition and bought him a car to get back and forth from school
- Darryl has a very close relationship with his mother; he's very respectful towards her; he worships the ground she walks on; treats her like a queen
- Darryl is Brenda's baby; she feels some guilt about him, because he was the last, and didn't get the love and attention he needed; she had to work long hours
- Lucki is the apple of Darryl's eye; he's crazy about her; he has tried to give her a good life and has made sure she had what she needed; we have been parents to Lucki; he has given Lucki the greatest gift, a stable, secure, loving home in which to be raised
- Darryl is a good person; the Darryl I know is a loving, caring, kind, concerned individual; he did nothing but give - gave to his family whenever they needed

9.   **David Johnson, nephew**
Phone 773-768-6914 (I don't have an address, but Brenda will have it)

David is twenty-two years old; he is Sharon Johnson Cresswell's oldest child. He recently graduated from college, and is planning to marry. He was an honors student in high school. He is now a practicing Muslim. He is a college graduate with a degree in Marketing, and works for Midwest Lighting, in sales.
- David reported that Darryl was like an older brother to him; they are very close
- His earliest memory of Darryl is of Darryl holding him, at his grandmother's house. David lived during his first nine years in the house on Hermosa, where Darryl lived
- Darryl was always very protective of David; he looked after him
- When David was young, he remembers Darryl going to the store an d buying soda pop for everyone in the neighborhood; he bought a whole case and handed it out; David remembers resenting this because he wanted Darryl to be special to him
- Darryl always made sure that David went to school; he would ask David how he was doing in school and how his grades were
- Darryl always told David that he should go to school, no matter what, because being out in the streets is not going anywhere; Darryl regretted not finishing school, so he always pushed David to finish
- Darryl shielded David from his business, and kept him from the gangs; he didn't want David to have anything to do with what he (Darryl) was involved in
- In their neighborhood, in Morgan Park, a lot of the kids were in gangs; their older brothers were in the gangs and drew them into it; Darryl didn't want David to do that
- David went to a gifted school; he feels that if he had remained in regular public school he might have been caught up in the gang, or in the streets
- Darryl had problems learning; he realized he didn't have that many avenues for succeeding

Page 19

- He would have David invite his friends over for the night; he would get videos for them to watch; he kept them off the streets and didn't allow any alcohol or drugs
- Darryl was always encouraging David in school, including college; David attended Tennessee State, and majored in Marketing; Darryl even encouraged David's friends and other young men in the neighborhood to stay in school, including Scott Davis
- David became a Muslim in October, 1995; he is devout; Darryl has encouraged him in his religious practices and is happy for him; he believes it is a positive force for David
- Darryl has helped David financially over the years, with school expenses, etc.; he bought David a 1990 Dodge in 1994 so he could drive back and forth from college
- Darryl has been the biggest help to David by just being someone he could talk to
- Darryl is not the person that everybody sees (the media, etc.); he has a street image, but at home is not like that; he's real kind-hearted and generous; he has provided financial help to his family, helping them with bills, etc.
- In Morgan Park, the schools were not very good; there was a lot of gang pressure in the neighborhood; Darryl didn't do very well in school; he was vulnerable to getting caught up in the gang; a lot of young men that David grew up with in the neighborhood got involved in the gang, including people who were his friends; they want to have money and things, but they just end up dead or in prison
- When Darryl went to prison the first time, on the manslaughter charge, it created a lot of expectations and assumptions about him; he was surprised by the reputation he had when he got out
- If Darryl involved persons under twenty-one in the business, they were people who were real poor; he was trying to put money in their pockets, even if it was wrong; I know they were poor - I knew where they lived; in Morgan Park the whole neighborhood was connected to this; for kids in the neighborhood, it was just a way of life, so it was accepted as part of the culture of the neighborhood
- Andre and Darryl are alike in that they are ambitious, and see money as the symbol of success, but Andre is smart and educated, so he was able to do it in the normal way; they are like this because they grew up poor
- Darryl wants Lucki to have a better life; he has sent her to good schools and placed her with his parents, in a good home
- Darryl is the most generous person David knows; he would give you the shirt off his back; he has always been like that, even before he made money

10.   **Nicole Johnson, niece**

Nicole Johnson is nineteen years old. She is the daughter of Darryl's sister Sharon. Nicole has two young children. She lived with Brenda for a while, but now has her own apartment and a new job. She lived, when she was young, with her mother in the house on Hermosa when Darryl was still living there.

Page 20

- Nicole said that her father wasn't around when she was a child; Darryl was like a father to her; she could talk to him about problems; he would always listen and understand; they have been very close
- Nicole sometimes spent the night at Darryl's house, when he was living with Michelle; she stayed with them one summer, when she was thirteen or fourteen so she wouldn't have to go to day camp while her mother worked
- She remembers when she was little, and they all still lived on Hermosa, that she would wake Darryl up in the middle of the night because she was hungry; he would fix her a grilled cheese sandwich
- Over the years he has helped her a lot; he bought her clothes for school
- Even though she got pregnant at a young age, Darryl encouraged her to stay in school and finish her education; she did graduate from high school, with his encouragement
- He encouraged her to go on to school after high school; she enrolled at DeVry Institute in computer information systems; she left school after having her second child a few months ago
- Darryl realized the importance of an education; he believes that if you finish high school and go on to school, college or vocational training, you can have a good career; he regrets his lack of education
- Darryl was a wonderful father to Bianca and Lucki; he spent time with them and played wit them; he treated them equally; he would feed and bathe them; he made sure they had everything they needed; he encouraged them in school
- All Darryl talks about is school, school, school
- Darryl has helped her mother by helping her (Sharon's) children; Sharon wouldn't ask for anything for herself, but appreciated the help he gave David and Nicole

11. **Kenya Pettigrew, former girlfriend**
18023 Idlewild, Country Club Hills, Phone 708-798-6354

Kenya Morgan Pettigrew was Darryl's first girlfriend. He was seventeen when they met and became involved. Kenya works at Northern Trust Bank on Canal, downtown, in the retirement benefits department. She is married with one child.
- Kenya said that she met Darryl at Central Y High School in March, 1981; she recalled that he was standing on the staircase of the school and he asked her if she wanted a pop; he bought her a pop and they talked; then she saw him every day; he started buying her lunch; they quickly became boyfriend and girlfriend
- She liked his personality; he was pleasant and very respectful; always kind-hearted to everyone; he was nice-looking, too, but that isn't what attracted her to him
- Her family really liked Darryl a lot; he spent time in her home; he would go to her house every day; she had a close-knit family; Darryl loved her mother, who died in December, 1982; her mother was very fond of Darryl
- Darryl liked to have Kenya cook for him; when he came to her house, he always brought enough food for everyone in her family; she is from a family of nine

Page 21

- One time her family's heat was turned off in the middle of winter; Darryl's family had four space heaters; he brought them to her house, telling her they needed the heaters to keep warm
- She and Darryl enjoyed going to movies and concerts; he didn't like parties and he didn't like to dance
- Darryl talk to her about his family, and about the way his father had treated his mother; she knew Darryl's father had been abusive to his mother; he didn't seem to like to talk about his father
- By late 1982, she became aware that Darryl was involved in selling small amounts of marijuana; she noticed that he was often late arriving at her house; he was spending time with Ricky Johnson, who was known to sell marijuana in Morgan Park; his activities affected their relationship; he was not actively involved with the Gangster Disciples at that time
- This was around the same time that her mother died; she began to draw away from Darryl; they would break up and get back together, over and over
- She did not like what he was doing in the streets, and told him; she confronted him about selling marijuana and broke up with him; he then got a job at McDonald's; it didn't last long
- She found out he was selling marijuana again; when she confronted him, he told her that it was the only way he knew to get ahead; he was just going to do it for a while
- Darryl talked to Kenya about going back to school; she thought he might have gone to a trade school briefly
- Darryl really cared about Kenya; he was always very upset when she broke up with him; one time, when she broke up with him he stood outside her house and cried; another time, when she broke up with him, he was so upset that he lost fifteen pounds; he would send his sister Kim to try to talk to her about getting back together; Kenya broke up with him the final time in the summer of 1983
- She believes that Darryl got involved in the drug economy because he didn't have enough confidence in himself; he didn't think he could be successful any other way; Darryl did not feel good about himself
- The gang and drugs became more organized in Morgan Park in the late 1980's, at about the time that Darryl got out of prison; she feels that he was drawn to it because he wasn't confident about himself and saw it as the only way to make money; he was not strong enough to resist
- Kenya believes that Darryl saw his involvement in the drug economy as a way to help his mother and family; his mother has always played a big part in his life; he looked back and saw what she had gone through, how she had struggled and never had enough money to do anything for herself; he wanted to give back to his mother; this was the only way he saw to make money fast
- Kenya said that Darryl was affected by having a criminal record so young (the manslaughter charge); he was labeled by this..."once you have a record, you're doomed...no one will give you a chance"
- His involvement made him feel like he could be good at something, he could succeed at something, and be looked up to; it takes control of you and you don't think rationally

Page 22

12.     **Letra Watson, former girlfriend**
Phone 773-933-7344 (H), 773-471-5437 (W); don't have address, but can get it.

Letra Watson was Darryl's girlfriend after Kenya Morgan; they met in 1983. She was involved with Darryl at the time of the Fletcher/Simpson incident. Letra was a legal secretary for twelve years. She now works at the Academy of Learning, a day care center owned and operated by her family.

- Letra met Darryl in 1983 through a friend who was dating Rick Johnson at the time; she was eighteen years old when they met, and was attending school to be a court reporter. She talked about dropping out of school, but Darryl persuaded her to stay in school; he helped pay her tuition

- When Letra met Darryl, his family still had the house on Hermosa; some time after they met Darryl got an apartment in Calumet City; then he went to prison on the manslaughter charge

- At the time that she met Darryl, she was in an abusive relationship with a man; she was also using crack cocaine; Darryl got her out of the relationship and made the guy leave her alone; the man had been waiting for her at her apartment when she came home from work; he would beat her; Darryl started going there when she was due to get home, and told the guy to stay away from her; he helped her get off drugs; she feels that he changed her life

- Darryl told her what happened in the Fletcher/Simpson incident; he said that Simpson had tried to kill Reggie Fletcher and then came towards Darryl; Letra believes that Darryl just "freaked out" in the situation; he was so young at the time (she went to the whole trial; Darryl was in jail for a while, then was released when the case was SOL'd; it came back up and he went to trial

- Letra visited Darryl while he was in prison (1984-86) and talked to him regularly; they also corresponded

- At Menard, Darryl was exposed to hard core prisoners; he was young and good-looking, and had to find a way to protect himself; Darryl told her that men would approach him, sexually, on a daily basis; he would get into fights to protect himself from being sexually assaulted; he said that not a day went by that he wouldn't have something happen

- He said that the guards ignored what went on; if you weren't connected to a gang, you would be taken advantage of

- Darryl would not tell her details of what happened in prison; she said, "with a man, when something bad and degrading happens, they won't tell you"; whatever happened, it happened at Menard, not Lincoln; he seemed more relaxed when he was at Lincoln

- She asked him, when he was at Menard, what would make people leave him alone; he said if you had money you could buy peace; she sent him money every week at Menard so he could have peace of mind

- While Darryl was in prison Ricky Johnson was killed; Letra had to give him the news; he was very upset; Rick had tried to get Darryl to go to school; Johnson was killed in his own home by two people he knew

- Darryl was not in the gang before he went to prison; he got into it when he came home; he met the people who got him involved when he was in prison

Page 23

- He seemed different to her when he came home from prison; he had a different outlook on life; he had hooked up with the Gangster Disciples; they were operating in Morgan Park in a more organized way, and were more involved in selling drugs
- Darryl kept his business away from the people he cared about
- When Darryl got out of prison, he stayed with her for a while; he couldn't sleep at night; he told her that he wasn't able to sleep because he had so many things on his mind
- She broke up with Darryl after he got out of prison because of what he was getting involved in
- Darryl was always respectful and kind to her; he always loved children; he was "kid crazy"; he would do anything for his daughters
- They remained friends after they broke up; he was always willing to help her, even when she had another boyfriend; if she needed anything she could always go to Darryl, e.g. if she got behind in her rent or car payment, he would give her the money; he has helped her over the years; he would visit her, and would tell her that he just wanted her to be happy; he always said, "call me if you need anything"; he always worried about other people and never wanted to burden anyone with his problems; he would never admit it if he had problems; she said, "I don't know where my life would be if I didn't meet him"

Page 24

16.   **Henrietta Johnson, mother of Michael Johnson, friend**
      1753 Steuben (off Vincennes), Phone 773-779-8954

Henrietta and Afford Johnson are the parents of Michael Johnson, a long-time friend of Darryl's. They have lived in Morgan Park sinsce 1970 or 1971. Michael is a couple years older than Darryl; the two met playing basketball on Esmond. Michael knew John Jr. before he met Darryl. They went to different elementary schools, but knew each other in the neighborhood. Michael recently got out of prison on a drug charge; he is trying to straighten his life out now; he is working at Walgreens
- Mrs. Johnson's first recollection of Darryl is from when he and Michael were teens; Michael had gotten into some trouble and got sent away to a juvenile facility; Michael asked Darryl to look after his sister, who went to Morgan Park High School (Darryl was attending there at the time); Darryl did this; he was protective of Michael's sister and made sure nobody bothered her
- Over the years, when Darryl was in the Johnson's home, he was always polite and respectful; he was always willing to help out and would ask if they needed anything or if there was anything he could do to help, e.g. mow the lawn, help in the garden, go to the store
- One time when Darryl was there, Henrietta mentioned that she could use some dishwashing soap; Darryl went out and got some for her; she didn't expect him to do that
- On another occasion, Afford Johnson had some trouble with his truck (may have had an accident); he didn't have any money to get it towed; Darryl saw him stalled on the side of the road and stopped and asked him if he needed help (about 1991 or 1992); Darryl called someone and had the truck towed for Mr. Johnson; Henrietta thought that "was beautiful" of Darryl to do that
- Henrietta and Afford have several children; Michael is the only one to get caught up in the gang; she feels that many of the young ment in the neighborhood got caught up because they had a hard time finding good jobs and they "see stuff (drugs) put out there...see a way to make some money"; many of the young people "came up hard" (poor), and when somebody higher up (somebody going to Mexico - suppliers to people like Darryl) bring it in, the young people see a way to make money; it's not right, but one can understand
- she has three sons and they all faced pressure to get into the gangs; Michael had problems in school and was more vulnerable to the lure of easy money
- People in the neighborhood understand the pressures that get the young men involved in the drug economy; lack of good jobs and the chance to make some quick money are part of it; it is not condoned, but people understand; church people try to talk to their sons, but they don't listen when they are young
- She knew what Darryl was doing
- Darryl was always willing to do for others, and was concerned about the young people in the neighborhood; he was involved in setting up the picnics in the neighborhood for the whole ward; they were hlep at the Forest Preserve; they would bring in buses of people, and have cookouts and games for them

Page 25

- He would always ask her if she needed anything; if she ran into him at the store or on the street, he would ask if she needed anything; he was always willing to help
- Darryl loves his daughters; he treated them well; the girls seemed to love him and be happy when they were with him

Page 26

17. **Carolyn Demeray, friend**
14638 Kenwood, Phone 708-891-3397

Carolyn is a single parent; I met her at her parents' home (the address above), but am not sure where she lives; she works, but I don't know where. Carolyn and Michelle became friends in high school; she met Darryl through Michelle.
- Carolyn met Darryl in about 1988, through Michelle; Michelle was pregnant with Bianca at the time; Carolyn and Darryl became friends
- Her first impression of Darryl was that he was a very caring person who was concerned with the well-being of everybody around him
- She guessed what he was involved in, but didn't really talk about it with him; Michelle didn't talk about it either
- They lived in apartment complexes that were close to each other
- Carolyn had relatively frequent contact with Darryl over the years, at least every month
- Darryl talked about Bianca and Lucki a lot; he looked on Bianca as his own; he never differentiated between the two girls once Lucki was born
- She admired the fact that Darryl was a good provider for his family; he was always very outgoing and concerned about others, including Carolyn, her mother and her sister; he would extend himself to help anybody
- One time her sister Sharisse got into some trouble; Darryl went out of his way to help her; he got her a lawyer
- One time when he came to visit Carolyn, he noticed that their storm door was broken; he offered to get it fixed or get a new one; another time, Carolyn had a flat tire; she was trying to get to the gas station when she met up with Darryl; he called a service place and got the tire fixed for her
- They were friends throughout the time they knew each other, not more; she respected Michelle as a friend
- Darryl was a positive motivator for her; he encouraged her to work for her goals; he was supportive
- Darryl gave her advice about being a single parent; he would send her articles from a child development book he was reading (he did this while at the MCC)
- Darryl sent her roses on Mother's Day; he sent them to her mother's house because he respected the relationship she has with her boyfriend
- Carolyn believes that Darryl got involved in the drug economy because he wanted to help his family, particularly his mother; she had struggled to raise her large family alone; he wanted to make a better life for his family; he did what he felt he had to do...'not everybody can go out and get a good job and make good money
- Darryl is crazy about his mother; he wanted to give something back to her for all the sacrifices she made; Carolyn doesn't feel it was a situation he was forced into or that greed was involved; it was just a way to make a better life for his family; she knows others who have taken the same path for the same reasons..."guys who can't read...can't make it out there...want to be a provider"

Page 27

- Darryl never talked about his father
- Darryl was always concerned about others and their problems; he wouldn't talk about his own problems
- Darryl would talk to her about what she wanted to do and what her goals in life were; he talked about wanting to open up some kind of business, e.g. laundromat or car-wash
- Michelle was always insecure and self-conscious about her looks; Michelle's mother focuses on looks and things; Darryl really cared for Michelle
- Carolyn sees Darryl as a very giving person, always concerned about people, especially children; he takes the time to talk to children, pays attention to them

Page 28

18.   **<u>Angie Gaines, sister of Michelle</u>**
      Merryville, Indiana, Phone 219-736-8853
      [To be interviewed]

Page 29

19.  **Dr. Mark Cunningham**

Page 30

20.   **Michelle Gaines, former girlfriend, mother of his children**
Metropolitan Correctional Center

Michelle Gaines met Darryl in 1987; they became involved in 1988. Michelle is the mother of Bianca Gaines and Daryl Lucki Johnson. Though they remained together, in many senses, particularly as parents, until Darryl's arrest, their relationship was not always monogamous. In later years, both had other relationships but remained committed to each other as the parents of the girls. Michelle needs to explain this. She also needs to explain that each girl has essentially been raised by a grandmother (Bianca by Linda Quinn and Lucki by Brenda), but that she and Darryl remained closely involved in the children's lives, and had frequent contact. This phenomenon is understood in African-American families, but may not be well understood by white jurors. Michelle also needs to acknowledge that she knew what Darryl was doing, while protecting her own situation, as to appeal. She does not have an attorney at this time, as she fired Donna Foley and no new attorney has yet been appointed.
- Michelle first met Darryl in 1987, through her sister Angie and through a man she met called "Peanut", who was a friend of Darryl's; she had dinner one time in early 1988 with Darryl, "Peanut", her sister Angie and her friend Alexis; they went to Red Lobster; at the time, Michelle was seeing Bianca's biological father; she didn't see Darryl again until spring, 1988, when she was pregnant with Bianca
- Michelle's sister Angie began dating Lavelle Clark (Chi Chi), a friend of Darryl's; Angie told Darryl that Michelle was pregnant; Michelle had broken up with her boyfriend, who married someone else
- In May, 1988, a very close friend of Michelle's, Angela Lockhart, was killed (or died of a drug overdose, though Michelle said she didn't do drugs); Michelle was quite upset and had no decent clothes to wear to Angela's funeral; Darryl contacted Michelle and told her to meet him; he gave her money to buy clothes for the funeral and to get her hair done; he observed that she was pregnant (about four months)
- In about June or July, 1988, Darryl took Michelle to an apartment at 119th and Alsip, which he had rented for her (as a surprise); it was furnished with a bedroom set, linens, things for the baby, food, etc. He told her that she needed a place for herself and her baby; he took her shopping for maternity clothes and more groceries; at this time, they were just friends (he was still with Stacy Curtis - sort of!); Darryl had his own apartment in Calumet City at the time; Stacy eventually broke up with Darryl
- Darryl visited Michelle at the apartment and, in time, they became romantically involved
- When asked what attracted her to Darryl, Michelle said that he was so nice..."real sweet...different from other guys...really a family man...loved the kids...all the kids...would bend over backwards for them"; Darryl was very healthy when she met him; he did not drink, smoke or do drugs; he worked out regularly and didn't eat meat
- Soon after seeing that Michelle was pregnant, Darryl went to see her mother, Linda Quinn, and told her that he wanted to be the godfather of Michelle's baby
- From the time Bianca was born (10-24-88), Darryl took her on as though she were his own; he has always treated her as his own; Bianca has always called him Daddy; Bianca's

Page 31

biological father was killed in a motorcycle accident in 1991, so Darryl is the only father she has ever known; Bianca only saw her real father one time

- When Bianca was a baby, including a newborn, Darryl would feed and clothe her, bathe her, get up in the middle of the night with her, dress her, etc.; Darryl is a homebody and enjoyed staying in with the baby all day; he would watch TV and read with Bianca; he took her to the park; as she got bigger, he spent a lot of time one-on-one with her

- Michelle's mother took Bianca home from the hospital, as Michelle, who had a caesarean, had gotten pneumonia and had to remained hospitalized; Bianca remained at Linda's much of the time, though spent weekends and other times with Darryl and Michelle; they would go to Linda's a lot to spend time with her (Bianca is clear about who her Mommy and Daddy are, and that Linda, who she calls' "Other Mommie" is her grandmother)

- Michelle knew what Darryl was involved in; she didn't like it, and said that she had never been with anyone like that before; when they met he told her he had his own business; she figured out what he was doing; she just accepted it and didn't talk to him much about it (I'm not clear what the evidence in her trial showed - that needs to be checked out)

- Darryl was shot in June, 1990; he went to Little Company of Mary Hospital, where he received stitches to his head; Michelle cared for Darryl after he was shot; Michelle said that Darryl had problems with the guy who shot him; he and Richard Lofton were just driving down the street (Esmond) in Darryl's car when these guys passed buy and shot; Richard Lofton, who was with Darryl in the car when he was shot, was shot and paralyzed from the waist down

- After Lofton was released from the hospital, Darryl took him to the apartment he (Darryl) shared with Michelle; he took care of Richard Lofton; he bathed him, fed him, carried him, did everything for him; Darryl did this for months, according to Michelle, until she "got tired of it" (appears she pressured Darryl about this); Michelle said that Darryl felt guilty (responsible) about what happened to Lofton

- While Darryl was caring for Lofton, Michelle learned she was pregnant with Lucki; Darryl was reluctant to have a child for a long time because he was afraid his children would be slow, like he was; he worried about this when Michelle was pregnant and after Lucki was born; when Michelle told Darryl she was pregnant, he said that he was ready to have a baby

- Michelle delivered Daryl Lucki Johnson on 4-19-91, by caesarean section, because the baby was breech; Darryl was in the delivery room with her; Michelle chose the name Daryl; Michelle was in the hospital for twelve days after Lucki's birth; Darryl stayed there with her and took care of the baby; he got a bed; he fed Lucki during the night, changed her diapers, etc.; Lucki was delivered at Lying In Hospital in Hyde Park

- After Lucki was born, things between Michelle and Darryl were good for a while; they spent a lot of time with their children; a little over one year after Lucki's birth, Darry lost his appeal on a case and had to serve a three year sentence (received at Joliet in May, 1992); he was gone for one year; during that time, Michelle visited him with the children every weekend; they stayed the whole weekend (there are photos; she said he did okay during this incarceration; he got day for day credit plus six months good time;

Page 32

- Darryl talked about being in special education as a child, and being labeled "slow"; this bothered him; he talked about how his sister Kim helped him learn to read; he worried about Lucki - whether she'd be smart, whether her hair would grow, or she would have the skin problem he has; he wanted her to do well; he always pushed education with everybody; he also talked about how his father beat his mother; he resented his father for this

- Darryl was a very good father; he spent time with his daughters; he always treated them equally; he was very close to BB; they had a little pool in the back yard; he'd get in the pool and play with her; he bought the girls a dog (different dog than Star); its name was Tuffy; he talked to them about taking care of the dog - feeding him, walking him, bathing him; he would take the girls to the park or the mall, read to them, watch cartoons and videos

- He liked to spend time with the girls by himself - at the park, etc.; he would go to Linda's house almost every day; he went to a few of BB's soccer games before he was arrested (she no longer plays soccer)

- Darryl used to take Lucki to school and pick her up almost every day; he would talk to her teachers to check on how she was doing; he sent the girls to Marva Collins school (pre-school); he worked with them to make sure they did their homework (especially Bianca, because Lucki was so young)

- Darryl felt that Christmas, birthdays and other holidays were for children; he tried to make them special for the children

- Darryl was always giving money away to everybody; he would buy people groceries and go out of his way to make a big deal of birthdays (ask her about Mother's Day - he gave several people roses, and gave Michelle's mother Linda, a beautiful ring)

- Darryl's skin condition became noticeable in 1991; he went to a doctor about it (vitiligo diagnosed); it spread over time; he worries that Lucki will get it..."he worries about everything"; when Lucki got the chicken pox, he insisted they take her to the hospital

- They did not live a high life; they lived in apartments and later a three bedroom rented house, for which they paid $850 rent each month; they often weren't able to pay Illinois Bell, or the cable or electric bills on time; Darryl didn't have a car; he used rental cars so he wouldn't get shot (Darryl's money went to everybody else - helping people)

- The "organization" was about more than just bad things; they gave picnics and concerts for kids; they played with kids at the Boys and Girls Club; they encouraged people to vote; Darryl tried to help people feel better about themselves (because he never felt good about himself)

- He talked about wanting to get out of the business, especially when Ron Showers (Hub) was killed; Darryl was really upset about Showers' death; he felt that it was his fault; then his cousin Salima died; Darryl and Salima were really close; Darryl was quite upset about her death, too

- During 1994 and 1995, Michelle saw increasing signs of stress and anxiety in Darryl; Michelle told him she wanted to leave Chicago; Darryl told her they didn't have enough money; she told him she didn't care if they had money; they could live in an apartment and work at K-Mart, as far as she was concerned; at least they would have peace of mind; he

Page 33

began to talk about leaving, moving away; in early 1995, he sent Michelle to Atlanta to look for a house

- Darryl knew that the government was coming for him; he knew he would be arrested soon; he told her he was tired - he just wanted a normal life; he could have left, but he didn't; he had opportunities to leave, but he just gave up; one time he laid on the floor and said, "I'm tired...I'm tired...I just want to get out"; it was like he just gave up, laid down and let them come for him; he wanted it over; he felt that being in jail/prison would at least be a way that he could watch his kids grow up

Page 34

21. **Linda Quinn, Michelle's mother**
1815 105th Street, Phone 773-779-3768

Linda Quinn is the mother of Michelle and Angie Gaines; she has known Darryl since Michelle was pregnant with Bianca (1988). She is the grandmother of both Bianca and Lucki.  Since Bianca has lived, primarily, in Linda's home, Darryl has spent a lot of time there (a different house than the one she lives in now).  Linda stressed that Darryl has been a good father to Bianca and has always treated her as his own, and equal to Lucki.  My primary purpose in meeting with her was to obtain her cooperation for the video.  I did not get as much information about Darryl, e.g. his relationship with the girls, things he has done to help her family and others, etc. as I would have liked.  I believe she has more to offer and should to be re-interviewed (Juliet could probably do this).  She has regular phone contact with Darryl, who calls often to speak to Bianca.  Linda is apprehensive about testifying, but I believe she will be willing to do it.
- Linda said that Angie knew Darryl before Michelle did; she met Darryl when Michelle was pregnant; Darryl would take Michelle to dinner and do things for her; he hovered over her..."you would have thought Bianca was his baby...he was there all the time"
- Darryl was with Michelle before and after the birth of Bianca; Michelle delivered Bianca by caesarean and contracted pneumonia; she had to remain in the hospital; Linda took Bianca home from the hospital, and just kept her; Darryl and Michelle would have her on weekends, and would see her often during the week [she can probably talk about Lucki's birth, as well, including how Darryl stayed at the hospital and took care of the baby for Michelle]
-Darryl would take Bianca to the park and the playground; he took her to movies; he picked her up from kindergarten and played with her on the school playground; she recalled that one time Darryl was wearing a white suit; he played with Bianca on the monkey bars and on the ground in his white suit
- Linda said that she didn't really know "that side" (gang/drug economy) side of Darryl; she just knew the caring family man; she clearly knew what he was doing (and will need to admit it); she said she was shocked by what she had read in the papers; she knew that he helped other people but said she didn't know details (she said Angie would know more)
- Linda described Darryl as kind of shy; he is polite, respectful and caring; he's very big on school and education, and would encourage everyone to stay in school; he would always ask Linda if she needed anything
- Darryl had some exercise equipment that he kept at Linda's, in her basement; he would frequently visit her and work out with her
- Bianca has a dog named Star that she got when she was two years old; originally Linda got the dog, but Darryl wanted it to be from him so he gave Linda the $600 that the dog cost (maybe we could leave the amount out)
- Bianca is a very good student; Darryl is proud of her; every time she got a good report card, he'd ask her what she wanted; she always wanted a Barbie doll; Linda always sends Darryl copies of Bianca's report cards
- Bianca talks to Darryl on the phone; her face lights up when she talks to him

Page 35

    - She feels that the streets "just caught" Darryl; he has talked to her about how his mother struggled when he was growing up; he wanted to help his family, especially his mother
    - Darryl really loves his daughters; they are both crazy about him; Darryl really wants the girls to be together; he didn't want them separated

# ATTACHMENT 4

**JILL MILLER, MSSW**

Forensic Social Work Services

330 East Wilson Street, Suite 100
Madison, Wisconsin 53703
(608) 257-7990
FAX (608) 256-7909

September 8, 1997

Attorney Jeffrey Urdangen
Attorney Cynthia Giachetti
343 S. Dearborn, Suite 1510
Chicago, Illinois 60604

RE: U.S. vs. Darryl Johnson

Dear Jeff and Cindy:

I am writing to you to express, and stress, my continuing and growing concern regarding our ability to be adequately prepared to proceed to trial in late October. We have only six and a half weeks to complete our work before jury selection begins. Obviously, I can continue to work on matters while you are in trial, prior to the commencement of the penalty phase, but the bulk of the work should be completed prior to jury selection. I have reviewed my file and developed a preliminary list of tasks to be done in preparation for the penalty phase. It is very lengthy and will require a great deal of time and effort. Even with the assistance of Juliet, and the minimal help I am getting from Mort (who has furnished virtually nothing that I have requested), it will be difficult to complete this work. While my schedule is improving, I do still have other cases to work on. I can devote the majority of my time to this case, but not all of it. In addition, I have no real feel for what the guilt phase strategy is, or what work has been done to prepare for it. Clearly, due to the number of tapes and the heavy use of informants, it will be a monumental task to be prepared. The Santiago proffer makes clear the magnitude of the challenge we face.

Among the many tasks yet to be completed are the following:

- obtaining information on the victims and preparing to address the issue of victim impact;
- considering approaching the victim's ("Blunt" Johnson) family;
- preparation of the video, including getting the cooperation of Linda Quinn, spending time with the girls, finding photos, choosing the audiotape overlays, scripting, filming and editing
- obtaining all requested records (see memos of 1-2-97 and 4-22-97), which include, but are not limited to, complete DOC file, probation and parole records, medical and mental health records on Darryl and Brenda, school records, MCC records, sentencing transcript of manslaughter case, police reports on all priors
- obtaining information on Robert Taylor Homes, including conditions during early years and any information on lead levels
- arranging for and completing testing, including PET scan, and physical exam with lab tests
- researching Vitiligo

Atty. Jeffrey Urdangen
Atty. Cynthia Ciachetti
RE:   U.S. vs. Darryl Johnson
Page 2

- researching gang structure and operation (including recruiting) in Illinois jails and prisons
- getting all experts on board (e.g. Carl Bell), providing them with supportive documents and information, getting assessments completed, reviewing and finalizing reports
- completion of all collateral interviews (there are many still to do, and some of the sources are difficult to locate or to gain their cooperation)
- completing all work to get certification of expert fees from the chief judge of the Circuit
- clarifying penalty phase strategy, choosing witnesses (and order), outlining their testimony, and preparing them
- preparing the challenge and mitigate the aggravation
- developing a list of mitigators to present to the jury

In addition to the above, we discussed the value of doing some research on the whereabouts and adjustment of life-sentenced federal capital defendants. While I feel this may be useful, it could be time-consuming. It is not at the top of my list and may have to be deferred. Hopefully, Mark Cunningham's information on Florence and Federal BOP policies will be enough.

I hope you can understand the basis of my concerns. I know that both of you have other commitments, beyond this case. While we have a wonderful team, among the best I have ever worked with, there remains an overwhelming amount of work to be done in the next few weeks. You have indicated that, based on your knowledge of the Court, you do not feel a request for continuance would be granted. Nevertheless, I feel that there is a need to make a record of concerns regarding the complexity of this case and the time and resources necessary to properly represent the interests of our client. I felt compelled to put my thoughts on this matter in writing. I hope that you will take it in the spirit that it is offered. I want to make sure that we have all done everything we possibly can to afford Darryl a fair trial, and to persuade the jury to spare his life.

Sincerely,

Jill Miller

# ATTACHMENT 5

**JILL MILLER, MSSW**

Forensic Social Work Services

330 East Wilson Street, Suite 100
Madison, Wisconsin 53703
(608) 257-7990
FAX (608) 256-7909

### CONFIDENTIAL MEMORANDUM TO ATTORNEYS

**TO:** Attorneys Jeffrey Urdangen & Cynthia Giachetti
**RE:** Darryl Johnson - Social History Investigation
**DATE:** October 3, 1997

I have, once again, reviewed my files in order to try to priortize the records and locates that we need. I spoke with Jeff this morning regarding those things that Mort could do and the tasks that Juliet (possibly with Mary Cay's help) can do. The most important things we need from Mort are locations, including phone numbers, of possible collateral sources/witnesses. I am trying to focus on family members of informants that Darryl has helped. I would like to locate Delano Finch's mother and his sister Lisa. Angie Gaines reported that Darryl had done a lot to help them. She thinks they may have moved out of town. She doesn't know how to find them. I am told that Darryl did a lot for Roger Stewart's family. His mother's name is Alma Stewart; she lives in the Morgan Park area (I got this from Michael Johnson's mother, Henrietta). I now have an address for Sheryl Fletcher; a phone number would really help. I can try to just drop in on her next week, but would prefer to phone.

We still need information on the victims in this case, at a minimum, Banks and "Blunt" Johnson. I am particularly concerned about Blunt, who will be a more sympathetic victim. We should probably get information on the other victims listed in the aggravators, at least their criminal histories and their role in the gang/drug crew. Perhaps Juliet or Mary Cay could locate the obituaries and information on their families, if Mort would obtain the other information.

With regard to Juliet's work, the records needed most urgently include: sentencing transcript from manslaughter conviction; all DOC records; all MCC records, especially threat or security assessments since 1-1996 and anything related to the solicitation to intimidate/harm Russell Romero, Lance Cleaton and Roger Stewart's family; Darryl's probation records; any special education records that might exist anywhere; Lucki's birth records; any childhood medical records re: Darryl - Dr. Beasley (deceased, but may may be stored somehwere); any record of Darryl's evaluation by the Chicago Board of Health in about 1965 or 1966. We should get the verdict forms from Quan's trial (I am getting the Virginia verdict forms). We need someone with knowledge or expertise regarding the operation of gangs in Illinois jails/prisons. Could Juliet call Morgan Park High School and see if a teacher named P. Hunter is still there? Can we find out if Darryl paid for Bank's funeral, and whether there is a record of this? When Juliet talks to Michelle, she needs to ask her where her photos, especially those of Lucki's birth, are stored. I have asked Mary Cay to ask Darryl to provide names of family members of informants that he has helped. I will be in Chicago on October 8 and 9 to do interviews and to meet with Juliet and Robin re: the video.

# EXHIBIT B

**JILL MILLER, MSSW**

_____

Forensic Social Work Services                                    P.O. Box 44343
E-mail: jillemiller@sbcglobal.net              Madison, Wisconsin  53744-4343
                                                              (608) 271-0227
                                                          FAX (608) 271-0491

## RESUME

### CURRENT POSITION

1984-present     Forensic Social Work Services.  Private practice in forensic social work, providing consultation and expert witness services to attorneys and courts in criminal, juvenile, family and other civil proceedings.  Specializing in social history investigations and psycho-social assessments;  the development of treatment and rehabilitation plans for sentencing and dispositional hearings;  preparation for the penalty phase of capital murder cases; and analysis of penalty phase preparation and presentation in post-conviction capital cases.  Primary focus in recent years has involved work on capital cases, at the trial and post-conviction levels; and in state, federal and military cases.  Sole proprietorship; opened in January, 1984.  Previously engaged in limited private practice from 1973 to 1976, and 1978 to 1983.

### LICENSE

Licensed as a Clinical Social Worker, State of Wisconsin, License Number 1662.

### EDUCATION

1983     Completed 20 hour training program on Mediation in Divorce and Family Disputes.

1973-74     Doctoral student, University of Wisconsin-Madison, School of Social Work.  Emphasis on legal aspects of social work practice and welfare economics.

1971     Masters of Science Social Work, University of Wisconsin-Madison.  Field placements at Legal Services Center and Dane County Mental Health Center.  Thesis research on

Page 2

attitudes of welfare recipients toward welfare rights organizations.  Recipient of HEW Social and Rehabilitation Services Training Grant.

1967        Bachelor of Arts Degree, major in Social Work, University of Wisconsin-Madison.    Recipient of UW-Madison tuition scholarship during all semesters

1963-64     Attended Carroll College, Waukesha, Wisconsin.  Recipient of tuition scholarship as National Merit finalist

**EMPLOYMENT HISTORY**

1973-85     Clinical Assistant Professor, School of Social Work, University of Wisconsin-Madison.   Taught courses in Social Work Advocacy and the Law, Social Work Methods, and Field Experience.  Supervised field course units at the Wisconsin State Public Defender Office, Youth Policy and Law Center, Legal Services Center of Dane County, Dane County Juvenile Court, Wisconsin Indian Legal Services and Wisconsin Council on Criminal Justice.  Areas of expertise included law and legal skills for social workers, advocacy, criminal and juvenile justice, and policy development.

1979-84     Client Services Director, Office of the State Public Defender, Wisconsin.  Position entailed responsibility for the social work services of the statewide public defender system and other administrative responsibilities.  Duties included development of positions, hiring, training, supervising, legislative monitoring, development of resource materials, consultation with trial offices throughout the state, development of student placements, and other duties as determined by the State Public Defender.   Special assignments included: coordinating the representation of unaccompanied Cuban minors placed in Wisconsin after the Mariel boat-lift; conducting a study of the issue of recoupment from parents for the costs of legal representation of their minor children; and developing and directing a joint training program with the Division of Corrections on probation and parole

Page 3

revocation procedures.  In addition, provided services to attorneys on selected cases.

1976-78          Associate Director, Youth Policy and Law Center, statewide public interest agency in Wisconsin.  Agency involved child advocacy and policy reform in the state's juvenile justice system. Responsibilities included administrative duties, fund-raising, supervising intern program, personnel and affirmative action, and involvement in substantive issues. Special projects included state budget issues, detention practices, dispositional alternatives, correctional practices, mental health issues and legislative monitoring.  Involved in the drafting and passage of a new state juvenile code.  Co-founder of agency.

1975             Instructor, University of Wisconsin Extension course on Law and Social Work.

1974-75          Program Co-director of U.S. HEW-funded project on "Legal Training for Child Welfare Workers", sponsored by the University of Wisconsin Center for Social Services.  Program involved workshops on legal aspects of substantive areas in child welfare field, production of eight videotape programs to be used as training tools in agencies, and production of training manual.  Co-authored grant proposal.

1974             Instructor, University of Wisconsin Extension course on Law and Social Work

1973             Instructor, University of Wisconsin Extension course on Juvenile Justice

1971-73          Staff Social Worker, Legal Services Center of Dane County, Madison, Wisconsin.  Supervisor of social services in juvenile, criminal and civil programs of agency; caseload in Juvenile Defender Program; liaison field instructor for graduate students of the University of Wisconsin-Madison School of Social Work.

1971-72          Staff, Emergency Mental Health Services; twenty-four hour suicide and crisis intervention service operated by the Dane

Page 4

County Mental Health Center, Madison, Wisconsin.  Part-time position.

1970-71    Teaching Assistant, School of Social Work, University of Wisconsin-Madison.  Assisted in teaching of undergraduate field experience and social work methods course at the Dane County Department of Social Services.

1967-70    Undergraduate Counselor, School of Social Work, University of Wisconsin-Madison.   Provided academic counseling to undergraduate students; prepared timetable of courses; assisted during registration; contributed to preparation of school bulletin; and performed other duties as required by the Director of the School of Social Work.

## PROFESSIONAL MEMBERSHIPS

1998 - 2005    The American Academy of Experts in Traumatic Stress; Board certified in Forensic Traumatology  (January, 1999)

1995 - present    National Alliance of Sentencing Advocates and Mitigation Specialists (formerly the National Association of Sentencing Advocates); member of Conference Committee for 2004 annual conference; past member of Policy Committee  and Mitigation committee; past co-ordinator of mentor project; organization recently became a section of the National Legal Aid & Defender Association

1992 - 2000    National Organization of Forensic Social Work; also a member from 1986 to 1989; Elected member of Board of Directors (1993 - 1996); Secretary of Board of Directors (1995 - 1996)

1980 - present    National Legal Aid & Defender Association.  Elected member of Defender Council (1993 - 1998, and 1983 - 1990); elected member of Board of Directors (1986 - 1990);  chairperson of Social Services Section and co-chairperson of Death Penalty Litigation Section; founder of Social Services Section; Chairperson of Defender Council (1996 - 1998); past member of Executive Committee, Conference and Awards

Page 5


Committee, Membership Committee, and Nominating and Resolutions Committee at various times.


## AWARDS

2000        Recipient of "Life in the Balance" Achievement Award, presented annually to a lawyer or mitigation specialist by the National Legal Aid & Defender Association in recognition of contributions to capital defense representation

1999        Recipient of award for "Outstanding Contributions to the Profession", annual award by the National Association of Sentencing Advocates, for dedication in the advancement of sentencing advocacy


## PROFESSIONAL SERVICES

2002        Consulted on the updating and revision of "Guidelines for the Appointment and Performance of Counsel in Capital Cases", American Bar Association; adopted by ABA in February, 2003

1997        Appointed member of Working Group for the U.S. Department of Justice, Bureau of Justice Assistance and Bureau of Justice Statistics co-sponsored national study of indigent defense systems.

1995-96    Member of Blue Ribbon Advisory Committee appointed by the National Legal Aid & Defender Association under a grant from the U.S. Department of Justice, Bureau of Justice Assistance. Committee composed of experienced academics and practitioners who were knowledgeable about the criminal justice system, particularly the defense function.  Purposes of the committee were to identify successful models of indigent defense programs, alternative initiatives crucial to the improvement of the criminal justice system, and areas of indigent defense representation that required further research and development.

Page 6

| | |
|---|---|
| 1993-96 | Board Member, Consortium for the National Equal Justice Library. |
| 1990-92 | Consultant, National Legal Aid & Defender Association, for Mitigation Specialists Training Project and Mitigation Affidavit Project. |
| 1991 | Consultant to the Missouri State Public Defender System; provided training for mitigation investigation staff. |
| 1990-91 | Consultant to the Illinois Capital Resource Center, provided two sixteen-hour training programs for mitigation staff. |
| 1986-89 | Consultant, Project FIT (Families in Transition), an intensive in-home treatment program for adolescents and their families, operated by Family Services, Madison, Wisconsin |
| 1988 | Consultant to State of Florida, Department of Health and Rehabilitation Services.  Prepared training monograph for state juvenile court workers titled "The Social Worker in Court: Case Preparation and Testifying." |
| 1983-89 | Task Force on Women in the Criminal Justice System, Wisconsin Women's Network.  Member and legislative coordinator. |
| 1979-86 | Mental Health Association in Wisconsin.  Member, Board of Directors; chairperson of the Public Policy Committee and the Child Advocacy Committee; treasurer. |
| 1983-84 | Judicial Council, State of Wisconsin, General Projects Committee.  Represented the Office of the State Public Defender at meetings to study the issue of recoupment from parents for the costs of legal representation of their children and appellate procedures in state courts. |
| 1978-84 | Project TRY Advisory Committee.  TRY (Treatment and Rehabilitation for Youth) was an intense treatment program for delinquent children in need of mental health treatment in a secure setting. |

Page 7

| | |
|---|---|
| 1981-82 | Committee on Revision of Administrative Rules Governing Child Welfare Institutions.  Appointed by Secretary of the Wisconsin Department of Health and Social Services. |
| 1980-82 | Consultant, ABT Associates, private consulting firm in Cambridge, Massachusetts.  Consulted on federally-funded project to develop program model materials on social services in public defender offices. |
| 1980 | Consultant, to Briarpatch (runaway center in Madison, Wisconsin) on the development of a group home for Cuban juveniles.

Consultant to University of Kentucky School of Social Work on the development of social work field placements in legal settings. |
| 1978-79 | Consultant and Research Associate, Youth Policy and Law Center. |
| 1979 | Foster Care Monitoring Project, Advisory Committee, joint project of the Wisconsin Department of Health and Social Services and the University of Wisconsin-Milwaukee.

Consultant to research project on issues in mental health, conducted by Dr. Dave Gustafson, Center for Health Sciences, University of Wisconsin |
| 1977-79 | Juvenile Grievance Procedure Implementation Committee, state committee appointed by Wisconsin Division of Corrections to implement a grievance mechanism in juvenile correctional programs. |
| 1976-79 | Law-Related Education Advisory Committee, committee established to oversee project co-sponsored by Wisconsin Department of Public Instruction and State Bar of Wisconsin, to establish law-related education in the state's secondary and middle schools. |
| 1975-79 | Wisconsin Civil Liberties Union, Children's Rights Committee. |

Page 8

1977-78         Juvenile Detention Implementation Committee, co-chairperson.  State committee established by the Wisconsin Department of Health and Social Services to implement the recommendations of the Juvenile Detention Study.

Juvenile Grievance Procedure Committee.  State committee appointed by the Wisconsin Division of Corrections to study the need for a grievance procedure in juvenile correctional programs and to establish guidelines for the development of a procedure.

Prison Health Care Advisory Committee.  State committee appointed by the Wisconsin Department of Health and Social Services to study and make recommendations on health care programs in adult and juvenile correctional facilities.

Title XX Advisory Committee.  Committee appointed by the Wisconsin Department of Health and Social Services to develop Title XX plan for the state.

1975-76         Joint Legislative Committee on Institutional Closings. Committee mandated and appointed by the Wisconsin Legislature to study the closing of the Wisconsin School for Girls and the Wisconsin Child Center, and to develop plans for alternate placements of the juveniles.

1972-75         Board of Directors, Briarpatch; Madison, Wisconsin agency serving runaway youths and their families.

1972-73         Consultant to Jonah House, a group home for emotionally disturbed adolescents in Madison, Wisconsin.

## TRAINING, WORKSHOPS AND SPEECHES

2008            Speaker, Capital Habeas Unit, Office of the Federal Public Defender, Salt Lake City, Utah; "Mitigation: Investigation, Development and Presentation of Mitigation at Trial and in Habeas"

Page 9

2007            Faculty, Life in the Balance; annual penalty conference sponsored by the National Legal Aid & Defender Association; Dallas, Texas

                Faculty, National Seminar on the Development and Integration of Mitigation Evidence in Capital Cases; sponsored by the Office of Defender Services, Administrative Office of the Courts, Department of Justice; Washington, D.C.

                Faculty, Death Penalty Mitigation Institute, sponsored by the National Alliance of Sentencing Advocates and Mitigation Specialists, a section of the National Legal Aid & Defender Association; Chicago, Illinois

                Faculty, "Managing the Capital Case In Arizona", sponsored by the National Judicial College; Phoenix, Arizona

                Faculty, Death Penalty Seminar, sponsored by the Oregon Criminal Defense Lawyers Association; Hood River, Oregon

2006            Faculty, Capital Defense Training; sponsored by the National Consortium for Capital Defense Training; Plano, Texas

                Faculty, Life in the Balance 2006, annual death penalty conference sponsored by the National Legal Aid & Defender Association; Philadelphia, Pennsylvania

                Faculty, National Seminar on the Development and Integration of Mitigation Evidence, sponsored by the Habeas Assistance and Training project; Washington, D.C.

                Faculty, Death Penalty Mitigation Institute and Annual Conference, sponsored by the National Alliance of Sentencing Advocates and Mitigation Specialists, a section of the National Legal Aid & Defender Association; Baltimore, Maryland

                Faculty, "Making the Case for Life", sponsored by the National Association of Criminal Defense Attorneys; Las Vegas, Nevada

                Guest speaker, University of Wisconsin-School of Social Work

Page 10

| | |
|---|---|
| 2005 | Faculty, "Making the Case for Life", sponsored by the National Association of Criminal Defense Attorneys; Oklahoma City, Oklahoma |
| | Trainer, NAACP Legal Defense Fund: Capital Punishment Seminar; Warrenton, Virginia |
| | Faculty, Life in the Balance 2005, annual death penalty conference sponsored by the National Legal Aid and Defender Association; New Orleans, Louisiana |
| | Faculty, Mitigation Training Program, sponsored by the ABA Death Penalty Representation Project and DePaul University College of Law, Center for Justice in Capital Cases; Chicago, Illinois |
| | Guest speaker, Lacrosse (Wisconsin) County Bar Association |
| | Guest speaker, University of Wisconsin School of Social Work |
| 2004 | Faculty, Building the Case for Life, program sponsored by the Washburn University School of Law; Topeka, Kansas |
| | Guest speaker, School of Social Work, University of Wisconsin, seminar on criminal justice |
| | Faculty, Making the Case for Life VII: Mitigation Investigation In Capital Case; sponsored by the National Association of Criminal Defense Lawyers; Arlington, Virginia |
| | Faculty, Annual Conference of the National Association of Sentencing Advocates; Milwaukee, Wisconsin |
| | Coordinator and faculty, Death Penalty Mitigation Institute; sponsored by the National Association of Sentencing Advocates; Milwaukee, Wisconsin |
| | Faculty, Life in the Balance XVI, annual death penalty conference sponsored by the National Legal Aide and Defender Association; Memphis, Tennessee |

Page 11

| | |
|---|---|
| 2003 | Faculty, Annual Conference of the National Association of Sentencing Advocates, presentation on 'Mitigation A to Z: A Primer"; Albuquerque, New Mexico |
| | Faculty, Making the Case for Life VI: Mitigation Investigation in Capital Cases", death penalty training sponsored by the National Association of Criminal Defense Lawyers; Memphis, Tennessee |
| | Presenter, "Strengthening the Guiding Hand of Counsel: Reforming Capital Defense Systems", conference on the American Bar Association Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases, sponsored by the ABA Death Penalty Representation Project and Hofstra University School of Law |
| 2002 | Faculty, "Making the Case for Life V: Mitigation Investigation in Capital Cases", death penalty training sponsored by the National Association of Criminal Defense Lawyers; Raleigh, North Carolina |
| | Faculty, "Defending Complex Cases", Naval Justice School; Newport, Rhode Island |
| | Faculty, "Life in the Balance XIV", annual death penalty conference sponsored by the National Legal Aid and Defender Association; Kansas City, Mo. |
| 2001 | Faculty, "Life in the Balance XIII", annual death penalty conference sponsored by the National Legal Aid and Defender Association; Albuquerque, New Mexico |
| | Faculty, "Capital Litigation Defense Course", sponsored by the Naval Justice School; Newport, Rhode Island |
| 2000 | Faculty, "Making the Case for Life IV: Mitigation Investigation in Capital Cases", sponsored by the National Association of Criminal Defense Lawyers; Houston, Texas |

Page 12

Trainer, "Death Penalty Defense Workshop", sponsored by the Office of the State Appellate Defender - Death Penalty Trial Assistance Division; Chicago, Illinois

Faculty, "Life in the Balance XII", annual death penalty conference sponsored by the National Legal Aid and Defender Association; Washington, D.C.

Faculty, Annual Conference of the National Association of Sentencing Advocates; San Diego, California; also, co-coordinator and faculty, Death Penalty Institute, held in conjunction with annual conference

1999      Faculty, "Making the Case for Life: Mitigation Investigation in Capital Cases", sponsored by the National Association of Criminal Defense Lawyers; Boise, Idaho

Faculty, Death Penalty Training Seminar, sponsored by the Florida Association of Criminal Defense Lawyers; Haines City, Florida

Faculty, Annual Conference of the National Association of Sentencing Advocates; Miami, Florida

Faculty, "Life in the Balance XI", annual death penalty conference sponsored by the National Legal Aid & Defender Association; Atlanta, Georgia

1998      Faculty, "The Fight for Life: Mitigation That Wins", sponsored by the Tennessee Association of Criminal Defense Lawyers and The Tennessee District Public Defenders Conference; Nashville.

Trainer, Annual Conference of the National Association of Sentencing Advocates; Washington, D.C..

Faculty, "Life in the Balance X", annual death penalty conference sponsored by the National Legal Aid & Defender Association; Philadelphia, Pennsylvania.

Page 13

Faculty, "Making the Case for Life: Mitigation Investigation in Capital Cases", sponsored by the National Association of Criminal Defense Lawyers; Scottsdale, Arizona.

Trainer, Death Penalty Seminar sponsored by the Federal Defender Office of Washington & Idaho; Boise, Idaho

1997        Trainer, Annual Conference of the National Legal Aid & Defender Association; St. Louis, Missouri.

Trainer, Annual Conference of the New Mexico Public Defender; Glorietta, New Mexico.

Trainer, Nebraska Commission on Public Advocacy; presented day-long training program on mitigation in capital cases for staff of the Major Case Resource Center; Lincoln, Nebraska.

Faculty, "Life in the Balance IX", annual death penalty conference sponsored by the National Legal Aid & Defender Association.

1996        Trainer, Annual Conference of the National Legal Aid & Defender Association; Las Vegas, Nevada.

Faculty, "Understanding Violence: Prevention Strategies and Mitigation Training", seminar sponsored by the Center for Death Penalty Litigation, the Carolina Justice Policy Center, and the UNC-Chapel Hill School of Social Work; Chapel Hill, North Carolina.

Faculty, "Life in the Balance VIII", annual death penalty conference sponsored by the National Legal Aid & Defender Association; St. Louis, Missouri.

Trainer, Client Services Workshop, Office of the State Public Defender; Madison, Wisconsin.

1995        Trainer, Annual Conference of the National Legal Aid & Defender Association; New Orleans, Louisiana.

Page 14

Trainer, Indiana Public Defender Council, Sentencing Training; Indianapolis, Indiana.

Trainer, "The Defense of Drug Cases", National Legal Aid & Defender Association regional conference; Baltimore, Maryland.

Trainer, Annual Conference of the National Association of Sentencing Advocates; Chicago, Illinois.

Trainer, Annual Conference of the National Organization of Forensic Social Work; Reno, Nevada.

Faculty, "Life in the Balance VII", annual death penalty conference sponsored by the National Legal Aid & Defender Association; Kansas City, Missouri.

1994    Trainer, Annual Conference of the National Legal Aid & Defender Association; Washington, D.C..

Speaker, University of Wisconsin-Madison Law School, course on Capital Punishment.

Trainer, NAACP Legal Defense and Education Fund; annual Capital Punishment Conference; Warrenton, Virginia.

Trainer, Annual Conference of the National Organization of Forensic Social Work; Atlanta, Georgia.

Faculty, "Life in the Balance VI", annual death penalty conference sponsored by the National Legal Aid & Defender Association; Austin, Texas.

1993    Trainer, Annual Conference of the National Legal Aid & Defender Association; Albuquerque, New Mexico.

Trainer, Defender Association of Philadelphia; day-long training for homicide unit; Philadelphia, Pennsylvania; April, 1993.

Page 15

Faculty, "Life in the Balance V", annual death penalty conference sponsored by the National Legal Aid & Defender Association; New Orleans, Louisiana; March, 1993.

1992   Trainer, Annual Conference of the National Legal Aid & Defender Association; Toronto, Ontario, Canada; October, 1993.

Trainer, Criminal Defense Conference, the Wisconsin State Public Defender; Oconomowoc, Wisconsin; October, 1992.

Faculty, Death Penalty Seminar, sponsored by the Indiana Public Defender Council; Indianapolis, Indiana.

1991   Trainer, Annual Conference of the National Legal Aid & Defender Association; Portland, Oregon.

Faculty, "Mitigation Specialists Training", sponsored by the National Legal Aid & Defender Association, the Missouri Capital Punishment Resource Center, and the National Association of Social Workers - Missouri Chapter; St. Louis, Missouri.

Faculty, "Life in the Balance III", annual death penalty conference sponsored by the National Legal Aid & Defender Association; New Orleans, Louisiana.

Trainer, Annual Conference of the National Organization of Forensic Social Work; Washington, D.C.

1990   Trainer, Annual Conference of the National Legal Aid & Defender Association; Pittsburg, Pennsylvania.

1989   Trainer, Annual Death Penalty Seminar, sponsored by the Office of the State Appellate Defender; Collinsville, Illinois.

1988   Trainer, Annual Conference of the National Legal Aid & Defender Association; San Diego, California.

Page 16

1987        Trainer, "Critical Issues in Juvenile Justice: A Working Conference", sponsored by the Wisconsin Department of Health and Social Services; Madison, Wisconsin.

Trainer, Annual Death Penalty Seminar, sponsored by the Office of the State Appellate Defender; Chicago, Illinois.

Trainer, "All About Families Conference", sponsored by the Wisconsin Child Advocacy Project; Madison, Wisconsin.

1986        Trainer, Annual Conference of the National Legal Aid & Defender Association; Atlanta, Georgia.

Speaker, Milwaukee Young Lawyers Association.

Trainer, Regional Conference of the National Defender Investigator Association; Madison, Wisconsin.

Trainer, Annual Conference of the Office of the State Public Defender; Milwaukee, Wisconsin.

Speaker, Criminal Law Section of the Dane County Bar Association; Madison, Wisconsin.

1985        Trainer, Annual Conference of the National Legal Aid & Defender Association; also, coordinator of day-long training program for social services personnel in defender offices and private practitioners providing sentencing services to attorneys; Washington, D.C.

Trainer, Annual Conference of the Office of the State Public Defender; Milwaukee, Wisconsin.

Speaker, University of Wisconsin-Madison School of Social Work, Spring Symposium; Madison, Wisconsin.

1984        Trainer, American Bar Association, Annual Program Meeting; Chicago, Illinois.

Trainer, Annual Conference of the Office of the State Public Defender; Milwaukee, Wisconsin.

Page 17

Trainer, Jefferson County Human Services Department and county law enforcement personnel.

Trainer, Eau Claire, Wisconsin region of Social Services Departments; Eau Claire, Wisconsin.

Speaker, Criminal Law Section of the Dane County Bar Association; Madison, Wisconsin.

1982          Trainer, Annual Conference of the National Legal Aid & Defender Association; Boston, Massachusetts.

1981          Trainer, Annual Conference of the National Legal Aid & Defender Association; San Francisco, California.

Faculty, Annual Conference of the Office of the State Public Defender; Madison, Wisconsin.

Trainer, First Annual Juvenile Court Intake Training Seminar, sponsored by the Wisconsin Juvenile Court Intake Association; Madison, Wisconsin.

Trainer and coordinator; Client Services Spring Workshop, Office of the State Public Defender; Madison, Wisconsin.

1973-80       Trainer and speaker at numerous programs in Wisconsin on Legal Skills for Social Work, Sentencing, Child Advocacy, Mental Health, Juvenile Justice, and Child Abuse and Neglect.

## PUBLICATIONS, PROFESSIONAL PAPERS & MEDIA PRODUCTIONS

2003          Author of article, "The Defense Team in Capital Cases", Hofstra Law Review; summer, 2003; Volume 31, No. 4, page 1117

1991-96       Contributed several newsletter articles to "Capital Report", newsletter of the Death Penalty Litigation Section of the National Legal Aid & Defender Association; articles covered topics relating to the death penalty and mitigation, including mentally retarded capital defendants, Fetal Alcohol Syndrome

Page 18

and Effects, and cultural and environmental mitigation; several articles have been reprinted in newsletters published by state defender programs, resource centers, and criminal defense attorney associations.

1981-82    Developed a series of videotape programs on "Probation and Parole Revocation Procedures in Wisconsin", as part of the Joint Training Program on Probation and Parole Revocation Procedures, funded by the National Institute on Corrections. Directed the development of the training manual to be used in conjunction with the tapes; authored the grant proposal.

1980       Paper presented before the 1980 Program Meeting of the Council on Social Work Education, on "The Social Worker as Client Advocate: Teaching Advocacy in a Legal Setting"; Los Angeles, California.

1979       Article published in the Journal of Education for Social Work (Fall, 1980), titled "Teaching Law and Legal Skills to Social Workers"; also presented as a paper before the 1979 Annual Program Meeting of the Council on Social Work Education; Boston, Massachusetts.

1978       Paper presented to the Prison Health Care Advisory Committee, state of Wisconsin, title "Health Care Needs in Juvenile Correctional Facilities."

1977       "Children in Jail and Detention", report to Acting Governor Martin Schreiber, state of Wisconsin, on the need for non-secure temporary care alternatives for juveniles.

1974       Developed and produced a series of eight videotape programs titled "Legal Training for Child Welfare Workers", used as training aids in social service agencies and social work classes; wrote grant proposal for development of training program, videotapes, and training manual; co-directors of program.

Page 19

## RESEARCH

1980-81          "Study of Recoupment From Parents for Costs of Legal Representation for Their Children", study mandated by the Wisconsin Legislature in Chapter 356, Laws of 1979.  Study included analyzing statutes from other states on recoupment and parental responsibility for costs of legal representation of their children; surveying policies and practices in a number of public defender systems in the country; researching case law on the issue; and conducting a survey of parents of juvenile clients regarding their ability to pay and attitudes towards recoupment.  Resulted in leglslative provision for recoupment in Chapter 20, laws of 1981.

1977-78          Conducted study of all juveniles present in Wisconsin juvenile correctional institutions on June 30, 1977. Variables included age, sex, race, county of residence, committing offense(s), prior offense history, prior services and placements, history of running away from placement, and recommendations of Juvenile Offender Review Board.  Data was used by state officials for future planning of juvenile correctional programs.

## GRANTS

1973-1982        Authored or co-authored grant proposals resulting in over $550,000 in grant awards for various projects, including for: the establishment of the Youth Policy and Law Center, a statewide public interest agency involved in juvenile justice policy issues in Wisconsin; a staff social worker position at the Legal Services Center of Dane County, in Madison, Wisconsin; a joint training program on probation and parole revocation procedures for the Department of Corrections and the Office of the State Public Defender; a project to train child welfare workers in the state of Wisconsin on law and legal skills; projects for the representation and resettlement of unaccompanied Cuban minors in Wisconsin; and a project to provide special services to indigent minority and veteran defendants through the Office of the State Public Defender.

Page 20

## OTHER ACTIVITIES

Testified before committees of the Wisconsin legislature on numerous occasions since 1976 on issues related to juvenile justice, mental health, and state funding for human services.

Served on oral examining boards for state and county positions in Wisconsin approximately twelve times since 1975.

Participated in the drafting and passage of several pieces of legislation in Wisconsin, including the Children's Code revision (1978), the Mental Health Act, bills related to the criminal justice and human services systems, and state budget proposals.

Guest speaker on numerous occasions in classes at the University of Wisconsin-Madison.

Along with husband, own and operate a Christmas tree farm in western Wisconsin.

[February, 2008]

# EXHIBIT C



DARRYL LAMONT JOHNSON
CHRONOLOGY

1890's     DOB, William Johnson; Tupelo, Miss., paternal grandfather

2-26-1897  DOB, Minnie Lou Johnson; Atlanta, Ga., paternal grandmother

02-28-11   DOB, John Taylor; Chicago, maternal grandfather

03-05-18   DOB, Josie Gilbert Taylor, Chicago, maternal grandmother

08-18-38   DOB, John Johnson, Sr., in Chicago

1940       Death of William Johnson, of heart attack

03-09-41   DOB, Brenda Taylor, Chicago

05-10-55   DOB, Andre Johnson, to Brenda Taylor, age fourteen, and
           John Johnson; Brenda was living with Johnson's family at
           3150 S. Prairie at the time

05-12-55   Death of Josie Taylor, two days after Andre's birth

06-13-55   Marriage of John Johnson and Brenda Taylor, in
           Clinton, Iowa; continued to live with Johnson family on S.
           Prairie

1956       John Johnson joined the Air Force; stationed at Andrews
           Air Force Base outside Washington, D.C.

11-09-56   Brenda, along with Andre, joined John in Washington; two
           days later her grandmother, who had helped raise her,
           died

09-17-58   DOB, Sharon Johnson, at Walter Reed Army Hospital

1959       (early) Brenda miscarried twins (had two other
           miscarriages at other times)

1959       (spring) Brenda left John, Sr. for the first time; she
           went to Chicago with her children, where John's family
           urged her to divorce John; she eventually returned to him
           in Washington

02-27-61   DOB, John Johnson, Jr., at Andrews Air Force Base;
           premature birth - eight months

**DARRYL LAMONT JOHNSON**
CHRONOLOGY
Page 2

1961        (summer) John, Brenda and children moved back to Chicago;
            John was discharged from Air Force; they lived with John,
            Sr.'s family at 3150 S. Prairie

12-07-61    DOB, Kim Johnson, at Michael Reese Hospital, Chicago
            (premature birth - seven or eight months)

06-13-63    Family moved to 5266 S. State Street, in the newly built
            Robert Taylor Homes

10-14-63    Brenda was admitted to the hospital with false labor;
            discharged the following day

11-11-63    **DOB, Darryl Lamont Johnson, at Presbyterian St. Luke's
            Hospital; father worked as a platformer for Railway
            Express at the time**

1960's      (mid) John Johnson also worked first shift at Railway
            Express

07-25-66    Brenda called police after John, Sr. beat her

11-12-66    Brenda started working at the Post Office, second shift

02-1967     John, Sr. lost his job at Railway Express; was fired for
            drinking and stealing; did not hold steady job after this
            time

*1967   Brenda had a hysterectomy (hx of cancer in her family)*

04-1968     Brenda left her job at the Post Office; went on AFDC

04-28-68    Brenda called police after John, Sr. choked and beat her

07-01-68    Brenda Johnson filed for divorce, citing her husband's
            uncontrollable temper, excessive alcohol use and failure
            to support his family (alleged he had been in a constant
            state of drunkeness for more than two years); John, Sr.
            was ordered to vacate the marital premises, and did so on
            7-3-68

08-06-68    John, Sr. returned to the home and the couple attempted
            to reconcile; records indicate that psychological
            guidance was sought

DARRYL LAMONT JOHNSON
CHRONOLOGY
Page 3

1968          (approx.) Darryl enrolled in a pre-kindergarten readiness program at Mary Terrell School, adjacent to Robert Taylor Homes; attended Terrell until 1-30-70

10-05-68      John, Sr. became drunk and held a gun to a neighbor's head, then beat Brenda and tore her clothes; the police were called; Brenda and the children had to flee the premises; John, Sr. was ordered to vacate the premises on 10-15-68 and a restraining order was issued; John, Sr. continued to constantly harrass Brenda and interfere with her freedom, calling her at all hours of the day and night at her home and her place of employment; he burned all of her clothes; he paid no support; Brenda called the police on 10-16-68; court order entered on 10-25-68 ordering support, affirming the order to vacate the premises, and ordering John, Sr. to be brought before the court; John, Sr. was arrested on 10-26-68

01-21-69      An order was issured dismissing the divorce petition for want of prosecution

07-1969       Brenda began outpatient psychiatric treatment at Michael Reese Hospital; depressed over abusive relationship with husband; had left him many times (taking children with her to home of Minnie Livingston, her sister-in-law); separated from John for several months in 1968-69, then reconciled

10-1969       Brenda left job at post office and started a training program at the YMCA

11-17-69      Death of Minnie Johnson, paternal grandmother

01-31-70      The family moved out of Taylor Homes and into the home of John Johnson's mother, at 3150 S. Prairie; Darryl was enrolled at Douglas Elementary School on 2-3-70

02-1970       Brenda was hired full-time at YMCA by Benjamin Smith, as a clerk typist

05-04-70      Brenda's divorce from John was finalized

07-21-70      Brenda took the children and moved to an apartment at 6509 S. Ellis (she lived briefly at 3126 S. Giles)

**DARRYL LAMONT JOHNSON**

**CHRONOLOGY**

Page 4

09-08-70    Darryl transferred to Dumas Elementary School; Brenda soon became involved with Benjamin Smith, for whom she worked at the YMCA; John continued to harass her over the phone and by showing up at her apartment

06-19-71    Brenda purchased a home at 11449 S. Hermosa, in Morgan Park neighborhood; Darryl enrolled at Esmond School

1971    (Fall) A few weeks into the school year Darryl was tested and placed in special education; he was classified EMH (educable mentally handicapped); his teacher from 1971 to 1975 was Edith Burford

1973    Andre Johnson left the home to attend college in Wisconsin; attended from 1973 to 1977

02-1977    Death of Darryl's maternal Aunt Mabel Coleman

06-16-78    Darryl graduated from the eighth grade at Esmond School

09-1978    Darryl enrolled at Morgan Park High School; attended through most of the 1979-80 academic year

06-12-79    Darryl was seen at Beverly Morgan Park Mental Health Center; taken there by his mother

06-30-80    Darryl enrolled at Central YMCA High School

04-1981    Brenda Smith earned her GED

09-12-81    Brenda Johnson married Benjamin Smith; moved to 7714 S. Prairie; Darryl and sisters remained in home on Hermosa

1982    Brenda Johnson Smith was laid off from her job at the YMCA due to funding cutbacks

1983    (approx.) Darryl was the victim of head trauma; four stitches to head

03-1983    John, Jr. entered the military and left Chicago; to 5-1986

05-06-83    Arrest for Criminal Damage to Property; no disposition

**DARRYL LAMONT JOHNSON**
**CHRONOLOGY**
Page 5

09-17-83    Arrest for Disorderly Conduct; convicted on 10-18-83; no disposition noted

11-01-83    Arrested and charged with murder and armed violence in the shooting death of Jesse Simpson; released at some point on $1000 bond; at first the case was SOL'd and dismissed; then presented to a Grand Jury and indictment obtained *(This is when Brenda moved her daughters + Darryl out of the home on Hermosa)*

12-12-83    Brenda Smith began work at the University of Illinois Dental School; remained there for six years

03-27-84    Darryl was arrested and charged with possession of marijuana; pled on 3-28-84; three months supervision; living at 11449 S. Hermosa

10-16-84    Darryl was charged with Possession of Cannabis; Unlawful Use of Weapon and Falsification of ID; pled to Delivery of Cannabis more than 500 GM on 12-27-84; sentenced to 2 years DOC, concurrent with four years on Vol. Mansl.

10-17-84    Start of bench trial on murder case; convicted of lesser included Voluntary Manslaughter on 10-18-84; bond revoked; held at Cook Co. Jail

11-19-84    Sentenced on Voluntary Manslaughter conviction to four years DOC

11-30-84    Received at Joliet

12-18-84    Darryl was sent to Diagnostic Unit at Logan

01-09-85    Darryl was transferred to Menard Corr. Inst.

1985        Death of Darryl's friend from neighborhood, Richard (Ricky) Johnson

11-14-85    Darryl was trasnferred to Shawnee Corr. Center, Vienna

04-16-86    Darryl was transferred to Lincoln Corr. Center

08-15-86    Mandatory release from Lincoln Corr. Ctr. to parole; shortly after release he became involved with Stacy Curtis

**DARRYL LAMONT JOHNSON**
**CHRONOLOGY**
Page 6

1987        Death of John Taylor, paternal grandfather

07-03-87    Death of Ruth Johnson, paternal aunt

03-18-88    Charged with Possession of Controlled Substance (cocaine); nolle prossed on 11-2-88

04-01-88    Seen in Emergency Room at St. Francis Hospital with complaints of pain in head, blurred vision, dizziness and nausea

05-1988     Met Michelle Gaines (pregnant at the time with Bianca); became involved with her in 6-88

08-29-88    Death of John Taylor, maternal grandfather

10-24-88    Birth of Bianca Gaines to Michelle Gaines

12-15-88    Arrested and charged with Possession of Stolen Vehicle, UUW - Felon, and Armed Violence (traffic stop - gun in glovebox); out on bond; found guilty on 1-30-90; sentenced to two years and three years, concurrent, on first two counts; subsequently released on appeal bond until 1992

07-30-89    Charged with Battery; no disposition; address 7714 S. Prairie (his mother's home)

02-1990     Brenda Smith went to work at Marshall Fields

06-1990     Shot in head by Mike Edwards; 33 stitches; treated in ER at Little Company of Mary Hospital; in same incident his friend Richard Lofton was shot and paralyzed

02-18-91    Brenda Smith went back to work at YMCA

04-19-91    Birth of daughter Daryl "Lucki" to Michelle Gaines; birth was by caesarean section; Michelle and Lucki remained hospitalized for twelve days; during this time Darryl took a bed at the hospital and helped care for Lucki and Michelle

DARRYL LAMONT JOHNSON
CHRONOLOGY
Page 7

04-29-91    Arrest of UUW - Felon and FOID (chasing Mike Edwards, who had shot him); pled on 9-30-91 to misdemeanor; eighteen months probation with 45 days work program; $500 fine

06-05-91    Arrested on Possession of Stolen Motor Vehicle; released on bond

08-1991     Darryl was diagnosed with Vitiligo by Dr. Nathanial Morgan

01-29-92    Arrested for Possession of Controlled Substance; nolle prossed on 3-3-92

05-15-92    Received at Joliet; lost appeal on 1988/89 case; three years on Theft of Motor Vehicle

05-28-92    Transferred to Taylorville Corr. Fac.

07-10-92    Transferred to Vienna Corr. Center

12-22-92    Transferred to Centralia Corr. Center

05-11-93    Paroled from Centralia Correctional Center

*Death of Shower*
12-17-9?    Death of cousin Salima Dantzler in traffic accident

1994        Father was in a nursing home; saw him at Thanksgiving at Kim's house for first time in ten to fifteen years

05-07-95    Death of Darryl "Blunt" Johnson

05-11-95    Discharged from parole

06-09-95    Death of Charles "Jello" Banks

07-03-95    Arrest in this case; held at MCC, Chicago

01-17-97    Transferred to federal medical facility at Springfield, for six weeks, fro treatment of eye condition; returned to MCC in early March

[10-15-97]

# EXHIBIT D

**JILL MILLER, MSSW**
_____
Forensic Social Work Services                          330 East Wilson Street, Suite 100
                                                       Madison, Wisconsin  53703
                                                       (608) 257-7990
                                                       FAX (608) 256-7909

### CONFIDENTIAL MEMORANDUM TO ATTORNEYS

**TO:**      Attorneys Jeff Urdangen, Cindy Giacchetti, Juliet Yackel
**RE:**      Darryl Lamont Johnson - Social History Investigation
**DATE:**    April 22, 1997


        Pursuant to our meeting last week and as a result of the interviews I conducted during that trip, I am updating my memo of 1-2-97 with information on phone numbers I have obtained, and additional records and locates that are needed.  I will begin with providing phone information I have obtained for names on the previous memo.

## Previous Sources

Brenda Smith, mother - 773-873-4442 (H), 773-947-0700 (W)
        Address: 7714 S. Prairie
John Johnson, father - 312-808-9644 (H);3245 S. Prairie, # 901
Andre Johnson, brother -708-339-4222 (H);17124 Vollbrecht, S. Holland
John Johnson, brother - through father's number or Andre
Kimberly Williams, sister - 773-846-2947 (H);7828 S. Wabash
Sharon Cresswell, sister - 773-783-5136 (H);7909 S. Eberhart
Benjamin Smith, step-father - through Brenda
Minnie Livingston, paternal aunt - 773-445-4350; 9015 S. Elizabeth
Michelle Gaines, girlfriend - 312-846-0983 (lives with Hoover's wife;
        currently in trial - need to go through her attorney)
Lucky Johnson, daughter by Michelle - lives with Brenda
Bianca Gaines, Michelle's daughter - through Michelle's mother
Kenya Morgan Pettigrew, former girlfriend - 708-798-6354
Lakiesha Hayes, friend - 630-829-1140
Letra Watson, former girlfriend - number needed
Carolyn Demeray, friend - 708-891-3397
Donald Taylor, maternal uncle - may be in Miami
Shirley Dantzler, paternal cousin - 708-489-0153
Mrs. Burford, former special ed teacher at Esmond - need locate
Mr. Weltz or Welch, former basketball coach at Esmond - need locate
Tommy Adams, engineer at YMCA (Darryl worked for him ) - Brenda
Richard Lofton, friend who was shot and paralyzed (shot by Mike Edwards,
        the same man who shot Darryl)
Reginald Fletcher and his sister Sheryl (re:manslaughter charge) -
        can be located through Stacy Curtis, friend
Dwight Conquergood, gang expert, Northwestern U - 847-491-3171 or 3259(W)
        or 773-275-5853 (H)

## New Sources

Stacy Curtis, friend - 708-331-4750
Eugene Austin, friend of father's - 773-779-8404; 1146 W. 104th
Clarence "Billy" Johnson, paternal uncle - 312-225-8241; 2851 King Dr.

Page 2

Michael Johnson, friend who is getting out of jail soon - through his
        mother - 773-779-8953; 1753 Steuben
Junior Prue, childhood friend, Morgan Park area - need locate
Dorothy Rivers, Darryl did some work for her at a warehouse (1983)
Willoughbys, neighbors and friends of family - ask Brenda or Andre
Louise Martin, neighbor in Morgan Park - ask Brenda or Kim
Kevin Matthews, friend of Andre's - 773-224-7757
Eileen Dean, an older woman with whom Darryl spent time as a teen,
        lived around 109th and Esmond (also her mother Helen Richardson) -
        through Stacy Curtis
Tony Livingston, paternal cousin - through Minnie
Ron Livingston, paternal cousin - through Minnie
Ron Showers, Jr., son of friend of Darryl's who was killed - through
        Michelle
Theresa Fletcher, Sherry's sister - through Stacy Curtis
Jane McBane, Ricky Johnson's widow - through Kim
Helen Sanders, friend - through Kim

        Please refer to the memo of 1-2-97 re: records that are needed, and
continue to try to obtain these.  In addition, we need information on the
Morgan Park neighborhood (Darryl lived there from 1971 on), including changes
over time.  Darryl spoke of a pool hall at 111th and Vincennes, where he said
"it all started."  Any information on this location, and police contacts with it
would be useful.  There may be records of police calls re: domestic abuse when
John, Sr. was in the home.  The family said that the precinct that was called
was at 48th and Wabash.  Darryl saw a Dr. Morgan in about 1992 re: his skin
condition.  He thought the office was in the area of 112th and Halstead.  Try to
locate this doctor and get his records.  Obtain the divorce records for Brenda
and John Johnson; they were divorced in about 1970.  Darryl was seen by a
social worker at the Chicago Board of Health on Monterey, between Hale and
Longwood (in the area of 111th) in about 1970.  Try to track down the records
and the social worker.

        Darryl was drawn into the business by Richard "Ricky" Johnson, out in the
Morgan Park neighborhood.  Johnson was later shot and killed.  It would be
helpful to get information about his death, and about his background, e.g.
criminal history, role in the Disciples, family, etc.  He died while Darryl was in
prison at Menard, and this was described as a traumatic event for Darryl.
Verify the deaths of Reginald Tolbert, in Morgan Park in about 1977 or 1978,
and the death of Wilbert Showers, who was shot in the early 1990's.  We need
all the MCC records, including discipline and medical, and all the records from
Darryl's stay in Springfield.  Locate a book on gangs by George Knox of Chicago
State University (Conquergood may have a cite).  He is likely to be relied on by
the government, and we will want to anticipate their approach to the gang
issue.  Another gang expert that the government may call on is Yablonski,
whose work is similar to Knox.  His book was published by University of Chicago
Press.  Irving Spergel, University of Chicago, is another recognized expert on
gangs.  I spoke to him at the time of the Davis case.  Conquergood reports that
he uses police department data in doing his work, which is faulty.

Page 3


I am awaiting the materials related to the case that you said you would furnish.  Any news accounts of the Hoover trial that mention Darryl should be obtained and provided, as well.  We also need to do some research on the victims.  Begin with their criminal histories and obituaries.  We need to anticipate victim impact evidence, and need to diminish the effect of it in the guilt phase.  Please furnish records as they are obtained.  I would like to return to Chicago in a few weeks, and hope to spend three days.  I need a long session with Darryl.  If teachers can be located before school is out for the summer, I will try to come before then, so I can interview them.  Andre will keep me apprised of his father's condition.  I said that I could come down on short notice to interview John, Sr. if he is having a good, i.e. lucid, day.

As you can see, there is much to do.  I am anxious to hear how Mike Gelbort's session went.  Let me know as soon as you know something.  I'm sure we'll be talking soon.

# EXHIBIT E

**JILL MILLER, MSSW**

Forensic Social Work Services

330 East Wilson Street, Suite 100
Madison, Wisconsin 53703
(608) 257-7990
FAX (608) 256-7909

## CONFIDENTIAL MEMORANDUM TO ATTORNEYS

**TO:**    Attorneys Jeffrey Urdangen & Cynthia Giachetti
**RE:**    Darryl Johnson - Preliminary Social History Findings
**DATE:**    August 8, 1997

Preliminary results of social history investigation are summarized below to aid other experts in conducting their assessments. The social history investigation in ongoing, and further results will be reported at a later time. Major findings to date include:

1.    Early (pre-birth) family history - Hereditary/Genetic factors and factors affecting his parents (their functioning, including parenting): There is a family history of alcohol and drug abuse on both sides of the family. Brenda's parents were both drug addicts; her mother abused alcohol. Her father was a major drug dealer. Both parents were incarcerated. Her brother abused drugs. Though Brenda has not abused alcohol or drugs, she is a classic child of an alcoholic, and fits the role of super-responsible child. Marrying an alcoholic (and marrying young, while pregnant) are also child of alcoholic behaviors. John, Sr.'s mother abused alcohol, as did his maternal grandmother. John, Sr. and his sister Ruth (deceased) are/were alcoholic. John, Sr. was also a compulsive gambler. John, Jr. appears to be the only child of Brenda and John, Sr. to abuse alcohol. Others report a low tolerance for alcohol - Darryl, Kim and Andre. Each child in this family fits a role of child of alcoholic: Andre is super-responsible; Kim is a placater; Sharon was a caretaker early, then became immature and self-centered - she married a man who abused substances and was abusive towards her; John, Jr. is alcoholic; Darryl was emotionally dependent and immature for some time, with some acting out (also had problems with relationships of trust and intimacy), then became a caretaker.

John, Sr., the youngest of five children, was only two years old when his father died. He was reportedly spoiled, as the baby of the family. The family received welfare. He reportedly attended school only through the ninth grade (he earned his GED in the Air Force). He did not abuse alcohol prior to being in the Air Force. Brenda has one brother, who lives in Miami, and with whom she has had little contact. Brenda's father physically abused her mother. He then left her mother and lived openly with another woman. Brenda's mother reportedly had a number of men in the home. Minnie Livingston believes that Brenda was accosted by men who stayed with her mother at various times. Brenda had little supervision or guidance. Brenda was out riding motorcycles with John, Sr., when she was twelve years

Page 2

old and he was fourteen or fifteen. She became pregnant at age thirteen. She gave birth to her first child at age fourteen, two days before her mother's death, from ovarian cancer. There is a history of cancer on Brenda's side of the family. Brenda then went to live with John, Sr.'s family. She and John married shortly after Andre's birth. She had five children in eight years (by age twenty-two), plus three miscarriages, including a set of twins. It appears that John. Sr.'s abuse of alcohol and physical abuse of Brenda began while he was in the Air Force, and they were living on or near Andrews Air Force Base, Washington, D.C. (1956-61).

There is a family history of mental illness on Brenda's side of the family, and a family history of Attention Deficit Hyperactivity Disorder (not clear yet where this comes from). Brenda's Aunt Mabel, with whom she was very close, was an alcoholic and was in and out of mental hospitals a number of times. She reportedly suffered from "nervous breakdowns" (diagnosis of paranoid schizophrenia). Brenda's nephew (her brother's child) has schizophrenia, and is currently in a halfway house. Other relatives on Brenda's side of the family have had mental health problems ("nervous breakdowns"). Brenda has been treated for depression. John, Sr. may have suffered from depression. There are multiple members of the family that appear to have ADHD (which is often hereditary), including Darryl, Lucki, Andre's son, Kim's son, Sharon, Sharon's daughter, Sharon's grandson, John, Jr., John's son (probably more, if we really look). This can have an hereditary basis. No one else seems to suffer from low cognitive functioning similar to Darryl so, review of prenatal and birth records is important for any clues.

2.  Birth: Darryl's birth appears to have been normal, with no anomalies apparent; birth weight of 7'6". Brenda was hospitalized, however, one month before his birth for false labor. The family moved to the newly opened Robert Taylor Homes in June, 1963, five months before Darryl's birth. By the time of his birth, Darryl's father had become an alcoholic and had been physically and verbally abusive towards Brenda for some time (appears to have begun while they lived in Washington, D.C.).

3.  Cognitive deficits/impairments: Darryl was diagnosed as a slow learner early, and placed in EMH (educable mentally handicapped) classes. Recent testing reveals a full scale IQ of 76 (mentally retarded is 70-75, with adaptive skills deficits). Developmental delay occurred in the area of speech; he did not talk until he was two years old. He was taken to Cook County Hospital for evaluation at that time (search for records is ongoing). Behavioral observations of family members and testing are indicative of probable Attention Deficit Hyperactivity Disorder (linked to impulsivity, poor judgement and risk-taking behaviors). This disorder appears to run in the family.

4.  Early family life - chaotic and violent: Darryl spent the first six years and three months of his life in the Robert Taylor Homes. The condition of the homes rapidly deteriorated. Large numbers of persons were confined to a small space. Physical condition and safety of

Page 3

buildings deteriorated. There were large numbers of children, including adolescents, with nothing to do. Poverty rate was high. Residents were almost totally African-American. Gang activity (Blackstone Rangers) was present, with pressure on young people to get involved. Uncle Clarence "Bill" Johnson opined that Taylor Homes were built for political and economic reasons, to keep minorities together in a small space. When Darryl was still a pre-schooler both parents were working second shift - Brenda at the Post Office and John, Sr. at Railway Express. Finances were still a problem for the large family. Darryl was looked after by his older siblings (Andre and Sharon), who were quite young themselves.

Ben Smith noted that during her pregnancy with Darryl, Brenda was in an abusive relationship with an alcoholic husband; she was under a great deal of stress and had four young children to care for during the pregnancy. Over the years, especially after she started working, John, Sr. became increasingly jealous, possessive and abusive. The older children enjoyed some pleasant times with their father, and were able to develop a relationship with him. Darryl's only memories of his father are of his mistreatment of his mother and his failure to support his family. He never had a positive relationship with his father. He witnessed a great deal of physical and verbal abuse of his mother by his father. The police were called to the home numerous times. There were a number of times that Brenda gathered the children and fled to a relative's home, usually Minnie Livingston's (John, Sr.'s sister).

In 1968, John, Sr. was laid off from his job at Railway Express. He never held a steady job after that time. He did not support his family. Brenda filed for divorce in 1968, but then reconciled with John. Brenda was robbed at gunpoint in Taylor Homes (there may have been two robberies). Shortly after that she and the family left Taylor Homes and moved back into John, Sr.'s mother's home on S. Prairie. Mrs. Johnson had died by this time, but family remained in the home. The death of Minnie Johnson was a loss for Darryl, who had been close to his grandmother. John, Sr. continued to be abusive towards Brenda. Family members, including Minnie and her daughter Shirley personally witnessed incidents.

Brenda left John and the home on S. Prairie in 1970. John, Sr. continued to harass her for years afterward. He would frequently phone her or would stand outside her home yelling at her and verbally demeaning her. Darryl would witness these incidents. Brenda had to work two jobs to try to support the family. They struggled financially. There were times there was nothing to eat in the house. Brenda would go to the grocer's and beg for food until payday (this continued even while they lived in Morgan Park). At times they ate ketchup or syrup sandwiches, or pancakes for dinner. Sometimes they would go to relative's or neighbor's for something to eat. Christmases and birthdays were difficult; they had very little. They had few clothes, which were often hand-me-downs, though Brenda kept the children neat and clean. Darryl was aware of the family's difficult circumstances and his father's failure to help the family. He was devoted to his mother - extremely attached to her -

Page 4

and did not like to see her struggle. His memories of her struggles were indelibly etched in his mind.

Darryl is described by all as an active and energetic youngster, but also a quiet child, who was a bit of a loner and extremely attached to his mother. Brenda reported that after she and John, Sr. divorced, Darryl stopped talking for a time. He wanted to be with his mother all the time, and was extremely demanding of her attention. Family described Darryl, as a child, as withdrawn and a loner.

5.   School - Special Education and Self-Esteem: Darryl started school at Mary Terrell at age four, in a pre-school class (1968). This was a time of great turmoil in his home (see divorce records). He was one of the slowest children in the class, and did not seem to communicate much. He did not mix well with other children. He attended Terrell for a year and a half; then transferred to Douglas School in 2-70. In the fall of 1970, he enrolled in the first grade at Dumas School (three schools in three years). In 1971, Brenda moved the family to Morgan Park. Darryl was enrolled in the second grade at Esmond School (fourth school). This number of school changes is problematic for any child, but particularly for a low-functioning child with special needs, who is somewhat withdrawn, immature and dependent (and who had experienced a high level of emotional turbulence in his home). We know that by this time he had been determined to be in need of EMH services (special education for educable mentally handicapped, e.g. mildly or borderline retarded). His second grade teacher, Edith Burford, took a special interest in him and gave him extra attention.

Darryl referred to himself as "slow", as did family members. It clearly bothered him to have this label attached to him. He was made fun of by other children at school because of this. Brenda recalled that Darryl would often cry about being teased and because he had such a hard time with schoolwork. She had to work long hours, and was attending school, so she was able to give him little help. Kim worked with Darryl to help him learn to read. At age twelve he was identified as a virtual non-reader. Brenda recalled that when he was little his father would "threaten and hound him" to be more like his siblings, who were good students. All of Darryl's siblings are cognitively competent. He felt he could never compete with them or be as good as they were at anything. Darryl did not like to go to school because of his low functioning and the teasing he received. He was easily frustrated in school and was distractible. He just gave up. Except for Ms. Burford, he could remember none of his teacher's names. He did not participate in organized activities at school. The neighborhoods in which the family lived, and, therefore, the schools, were segregated - primarily black. The quality of education in Chicago's inner city schools, especially for children with special needs, was poor at the time. All family members report that Darryl's self-esteem was severely affected by his low functioning and by being identified as "slow"/EMH. Ben Smith noted that Darryl always questioned his worthiness and ability; he was always looking for approval.

Page 5

Darryl's elementary school years, from second through eighth grades, were spent in the Morgan Park neighborhood. During that period the neighborhood changed rapidly from one that was integrated to one that was primarily black, due to white flight. Brenda worked, went to school, and was involved with Ben Smith. Though she was always a loving mother, she did not spend much time with Darryl. He was often in the care of older siblings or left to fend for himself. Sharon, who had looked after him much of the time, became pregnant at a young age (16 or 17, in 1975-or 1976). His father was non-existent in his life; Darryl wanted nothing to do with him anyway. As he approached his teens, he was out in the streets and neighborhood more, and subject to the influence of the neighborhood gang, the Gangster Disciples. It appears he had few, if any, close friends. Darryl began truanting during high school. His performance was poor. He withdrew from Morgan Park High School (or just stopped attending) in the spring of 1980. He started spending time at Eileen Dean's house, on Esmond. He was using marijuana, and probably selling a little marijuana. At the time, marijuana was the thing in the neighborhood; cocaine did not come into the neighborhood until he returned from his first stint in prison.

In June, 1980, Darryl entered the alternative school at Central YMCA (which it appears he only attended until early 1981). By that time, he had hooked up with Ricky Johnson, the neighborhood drug dealer (marijuana). Darryl said that he idolized Johnson. The pressure to get into the gang (Gangster Disciples) in the neighborhood was "relentless." It was not highly structured or organized at that time. Andre was able to avoid it because he was an honor student and bookworm, college bound. John, Jr. flirted with the gang - was on the fringes - but was a talented athlete in school and an average student who went on to join the military.

6.    Darryl's need for acceptance and belonging, and to feel good about himself made him vulnerable to gang recruiters. He was also a passive and easily led adolescent. The center of the marijuana selling trade was at 111th Street and Vincennes. As a teen, Darryl had little supervision, guidance or limits. He drifted into the gang and the selling of marijuana. His mother married in 1981, moving out of the house on Hermosa, and leaving Darryl, Sharon and Kim there. Andre was in college and John, Jr. in the service. Darryl was pretty much on his own. Darryl's marijuana use was regular (daily) through the early 1980's, until his incarceration. He had some occasional employment prior to his first incarceration, but his lack of education and skills, and his low functioning, combined with the fact of being African-American meant that only menial, low paying jobs were available to him. Ben Smith noted that teens got drawn in by being offered a way to make quick money..."go to the corner and take this package to this man for $10...or stand on the corner and tell us if the police are coming...get $50 a day...take that home to Momma, who is living on food stamps...so he has sanction at home (and in the community)... making money to help out...gets hooked."

Page 6

Darryl's involvement in the offense which led to his voluntary manslaughter conviction was a turning point. At the time, he was a regular marijuana user and occasional drinker, and a low-level seller of marijuana. His low cognitive functioning and ADHD contributed to impulsivity and poor social judgement. In the situation, he felt he was helping a friend and protecting the friend's sister. He is described as extremely distraught upon learning that Jesse Simpson had died, and extremely concerned about Simpson's family. He was also terrified of being incarcerated. He was actually twenty-one years old (not nineteen, as previously thought) when he was incarcerated at Menard, though he functioned socially and emotionally at a lower level. He was not well-prepared for the prison experience.

Two things did happen while Darryl was in prison that had an impact on him. The first was the death of Ricky Johnson (I believe he was shot and killed). Darryl said that Johnson had been trying to turn his life around at the time. He was going to college and trying to find a way out of the drug economy. He had a family and was "stepping away from the life." He was turning away from violence. He had been Darryl's mentor. Darryl was extremely upset about his death. He stopped using marijuana at that time, and did not abuse substances again. The second thing appears to be his recruitment into the serious and more organized drug dealing of the Gangster Disciples. They were extremely organized in the jails and prison system. There was a formal screening process when someone entered the prisons, and distribution of literature. Darryl made the decision to become more involved in selling drugs when he left prison; it is while in Menard that he made this life choice.

Darryl's reasons for this career choice were his desire to gain respect (especially self-respect/self-esteem) and to earn money to take care of his family. Money would enable him to help his mother, whose financial struggles he had witnessed throughout his life, as well as others in his family (see below), and to feel successful (enhance his self-esteem). Stating, "I always had dreams...just because I'm slow doesn't mean I don't have dreams," Darryl said he knew of no other way to compete with his siblings or to make the kind of money, and have the material things, that symbolized success in America. Like most young people, he wanted the outward symbols of success in our society, e.g. car, clothes, jewelry. He said that in his community, and his circumstances, selling drugs was how a lot of people "got things...it was on every corner." Others noted that in Morgan Park many people in the neighborhood were connected to the drug economy. David (nephew) said it was a way of life for kids in the neighborhood, accepted as part of the culture of the neighborhood.

By this time he had several obstacles to legitimate opportunities: low cognitive functioning; being black (especially young, black male) in a racist society; no education, and no training or job skills; and being a convicted felon. In the world of the underground economy the fact of having spent time in prison, especially for having shot someone to protect a friend's sister, earned him automatic respect in the streets and neighborhood. John, Jr. noted that in this world he could be "be a big shot...the fact he couldn't read didn't matter." Ben Smith said that Darryl got "caught up trying to be somebody...brothers and sisters were accomplishing

Page 7

things...he wanted to compete...be as good...saw having money as a sign of making it ...drug dealing as the easiest, quickest way to have money." Stacy Curtis, who met him shortly after he got out of prison in 1986, said that Darryl started selling cocaine as a low-level street dealer. He said he was just going to do it for a little while; he wanted to get some money together and start a business.

Darryl progressed in the drug economy over the years. When he came back into the neighborhood in 1986, cocaine/crack had become the main drug that was sold (previously it had been marijuana). It became known that he was selling, and making money. He earned respect in the neighborhood. Then others he knew would ask him to get some for them. Suppliers became willing to front him because he was known to pay his bills. He was then able to obtain larger amounts. He gradually became a coordinator; he had people selling under him. Curtis said these were generally people he knew, and were generally his same age. He was making more money, and spending more money. At first, he seemed to need to have the outward symbols of success. He dressed in flashy clothes, wore jewelry and drove a Mercedes. As he gained in confidence, he did not need these things as much. He did help his family financially. He also helped others (see below). By 1989, Darryl was reportedly a governor in Morgan Park. He remained in that position until he went to prison in 1992. When he came out, he was reportedly on the Board of Directors, where he remained until his arrest.

Over the years of his involvement in the drug economy, Darryl was exposed to violence. He was shot. A friend was shot and paralyzed in the same incident. He lost other friends to violent deaths (particularly the Showers). His early life had been violent, as well. Witnessing violence and suffering traumatic losses caused him to develop self-protective behaviors, including numbing of feelings. He said that, growing up, "violence (was) all around you...you have to turn off your emotions to survive." In his world, violence was dramatized, romantized and justified. Compounding the problem is the sense of futurelessness and fatalism that young black men develop. Homicide rates and incarceration rates of young black males leads to a belief that they will be dead or in prison at a very young age. This facilitates rationalization of involvement in the drug economy where quick money can be made. I believe Darryl did not feel he would last long in the business - he knew he would be dead or in prison. Towards the end he evidenced increasing signs of stress and anxiety. The Vitiligo is an immune system disorder exacerbated by stress. His hair was falling out. He had a nervous stomach, and a rash. He had symptoms of depression and anxiety, including hypervigilance. The death of his cousin Salima in December, 1994 was a devastating loss for him. He talked about wanting to get out. While he may, at times, have not believed he could get out, he did make some plans. He even sent Michelle to Atlanta in early 1995 to look for a place for them to live. He worried about having enough money to start a legitimate business. Michelle said he did not have that much money; they were often behind in the rent and other bills. He told Kim that he wanted to get out of the business, but that he feared for the safety of his family if he tried.

Page 8

## Positive Qualities and Acts/Good Deeds

Collateral sources reported that Darryl has exhibited positive qualities and has performed acts of kindness towards others. There are many examples of this. This demonstrates, in many ways, his true concern for his family and others, and an understanding of his own mistakes, including an awareness of the wrongfulness of what he was doing. Family and friends know describe Darryl as warm and caring, generous and loyal, friendly and affectionate. Some examples:

He was determined that his children not be exposed to what he was exposed to growing up (domestic violence). He was careful with Bianca and Lucki, making sure they were not exposed to this.

When Lucki was born, the delivery was by caesarean. Darryl was present for her birth. Michelle remained hospitalized for twelve days. Darryl took a bed at the hospital and remained with her. He did nighttime feedings, changed and bathed Lucki in the hospital.

He participated in all aspects of care for both daughters, feeding, changing, bathing, reading to them, taking them to the park, etc. He made sure they had good health care, as well as good educations.

He made sure that Bianca and Lucki went to good schools (private schools), and that they are receiving a good education.

He always treated Bianca as though she were his biological daughter, and treated her the same as Lucki. He is the only father Bianca has known. She calls him Daddy. Her biological father died in 1991.

He met Michelle when she was pregnant with Bianca. He was with Stacy Curtis at the time. Michelle's good friend had just died. She had no money. He bought her clothes to go to the funeral. Then he got her an apartment and furnished it with furniture and equipment for the baby, and food. He bought her maternity clothes. At this time, they were only friends, though they soon became involved.

As a teen, when he worked at the YMCA, other odd jobs, or even selling small amounts of marijuana, he would do things for his cousins and other children in the neighborhood, like buying everyone ice cream or soda.

Page 9

He often brought children from the neighborhood home to eat, if they had nothing to eat. He helped an elderly lady (deceased) in the neighborhood, when they lived on Ellis, by doing errands and chores for her.

He has helped family and relatives out financially, including giving them food, or money for clothes, furniture, or to send children to school.

When Richard Lofton was shot and paralyzed (while with Darryl, in Darryl's car - drive-by shooting), he brought Lofton home from the hospital to the apartment that he and Michelle shared, and personally cared for Lofton for months, including bathing, feeding, and carrying him.

He encouraged his nieces and nephew in school, constantly reminding them to stay in school and finish their education. He helped some of them with college expenses. He constantly stressed the importance of a good education.

He has always remained absolutely devoted to his mother, and respectful towards her. He has done things to help her over the years.

He wanted Lucki to have a safe, stable and normal upbringing, so he placed her in the care of his mother, though he spent a great deal of time with her. His greatest gift to his daughter has been the stable and loving home in which he chose to have her raised. He continues to encourage Lucki and Bianca in school and in their activities, including rewarding them for good report cards.

He encouraged his nephew David, an honor student, in his education. He kept him out of the gang. He helped him with college expenses. He bought him a car for getting back and forth from college. He told David that he regretted not finishing school and told him that being in the streets is no way to live. He has motivated David to do well and to achieve (he is a recent college graduate and a devout Muslim). He encouraged David in his faith. He has been a good listener, and someone David could talk to about problems. David said that Darryl even pushed other kids in the neighborhood to go to school, and rewarded them if they did.

He has been like a father to his niece Nicole. He has helped her financially. She is eighteen and has two young children. He encouraged her to stay in school, even when she had the babies. She did finish high school. He took care of Nicole one summer when her mother was working.

He was a good friend to Carolyn Demeray, and encouraged her to stay in school. She, too, is a single parent. He has read books and articles on child development and child rearing, and shared these materials with her.

Page 11

## AGGRAVATING FACTORS/ADDITIONAL AGGRAVATION

### Noticed Aggravating Factors

I.    Count Five and Count Six - Murder/Intentional Killing of Darryl "Blunt" Johnson
      **A.** Threshold Culpability Factors

      1. Intentional Acts to Take Life or Use Lethal Force (death of Darryl "Blunt" Johnson)

      2. Intentional Acts in Reckless Disregard for Life (death of Darryl "Blunt" Johnson

      **B.** Statutory Aggravating Factors

      1. Procurement of Offense by Payment - alleges that he paid money to Anthony Copeland to shoot "Blunt" Johnson

      2. Substantial Planning and Premeditation (conversations with Roger Stewart, et. al. re problems caused by "Blunt" cooperating)

      3.    Continuing Criminal Enterprise Involving Drug Sales to Minors - alleges that the CCE involved the distribution of drugs to persons under the age of 21 (information as to Darryl's participation in, or knowledge of, sales to minors?)

      **C.** Non-Statutory Aggravating Factors

      1. Vileness of the Crime - Johnson ordered the murder in order to obstruct justice.

      2. Future Dangerousness - probability that Johnson would commit serious acts of violence in the future which would be a continuing and serious threat to society. Alleges numerous instances of violent criminal conduct including: (1) ordering the murder of Gregory Sharp; (2) threatening and ordering the beatings, shootings and /or murders of gang members for violating rules (some specific acts detailed below); (3) urging and ordering GD members to commit acts of violence against rival gang members, including drive-by shootings (see below); (4) planning to kill a witness against him while he was incarcerated at the MCC (presumably the "threat" against Quan); and (5) conviction for the voluntary manslaughter of Jesse Simpson in 1983.

      3. Victim Impact - impact upon the victim's family ("devastating!") [Obviously, we need all information possible on Darryl "Blunt" Johnson, including his criminal history, role in the gang, acts of violence, and his family]

Page 12

II.   Counts Seven and Eight - Murder/Intentional Killing of Charles "Jello" Banks

   A. Same as above

   B. Statutory Aggravating Factors

   1. Previous conviction of violent felony involving a firearm (the voluntary manslaughter conviction for the shooting of Jesse Simpson)

   2. Procurement of Offense By Payment - paying Quan Ray with an automobile

   3. Substantial Planning and Premeditation

   4. Continuing Criminal Enterprise Involving Drug Sales to Minors

   C. Non-Statutory Aggravating Factors

   1. Future Dangerousness - same as above

   2. As to Count Eight only - Vileness of the Crime - Johnson ordered this murder because he believed Banks was cooperating with federal authorities and to obstruct the effective enforcement of the law

   [Notice: they do not allege victim impact on Bankcs]


**Other Aggravating Evidence/Information** : that will be used to support Future Dangerousness or that will be presented in the guilt phase (from statements and Grand Jury testimony)

-   Larry Hoover is the only person above Darryl "Pops" Johnson in the Gangster Disciples; Pops generally relayed his orders through Roger Stewart

-   The offense of involving minors in the distribution of drugs is aggravating (will be viewed as such by the jury)

Pugh Affidavit/testimony:

-   Pugh joined the Gangster Disciples at age 12 or 13; sold marijuana as a teen in Morgan Park; sold for Ronnie Showers (as did Richie Wash and Roger Stewart); Showers got his marijuana from Darryl

Page 13

- At age sixteen he worked security for Darryl; the first time he did this he was paid $50; was seventeen when he sold (distributed/delivered) for Darryl

- Darryl directed the drug business from prison during 1992-93; he used Michelle Gaines (the mother of his children - thereby placing her at risk) and others to direct the business

- Pugh witnessed the violation of Delano "Trouble" Finch the day that Darryl got out of prison (5-11-93); Finch was given a "pumpkin head" for messing up the peace treaty with the Vice Lords - he lied to Shorty G; Mike J (Johnson) told Finch that Darryl said he was in violation; Finch accepted the violation; he ended up at the hospital

- Pugh was made to take a violation for not taking a gun charge (not taking the weight) for Big Rog (Roger Stewart), who had already been in jail/prison; the violation was a punch in the eye from Stewart after Darryl asked Pugh why he didn't take the weight

Finch Testimony/Affidavit:

- When Finch was a governor he violated members on orders from Darryl, e.g. Dre - Darryl ordered him violated for being responsible for getting a member murdered

- Finch was violated by Darryl when Darryl got out of prison because he had argued with Darryl while he was in prison; had to go to the hospital (medical records from St. Francis Hospital confirm that he was treated in the ER for head injuries from being assaulted on 5-11-93, the same day Darryl was paroled from Centralia)

- As a director Darryl had the power to name governors, assistant governors and regents, e.g. he made Finch governor of the south suburbs the night that Ronnie Showers was murdered; he took this job away from Finch when he got out of prison

- Darryl gave Nation Work to governors, etc.; the quality of the nation dope was poor and the price was high - $1200 (the cocaine had been "stepped on" several times - good cocaine was $800/oz.); he required members to sell a certain amount of Nation Dope

- BJ reported that Parks told his partner to kill BJ because Darryl thought BJ was cooperating (BJ was governor in Minnesota after Noonie Ward)

- Finch heard a conversation between Darryl and Parks in which Darryl told Parks to get together with Herron (Harold Jackson) to eliminate a situation; Finch believed that Darryl wanted Herron killed; Herron was removed as regent

Page 14

- Darryl had Finch's name on a list of people he thought were cooperating; Darryl saw Finch in the bullpen the day of Finch's proffer;  Darryl told Finch he saw Finch's family in court (which can be interpreted as a threat to harm Finch's family)

- Richie Wash told Finch that Darryl wanted Lance and someone in Roger Stewart's family killed because they could testify as to who killed Jello and Blunt

- Richie Wash told Finch that Quan Ray murdered Angel (nothing about an order from Darryl, though Quan was known as enforcer for Darryl)

- Finch heard Darryl say that he wanted Capone and Victor Thompson murdered; Darryl personally went looking for Capone

- Darryl sent Roger Stewart, Kevin Williams and Blue to shoot up Victor Thompson's mother's house; Darryl told Finch to send a couple guys with them; Darryl talked about shooting up and burning Thompson's mother's house

- Finch was present when Meechie and two of his guys told Darryl they had murdered Capone's brother, E-Man (presumably for Darryl)

- Eight Ball was murdered by Quan Ray and Mendell; Eight Ball worked as security under Victor Thompson; Darryl had Eight Ball killed so it would be easier to kill Thompson

- Richie Wash told Finch that Darryl had Stan murdered; Stan was one of Darryl's guys

- Finch heard Darryl tell Thael ( or Thel - Jathael Garrett) to kill E-Man, Victor Thompson's brother; he also heard Darryl tell Meechie to kill Kenny, Thompson's nephew; Darryl said if they didn't do it, Trouble (Finch) and Fool (Parks) would kill them (Thael and Meechie); Darryl gave them a week to do the murders; within a week E-Man was dead (Ricky G was, however, locked up for the murder; there was also a rumor that the opposition killed E-Man)

- In March, 1995, Finch's house was shop up; Darryl blamed it on Victor Thompson and Thompson blamed Darryl

- Murder of Gregory Sharp (G Sharp):  Sharp was a governor; Finch said that Darryl told him that the other governors were complaining about Sharp, alleging that he was mistreating members;  Darryl said he was going to "holler at" G. Sharp; there was a meeting in the gym at the Boys Club during which Darryl and G Sharp had a heated discussion;  a week before Sharp's murder Darryl said he was going to hit Sharp (though Finch could not recall the exact words); logistics were discussed; on the day of Sharps murder, several GDs met at a gas station; Darryl told K-Dog, Parks and Finch to kill G

Page 15

Sharp whenever they got the chance; later Sharp was in a car going down the Dan Ryan; Parks said "it's a go"; K-Dog and Heavy (not Roger Stewart, but a different Heavy) shot Sharp and Otis; Parks called Darryl and told him that they took care of it

Roger Stewart testimony/statement:

- Darryl had Michelle Gaines (the mother of his children) get guns and ammunition for the GDs; she picked up and delivered drugs and money, and picked up burn-out cellphones for Darryl

- Stewart implied that Darryl had Finch violated by Mendell and Mike J after Darryl got out of prison because he didn't like the way Finch handled the business in Morgan Park while he was away

- Darryl had Stewart violated for failing to go to the funeral of a GD drug dealer; Darryl had two other GDs violated for the same reason

- The GDs who worked security were usually fourteen or fifteen (though as old as twenty-five); security made sure the streets had lookouts; they had guns

- Darryl told Parks to have some GDs drive by and shoot up Victor Thompson's mother's house and burn the garage down; Parks had K-Dog and his crew do the drive-by shooting

- Darryl told Richie Wash to "stand strong, stand on his function...don't let anyone play you." Richie took the advice too seriously and shot someone (Stewart said Richie was talking crazy)

- Quan Ray would do violations and executions for Darryl; he was Darryl's enforcer

- Jamie Pugh did whatever Darryl ordered him to do

- Darryl ordered the murders of several people, including "Blunt"

- Murder of Angel:  Darryl thought Angel had something to do with the murder of Ronnie Showers; Angel was a rival coke dealer;  the day Angel was murdered Q asked Stewart for a gun; later Q said he had murdered Angel; Q did this murder to get back in Darryl's good graces; Darryl bought Q a car

- Darryl would buy cars for GDs for their silence

Will Showers statement/testimony:

Page 16

- The death of Ron Showers: that night Darryl was going, with Will Showers, to talk to Capone (a member of another gang); Darryl and Capone's nephew had words, and Darryl hit him; the nephew got a gun and fired it, but it didn't go off; Will Showers was given a gun and shots were exchanged - no one was hit; later Darryl wanted Will to go back and get Darryl's rental car; Ron Showers said he would go for the car; Showers left with Speedio and Bugaloo, and Will followed; Will heard gunshots; when he pulled up he saw a body lying in the street - it was Ron Showers, who had been shot by a rival gang (Darryl felt responsible for the death of Showers, who was a close friend)

- A few days after Showers death, Michael Harris, Capone's brother, was killed; Will Showers was present at Finch's, with Darryl, Finch and Parks when Parks said to Will that he "got them" for his brother; while there is no statement that Darryl ordered this, Darryl did give Will some work after this, including picking money up from Darryl's workers and delivering drugs

Debriefing of Delano Finch:

- Darryl was having problems with Victor Thompson, a GD governor; he wanted Thompson killed but was unable to do so; Darryl told Jathel Garrett (Thel/Thael) to kill E-Man, Thompson's brother - E-Man was killed; Darryl told Meechie to kill Kenny, Thompson's nephew - Kenny was not killed

- Darryl told Dollar Bill (may be Lamar Rozier) to kill Mike Edwards, who had previously shot Darryl (need to get the circumstances of shooting, which Finch may have wrong); later Darryl said that Dollar Bill "took care of that"

- Patrick White, a supplier of cocaine to the GD's and close associate of Darryl's, said that he had kilos of cocaine and money stolen from him by two GDs; Darryl wanted to find out who was responsible; two possible GDS who located and were taken to a residence to be interrogated by Darryl; the subjects were told they would be beaten if they didn't reveal the whereabouts of the cocaine and money; the subjects were stripped and beaten, including with a metal pipe; salt was poured on their wounds; hot curling irons were used to burn their chests; at some point Darryl left, then returned, stating that the two didn't know anything; they were released

- Finch was present at times when Darryl ordered violations on numerous GDs; he heard about other violations ordered by Darryl; some beatings required hospitalizations. Victims of violations/beatings included: Finch, Roger Stewart, James Yates, Dre, Blue, Sherman Moore, Andrew Howard, Torrence, William Edwards, Jathel Garrett, Patrick White, Victor Thompson, Mendel, Quan Ray, Jamie Pugh, Mickey Red, Charles Dorsey, Raynard McDowell, Lil Rob, Germaine Haslett, Meechie, and Dollar Bill

Page 17

-   Quan Ray, who was enforcer for Darryl, was involved in the murders of Gregory Sharp, Charles Banks, Angel and Eight-Ball

Other:

-   There are transcripts of Grand Jury testimony by Roshawn Smith, age 16, Alonzo Butler, age 16, and Demetrius Banks, age 13, all regarding the murder of Charles "Jello" Banks. All say the were members of the GDs, but do not describe roles in the drug economy. They may be used, however, as evidence of use of minors

Page 10

## Prison Adjustment

Darryl's conduct records in prison, both state and federal, are not really bad. There is the write-up for allegedly threatening Quan, though Quan denies he was threatened. He did participate in programs, including educational programming, and had work assignments. He moved quickly to low-security facilities and received extra good time credits.

# EXHIBIT F

**JILL MILLER, MSSW**
Forensic Social Work Services

330 East Wilson Street, Suite 100
Madison, Wisconsin 53703
(608) 257-7990
FAX (608) 256-7909

### CONFIDENTIAL MEMORANDUM TO ATTORNEYS

**TO:**   Jeffrey Urdangen & Cynthia Giachetti
**RE:**   Darryl Johnson - Social History
          Supportive information for Neuropsychologist
**DATE:** October 24, 1997

This memo provide a summary of my interview with Edith Burford, Darryl's special education teacher at Esmond Elementary School as well as information I obtained from the administrative assistant at Morgan Park High School regarding interpretation of the high school transcript. This information should be helpful to Dr. Gelbort, and should be provided to him. I am assuming that he has the few school records we have been able to obtain. As you know, despite extensive efforts, it has not been possible, thus far, to locate Darryl's special education records from Esmond. Should they be found, they should be furnished to Dr. Gelbort.

### Edith Burford, former special education teacher, Esmond School

Ms. Burford is now retired. She was Darryl's special education teacher at Esmond Elementary School from the fall of 1971 until the fall of 1975. She had the classroom for EMH (educable mentally handicapped) students who were working below the third grade level, and were under the age of twelve. At that time, the school had two special classrooms. One for children up to age twelve (they stayed in the same classroom until they reached the third grade level or turned twelve), and one for children twelve to fifteen, or working at the third grade level or above. The school graduated children in special education at age fifteen, regardless of the level at which they were working.

Ms. Burford said that in order to be placed in her classroom children were tested. An IQ test and achievement testing were done, and additional psychological assessment was performed. A social history was done, as well. To be in her room, they usually had an IQ in the range of 68 - 75. Later, the schools stopped using IQ tests. Her room usually had twelve to fifteen children in it. They each worked at their own level. Her coursework included primary level work, kindergarten through third grade levels. They were promoted within the classroom if they were able to do the work at the next level.

Darryl was in Ms. Burford's room for almost four years. She became close to Darryl and was clearly fond of him. She said he would talk to her about problems he was having. He was a sweet and gentle boy, who always worked very hard and really tried to understand his schoolwork. He had a difficult time with the work, and struggled. He was responsive to her direction. He was polite and respectful.

The special education classroom was in the basement of the building when Darryl entered the program. Later it was in a trailer next to the building. The children were physically isolated from the other children. Special ed children were teased and made fun of by the other students.

Page 2

Burford's room was called "the dummy room." The children felt isolated and different. Darryl, like the other children in the room, wanted to feel good about himself. She tried to encourage him. He had self-esteem problems. She thought that Darryl did learn to read at the third grade level, though he never read well when he was in her room. She left the school the following year, transferring to a different school, and did not know how he did after he left her classroom. Her recollection was that the high school did not have the same kind of special education program. Children were not given the kind of individual attention they received in grade school.

**<u>Mr. Herry Administrative Assistant, Morgan Park High School</u>**

Mr. Herry provided some interpretation of the high school transcript. There is a column in the transcript, after each subject, labeled LEV (level). It describes the course level. R stands for regular course level, i.e. the general level at which most students worked. Darryl had only performance classes at the R level, including Music, Art and Physical Education. E or ESS stands for essential, which is below the regular level of achievement. These courses were for children/students who had been in special education at the grade school level. B stood for basic, which was below the level of essential, for pretty low-functioning students. Darryl was at the B level in Math, and in Reading Lab. The Reading Lab was a special resource for low-achieving/low-functioning students. These special levels of coursework constituted the special education services available at the time. None of the teachers listed on Darryl's high school transcript are currently at the school.

# EXHIBIT G

## AFFIDAVIT OF JULIET YACKEL

I, Juliet Yackel, state that the following is true and correct to the best of my knowledge under penalty of perjury under 28 U.S.C. §1746.

1.      I am an attorney and capital mitigation expert specializing in federal capital cases. I have worked on over 40 capital cases nationwide since 1992 in the capacity as lead counsel, co-counsel, and mitigation expert.

2.      The Darryl Johnson case was only the second case in which I served as a mitigation expert - -and it was the first capital case in which I was involved that went to trial and in which there was a capital sentencing hearing.

3.       I am now a nationally recognized expert in the area of capital mitigation, and I train both attorneys and mitigation experts alike in the defense of capital cases.

### Education & Experience

4.      I graduated from Tulane Law School in 1992 and am licensed to practice law in the states of Illinois and Indiana.  I am also admitted to practice before the Seventh Circuit Court of Appeals and the United States Supreme Court.

5.      I started my practice as a staff attorney in the Capital Case Unit of the Office of the Indiana Public Defender.   In this capacity, I handled capital cases in post-conviction proceedings.

6.      I left the Indiana Public Defender's Office in the fall of 1996 to start my own criminal defense practice in Chicago, Illinois. I became associated, through shared office space, with attorneys Jeffrey Urdangen and Cynthia Giachetti.

7.      At the time I moved into their office space, Jeffrey Urdangen and Cynthia Giachetti were representing Darryl Johnson in his capital case pending in the federal district court with The Honorable Suzanne Conlon presiding.

8.      In the fall of 1996, Jeffrey Urdangen asked me to assist him as a capital mitigation expert in *USA v. Tyrone Tidwell*, a federal capital case that was as the pre-authorization phase.  I was appointed by the court to assist another, more experience, mitigation expert in this case.  After a several months, the Department of Justice opted not to seek the death penalty against Mr. Tidwell and my involvement in that case ended.

### Involvement in Johnson's Defense

9.      Around the time my involvement in the Tidwell case came to a close, in about March of 1997, Jeffrey Urdangen and Cynthia Giachetti asked me to assist their mitigation specialist, Jill Miller, in the Darryl Johnson case.  I agreed, since I had previously developed a positive working relationship with Ms. Miller when we worked together on a capital case I handled as counsel in Indiana.

10.     At the time, I lived and worked in Chicago, IL while Jill Miller lived in Wisconsin.  I was able to assist Jill Miller by meeting with Darryl Johnson, collecting certain records, locating and interviewing certain witnesses in the Chicago area.

**Johnson Defense Team**

11.     Since my involvement in Johnson's case, I have accumulated ten yeas of experience in working with lawyers, mitigation specialist, and investigators and other professionals who make up capital defense teams.

12.     It is clear to me that sometime in the months before Johnson's trail there was a total breakdown in communication between counsel and mitigation specialist Jill Miller.  This break-down it the defense team was never repaired and, in my view, it intensified as the case moved into the capital sentencing hearing.

13.     At some point, I served as the de facto liaison between counsel and the defense team.  This was not an adequate substitute for direct communication between the parties, particularly since I had absolutely no experience serving as the mitigation specialist at the trial phase of a capital sentencing hearing.  Jill Miller, on the other hand, had significant experience in this area – but Mr. Johnson did not receive the full benefit of her experience due to the breakdown in the defense team.

14.     One of my assigned tasks was to work closely with Mr. Johnson and I spent a substantial amount of time meeting with him at the Metropolitan Correctional Center. As the penalty phase approached, Mr. Johnson expressed to me his growing distrust of counsel.    This distrust manifested in Johnson not wanting to attend the penalty phase proceedings.  It was my job each morning of the penalty phase trial to convince Johnson to enter the courtroom.

**Robert Taylor Homes**

15.     One of my tasks was to gather information about the Robert Taylor Homes where Johnson and his family lived when he was young.  Miller suggested that I look for any documentation of the violent crime rates in the neighborhood.  Johnson had not only witnessed his mother physically abused by his father, but had also spent his early years in a neighborhood were violent crime was an everyday occurrence.  I started this area of research, but did not complete it.    Based on my current training and experience, I believe that documentation of the crime rates and other problems at the Robert Taylor Homes during the time period that Johnson lived there would have helped to convince the jury that Johnson was in fact subjected to violence as a child such that he did not develop the sense of security and safety that Dr. Kostelney testified is so imperative to normal childhood development.  The lack of a sense of safety according to Kostelney's and other's research is what drives young men raised around such violence to feel the need to be armed with guns and other weapons.  The documentation of the crime rates in Johnson's neighborhood would have also demonstrated that Johnson was chronically surrounded by violence and not just on the occasions that his father beat his mother.

**Turning Point in Johnson's Life**

16.   My interviews, review of records, and investigation revealed that the turning point in Darryl Johnson's life was the shooting of Jesse Simpson. Prior to Simpson's death, Darryl had been a quiet and somewhat withdrawn young man who had no involvement with the Gangster Disciples or any other street gang.

17.   The time I spent with Johnson led me to the conclusion that Johnson was exceptionally sensitive to violence against women based in large part upon what he had witnessed his mother suffer as a child. It was Johnson's abhorrence of the violence his mother suffered that led him to accompany his friend Reginald Fletcher to Cheryl Fletcher's home in October of 1983. And, it was his undeveloped sense of security that mandated he be armed with a weapon. The violent struggle Johnson witnessed in the Fletcher home triggered Johnson's shooting of Jesse Simpson.

18.   I assisted Miller in locating Cheryl Fletcher. Fletcher was outside the courtroom during the penalty phase of Johnson's trial prepared and willing to testify. Counsel were aware that she was there but she was not called to testify. Had Fletcher testified, she would have explained that Johnson shot Simpson after Simpson had stabbed her brother in the face and was attempting to stab him again, in the back. This testimony would have been consistent with her prior testimony before the grand jury and at Johnson's and Fletcher's trial. She would have testified that Johnson was horribly upset over Simpson's death and that he exhibited remorse. This evidence would have contradicted the government's assertions that Johnson had cold bloodedly shot Simpson in the back.

19.   One of my tasks was to research the problem of gangs and gang recruitment in the Cook County Jail and Illinois prisons. I had learned that between Johnson's incarceration for voluntary manslaughter and his being indicted in the instant case, the Illinois legislature held hearings on the prevalence of gangs such as the Gangster Disciples in both the Cook County Jail and the Illinois Department of Corrections. Miller suggested that I obtain transcripts of those hearings to learn who had testified for the purpose of identifying possible witnesses who could substantiate that young men incarcerated in the Cook County Jail and the Illinois Department of Corrections were recruited into gangs in order to obtain protection from other inmates. I started researching this area, but ultimately did not obtain the available materials regarding this matter.

20.   Johnson's detention and incarceration for Jesse Simpson's manslaughter was the first time he had spent any significant time in jail or prison. I learned through my interviews that Johnson had been the victim of some type of violence while he was detained. In an interview with Brenda Smith, she told me how when she went to visit him at the jail, he was "climbing the walls," crying, and begging her to get him out of the jail. Smith described her son as clearly scared to death. Other witnesses described Johnson as changed when he came out of prison. He was built up and muscular and a member of the Gangster Disciples. Had I obtained information about the legislative hearings on gang recruitment in Illinois jails and prisons, the jury would have been presented evidence which showed that like others, Johnson joined the gang out of a need for protection.

FURTHER AFFIANT SAYETH NAUGHT.


/s/  Juliet Yackel
Juliet Yackel

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA,                )
                                         )
            Plaintiff - Appellee - Respondent,   )        No. 02 C 6998
                                         )
      vs.                                )        Hon. Suzanne B. Conlon
                                         )
DARRYL JOHNSON,                          )
                                         )        **Death Sentence Imposed**
            Defendant - Appellant - Petitioner.   )

**NOTICE OF FILING**

TO:   David Bindi
      Assistant United States Attorney
      219 South Dearborn Street, Suite 500
      Chicago, Illinois  60604

      PLEASE TAKE NOTICE that on Thursday, February 28, 2008,  at 9:00 a.m., we filed with
the Clerk of the United States District Court for the Northern District of Illinois, Eastern Division,
Petitioner's Supplemental Submission in Support of Ineffective Assistance of Counsel Claim, a copy
of which accompany this Notice and are hereby served upon you.

                                    Respectfully submitted,


                                    /s/ Terence H. Campbell
                                    Attorney for defendant

                                    Terence H. Campbell
                                    Cotsirilos, Tighe & Streicker, Ltd.
                                    33 North Dearborn Street, Suite 600
                                    Chicago, Illinois  60602
                                    (312) 263-0345

Order Form (01/2005)

## United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Suzanne B. Conlon | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 6998 (96 CR 379) | **DATE** | 2/29/2008 |
| **CASE TITLE** | UNITED STATES OF AMERICA vs. DARRYL LAMONT JOHNSON | | |

**DOCKET ENTRY TEXT**

Hearing held on defendant's motion to vacate his sentence pursuant to 28 U.S.C § 2255, and the government's motion to reconsider the basis for rejecting defendant's ineffective assistance claim. The government's unopposed motion [27] is granted. The court vacates portions of its Memorandum Opinion and Order issued March 11, 2003 finding that defendant procedurally defaulted his ineffective assistance of counsel claim by not raising this issue on direct appeal. *See Massaro v. United States*, 538 U.S. 500 (2003) (ineffective assistance of counsel claims may be raised in a collateral proceeding under § 2255 even if not raised on direct appeal). The court therefore shall consider the ineffective assistance of counsel claim fully on the merits. Defendant's renewed motion for leave to conduct discovery [30] is held in abeyance.

*Notices mailed by Judicial staff.*

| | | Courtroom Deputy Initials: | WH |
|---|---|---|---|

02C6998 UNITED STATES OF AMERICA vs. DARRYL LAMONT JOHNSON                                    Page 1 of 1

# United States District Court
## Northern District of Illinois

In the Matter of

UNITED STATES OF AMERICA

v.

DARRYL JOHNSON, ET AL

Case No. 02 C 6998

(96 CR 379)

### TRANSFER OF CASE TO THE EXECUTIVE COMMITTEE
### FOR A REASSIGNMENT

I recommend to the Executive Committee that the above captioned case be reassigned by lot to another judge of this Court. The reasons for my recommendation are indicated on the reverse of this form.

Judge Suzanne B. Conlon

Dated: March 3, 2008

---

### ORDER OF THE EXECUTIVE COMMITTEE

IT IS HEREBY ORDERED that the above captioned case be reassigned by lot to the calendar of an individual judge of this Court in accordance with the Rules.

### ENTER

### FOR THE EXECUTIVE COMMITTEE

Chief Judge James F. Holderman

Dated: MAR - 6 2008

Reassignment/Lot (Rev. 9/99)

☐    40.5(c)    This case is to be reassigned by lot pursuant to the provisions of Local Rule 40.5(c).

☐    IOP 13F1    I recuse myself from this case for the following reasons:

    Two or more recusals have been entered in this case. The initial recusal was entered by

☐    IOP 13F2    I recuse myself from this case because a relative works for a law firm, or the U.S. Attorney's Office, which represents one of the parties to this case.

☐    IOP 13F2    I recuse myself from this case because one of the parties is represented by a law firm I was associated with during the past five years.

☐    The reason for recusal having been provided for in IOP Rule 13F2; it is requested that in lieu of a replacement case this matter be made part of the equalization of cases provided for in that rule.

☐    IOP 13    This case having last been assigned to the calendar of Judge _____ who is no longer sitting; it is recommended that this case be reassigned to the calendar of an active judge of this Court as it appears to require further judicial action.

■    28:294(b)    I transfer this case to the Executive Committee for reassignment to another judge pursuant to the provisions 28 USC § 294(b). [It is my understanding that the receiving judge will receive equalization credit for the case, but that no case will be returned to my calendar in exchange for this case.]



Reassignment/Lot (Rev. 9/99)

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| vs. | ) | No.  02 C 6998 |
| | ) | Judge William J. Hibbler |
| DARRYL JOHNSON | ) | |

**GOVERNMENT'S RESPONSE TO THE SUPPLEMENTAL SUBMISSION**

The UNITED STATES OF AMERICA, by its attorney, PATRICK J. FITZGERALD, United States Attorney for the Northern District of Illinois, responds to defendant's Supplemental Submission as follows:

Defendant has filed a Supplemental Submission in support of his ineffective assistance of counsel claim, consisting of a page-and-a-half of argument with seven exhibits attached.  The first exhibit, Exhibit A, is an affidavit from Jill Miller, a clinical social worker and capital case mitigation specialist who was hired by the trial defense team two months after defendant was indicted to assist in preparing evidence in mitigation for the sentencing hearing.  She asserts that the defense team did not pursue several leads she developed for mitigating evidence, gave her little direction in terms of what sort of evidence they wanted to focus on, and were generally unprepared to present a persuasive case in mitigation when the time came.  Attached to the affidavit are several memoranda she prepared for the defense team before the trial documenting what she did, what she was unable to do, and her concerns that the case in mitigation was being neglected.  Exhibit B is Miller's curriculum vitae. Exhibit C is a Johnson family chronology going back to the births of defendant's

grandparents.  Exhibits D, E, and F are more memoranda from Miller to the defense team along the same lines as the memoranda attached to the affidavit in Exhibit A.  Exhibit G is the affidavit of Juliet Yackel, an attorney who shared office space with defendant's lawyers around the time of the trial, and who was hired to work with Miller on preparing the case in mitigation.  She asserts that crime rate statistics for the area including the Robert Taylor Homes, where defendant spent part of his childhood, would have bolstered the evidence that defendant was exposed to a great deal of violence in the community where he grew up.

Defendant states that these exhibits present "a raft of weighty mitigation issues which were, alternatively, either unexplored, underdeveloped, not presented to the jury at the penalty phase, or some combination thereof."  Supp2.  There is no effort to compare the mitigating evidence that was presented to the jury with the evidence Miller's memos suggest might have been presented, to show what avenues were opened to counsel, the ones they pursued, and the ones they ignored.

### The Supplemental Submission Is Untimely.

Defendant's conviction became final on October 1, 2001, when his *certiorari* petition was denied. *Johnson v. United States*, 534 U.S. 829 (2001).  See *Clay v. United States*, 537 U.S. 522, 527 (2003) (conviction final when *certiorari* denied or time to file petition lapses). Under 28 U.S.C. § 2255, ¶ 6, he had one year from that date within which to file a timely § 2255 motion.  He filed a timely motion on September 30, 2002.  That motion raises an ineffective assistance claim pertaining to the defense team's preparation for and performance

2

at the sentencing hearing.  The claim is that defense counsel should have discovered the statute and regulations providing for Special Administrative Measures (SAMS) – the ability of the Bureau of Prisons to house an inmate in solitary confinement, *i.e.*, a control unit, and restrict his ability to communicate with anyone, on a showing that without these restrictions the inmate poses a danger to others.  This information, and the few examples of cases in which SAMS had been implemented at the time of defendant's sentencing hearing, could have been used to impeach rebuttal witness John Vanyur's testimony that defendant likely would be housed in the general population of a maximum security prison with the ability to communicate with anyone, limited only by his ability to pay for phone calls.

The Supplemental Submission, filed on February 28, 2008, more than five years after the deadline for a § 2255 motion, seeks to add on to the ineffective assistance claim a further argument that defense counsel inadequately developed the case in mitigation, despite being shown the way by Miller.  This addition is barred by the 1-year limit, because amendments to a § 2255 motion filed after the limitations period lapses must relate back to the timely filed claim, *Mayle v. Felix*, 545 U.S. 644, 650 (2005), in the sense that there is "a common core of operative facts uniting the original and newly asserted claims."  *Id.* at 659 (internal quotations omitted).  Here, the newly asserted claim has no operative facts in common with the original.  It has nothing to do with Vanyur's testimony, or SAMS, or the ability of the government to house defendant in isolation so as to mute his ability, as a high-ranking gang leader, to order others to commit violent acts.

3

Fed R.Civ.P. 15 governs amended and supplemental pleadings, and Rule 15(c) states that an amendment or supplement "relates back" to the original pleading if it "arose out of the conduct, transaction, or occurrence set forth" in the original pleading.  The purpose of the Rule is to relax, but not obliterate statutes of limitations.  *Felix*, 545 U.S. at 659.  Unlike most civil litigation, where notice pleading is sufficient, a § 2255 motion requires some fact pleading.  *Taylor v. United States*, 287 F.3d 658, 661 (7th Cir. 2002).  Rule 2(b) of the Rules Governing Section 2255 Proceedings provides that a § 2255 motion "must . . . specify all the grounds for relief available to the moving party [and] state the facts supporting each ground."  Failure to do so means that a new ground raised after the limitations period has expired and which does not relate back to the original ground is barred.  *Felix*, 545 U.S. at 655-656.  Relation back in this context means that the new ground and the original must both be based on "a common core of operative facts."   *Id.* at 659 (internal quotations omitted).  "Each separate congeries of facts supporting the grounds for relief . . . would delineate an 'occurrence'" within the meaning of Rule 15(c).  *Id.* at 661.  The new claim here is outside the boundaries delineated by the original.

The time limits for § 2255 motions reflect the judgment of Congress that at some point, there must be finality to criminal judgments.  *Felix*, 545 U.S. at 662.  Allowing a defendant to do what defendant has done here – hold back a potential ground for relief he knew about before he filed his original § 2255 motion, and then, before judgment is entered against him, add it to the mix, would effectively undo the time limits on filing § 2255

4

motions.  *Id.* at 662-663.[1]

### The Claim Raised in the Supplemental Submission Is Waived.

As noted above, defendant makes no effort to detail the evidence that was presented at the sentencing hearing and compare it to that made available by Miller, to show deficient performance and prejudice.  To the extent that he contends certain investigations should have been performed but were not, he presents no new evidence that would have been discovered by those investigations.  Presentation of an argument like this to the Court of Appeals would constitute a waiver, for failure to develop it, and it is no answer to attempt further development in a reply.  *United States v. Useni*, 2008 WL 451303 at *17-18 (2008).  The claim raised in the Supplemental Submission should be deemed waived.

### The Supplemental Submission Does Not Establish Ineffective Assistance.

Defendant argues that "a proper investigation and presentation of mitigating evidence is absolutely essential in capital cases," citing *Rompilla v. Beard*, 545 U.S. 374 (2005), and *Wiggins v. Smith*, 539 U.S. 510 (2003).  Supp2.  This overstates the case.  Counsel must make reasonable strategic decisions about what investigations to perform, what investigations need not be performed, and what evidence, if any, should be presented.

---

[1] Defendant does not claim that the facts supporting this claim are newly discovered, and that the claim is timely under § 2255 ¶ 6(4).  He is in a poor position to do so now.  The Miller memoranda were provided to defense counsel before trial.  Counsel now representing defendant were required to exercise due diligence in discovering evidence to support the § 2255 motion prior to the October 1, 2002 filing deadline, see ¶ 6(4), and they had access to trial counsels' files.  Miller's affidavit is dated February 27, 2008, but the evidence supporting the new claim is the memoranda, all dated 1997.

*Strickland v. Washington*, 466 U.S. 668, 690-691 (1984). *Strickland* itself was a capital

case, and the claim was that counsel's performance was deficient because he presented *no*

evidence in mitigation at the sentencing hearing. *Id.* at 672-675. The district court denied

habeas relief, but the Fifth Circuit, *en banc*, reversed. *Id.* at 678-679. The Supreme Court,

in turn, reversed the Court of Appeals, holding that the sentencing hearing was

fundamentally fair and that habeas relief was properly denied. *Id.* at 700-701. *Strickland*

was decided on May 14, 1984, and rehearing was denied on June 25, 1984. 466 U.S. 668.

David Leroy Washington was executed by the state of Florida on July 13, 1984.[2]

Seventeen witnesses testified on defendant's behalf in mitigation at the sentencing

hearing. They included his brother, Andre Johnson, nine years his senior, and Brenda Smith,

his mother, who testified regarding defendant's childhood, the prevalence of gangs and

violence in the neighborhoods they lived in, the father's alcoholism and physical abuse of

the mother, and how defendant got sucked into the gang life. Tr2019-56; 2364-2420. His

sister, Sharon Creswell, testified about defendant's learning disability, and his love for her

children. Tr2068-76. A former high school teacher also testified about his learning

disability, and that he was a lovable child. Tr2167-76. Another sister, Kimberly Williams,

testified that defendant loved his own children and was an attentive father, and that he

lamented the impossibility of simply walking away from the gang. Tr2180-91. A cousin

testified that defendant said he could not leave the gang alive. Tr2198-2202.

---

[2]http://en.wikipedia.org/wiki/List_of_individuals_executed_in_Florida

6

Other cousins and a nephew testified that defendant was good with children, and stressed the importance of working hard in school and getting good grades. Tr2227-42. A former girlfriend testified that defendant helped her out of an abusive relationship, got her to stop using drugs, and encouraged her schoolwork. Tr2205-07.

Dr. Michael Gelbort, a neuropsychologist, testified that defendant was borderline mentally defective, with an IQ of 76. Tr2099-2123. Kathleen Kostelny, an expert on child development, testified about the effects on children of witnessing violence in the home and in the community. 2343-56. Finally, of course, there was the testimony of Dr. Mark Cunningham, which concerned the circumstances of confinement in the control unit at ADX Florence. Tr2282-97. He also testified regarding actuarial studies showing that violent crime is a young man's game, and the after age 30, the incidence of violent crime drops. 2265-82. Defendant was 33 years old at the time of the sentencing hearing. Tr2020.

The government disputed very little of this. The rebuttal focused on Dr. Cunningham's testimony that "conceivably" (Tr2287), defendant could be housed for life in the control unit at Florence. John Vanyur testified about the BOP's procedures for assigning inmates to prisons (Tr2462-93), and Craig Trout testified about how the BOP monitors gang members in the system and keeps track of incidents involving gangs. Tr2509-36. The only other rebuttal witness was an agent who authenticated a wiretap tape of defendant talking on the phone about bond money during a family gathering where children were present. Tr2428-35. A psychologist was called, but withdrawn. Tr2438.

Defendant submitted a list of 24 mitigating factors for the jury to consider in relation to the murder of "Blunt" Johnson, and 25 in relation to the murder of Charles Banks. R201, 203.

The Miller affidavit catalogues several possibilities for investigating potential mitigating evidence that were not pursued. They include information about Chicago street gangs and why young men join them (¶¶8, 12), the pressure to join gangs in prison for protection (¶13), what happened to defendant in Menard Penitentiary when he served time for voluntary manslaughter (¶13), why the judge who sentenced him for that crime imposed the minimum sentence (¶ 16), what the girlfriend of the victim of that crime might have testified about (¶¶17, 18), and more detail about his father's alcoholism and abuse of his mother (¶20). However, it is not enough to show either deficient performance or prejudice under *Strickland* simply to say that more could have been done. Defendant must produce the evidence that was not presented, and demonstrate that there is a reasonable probability that the evidence would have changed the outcome, 466 U.S. at 689, 693, and defendant has not done this.

Defendant seeks the granting of his § 2255 motion, or alternatively, an evidentiary hearing. If the Supplemental Submission is not time-barred or waived, then an evidentiary hearing is necessary. Counsel are presumed to have made reasonable strategic decisions about how to present the case in mitigation until defendant produces evidence to overcome the presumption. *Strickland*, 466 U.S. at 689. There can be no granting of relief until trial

8

defense counsel has an opportunity to explain their decisions.


                                    Respectfully Submitted,

                                    PATRICK J. FITZGERALD,
                                    United States Attorney



                      By:    /s/ David E. Bindi
                             DAVID E. BINDI
                             Assistant U.S. Attorney
                             219 South Dearborn Street
                             5th Floor
                             Chicago, Illinois 60604
                             (312) 886-7643

9

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA )
)
vs. ) No.  02 C 6998
) Judge William J. Hibbler
DARRYL JOHNSON )

**NOTICE OF FILING**

To:   Terrence Campbell                    Lorinda Meier Youngcourt
      Cotsirilos, Tighe & Streicker, Ltd.  P.O. Box 206
      33 North Dearborn Street             Huron, Indiana 47437-0206
      Suite 600
      Chicago, Illinois 60602

     PLEASE TAKE NOTICE that on Wednesday, March 12, 2008, I caused the foregoing GOVERNMENT'S RESPONSE TO THE SUPPLEMENTAL SUBMISSION, service of which is made upon you, to be filed.

                                    Respectfully Submitted,

                                    PATRICK J. FITZGERALD,
                                    United States Attorney

                          By:    /s/ David E. Bindi
                                    DAVID E. BINDI
                                    Assistant U.S. Attorney
                                    219 South Dearborn Street
                                    5th Floor
                                    Chicago, Illinois 60604
                                    (312) 886-7643

**UNITED STATES DISTRICT COURT**
**FOR THE Northern District of Illinois – CM/ECF LIVE, Ver 3.1.3**
**Eastern Division**

United States of America

                              Plaintiff,

v.                                                    Case No.: 1:02–cv–06998
                                                      Honorable William J. Hibbler

Darryl Lamont Johnson

                              Defendant.

**NOTIFICATION OF DOCKET ENTRY**

This docket entry was made by the Clerk on Tuesday, May 20, 2008:

        MINUTE entry before the Honorable William J. Hibbler: Status hearing to set
scheduling order set for 5/29/2008 at 09:30 AM. Mailed notice (jdh)

**ATTENTION:** This notice is being sent pursuant to Rule 77(d) of the Federal Rules of
Civil Procedure or Rule 49(c) of the Federal Rules of Criminal Procedure. It was
generated by CM/ECF, the automated docketing system used to maintain the civil and
criminal dockets of this District. If a minute order or other document is enclosed, please
refer to it for additional information.

For scheduled events, motion practices, recent opinions and other information, visit our
web site at ***www.ilnd.uscourts.gov***.

**UNITED STATES DISTRICT COURT**
**FOR THE Northern District of Illinois – CM/ECF LIVE, Ver 3.2.1**
**Eastern Division**

United States of America
                                          Plaintiff,

v.                                                          Case No.: 1:02−cv−06998
                                                            Honorable William J. Hibbler

Darryl Lamont Johnson
                                          Defendant.

**NOTIFICATION OF DOCKET ENTRY**

This docket entry was made by the Clerk on Thursday, May 29, 2008:

        MINUTE entry before the Honorable William J. Hibbler: Status hearing reset to
6/3/2008 at 10:30 AM. Telephoned notice (jdh)

**ATTENTION:** This notice is being sent pursuant to Rule 77(d) of the Federal Rules of
Civil Procedure or Rule 49(c) of the Federal Rules of Criminal Procedure. It was
generated by CM/ECF, the automated docketing system used to maintain the civil and
criminal dockets of this District. If a minute order or other document is enclosed, please
refer to it for additional information.

For scheduled events, motion practices, recent opinions and other information, visit our
web site at ***www.ilnd.uscourts.gov***.

## United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | William J. Hibbler | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 6998 | **DATE** | 6/3/2008 |
| **CASE TITLE** | U.S.A. vs. JOHNSON, et al. | | |

**DOCKET ENTRY TEXT**

Status hearing held and continued to 8/26/08 at 10:30 am.  At the next status, the government is to report on the state of Darryl Johnson's adjustment in the BOP, and turnover as discovery materials any instances of either special administrative measures under the BOP regulations or statutory provisions providing for extraordinary security measures for inmates that were requested or imposed at the time of Darryl Johnson's sentencing that involved restrictions continuously.  Defendants' counsel to tender to the Court a complete set of all pleadings since the 2255 petition was filed.  Parties to tender to the Court any missing transcript pages.

Docketing to mail notices.

01:00

| | Courtroom Deputy Initials: | JHC |
|---|---|---|

**UNITED STATES DISTRICT COURT**
**FOR THE Northern District of Illinois – CM/ECF LIVE, Ver 3.2.1**
**Eastern Division**

United States of America
                                    Plaintiff,

v.                                                  Case No.: 1:02−cv−06998
                                                    Honorable William J. Hibbler

Darryl Lamont Johnson
                                    Defendant.

**NOTIFICATION OF DOCKET ENTRY**

This docket entry was made by the Clerk on Tuesday, August 26, 2008:

        MINUTE entry before the Honorable William J. Hibbler:Status hearing held on
8/26/2008 and continued to 10/21/2008 at 10:00 a.m.Mailed notice(jlj, )

**ATTENTION:** This notice is being sent pursuant to Rule 77(d) of the Federal Rules of
Civil Procedure or Rule 49(c) of the Federal Rules of Criminal Procedure. It was
generated by CM/ECF, the automated docketing system used to maintain the civil and
criminal dockets of this District. If a minute order or other document is enclosed, please
refer to it for additional information.

For scheduled events, motion practices, recent opinions and other information, visit our
web site at *www.ilnd.uscourts.gov*.

Order Form (01/2005)

# United States District Court, Northern District of Illinois

*MHK*

| Name of Assigned Judge or Magistrate Judge | William J. Hibbler | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 6998 | **DATE** | 9/25/2008 |
| **CASE TITLE** | U.S.A. vs. DARRYL JOHNSON | | |

**DOCKET ENTRY TEXT**

Petitioner's ex parte motion for interim payment of fees is granted. Payment of interim attorneys' fees and expenses is appropriate under the Criminal Justice Act because, due to the length and complexity of this case, the appointed attorneys in this matter will experience a hardship in undertaking the representation without compensation for a substantial period of time.

Attorney Notified by telephone.
*Copy delivered to Fiscal.

| | | Courtroom Deputy Initials: | JHC |
|---|---|---|---|

02C6998 U.S.A. vs. DARRYL JOHNSON

Page 1 of 1

**UNITED STATES DISTRICT COURT**
**FOR THE Northern District of Illinois – CM/ECF LIVE, Ver 3.2.2**
**Eastern Division**

United States of America

                            Plaintiff,

v.                                                    Case No.: 1:02–cv–06998
                                                      Honorable William J. Hibbler

Darryl Lamont Johnson

                            Defendant.

---

**NOTIFICATION OF DOCKET ENTRY**

This docket entry was made by the Clerk on Tuesday, October 21, 2008:

        MINUTE entry before the Honorable William J. Hibbler: Status hearing held on
10/21/2008 and continued to 1/8/2009 at 10:00 AM. Defendant to file discovery request
by 11/21/0–8. Government to respond by 12/5/08. Defendant to reply by 12/15/08. Ruling
set for 1/8/09 at 10:00 a.m. Mailed notice (jdh)

**ATTENTION:** This notice is being sent pursuant to Rule 77(d) of the Federal Rules of
Civil Procedure or Rule 49(c) of the Federal Rules of Criminal Procedure. It was
generated by CM/ECF, the automated docketing system used to maintain the civil and
criminal dockets of this District. If a minute order or other document is enclosed, please
refer to it for additional information.

For scheduled events, motion practices, recent opinions and other information, visit our
web site at *www.ilnd.uscourts.gov*.

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff - Appellee - Respondent, | ) | No. 02 C 6998 |
| | ) | |
| vs. | ) | Hon. William J. Hibbler |
| | ) | |
| DARRYL JOHNSON, | ) | |
| | ) | Death Sentence Imposed |
| Defendant - Appellant - Petitioner. | ) | |

### DEFENDANT'S RENEWED AND AMENDED
### MOTION FOR DISCOVERY ON PETITIONER'S
### INEFFECTIVE ASSISTANCE OF COUNSEL AND *BRADY* CLAIMS

Defendant, Darryl Lamont Johnson, by his counsel, Terence H. Campbell of Cotsirilos,

Tighe & Streicker, and Lorinda Meier Youngcourt, files this Renewed and Amended Motion for

Discovery pursuant to this Court's Order of October 21, 2008.  In support of this motion, Mr.

Johnson states as follows:

A.      **Procedural History And Law**

1.      Mr. Johnson filed his Motion to Vacate Conviction and Sentence and for New Trial

Pursuant to 28 U.S.C. §2255 and Rule 33 of the Federal Rules of Criminal Procedure on October

1, 2002.  Mr. Johnson filed his first Motion for Leave to Conduct Discovery on February 3, 2003.

2.      Mr. Johnson's §2255 and discovery motions were initially denied on March 11, 2003,

based upon a finding that Mr. Johnson had procedurally defaulted his ineffective assistance of

counsel claim by failing to raise it on direct appeal. (Mem. Opin. and Order at 6-7).  Applying the

cause and prejudice standard of *McCleese v. United States*, 75 F.3d 1174, 1177-78 (7th Cir. 1996),

the Court ruled that Johnson had failed to show good cause for the default.  (Mem. Opin. and Order,

p 10).

3.   On April 23, 2003, the United States Supreme Court held "that an ineffective assistance of counsel claim may be brought in a collateral proceeding under §2255, whether or not the petitioner could have raised the claim on direct appeal." *Massaro v. United States*, 538 U.S. 500, 509, 123 S.Ct. 1690, 1696 (2003).  Accordingly, after deliberating about resolving this case, on November 11, 2007, the government moved the Court to reconsider its basis for rejecting Mr. Johnson's ineffective assistance of counsel claim in light of *Massaro*.

4.   The government has now conceded before this Court that defense counsel's performance in defending Mr. Johnson at trial was deficient under the first prong of *Strickland v. Washington* (*e.g.*, Transcript of 2/29/08 hearing at 4-5; Transcript of 6/3/2008 hearing at 10), but contests whether Mr. Johnson can show he suffered "prejudice" as a result of that deficient performance (*i.e.* the second prong of *Strickland*).  466 U.S. 668, 692,104 S.Ct. 2052, 2067 (1984).

5.   Mr. Johnson asserts that his *Brady-Giglio* claim -- which is based on much the same evidence that supports his ineffective assistance of counsel claim -- must also be reconsidered and requires relief.  *Brady v. Maryland,* 373 U.S. 83, 83 S. Ct. 1194 (1963); *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763 (1972).

6.   In conceding the performance prong of *Strickland* the government has also effectively conceded that it suppressed evidence in its possession which would have impeached the testimony of Warden Vanyur and was clearly relevant to the issue of the punishment to be imposed.  Thus, Mr. Johnson has satisfied the base requirement of *Brady* and *Giglio* and has only to prove the materiality of the evidence.  When a Court assesses the likely impact of suppressed evidence in *Brady* cases, their analysis of the "materiality" issue is equivalent to an assessment of "prejudice" in an ineffective assistance of counsel case, particularly where, as here, counsel failed to present available, exculpatory evidence to the jury.  *United States v. Bagley*, 473 U.S. 667, 682 (1985) (opinion of

Blackmun, J.) (the standard of materiality applicable to withheld impeachment evidence was adapted

from the formulation of "prejudice" in *Strickland*).

7.   On August 26, 2008, the government provided a letter written by Ann H. Zgrodnik,

Senior Counsel of the Litigation Branch of the Federal Bureau of Prisons ("BOP"), within the U.S.

Department of Justice ("DOJ").  Ms. Zgrodnik's letter details her contact with various employees

of the Department of Justice and the Bureau of Prisons, and indicates that there were several inmates

housed under strict conditions of confinement due to security concerns and/or because of their future

dangerousness, including inmates Thomas Silverstein and Clayton Fountain.  As for inmates

subjected to strict conditions of confinement pursuant to Special Administrative Measures

("SAMS"), the government provided an e-mail from Dominique Raia of the BOP to AUSA Bindi

stating,

> As per our conversation this afternoon, I am providing the following
> information regarding the number os SAMs in BOP prior to
> 11/17/97:
>
> Five SAMs pursuant to 28 CFR 501.3 (terrorism); one SAM pursuant
> to 28 CFR 501.2 (espionage).  Four of the terrorism SAMs were
> imposed in 8/96 and one in 3/97; the espionage SAM was impoed in
> 3/96.  All of the aforementioned SAMs have been extended in
> accordance with the regulations and are currently still in place.

(Ex. C).  As for inmates subjected to such strict conditions of confinement specifically by Court

order under 18 U.S.C. §3582(d) and prior to November 1997, Ms. Zgodnik reports that other than

inmate Luis Felipe, the people she contacted within the BOP do not recall any inmates subjected to

formal, court-ordered restrictions on communication and association under 18 U.S.C. §3582(d) prior

to November 1997.  Notably, Ms. Zgrodnik makes clear that there may well be other inmates who

were subjected to such conditions of confinement in the relevant time period.  (Ex. Ex. C at ¶6

("Thus, it is entirely probably that other inmates may be or have been in Bureau of Prisons custody

with court imposed communication restrictions that [BOP staff] are not aware of."); *id*. at ¶10 (similar).

8. Mr. Johnson has learned from Mark Bezy, retired Warden of the Federal Correctional Complex at Terre Haute, Indiana, and 28 year veteran of the BOP, that despite the representations of the government, records such as those Mr. Johnson requests in this motion exist in various files maintained by the BOP. (*See* Ex. A attached hereto, Affidavit of Mark A. Bezy). Mr. Bezy also confirms that a number of additional BOP inmates beyond those thus far identified by the government were housed at various BOP facilities under the very types of strict conditions of confinement that Warden Vanyur testified were not possible "*for as long as was deemed necessary by the BOP in order to alleviate the risk that the inmate would constitute either a security risk or a future danger to either BOP staff, other inmates, or the public.*" (Ex. A, Bezy Affidavit at ¶¶7, 9, 11, 12, 13, and 14) (emphasis added).

B.   **Discovery Requested**[1]

In order to adduce further evidence establishing the prejudice prong of *Strickland* and the materiality standard of *Brady* and *Giglio,* Mr. Johnson requests the government be ordered to produce the following discovery:

---

[1]Mr. Johnson filed motions for discovery on February 3, 2003 and November 13, 2007. By this submission, Mr. Johnson is not waiving or withdrawing his earlier requests for discovery, but is merely providing this discrete request at this time which is focused on the particular issues the Court has addressed in recent hearings.

1.  for the period of time prior to July 27, 1998[2], the DHO (Disciplinary Hearing Officer) record of all BOP inmates held under strict conditions of confinement (*e.g.*, strict limitations on, and/or strict monitoring of, communications with people outside the prison, whether by phone, mail, and/or visits), for 60 days or more consecutively, based on concerns about the inmate's future dangerousness and/or security concerns (*i.e.* not for mere discipline of an inmate).  This request includes, but is not limited to, information about BOP inmates Thomas Silverstein, Clayton Fountain, Rodney Hamrick, Luis Felipe, David Sahakian, John Walker, Ed Wilson, Jonathan Pollard, Christopher Boyce, Peter Rollack, John Gotti, Ramzi Yousef, Anthony Ayeni Jones, Barry Mills, T.D. Bingham, and any other similarly situated inmate.  (*See* Ex. A, Bezy Affidavit at ¶¶6-9);

2.  for the period of time prior to July 27, 1998, the SIS (Special Investigation Supervisor) Files of all BOP inmates held under strict conditions of confinement (*e.g.*, strict limitations on, and/or strict monitoring of, communications with people outside the prison, whether by phone, mail, and/or visits), for 60 days or more consecutively, based on concerns about the inmate's future dangerousness and/or security concerns (*i.e.* not for mere discipline of an inmate).  This request includes, but is not limited to, information about BOP inmates Thomas Silverstein, Clayton Fountain, Rodney Hamrick, Luis Felipe, David Sahakian, John Walker, Ed Wilson,

---

[2] July 27, 1998 is the date Mr. Johnson's post-trial motions were denied and his death penalty formally imposed by the trial court.

Jonathan Pollard, Christopher Boyce, Peter Rollack, John Gotti, Ramzi Yousef, Anthony Ayeni Jones, Barry Mills, T.D. Bingham, and any other similarly situated inmate.  (*See* Ex. A, Bezy Affidavit at ¶¶6-9);

3.    for the period 1984 through 1996, the DHO record, SIS files and inmate files for all inmates who were housed in the "K-Unit" at the United States Penitentiary at Marion for 60 days or more consecutively.  (*See* Ex. A, Bezy Affidavit at ¶9);

4.    for the period July 27, 1998 and prior, any BOP inmates held at the Florence ADX facility in a "side pocket" or "special cell" for 60 days or more continuously.  (*See* Ex. A, Bezy Affidavit at ¶11);

5.    for the period July 27, 1998 and prior, records regarding any BOP inmates held in the Control Unit at USP Marion for 60 days or more continuously based on concerns about the inmate's future dangerousness and/or security concerns (*i.e.* not for mere discipline of an inmate).  (*See* Ex. A, Bezy Affidavit at ¶7);

6.    for the period July 27, 1998 and prior, records relating to any BOP inmates held at the Florence ADX facility under strict conditions of confinement (*e.g.*, strict limitations on, and/or strict monitoring of, communications with people outside the prison, whether by phone, mail, and/or visits), for 60 days or more consecutively, because of security concerns or in order to reduce/eliminate the inmate's future dangerousness (*i.e.* not for mere discipline of an inmate).  (*See* Ex. A, Bezy Affidavit at ¶¶8, 11);

7.   for the period July 27, 1998 and prior, records relating to any BOP inmates held in a Special Housing Unit ("SHU") within any maximum/high security BOP facility, for 60 days or more consecutively, because of security concerns or in order to reduce/eliminate the inmate's future dangerousness (*i.e.* not for mere discipline of an inmate).  (*See* Ex. A, Bezy Affidavit at ¶13);

8.   for the period of time prior to July 27, 1998, any memos written by a Warden or a member of the Department of Justice or Attorney General's Office, which ordered or documented that an inmate be held under strict conditions of confinement (*e.g.*, strict limitations on, and/or strict monitoring of, communications with people outside the prison, whether by phone, mail, and/or visits) based on concerns about the inmate's future dangerousness and/or security concerns (*i.e.* not for mere discipline of an inmate).  (See Ex. A, Bezy Affidavit at  ¶135);

9.   for the period July 27, 1998 and prior, any inmates who were housed under strict conditions of confinement (*e.g.*, strict limitations on, and/or strict monitoring of, communications with people outside the prison, whether by phone, mail, and/or visits), whether pursuant to 28 C.F.R. §501.3, 18 U.S.C. §3582(d), Court order, a Special Administrative Measure (SAM), or under the inherent power of the BOP, for 60 days or more consecutively, because of security concerns or in order to reduce/eliminate the inmate's future dangerousness (*i.e.* not for mere discipline of an inmate).

C.      **Basis for Items Requested**

1.      A habeas corpus petitioner is entitled to discovery if he can establish "good cause" for his request. *Bracy v. Gramley*, 520 U.S. 899, 908-09 (1997). A petitioner establishes "good cause" whenever "specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief." *Id.*, 520 U.S. at 908-09 (1997) (quoting *Harris v. Nelson*, 394 U.S. 286, 299 (1969)). *See also* Rule 6 of the Rules On Motion Attacking Sentence Under Section 2255.

2.      On June 3, 2008, the Court ordered the government to produce certain discovery requested by the defense.  Specifically, the Court ordered the government to produce documents relating to any BOP inmate who was held under strict conditions of confinement (*e.g.*, strict limitations on, and/or strict monitoring of, communications with people outside the prison, whether by phone, mail, and/or visits), for 60 days continuously or longer, based on security concerns and/or to curtail/eliminate that inmate's future dangerousness.  *See* Transcript, June 3, 2008 at 30-34 (attached hereto as Exhibit B).

3.      In response to that Order, on August 26, 2008, the government produced some information about a number of inmates held under such strict conditions prior to November 17, 1997.  (*See* Group. Ex. C, discovery responses from the government).  Based upon the language of the government's disclosures themselves, as well as on the information contained in the Mark Bezy affidavit attached to this motion, we believe that the information provided by the government on August 26, 2008 is incomplete.  For example, in the government's written response via letter dated August 25, 2008 from BOP attorney Ann H. Zgrodnik directed to AUSA Bindi (Ex. C), Ms. Zgrodnik indicates that, in responding to the discovery requests, she contacted several people within the BOP, but was told, in essence, that the imposition of these types of "strict conditions of

confinement" are not formally tracked by the BOP and cannot be queried on the BOP database. (Ex. C at ¶¶1-3, 5, 10). As a result, BOP attorney Zgrodnik expressly states that it is "entirely probably" that the list of inmates provided does not capture all the inmates who were housed under the strict conditions of confinement, per the Court's Order. (Ex. C at ¶6 ("Thus, it is entirely probably that other inmates may be or have been in Bureau of Prisons custody with court imposed communication restrictions that [BOP staff] are not aware of."; *id.* at ¶10 ("[BOP Supervisory Attorney] Mr. Synsvoll was doubtful that his list [of inmates held under these strict conditions of confinement prior to November 17, 1997] was exhaustive.").

4.      It also appears that Ms. Zgrodnik requested information solely on inmates who "were housed under ***no-human-contact conditions***, not including normal disciplinary segregation." (Ex. C at ¶2, 9) (emphasis added). This request – *i.e.* asking only for inmates held under "no-human-contact conditions" – is significantly more restrictive than what was ordered by the Court. That overly-restrictive criteria must be rectified in a subsequent response to the discovery already ordered.

5.      Finally, Ms. Zgordnik's letter also makes clear that the request was expressly limited to inmates housed under these strict conditions "prior to November 17, 1997." (Ex. C at ¶¶1, 6, 7). Based on the Court's prior ruling, the government is required to obtain information about any inmates held under such conditions prior to July 27, 1998 (the date that the trial court ruled on Mr. Johnson's post-trial motions and imposed the death sentence). (Docket Entry 6/3/2008).

6.      Notably with respect to his *Brady* claim, Mr. Johnson is not arguing – nor need he prove – that the individual prosecutors who tried Mr. Johnson's case knew of the *Brady* material that was not turned over, or that they acted in bad faith. As the *Brady* decision itself made clear, "the suppression by the prosecution of evidence favorable to an accused upon request violates due

proceeds where the evidence is material either to guilt or to punishment, ***irrespective of the good faith or bad faith of the prosecution***." *Brady*, 373 U.S. at 87 (emphasis added). Rather, the fact that the government, in the form of any of its departments that were involved in Mr. Johnson's prosecution – including, for example, Warden Vanyur's own BOP and the Department of Justice – had in its possession the information is sufficient to support Mr. Johnson's *Brady* claim. *Kyles v. Whitley*, 514 U.S. 419, 437 (1995) ("the individual prosecutor has a duty to learn of any favorable evidence known to the others *acting on the government's behalf in the case*.") (emphasis added) *United States v. Andrews*, 824 F.Supp. 1273, 1289-90 (N.D. Ill. 1993) (J. Conlon) (prosecution team responsible under *Brady* for exculpatory and impeachment information known to the Bureau of Prisons, and the prosecution's failure to disclose the impeaching material "deprived defense counsel of the opportunity to independently investigate and fully develop a defense to these serious charges.") (internal citations omitted). *See also*, *Schneider v. Estelle*, 552 F.2d 593 (5th Cir. 1977) (holding prosecution responsible for information known to government agent who testifies for prosecution); *United States v. Rosner*, 516 F.2d 269 (2d Cir. 1975) (same); *United States v. Deutsch*, 475 F.2d 55, 57 (5th Cir. 1973).

7.      In addition to the information – statutory authority, BOP regulations, and various inmate-specific information – previously cited in defense briefs in this §2255 proceeding which directly contradicts Warden Vanyur's testimony, Mr. Johnson has now put before the Court the affidavit from Mr. Mark A. Bezy, a former long-serving Warden in the BOP. In his affidavit, Mr. Bezy confirms what Mr. Johnson has long alleged:

> Based on my experience at the BOP, including the orders I gave and the conditions of confinement I observed, administered, and/or imposed both prior to 1998 and after, there is no doubt that the Bureau of Prisons had, at all times, the authority and ability to house inmates in the most restrictive conditions of confinement necessary

to ensure security and/or to reduce or eliminate an inmate's "future dangerousness."  This included, but was not limited to, housing inmates in conditions of confinement where they did not have the ability to freely communicate with anyone from outside the prison, whether by phone, in person, or mail.  The BOP could, and did, take away prisoners' ability to have visitors, to have mail privileges, and to make or receive phone calls whenever the BOP deemed it necessary to do so for the security of either prison staff, other inmates, or the public.

(Ex. A, Affidavit of Mark A. Bezy).  Mr. Bezy, in fact, identifies a number of BOP inmates who were actually subjected to these types of strict conditions of confinement, due specifically to security and/or future dangerousness concerns, at various BOP facilities prior to July 1998, and further testifies that these strict conditions of confinement could be, and were, imposed on inmates *"for as long as the BOP deems those conditions necessary to ensure the security and safety of BOP staff, other inmates, and the public (i.e. to reduce or eliminate the inmate's future dangerousness)."*[3] (Ex. A at ¶12 (emphasis added); *see also*, *id*. at ¶¶7, 9, 11, 13, and 14 (same)).

8.      In light of the information now before the Court, including that contained in the affidavit of former BOP Warden Bezy, regarding the facilities and practices of the BOP, and about specific inmates who were housed under the very type of strict conditions of confinement that Warden Vanyur testified were not available in Darryl Johnson's case, we respectfully submit that the *Brady* violation has been proven.  This *Brady* violation provides another, independent basis for the relief sought by Mr. Johnson (*i.e.* a new sentencing hearing).

If, based upon the evidence of record, including Mark Bezy's affidavit, the government is now willing to concede that Mr. Johnson's alleged *Brady* violation claim has been established, more discovery on that topic will not be necessary.  However, if, after being confronted with the evidence

---

[3] Former Warden Bezy provides significant additional detail in his affidavit which strongly supports both Johnson's ineffective assistance of counsel claim and his *Brady* claim.

11

of record thus far, the government remains unwilling to concede that – intentionally or unintentionally (*Brady*, 373 U.S. at 87) – there was a *Brady* violation relating to Warden Vanyur's testimony, then Mr. Johnson is entitled to further discovery and necessary expert assistance on this issue.

WHEREFORE, for the foregoing reasons and those set forth in his prior submissions, Darryl Lamont Johnson respectfully requests that the Court enter an Order authorizing him to conduct discovery related to the claims contained in his §2255 motion, and directing the government to produce the discovery requested herein.

Respectfully submitted,

/s/ Terence H. Campbell                  /s/ Lorinda M. Youngcourt  
Terence H. Campbell                      Lorinda Meier Youngcourt  
Cotsirilos, Tighe & Streicker, Ltd.          1773 Huron Williams Road  
33 North Dearborn Street, Suite 600        Mitchell, Indiana 47446  
Chicago, Illinois 60602                  (812) 849-9852  
(312) 263-0345

Counsel for Darryl Lamont Johnson

## **CERTIFICATE OF SERVICE**

Terence H. Campbell, an attorney, hereby certifies that in accordance with hereby certifies that in accordance with Fed.R.Crim.P. 49, LR 5.5, and the General Order on Electronic Case Filing (ECF), the following document:

1.    Petitioner's Renewed And Amended Motion for Discovery on Petitioner's Ineffective Assistance of Counsel and *Brady* Claims

was served pursuant to the District Court's ECF system as to ECF filers, including the United States Attorney's Office.

/s/  Terence H. Campbell
Terence H. Campbell

# EXHIBIT A

STATE OF ARIZONA )
) ss
COUNTY OF PINAL )

### AFFIDAVIT OF MARK A. BEZY

MARK BEZY, after being duly sworn, deposes and states under oath as follows:

1. I am over the age of 18, and I am competent to testify to the matters stated herein. I make the statements in this affidavit based upon my personal knowledge.

2. I worked for the United States Bureau of Prisons ("BOP") for 28 years, from 1978 to 2006, starting my career as a Correctional Officer and working my way up. During that time, I held a number of positions, including: (a) Warden of the Federal Correctional Complex at Terre Haute, Indiana from August, 2004 through October, 2006; (b) Warden of the Federal Correctional Institution in Elkton, Ohio from December, 2002 through August 2004; (c) Associate Warden at the United States Penitentiary in Leavenworth, Kansas, a high security facility, from July, 1999 through November, 2002; (d) Correctional Services Administrator of the North Central Regional Office of the BOP in Kansas City, Kansas from May, 1995 through July, 1999; and (e) Captain at the maximum security U.S. Penitentiary in Marion, Illinois ("USP Marion") from February, 1992 through May, 1995.

3. I received a number of awards during my service with the Bureau of Prisons, including being named a Member of the Senior Executive Services; being named Associate Warden of the Year for the North Central Region; and receiving a Director's Award in 1997.

4. While I was Warden at Terre Haute, I was responsible for the operation of, among others, the high security penitentiary and the Federal Death Row which is located at the FCC in Terre Haute. As Warden at Terre Haute, I oversaw 1,500 adult male high security offenders, as well as 37 inmates who were under death sentences. I managed several emergency situations that

occurred while I was Warden at Terre Haute, including a homicide, and numerous inmate assaults and emergency lockdowns.

5.      As Correctional Services Administrator for the North Central Regional Office of the BOP, my duties included providing consultation, advice and on-site assistance to 18 federal correctional institutions within the North Central region of the United States, which included at the time the states of Illinois, Wisconsin, Minnesota, Missouri, South Dakota, Kansas, and Colorado. I also oversaw the regional disciplinary transfer program for the North Central Region, and the Control Unit Hearing Program for the entire BOP.

6.      When I worked at USP Marion, that facility was the highest security prison in the United States.  USP Marion housed the "worst of the worst" of federal prisoners in its general population, and did so under highly secure and restrictive conditions of confinement, including, for example, restrictions on telephone communications, all of which were recorded and monitored, and restrictions on visitation, including no contact visits of any sort.  While the hope of the BOP was that inmates sent to the general population at USP Marion would modify their behavior and return to a mainstream maximum security facility after two to three years, there were many inmates who were housed at USP Marion for many years, including some who were housed at USP Marion for years and then transferred directly to the Administrative Maximum ("Super-Max" or "ADX") facility in Florence, Colorado when that facility opened.  In addition, there were some inmates who were assigned directly to USP Marion from the sentencing court.  For example, John Gotti was an inmate sent directly to USP Marion from the sentencing court.

7.      While I worked there, USP Marion had units within the facility where the most dangerous and/or high security risk inmates were housed under even more strict conditions of

-2-

confinement than those imposed on USP Marion's general population. These even more strict conditions of confinement were imposed for as long as the BOP and/or the Warden deemed necessary to ensure security and to reduce or eliminate the inmate's risk of violence or future dangerousness. For example, USP Marion had a Control Unit within the prison where the most violent offenders, including particularly those who were deemed to pose a future danger of violence and/or criminal activity, were housed prior to the opening of the Super-Max ADX facility in Florence, Colorado. Typically, inmates could be assigned to the Control Unit at USP Marion for a specific amount of time, up to five years, based on their offense. The specific amount of time that an inmate was committed to the Control Unit was determined by the BOP. Moreover, if an inmate engaged in additional criminal or violent activity, they could be re-committed to the Control Unit for additional time beyond the five years. Inmates assigned to the Control Unit were housed in that Unit for as long as was deemed necessary by the BOP in order to alleviate the risk that the inmate would constitute either a security risk or a future danger to either BOP staff, other inmates, or the public.

8. The Super-Max ADX facility in Florence, Colorado opened in approximately 1994. I know that a number of inmates who, due to security and/or "future dangerousness" concerns, had been housed at Marion under very strict conditions of confinement for years prior to the opening of the ADX facility in Colorado, were then transferred to the ADX facility where they continued to be held under very strict conditions of confinement due to the same long-standing security and/or future danger concerns. Inmates who fit this description that I can recall at this time include Barry Mills, and T.D. Bingham, high ranking members of the Aryan Brotherhood gang, as well as leaders of other gangs and disruptive groups. In addition, shortly after ADX was opened, a number of other

-3-

violent inmates, including gang members, domestic terrorists, and organized crime figures, were also were transferred directly from USP Marion to the ADX facility. At ADX, both before and after 1998, these types of inmates were housed in conditions that were even more restrictive than the conditions had been at USP Marion in terms of their ability to interact or communicate with staff, other inmates, or persons outside the facility.

9.     USP Marion also had what was called the "K-Unit" from at least the mid-1980's through the mid-1990's in which inmates who were a security risk were housed under extremely strict conditions of confinement. Inmates housed in the K-Unit due to security and/or future dangerousness concerns that I can recall included John Walker, a convicted spy, Ed Wilson, a former CIA operative, Jonathan Pollard, a convicted spy, and Christopher Boyce, a former CIA operative. These inmates were held in K-Unit because of security and/or future danger concerns, and were held there for as long as the BOP deemed it necessary to ensure security and that these individuals did not constitute a future danger. Inmates housed in K-Unit were housed in single cells and had no physical interaction with other inmates. All their mail was screened by BOP officers, all telephone calls had to be arranged through BOP officers who would bring the phone to the inmate in his cell. Those calls could only be made to people who were on an approved phone list, and all such calls were recorded and monitored by the BOP. All visitors to any inmates on K-Unit had to go through a somewhat intensive background screening process, and had to be pre-approved by the BOP before they could visit.

10.     Also at the USP Marion, there is an inmate housing unit above the hospital called the "I-Up Unit". Similar to the K-Unit, in the I-Up Unit, all inmate mail was screened and/or copied, and all telephone calls were recorded and monitored. I know, for example, that gang leader David

-4-

Sahakian, whose crimes included ordering the murders of others, was held in the I-Up Unit during his pre-trial detention in order to protect others and ensure that he did not commit, order or direct any additional criminal activity.  I believe this was after 1998, but inmate Sahakian was held under conditions of confinement that were available to the BOP at USP Marion in and prior to 1998.

11.    The Super-Max facility in Florence, Colorado, was designed to hold the most dangerous inmates under extremely strict conditions of confinement, including with strict limitations on any communications with people outside the prison, whether by phone, mail, or visits, whenever deemed necessary by the BOP.  It is my understanding that inmates were in 1998 and prior thereto (and have been from 1998 through the present) held at the ADX facility under strict conditions of confinement, including severe restrictions on their communications, whether by mail, phone or visitation, whenever that was deemed necessary by the BOP or the ADX Warden, and for as long as necessary to deal with the security or future danger concern raised by a particular inmate.  I also know that some inmates have been assigned to the ADX facility directly from the sentencing court, when the circumstances warranted.  The ADX facility also has areas within the prison that are referred to as "side pockets" or "special cells," which are used to hold prisoners who are deemed to be exceptionally dangerous.  For example, inmate Luis Felipe was assigned to ADX directly from the sentencing court and inmate Felipe was held in one of these "side pockets" after being sentenced in 1997 due to concerns about security and/or his future dangerousness as set forth by the sentencing court.  It is my belief that other inmates, too, were housed in these "side pockets" in order to address concerns about security and/or future dangerousness in and before 1998.

12.    I know of some other examples of inmates who, in 1998 and prior, were housed under strict conditions of confinement specifically in order to reduce or eliminate their potential future

-5-

dangerousness.  For example, Federal inmate Rodney Hamrick, a convicted bomber, was housed at USP Marion when I worked there.  All of Hamrick's mail, including his legal mail, was specially monitored by the BOP in order to reduce or eliminate his future dangerousness.  Inmate Manuel Noriega was also held under very strict conditions of confinement by the BOP because of the assessed risk that he posed to be a future danger by ordering crimes or violence while incarcerated.  Other inmates that I can recall who, in 1998 and prior, were housed under very strict conditions of confinement due to security concerns include Thomas Silverstein and Clayton Fountain.  Again, these strict conditions of confinement were (and are, to my knowledge) imposed on high security inmates by the Bureau of Prisons for as long as the BOP deems those conditions necessary to ensure the security and safety of BOP staff, other inmates, and the public (*i.e.* to reduce or eliminate the inmate's future dangerousness).  In the years after 1998, there have been a great many more federal inmates housed under such strict conditions of confinement in order to address security and/or future dangerousness concerns.

13.     All maximum security BOP facilities also have what is called a Special Housing Unit ("SHU") within the facility.  SHU's are, in essence, a prison within a prison where security and conditions of confinement are more strict than those imposed on the general population within the maximum security facility generally.  Both before and after 1998, inmates could be and were housed in a SHU for a variety of reasons, including because of concerns about security and/or an inmate's "future dangerousness."

14.     Based on my experience at the BOP, including the orders I gave and the conditions of confinement I observed, administered, and/or imposed both prior to 1998 and after, there is no doubt that the Bureau of Prisons had, at all times, the authority and ability to house inmates in the

most restrictive conditions of confinement necessary to ensure security and/or to reduce or eliminate an inmate's "future dangerousness." This included, but was not limited to, housing inmates in conditions of confinement where they did not have the ability to freely communicate with anyone from outside the prison, whether by phone, in person, or mail. The BOP could, and did, take away prisoners' ability to have visitors, to have mail privileges, and to make or receive phone calls whenever the BOP deemed it necessary to do so for the security of either prison staff, other inmates, or the public. Under the BOP regulations, these are considered "privileges" and not "rights," so they could be taken away whenever it was deemed necessary. Moreover, these strict conditions of confinement could be, and were, imposed for as long as the BOP deemed it necessary to ensure the security and safety of either prison staff, other inmates, or the public (*i.e.* to reduce or eliminate the inmate's future dangerousness).

15.     When strict conditions of confinement, such as being sent to the Control Unit or a SHU, or having mail, visiting and/or phone privileges taken away, were imposed on federal inmates for security reasons or concerns about violence, documentation of that action would normally be created and maintained in one or more places within the BOP. Information about both the restrictive conditions imposed and the reason(s) for imposing those conditions could be contained in one or more of the following: (a) in the DHO (Disciplinary Hearing Officer) record which is kept at the individual BOP facilities; (b) in the SIS (Special Investigation Supervisor) Files, which are kept at all high and maximum security BOP facilities; and (c) when the Warden imposed such conditions, s/he would write a memo which should be contained both in the inmate's file and the files of the BOP facility where the conditions were imposed. In order to ascertain all the inmates on whom these types of restrictive conditions were imposed based on security and/or "future dangerousness"

concerns, at a minimum, one would need to review the above files at each of the high and maximum security BOP facilities.

16. While restrictive conditions of confinement, including taking away communication privileges such as mail, phone and correspondence, could be imposed for a variety of reasons, I know that, in 1998 and prior thereto, those conditions were imposed on a number of inmates specifically in order to address security and violence/future danger concerns, and that those strict conditions of confinement were maintained for as long as the BOP deemed necessary to address the security of violence concerns regarding the particular inmate. I do not know the names of all the inmates who had strict conditions of confinement imposed on them in order to address security and/or future dangerousness concerns, but believe that, in 1998 and prior, there were a number more such inmates beyond those that I have recalled and described in this affidavit.

Further, Affiant sayeth not.

_____
Mark A. Bezy

Subscribed and sworn to
before me this 21st day
of November, 2008.

_____
Notary Public

AARON HALLSTROM
Notary Public - Arizona
MARICOPA COUNTY
My Comm. Exp. 04-30-2011

-8-

Case 1:02-cv-06998   Document 53   Filed 11/24/08   Page 23 of 36   PageID 581
Case: 11-1326      Document: 8-3         Filed: 03/04/2011      Pages: 278

# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA,            )   Docket No. 02 C 6998
                                     )
                    Plaintiff,       )
                                     )
          v.                         )   Chicago, Illinois
                                     )   June 3, 2008
DARRYL LAMONT JOHNSON,               )   10:30 o'clock a.m.
                                     )
                    Defendant.       )

TRANSCRIPT OF PROCEEDINGS - STATUS
BEFORE THE HONORABLE WILLIAM J. HIBBLER

APPEARANCES:

For the Government:          HON. PATRICK J. FITZGERALD
                             United States Attorney, by
                             MR. DAVID E. BINDI
                             Assistant United States Attorney
                             219 South Dearborn Street
                             Chicago, Illinois 60604

For the Defendant:           COTSIRILOS, TIGHE & STREICKER, by
                             MR. TERENCE H. CAMPBELL
                             33 North Dearborn Street
                             Suite 600
                             Chicago, Illinois 60602

ALEXANDRA ROTH, CSR, RPR
Official Court Reporter
219 South Dearborn Street
Room 1224
Chicago, Illinois 60604
(312) 294-0134

that related to inmates who were ordered housed for the rest of their lives in these kinds of conditions?  Or is it just inmates who were ordered -- in comportment with the defense argument that was made at sentencing, or it is just inmates who were ordered held in special conditions of confinement?

And I'm also trying to make sure that I have a distinction between the highly restrictive sorts of things involved in special conditions of confinement or special administrative measures as opposed to ordinary disciplinary measures that BOP institutions take when they put someone in a solitary confinement unit.

THE COURT:  Okay.  I will answer your questions.  I am not talking about those situations where somebody hits a correctional officer and they are put in segregation or whatever for some 30-day period or whatever.  I am talking about people who are housed under those kinds of restrictions for an extended period of time.

Doesn't have to be forever.  If they are designated to a particular institution which has such restrictions for the foreseeable future, let's assume their behavior changes or there is a long period by which they seem to adjust appropriately within the institution and then they are released, I still want those people to be disclosed to the defense.

MR. BINDI:  Okay.  I understand.

Case 1:02-cv-06998   Document 53   Filed 11/24/08   Page 26 of 36   PageID 584
Case: 11-1326   Document: 8-3        Filed: 03/04/2011   Pages: 278

31

THE COURT:  Because they are restricted under those conditions for an indeterminate period of time.  But I don't mean short term.

MR. BINDI:  Actually under the law you can't restrict anybody for an indeterminate period of time.  There has to be a risk assessment done every I think 30 or 60 days.  You can't just impose these kinds of restrictions, particularly communications restrictions, you know, or physical environment restrictions indefinitely.  The rules never -- that I'm aware of just never provided for that.

But we will look for any other inmates against whom special administrative measures or statutory measures beyond merely disciplinary segregation --

THE COURT:  Okay.

MR. BINDI:  -- were imposed at the time of the sentencing here.

MR. CAMPBELL:  Well, and, Judge, I want to be clear because we have I think now at lease some gray area as to the time period that somebody has to be held under these conditions.  I think Mr. Bindi is correct that in general -- I think there have been exceptions, but in general certainly under the SAMS provisions, it has to be revisited.

THE COURT:  Right.

MR. CAMPBELL:  So to me there are -- there are at least a couple limitations that we -- you know, we may have

disagreements about. One is the length of time that they have to have been held under that. It was never the defense's position in this case that Mr. Johnson had to be held under these conditions for the remainder of his life. The position was for as long as it was deemed necessary by the Bureau of Prisons.

And so if somebody is held under the SAMS restrictions for 60 days, whether it is directly ordered from the sentencing Court, you know, from day one or it happens because of some conduct in prison doesn't matter to the argument here. The argument was, the BOP has the authority and the power to house this person however they deem necessary.

So it should not be limited solely to people who were sent from a sentencing Court into these strict conditions. That's certainly a subcategory, which is, you know, on all fours with this. But it is not the only thing that's relevant to the issue that Warden Vanyur testified about, which is we can't do this. He said the ADX and these strict conditions are solely for people who committed violence in prison, and they are solely for a short period of time, people sent to go to general population.

It should not be limited to -- solely to people who are sent directly from the sentencing Court. And my suggestion would be, anyone who's being held under these conditions for more than 60 days consecutively, after reviews they're still

Case 1:02-cv-06998   Document 53   Filed 11/24/08   Page 28 of 36   PageID 586
Case: 11-1326   Document: 8-3         Filed: 03/04/2011   Pages: 278

33

being held at these strict conditions of confinement, we ought to get. Some of them may be more probative than others. There is no reason for us not to get that information.

Second --

THE COURT: Let me ask, counsel, do you have any objection to that 60-day limit, persons 60 days or more?

MR. BINDI: No, I have no objection to that.

THE COURT: Okay.

MR. CAMPBELL: The second issue, which I referred to earlier was the Brady claim. There should be no surprise. In our September 30, 2002 petition on page 9 we have a section entitled Violation of Brady versus Maryland. In the initial memorandum in support also filed on September 30, 2002, the initial filings on this 2255 has a section that's briefed on the Brady versus Maryland issue because the government had a responsibility to turn over the information that they knew contradicted or impeached or was inconsistent with Warden Vanyur's testimony.

So this is not a new issue, and there is no surprise on that Brady claim. But it certainly ties into what we are talking about here.

MR. BINDI: I apologize for that, your Honor. If it slipped my mind, I guess it's because it was rejected by Judge Conlon five years ago.

THE COURT: Well, let me just say this: That issue, I

Case 1:02-cv-06998   Document 53   Filed 11/24/08   Page 29 of 36   PageID 587
Case: 11-1326   Document: 8-3         Filed: 03/04/2011   Pages: 278

34

think we need not highlight that issue because the information that counsel receive for the defendant, should it suggest that there was knowledge out there within the government's possession, that -- and perhaps, you know, I'm not sure.  I am sure as I tried cases that there were things that I should have known that I didn't.  But the fact that the knowledge is out there can be impugned to me.

Then, you know, whether or not it's a Brady violation is one thing.  But clearly it's information that the defense would have been entitled to and would be considered by the Court in its ultimate determination.

MR. CAMPBELL:  Thank you, Judge.

THE COURT:  Okay.

MR. BINDI:  Just to clarify, your Honor.  There is a couple of things that I want to make sure I have in mind here in terms of our marching orders from this point.

THE COURT:  Okay.

MR. BINDI:  You need to find out what the extent or what is the state of Darryl Johnson's adjustment in the BOP?

THE COURT:  Yes.

MR. BINDI:  Okay.  You want me to turn over as discovery materials any instances of either special administrative measures under the BOP regulations or statutory provisions providing for extraordinary security measures for inmates that were requested or imposed at the time of Darryl

Case 1:02-cv-06998  Document 53  Filed 11/24/08  Page 30 of 36  PageID 588
Case: 11-1326  Document: 8-3  Filed: 03/04/2011  Pages: 278

38

THE CLERK:  Yes.

THE COURT:  Okay.  Thank you, gentlemen.

MR. CAMPBELL:  Thank you, Judge.

MR. BINDI:  Thank you, Judge.

(Which were all the proceedings had at the hearing of the within cause on the day and date hereof.)

CERTIFICATE

I HEREBY CERTIFY that the foregoing is a true, correct and complete transcript of the proceedings had at the hearing of the aforementioned cause on the day and date hereof.

_____              _____
Official Court Reporter                              Date
U.S. District Court                        6-9-08
Northern District of Illinois
Eastern Division

# EXHIBIT C

**Bindi, David (USAILN)**

| | |
|---|---|
| **From:** | Dominique Raia [DRaia@bop.gov] |
| **Sent:** | Thursday, July 10, 2008 1:52 PM |
| **To:** | Bindi, David (USAILN) |
| **Cc:** | Ann Zgrodnik; Joyce Zoldak |
| **Subject:** | SAM information in Johnson case |

As per our conversation this afternoon, I am providing the following information regarding the number of SAMs in the BOP prior to 11/17/97:

Five SAMs pursuant to 28 CFR 501.3 (terrorism); one SAM pursuant to 28 CFR 501.2 (espionage). Four of the terrorism SAMs were imposed in 8/96 and one in 3/97; the espionage SAM was imposed in 3/96.  All of the aforementioned SAMs have been extended in accordance with the regulations and are currently still in place.

Thank you,
Dominique


Dominique Raia
Senior Counsel
Legislative and Correctional Issues Branch Office of General Counsel Federal Bureau of Prisons
phone: (202) 353-8250
fax: (202) 307-2995

1

U.S. Department of Justice

Federal Bureau of Prisons

_Washington, DC 20534_

August 25, 2008

David E. Bindi
Assistant U.S. Attorney
United States Attorney's Office
for the Northern District of Illinois
219 South Dearborn Street
Chicago, Illinois 60604

      Re:    United States v. Darryl Johnson, N.D. Ill., No. 02 C 6998

Dear Mr. Bindi:

      This letter is written in response to your request for a response from the BOP to a court order in the above-referenced matter. Specifically, Judge Hibbler has ordered the government to turn over to Mr. Johnson's attorneys information believed to be maintained in the records of the Bureau of Prisons (BOP) regarding instances of <u>formal restrictions</u> being placed on the communications privileges of BOP inmates. As outlined in your letter dated June 18, 2008, the order is limited to instances of formal restrictions on communications imposed prior to Mr. Johnson's sentencing hearing, which began on November 6, 1997, and concluded on November 17, 1997. In responding to the court's order, I have taken the following actions.

      (1)    On June 27, 2008, your letter and court order were forwarded to Dominique Raia, Senior Counsel in the Legislative and Correctional Issues (LCI) Branch, to determine whether she had any responsive information. On July 10, 2008, Ms. Raia provided you with an e-mail regarding the number of special administrative matters (SAMs) in the BOP prior to November 17, 1997.

      (2)    Soon thereafter, I discussed with Ms. Raia ideas for obtaining information about communication restrictions ordered by the district courts pursuant to 18 U.S.C. §3582, or any other similar statutory or other regulatory measures. She suggested that I speak to a Research Analyst for the BOP and our Correctional Programs Division to see if they have this information. She also recommended that I speak with Chris Synsvoll, Supervisory Attorney at the Consolidated Legal Center, Florence, Colorado, and to Linda Thomas, Administrator of the Correctional Services Branch with regard to the request pertaining to how many BOP inmates were housed under no-human-contact conditions, not including normal

disciplinary segregation.

(3)   I initially spoke with Randy Etemick, Administrator of the Correctional Programs Branch, with regard to any information he may have concerning the court order. He did not have any responsive information, and referred me to Linda Thomas of the Correctional Services Branch.

(4)   On August 18, 2008, I e-mailed Ms. Linda Thomas, Administrator of the Correctional Services Branch requesting information on whether she was aware of any BOP inmates other than Thomas Silverstein and Clayton Fountain who were subject to similar restrictions. Ms. Thomas stated that the Correctional Services Branch does not have any information that would be responsive to this request. Ms. Thomas had no additional recommendations from what I had already.

(5)   I contacted Jennifer Batchelder, Research Analyst for the BOP in order for her to determine whether these type of restrictions had been tracked by the BOP. She suggested that I speak to Ron Riker at the Designation Sentence Computation Center (DSCC), located in Grand Prarie, Texas, to find out if there are any codes in our BOP database that are used for tracking these restrictions. Mr. Riker identifed several basis of change codes which I provided to Ms. Batchelder. Ms. Batchelder then provided this information to William Saylor, the Director of Research and Evaluation for his opinion. Mr. Saylor agreed that the codes identified by Mr. Riker are not relevant to obtaining information on communication restrictions as they are applied when an inmate's sentence is changed. Based on the input she received from Mr. Saylor, Ms. Batchelder recommended that we speak to Mr. Rowles from the Correctional Services Branch for his input.

(6)   On August 4, 2008, I met with Mr. Rowles the Administrator of the Central Office Intelligence Section with regard to any inmates who were placed on court imposed communication restrictions prior to November 17, 1997. Beginning in January, 2002, the Central Office Intelligence Section began compiling a monthly report identifying, by facility and category of restriction, inmates who have SAMs, court imposed restrictions, or restrictions agreed to during plea negotiations. The first report shows two inmates as having court ordered restrictions. Inmate Luis Felipe, Register Number 14067-074, was the only inmate listed in this report in which the court imposed restrictions prior to November 17, 1997. All of the other reports that were provided to me listed inmates names whose restrictions were imposed by the court after November 17, 1997. In compiling these reports, the intelligence section relies upon the SENTRY assignment loaded by field or other Central Office staff and does not verify the court order, request copies of any court documents, or verify the assignment in SENTRY. Thus, it is entirely probable that other inmates may be or have been in Bureau of Prisons custody with court

2

imposed communication restrictions that they are not aware of. Additionally, Kevin Schwinn, Chief of Intelligence Section at Central Office indicated that his office does not track those individuals with similar restrictions to inmates Silverstein and Fountain. Mr. Schwinn was unaware of anyone having this information.

(7)   Mr. Schwinn also provided me with the SENTRY assignment for inmates with court ordered communication restrictions. He was unaware of when this SENTRY assignment was created. I provided this information to Ms. Batchelder. She ran a search and provided me with a list of inmates who are subject to court ordered communication restrictions. This list included seven inmates names. Inmate Luis Felipe, Register Number 14067-074, was the only inmate listed in this report in which the court imposed restrictions prior to November 17, 1997.

(8)   Based on Ms. Raia's recommendation, I contacted Chris Synsvoll, Supervisory Attorney for the Consolidated Legal Center, located in Florence, Colorado, to determine whether he had any responsive information. He indicated that Luis Felipe is the only inmate who is currently housed at the Administrative Maximum, Florence, Colorado (ADX) whose restrictions were imposed prior to November 17, 2007.

(9)   Mr. Synsvoll also indicated that he is not aware of any inmate being housed under a no-human-contact status. Rather, inmates such as Thomas Silverstein and Clayton Fountain were housed under restrictive conditions of confinement to minimize their impact on security and orderly running of the institution. Even with that assignment, their access to programs and communication (telephone, correspondence, and visitation) was handled in accordance with BOP program statements.

(10)  Since Mr. Synsvoll was doubtful that his list was exhaustive, he suggested that I contact the DSCC to see if they have a mechanism for tracking these type of restrictions. Based on Mr. Synsvoll's recommendation, I contacted Sonya Cole who is the Assistant General Counsel assigned to the DSCC. She indicated that the DSCC has no responsive materials prior to November 6, 1997 because it came into existence in 2005, and records of such communication restrictions are not and have never been maintained at the DSCC. Ms. Cole suggested that I contact each Regional Counsel and Regional Correctional Programs Administrator to see if they may still have any responsive documents.

(11)  On August 5, 2008, I e-mailed all six Regional Counsels requesting responsive documents and provided them with a copy of your letter and the court order. I asked them to check with their Regional Correctional Programs Administrator for responsive documents. All six Regional Counsels did not have any responsive documents. In fact, Hank Sadowski, Regional Counsel for the Northeast Region,

3

recalled involvement in the § 3582 (d) order and the appeal of that order in the case of <u>United States v. Felipe</u>, 148 F.3d 101 (2nd Cir.), cert. denied, 525 U.S. 907 (1998).  At that time, he remembers, to the best of his recollection, that this was the first time a court utilized 18 U.S.C. § 3582(d).  Mr. Sadowski recommended that I speak to Daryl Kosiak, former Regional Counsel for the North Central Region, regarding his recollection.  On August 20, 2008, I spoke with Mr. Kosiak who explained to me that to his knowledge inmate Felipe's case was the first time a court had utilized 18 U.S.C. § 3582 (d).

Based on the above steps that I have taken in response to the court order and your letter, aside from inmate Luis Felipe, no other inmates have been identified prior to November 17, 1997, who are or were subject to formal restrictions in their ability to communicate and associate with others, based on § 3582(d), or any similar statutory or regulatory provision addressing long-term security problems, not including normal disciplinary segregation.  As discussed above, inmates Thomas Silverstein and Clayton Fountain did receive visits, and had mail and telephone access.

I trust this has been responsive.  If you have any questions, or need additional information, please contact me at (202) 616-7706.

Sincerely,

Ann H. Zgrodnik
Senior Counsel
Litigation Branch

4

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff - Appellee - Respondent, | ) | No. 02 C 6998 |
| | ) | |
| vs. | ) | Hon. William J. Hibbler |
| | ) | |
| DARRYL JOHNSON, | ) | |
| | ) | Death Sentence Imposed |
| Defendant - Appellant - Petitioner. | ) | |

**PETITIONER'S MOTION FOR LEAVE TO FILE
APPLICATION FOR FUNDS FOR EXPERT ASSISTANCE AND
NECESSARY INVESTIGATION *EX PARTE* AND UNDER SEAL
AND MEMORANDUM OF LAW IN SUPPORT**

**I. MOTION**

Defendant, Darryl Lamont Johnson, through undersigned counsel, respectfully moves the

Court, pursuant to 18 U.S.C. § 3599(f), for leave to proceed *ex parte*, *in camera*, and on a sealed

record with regard to his applications for expert assistance and necessary investigation, for the

reasons set forth below.  Mr. Johnson requests that the Court order the Clerk to file all motions,

documents, and exhibits submitted in connection with such application under seal, and that the Court

hold such documents *in camera* for review exclusively by the Court.

**II. MEMORANDUM OF LAW IN SUPPORT**

**A. Background**

Following a jury trial in the Fall of 1997, Darryl Johnson was convicted of numerous counts

of continuing criminal enterprise, two counts of murder, and various drug charges.  After a

sentencing hearing, the jury deliberated for thirteen hours before returning a death sentence. After

post-trial hearings, Mr. Johnson was sentenced to death on July 27, 1998.  Mr. Johnson's convictions

and sentences were affirmed on appeal. *United States v. Johnson*, 223 F.3d 665 (7th Cir. 2000). The Supreme Court of the United States denied Mr. Johnson's Petition for Writ of *Certiorari* on October 1, 2001. *Johnson v. United States*, 534 U.S. 829 (2001). Undersigned counsel were appointed to represent Mr. Johnson in post-conviction proceedings pursuant to 18 U.S.C. § 2255, the instant case.

The primary issues being litigated at this point consist of the following: (1) Mr. Johnson's ineffective assistance of counsel claim, based on counsel's failure to investigate, impeach and/or rebut the testimony of Warden John Vanyur which was presented by the government at Mr. Johnson's sentencing hearing; (2) Mr. Johnson's Brady claim, based on the government's failure to turn over required information in its possession pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963) and its progeny that was inconsistent with, or contradictory to, the testimony of Warden Vanyur; and (3) a claim of potential mental retardation or other mental defect.

As the Court is aware, Mr. Johnson has raised meritorious claims in this proceeding. To provide Mr. Johnson the representation to which he is entitled under federal statutes, undersigned counsel require the assistance of experts with the special knowledge, skills, and experience necessary to develop evidence relating to the claims upon which Mr. Johnson seeks relief.

B. **Mr. Johnson's Right to Expert Assistance in This Proceeding**

It is well settled that "[t]he services of investigators and other experts may be critical in … habeas corpus proceedings, when possible claims and their factual bases are researched and identified." *McFarland v. Scott*, 512 U.S. 849, 855 (1994). The Criminal Justice Act speaks in terms of services "necessary for adequate representation," and the Anti-Drug Abuse Act uses the analogous phrase services that are "reasonably necessary." Taken together with established habeas corpus jurisprudence, the language of both Acts makes clear that Congress intended to provide

2

indigent prisoners, upon request, with all resources needed to discover, plead, develop, and present evidence determinative of their "colorable" constitutional claims. *McFarland*, 512 U.S. at 860; *Burris v. Parke*, 116 F.3d 256, 259 (7th Cir.), *cert. denied*, 118 S. Ct. 462 (1997).

Congress and the Supreme Court thus have both recognized that habeas corpus claims often turn on factual questions, and that "the procedures by which the facts of a case are determined assume an importance fully as great as the validity of the substantive rule of law to be applied." *Wingo v. Weddings*, 418 U.S. 461, 468, 474 (1974); *McFarland*, 512 U.S. at 855; *Townsend v. Sain*, 372 U.S. 293, 312 (1963). Therefore full development of determinative factual issues is necessary before final adjudication of habeas corpus claims, and a variety of fact-determining procedures are available to habeas corpus petitioners, including discovery, expansion of the record to include documentary evidence, and, where appropriate, evidentiary hearings. Indeed, federal courts have a duty to provide appropriate fact-development procedures whenever (1) "specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is confined illegally and is therefore entitled to relief," and (2) the fact-determining procedure in question is "indispensable to a fair, rounded, development of the material facts." *Harris v. Nelson*, 394 U.S. 286, 300 (1969); *Coleman v. Zant*, 708 F.2d 541, 547 (11th Cir. 1983).

The policies favoring provision of expert assistance are obviously even stronger in capital cases than in noncapital cases because of the "finality" of death and its "qualitative[] differen[ce] from a sentence of imprisonment, however long," magnifies the "need for reliability" and, accordingly, the need for reliable fact-determination procedures. *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976); *McFarland*, 512 U.S. at 85.

In the instant case, the assistance of expert witnesses and investigators are required because the reliability of Mr. Johnson's sentence is, at best, in grave doubt in light of the now admittedly inaccurate testimony by government witness Warden John Vanyur and the admittedly deficient performance of Mr. Johnson's trial counsel with respect to that testimony.  (Warden Vanyur's testimony has been extensively discussed in prior filings by Mr. Johnson and, therefore, will not be recited again here.)  We submit that the government's admission that Warden Vanyur's testimony was inaccurate and may well have misled the jury as to the actual authority, ability and practices of the BOP with respect to numerous prisoners thought to constitute a security risk and/or a "future danger" also proves Mr. Johnson's *Brady* claim, because the government did not turn over to the defense any information it had in its possession which was clearly inconsistent with, if not outright contradictory of, Warden Vanyur's testimony.

With respect to both of these claims, expert assistance is both necessary to properly and fairly present Mr. Johnson's claims, and will undoubtedly be of benefit to the Court by creating a more fulsome record with respect to the issues in dispute.

**C.  The Right to Proceed *Ex Parte***

Given the need for expert assistance, federal statutes specifically contemplate *ex parte* requests in Mr. Johnson's situation.  For example, 18 U.S.C. §3006A(e)(1) states: "Counsel for a person who is financially unable to obtain investigative, expert, or other services necessary for adequate representation may request them in an *ex parte* application.  Upon finding, after appropriate inquiry in an *ex parte* proceeding, that the services are necessary and that the person is financially unable to obtain them, the court . . . shall authorize counsel to obtain the services."  This statute (18 U.S.C. §3006A) is applicable to persons seeking relief under 28 U.S.C. §2255.  *See* 18 U.S.C.

4

§3006A(a)(2)(B).

Further, 21 U.S.C. §848(q)(9) specifically provides that, upon a proper showing of the need

for confidentiality, a death-sentenced defendant may seek funds for post-conviction investigation in

confidence:

> Upon a finding that investigative, expert, or other services are reasonably necessary
> for the representation of the defendant, whether in connection with issues relating to
> guilt or the sentence, the court may authorize the defendant's attorneys to obtain such
> services on behalf of the defendant and, if so authorized, shall order the payment of
> fees and expenses therefor under paragraph (10). No *ex parte* proceeding,
> communication, or request may be considered pursuant to this section unless a proper
> showing is made concerning the need for confidentiality.

Courts construing the amended §848(q)(9) have held that the presence of attorney work-product in

a funding application is sufficient to necessitate *ex parte* proceedings. "[A] federal habeas petitioner

shows sufficient need for *ex parte* proceedings when his funding applications reveal information that

would be protected from disclosure under the work product doctrine." *See* Order Denying

Respondent's Motion to Unseal Petitioner's *Ex Parte* Applications for Payment of Fees and

Expenses, from *Fudge v. Calderon*, CV-95-5369 (C.D. Cal. March 24, 1997) (Davies, J.), at 6. The

work-product doctrine is firmly established by Supreme Court precedent, and supported by strong

public policy. Over fifty years ago, the Supreme Court explained the rationale supporting the

doctrine:

> [I]t is essential that a lawyer work with a certain degree of privacy, free
> from unnecessary intrusion by opposing parties and their counsel.
> Proper preparation of a client's case demands that he assemble
> information, sift what he considers to be the relevant from the irrelevant
> facts, prepare his legal theories and plan his strategy without undue and
> needless interference. That is the historical and the necessary way in
> which lawyers act within the framework of our system of jurisprudence
> to promote justice and to protect their clients' interests. This work is
> reflected, of course, in interviews, statements, memoranda,

5

> correspondence, briefs, mental impressions, personal beliefs, and
> countless other tangible and intangible ways. . . . Were such materials
> open to opposing counsel on mere demand, much of what is now put
> down in writing would remain unwritten. An attorney's thoughts,
> heretofore inviolate, would not be his own. Inefficiency, unfairness and
> sharp practices would inevitably develop in the giving of legal advice
> and in the preparation of cases for trial. The effect on the legal
> profession would be demoralizing. And the interests of the clients and
> the cause of justice would be poorly served.

*Hickman v. Taylor*, 329 U.S. 495, 510-11 (1947).[1]

Finally, section 848(q)(9)'s provision for *ex parte* applications serves to "level the playing field between petitioners able to purchase (and thereby not disclose to the opposing side) the usual litigation services – experts, investigators, subpoena-servers – and those forced to request payment of these services from the court." *See In re Pruett*, 133 F.3d 275, 279 (4th Cir. 1997) (citing cases and treatises).

Here, the request for expert and/or investigative assistance may well reveal work-product of defense counsel to which the government has no right, and which would not be the subject of a motion at all were it not for Mr. Johnson's indigency. Accordingly, Mr. Johnson respectfully requests the Court to grant his motion to proceed with *ex parte*, sealed applications for expert funding that will provide the Court with evidence critical to the Court's adjudication of Mr. Johnson's ineffective assistance of counsel and prosecutorial misconduct claims.

---

[1] Moreover, as a defendant in a federal case, this is the one and only habeas proceeding to which Mr. Johnson is entitled, and he maintains an ongoing interest in shielding "the theory of his defense from the prosecutor's scrutiny." *See United States v. Gaddis*, 891 F.2d 152, 154 (7th Cir. 1989) (noting that "indigent defendants, in requesting . . . the payment of [expert] witness expenses, need reveal their defense theory only to an impartial court and not to their government adversary")*; United States v. Meriwether*, 486 F.2d 498, 506 (5th Cir.), *cert. denied*, 417 U.S. 948 (1973)*.

### III. CONCLUSION

For the foregoing reasons, Mr. Johnson respectfully requests that the Court grant him leave to file any and all applications for reasonably necessary funds for expert assistance and investigation in this matter *ex parte, in camera* and on a sealed record.

Respectfully submitted,

/s/  Terence H. Campbell
An attorney for Defendant Darryl Johnson

Terence H. Campbell                          Lorinda Meier Youngcourt
Cotsirilos, Tighe & Streicker, Ltd.          Post Office Box 206
33 North Dearborn Street, Suite 600          Huron, Indiana  47437-0206
Chicago, Illinois  60602                     (812)849-9852
(312) 263-0345

## CERTIFICATE OF SERVICE

Terence H. Campbell, an attorney, hereby certifies that in accordance with hereby certifies that in accordance with Fed.R.Crim.P. 49, LR 5.5, and the General Order on Electronic Case Filing (ECF), the following document:

1.      Petitioner's Motion for Leave to File Application For Funds for Expert Assistance and Necessary Investigation Ex Parte and Under Seal, And Memorandum of Law in Support

was served pursuant to the District Court's ECF system as to ECF filers, including the United States Attorney's Office.


                                        /s/  Terence H. Campbell
                                        Terence H. Campbell

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff - Appellee - Respondent, | ) | No. 02 C 6998 |
| | ) | |
| vs. | ) | Hon. William J. Hibbler |
| | ) | |
| DARRYL L. JOHNSON, | ) | |
| | ) | Death Sentence Imposed |
| Defendant - Appellant - Petitioner. | ) | |

**AGREED MOTION FOR LEAVE TO FILE HIS RENEWED DISCOVERY AND LEAVE TO SEEK EXPERT FUNDING *EX PARTE* FUNDING MOTIONS *INSTANTER***

Petitioner, Darryl Lamont Johnson, by his attorneys, Terence H. Campbell of Cotsirilos, Tighe & Streicker, and Lorinda Youngcourt, respectfully submits this Agreed Motion for Leave to File His Renewed Discovery and Leave to Seek Expert Funding *Ex Parte* Motions *Instanter*. In support of this motion, Mr. Johnson states as follows:

1.      Darryl Johnson's Section 2255 case is pending before the Court. By prior Order, the Court directed Johnson's counsel to file (a) a renewed and narrowed discovery request relating to the conditions of confinement available and implemented by the BOP at or prior to the time that Darryl Johnson's sentence was finalized in the trial court in July 1998; and (b) a motion regarding our request for leave to seek expert funding *ex parte*. These motions were due to be filed on Friday, November 21, 2008.

2.      During the two-plus weeks preceding November 21, 2008, undersigned counsel's time was been dominated by other matters, including: (a) meetings with client, research, and in-person representation of a public school teacher in a termination proceeding before the Board of Education; (b) several new and existing matters which unexpectedly required immediate attention, including representing individuals who are subjects of ongoing grand jury proceedings, or defendants

in criminal and SEC cases.  Because of these and other commitments, undersigned counsel was not able to complete and file Petitioner's Renewed Discovery Motion and his Motion for Leave to Seek Expert Funding *Ex Parte* motion until Monday, November 24, 2008 – one business day after the scheduled filing date.

3.      ***On November 21, 2008, undersigned counsel communicated with AUSA David Bindi, who represents the government in this matter, and Mr. Bindi stated he has no objection to Petitioner filing his Renewed Discovery motion and his Leave to Seek Expert Funding Ex Parte motions one day late, on November 24, 2008, and agreed to this motion***.

4.      Petitioner filed his Renewed Discovery and Leave to Seek Expert Funding *Ex Parte* motions on Monday, November 24, 2008, and copies were served on the government through the ECF system that day.  Currently, the government's responses, if any, are due on December 5, 2008, and Petitioner's replies are due on December 12, 2008. The Court set January 8, 2009 as a ruling and status date in this matter. Thus, the filing of these motions one business day after the previously set date causes no prejudice to the government, and we obviously have no objection if the government wants additional time to respond to one or both of the motions.

WHEREFORE, for the reasons set forth herein, Petitioner Darryl L. Johnson respectfully requests that this Court grant this Agreed Motion For Leave to File His Renewed Discovery and *Ex Parte* Funding Motions *Instanter*.

Respectfully submitted,

/s/ Terence H. Campbell
An Attorney for Darryl L. Johnson

Terence H. Campbell
COTSIRILOS, TIGHE & STREICKER, LTD.
33 North Dearborn Street, Suite 600
Chicago, IL 60602
312-263-0345

**CERTIFICATE OF SERVICE**

Terence H. Campbell, an attorney, hereby certifies that in accordance with Fed.R.Civ. P.

5, LR 5.5, and the General Order on Electronic Case Filing (ECF), the following documents:

1. Notice of Motion

2. Agreed Motion For Leave to File His Renewed Discovery and *Ex Parte* Funding
   Motions *Instanter*

were served pursuant to the District Court's ECF system as to ECF filers, including the United

States Attorney's Office.

/s/  Terence H. Campbell
Terence H. Campbell

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA,           )
                                    )
        Plaintiff - Appellee - Respondent,   )        No. 02 C 6998
                                    )
    vs.                             )        Hon. Suzanne B. Conlon
                                    )
DARRYL JOHNSON,                     )
                                    )        Death Sentence Imposed
        Defendant - Appellant - Petitioner.   )

**NOTICE OF MOTION**

TO:   David Bindi
      Assistant United States Attorney
      219 South Dearborn Street, Suite 500
      Chicago, Illinois  60604

        PLEASE TAKE NOTICE that on Thursday, December 4, 2008, at 9:30 a.m., we shall appear before the Honorable William J. Hibbler, United States District Judge, in the courtroom usually occupied by him at 219 South Dearborn Street, Chicago, Illinois, and present our Agreed Motion For Leave to File His Renewed Discovery and *Ex Parte* Funding Motions *Instanter*, a copy of which accompany this Notice and are hereby served upon you.

                                Respectfully submitted,


                                /s/ Terence H. Campbell
                                Attorney for defendant

                                Terence H. Campbell
                                Cotsirilos, Tighe & Streicker, Ltd.
                                33 North Dearborn Street, Suite 600
                                Chicago, Illinois  60602
                                (312) 263-0345

**UNITED STATES DISTRICT COURT**
**FOR THE Northern District of Illinois – CM/ECF LIVE, Ver 3.2.2**
**Eastern Division**

United States of America

               Plaintiff,

v.

Darryl Lamont Johnson

               Defendant.

Case No.: 1:02–cv–06998

Honorable William J. Hibbler

**NOTIFICATION OF DOCKET ENTRY**

This docket entry was made by the Clerk on Wednesday, December 3, 2008:

      MINUTE entry before the Honorable William J. Hibbler: Agreed Motion for leave to file his renewed discovery and for leave to seek expert funding ex parte funding motions instanter [54] [55] is granted. The previously set briefing schedule to stand. Mailed notice (jdh)

**ATTENTION:** This notice is being sent pursuant to Rule 77(d) of the Federal Rules of Civil Procedure or Rule 49(c) of the Federal Rules of Criminal Procedure. It was generated by CM/ECF, the automated docketing system used to maintain the civil and criminal dockets of this District. If a minute order or other document is enclosed, please refer to it for additional information.

For scheduled events, motion practices, recent opinions and other information, visit our web site at *www.ilnd.uscourts.gov*.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA,        )
     Respondent,   )
             )
 vs.         ) No.  02 C 6998
             ) Judge William J. Hibbler
DARRYL JOHNSON,    )
     Petitioner   )

**AGREED MOTION FOR AN EXTENSION OF TIME TO RESPOND
TO PETITIONER'S DISCOVERY AND EXPERT WITNESS MOTIONS**

The UNITED STATES OF AMERICA, by its attorney, PATRICK J. FITZGERALD, United States Attorney for the Northern District of Illinois, moves this Court for a 14-day extension of time, from December 5, 2008, to and including December 19, 2008, within which to respond to petitioner's discovery and expert witness motions.  In support of this motion, the government states as follows:

1.  Briefing on petitioner's renewed motion for discovery and motion for finding for an expert witness was set by order of this Court on October 21, 2008.  Petitioner filed his motions on November 24, 2008.  The government's response is due December 5, 2008.

2.  In the time since the briefing schedule was set, counsel for the government has been assigned a priority task that has consumed the bulk of his time, and he has been unable to prepare the government's response to petitioner's motions.  An additional two weeks, until December 19, 2008, is requested.

3.  Counsel for the government contacted one of petitioner's attorney's, Terrence Campbell, by phone on December 4, 2008, and Mr. Campbell stated that petitioner had no

objection to this motion.

WHEREFORE, the government respectfully requests that this Court grant a 14-day

extension of time within which to answer petitioner's motions.


Respectfully Submitted,

PATRICK J. FITZGERALD,
United States Attorney


By:    /s/ David E. Bindi
DAVID E. BINDI
Assistant U.S. Attorney
219 South Dearborn Street
5th Floor
Chicago, Illinois 60604
(312) 886-7643

2

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA        )
                                )
        vs.                     )       No.  02 C 6998
                                )       Judge William J. Hibbler
DARRYL JOHNSON                  )

## <u>NOTICE OF MOTION</u>

To:     Terrence Campbell               Lorinda Meier Youngcourt
        Cotsirilos, Tighe & Streicker, Ltd.     P.O. Box 206
        33 North Dearborn Street        Huron, Indiana 47437-0206
        Suite 600
        Chicago, Illinois 60602

        PLEASE TAKE NOTICE that on Thursday, December 11, 2008, at 9:30 a.m., I shall appear before the Honorable William J. Hibbler, United States District Court, in the courtroom usually occupied by him at 219 South Dearborn Street, Chicago, Illinois, and present the government's Motion for an Extension of Time, service of which is made upon you.

                        Respectfully Submitted,

                        PATRICK J. FITZGERALD,
                        United States Attorney

                By:     __/s/ David E. Bindi_____
                        DAVID E. BINDI
                        Assistant U.S. Attorney
                        219 South Dearborn Street
                        5th Floor
                        Chicago, Illinois 60604
                        (312) 886-7643

**UNITED STATES DISTRICT COURT**
**FOR THE Northern District of Illinois – CM/ECF LIVE, Ver 3.2.2**
**Eastern Division**

United States of America
                                    Plaintiff,

v.                                                      Case No.: 1:02–cv–06998
                                                        Honorable William J. Hibbler

Darryl Lamont Johnson
                                    Defendant.

---

**NOTIFICATION OF DOCKET ENTRY**

This docket entry was made by the Clerk on Wednesday, December 10, 2008:

        MINUTE entry before the Honorable William J. Hibbler: Government's Agreed
Motion for an extension of time to respond to petitioner's discovery and expert witness
motions [58] is granted. Government to respond by 12/19/2008. Petitioner to reply by
1/8/2009. Ruling to reset to 2/4/09 at 10:00 a.m. Mailed notice (jdh)

**ATTENTION:** This notice is being sent pursuant to Rule 77(d) of the Federal Rules of
Civil Procedure or Rule 49(c) of the Federal Rules of Criminal Procedure. It was
generated by CM/ECF, the automated docketing system used to maintain the civil and
criminal dockets of this District. If a minute order or other document is enclosed, please
refer to it for additional information.

For scheduled events, motion practices, recent opinions and other information, visit our
web site at *www.ilnd.uscourts.gov*.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA,      )
         Respondent,      )
                              )
   vs.                  )  No.  02 C 6998
                              )  Judge William J. Hibbler
DARRYL JOHNSON,        )
         Petitioner      )

**GOVERNMENT'S RESPONSE TO THE RENEWED AND
AMENDED MOTION FOR DISCOVERY AND FOR LEAVE
TO APPLY FOR FUNDS FOR EXPERT ASSISTANCE**

The UNITED STATES OF AMERICA, by its attorney, PATRICK J. FITZGERALD, United States Attorney for the Northern District of Illinois, asserts that this Court should deny petitioner's renewed and amended motion for discovery for the reasons that follow. The government does not oppose petitioner's motion for leave to file an *ex parte*, under seal, application for funds for expert assistance. However, for the reasons stated in the government's response to the discovery motion, the expenditure of funds on the proposed expert is unnecessary, and ought to be denied.

**Discovery Motion**

1. In his motion under 28 U.S.C. § 2255, petitioner raised a claim of ineffective assistance of trial counsel, alleging that counsel performed deficiently "in investigating, researching, preparing for, and confronting through the adversarial process the testimony of Warden Vanyur." R1 at 6. The information petitioner claimed counsel should have discovered and used in cross-examination of Warden Vanyur was **(a)** the special

administrative measures (SAMs) regulations, which allow the Attorney General to order the Bureau of Prisons to house an inmate in administrative detention and place strict limits on the inmate's ability to communicate, if it can be shown that by communication, the inmate poses a danger to others; **(b)** a statute, 18 U.S.C. § 3582(d), which allows a district court to impose the same sort of restrictive conditions on an inmate in the BOP if there is probable cause to believe that the inmate will use his ability to communicate to continue participating in the affairs of a criminal organization; and **(c)** the case of Luis Filipe, in which, prior to petitioner's sentencing hearing, the district court for the Southern District of New York ordered restrictions pursuant to § 3582(d), an order affirmed after the sentencing hearing. *United States v. Filipe*, 148 F.3d 101, 109-112 (2nd Cir. 2000).  R1 at 14-22.  This claim was adjudicated by Judge Conlon (R20), but subsequently reopened (R 34), and is properly before this Court.  In previously ordered discovery, the government has disclosed that at the time of petitioner's sentencing hearing, the Felipe case was the only known case in which restrictions had been ordered pursuant to § 3582(d), and that SAMs had been invoked in six cases, five terrorism and one espionage.

2.  Petitioner also raised in his § 2255 motion a claim that the government violated the rule of *Brady v. Maryland*, 373 U.S. 83 (1963), and *Giglio v. United States*, 405 U.S. 150 (1972), which require the prosecution to turn over to the defense evidence in its possession which is exculpatory or impeaching, and material to an issue at trial.  R1 at 48-54.  The information he claimed to have been suppressed was the same information detailed

2

above, plus information regarding BOP inmates Thomas Silverstein and Clayton Fountain, who had been housed in solitary confinement for years, though without significant communications restrictions, because while incarcerated, they committed multiple murders of other inmates, and guards.  *See* "The Caged Life," http://www.westword.com, August 16, 2007 (attached).  This claim is no longer before this Court.  In the March 11, 2003, Memorandum Opinion and Order, Judge Conlon rejected it on three grounds.  First, she found that it was procedurally defaulted, and that petitioner had not shown cause and prejudice.  Second, she found that petitioner could have discovered the SAMs, the statute, and the Felipe case on his own using due diligence, so this information was not suppressed. *United States v. Bland*, 517 F.3d 930, 934 (7th Cir. 2008) (*Brady* only applies to evidence defendant could not have discovered on his own using due diligence).  Third, she found that this evidence was not material in any event.  R20 at 12-14.

3.  The *Brady-Giglio* claim is fundamentally at odds with the ineffective assistance claim.  If counsel performed deficiently in failing to discover this evidence on their own, which the government concedes, then it cannot have been suppressed.  *Bland, supra*. Further, it is bizarre, to say the least, to speak of an Act of Congress, a set of published regulations, and a court case open to the public as having been suppressed.

4.  Further still, the *Brady-Giglio* doctrine applies only to the prosecution team, *i.e.*, the U.S. Attorney's Office and the law enforcement agencies responsible for the investigation and prosecution of the case.  *Kyles v. Whitley*, 514 U.S. 419, 437 (1995);

3

*United States v. Morris*, 80 F.3d 1151, 1169 (7th Cir. 1996).  The BOP was not part of the prosecution team in petitioner's case.  It was not involved in the investigation or the prosecution, and the BOP witnesses who testified in rebuttal at the sentencing hearing had no personal or professional stake in the outcome.  Petitioner's argument on this claim assumes that the functional unit for *Brady-Giglio* purposes is not the prosecution team, but the entire United States government.  This is not the law, and the cases cited by petitioner (Motion at 10) do not support this view.

a.  Petitioner quotes from *Kyles v. Whitley*, 514 U.S. 419, 437 (1995) – "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case" – but he cites no authority that those acting on the government's behalf includes those whose only role in the case is to be a witness. *Morris*, *supra*, applied *Kyles* when it held that the duty to disclose is limited to the prosecution team, and the prosecution team is the U.S. Attorney's Office and the law enforcement agencies participating in the investigation and prosecution of the case.  In *Kyles*, the undisclosed evidence was in the possession of the police department that investigated the crime.  514 U.S. at 428-429.

b.  In *United States v. Andrews*, 824 F.Supp. 1273, 1289-90 (N.D. Ill. 1993), the prosecutors where chargeable with knowledge of information in the possession of the MCC because they had first-hand knowledge of misconduct committed by government witnesses in the MCC, and had worked closely with MCC officials on that and a raft of other

issues concerning the witnesses. The MCC information was "readily accessible" to the prosecutors "upon reasonable inquiry." *Id.* The relationship between the prosecution and the BOP in this case is not similar, and the information petitioner now wants disclosed – which is considerably more expansive than information about SAMs, § 3582(d), and the Felipe case – is not readily available. As he himself points out (Motion at 8-9, ¶ 3), retrieval of the requested discovery cannot be done by querying computer databases, because the data is not sorted by the criteria relevant to petitioner's request. Compliance would require hand-searching individual inmate records from 1997 going backwards.

c. *Schneider v. Estelle*, 552 F.2d 593 (5th Cir. 1977), has nothing to do with *Brady*. It holds that a habeas petitioner is entitled to an evidentiary hearing when he produces evidence that a key prosecution witness, an officer of the police department that investigated and prosecuted the case, lied about a critical fact. *Id.*, at 594-596. In *United States v. Rosner*, 516 F.2d 269 (2nd Cir. 1975), the undisclosed evidence was impeachment material on the undercover police officer who set up the sting. *Id.*, at 270-271. In *United States v. Deutsch*, 475 F.2nd 55 (5th Cir. 1973), it was the personnel file of an officer of the agency that investigated and prosecuted the case.

5. The cases of Silverstein and Fountain are immaterial. They corroborate Warden Vanyur's testimony that restrictive conditions are typically imposed based on an inmate's conduct in custody, not on what he might do in custody or has done in the community. Tr2484-85.

5

6.   Petitioner asks that the rejection of his *Brady-Giglio* claim be reconsidered. Motion at ¶¶ 5-6.  As noted above, there was a sound basis (several, in fact) for rejecting the claim.  Reconsideration of a dispositive ruling is permissible but not favored.  "A judge may reexamine his earlier ruling (or the ruling of a judge previously assigned to the case . . .) if he has a conviction at once strong and reasonable that the earlier ruling was wrong . . . ." *Avita v. Metropolitan Club of Chicago, Inc.*, 49 F.3d 1219, 1227 (7th Cir. 1995).  Petitioner offers no reason to reopen this issue.  He cannot point to anything Judge Conlon overlooked, or any intervening event that casts her ruling into question.  The only thing that has changed between March 11, 2003, and now is the prejudice standard applicable to the ineffective assistance claim.

7.   None of the requested discovery is relevant to the issue of whether the failure of counsel to discover the SAMs regulations, § 3582(d), and the Felipe case was prejudicial, as that term is used in *Strickland v. Washington*, 466 U.S. 668 (1984).  There is no pending allegation that counsel performed deficiently in failing to find the requested discovery in time to use for impeachment of rebuttal witness Warden Vanyur, and the government does not concede such.  Indeed, if petitioner were to now allege that the failure of counsel to find the requested discovery in anticipation of a rebuttal witness amounted to representation so deficient as to violate the Constitution, the government would answer that the allegation was frivolous.

8.   The requested discovery is overbroad, so the information sought is not material

within the meaning of *Brady*.  The request is not limited to records regarding the treatment of inmates similarly situated to petitioner, and so the information could not have been used to impeach Warden Vanyur.  Petitioner wants records regarding inmates held in strict conditions of confinement for 60 days or more prior July 1998, when his post-trial motions were denied, but knowing something about the imposition of restrictive conditions of confinement based on misbehavior in custody is irrelevant here.  So is knowing about the initial placement of espionage agents and mafia dons in more restrictive prisons.  Affidavit at ¶¶ 6, 9.  The defense theory at sentencing was that petitioner, a street gang leader, could conceivably be sent straight from court to the control unit, solitary confinement, at ADX Florence, the super maximum security prison, based solely on future dangerousness as reflected by the crime of conviction.  Petitioner qualifies his discovery request by calling for records regarding restrictive conditions imposed based on future dangerousness, but he does not qualify it by calling for records of inmates sent to control units straight from the sentencing court.  The fact that inmates who commit or threaten acts of violence while in custody are put in administrative segregation, or transferred to more secure prisons, to both deter and incapacitate them, is not relevant and could not have been used to impeach Warden Vanyur.  This why Judge Conlon denied the original discovery motion on this claim, in part, because the requested discovery was not material.  R20 at 4, 13-14.  The post-trial motion sought a new sentencing hearing on the ground that Warden Vanyur's testimony was false.  The false-testimony theory was premised on the contention, repeated here (Motion at 11, ¶

7

8), that Warden Vanyur testified that certain restrictive measures were not possible or unavailable. Judge Conlon rejected that characterization of Warden Vanyur's testimony, characterizing it as concerning BOP policies and procedures, and what was likely to happen, not what was possible or impossible. 96 CR 379 R270 at 34-38. With Warden Vanyur's testimony viewed in that light, evidence about restrictive conditions imposed on other inmates not similarly situated to defendant is not material.

9. In the section of his motion entitled "Basis for Items Requested," petitioner essentially concedes that none of the requested discovery is relevant to the pending ineffective assistance claim. Nowhere does he assert that it is. Instead, he maintains that the requested discovery is relevant to his *Brady-Giglio* claim, and that the discovery produced so far regarding inmates held in restrictive conditions of confinement is incomplete. Motion at 8-12. On June 3, 2008, this Court ordered the government to produce information regarding "any instances of either special administrative measures under the BOP regulations or statutory provisions providing for extraordinary security measures for inmates that were requested or imposed at the time of Darryl Johnson's sentencing that involved restrictions continuously." R48.[1] The government complied with that order. We turned

---

[1] Contrary to petitioner's assertion that the relevant cutoff date was the denial of the post-trial motions (Motion at 9, ¶ 5) this Court set the cutoff "at the time of Darryl Johnson's sentencing." Further, the information produced regarding no-human-contact conditions was not, contrary to petitioner's assertion (Motion at 9, ¶ 4), more restrictive than what was ordered. It was in excess of what was ordered. This Court ordered information on the imposition of SAMs and the existence of § 3582(d) orders. The no-human-contact conditions imposed on Silverstein and Fountain had nothing to do with SAMs or § 3582(d), and providing that was a bonus.

8

over information regarding instances of SAMs (five instances), and § 3582(d) orders (one case).[2] As noted above, petitioner now wants information regarding disciplinary measures taken against inmates who committed or threatened acts of violence while in custody prior to July 1998, or were initially designated to highly restrictive prisons. This goes well beyond what this Court ordered. In fact, this Court explicitly limited its order to instances where SAMs or § 3582(d) were resorted to in order to exclude routine disciplinary measures for conduct while in custody, and to tailor the discovery to what was at issue at the sentencing hearing and the post-trial motion stage in this case.

10. Petitioner asserts that the information thus far disclosed, the discovery he requests, and the affidavit former BOP Warden Mark Bezy attached to his motion "directly contradicts Warden Vanyur's testimony." Motion at 10, ¶ 7. He does not cite one statement by Warden Vanyur that is contradicted by anything. As the Court of Appeals found on direct review, Warden Vanyur's testimony was largely about practice and policy, not what was possible or impossible, and it was not false. *United States v. Johnson*, 223 F.3d 665, 672 (7th Cir. 2000).

11. Petitioner states that Bezy's affidavit details restrictive confinement measures that the BOP could use which "Warden Vanyur testified were not available in Darryl Johnson's case." Motion at 11, ¶ 8. Warden Vanyur never testified that restrictive measures were unavailable. He testified that incoming inmates were typically assigned to a more or

---

[2]We know of no relevant statutory provision other than § 3582(d), and petitioner has cited none.

less restrictive prison setting based on the crime of conviction, and an individual risk assessment, and that placement is subject to available space. Tr2471-74. Applying these policies to what he knew about petitioner, Warden Vanyur surmised that petitioner would probably be designated to a general population penitentiary. Tr2474-75. He turned out to be right. That Bezy knows of other inmates who were treated differently does not contradict Vanyur. Vanyur's testimony was mostly about practice and policy. It was about likelihood, not possibility. Bezy's affidavit is case-specific.

12. Bezy's affidavit recounts his knowledge of restrictions placed on particular inmates to reduce "future dangerousness" which policy permits to be kept in place for as long as necessary. Affidavit at ¶¶ 7, 9, 11, 12, 13, and 14. Curiously, he does not state the circumstances which prompted these measures in the instances he recalls. Specifically, he does not state that the restrictive measures were imposed based on something other than misconduct while in custody. He mentions strict conditions of confinement imposed on Silverstein and Fountain to curtail their "future dangerousness" without mentioning that the reason for it was that while they were in custody, they murdered inmates and guards. Affidavit ¶ 12.

13. Rule 6(a) of the Rules Governing Section 2255 Proceedings authorizes this Court, in the exercise of its discretion, to permit discovery to proceed under the Federal Rules of Criminal or Civil Procedure, if defendant shows "good cause" for his request, "but not otherwise." "Good cause" is established only if defendant shows that the information

sought is essential to an adequate factual development of the claims raised. *Bracy v. Gramley*, 520 U.S. 899, 908-909 (1997); *Henderson v. Walls*, 296 F.3d 541, 553-554 (7th Cir. 2002). Good cause has not been shown. The requested discovery is not relevant to the ineffective assistance claim, the only claim still pending, and petitioner does not assert that it is. The *Brady-Giglio* claim, and discovery on it, has already been rejected. Petitioner asks that it be reopened, but he does not argue that any part of Judge Conlon's ruling was wrong, other than to gainsay her ruling that the requested discovery is not material. The requested discovery was never in the possession of the prosecution to begin with. The authorities cited by petitioner for the proposition that the prosecution team chargeable with knowledge for *Brady* purposes extends beyond the U.S. Attorney's Office and the law enforcement agencies participating in the investigation and prosecution of the case do not support that proposition. Certainly, there is no authority that an when agency whose only contact with a case is to have one of its agents called as a witness, this imputes knowledge to the prosecutors of everything known to the agency, even if not to the agent. A hand-search of inmate files predating 1997 looking for information regarding the treatment of inmates not similarly situated to petitioner would serve no purpose. The discovery motion should be denied.

**Leave to File Application For Funds for Expert Assistance**

The government does not oppose petitioner's motion to file an *ex parte*, under seal, application for funds for expert assistance.  Petitioner invokes 18 U.S.C. § 3599, which authorizes granting funds for expert or investigative services in § 2255 proceedings where the  petitioner is under sentence of death, § 3599(a)(2), but the statute discourages *ex parte* proceedings. § 3599(f).  However, as petitioner notes, 18 U.S.C. § 3006A(a)(2) and (e) allow authorization of funds for an expert in any § 2255 proceeding by way of an *ex parte* motion.

For the reasons set forth in response to the discovery motion, funds should not be authorized.

Respectfully Submitted,

PATRICK J. FITZGERALD,
United States Attorney


By:      /s/ David E. Bindi
DAVID E. BINDI
Assistant U.S. Attorney
219 South Dearborn Street
5th Floor
Chicago, Illinois 60604
(312) 886-7643

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| vs. | ) | No.  02 C 6998 |
| | ) | Judge William J. Hibbler |
| DARRYL JOHNSON | ) | |

## CERTIFICATE OF SERVICE

David E. Bindi, an Assistant United States Attorney, hereby certifies that pursuant to Fed.R.Civ.P. 5(a), LR 5.5, and the General Order on electronic case filing, the Government's Response to the Renewed and Amended Motion for Discovery and for Leave to Apply for Funds for Expert Assistance was served through the District Court's ECF system on the following counsel for the petitioner.

Terrence Campbell
Cotsirilos, Tighe & Streicker, Ltd.
33 North Dearborn Street
Suite 600
Chicago, Illinois 60602

Lorinda Meier Youngcourt
P.O. Box 206
Huron, Indiana 47437-0206

Respectfully Submitted,

PATRICK J. FITZGERALD,
United States Attorney

By:      /s/ David E. Bindi
DAVID E. BINDI
Assistant U.S. Attorney
219 South Dearborn Street
5th Floor
Chicago, Illinois 60604
(312) 886-7643


EXCEPTIONAL TASTE THAT'S NEVER FILLING
STEP UP TO SELECT
SELECT.
99 CALORIES   3.1 G CARBS
RADIOHEAD

# The Caged Life

## Is Thomas Silverstein a prisoner of his own deadly past — or the first in a new wave of locked-down lifers?

**By Alan Prendergast**
published: August 16, 2007

When the goon squad showed up at his place at five in the morning, Tommy Silverstein knew something was up. He wasn't accustomed to greeting guests at such an ungodly hour — much less a team of corrections officers, helmeted and suited up for action. In fact,



Lockdown world: Thomas Silverstein in 2005, a few months after his arrival at ADX, in Atlanta in the 1980s (inset) around the time he began his tour in solitary.

Silverstein wasn't used to company at any hour. His home was a remote cell, known as the Silverstein Suite, in the special housing unit of the federal penitentiary at Leavenworth, Kansas. He'd been cut off from other inmates and all but a few emissaries from the outside world for more than two decades.

He stayed in the Silverstein Suite 23 hours a day. His interactions with staff typically amounted to some tight-lipped turnkey delivering his food through a slot in the cell door. The only change of scenery came when an electronic door slid open, allowing him an hour's solitary exercise in an adjoining recreation cage. Visitors were rarely permitted, and entire years had gone by during which he never left the cell.



High lonesome: Located in the heart of a four-prison complex outside Florence, ADX was the government's solution to violence at other high-security prisons.



Dreams of flight: Silverstein learned about art in prison and discovered his "niche in life."



Alone in the crowd: Any trip outside his cell requires a heavy escort for inmate #14634-116.

Details:

**Click here for a complete list of Westword reports from the ADX Supermax in Florence.**

But this day was different. Silverstein could think of only a couple of reasons why so many well-padded, well-equipped officers would be at his door, ordering him to strip for a search. Cell shakedown? Time for a game of hockey, with Tommy as the puck? No, that was a captain leading the squad. Something big.

A transfer.

So it came to pass that on July 12, 2005, U.S. Bureau of Prisons inmate #14634-116 left his cage in Kansas for one in Colorado. Security for the move was tighter than Borat's Speedo — about what you'd expect for a former Aryan Brotherhood leader convicted of killing four men behind prison walls. (One conviction was later overturned; Silverstein disputes the second slaying but admits the other two.) The object of all this fuss didn't mind the goon squad. He was enjoying the view — and hoping that the move signaled the end to his eight-thousand-plus days of solitary confinement. Maybe, just maybe, his decades of uneventful good behavior had paid off.

"They said for me to keep my nose clean, and maybe one day it'd happen," he recalled recently. "So I foolishly thought this was it. If you saw me in that van, you'd think I was Disneyland-bound, smiling all the way."

But the smile vanished after Silverstein reached his destination: the U.S. Penitentiary Administrative Maximum, better known as ADX. Located two miles outside of the high-desert town of Florence, ADX is the most secure prison in the country, a hunkered-down maze

**Also, check out our** rogues' gallery slide show **of the most (in) famous residents of Colorado and click** here **to see a slide show display of Tommy Silverstein's artwork.**

Subject(s):

Thomas Silverstein, ADX, Supermax, Solitary Confinement

of locks, alarms and electronic surveillance, designed to house gang leaders, terrorists, drug lords and other high-risk prisoners in profound isolation. Its current guest list is a who's who of enemies of the state, including Unabomber Ted Kaczynski, shoe bomber Richard Reid, plane bomber Dandenis Muñoz Mosquera, abortion clinic bomber Eric Rudolph and double-agent Robert Hanssen.

When it opened in 1994, ADX was hailed as the solution to security flaws at even the highest levels of the federal prison system. Much of the justification for building the place stemmed from official outrage at the brutal murders of two guards in the control unit of the federal pen in Marion, Illinois, during a single 24-hour period in 1983. The first of those killings was committed by Thomas Silverstein, who was already facing multiple life sentences for previous bloodshed at Marion. The slaying of corrections officer Merle Clutts placed Silverstein under a "no human contact" order that's prevailed ever since, and it gave the Bureau of Prisons the perfect rationale for building its high-tech supermax. Although he never bunked there until 2005, you could call ADX the House that Tommy Built.

What greeted Silverstein two years ago was nothing like Disneyland. His hosts hustled him down long, sterile corridors with gleaming black-and-white checkerboard floors that reminded him of *A Clockwork Orange* or some other cinematic acid trip. One set of doors, then another and another, until he finally arrived at the ass-end of Z Unit, on a special range with only four cells, each double-doored. His new home was less than half the size of the Silverstein Suite and consisted of a steel slab with a thin mattress, a steel stool and desk, a steel sink-and-toilet combination, a steel shower and a small black-and-white TV.

Stripped of most of his small store of personal belongings, Silverstein had little to do besides take stock of his eighty-square-foot digs. The

Silverstein Suite was a penthouse at the Plaza compared to this place. There were steel rings on the sides of the bed platform, ready for "four-pointing" difficult inmates. A camera mounted on the ceiling to record his every move. If he stood on the stool and peered out the heavily meshed window, he could get a glimpse of a concrete recreation cage and something like sky. So this was his reward for all those years of following the rules — 24-hour surveillance in his own desolate corner of the Alcatraz of the Rockies. He was no longer simply in the belly of the beast. He was, he would later write, "stuck in its bowels, with no end/exit in sight."

The double doors muffled sound from outside. But over time, Silverstein realized that there was one other prisoner on the range. He shouted greetings. The man shouted back. He asked the man how long he'd been in the unit. Four years, the man said.

Silverstein told the man his name. His neighbor introduced himself: Yousef. Ramzi Yousef. Convicted of the 1993 World Trade Center bombing, the one that killed six people and injured a thousand. Nephew of Khalid Sheikh Mohammed, the al-Qaeda leader who recently confessed to planning that failed effort to bring down the towers as well as the 9/11 attacks.

His keepers had put Silverstein in the beast's bowels, all right — right next to the one man in the entire federal system more loathed than he was. Still, it was somebody to talk to. Shouting to Yousef was the first conversation with another inmate that Silverstein had managed in almost twenty years.

But talking wasn't allowed. Within days, a new barrier was erected in the corridor outside his cell, preventing any further communication between the two residents of the range. Inmate #14634-116's transfer to ADX was now complete.

Entombed, Terrible Tommy was alone again. Naturally.

In the late 1980s, Pete Earley, a former *Washington Post* reporter,

persuaded Bureau of Prison officials to grant him an unprecedented degree of access to inmates and staff at the Leavenworth penitentiary. Earley was allowed to walk the yard without an escort, to interview inmates without official monitoring, to talk candidly with veteran corrections officers about the dangers and frustrations of their work.

The resulting book, *The Hot House: Life Inside Leavenworth Prison*, is one of the most vivid works of prison reportage ever published. Among several unsettling portraits of career criminals and their keepers, the most memorable character is probably one Thomas Silverstein, who was then being housed, a la Hannibal Lecter, in a zoo-like cage in Leavenworth's basement, where the fluorescent lights stayed on around the clock to make it easier to watch him. Wild-haired and bearded — the BOP would not allow him a razor or a comb — Silverstein spent hours talking into Earley's tape recorder, describing his violent past and the petty torments he claimed the guards were putting him through in an effort to drive him insane.

Earley's book made Leavenworth's dungeon monster seem not only rational but quite possibly human. Granting a journalist unfettered access to him was a public relations blunder the BOP has been unwilling to repeat. Silverstein hasn't been allowed to have a face-to-face interview with a reporter for the past fifteen years. When *Westword* recently asked to visit him, ADX warden Ron Wiley promptly denied the request, citing "continued security concerns." But then, Wiley and his predecessors haven't let any journalist inside ADX to interview any inmate since 2001 because of "continued security concerns" (see related story).

Although he readily agreed to an interview with *Westword*, Silverstein isn't a huge fan of the press, either. He remains friendly with Earley, but he's learned to be wary of hit-and-run tabloid writers following in his wake, eager to write about "the most dangerous prisoner in America." Most of what the outside world knows about him, if it pays any attention at all, is the fragmentary image presented in *The Hot House*; he's a captive of his own legend, like some prehistoric insect trapped in amber. His letters seethe with contempt for lazy "plagiarists" who have simply appropriated snatches of Earley's

account as well as for those who've produced long magazine pieces or cheeseball cable programs about the Aryan Brotherhood that largely rely on the lurid tales of government snitches.

"For some odd reason the media pees when Master snaps his fingers," he wrote recently. "I wouldn't call 'em 'mainstream' any more cuz there isn't anything mainstream about 'em. They're just lackeys for the powers that be."

Silverstein's response to the "injurious lies" spread about him has been to launch his own information campaign at www.tommysilverstein.com. That's right — America's most solitary prisoner, a man who's been inside since before the personal computer was invented and has never been allowed near one, has his own website, maintained by outside supporters who forward messages to him and post his responses.

"He's got a pretty impressive network," says Terry Rearick, a California private investigator who has communicated with Silverstein by letter and phone over several years. After the two lost touch for a time, Rearick got a call from a woman in England on Silverstein's behalf.

The same woman posts regularly on the website, where Silverstein himself duels at length with his detractors. (A similarly heated debate has ignited over the wording of Silverstein's entry on Wikipedia; his defenders and his critics alternately revise the account to suit their competing versions of his crimes.) Some visitors to his site dismiss him as a textbook psychopath. But Silverstein contends that if people understood the grim context in which the killings at Marion took place, the snitch games and psychological warfare and organized violence of prison life, they wouldn't be so quick to demonize him.

It's a strangely disconnected argument — a garbled dialogue between cultures on different planets. Most of the visitors to his website know little about Silverstein's world, just as he knows little about theirs. He's been in prison for the past 32 years, and much of what he's learned about life on the street since he was put in solitary in 1983 has come from reading or watching television. No American prisoner, not even

Robert Stroud, the Birdman of Alcatraz, has ever been condemned to such a walled-off existence for such a long period of time. Many of Stroud's years of solitary confinement were spent in relative ease at Leavenworth; he had not only frequent visitors, but also a full-time secretary. Even his seventeen-year stretch in Alcatraz allowed for much more daily communication with others than Silverstein has had.

"I'm amazed that he's not stark, raving mad," says Paul Wright, the editor of *Prison Legal News*, who's corresponded with Silverstein for years and published some of his writing. "He's been in total isolation for almost 25 years. The only people I can think of that have been held in anything remotely like this in modern times are some of the North Korean spies held in South Korea."

Yet the no-contact conditions imposed on Silverstein are becoming less unique by the day. There are now 31 supermax prisons in the country, with more under construction, including Colorado's own 948-bed sequel to the current state supermax, known as Colorado State Penitentiary II. They are costly on several levels — the operational expense per cell can be double that of a less-secure prison, and the rate of mental illness in solitary confinement far exceeds that of the general prison population — but lockdown prisons are all the rage with a vengeful public. Increasingly, they are being used not for short-term punishment (disciplinary segregation) but for long-term confinement of hard-to-manage inmates (administrative segregation), whose privileges keep shrinking. Colorado, for example, no longer allows journalists to interview its supermax inmates except by mail.

"The phenomenon is disturbingly common," says David Fathi, a staff attorney for the ACLU's National Prison Project. "If it's disciplinary confinement, it's finite — when you're done, you're done. But with administrative segregation, there's a real lack of transparency about what a prisoner can do to earn his way out."

In the federal system, the past decade has seen the rise of "special administrative measures," or SAMs, which are imposed on terrorists or other inmates whose communications with the outside world "could result in death or serious bodily injury to persons." There are now at

least two dozen SAMs cases in federal prisons, including Yousef and Zacarias Moussaoui, whose access to mail, phone calls, media interviews or other visits are extremely limited or banned outright. At present the restrictions must be approved by the U.S. Attorney General, but the Bush administration is considering changes that would allow wardens at ADX or other high-security prisons to designate inmates as terror threats and thus ban them from all media contact — even if they haven't been convicted on terrorism charges yet, Fathi notes.

Silverstein isn't a SAMs case. He still has his website and his mail (although he claims it's frequently withheld or "messed with" in other ways). But he may be the prototype of what the government has in mind for other infamous prisoners — to bury them in strata of supermax security to the point of oblivion.

Responding in letters to questions about the psychological impact of his isolation, Silverstein struggles to find the right words. "Trying to explain it is like trying to explain what an endless toothache feels like," he writes. "I wish I could paint what it's like."

In an article a few years ago, he called solitary confinement "a slow constant peeling of the skin, stripping of the flesh, the nerve-wracking sound of water dripping from a leaky faucet in the still of the night while you're trying to sleep. Drip, drip, drip, the minutes, hours, days, weeks, months, years, constantly drip away with no end or relief in sight."

---

In a Darwinian world, predators have to adapt or die, just like their prey. Tommy Silverstein arrived in the federal prison system at a critical phase of its evolution, when the number of inmate assaults on other inmates and staff was rising sharply and officials were looking at the idea of control units as a way to neutralize the growing threat posed by prison gangs. Silverstein quickly became a symbol of the problem — and the inadequacy of the proposed solution. It's not a stretch to say that the Marion control unit helped to make him what he became, just as the mayhem that erupted there helped to reshape the American

prison system.

Before he reached the nether regions of the BOP, Silverstein's criminal career had been thoroughly unremarkable. Born in 1952 in California, he'd grown up in a middle-class neighborhood in Long Beach, but he was bullied by other kids who thought he was Jewish. (According to *The Hot House,* Silverstein's biological father was a man named Thomas Conway, whom his mother divorced when Tommy was four years old; she later married a man named Silverstein.) As a teenager, he ripped off houses for money to buy drugs; his sister, Sydney McMurray, says he was battling a heroin addiction and problems with his volatile, controlling mother.

"We were taught never to throw the first punch, but never to walk away from a fight," McMurray recalls. "My brother started getting into trouble because he was running away from a violent environment at home. Then he got into drugs, and he became a brother I never knew."

At nineteen, Silverstein landed in San Quentin for armed robbery. Paroled, he was soon arrested again for series of robberies — pulled with Conway and another relative — that yielded less than $1,400. This time, he went into the federal system on a fifteen-year jolt. He was 23 years old, and his life on the streets was already over.

At Leavenworth Silverstein became closely associated with Aryan Brotherhood members who allegedly controlled the heroin trade inside the prison — close enough that when convict Danny Atwell was found stabbed to death, supposedly because he'd refused to be a mule for the heroin business, Silverstein and two other AB members were charged with the murder. In 1980, he was convicted at trial on the basis of shifting testimony from other inmates and sentenced to life in prison. A federal appeals court later ruled that much of the testimony should never have been allowed and threw out the conviction. But by that time, Silverstein was in the Marion penitentiary and facing more murder charges.

Marion opened in 1963, the same year that Alcatraz closed. It was intended to be not just a replacement for the Rock but an

improvement, with a more open design and modern rehabilitation programs. Yet by the late 1970s, it had the most restrictive segregation unit in the BOP; not coincidentally, it was also the most violent prison in America, a dumping ground for gang leaders and crazies. Between 1979 and 1983, the prison logged 81 inmate assaults on other inmates and 44 on staff; 13 prisoners were killed. BOP reports issued in 1979 and 1981 proposed turning the entire facility into a "closed-unit operation."

Confined to a one-man cell in the control unit 23 hours a day, Silverstein says he spent much of his time learning how to draw and paint. "I could hardly read, write or draw when I first fell," he explains. "But most of us lifers are down for so long and have so much time to kill that we actually fool around and discover our niche in life, often in ways we never even dreamt possible on the streets. We not only find our niche, we excel."

Prison officials worried that Silverstein was finding his niche in other areas, too. Long-simmering disputes between white and black gangs had a way of coming to a boil in the control unit. In 1981, D.C. Blacks member Robert Chappelle was found dead in his cell. He'd apparently been sleeping with his head close to the bars and had been strangled with a wire slipped around his neck, plied by someone exercising on the tier. Silverstein and another convicted killer, Clayton Fountain, received life sentences for the crime; inmates who testified for the prosecution claimed the two had boasted of it.

Silverstein has always denied killing Chappelle. (Another inmate later claimed to have done the deed, but investigators found his confession at odds with the facts.) Yet even if he hadn't been convicted in court, the suspicion that he was responsible was sufficient to trigger more violence. Shortly after the slaying, the BOP saw fit to transfer one of Chappelle's closest friends, D.C. Blacks leader Raymond "Cadillac" Smith, to the Marion control unit from another prison. Within days, Smith had tried to stab Silverstein and shoot him with a zip gun. Silverstein and Fountain responded by cutting their way out of an exercise cage with a piece of hacksaw blade and paying a visit to Smith while he was in the shower. Smith was stabbed 67 times, in what

Silverstein still describes as an act of convict self-defense.

"Everyone knew what was going on and no one did anything to keep us apart," he told Earley. "The guards wanted one of us to kill the other."

At the time, there was no federal death penalty for inmate homicides — and not much the system could do to Silverstein, who was already serving multiple life sentences in the worst unit of the worst prison the BOP had to offer. But some staffers, concerned about Silverstein's outsized rep among white inmates, apparently did their best to keep him in check. In the months that followed Cadillac's death, Silverstein began to regard Officer Merle Clutts, a bull-headed regular of the control unit, as his chief tormentor.

Silverstein has given different explanations about what Clutts did to deserve such attention. Clutts trashed his cell during shakedowns and withheld mail; he smudged his artwork and taunted him; he even tried to set him up for attack by other inmates, Silverstein has suggested. Silverstein claims he told Earley "the whole story," but only pieces made it into *The Hot House*. Earley won't comment, saying he no longer discusses Silverstein with other reporters because of past misunderstandings.

The BOP has denied that Clutts harassed Silverstein. Whatever the source of the feud might have been, there's no question that Silverstein became fixated on Clutts. One study by Harvard psychiatrist Stuart Grassian suggests that prisoners in control units sometimes experience "the emergence of primitive, aggressive fantasies of revenge, torture, and mutilation" of the guards who watch over them.

Silverstein thought about Clutts, and he thought about the difficulties involved in getting to his enemy when he was allowed out of his cell only one hour a day, shackled, escorted by three guards.

Locked down for life, he had a mountain of time to consider the problem.

---

One day in solitary is pretty much like another. Prisoners have different strategies for filling up their days, but there are always more days to come.

In his cell at Florence, 54-year-old Tom Silverstein usually rises before dawn, catches up on letters and reads, waiting for the grand event that is the delivery of his breakfast. He goes to rec for an hour, comes back to the grand event that is lunch, showers and cleans his cell. Time for some channel-flipping on the small black-and-white TV, in search of something fresh amid the religious chatter and educational programs he's watched over and over. More reading, some yoga. Then dinner, more TV - he's a sucker for *Survivor*, *Big Brother* and other "reality-type shows" — and so to bed.

When he was in the Silverstein Suite at Leavenworth, Silverstein had access to paintbrushes, pens and other art supplies. At ADX, he's only permitted pastels, colored pencils and "cheap-ass paper," he reports; consequently, he hasn't drawn a lick since he's been there. He says that every few weeks, he's moved from the cell with the heavily meshed window to one with no window at all, then back again a few weeks later. There are rare, glorious interruptions in the routine — a visit with sister Sydney last May, an occasional lawyer checking in. Visitors sit in a booth outside the cell and talk to him on a phone; he sits shackled on the other side of a glass partition and talks back. But these dazzling bursts of conversation quickly fade into a muddle. Did the last lawyers come before or after his sister? Silverstein isn't sure.

"It's all a blur, a dream state of mind," he writes. "Like my memories. When I venture back to my yesterdays, it's hard to distinguish fact from fiction."

Yet there is one memory, one day that stands out from all the rest — the day that started it all. Twenty-four years later, Silverstein is still in the position of analyzing, defending and regretting the act that has defined his fate. But nothing can explain away the act itself, a murder that was meticulously planned and ruthlessly executed.

Marion wasn't designed to be a supermax. Control unit prisoners had

to be shackled and escorted to the shower every day, and the guards permitted them to have brief conversations with other inmates in cells along the way. On October 22, 1983, Silverstein was on his way back from his shower when another inmate in a rec cage called over one of his three escorts — Merle Clutts. Now flanked by only two guards, Silverstein paused at the cell of one of his buddies, Randy Gometz, and struck up a conversation.

Before the guards knew what was happening, Gometz had reached through the bars, uncuffed Silverstein with a hidden key — and supplied him with a shank. Silverstein broke away from the guards and headed toward Clutts, now isolated at the far end of the tier. "This is between me and Clutts!" he shouted.

He stabbed the officer forty times before the dying Clutts could make it off the tier. Hours later, Silverstein's friend Clayton Fountain pulled the same handcuff trick and attacked three more guards in the control unit, fatally wounding Robert L. Hoffman Sr.

Two federal officers slaughtered in one day, on what was supposed to be the most secure unit in the entire BOP, sent the system into shock. The bureau's response was to forge ahead with the long-considered plan to turn all of Marion into a control unit while whisking Silverstein and Fountain into even more restricted quarters. (Fountain died in 2004 at the age of 48).

For years prison activists attempted to challenge the Marion lockdown in court, charging that the prison staff set about beating other prisoners and subjecting them to "forced rectal searches" as payback for the deaths of Clutts and Hoffman. In 1988, a federal judge ruled that the inmate accounts of staff brutality were simply not credible.

By that point, Silverstein and the bureau were already on the road that would lead to ADX — a place where communication among inmates, and physical contact between inmates and staff, could be strictly controlled and all but eliminated.

If the guard killings in Marion happened at any federal prison today,

the perpetrators would almost certainly face the death penalty. Silverstein has suggested more than once that death would have been a more merciful option in his case.

"Even though we may not execute people by the masses, as they do in other countries, our government leaders bury people alive for life in cement tombs," he writes. "It's actually more human to execute someone than it is to torture them, year, after year, after year."

---

Silverstein's last taste of some kind of freedom came in the fall of 1987. Rioting Cuban prisoners broke into his special cell in the Atlanta federal penitentiary and set him loose. For one surreal week, he was able to roam the yard while the riot leaders dickered with federal negotiators over the release of more than a hundred prison staffers who'd been taken hostage.

Then the Cubans jumped him, shackled him and turned him over to the feds. Surrendering Silverstein had been high on the BOP's list of demands for resolving the situation, right up there with releasing all hostages unharmed.

Contrary to the bureau's expectations, Silverstein didn't butcher any guards during his precious days of liberty. He didn't harm anyone. He suggests the episode shows that he's not the killing machine the BOP says he is, and that he could exist in a less restrictive prison without resorting to violence.

The bureau isn't convinced. He killed Clutts.

Terrible Tommy says he's changed. He claims to have gone 21 years without a disciplinary writeup. Other long-term solitaries go berserk, smearing their cells with feces and "gassing" their captors with shit-piss cocktails. Not him.

"The BOP shrinks chalk it up as me being so isolated I haven't anyone to fight with," he writes, "but they're totally oblivious to all the petty BS that I could go off on if I chose to. I can toss a turd and cup of piss with

the best of 'em if I desired. What are they going to do, lock me up?

"But I just have more self-control now, after 25 years of yoga, meditation, studying Buddhism and taking some anger-management courses. All that goes unacknowledged."

McMurray says her brother has learned a great deal about patience and suffering over the years. "He's more like the brother I knew on the outside years ago," she says. "I have spoken with the guards who deal with him every day, and they don't have a bad thing to say about him. It's the ones in administration who are trying to make it as difficult as they can for him.

"But my brother has a spirit that is unbreakable. In Leavenworth, at least he could draw. It's been more of a challenge for him in this situation, but he hasn't let it break his spirit."

The bureau doesn't care about his spiritual progress. He killed Clutts.

Silverstein has told reporters that he wants to apologize to the families of the men he killed, "even though it was in self-defense." He has recanted some oft-quoted lines from his interviews with Earley about "smiling at the thought of killing Clutts" and feeling the hatred grow every time he was denied a phone call or a visit. He says he regrets the grief he's caused and no longer seethes with hatred.

The bureau is unmoved by his repentance. He killed Clutts.

Silverstein has been cut off from the operations of the Aryan Brotherhood for decades. His story is still told among the faithful, in an effort to keep his memory alive among the younger members, but he disputes that the group is a white supremacist organization. His own paintings include an ethnically diverse array of portraits. "I think it's worth noting that Tommy is no longer a racist, if he ever was," says *Prison Legal News* editor Wright.

The bureau could give fuck-all. He killed Clutts.

Twice a year, prison officials hold a brief hearing to review Silverstein's

placement in administrative segregation. For many years, the hearings were held in the corridor outside the Silverstein Suite in Leavenworth. Silverstein stopped attending because the result was always the same: no change. At ADX, he's taken to filing grievances, claiming that the move has left him more isolated, with fewer privileges than ever before.

"I am being punished for good conduct under ploy of security reasons," he wrote last year in a formal appeal of his situation. "The goal of these units is clearly to disable prisoners through spiritual, psychological and/or physical breakdown."

In his response, Warden Wiley pointed out that Silverstein is provided with food and medical care, "daily contact with staff members" and access to television, radio and reading materials.

"It's ridiculous to call a nameless guard that shoves a food tray through the hole in the door...a source of meaningful 'human contact,'" Silverstein fired back. "I request placement in general population."

He took his appeal to the regional office, then to headquarters, where it was swiftly denied. "You are serving three consecutive life terms plus 45 years for bank robbery and murder, including the murder of Bureau of Prisons staff," an administrator noted. "You are a member of a disruptive group and an escape risk. Your heinous criminal and institutional behavior warrant a highly individualized and restrictive environment."

Wiley declines to comment on Silverstein's treatment at his prison. Last spring, a group from Human Rights Watch was allowed to tour certain areas of ADX. The group wasn't let in Z-Unit, where Silverstein lives, or anywhere near A-Unit — the "hole," where most disciplinary cases are housed. But they saw enough to realize that the staffers who bring meals "do not converse regularly, if at all, with the inmates." Despite claims that clinical psychologists checked on prisoners every other week, "several inmates said they had not spoken to a psychologist in many months," and such conversations tended to be brief.

The group also reported that many ADX prisoners are trapped in a

catch-22 predicament — they've been sent there directly after sentencing but have never been provided any opportunity to "progress" to a less restrictive setting because of the nature of their crime. Every placement review finds that the "reason for placement at ADX has not been sufficiently mitigated."

"No matter how well they behave in prison, they cannot undo the past crimes that landed them in prison, generally, and then ADX, specifically," Human Rights Watch director Jamie Fellner wrote to BOP director Harley Lapin.

Some crimes, it seems, are beyond redemption.

Silverstein got a copy of the do-gooders' report and immediately fired off a letter to the group, suggesting that they come see him in Z-Unit if they want the real story about the government's "failed and draconian penal system."

No one from the group has come to see him yet. Silverstein waits for them in his box within a box. He knows that the bureau just wants to bury him and that he turned the key himself. But he also knows he didn't build that box all on his own.

His earliest possible date of release is eighty-eight years away. He has nothing but time.

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff - Appellee - Respondent, | ) | No. 02 C 6998 |
| | ) | |
| vs. | ) | Hon. William J. Hibbler |
| | ) | |
| DARRYL JOHNSON, | ) | |
| | ) | Death Sentence Imposed |
| Defendant - Appellant - Petitioner. | ) | |

**AGREED MOTION FOR SHORT EXTENSION OF TIME TO FILE REPLY**

Petitioner Darryl Johnson, by his attorney, Terence H. Campbell of Cotsirilos, Tighe &
Streicker, respectfully requests leave of this Court for a short extension of time to file Petitioner's
Reply brief in support of his Motion for Leave to File Application For Funds for Expert Assistance
and Necessary Investigation *Ex Parte* and Under Seal.  In support of this motion, Petitioner states
as follows:

1.      On November 24, 2008, Petitioner filed his Motion for Leave to File Application For
Funds for Expert Assistance and Necessary Investigation *Ex Parte* and Under Seal.  Pursuant to an
agreed extension, the government filed its response to that motion on December 19, 2009.
Petitioner's Reply is currently due to be filed on January 8, 2009.  The Court has set ruling on the
motion for February 4, 2009

2.      Undersigned counsel has been occupied with several other matters during the past few
weeks that have taken up a good deal of his time.  Most notably, counsel has had to spend a good
deal of time recently on the representation of clients who have knowledge of and/or involvement in,
to one degree or another, various matters alleged in a criminal complaint recently filed against a

certain Illinois public official.   In addition, counsel has had to devote substantial time to other matters in recent days, including for example, a new client who is the subject of a Grand Jury investigation and required immediate attention.[1]

3.      Because of matters described in the preceding paragraph, undersigned counsel has not been able to prepare Petitioner's Reply on this issue by January 8, 2009 and, accordingly, respectfully requests that he be granted one additional week – *i.e.* until Thursday, January 15, 2009 – to file Petitioner's reply brief in this matter.  Counsel believes that a reply will be beneficial to the Court in deciding the motion, and given that the ruling date is set for February 4, 2009, the requested extension should not affect any future scheduled dates.

4.      Undersigned counsel has spoken with Assistant U.S. Attorney David Bindi who is handling this matter for the government, and the government has no objection to this one-week extension.  This one-week extension will not prejudice any party and is not requested for any improper purpose.

WHEREFORE, Johnson respectfully requests this Court to grant an extension of time, until January 15, 2009, for Petitioner to file his Reply in support of his Motion for Leave to File Application For Funds for Expert Assistance and Necessary Investigation *Ex Parte* and Under Seal.

Respectfully submitted,

/s/  Terence H. Campbell
An attorney for Petitioner Darryl Johnson

---

[1] In the interest of full disclosure, undersigned counsel also spent some time with family and friends over the holidays, which was necessary to both his familial good standing and domestic tranquility.

2

Terence H. Campbell
Cotsirilos, Tighe & Streicker, Ltd.
33 North Dearborn Street, Suite 600
Chicago, Illinois  60602
(312) 263-0345

Lorinda Meier Youngcourt
Post Office Box 206
Huron, Indiana  47437-0206
(812) 849-9852

## <u>CERTIFICATE OF SERVICE</u>

Terence H. Campbell, an attorney, hereby certifies that in accordance with hereby certifies

that in accordance with Fed.R.Crim.P. 49, LR 5.5, and the General Order on Electronic Case Filing

(ECF), the following document:

1.      Agreed Motion for Short Extension of Time to File Reply

was served pursuant to the District Court's ECF system as to ECF filers, including the United States

Attorney's Office.

/s/  Terence H. Campbell
Terence H. Campbell

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff - Appellee - Respondent, | ) | No. 02 C 6998 |
| | ) | |
| vs. | ) | Hon. William J. Hibbler |
| | ) | |
| DARRYL JOHNSON, | ) | |
| | ) | Death Sentence Imposed |
| Defendant - Appellant - Petitioner. | ) | |

## NOTICE OF AGREED MOTION

TO:   David Bindi
      Assistant United States Attorney
      219 South Dearborn Street, Suite 500
      Chicago, Illinois  60604

PLEASE TAKE NOTICE that on Tuesday, January 13, 2009,  at 9:30 a.m., we shall appear before the Honorable William J. Hibbler, United States District Judge, in the courtroom usually occupied by him at 219 South Dearborn Street, Chicago, Illinois, and present our Agreed Motion For Short Extension of Time to File Reply Brief, a copy of which accompany this Notice and are hereby served upon you.

Respectfully submitted,

/s/ Terence H. Campbell
Attorney for defendant

Terence H. Campbell
Cotsirilos, Tighe & Streicker, Ltd.
33 North Dearborn Street, Suite 600
Chicago, Illinois  60602
(312) 263-0345

**UNITED STATES DISTRICT COURT**
**FOR THE Northern District of Illinois – CM/ECF LIVE, Ver 3.2.2**
**Eastern Division**

United States of America

                        Plaintiff,

v.                                             Case No.: 1:02–cv–06998
                                               Honorable William J. Hibbler

Darryl Lamont Johnson

                        Defendant.

---

**NOTIFICATION OF DOCKET ENTRY**

This docket entry was made by the Clerk on Monday, January 12, 2009:

        MINUTE entry before the Honorable William J. Hibbler: Defendant's Agreed
Motion for short extension of time until 1/15/09 to file reply brief regarding MOTION by
Defendant Darryl Lamont Johnson for discovery – *Renewed and Amended*[53], MOTION
by Defendant Darryl Lamont Johnson for discovery – *Renewed Based on Massaro v.
United States*[30] [62] is granted. Ruling on motion for discovery [53], motion for
discovery [30] before Honorable William J. Hibbler on 2/4/2009 at 10:00 AM. Mailed
notice (jdh)

**ATTENTION:** This notice is being sent pursuant to Rule 77(d) of the Federal Rules of
Civil Procedure or Rule 49(c) of the Federal Rules of Criminal Procedure. It was
generated by CM/ECF, the automated docketing system used to maintain the civil and
criminal dockets of this District. If a minute order or other document is enclosed, please
refer to it for additional information.

For scheduled events, motion practices, recent opinions and other information, visit our
web site at ***www.ilnd.uscourts.gov***.

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff - Appellee - Respondent, | ) | No. 02 C 6998 |
| | ) | |
| vs. | ) | Hon. William J. Hibbler |
| | ) | |
| DARRYL JOHNSON, | ) | |
| | ) | Death Sentence Imposed |
| Defendant - Appellant - Petitioner. | ) | |

**PETITIONER'S REPLY IN SUPPORT OF HIS RENEWED
AND AMENDED MOTION FOR DISCOVERY ON PETITIONER'S
INEFFECTIVE ASSISTANCE OF COUNSEL AND *BRADY* CLAIMS;
AND HIS MOTION FOR LEAVE TO SEEK EXPERT FUNDING EX PARTE**

Defendant, Darryl Lamont Johnson, by his counsel, Terence H. Campbell of Cotsirilos, Tighe

& Streicker, and Lorinda Meier Youngcourt, respectfully submits this Reply in Support of His

Renewed and Amended Motion for Discovery on Petitioner's Ineffective Assistance of Counsel and

*Brady* Claims.

**ARGUMENT**

**I.      Motion for Leave to Seek Expert Funding *Ex Parte***

On November 24, 2008, Petitioner filed two motions – one asking leave to seek expert

funding *ex parte*, and the second, a renewed and amended discovery motion pursuant to Habeas Rule

6.  The government responded to both motions in its most recent brief.  As to the Motion for Leave

to Seek Expert Funding *Ex Parte*, the government states that it "does not oppose [P]etitioner's

motion for leave to file an *ex parte*, under seal, application for funds for expert assistance."  Govt.

Resp. at 1, 12.[1]  Accordingly, Petitioner's motion for leave to seek expert funding *ex parte* should

---

[1] The government argues only that it does not believe expert assistance on Mr. Johnson's
ineffective assistance of counsel and *Brady* claims is necessary.

be granted as unopposed.

## II.   Renewed And Amended Motion For Discovery

Mr. Johnson's second motion was a renewed and amended motion for discovery, specifically focused on necessary discovery relating to the BOP's abilities, policies, and practices regarding the imposition of strict conditions of confinement on inmates (*e.g.*, strict limitations on, and/or strict monitoring of, communications with people, whether by phone, mail, and/or visits), for 60 days continuously or longer, based on security concerns and/or to curtail/eliminate that inmate's future dangerousness. *See* Transcript, June 3, 2008 at 30-34 (Attached as Exhibit B to Petitioner's Motion). The discovery requested by Petitioner in his most recent filing is relevant to two of his claims: (1) his *Brady* claim based on the government's failure to disclose any number of inmates that it had, in fact, held under the very type of strict conditions of confinement that Warden Vanyur testified were not possible; and (2) the prejudice prong of his ineffective assistance claim.[2]

### A.   Affidavit of Former BOP Warden Mark Bezy

In addition to making specific discovery requests, Mr. Johnson also submitted an affidavit from Mr. Mark Bezy, a long-time BOP Warden, which, we respectfully submit, establishes the alleged *Brady* violation. At a minimum, Mr. Bezy's affidavit demonstrates that the information requested by Mr. Johnson which would further establish his *Brady* claim does, in fact, exist and is in the exclusive possession, custody and control of the BOP. Because, in its response, the government persists in its contention that *Brady* information was not suppressed – *even if*

---

[2] Because of the government's prior concessions that the performance of Johnson's trial counsel was deficient, and what we believe to be clear evidence "prejudice" under *Strickland* resulting from that performance, much of our argument in the latest discovery motion was directed to the *Brady* claim. However, the discovery requested is also relevant to the prejudice prong of Johnson's ineffective assistance of counsel claim.

*inadvertently* (*Brady v. Maryland,* 373 U.S. 83, 87 (1963) – and claims that there is "not [] one

statement by Warden Vanyur that is contradicted by anything [in Bezy's affidavit or otherwise]," we

quote below some significant portions of Mr. Bezy's testimony verbatim.

First, a brief review of Warden Vanyur's testimony at Johnson's penalty-phase trial

establishes the following[3]:

> (a) Vanyur testified that the BOP cannot hold any prisoner indefinitely
> in segregation without access to telephone or correspondence privileges.
> According to Vanyur, strict segregated detention is only available as a
> *temporary* option.   Tr. 2482-83 ("But in either case, administrative
> detention or administrative segregation, those are both temporary
> holding patterns, those are not permanent statuses for inmates.").
>
> (b) Warden Vanyur testified, "When you are in this special housing unit,
> you don't have the same access as the rest of the inmate population to
> programs, educational opportunities, and so forth.  There is definitely a
> degree of deprivation inside there. *And so it is not permissible, by the
> Bureau of Prisons policy, to keep an inmate in that status indefinitely.*"
> Tr. 2483 (emphasis added).
>
> (c) Warden Vanyur testified that even inmates at ADX Florence would
> ultimately have "a lot of contact with inmates" and "frequent and
> constant contact with staff unrestrained."  Tr. 2489-90.
>
> (d) After declaring that strict conditions of confinement could only be
> imposed as a temporary measure, Warden Vanyur testified that even the
> most dangerous inmates would end up in general population maximum
> security prisons.  In describing the freedoms of inmates at those general
> population prisons, Warden Vanyur testified, "in open population
> penitentiary, you have constant contact, unrestrained with other staff and
> inmates. ...  you are out and about in large recreation areas; you have
> movement unrestrained to and from the dining hall; there is virtually
> unlimited access to telephones and a great deal of open visiting contact."
> Tr. 2472.  Warden Vanyur later stated, "the inmate would have a great
> deal of open contact visiting with his family, probably in excess of
> twelve visits a month.  He would have as many phone calls as he could

---

[3] Warden Vanyur's testimony is quoted at length in Johnson's Reply in Support of His
Sec. 2255 Motion.  R.19 in the docket.

pay for or get someone to accept them as collect charges, so he would have virtually unlimited phone access if he had the time to make the phone calls.  And he would have unlimited correspondence privileges." Tr. 2477.

(e)  Warden Vanyur testified that even in the Control Unit at ADX Florence, "you have one fifteen-minute phone call per month" as well as "five visits per month" and "virtually unlimited correspondence with the outside world."  Tr. 2485.

The meaning, import, and substance of Warden Vanyur's testimony was clear to everyone in the courtroom.

Contrary to Warden Vanyur's testimony at Johnson's trial, former Warden Bezy's affidavit plainly establishes that the BOP had the ability, facilities, policies, and actual practices in place – at the time of Darryl Johnson's case – to impose the strict conditions of confinement on inmates whenever the BOP deemed it necessary, and for as long as the BOP deemed it necessary, to ensure the safety and security of the institution, staff, and the public.  Thus, former Warden Bezy attests in his affidavit, *inter alia*:

> 6.    When I worked at USP Marion, that facility was the highest security prison in the United States.  USP Marion housed the "worst of the worst" of federal prisoners in its general population, and did so under highly secure and restrictive conditions of confinement, including, for example, restrictions on telephone communications, all of which were recorded and monitored, and restrictions on visitation, including no contact visits of any sort.  While the hope of the BOP was that inmates sent to the general population at USP Marion would modify their behavior and return to a mainstream maximum security facility after two to three years, there were many inmates who were housed at USP Marion for many years, including some who were housed at USP Marion for years and then transferred directly to the Administrative Maximum ("Super-Max" or "ADX") facility in Florence, Colorado when that facility opened.  In addition, there were some inmates who were assigned directly to USP Marion from the sentencing court.  For example, John Gotti was an inmate sent directly to USP Marion from the sentencing court.

4

7.      While I worked there, USP Marion had units within the facility where the most dangerous and/or high security risk inmates were housed under even more strict conditions of confinement than those imposed on USP Marion's general population.  These even more strict conditions of confinement were imposed for as long as the BOP and/or the Warden deemed necessary to ensure security and to reduce or eliminate the inmate's risk of violence or future dangerousness.  For example, USP Marion had a Control Unit within the prison where the most violent offenders, including particularly those who were deemed to pose a future danger of violence and/or criminal activity, were housed prior to the opening of the Super-Max ADX facility in Florence, Colorado. * * *  Inmates assigned to the Control Unit were housed in that Unit for as long as was deemed necessary by the BOP in order to alleviate the risk that the inmate would constitute either a security risk or a future danger to either BOP staff, other inmates, or the public.

8.      The Super-Max ADX facility in Florence, Colorado opened in approximately 1994.  I know that a number of inmates who, due to security and/or "future dangerousness" concerns, had been housed at Marion under very strict conditions of confinement for years prior to the opening of the ADX facility in Colorado, were then transferred to the ADX facility where they continued to be held under very strict conditions of confinement due to the same long-standing security and/or future danger concerns.  Inmates who fit this description that I can recall at this time include Barry Mills, and T.D. Bingham, high ranking members of the Aryan Brotherhood gang, as well as leaders of other gangs and disruptive groups.  In addition, shortly after ADX was opened, a number of other violent inmates, including gang members, domestic terrorists, and organized crime figures, were also were transferred directly from USP Marion to the ADX facility.  At ADX, both before and after 1998, these types of inmates were housed in conditions that were even more restrictive than the conditions had been at USP Marion in terms of their ability to interact or communicate with staff, other inmates, or persons outside the facility.

9.      USP Marion also had what was called the "K-Unit" from at least the mid-1980's through the mid-1990's in which inmates who were a security risk were housed under extremely strict conditions of confinement. Inmates housed in the K-Unit due to security and/or future dangerousness concerns that I can recall included John Walker, a convicted spy, Ed Wilson, a former CIA operative, Jonathan Pollard, a convicted spy, and Christopher Boyce, a former CIA operative.  These inmates were held in K-Unit because of security and/or future danger

5

concerns, and were held there for as long as the BOP deemed it necessary to ensure security and that these individuals did not constitute a future danger. Inmates housed in K-Unit were housed in single cells and had no physical interaction with other inmates. All their mail was screened by BOP officers, all telephone calls had to be arranged through BOP officers who would bring the phone to the inmate in his cell. Those calls could only be made to people who were on an approved phone list, and all such calls were recorded and monitored by the BOP. All visitors to any inmates on K-Unit had to go through a somewhat intensive background screening process, and had to be pre-approved by the BOP before they could visit.

\* \* \*

11.     The Super-Max facility in Florence, Colorado, was designed to hold the most dangerous inmates under extremely strict conditions of confinement, including with strict limitations on any communications with people outside the prison, whether by phone, mail, or visits, whenever deemed necessary by the BOP. It is my understanding that inmates were in 1998 and prior thereto (and have been from 1998 through the present) held at the ADX facility under strict conditions of confinement, including severe restrictions on their communications, whether by mail, phone or visitation, whenever that was deemed necessary by the BOP or the ADX Warden, and for as long as necessary to deal with the security or future danger concern raised by a particular inmate. I also know that some inmates have been assigned to the ADX facility directly from the sentencing court, when the circumstances warranted. The ADX facility also has areas within the prison that are referred to as "side pockets" or "special cells," which are used to hold prisoners who are deemed to be exceptionally dangerous. For example, inmate Luis Felipe was assigned to ADX directly from the sentencing court and inmate Felipe was held in one of these "side pockets" after being sentenced in 1997 due to concerns about security and/or his future dangerousness as set forth by the sentencing court. It is my belief that other inmates, too, were housed in these "side pockets" in order to address concerns about security and/or future dangerousness in and before 1998.

12.     I know of some other examples of inmates who, in 1998 and prior, were housed under strict conditions of confinement specifically in order to reduce or eliminate their potential future dangerousness. For example, Federal inmate Rodney Hamrick, a convicted bomber, was housed at USP Marion when I worked there. All

of Hamrick's mail, including his legal mail, was specially monitored by the BOP in order to reduce or eliminate his future dangerousness. Inmate Manuel Noriega was also held under very strict conditions of confinement by the BOP because of the assessed risk that he posed to be a future danger by ordering crimes or violence while incarcerated. Other inmates that I can recall who, in 1998 and prior, were housed under very strict conditions of confinement due to security concerns include Thomas Silverstein and Clayton Fountain.  * * *

14.  Based on my experience at the BOP, including the orders I gave and the conditions of confinement I observed, administered, and/or imposed both prior to 1998 and after, there is no doubt that the Bureau of Prisons had, at all times, the authority and ability to house inmates in the most restrictive conditions of confinement necessary to ensure security and/or to reduce or eliminate an inmate's "future dangerousness."  * * * Moreover, these strict conditions of confinement could be, and were, imposed for as long as the BOP deemed it necessary to ensure the security and safety of either prison staff, other inmates, or the public (*i.e.* to reduce or eliminate the inmate's future dangerousness).

(Ex. A to Johnson's Renewed and Amended Motion for Discovery).

Most of this information from Mr. Bezy is either directly contradictory or impeaching of Warden Vanyur's substantive testimony (and, perhaps as importantly, the government's argument to the jury based on Warden Vanyur's testimony).  Yet none of this information contained in former Warden Bezy's affidavit – whether as to general BOP policies and authority, or as to case-specific practices – was disclosed to the defense in Darryl Johnson's case.

The government's primary retort to the Bezy affidavit consists of the following argument: "That Bezy knows of other inmates who were treated differently does not contradict Vanyur." Govt. Resp. at 10, ¶11.  In light of the evidence of record (summarized above), this is a difficult argument to swallow on its face.  But even if the raft of information in Mr. Bezy's affidavit doesn't directly "contradict" Vanyur, it most certainly impeaches Vanyur's testimony and casts great doubt on his credibility and/or bias.  It is black-letter law that the prosecutor's "*Brady* duty extends to

*impeachment evidence* as well as exculpatory evidence." *Youngblood v. West Virginia*, 547 U.S.

867, 869-70 (2006) (emphasis added), citing *United States v. Bagley*, 473 U.S. 667, 676 (1985).

Notwithstanding the government's assertion, absolute "contradiction" is not a *sine qua non* to

establish a violation under *Brady* and its progeny; impeachment evidence is sufficient.[4]

Indeed, evidence that undermines the credibility of a key prosecution witness is routinely the

basis for successful *Brady* claims.  *Giglio v. United States*, 405 U.S. 150 (1972); *United States v.*

*Latham*, 874 F.2d 852 (1st Cir. 1989); *Bagley v. Lumpkin*, 798 F.2d 1297 (9th Cir. 1986).  Most

recently, the Seventh Circuit issued its decision in *United States v. Banks*, in which it held that the

failure of the prosecution to disclose evidence of an unrelated internal investigation about credit card

misuse by a DEA chemist who testified on behalf of the prosecution, identifying a substance as

cocaine, was "material" and "impeaching" under *Brady* and warranted a new trial.  546 F.3d 507 (7th

Cir. 2008).  In the instant case, the facts are far more severe than *Banks*, as the suppressed

impeachment information goes not only to the credibility of Warden Vanyur, but directly to the

substantive heart of the prosecution's penalty-phase case.

There can be no doubt that in Darryl Johnson's case, the information set forth by former

Warden Bezy (a) was well known to Warden Vanyur and the BOP, an agency of the Department of

Justice; (b) is material to the central issue at Darryl Johnson's penalty-phase hearing; and (c) is, at

a minimum, impeaching of the testimony of Warden Vanyur – even accepting, *arguendo*, the

government's position that Vanyur testified only about "what was likely to happen, not what was

---

[4] In its response, the government again recites its hair-splitting mantra that Vanyur's
testimony was limited to "what was likely to happen, not what was possible or impossible,"
(Govt. Resp. at 8, ¶8), suggesting that this distinction eliminates the viability of Johnson's *Brady*
claim.  Of course, that, too, is incorrect.

possible or impossible." *See* Govt. Resp. at 8, ¶8.

It cannot be overstated how incredibly powerful it would have been for the defense case had Johnson's counsel been told that not just one or two, but many inmates had been – and were being – held by the BOP under the very type of strict conditions of confinement they had posited were possible to be imposed for as long as necessary to alleviate any future dangerousness. Likewise, had the defense been informed of the BOP's policies and practices, as set forth by Mr. Bezy, Warden Vanyur's testimony could have been almost wholly devastated. There is no doubt that this information would have severely impeached Vanyur's both on the substance of his testimony and as to his credibility. And, particularly in the context of a death penalty hearing where it takes just one juror to stop a death sentence from being imposed (*Emerson v. Gramley*, 91 F.3d 898, 907 (7th Cir. 1996); 18 U.S.C. §3593(e) (requiring unanimous vote of jury to impose death sentence)), there is undoubtedly a "reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Strickler v. Greene*, 527 U.S. 263, 280 (1999) (quoting *Bagley*). The suppressed evidence was material, and Johnson deserves a new sentencing hearing on that basis.

Petitioner respectfully submits that he has demonstrated a *Brady* violation occurred in this case on the current record. To the extent, however, that the Court believes further evidence is necessary, we are entitled to get the discovery requested under Habeas Rule 6. "[W]here specific allegations before the court show reason to believe that the petitioner *may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief,* it is the duty of the court to provide the necessary facilities and procedures for an adequate inquiry." *Bracy v. Gramley,* 502 U.S. 899, 908-09 (1997) (emphasis added, citation omitted).

**B.**     **The Government's Attempt to Create a "Catch-22" Regarding**
                 **Discovery On The Brady Claim**

The government next urges the Court to discard Petitioner's *Brady* claim because, says the

prosecutor, it is hopelessly inconsistent with his ineffective assistance claim, as to which the

government has already conceded defense counsel's deficient performance.  Govt. Resp. at 2-3.  The

government thus claims that Johnson's *Brady* claim is based on, *and limited to*, the same information

that underlaid Johnson's ineffective assistance claim (*i.e.* the SAM's regulations; 18 U.S.C.

§3582(d); and the case of Luis Felipe), "plus information regarding BOP inmates Thomas Silverstein

and Clayton Fountain ..."  Govt. Resp. at 2-3.  Based on this (false) premise, the government argues:

> [Johnson's] *Brady-Giglio* claim is fundamentally at odds with the
> ineffective assistance claim.  If counsel performed deficiently in failing
> to discovery this evidence on their own, which the government concedes,
> then it cannot have been suppressed.  Further, it is bizarre, to say the
> least, to speak of an Act of Congress, a set of published regulations, and
> a court case [*Felipe*] open to the public as having been suppressed.

Govt. Resp. at 3, ¶3.  Of course, the government's premise is false, and its conclusion unsupported.

In his Initial §2255 Petition filed in 2002, Johnson alleged that "the BOP and/or the

Department of Justice were in possession of information and documents which were clearly material

and impeaching of Warden Vanyur's testimony, yet none of that information was turned over to the

defense."  R.1 at 9.  He further specified what he knew at the time about the policy, practices and

inmates of the BOP that constituted *Brady* evidence.  Specifically, Johnson alleged that "the BOP

and/or the Department of Justice was, at the time of Johnson's penalty-phase hearing and for months

prior thereto, housing Luis Felipe under the strict conditions of confinement that Warden Vanyur

testified were impossible to impose or carry out for any indefinite period of time; (b) the BOP and/or

the Department of Justice was, at the time of Johnson's penalty-phase hearing and for years prior

10

thereto, housing Thomas Silverstein [and Clayton Fountain] under the strict conditions of confinement that Warden Vanyur testified were impossible to impose or carry out for any indefinite period of time. ...” R.1 at 9-10 (Johnson’s §2255 Petition).  Suspecting that this might not constitute the only information possessed by the DOJ/BOP that was impeaching of Warden Vanyur, Johnson further alleged, ***“There may well be other instances of such confinements being imposed which, likewise, were not turned over to the defense.  This is a subject of  requested discovery pursuant to this petition.”***  R.1 at 10.

Thus, the government is incorrect in asserting that Petitioner argued a failure to disclose the publicly-available SAM’s regulations and §3582(d) are the basis of his *Brady* claim.  They are not.  Rather, the *Brady* claim was based on information about then-existing **policies**, **practices**, and **inmates** that the Department of Justice and the BOP had housed, and were then housing, under the type of strict conditions of confinement that Johnson’s counsel had argued could be imposed for as long as necessary, but which Warden Vanyur testified, alternatively, would not and could not be imposed.  This was the central issue at the penalty phase hearing in Darryl Johnson’s case.  And we now know that there were any number of such inmates who had those conditions imposed on them for extended periods of time, and specifically to address concerns about their future dangerousness.  *See*, *e.g.*, Bezy Affidavit (Ex. A to Renewed and Amended Motion for Discovery); Govt. responses to discovery (Group Ex. C to Renewed and Amended Motion for Discovery).  Mr. Bezy identified not only the policies and practices of the BOP which are inconsistent with, if not directly contradictory to, Warden Vanyur’s testimony, but also named several individual inmates he recalls who were housed under the same strict conditions of confinement at issue in Darryl Johnson’s case.  Even without benefit of any of the records requested in discovery, Mr. Bezy was able to identify at

11

least a dozen inmates who, in 1998 and prior, were held under the type of strict conditions of confinement at issue in Petitioner's case, due to future dangerousness concerns, and for as long as the BOP deemed necessary to ensure security and safety of the institution, staff, other inmates, and the public.  These inmates include:  Barry Mills, T.D. Bingham,  Ed Wilson, Jonathan Pollard, Christopher Boyce, Luis Felipe, Rodney Hamrick, John Gotti, Manuel Noriega, Thomas Silverstein, Clayton Fountain, other high ranking members of the Aryan Brotherhood gang and other gangs, domestic terrorists, and organized crime figures.  (Bezy Affidavit).  Bezy further described the policies and practices of the BOP which further impeach and/or directly contradict Warden Vanyur's testimony. Yet exactly *zero* information about any of the inmates held by the DOJ and BOP under these types of strict conditions of confinement, and *zero* information about the existing policies and practices of the BOP, was ever disclosed to the defense.  This is the essence of a *Brady* violation.

Second, the hidden assumption in the government's argument is that if a Petitioner doesn't recite *all* the evidence that was suppressed, item by item, in his initial petition, then he has no right to get discovery which might reveal *additional* suppressed evidence beyond that which he was able to allege at the very outset of the case.  Of course, if the additional evidence, in fact, was suppressed and further, as here, it is solely in the possession of the government, it is difficult to fathom how a petitioner could *ever* get that information except through discovery.  Indeed, if the government's hidden assumption were correct, there would be no need for the discovery provisions of Habeas Rule 6 in the first place; a §2255 petitioner would have to already have marshaled all the evidence supporting his *Brady* claim before he could even file his suit.

Here, Petitioner alleged at least three specific pieces of information that the government failed to disclose:  (1) the strict conditions of confinement the Luis Felipe was being held under by

the BOP/DOJ; (2) the strict conditions of confinement that Thomas Silverstein was being held under, and had been held under for more than a decade at that point, by the BOP/DOJ; and (3) the strict conditions of confinement that Clayton Fountain was being held under, and had been held under for more than a decade at that point, by the BOP/DOJ. R.1 at 9-10. Johnson then further specifically alleged "[t]here may well be other instances of such confinements being imposed which, likewise, were not turned over to the defense. This is a subject of requested discovery pursuant to this petition." R.1 at 9-10. This is precisely the situation in which discovery is appropriate – to illuminate the full scope of the information that was suppressed when good cause has been shown to believe that such evidence exists and is relevant to the petitioner's claims. The discovery requested here goes directly to the heart of the alleged *Brady* violation. Indeed, if discovery is not warranted in this situation, it is difficult to imagine when it would be.

C.    **The Prosecution Is Responsible Under *Brady* For Information Known to The DOJ, the BOP and Warden Vanyur**

The government next claims that neither the BOP (Warden Vanyur's agency) nor Warden Vanyur were "part of the prosecution team in [P]etitioner's case" nor were they "involved in the investigation or the prosecution" of Petitioner's case. Govt. Resp. at 4. This argument, too, is without merit.

First, notwithstanding the government's contention to the contrary, it is clear that Warden Vanyur was "involved in the investigation or prosecution" of Johnson's case. He was a Warden at the Bureau of Prisons, an arm of the Department of Justice – the same Department of Justice that oversees the prosecutors' office. (Discussed further below). He was called to consult with the prosecutors on the case, and did so. At the behest of the prosecutors, he attended the testimony of

13

defense expert Dr. Mark Cunningham the day before his own testimony. (*E.g.*, Tr. 2467, 2468, 2475, 2482).   On information and belief, he met with the prosecutors and discussed the case and his analysis of Dr. Cunningham's testimony with them before his testimony; he never met with the defense.   He then testified as an "expert" for the prosecution and, on information and belief, did so without seeking or receiving any compensation beyond his regular pay as a Warden.   Finally, based on the evidence adduced thus far in this proceeding which severely impeaches the most critical aspects of his testimony, it is becoming apparent that his role at the trial was that of an advocate for the prosecution's position, not a neutral.   Given the facts, the suggestion that he was a detached, third-party witness with no ties to or relationship with the prosecution of this case strains credulity.

Cases analyzing *Brady* claims with analagous relationships further make plain the faulty nature of the government's position.  For example, in *United States v. Wood*, the court found a *Brady* violation in the government's failure to disclose exculpatory material contained in FDA reports because the FDA was charged with administering the statute at issue and consulted with the prosecutor during the prosecution.   57 F.3d 733, 737 (9th Cir. 1995).   Wood and his co-defendant were charged with conspiracy in violation of 18 U.S.C. § 371 to defraud the FDA by obstructing the FDA's function of ensuring that prescription drugs are safe and effective and dispensed pursuant to a prescription from a practitioner licensed by law to administer such drugs.   The drugs in question were GHB and Clenbuterol, each alleged to be prescription drugs within the meaning of 21 U.S.C. §353(b)(1)(B).

In order to prove that GHB was a prescription drug the government called an FDA doctor to testify about tests he had run on cats and how the cats acted like they were hallucinating.   While the FDA doctor testified he had never done human tests, the thrust of his testimony was that GHB was

a dangerous drug which would have hallucinogenic affect on humans.  What the FDA did not reveal is that GHB had, in fact, been studied in humans for 20 years and was found to have no habituation, addiction, or side effects.  The written results of these human studies were in the FDA's files.  The court held the failure to locate and turn over these human test results, which were inconsistent with, or at a minimum impeaching of, the FDA doctor's testimony, constituted a *Brady* violation and granted relief to the defendant.

Similarly, in *United States v. Bhutani*, the Seventh Circuit held that "[w]hile the government does not have the duty to disclose information of which it is unaware, if a government agency is charged with the administration of a statute and has consulted with the prosecution in the case, the agency will be considered part of the prosecution, and its knowledge of *Brady* material will be imputed to the prosecution." *Bhutani*, 175 F.3d 572, 577 (7th Cir. 1999) (citing *Wood*, 57 F.3d at 737; *United States v. Anderson*, 31 F.Supp.2d 933, 948 (D. Kan. 1998).  "The government cannot with its right hand say it has nothing while its left hand holds what is of value."  *Bhutani* at 577, quoting *Wood* at 737.  As in Wood, in *Bhutani*, the Court held that the information known to the relevant agency was properly imputed to the prosecution.  *Id*. at 577.  This principle is reinforced in other cases we have previously cited.  *E.g.*, *Kyles v. Whitley*, 514 U.S. 419, 437 (1995) ("the individual prosecutor has a duty to learn of any favorable evidence known to the others *acting on the government's behalf in the case*.") (emphasis added); *United States v. Andrews*, 824 F.Supp. 1273, 1289-90 (N.D. Ill. 1993) (prosecution team responsible under *Brady* for exculpatory and impeachment information known to the BOP, and the prosecution's failure to disclose the impeaching material "deprived defense counsel of the opportunity to independently investigate and fully develop a defense to these serious charges.").  *See generally*, *United States v. Auten*, 632 F.2d

15

478 (5th Cir. 1980) ("If disclosure were excused in instances where the prosecution has not sought out information readily available to it, we would be inviting and placing a premium on conduct unworthy of representatives of the United States Government.  This we decline to do.").

Here the same result must enure.  Just as the FDA was the agency charged with administering the statutes and regulation at issue in *Wood*, it was the BOP that was (and is) charged with administering the statutes and BOP regulations at issue in Darryl Johnson's case.  In Johnson's case, it was the BOP, through Warden Vanyur, that advised and consulted with the prosecutors during the penalty-phase of the prosecution, and Warden Vanyur then testified as an expert on the prosecution's behalf in the name of the BOP.  Under these circumstances, it would be a perverse result to find that the government cannot be charged with the knowledge of the BOP in this case, under these facts, as to these issues.

Moreover, as we have argued previously, the government's attempt here to dissociate itself from the BOP is further undercut by the very structure of the Department of Justice (of which the BOP is a part), and the substantive procedural requirements of the DOJ in federal death penalty cases.  As a starting point, *the BOP is an agency of the Department of Justice.  See* R.4 (Initial Memorandum, Exhibit D, Organizational Chart from the DOJ website).  According to the DOJ's own document, the BOP is under the direct supervision of the Attorney General.  *Id.*  And the Attorney General has a specific and substantive role in federal death penalty cases.  Pursuant to Title 9, §9-10.000 *et seq.* of the United States Department of Justice Manual, the federal death penalty may only be sought upon the written approval of the head of the Department of Justice, the Attorney General of the United States.  That is, the Attorney General has the sole ultimate responsibility for deciding which cases to prosecute as death penalty cases.  Thus, there is a defining difference

16

between the run-of-the-mill criminal case and that in which the federal death penalty is sought in terms of the prescribed role of the Attorney General and his staff in death penalty prosecutions. The Department of Justice is, indeed, an integral part of the prosecutorial team in every federal death penalty case and, under the law, therefore, the knowledge of the Department of Justice is imputed to the prosecutors in each death penalty case. Likewise, the prosecutors in this case were employees of the Department of Justice, and they are imputed with knowledge in the possession of other employees of that same agency. *See United States v. Kattar*, 840 F.2d 118, 127 (1st Cir. 1988) ("The Justice Department's various offices ordinarily should be treated as an entity, the left hand of which is presumed to know what the right hand is doing."); *see generally*, *Carey v. Duckworth*, 738 F.2d 875, 878 (7th Cir. 1984) ("a prosecutor's office cannot get around *Brady* by keeping itself ignorant, or compartmentalizing information about different aspects of a case").

### D.      The Government's Assertion That There Is No Basis to Revisit Johnson's *Brady* Claim

Finally, the government argues that Judge Conlon previously rejected the *Brady* claim and makes the following remarkable claim:

> Petitioner offers no reason to reopen [the *Brady*] issue. He cannot point to anything Judge Conlon overlooked, or any intervening event that casts her ruling into question. The only thing that has changed between March 11, 2003 , and now is the prejudice standard applicable to the ineffective assistance claim.

Govt. Resp. at 6. This contention is easily disposed of, as there are at least three highly significant things that have changed since March 11, 2003 and make plain that this Court should review Johnson's *Brady* claim.

First, after noting that the materiality standard under *Brady* is the same as the prejudice

17

standard for an ineffective assistance of counsel claim under *Strickland*, Judge Conlon's March 11, 2003 decision rejected Johnson's *Brady* claim, stating, "For the same reasons Johnson failed to establish prejudice for his ineffective assistance of counsel claim, he fails to establish materiality for is *Brady* claim." (Mem. Opin. and Order at 13-14). Of course, now even the government now agrees that the ineffective assistance of counsel claim is viable, and has conceded the deficient performance prong. Thus, the basis for the March 11, 2003 decision rejecting Johnson's *Brady* claim (*i.e.* the lack of a viable claim of "prejudice" on the ineffective assistance claim) is no longer in place. That change alone suffices to defeat the government's argument that Johnson's *Brady* claim doesn't warrant review.

Second, last Summer, the Court directed the government to provide certain discovery to the Petitioner. In doing so, the government disclosed that not less that six other individuals – in addition to the four that Petitioner had previously identified (Yousef, Felipe, Silverstein and Fountain) – had been held under the same kind of strict conditions of confinement that were the primary focus of Johnson's penalty-phase hearing. These disclosures, obviously, had not been made in March, 2003.

Third, the Court now has before it the detailed affidavit of former BOP Warden Mark Bezy detailing the policies and practices of the BOP that were in place at and before the time of Darryl Johnson's sentencing, as well as identifying at least a dozen other inmates who were held under the conditions of confinement that Warden Vanyur testified would not, or could not, be imposed.

Both the legal landscape and the factual record of this case has changed markedly since March 2003. Review of Petitioner's *Brady* claim in light of those changes is certainly warranted and appropriate.

**E.**      **The Relevant Time and Scope of Discovery Materials Previously Ordered**

Finally, the government that the scope of the discovery previously ordered by the Court is smaller than what Petitioner understood.  The government produced discovery using a cutoff date of November 17, 1997, the date of the original sentencing (Govt. Resp. at 8-9), while we believe the Court agreed that the operative cutoff date for the previously ordered discovery should be July 27, 1998 – the date the death sentence was formally imposed at the conclusion of the post-trial proceedings.

Second, it was clear from the arguments that we believe we are entitled to get information about inmates held under these types of strict conditions of confinement in response to future dangerousness concerns (a) regardless of whether they were imposed directly from the sentencing court, or after the inmate was already in the BOP (*see* Ex. B to Renewed and Amended Motion at 32-33); and (b) regardless of whether they were imposed pursuant to SAM's, §3582(d), the BOP's inherent authority, or otherwise.  (June 3, 2008 Transcript at 27-28; Aug. 26, 2008 Transcript at 6-9).  Each of those situations is relevant to the fundamental argument – *i.e.* whether the BOP had the authority, facilities, policy, and practices in place that allowed it to house an inmate under these types of strict conditions of confinement for as long as necessary to alleviate the future dangerousness concerns.  We respectfully suggest that these issues can be addressed at the Court's direction when we appear before the Court on February 4, 2009.

Respectfully submitted,


/s/ Terence H. Campbell                          /s/ Lorinda M. Youngcourt

Terence H. Campbell                              Lorinda Meier Youngcourt
Cotsirilos, Tighe & Streicker, Ltd.              1773 Huron Williams Road
33 North Dearborn Street, Suite 600              Mitchell, Indiana  47446
Chicago, Illinois  60602                         (812) 849-9852
(312) 263-0345

Counsel for Darryl Lamont Johnson

## CERTIFICATE OF SERVICE

Terence H. Campbell, an attorney, hereby certifies that in accordance with hereby certifies that in accordance with Fed.R.Crim.P. 49, LR 5.5, and the General Order on Electronic Case Filing (ECF), the following document:

1.    Reply in Support of His Renewed and Amended Motion for Discovery on Petitioner's Ineffective Assistance of Counsel and *Brady* Claims, and His Motion For Leave to Seek Expert Funding *Ex Parte*

was served pursuant to the District Court's ECF system as to ECF filers, including the United States Attorney's Office.

/s/  Terence H. Campbell
Terence H. Campbell