APPEAL, BROWN, TERMED

# United States District Court
## Northern District of Illinois – CM/ECF LIVE, Ver 4.2 (Chicago)
## CIVIL DOCKET FOR CASE #: 1:02–cv–06998
### *Internal Use Only*

USA v. Johnson
Assigned to: Honorable William J. Hibbler
Demand: $0
Case in other court:  11–01326
                11–01443
                ND IL, :96–CR–00379
Cause: 28:2255 Remedies on motion attacking sentence

Date Filed: 09/30/2002
Date Terminated: 03/11/2003
Jury Demand: None
Nature of Suit: 510 Prisoner: Vacate Sentence
Jurisdiction: U.S. Government Defendant

**Plaintiff**

**United States of America**      represented by  **David E. Bindi**
United States Attorney's Office (NDIL)
219 South Dearborn Street
Suite 500
Chicago, IL 60604
(312) 353–5300
Email: david.bindi@usdoj.gov
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Darryl Lamont Johnson**      represented by  **Terence H. Campbell**
Cotsirilos, Tighe &Streicker
33 North Dearborn Street
Suite 600
Chicago, IL 60602
(312) 263–0345
Email: tcwolfram@aol.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Lorinda Meier Youngcourt**
Lorinda Meier Youngcourt
Attorney at Law
P.O. Box 206
Huron, IN 47437
(812)849–9852
Email: lmyoungcourt@incrimlaw.org
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Page | Docket Text |
|---|---|---|---|

| 01/16/2009 | 68 | 4 | NOTICE by Darryl Lamont Johnson re reply 65 *In Support of Renewed and Amended Motion For Discovery* (Campbell, Terence) (Entered: 01/16/2009) |
|---|---|---|---|
| 02/04/2009 | 69 | 5 | MINUTE entry before the Honorable William J. Hibbler: Motion hearing held on 2/4/2009. The Court will rule on defendant's motion for discovery 53 by mail. Mailed notice (jdh) (Entered: 02/04/2009) |
| 05/15/2009 | 70 | 6 | MINUTE entry before the Honorable William J. Hibbler: Enter Memorandum Opinion and Order. The Court DENIES Defendant's Motion for Discovery (Doc. # 53 ). Status hearing set for 5/26/09 at 10:00 a.m. [ For further detail see separate order(s).] Mailed notice (aac, ) (Entered: 05/19/2009) |
| 05/15/2009 | 71 | 7 | MEMORANDUM Opinion and Order. Signed by the Honorable William J. Hibbler on 5/15/2009. (aac, ) (Entered: 05/19/2009) |
| 05/26/2009 | 72 | 15 | MINUTE entry before the Honorable William J. Hibbler: Status hearing reset to 6/9/2009 at 9:30 AM. Mailed notice (jdh) (Entered: 05/27/2009) |
| 06/09/2009 | 73 | 16 | MINUTE entry before the Honorable William J. Hibbler: Status hearing held. Petitioner to file additional motions with supporting memoranda by 7/31/09. Government to respond by 8/31/09. Petitioner to reply by 9/21/09. Ruling by mail. Mailed notice (aac, ) (Entered: 06/10/2009) |
| 07/17/2009 | 74 | 17 | MOTION by Defendant Darryl Lamont Johnson for extension of time to file *Brief in Support of Relief Under Sec. 2255 Petition* (Campbell, Terence) (Entered: 07/17/2009) |
| 07/17/2009 | 75 | 21 | *AGREED* NOTICE of Motion by Terence H. Campbell for presentment of motion for extension of time to file 74 before Honorable William J. Hibbler on 7/22/2009 at 09:30 AM. (Campbell, Terence) (Entered: 07/17/2009) |
| 07/21/2009 | 76 | 22 | MINUTE entry before the Honorable William J. Hibbler: Agreed motion to modify briefing schedule 74 is granted. Petitioner's brief in support of his claim for relief under Section 2255 to be filed by 8/28/2009. Government to respond by 9/28/2009. Petitioner to reply by 10/19/2009. Ruling by mail. Mailed notice (jdh) (Entered: 07/21/2009) |
| 08/19/2009 | 77 | 23 | MOTION by Defendant Darryl Lamont Johnson for extension of time to file *brief* (Campbell, Terence) (Entered: 08/19/2009) |
| 08/19/2009 | 78 | 28 | NOTICE of Motion by Terence H. Campbell for presentment of motion for extension of time to file 77 before Honorable William J. Hibbler on 8/25/2009 at 09:30 AM. (Campbell, Terence) (Entered: 08/19/2009) |
| 08/20/2009 | 79 | 29 | MOTION by Defendant Darryl Lamont Johnson for extension of time to file *brief* (Campbell, Terence) (Entered: 08/20/2009) |
| 08/20/2009 | 80 | 34 | *AGREED* NOTICE of Motion by Terence H. Campbell for presentment of motion for extension of time to file 79 before Honorable William J. Hibbler on 8/25/2009 at 09:30 AM. (Campbell, Terence) (Entered: 08/20/2009) |
| 08/24/2009 | 81 | 35 | MINUTE entry before the Honorable William J. Hibbler: Motion to modify briefing schedule 77 is withdrawn as moot. Agreed Amended Motion to modify briefing schedule 79 is granted. Petitioner's brief in support of his claim for relief under Section 2255 to be filed by 11/10/09. Government to respond by 12/10/09. Petitioner to reply by 1/11/10. Ruling by mail. Mailed notice (jdh) (Entered: |

| | | | |
|---|---|---|---|
| | | | 08/24/2009) |
| 10/30/2009 | 82 | 36 | MOTION by Defendant Darryl Lamont Johnson for extension of time to file *Brief* (Campbell, Terence) (Entered: 10/30/2009) |
| 10/30/2009 | 83 | 41 | *AGREED* NOTICE of Motion by Terence H. Campbell for presentment of motion for extension of time to file 82 before Honorable William J. Hibbler on 11/3/2009 at 09:30 AM. (Campbell, Terence) (Entered: 10/30/2009) |
| 11/02/2009 | 84 | 42 | MINUTE entry before the Honorable William J. Hibbler: Petitioner's Motion to modify briefing schedule 82 is granted. Petitioner's initial brief to be due by 12/17/09. Government to respond by 1/22/10. Petitioner to reply by 2/19/10. Ruling by mail. Mailed notice (jdh) (Entered: 11/02/2009) |
| 12/17/2009 | 85 | 43 | MEMORANDUM by Darryl Lamont Johnson – *Supplemental in Support of Ineffective Assistance Claim* (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Affidavit, # 4 Affidavit, # 5 Exhibit, # 6 Exhibit, # 7 Affidavit, # 8 Exhibit)(Campbell, Terence) (Entered: 12/17/2009) |
| 12/17/2009 | 86 | 241 | MEMORANDUM *In Support of Motion to Reconsider Brady Claim* (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Affidavit, # 4 Affidavit)(Campbell, Terence) (Entered: 12/18/2009) |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff - Appellee - Respondent, | ) | No. 02 C 6998 |
| | ) | |
| vs. | ) | Hon. William J. Hibbler |
| | ) | |
| DARRYL JOHNSON, | ) | |
| | ) | Death Sentence Imposed |
| Defendant - Appellant - Petitioner. | ) | |

**NOTICE OF FILING**

TO:   David Bindi
      Assistant United States Attorney
      219 South Dearborn Street, Suite 500
      Chicago, Illinois  60604

PLEASE TAKE NOTICE that on Thursday, January 15, 2009, we filed with the Clerk of the United States District Court for the Northern District of Illinois, Eastern Division, Reply in Support of His Renewed and Amended Motion for Discovery on Petitioner's Ineffective Assistance of Counsel and *Brady* Claims, and His Motion For Leave to Seek Expert Funding *Ex Parte*, a copy of which accompany this Notice and are hereby served upon you.

Respectfully submitted,

/s/ Terence H. Campbell
Attorney for defendant

Terence H. Campbell
Cotsirilos, Tighe & Streicker, Ltd.
33 North Dearborn Street, Suite 600
Chicago, Illinois  60602
(312) 263-0345

**UNITED STATES DISTRICT COURT**
**FOR THE Northern District of Illinois – CM/ECF LIVE, Ver 3.2.2**
**Eastern Division**

United States of America

                Plaintiff,

v.                                     Case No.: 1:02–cv–06998
                                    Honorable William J. Hibbler

Darryl Lamont Johnson

                Defendant.

**NOTIFICATION OF DOCKET ENTRY**

This docket entry was made by the Clerk on Wednesday, February 4, 2009:

      MINUTE entry before the Honorable William J. Hibbler: Motion hearing held on 2/4/2009. The Court will rule on defendant's motion for discovery [53] by mail. Mailed notice (jdh)

**ATTENTION:** This notice is being sent pursuant to Rule 77(d) of the Federal Rules of Civil Procedure or Rule 49(c) of the Federal Rules of Criminal Procedure. It was generated by CM/ECF, the automated docketing system used to maintain the civil and criminal dockets of this District. If a minute order or other document is enclosed, please refer to it for additional information.

For scheduled events, motion practices, recent opinions and other information, visit our web site at ***www.ilnd.uscourts.gov***.

Case 1:02-cv-06998 Document 70 Filed 05/15/09 Page 1 of 1 PageID 674
Case: 11-1326 Document: 8-4 Filed: 03/04/2011 Pages: 369



Order Form (01/2005)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | William J. Hibbler | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 6998 | **DATE** | 5/15/2009 |
| **CASE TITLE** | UNITED STATES OF AMERICA vs. JOHNSON | | |

**DOCKET ENTRY TEXT**

Enter Memorandum Opinion and Order. The Court DENIES Defendant's Motion for Discovery (Doc. #53). Status hearing set for 5/26/09 at 10:00 a.m.

■ [ For further detail see separate order(s).]

Docketing to mail notices.

| | Courtroom Deputy Initials: | JHC |
|---|---|---|

02C6998 UNITED STATES OF AMERICA vs. JOHNSON

Page 1 of 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA,                  )
                                           )
        Plaintiff-Respondent               )
                                           )           No. 02 C 6998
        v.                                 )
                                           )           The Honorable William J. Hibbler
                                           )
DARRYL LAMONT JOHNSON,                     )
                                           )
        Defendant-Movant.                  )
                                           )

## MEMORANDUM OPINION AND ORDER

A jury convicted Darryl Lamont Johnson for ordering the murder of a person assisting in a federal criminal investigation and ordering the murder of that person and another in furtherance of a continuing criminal enterprise, among 41 other counts. The jury later concluded that death was the appropriate sentence. The Seventh Circuit denied Johnson's appeal and the Supreme Court denied his petition for a writ of *certiorari. United States v. Johnson*, 223 F.3d 665 (7th Cir. 2000); *Johnson v. United States*, 534 U.S. 829, 122 S.Ct. 71, 151 L.Ed.2d 37 (2001).

Johnson then sought to set aside his sentence pursuant to 28 U.S.C. § 2255, raising among other claims an ineffective assistance of counsel claim and a claim that the government withheld exculpatory evidence in violation of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The Court denied Johnson's § 2255 motion, holding that he procedurally defaulted both his ineffective assistance of counsel claim and his *Brady* violation claim because he failed to raise those claims in his direct appeal.

1

A few years after the initial ruling on Johnson's § 2255 motion, the Supreme Court announced

its decision in *Massaro v. United States*. 538 U.S. 500, 509, 123 S.Ct. 1690, 155 L.Ed.2d 714 (2003).

In *Massaro*, the Supreme Court held that a petitioner may bring an ineffective assistance of counsel in

a collateral proceeding whether or not the petitioner could have raised the claim on direct appeal. *Id.*

Consequentially, the Court vacated the portion of its ruling concerning Johnson's ineffective assistance

of counsel claim. The Court, however, did not reopen Johnson's *Brady* claim. Though Johnson's

*Brady* claim is intertwined with his ineffective assistance of counsel claim, he has not formally moved

the Court to reconsider the decision regarding the *Brady* claim and that claim is not currently pending.[1]

Johnson's ineffective assistance claim centers on trial counsel's efforts to convince the jury to

impose a sentence of life imprisonment rather than one of death. At Johnson's sentencing, counsel

presented evidence about the custodial options for housing him. In particular, Johnson presented

evidence to suggest that if he were placed permanently in the control unit in ADX-Florence, where

inmates are confined to their cells 23 hours per day and not allowed contact with other inmates, he

would have no opportunity to carry out a continuing criminal enterprise and his dangerousness to

society would be mitigated.

In rebuttal, the government called an expert, a former Bureau of Prisons (BOP) warden, who

testified generally about what BOP placement was likely in Johnson's case. The expert testified that

typically gang leaders like Johnson do not get directly assigned to ADX-Florence but instead go to the

general prison population. The expert also testified that even prisoners in strictly controlled

---

[1] Another judge in this district initially ruled on Johnson's § 2255 motion and the motion to reconsider pursuant to *Massaro*. The executive committee has since reassigned the case.

environments had managed to commit crimes, including ordering the killing of other inmates. The expert also testified that the BOP could not house prisoners in such strict conditions indefinitely.

The jury rejected Johnson's proposed finding that he would not be "a serious and continuing danger to the society because the government has the power to imprison him for the rest of his life in a maximum security federal prison designed to control and monitor his behavior." The jury also found other aggravating factors, both statutory and non-statutory. In particular, the jury found that Johnson caused the killing after substantial planning and premeditation in the course of a continuing criminal enterprise that involved distribution of drugs to persons under the age of 21. It also found that he ordered the murder to obstruct justice by preventing the victim from testimony and also caused harm to the victim's family. As a result of its deliberation, the jury sentenced Johnson to death.

In Johnson's § 2255 motion, he argues that he was prejudiced by his trial counsel's failure to investigate the law and facts necessary to subject the government's case on future dangerousness to meaningful adversarial testing. In short, Johnson suggests that trial counsel was ineffective in allowing the government expert's testimony to go unrebutted.

Johnson argues that, contrary to the government expert's testimony, the BOP could employ strict conditions of confinement indefinitely to alleviate the risk a particular inmate poses to society. After sentencing, Johnson learned of several procedures that the BOP utilized to control the conditions of confinement of inmates deemed to be dangerous. First, the BOP could control the conditions of confinement by employing Special Administrative Measures (SAMS) authorized by 28 C.F.R. § 501.3(a). Second, courts could order restrictions on communication and association pursuant to 18 U.S.C. § 3582(d). Johnson also learned of specific inmates subjected to such controls.

3

Johnson's trial counsel presented none of this evidence to the jury, and had he done so, the jury might not have rejected Johnson's proposed finding on future dangerousness. Now Johnson moves for discovery from the government, hoping to uncover more evidence that contradicts or impeaches the government's expert. Specifically, Johnson seeks substantial BOP records involving prisoners kept under strict conditions of confinement[2] for more than 60 days, including the Disciplinary Hearing Officer (DHO) record and the Special Investigation Supervisor (SIS) Files. Johnson also seeks the DHO and SIS files for all inmates in the "K-Unit" at USP Marion, inmates in a "side pocket" or "special cell" at Florence-ADX, inmates in the Control Unit at USP Marion, any BOP inmates in a Special Housing Unit in a maximum or high security facility, and any memoranda written by a warden, Department of Justice staff, or Attorney General staff ordering an inmate held under strict conditions of confinement.

The discovery rules applicable to other civil cases do not apply to petitions for writs of *habeas corpus*, and a petitioner is not entitled to discovery as a matter of course. *Bracy v. Gramley*, 520 U.S. 899, 904, 117 S.Ct. 1793, 138 L.Ed.2d 97 (1977). Under Rule 6 of the rules governing *habeas corpus* proceedings, a judge *may* allow discovery upon a petitioner's showing of "good cause." Rule 6 of the Rules Governing § 2255 Cases. To satisfy good cause, Johnson must put forward specific allegations that show reason to believe that he may be able to demonstrate a constitutional violation if the facts were fully developed. *Bracy*, 520 U.S. at 908-09, 117 S.Ct. 1793. The information must be essential

---

[2] Johnson does not limit these conditions to inmates subject to SAMS or orders pursuant to § 3582(d). Instead, he defines a "strict condition of confinement" as any strict limitation upon or monitoring of communication with people outside the prison whether by phone, mail or visits based on concerns regarding dangerousness or security.

4

to an adequate factual development of the record. *Id.* The Court, however, retains the discretion to limit the extent of discovery.

To start, the parties spend much of their respective briefs arguing about whether the U.S. Attorney's office should be charged with the knowledge of BOP wardens. This argument is misplaced, and the Court need address it only briefly. First, as noted earlier, the only claim that the Court has reopened in Johnson's ineffective assistance of counsel claim. Second, the information he characterizes as suppressed is actually scattered throughout the BOP records. Johnson admits that the BOP record keeping procedures do not even allow for a computer-generated search to locate the records he claims the government suppressed; rather, some BOP official would have to sort through individual records by hand to determine whether they fit the profile of Johnson's current request. This is not a case where, prior to trial or sentencing, Johnson made a request that the government ignored. Nor is it a case where a particular individual had specific knowledge of specific records that might have been exculpatory. Instead, Johnson seeks to charge the entire BOP with perfect knowledge of its voluminous records and impute this knowledge to all of its agents. The Court will thus limit its inquiry to whether the records Johnson seeks are essential to develop an adequate factual record with regards to his ineffective assistance of counsel claim.

Rule 6 grants the judge discretion to authorize a party to conduct discovery pursuant to the Federal Rules of Criminal or Civil Procedure. Under both the Criminal and Civil discovery rules, courts maintain the discretion to limit discovery where the evidence sought is unreasonably cumulative or unduly burdensome. *See Sizemore v. Miller*, No. 92-2098, 1994 WL 123901, * 4 (7th Cir. Apr. 7, 1994); *United States v. Reed*, 2 F.3d 1441, 1447 (7th Cir. 1994) (noting that discovery under Rule 16

5

is not without limit); *United States v. Garza*, 664 F.2d 135, 141 (7th Cir. 1981) (affirming court's denial of subpoena for witnesses whose testimony would be cumulative).

In this case, the Court finds that the discovery Johnson requests is both cumulative and unduly burdensome. The parties agree that Johnson's trial counsel was ineffective in failing to impeach the testimony of the government's expert regarding Johnson's future dangerousness and dispute only whether this failure prejudiced Johnson. In order to succeed on this claim, Johnson must establish that but for counsel's failure, there is a reasonable probability that a jury may have declined to reject Johnson's proposed finding on future dangerousness and reached a different outcome in its decision to sentence him to death. *Eckstein v. Kingston*, 460 F.3d 844, 848-50 (7th Cir. 2006). And because "it takes only one juror to nix a death sentence," *United States v. Johnson*, 223 F.3d at 670, that threshold is even lower here.

Johnson points to the affidavit of former a BOP Warden that contradicts much of the testimony provided by the government's expert to support his request for further discovery. The affidavit outlines a pattern of evidence that appears to contradict much of what the government's expert testified to. For example, Johnson's expert points to conditions in the Control Unit at USP Marion, where the conditions of confinement were imposed to ensure security and reduce or eliminate the inmate's risk for violence of future dangerous. Johnson's expert also points to other units, such as the I-Up Unit and the K-Unit where inmate mail might be screened or copied and telephone calls recorded. The warden avers to many examples of inmates housed under these and other conditions, all for the purpose of reducing the potential that the inmate could cause harm to BOP staff, other inmates, or the general public. The thrust of the affidavit thus paints a very different portrait of the potential to house Johnson safely upon his conviction.

6

The affidavit of the BOP Warden provides a factual foundation for Johnson's claim that the government expert's testimony misled the jury regarding the BOP's ability to confine him immediately and indefinitely while at the same time minimizing the risk that Johnson would continue to be a danger to society. Moreover, the government has produced some information regarding other inmates held in strict conditions of confinement, also which seems to contradict the testimony of the government's expert and which could lend credibility to the testimony Johnson's expert might provide. Johnson, however, wants a more exhaustive list of each and every inmate held under any sort of strict condition of confinement.

It matters little whether more than ten inmates were confined in this manner, for at some point, the information Johnson might present to impeach or rebut the government's expert becomes cumulative. *See United States v. Jackson*, 51 F.3d 646, 652 (acknowledging the Sixth Amendment leaves courts broad discretion in limiting the extent and scope of cross-examination); *Garza*, 664 F.2d at 141 (limiting the number of witnesses a defendant may call where their testimony would be cumulative). Given the information contained in Johnson's expert's affidavit and in the discovery already provided, the Court finds that further discovery is unnecessary to develop an adequate factual record to determine whether Johnson's trial counsel's deficiency prejudiced him.

Moreover, the government points out that the records sought by Johnson are not capable of being located by means of a simple computer search. Instead, the government would have to sort through the records of inmates by hand to determine whether a particular inmate's DHO or SIS file fit the profile of what Johnson seeks. The BOP houses over 200,000 inmates. Bureau of Justice Statistics (2008), *at* http://www.ojp.usdoj.gov/bjs/pub/pdf/pim08st.pdf. While excluding from the search any inmates housed in low security penitentiaries might reduce the number of files that needed to be

7

reviewed by hand, Johnson's request more than probably would require the government to sort through tens of thousands of files. Where a defendant already has evidence to provide an adequate factual background to present his claim, such a gargantuan task is overly burdensome.

The Court believes that Johnson possesses sufficient information to argue that his trial counsel's failure to present evidence in rebuttal of the government's expert prejudiced him. It therefore DENIES his request for further discovery.

IT IS SO ORDERED.

5/15/09
Dated

Hon. William J. Hibbler
United States District Court

# UNITED STATES DISTRICT COURT
## FOR THE Northern District of Illinois – CM/ECF LIVE, Ver 3.2.2
### Eastern Division

United States of America

                          Plaintiff,

v.                                           Case No.: 1:02−cv−06998
                                             Honorable William J. Hibbler

Darryl Lamont Johnson

                          Defendant.

## NOTIFICATION OF DOCKET ENTRY

This docket entry was made by the Clerk on Tuesday, May 26, 2009:

          MINUTE entry before the Honorable William J. Hibbler: Status hearing reset to 6/9/2009 at 9:30 AM. Mailed notice (jdh)

**ATTENTION:** This notice is being sent pursuant to Rule 77(d) of the Federal Rules of Civil Procedure or Rule 49(c) of the Federal Rules of Criminal Procedure. It was generated by CM/ECF, the automated docketing system used to maintain the civil and criminal dockets of this District. If a minute order or other document is enclosed, please refer to it for additional information.

For scheduled events, motion practices, recent opinions and other information, visit our web site at *www.ilnd.uscourts.gov*.

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | William J. Hibbler | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 6998 | **DATE** | 6/9/2009 |
| **CASE TITLE** | U.S.A. vs. JOHNSON | | |

**DOCKET ENTRY TEXT**

Status hearing held. Petitioner to file additional motions with supporting memoranda by 7/31/09. Government to respond by 8/31/09. Petitioner to reply by 9/21/09. Ruling by mail.

Docketing to mail notices.

00:04

| | | Courtroom Deputy Initials: | JHC |
|---|---|---|---|

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff - Appellee - Respondent, | ) | No. 02 C 6998 |
| | ) | |
| vs. | ) | Hon. William J. Hibbler |
| | ) | |
| DARRYL JOHNSON, | ) | |
| | ) | Death Sentence Imposed |
| Defendant - Appellant - Petitioner. | ) | |

**AGREED MOTION TO MODIFY BRIEFING SCHEDULE**

Petitioner Darryl Johnson, by his attorney, Terence H. Campbell of Cotsirilos, Tighe & Streicker, respectfully requests leave of this Court for a short extension of time to file Petitioner's Brief in support of his claim for relief under Section 2255. In support of this motion, Petitioner states as follows:

1.      On June 9, 2009, the Court entered a scheduling order that calls for Petitioner to file any briefs on the outstanding issues underlying his Sec. 2255 petition by July 31, 2009. (Docket Entry 73). The government was to file a response brief on August 31, 2009, and Petitioner's reply brief was due on September 21, 2009. (*Id*.). No hearings are set, and the Court's Order indicates that after briefing by the parties, it would issue a ruling by mail. (*Id*.).

2.      Since the date of that scheduling order, undersigned counsel has been occupied with several other matters which have taken up a great majority of his time. For example, counsel has had to spend a good deal of time during the past several weeks on a preliminary injunction hearing in the case *Colophon Real Properties v. William J. McEnery Revocable Trust Dated April 22, 1993*, Case No. 09 CH 2038, which is pending in the Circuit Court of Will County. The evidentiary hearing on

plaintiff's motion for a preliminary injunction occurred over seven court days during a two-week-plus time period in June.  Counsel has also been required to spend a substantial amount of time representing one of the defendants in the related cases of *SEC v. Sentinel Management Group, Eric Bloom, and Charles Mosley*, Case No.  07 C 4684 and *CFTC v. Sentinel Management Group, Eric Bloom, and Charles Mosley*, Case No. 08 C 2410, which cases are pending before the Hon. Charles B. Kocoras in this district.  These cases are complex securities fraud cases involving literally millions of pages of documents and a claimed loss of more than $500 million.  Several all-day depositions -- which had not been scheduled at the time the briefing schedule was set in this case -- have taken place in July, with more to come.  In addition, undersigned counsel has been required to spend a substantial amount of time representing three foreign clients who are subjects of a complex, inter-national criminal anti-trust investigation by the Department of Justice.  This representation has not only been time-consuming, but has required counsel to travel out of state recently, and will require further out-of-state travel later this month.

3.       In addition, Petitioner's co-counsel, Ms. Lorinda Youngcourt, recently had to undergo a surgical procedure which caused her to miss a week of work.  Accordingly, she, too, has been unable to devote the necessary time to the preparation of Petitioner's brief.

4.       Because of these matters (and others) that have dominated undersigned counsel's time during the past month -- and which will continue to demand substantial time over the coming weeks -- he has not been able to devote the time necessary to research and prepare the brief due to be filed in this case by July 31, 2009.  *Accordingly, we respectfully request that Petitioner be granted an extension until August 28, 2009 to file his brief in this matter*.  Undersigned counsel believes that this short extension will be beneficial both to the Court and to the parties, particularly given the

significant issues presented in this case.

5.      If the Court is amenable to the requested extension, we would ask that the remaining briefing schedule also be adjusted by 28 days – *i.e.*, Petitioner's initial brief would be due by August 28, 2009; the response brief by September 28, 2009; and the reply brief by October 19, 2009.

6.      Undersigned counsel has spoken with Assistant U.S. Attorney David Bindi who is handling this matter for the government, and the government has no objection to this motion.  This modification of the briefing schedule will not prejudice any party and is not requested for purposes of delay or any other improper purpose.

WHEREFORE, Petitioner Darryl Johnson respectfully requests this Court to grant his motion to modify the briefing schedule in this case, and order the briefing to proceed as follows:  Petitioner's initial brief to be due by August 28, 2009; the response brief by September 28, 2009; and the reply brief by October 19, 2009.

Respectfully submitted,

/s/  Terence H. Campbell
An attorney for Petitioner Darryl Johnson

Terence H. Campbell
Cotsirilos, Tighe & Streicker, Ltd.
33 North Dearborn Street, Suite 600
Chicago, Illinois  60602
(312) 263-0345

Lorinda Meier Youngcourt
Post Office Box 206
Huron, Indiana  47437-0206
(812) 849-9852

3

## CERTIFICATE OF SERVICE

Terence H. Campbell, an attorney, hereby certifies that in accordance with hereby certifies

that in accordance with Fed.R.Crim.P. 49, LR 5.5, and the General Order on Electronic Case Filing

(ECF), the following document:

1.      Agreed Motion To Modify Briefing Schedule

was served pursuant to the District Court's ECF system as to ECF filers, including the United States

Attorney's Office.


/s/  Terence H. Campbell
Terence H. Campbell

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff - Appellee - Respondent, | ) | No. 02 C 6998 |
| | ) | |
| vs. | ) | Hon. Suzanne B. Conlon |
| | ) | |
| DARRYL JOHNSON, | ) | |
| | ) | Death Sentence Imposed |
| Defendant - Appellant - Petitioner. | ) | |

**NOTICE OF AGREED MOTION**

TO:   David Bindi
      Assistant United States Attorney
      219 South Dearborn Street, Suite 500
      Chicago, Illinois  60604

        PLEASE TAKE NOTICE that on Wednesday, July 22, 2009, at 9:30 a.m., we shall appear before the Honorable William J. Hibbler, United States District Judge, in the courtroom usually occupied by him at 219 South Dearborn Street, Chicago, Illinois, and present our Agreed Motion To Modify Briefing Schedule, a copy of which accompany this Notice and are hereby served upon you.

                                    Respectfully submitted,


                                    /s/ Terence H. Campbell
                                    Attorney for defendant

                                    Terence H. Campbell
                                    Cotsirilos, Tighe & Streicker, Ltd.
                                    33 North Dearborn Street, Suite 600
                                    Chicago, Illinois  60602
                                    (312) 263-0345

**UNITED STATES DISTRICT COURT**
**FOR THE Northern District of Illinois – CM/ECF LIVE, Ver 3.2.2**
**Eastern Division**

United States of America
                         Plaintiff,

v.                                                    Case No.: 1:02−cv−06998
                                                      Honorable William J. Hibbler

Darryl Lamont Johnson
                         Defendant.

_____

**NOTIFICATION OF DOCKET ENTRY**

This docket entry was made by the Clerk on Tuesday, July 21, 2009:

        MINUTE entry before the Honorable William J. Hibbler: Agreed motion to
modify briefing schedule [74] is granted. Petitioner's brief in support of his claim for relief
under Section 2255 to be filed by 8/28/2009. Government to respond by 9/28/2009.
Petitioner to reply by 10/19/2009. Ruling by mail. Mailed notice (jdh)

**ATTENTION:** This notice is being sent pursuant to Rule 77(d) of the Federal Rules of
Civil Procedure or Rule 49(c) of the Federal Rules of Criminal Procedure. It was
generated by CM/ECF, the automated docketing system used to maintain the civil and
criminal dockets of this District. If a minute order or other document is enclosed, please
refer to it for additional information.

For scheduled events, motion practices, recent opinions and other information, visit our
web site at ***www.ilnd.uscourts.gov***.

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff - Appellee - Respondent, | ) | No. 02 C 6998 |
| | ) | |
| vs. | ) | Hon. William J. Hibbler |
| | ) | |
| DARRYL JOHNSON, | ) | |
| | ) | Death Sentence Imposed |
| Defendant - Appellant - Petitioner. | ) | |

**MOTION TO MODIFY BRIEFING SCHEDULE**

Petitioner Darryl Johnson, by his attorney, Terence H. Campbell of Cotsirilos, Tighe & Streicker, respectfully requests leave of this Court for an extension of time to file Petitioner's Brief in support of his claim for relief under Section 2255. In support of this motion, Petitioner states as follows:

1. On July 21, 2009, the Court entered a modified scheduling order that calls for Petitioner to file any briefs on the outstanding issues underlying his Sec. 2255 petition by August 28, 2009. (Docket Entry 76). The government was to file a response brief on September 28, 2009, and Petitioner's reply brief was due on October 19, 2009. (*Id*.). No hearings are set, and the Court previously indicted its intent to issue a ruling by mail after full briefing. (*Id*.).

2. Since the date of that scheduling order, undersigned counsel has continued to be occupied with several other matters which have taken up a great majority of his time, and which will demand a great deal of time in the coming weeks. For example, counsel is representing one of the defendants in *Citadel Investment Group v. Teza Technologies, et al.*, Case No. 09 CH 22478, which is pending in the Circuit Court of Cook County. This is a complex case alleging various intellectual

property and theft of trade secret violations. The plaintiff is seeking a preliminary injunction against the defendants, and the court has set an evidentiary hearing for that preliminary injunction to begin on September 29, 2009. It is estimated by the parties that the hearing will take up to two weeks to try. Moreover, there is a huge volume of documents and there are expected to be over 20 depositions taken in the next 5 weeks, as well as fairly extensive expert discovery, in advance of the evidentiary hearing staring in late September.

Counsel has also been required to spend a substantial amount of time representing the lead defendant in the related cases of *SEC v. Sentinel Management Group, Eric Bloom, and Charles Mosley*, Case No. 07 C 4684 and *CFTC v. Sentinel Management Group, Eric Bloom, and Charles Mosley*, Case No. 08 C 2410, which cases are pending before the Hon. Charles B. Kocoras in this district. These cases are complex securities fraud cases involving literally millions of pages of documents and a claimed loss of more than $500 million. Several day-long depositions have taken place this month, with a good many more to come, both in August and September. In addition, undersigned counsel has been required to spend a substantial amount of time recently representing a client who is the subject of an SEC and grand jury investigation, and who was recently deposed by the SEC. Finally, undersigned counsel also has a number of criminal cases pending in the Northern District of Illinois that require his attention in the coming days and weeks.

3.       In addition, Petitioner's co-counsel, Ms. Lorinda Youngcourt, has been, and will continue to be, substantially occupied on various matters. Specifically, Ms. Youngcourt is spending the good majority of her time preparing for a death penalty trial that is scheduled to start on October 5, 2009, in *State of Indiana v. Desmond Turner*, Case No. 49 G 02-0606-MR-101336, which is pending in the Marion County Superior Court in Indiana. Mr. Desmond's trial is expected to take

2

approximately 6 weeks. Accordingly, she, too, has been unable to devote the time necessary to the preparation of Petitioner's brief in order to meet the current August 28, 2009 date.

4. To be sure, counsel have also spent time working on Petitioner's case during the past several weeks, but because of the above-referenced matters and others that have dominated undersigned counsel's time during the past month-plus – and which will continue to demand substantial time over the coming weeks – Petitioner's counsel will not be able to devote the time necessary to properly research and prepare the brief currently due to be filed in this case by August 28, 2009. ***Based on the above schedules of Petitioner's counsel, we respectfully request that Petitioner be granted a 60-day extension, until October 30, 2009, to file his brief in this matter.*** Undersigned counsel believes that this extension will be beneficial both to the Court and to the parties, particularly given the significant issues presented in this case.

5. If the Court is amenable to the requested extension, we would ask that the remaining briefing schedule also be adjusted by the same 60 days – *i.e.*, Petitioner's initial brief would be due by October 30, 2009; the response brief by November 30, 2009; and the reply brief by December 21, 2009.

6. Undersigned counsel has tried to reach Assistant U.S. Attorney David Bindi who is handling this matter for the government, but Mr. Bindi is out of town this week, so we are not able to represent here whether the government has no objection to this request. This modification of the briefing schedule will not prejudice any party and is not requested for purposes of delay or any other improper purpose.

WHEREFORE, Petitioner Darryl Johnson respectfully requests this Court to grant his motion to modify the briefing schedule in this case, and order the briefing to proceed as follows: Petitioner's

3

initial brief to be due by October 30, 2009; the response brief by November 30, 2009; and the reply

brief by December 21, 2009.

Respectfully submitted,

/s/  Terence H. Campbell
An attorney for Petitioner Darryl Johnson

Terence H. Campbell                         Lorinda Meier Youngcourt
Cotsirilos, Tighe & Streicker, Ltd.         Post Office Box 206
33 North Dearborn Street, Suite 600         Huron, Indiana  47437-0206
Chicago, Illinois  60602                    (812) 849-9852
(312) 263-0345

4

**CERTIFICATE OF SERVICE**

Terence H. Campbell, an attorney, hereby certifies that in accordance with hereby certifies that

in accordance with Fed.R.Crim.P. 49, LR 5.5, and the General Order on Electronic Case Filing

(ECF), the following document:

1.      Motion To Modify Briefing Schedule

was served pursuant to the District Court's ECF system as to ECF filers, including the United States

Attorney's Office.


                                    /s/  Terence H. Campbell
                                    Terence H. Campbell

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff - Appellee - Respondent, | ) | No. 02 C 6998 |
| | ) | |
| vs. | ) | Hon. Suzanne B. Conlon |
| | ) | |
| DARRYL JOHNSON, | ) | |
| | ) | Death Sentence Imposed |
| Defendant - Appellant - Petitioner. | ) | |

**NOTICE OF MOTION**

TO:   David Bindi
Assistant United States Attorney
219 South Dearborn Street, Suite 500
Chicago, Illinois  60604

PLEASE TAKE NOTICE that on Tuesday, August 25, 2009, at 9:30 a.m., we shall appear before the Honorable William J. Hibbler, United States District Judge, in the courtroom usually occupied by him at 219 South Dearborn Street, Chicago, Illinois, and present our Motion To Modify Briefing Schedule, a copy of which accompany this Notice and are hereby served upon you.

Respectfully submitted,

/s/ Terence H. Campbell
Attorney for defendant

Terence H. Campbell
Cotsirilos, Tighe & Streicker, Ltd.
33 North Dearborn Street, Suite 600
Chicago, Illinois  60602
(312) 263-0345

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff - Appellee - Respondent, | ) | No. 02 C 6998 |
| | ) | |
| vs. | ) | Hon. William J. Hibbler |
| | ) | |
| DARRYL JOHNSON, | ) | |
| | ) | Death Sentence Imposed |
| Defendant - Appellant - Petitioner. | ) | |

### *AGREED* AMENDED MOTION TO MODIFY BRIEFING SCHEDULE

Petitioner Darryl Johnson, by his attorney, Terence H. Campbell of Cotsirilos, Tighe &
Streicker, respectfully submits this *Agreed Motion* requesting an extension of time to file Petitioner's
Brief in support of his claim for relief under Section 2255.[1]  In support of this motion, Petitioner
states as follows:

1.      On July 21, 2009, the Court entered a modified scheduling order that calls for
Petitioner to file any briefs on the outstanding issues underlying his Sec. 2255 petition by August 28,
2009. (Docket Entry 76).  The government was to file a response brief on September 28, 2009, and
Petitioner's reply brief was due on October 19, 2009.  (*Id*.).  No hearings are set, and the Court
previously indicted its intent to issue a ruling by mail after full briefing.  (*Id*.).

2.      Since the date of that scheduling order, undersigned counsel has continued to be
occupied with several other matters which have taken up a great majority of his time, and which will
demand a great deal of time in the coming weeks.  For example, counsel is representing one of the

---

[1] This motion replaces the similar motion filed yesterday, as we can now report that the
government has no objection to this request, so this is now an "Agreed Motion," and yesterday's
motion is hereby withdrawn as moot.

defendants in *Citadel Investment Group v. Teza Technologies, et al.*, Case No. 09 CH 22478, which is pending in the Circuit Court of Cook County.  This is a complex case alleging various intellectual property and theft of trade secret violations.  The plaintiff is seeking a preliminary injunction against the defendants, and the court has set an evidentiary hearing for that preliminary injunction to begin on September 29, 2009.  It is estimated by the parties that the hearing will take up to two weeks to try.  Moreover, there is a huge volume of documents and there are expected to be over 20 depositions taken in the next 5 weeks, as well as fairly extensive expert discovery, in advance of the evidentiary hearing staring in late September.

Counsel has also been required to spend a substantial amount of time representing the lead defendant in the related cases of *SEC v. Sentinel Management Group, Eric Bloom, and Charles Mosley*, Case No.  07 C 4684 and *CFTC v. Sentinel Management Group, Eric Bloom, and Charles Mosley*, Case No. 08 C 2410, which cases are pending before the Hon. Charles B. Kocoras in this district.  These cases are complex securities fraud cases involving literally millions of pages of documents and a claimed loss of more than $500 million.  Several day-long depositions have taken place this month, with a good many more to come, both in August and September.  In addition, undersigned counsel has been required to spend a substantial amount of time recently representing a client who is the subject of an SEC and grand jury investigation, and who was recently deposed by the SEC.  Finally, undersigned counsel also has a number of criminal cases pending in the Northern District of Illinois that require his attention in the coming days and weeks.

3.      In addition, Petitioner's co-counsel, Ms. Lorinda Youngcourt, has been, and will continue to be, substantially occupied on various matters.  Specifically, Ms. Youngcourt is spending the good majority of her time preparing for a death penalty trial that is scheduled to start on October

5, 2009, in *State of Indiana v. Desmond Turner*, Case No. 49 G 02-0606-MR-101336, which is pending in the Marion County Superior Court in Indiana.  Mr. Desmond's trial is expected to take approximately 6 weeks (*i.e.* into early November).  Accordingly, she, too, has been unable to devote the time necessary to the preparation of Petitioner's brief in order to meet the current August 28, 2009 date.

4.      To be sure, counsel have also spent time working on Petitioner's case during the past several weeks, but because of the above-referenced matters and others that have dominated undersigned counsel's time during the past month-plus – and which will continue to demand substantial time over the coming weeks – Petitioner's counsel will not be able to devote the time necessary to properly research and prepare the brief currently due to be filed in this case by August 28, 2009.  ***Based on the above schedules of Petitioner's counsel, we respectfully request that Petitioner be granted a 70-day extension, until November 10, 2009, to file his brief in this matter.***  Undersigned counsel believes that this extension will be beneficial both to the Court and to the parties, particularly given the significant issues presented in this case.

5.      If the Court is amenable to the requested extension, we would ask that the remaining briefing schedule also be adjusted by the same 70 days – *i.e.*, Petitioner's initial brief would be due by November 10, 2009; the response brief by December 10, 2009; and the reply brief, in light of the holidays, by January 11, 2010.

6.      Undersigned counsel has now spoken with Assistant U.S. Attorney David Bindi who is handling this matter for the government, and ***the government has no objection to this motion***.  This modification of the briefing schedule will not prejudice any party and is not requested for purposes of delay or any other improper purpose.

WHEREFORE, Petitioner Darryl Johnson respectfully requests this Court to grant his motion

to modify the briefing schedule in this case, and order the briefing to proceed as follows:  Petitioner's

initial brief to be due by November 10, 2009; the response brief by December 10, 2009; and the reply

brief by January 11, 2010.

Respectfully submitted,

/s/  Terence H. Campbell
An attorney for Petitioner Darryl Johnson

Terence H. Campbell
Cotsirilos, Tighe & Streicker, Ltd.
33 North Dearborn Street, Suite 600
Chicago, Illinois  60602
(312) 263-0345

Lorinda Meier Youngcourt
Post Office Box 206
Huron, Indiana  47437-0206
(812) 849-9852

**CERTIFICATE OF SERVICE**

Terence H. Campbell, an attorney, hereby certifies that in accordance with hereby certifies that in accordance with Fed.R.Crim.P. 49, LR 5.5, and the General Order on Electronic Case Filing (ECF), the following document:

1.    Motion To Modify Briefing Schedule

was served pursuant to the District Court's ECF system as to ECF filers, including the United States Attorney's Office.


/s/  Terence H. Campbell
Terence H. Campbell

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff - Appellee - Respondent, | ) | No. 02 C 6998 |
| | ) | |
| vs. | ) | Hon. Suzanne B. Conlon |
| | ) | |
| DARRYL JOHNSON, | ) | |
| | ) | Death Sentence Imposed |
| Defendant - Appellant - Petitioner. | ) | |

**NOTICE OF AGREED MOTION**

TO:   David Bindi
Assistant United States Attorney
219 South Dearborn Street, Suite 500
Chicago, Illinois  60604

PLEASE TAKE NOTICE that on Tuesday, August 25, 2009, at 9:30 a.m., we shall appear before the Honorable William J. Hibbler, United States District Judge, in the courtroom usually occupied by him at 219 South Dearborn Street, Chicago, Illinois, and present our *Agreed Amended Motion To Modify Briefing Schedule*, a copy of which accompany this Notice and are hereby served upon you.

Respectfully submitted,

/s/ Terence H. Campbell
Attorney for defendant

Terence H. Campbell
Cotsirilos, Tighe & Streicker, Ltd.
33 North Dearborn Street, Suite 600
Chicago, Illinois  60602
(312) 263-0345

## UNITED STATES DISTRICT COURT
### FOR THE Northern District of Illinois – CM/ECF LIVE, Ver 3.2.3
### Eastern Division

United States of America

                Plaintiff,

v.

                                       Case No.: 1:02−cv−06998
                                       Honorable William J. Hibbler

Darryl Lamont Johnson

                Defendant.

## NOTIFICATION OF DOCKET ENTRY

This docket entry was made by the Clerk on Monday, August 24, 2009:

      MINUTE entry before the Honorable William J. Hibbler: Motion to modify briefing schedule [77] is withdrawn as moot. Agreed Amended Motion to modify briefing schedule [79] is granted. Petitioner's brief in support of his claim for relief under Section 2255 to be filed by 11/10/09. Government to respond by 12/10/09. Petitioner to reply by 1/11/10. Ruling by mail. Mailed notice (jdh)

**ATTENTION:** This notice is being sent pursuant to Rule 77(d) of the Federal Rules of Civil Procedure or Rule 49(c) of the Federal Rules of Criminal Procedure. It was generated by CM/ECF, the automated docketing system used to maintain the civil and criminal dockets of this District. If a minute order or other document is enclosed, please refer to it for additional information.

For scheduled events, motion practices, recent opinions and other information, visit our web site at *www.ilnd.uscourts.gov*.

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA,       )
                                )
          Plaintiff - Appellee - Respondent,   )       No. 02 C 6998
                                )
     vs.                        )       Hon. William J. Hibbler
                                )
DARRYL JOHNSON,                 )
                                )       Death Sentence Imposed
          Defendant - Appellant - Petitioner.   )


### *AGREED* MOTION TO MODIFY BRIEFING SCHEDULE

Petitioner Darryl Johnson, by his attorney, Terence H. Campbell of Cotsirilos, Tighe &
Streicker, respectfully submits this *Agreed Motion* requesting an extension of time to file Petitioner's
Brief in support of his claim for relief under Section 2255.  In support of this motion, Petitioner states
as follows:

1.      On August 24, 2009, the Court entered a modified scheduling order that calls for
Petitioner to file any briefs on the outstanding issues underlying his Sec. 2255 petition by November
10, 2009. (Docket Entry 81).  The government was to file a response brief on December 10, 2009,
and Petitioner's reply brief was due on January 11, 2009.  (*Id*.).  No hearings are set, and the Court
previously indicted its intent to issue a ruling by mail after full briefing.  (*Id*.).

2.      Since the date of that scheduling order, undersigned counsel has continued to be
occupied with several other matters which have taken up a great majority of his time, and which will
demand a great deal of time in the next few weeks.  For example, counsel is representing several
lawyers who are being deposed as to their involvement in matters relating to the collapse of Refco,
a large trading firm that went bankrupt a few years ago and which has led to several criminal

convictions. *In Re Refco Securities Litig.*, 07 MDL No. 1902 (GEL) (U.S. District Court for the Southern District of New York). This Multi-District Litigation case will require counsel to be out of town from the afternoon of Monday November 2 through Friday, November 6, 2009. Undersigned counsel also has a trial set for November 18, 2009 before Judge Lefkow, in *United States v. John Esposito*, Case No. 08 CR 565, and both the government and defense are firmly of the opinion that the case will not be resolved short of trial. Preparation for that case will require a good deal of counsel's time in the next three weeks, and the trial is likely to go into the week of November 23. In addition, counsel is representing two individuals in three separate enforcement actions brought by the SEC and CFTC. *SEC v. Sentinel Management Group, Eric Bloom, and Charles Mosley*, Case No. 07 C 4684 (J. Kocoras); *CFTC v. Sentinel Management Group, Eric Bloom, and Charles Mosley*, Case No. 08 C 2410 (J. Kocoras); and *SEC v. Fisher, et al.*, 07 C 4483 (J. Zagel). (The *Bloom* cases and the *Fisher* case are entirely unrelated to each other.) Depositions are being taken in these complex financial cases, and that, too, has occupied and will continue to occupy a significant amount of counsel's time in the coming weeks. Discovery in the *Bloom* cases is set to close at the end of November, and there are at least 8-10 more significant depositions to be taken, some out of town.

3.      In addition, Petitioner's co-counsel, Ms. Lorinda Youngcourt, has been, and will continue to be, substantially occupied on various matters. Ms. Youngcourt recently finished a lengthy murder trial in State of Indiana v. Desmond Turner, *Case No. 49 G 02-0606-MR-101336, in the* Marion County Superior Court in Indiana. Ms. Youngcourt was also just appointed to represent the defendant in *State v. Larry M. Caraway*, 47C01-0910-MR-620, a murder case pending in the State Court of Indiana. The Caraway case requires some immediate attention by Ms. Youngcourt. Ms.

2

Youngcourt also has a substantial sentencing hearing set for December 1, 2009 in *State v. Ruby G. Ramsey*, 14D1-0710-FB-786, also pending in the Indiana state court, which will require substantial time in the coming weeks.  Ms. Youngcourt also has a number of other criminal matters that, likewise, will require her attention in November, including preparation of a petition for certiorari in the capital case of *State v. Roy Lee Ward*.  Accordingly, she, too, has been unable to devote the time necessary to the preparation of Petitioner's brief in order to meet the current November 10, 2009 date.

4.      To be sure, counsel have also spent time working on Petitioner's case during the past several weeks, but because of the above-referenced matters and others that have dominated undersigned counsel's time during the past month-plus – and which will continue to demand substantial time over the coming weeks – Petitioner's counsel will not be able to devote the time necessary to properly research and prepare the brief currently due to be filed in this case by November 10, 2009.  ***Based on the above schedules of Petitioner's counsel, we respectfully request that Petitioner be granted a one month extension, until December 16, 2009, to file his brief in this matter.***  Undersigned counsel believes that this short extension will be beneficial both to the Court and to the parties, particularly given the significant issues presented in this case.

5.      If the Court is amenable to the requested extension, we would ask that the remaining briefing schedule also be adjusted accordingly – *i.e.*, Petitioner's initial brief would be due by December 17, 2009; the response brief by January 22, 2010 (given the holidays); and the reply brief by February 19, 2010.

6.      Undersigned counsel has spoken with Assistant U.S. Attorney David Bindi who is handling this matter for the government, and ***the government has no objection to this motion***.  This

modification of the briefing schedule will not prejudice any party and is not requested for purposes of delay or any other improper purpose.

WHEREFORE, Petitioner Darryl Johnson respectfully requests this Court to grant his motion to modify the briefing schedule in this case, and order the briefing to proceed as follows:  Petitioner's initial brief to be due by December 17, 2009; the response brief by January 22, 2010; and the reply brief by February 19, 2010.

Respectfully submitted,


/s/  Terence H. Campbell
An attorney for Petitioner Darryl Johnson


Terence H. Campbell
Cotsirilos, Tighe & Streicker, Ltd.
33 North Dearborn Street, Suite 600
Chicago, Illinois  60602
(312) 263-0345

Lorinda Meier Youngcourt
Post Office Box 206
Huron, Indiana  47437-0206
(812) 849-9852

**CERTIFICATE OF SERVICE**

Terence H. Campbell, an attorney, hereby certifies that in accordance with hereby certifies that in accordance with Fed.R.Crim.P. 49, LR 5.5, and the General Order on Electronic Case Filing (ECF), the following document:

1.      Agreed Motion To Modify Briefing Schedule

was served pursuant to the District Court's ECF system as to ECF filers, including the United States Attorney's Office.


/s/  Terence H. Campbell
Terence H. Campbell

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff - Appellee - Respondent, | ) | No. 02 C 6998 |
| | ) | |
| vs. | ) | Hon. William J. Hibbler |
| | ) | |
| DARRYL JOHNSON, | ) | |
| | ) | Death Sentence Imposed |
| Defendant - Appellant - Petitioner. | ) | |

**AGREED NOTICE OF MOTION**

TO:   David Bindi
      Assistant United States Attorney
      219 South Dearborn Street, Suite 500
      Chicago, Illinois  60604

PLEASE TAKE NOTICE that on Tuesday, November 3, 2009, at 9:30 a.m., we shall appear before the Honorable William J. Hibbler, United States District Judge, in the courtroom usually occupied by him at 219 South Dearborn Street, Chicago, Illinois, and present our Motion To Modify Briefing Schedule, a copy of which accompany this Notice and are hereby served upon you.

Respectfully submitted,


/s/ Terence H. Campbell
Attorney for defendant

Terence H. Campbell
Cotsirilos, Tighe & Streicker, Ltd.
33 North Dearborn Street, Suite 600
Chicago, Illinois  60602
(312) 263-0345

**UNITED STATES DISTRICT COURT**
**FOR THE Northern District of Illinois – CM/ECF LIVE, Ver 3.2.3**
**Eastern Division**

United States of America

                 Plaintiff,

v.                                                         Case No.: 1:02−cv−06998
                                                           Honorable William J. Hibbler

Darryl Lamont Johnson

                 Defendant.

---

### NOTIFICATION OF DOCKET ENTRY

This docket entry was made by the Clerk on Monday, November 2, 2009:

     MINUTE entry before the Honorable William J. Hibbler: Petitioner's Motion to modify briefing schedule [82] is granted. Petitioner's initial brief to be due by 12/17/09. Government to respond by 1/22/10. Petitioner to reply by 2/19/10. Ruling by mail. Mailed notice (jdh)

**ATTENTION:** This notice is being sent pursuant to Rule 77(d) of the Federal Rules of Civil Procedure or Rule 49(c) of the Federal Rules of Criminal Procedure. It was generated by CM/ECF, the automated docketing system used to maintain the civil and criminal dockets of this District. If a minute order or other document is enclosed, please refer to it for additional information.

For scheduled events, motion practices, recent opinions and other information, visit our web site at *www.ilnd.uscourts.gov*.

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff - Appellee - Respondent, | ) | No. 02 C 6998 |
| | ) | |
| vs. | ) | Hon. William J. Hibbler |
| | ) | |
| DARRYL JOHNSON, | ) | |
| | ) | Death Sentence Imposed |
| Defendant - Appellant - Petitioner. | ) | |

**PETITIONER'S SUPPLEMENTAL BRIEF IN SUPPORT
OF HIS INEFFECTIVE ASSISTANCE OF COUNSEL CLAIM**

Petitioner, Darryl Lamont Johnson, by his counsel, Terence H. Campbell of Cotsirilos, Tighe & Streicker, and Lorinda Meier Youngcourt, respectfully files this Supplemental Brief in Support of His Ineffective Assistance of Counsel Claim.

I.   INTRODUCTION

Based on the prior pleadings and hearings, the Court is now familiar with the substantive and procedural background of this case. In short, in 1997, Darryl Johnson was convicted of a large drug conspiracy and ordering the murders of two fellow gang members. The government sought the death penalty on the two murder counts, and a penalty-phase trial was held before the jury to determine whether he would be sentenced to life without parole or to death, the only two options available under the law.

The penalty-phase hearing was held in November, 1997. During that hearing, the central issue in dispute between the parties, and the focus of the evidence presented, was Johnson's alleged "future dangerousness" and the potential conditions of confinement which could (or could not) be imposed and implemented by the Bureau of Prisons in order to eliminate any such future danger. At the

penalty-phase hearing, the government called BOP Warden John Vanyur, a long-time veteran of the

BOP who had formerly served as Assistant Warden at the BOP's SuperMax ADX facility, to testify

about a number of matters relating to the authority and capabilities of the BOP to house inmates

under restrictive conditions of confinement in order to alleviate or eliminate their potential future

dangerousness.

In sum, Warden Vanyur told the jury in no uncertain terms that if the jury spared him from

death, Johnson would necessarily have access to telephone privileges, to in-person visits, to

correspondence, and would inevitably be housed in an open-population environment.  Ex. A, Tr.

2474-78.  (A copy of Warden Vanyur's testimony at Petitioner's penalty-phase trial is attached hereto

as Exhibit A.)  Warden Vanyur testified that even inmates in the Control Unit of the Supermax facility

– the most restrictive environment within the BOP – get one fifteen-minute phone call per month, five

visits per month, and virtually "unlimited correspondence with the outside world."  Ex. A, Tr. 2485.

According to Warden Vanyur, these privileges could be revoked only if Johnson was caught actually

violating the rules while incarcerated.  Ex. A, Tr. 2478.  Warden Vanyur further testified that even

if Johnson were to be placed at SuperMax, or in a Control Unit or similar segregation, such

placement could only be for some short period of time because "those are both temporary holding

patterns" that cannot be used for extended periods of time.  Ex. A, Tr. 2482-2483.  According to

Warden Vanyur, it was inevitable that Johnson would ultimately be placed in an open-population

penitentiary.  Ex. A, Tr. 2472, 2485, 2490.  In that open-population setting, Warden Vanyur testified,

Johnson "would have as many phone calls as he could pay for or get someone to accept them as

collect charges, so he would have virtually unlimited phone access if he has the time to make the

phone calls.  And he would have unlimited correspondence privileges."  Ex. A, Tr. 2477.  *See also*

Ex. A, Tr. 2477 (describing how an inmate "would have a great deal of open contact visiting with his family, probably in excess of twelve visits a month"); Ex. A, Tr. 2475-76 (testifying that because segregation is never a permanent option, it was "virtually impossible" to prevent Johnson from interacting with other members of the Gangster Disciples).

In its closing argument to the jury in the penalty-phase, the government focused on Warden Vanyur's testimony.  The government asserted that all Johnson needed to kill others was a telephone, and that there was no BOP facility or regulation that could possibly prevent him from having access to one.  (Tr. 2647-48).  The government argued, "nobody is safe; no witness, no witness's family, anybody who stands in his way, they are not safe.  It doesn't matter where he is locked up."  Tr. 2593-94 (emphasis added).  The prosecutor later returned to this point, urging again that "[n]o prison system can stop him," and "no one is safe as long as the defendant, Darryl Lamont Johnson, is allowed to live."  (Ex. A, Tr. 2648, 2598).

After hearing this evidence and argument, the jury *unanimously found* that Johnson "would commit serious acts of violence in the future which would be a continuing and serious threat to society."  (*See* Init. Memo in Support of His §2255 Petition [Docket No. 4], Ex. C, Johnson Special Verdict forms at Part III).  At the same time, the jury *unanimously rejected* the defense's proposed finding that Johnson "will not be a serious and continuing danger to society because the government has the power to imprison him for the rest of his life in a maximum security federal prison designed to control and monitor his behavior."  *Ibid*.  Although many of the jurors found that many mitigating factors were present, the jury nonetheless returned verdicts of death against Johnson.

Johnson's direct appeal was denied, and he timely filed a petition under 28 U.S.C. §2255, asserting a number of claims, including a claim of ineffective assistance of counsel.  It is that claim

which is the subject of this supplemental brief.

II.   JOHNSON'S CLAIM OF INEFFECTIVE ASSISTANCE OF COUNSEL

Darryl Johnson's ineffective assistance of counsel claim is premised primarily on his trial

counsel's failure to adequately investigate, research and present evidence, law and regulations that

were readily available and would have directly refuted and/or severely impeached the testimony of

Warden Vanyur.  As summarized in Petitioner's Initial Memo in Support of His §2255 Petition, trial

counsel was ineffective in that they:

1.   did not cross-examine Warden Vanyur with respect to BOP regulation 501.3 which specifically allows exactly the type of conditions of confinement that Vanyur testified on direct were impossible and likely illegal;

2.   did not cross-examine Warden Vanyur as to the sentence and conditions of confinement imposed on Luis Felipe in a case decided *more than eight months prior* to the sentencing hearing in Johnson's case;

3.   did not cross-examine Warden Vanyur as to the conditions of confinement available under 18 U.S.C §3582(d) and 28 C.F.R. 501.3, particularly after Vanyur had been allowed to testify about the law on direct[1];

4.   did not offer a jury instruction based on or that set out the relevant law (*i.e.* 18 U.S.C. §3582(d) and 28 C.F.R. 501.3) for the jury to consider in making its decision;

---

[1] As an example, Warden Vanyur testified on direct as follows:

Q:   Is it, under the law, even a possibility to place Darryl Johnson directly into that 68-bed control unit [at ADX]?

* * *

A:   *It is not.*  28 CFR Section 541 is very clear that inmates cannot be placed in a control unit solely on the basis of the offenses they committed in the community.

(Ex. A, Tr. 2484 (emphasis added)).

4

5. did not object to the jury instructions which omitted the law under 18 U.S.C §3582(d) and 28 C.F.R. 501.3;

6. did not satisfactorily investigate the conditions of confinement which were *at the time* both being imposed by federal courts and administered by the BOP; and

7. did not object to certain of Vanyur's testimony about the state of the law which testimony was elicited by the government on direct examination and was found to be improper by the Seventh Circuit.

Both the BOP regulations contained in §501.3 and §541.41(b)(2), and the statutory authority conferred by§3582(d) make clear that the sentencing court and the BOP each have the independent authority to order and impose, for as long as necessary, precisely the strict conditions of confinement that Warden Vanyur testified could not possibly occur. Moreover, there was evidence available to defense counsel that not only did the BOP and the courts have this authority, but such strict conditions of confinement were, in fact, being imposed and carried out on other inmates by Warden Vanyur's BOP *at the very same time* he testified unequivocally to Darryl Johnson's jury that those conditions were impossible to impose or carry out. ***Indeed, we now know that the BOP had been imposing precisely those types of conditions on any number of prisoners for years prior to Warden Vanyur's testimony at Johnson's trial***. (*See* Ex. C, First Affidavit from Mark Bezy (previously attached as Ex. A to Petitioner's Renewed and Amended Motion for Discovery [Docket 51]); Ex. D  attached hereto, Supplemental Affidavit from Mark Bezy dated Dec. 14, 2009; Ex. F, Letter from BOP employee Zgrodnik).

In addition, earlier in 1997, prior to Johnson's trial, the government had forcefully argued to the Second Circuit that both the court and BOP had the express authority, under those same BOP regulations and statutory provisions cited above, to impose precisely the strict conditions of confinement that were disavowed by Vanyur. (*See* "Petitioner's Response to the Government's

5

Motion to Reconsider the Court's March 11, 2003 Opinion and Order in Light of the Supreme

Court's Subsequent Decision in *Massaro*," [Docket No. 29], Ex. A at 36-45 (Govt. Br. in *United

States v. Felipe*, Case No. 97-1155)).  None of this, however was brought to the attention of the trial

court or the jury.  In fact, Johnson's trial counsel did virtually nothing to confront or refute Warden

Vanyur's inaccurate and misleading testimony on this central issue of future dangerousness.  Trial

counsel's failure to investigate was then compounded by the fact that they allowed the government's

BOP "expert," Warden Vanyur, offer, without objection, improper (and inaccurate) legal opinion

testimony regarding the BOP's power and authority to impose and maintain these strict conditions

of confinement for as long as necessary – testimony which, likewise, has been shown to be flatly

inaccurate.  (Ex. C, First Affidavit of Mark Bezy; Ex. D, Supplemental Affidavit of Mark Bezy dated

December 14, 2009.

As discussed further below (and in our prior briefs), for some time now, the government has

conceded that Mr. Vanyur's testimony on these  matters was inaccurate, "incomplete" and may well

have "left the jury with a mistaken impression" of BOP's authority, policy, and actual practices with

respect to the housing of inmates and the conditions of confinement available to be imposed.  (*See*

Init. Mem. in Support of §2255 Pet., Ex. A, Govt. Opp. to *cert*. at 14, 20, 21, 28-29 [Docket No.

4]).  Indeed, the government has now conceded before this Court that defense counsel's performance

in failing to challenge, rebut, and refute the demonstrably inaccurate testimony of Warden Vanyur was

constitutionally deficient under the first prong of *Strickland v. Washington*.  (*E.g.*, Transcript of

2/29/08 hearing at 4-5; Transcript of 6/3/2008 hearing at 10).  466 U.S. 668, 692,104 S.Ct. 2052,

2067 (1984).  The government, however, persists in its contention that Mr. Johnson has not shown

that he suffered "prejudice" as a result of his counsel's constitutionally deficient performance (*i.e.* the

6

second prong of *Strickland*).  *Id*.

Thus, the lone issue yet to be resolved by the Court with respect to his ineffective assistance claim is whether his counsel's now stipulated  errors – errors which went to the heart of the penalty phase case – were prejudicial to Johnson under *Strickland*.  In its May 15, 2009 Order, the Court described the posture of the case on this issue as follows:

> The parties agree that Johnson's trial counsel was ineffective in failing to impeach the testimony of the government's expert regarding Johnson's future dangerousness and dispute only whether this failure prejudiced Johnson.  In order to succeed on this claim, Johnson must establish that but for counsel's failure, there is a reasonable probability that a jury may have declined to reject Johnson's proposed finding on future dangerousness and reached a different outcome in its decision to sentence him to death.  *Eckstein v. Kingston*, 460 F.3d 844, 848-50 (7th Cir. 2006).  ***And because 'it takes only one juror to nix a death sentence," United States v. Johnson, 223 F.3d at 670, that threshold is even lower here***.

(Ex. B, Memorandum Opin. and Order dated May 15, 2009 at 6 (emphasis added)).  We submit this brief, therefore, to highlight the facts and law that overwhelmingly support a finding of prejudice under *Strickland*.[2]

III.    THE LEGAL STANDARDS UNDER *STRICKLAND* AND ITS PROGENY

As has been discussed in Johnson's prior submissions, in order to establish prejudice, it is required only that Petitioner establish that, absent counsel's errors, there is a "***reasonable probability***" that the outcome of the sentencing hearing may have been different.  *Strickland v. Washington*, 466 U.S. 668 (1984), *United States v. Cronic*, 466 U.S. 648 (1984)*, Strickler v. Greene*, 527 U.S. 263 (1999), *Williams v. Taylor*, 529 U.S. 362 (2000); *Wiggins v. Smith*, 539 U.S. 510

---

[2] By highlighting the issues addressed herein and in the contemporaneously filed motion relating to his *Brady/Napue* claim, Petitioner does not intend to, nor does he, waive any of his other arguments or issues that have been presented in this case.

(2003); *Rompilla v. Beard*, 545 U.S. 374 (2005) (discussed below). *See also*, Init. Memo in Support of §2255 Pet. at 6, 33-35, 45 [ Docket No. 4] (discussing standard). If there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting its verdict, "then we *must* find prejudice." *Strickland*, 466 U.S. at 695 (emphasis added).

Notably, the Supreme Court has made clear that *a "reasonable probability" is a lesser burden than a preponderance standard.* *Strickland* at 693 ("a defendant need not show that counsel's deficient conduct more likely than not altered the outcome of the trial."); *see also Williams,* 529 U.S. at 405-06 (2000) (O'Connor, J., concurring) (state court rejection of ineffectiveness claim on grounds that prisoner failed to establish by "a preponderance of the evidence" that the outcome would have differed would be contrary to clearly established precedent).[3]

For all the reasons set forth herein, as well as those in our prior submissions, we respectfully submit that a "reasonable probability" of a different result is plainly and certainly established by the factual evidence and legal authority already of record in this §2255 proceeding. This is particularly so in light of the fact that **the death penalty would have been avoided had the defense been able to "convince only one of twelve jurors to refuse to go along with a death sentence."**[4] *Emerson v.*

---

[3] Moreover, the Supreme Court's decision in *Cronic*, 466 U.S. 648 holds that where defense counsel "fails to subject the prosecution's case to meaningful adversarial testing, then there has been a denial of Sixth Amendment rights that makes the adversary process itself presumptively unreliable" – and therefore, *no additional showing of prejudice is required*. *Cronic*, 466 U.S. at 659. Clearly, the lack of meaningful adversarial testing has been established as to the evidence offered by Vanyur which was, even according to the government, incomplete and quite possibly misled the jury on the critical issue of "future dangerousness." (*See, e.g.*, Init. Memo in Support of §2255 Pet. at 4, 21-22, 31-32 (discussing *Cronic* in argument on ineffective assistance claim at pp. 3-48)).

[4] The bases for Petitioner's ineffective assistance of counsel claims are set forth in further detail in his §2255 Petition and supporting memoranda (*see* Initial §2255 Memo in Support at 3-48; Reply Mem. at 6-24) and have been further buttressed by the facts that have come to light

*Gramley*, 91 F.3d 898, 907 (7th Cir. 1996) (emphasis added).  *See also*, 18 U.S.C. §3593(e) (requiring unanimous vote of jury to impose death sentence); *Strickland*, 466 U.S. at 706 ("counsel's general duty to investigate * * * takes on supreme importance to a defendant in the context of developing mitigating evidence to present to a judge or jury considering the sentence of death; claims of ineffective assistance in the performance of that duty should therefore be considered with commensurate care.") (Brennan, J., concurring in part and dissenting in part); *California v. Ramos*, 463 U.S. 992, 1009 (1983) (stressing need that capital juries receive only "accurate information for its deliberation in selecting an appropriate sentence");  *Monge v. California*, 524 U.S. 721, 732 (1998) (recognizing an "acute need for reliability in capital sentencing proceedings");  *Gardner v. Florida*, 430 U.S. 349, 363-64 (1977) (imposition of the death penalty gives rise to a special "need for reliability in the determination that death is the appropriate punishment") (White, J., concurring); *see also*, *Johnson v. Mississippi*, 486 U.S. 578, 590 (1988) (reversing death sentence where "the jury was allowed to consider evidence that has been revealed to be materially inaccurate").

IV.   JOHNSON HAS DEMONSTRATED PREJUDICE UNDER *STRICKLAND* AND ITS PROGENY

A.   Warden Vanyur's Testimony and The Issue of "Future Dangerousness"

As the Court is now well-aware, the central issue at the penalty phase of Johnson's trial was the issue of "future dangerousness" and, more particularly, the facilities, authority, and practices of the BOP that could eliminate the possibility of Johnson posing a future danger to anyone, whether

---

since the filing of the Petition, including the information contained in former BOP Warden Mark Bezy's two affidavits, and the information obtained from the BOP regarding other inmates who were, at the time of Johnson's trial, housed under the very conditions of confinement that Warden Vanyur testified were not possible.

inside or outside a BOP prison.[5]  This issue was the subject of significant testimony, and was central to the arguments to the jury, both for the prosecution and the defense.

There is now no doubt that Warden Vanyur testified falsely about several matters relating directly to *the* material issue of future dangerousness and the authority, abilities, policies, and practices of the BOP with regard to housing inmates under strict conditions of confinement whenever it is deemed necessary.  The false, inaccurate, and/or misleading testimony of Warden Vanyur includes, *inter alia*, the following:

> (a) Vanyur testified that the BOP cannot hold any prisoner indefinitely in segregation without access to telephone or correspondence privileges. According to Vanyur, strict segregated detention is only available as a *temporary* option.   Ex. A, Tr.  2482-83 ("But in either case, administrative detention or administrative segregation, those are both temporary holding patterns, those are not permanent statuses for inmates.").

> (b)  Warden Vanyur testified, "When you are in this special housing unit, you don't have the same access as the rest of the inmate population to programs, educational opportunities, and so forth.  There is definitely a degree of deprivation inside there.  *And so it is not permissible, by the Bureau of Prisons policy, to keep an inmate in that status indefinitely.*" Ex. A, Tr. 2483 (emphasis added).

---

[5] As discussed in Petitioner's Initial Memo in Support of His §2255 Petition [Docket No. 4], it is well established that the issue of "future dangerousness" is generally the single most critical issue for juries considering whether to impose the death penalty.  *See generally* Sally Costanzo and Mark Costanzo, *Life or Death Decisions: An Analysis of Capital Jury Decision Under the Special Issues Sentencing Framework*, 18 L.& Hum. Behav. 151, 168 (1994) ("[F]uture dangerousness plays a prominent, if not central role * * *.  Jurors clearly perceived the penalty decision as hinging on this issue."); James W. Marquart et al., *Gazing Into the Crystal Ball: Can Jurors Accurately Predict Dangerousness in Capital Cases?*, 23 L.& Soc. Rev. 449, 463 (1989) ("[D]ata show[s] that the decision to give life versus death in Texas rests squarely on Question 2--future dangerousness.").  *See generally, Skipper v. South Carolina*, 476 U.S. 1, 5 n.1 (1986) (discussing importance of ensuring that the jury understands the actual facts to assess the "prosecutor's closing argument, which urged the jury to return a sentence of death in part because petitioner could not be trusted to behave if he were simply returned to prison").

10

(c)  Warden Vanyur testified that even inmates at ADX Florence would ultimately have "a lot of contact with inmates" and "frequent and constant contact with staff unrestrained."  Ex. A, Tr. 2489-90.

(d)  After declaring that strict conditions of confinement could only be imposed as a temporary measure, Warden Vanyur testified that even the most dangerous inmates would end up in general population maximum security prisons.  In describing the freedoms of inmates at those general population prisons, Warden Vanyur testified, "in open population penitentiary, you have constant contact, unrestrained with other staff and inmates. ...  you are out and about in large recreation areas; you have movement unrestrained to and from the dining hall; there is virtually unlimited access to telephones and a great deal of open visiting contact." Ex. A, Tr. 2472.  Warden Vanyur later stated, "the inmate would have a great deal of open contact visiting with his family, probably in excess of twelve visits a month.  He would have as many phone calls as he could pay for or get someone to accept them as collect charges, so he would have virtually unlimited phone access if he had the time to make the phone calls.  And he would have unlimited correspondence privileges." Ex. A, Tr. 2477.

(e)  Warden Vanyur testified that even in the Control Unit at ADX Florence, "you have one fifteen-minute phone call per month" as well as "five visits per month" and "virtually unlimited correspondence with the outside world."  Ex. A, Tr. 2485.

The meaning, import, and substance of Warden Vanyur's testimony was unmistakable:  the BOP, said Warden Vanyur, was entirely incapable of housing Darryl Johnson under conditions of confinement which would alleviate or eliminate his future dangerousness.  Indeed, according to Warden Vanyur, it was prohibited from doing so both by its policies, the law, and its own regulations.

Based on Warden Vanyur's now discredited testimony, the prosecutor dramatically told the jury in closing that, ***"[a]s long as the defendant has the ability to convey his orders to his followers, either on the street or in prison with him, nobody is safe; no witness, no witness's family, anybody who stands in his way, they are not safe.  It doesn't matter where he is locked up."*** Tr. 2593-94 (emphasis added).  The prosecutor returned to this theme again later in his closing, again pointedly

11

arguing to the jury, ***"No one is safe as long as the defendant, Darryl Lamont Johnson, is allowed to live."*** Tr. 2598. The power of this argument, backed by the false, but unchallenged, testimony of a high official from the BOP, can not be overstated.

As noted above, the government has now honorably and candidly admitted that Warden Vanyur's testimony was inaccurate and may well have misled the jury on the central matter at issue in the penalty phase. (*See* Transcript of 2/29/08 hearing at 4-5; Transcript of 6/3/2008 hearing at 10; Govt. Opp. to Cert. Pet., Ex. A to Petitioner's Initial 2255 Brief, [Docket No. 4] (Vanyur's testimony may well have "left the jury with a mistaken impression" of the BOP's true authority and actual practices). The government has further conceded that Johnson's counsel provided ineffective assistance satisfying the first prong of *Strickland*. (*See* Transcript of 2/29/08 hearing at 4-5; Transcript of 6/3/2008 hearing at 10).

B. The Supplemental Affidavit of Former BOP Warden Mark Bezy

The breadth of Warden Vanyur's inaccurate testimony now has been further laid bare by the two affidavits submitted to the Court by Mr. Mark A. Bezy, a former BOP warden and 28 year veteran of the BOP, as well as the additional admissions of the government regarding any number of inmates who were then, and are now, being housed under the very conditions of confinement Warden Vanyur testified were not possible to impose for any extended length of time. Former Warden Bezy's two affidavits submitted in this case demonstrate beyond peradventure that Warden Vanyur's testimony was both materially false, demonstrably misleading, and undoubtedly prejudicial to Mr. Johnson.

As the Court recalls, attached to "Defendant's Renewed and Amended Motion for Discovery on Petitioner's Ineffective Assistance of Counsel and *Brady* Claims" [Docket No. 53], Mr. Johnson

attached an affidavit from Mr. Bezy.   In his original affidavit, Mr. Bezy plainly exposed the

inaccurate, misleading and false testimony presented by Mr. Vanyur at Petitioner's penalty-phase trial.

In his initial affidavit, Mr. Bezy stated unequivocally that, at the time of Johnson's trial and before,

a good number of federal inmates were housed at various BOP facilities under the very types of strict

conditions of confinement that Warden Vanyur testified were not possible – and those inmate were

housed under those strict conditions of confinement ***"for as long as was deemed necessary by the***

***BOP in order to alleviate the risk that the inmate would constitute either a security risk or a***

***future danger to either BOP staff, other inmates, or the public."***   (Ex. C, First Bezy Affidavit at

¶¶7, 9, 11, 12, 13, and 14) (emphasis added).   Mr. Bezy detailed not only the available conditions of

confinement that were always at the disposal of the BOP, should the facts warrant it, but also

identified a number of federal inmates who were, in fact, held under those strict conditions of

confinement for extended, essentially indefinite, periods of time.   (*Id*.).

Attached to this brief is a Supplemental Affidavit from Mr. Bezy, further detailing the BOP's

policies, practices, and capabilities as it relates to the imposition of strict conditions of confinement.

(Ex. D, Supplemental Affidavit of Mark Bezy dated Dec. 14, 2009).   In his Supplemental Affidavit,

Mr. Bezy testifies, *inter alia*, to the following facts which further cement the false and misleading

nature of Warden Vanyur's testimony at Petitioner's trial, and make plain the prejudice suffered by

Petitioner as a result[6]:

> 4.    At the time I served as a captain at USP-Marion, that
> facility was the highest-security federal correctional facility in the country
> and housed many of what were considered the most incorrigible and

---

[6] We quote Mr. Bezy's affidavit at length here because it is, quite frankly, stunning to view an accurate statement of the facts regarding the BOP's authority, capability, and practices side-by-side with the testimony of Warden Vanyur at Johnson's trial.

difficult inmates in the BOP, and did so under highly secure and restrictive conditions of confinement.  This included, for example, restrictions on telephone communications, all of which were recorded and monitored, and restrictions on visitation, including no contact visits of any sort.  At USP-Marion, I was a member of the review and classification committee for the movement of high-security inmates through the facility's step-down process.

5.      While the hope of the BOP was that inmates sent to the general population at USP-Marion would modify their behavior and cycle out of USP-Marion to a mainstream maximum-security facility after two to three years, there were many inmates who were housed at USP-Marion for much longer than three years and were unable to cycle out of the program.  The BOP recognized that a small percentage of individuals would most likely require such restrictive security measures during the entire term of their incarceration because of the potential future dangerousness posed by those inmates.  These inmates, such as T.D. Bingham, Barry Mills, and Jeff Fort, were later transferred directly to the United States Penitentiary Administrative Maximum Facility in Florence, Colorado ("ADX" or "SuperMax") when that facility opened in 1994, and they remain housed at ADX today.  Although many inmates came to USP-Marion as a result of a demonstrated inability to function properly in other, less-restrictive environments, a number, such as John Gotti, were assigned directly to USP-Marion from the sentencing court.

*   *   *

18.     Based on my experience at the BOP, including the orders I gave and the conditions of confinement I observed, administered, and imposed, there is no doubt that the BOP had, at all times, the authority and ability to house inmates in severely restrictive conditions of confinement necessary to ensure security and/or to reduce or eliminate an inmate's future dangerousness.  This includes, but is not limited to, housing inmates in conditions of confinement where they do not have the ability to freely communicate with anyone from outside the prison, whether by phone, in person, or by mail.  ***The BOP can, does, and did at the time of Mr. Johnson's trial in 1997, take away prisoners' ability to have visitors, to have mail privileges, and to make or receive phone calls whenever the BOP deems it necessary to do so for the security of prison staff, other inmates, or the public.***  Under the BOP regulations, these are considered "privileges" – not "rights" – so they can, and could at the time of Mr. Johnson's trial in 1997, be taken away whenever it is deemed necessary by the BOP.  ***Moreover, these strict conditions of confinement can be, and were at the time of Mr. Johnson's trial in***

14

*1997, imposed for as long as the BOP deems it necessary to ensure the security and safety of either prison staff, other inmates, or the public (i.e. to reduce or eliminate the inmate's future dangerousness).*

\* \* \*

20. ... Accordingly, the suggestion that Mr. Johnson was not eligible for placement at ADX immediately after sentencing, if deemed necessary and appropriate, is false and is belied by ADX's history. Similarly, the notion that the BOP is somehow powerless to prohibit specific inmates from committing serious crimes while incarcerated is also false.

21. ... Given the nature of Mr. Johnson's convictions, and if the BOP determined it was warranted based on his behavioral history and perceived "future dangerousness," he could have been placed in the control unit at ADX.

22.   *Regardless of whether Mr. Johnson was eligible for direct placement in ADX's general-population unit or its control unit, the BOP had both the authority and the ability to craft conditions of confinement that would alleviate any risk presented by Mr. Johnson that he would constitute either a security risk or a future danger to either BOP staff, other inmates, or the public*. Indeed, the BOP individualizes conditions of confinement on a regular basis. The either/or proposition that an inmate receives a great deal of freedom if not incarcerated at ADX advanced in Mr. Johnson's trial by Dr. Vanyur (see Johnson T. at 2475 (general population means that an inmate would have "open and frequent contact unrestrained with staff and inmates"); Johnson T. at 2472 (inmates have "virtually unlimited access to telephones and a great deal of open visiting contact"); Johnson T. at 2477 (an inmate at high-security facilities has "a great deal of open contact visiting," "virtually unlimited phone access," and "unlimited correspondence privileges"); Johnson T. at 2485 (even in a control unit, inmates have "virtually unlimited correspondence with the outside world"); Johnson T. at 2504 (dangerous inmates cannot be separated at high-security institutions)) are at best serious misstatements and are at worst gross distortions and mischaracterizations of the BOP's role, function, authorities, and abilities, at the time of Mr. Johnson's trial and presently, to house prisoners under secure and restrictive conditions of confinement for as long as deemed necessary by the BOP in order to alleviate the risk that the inmate would constitute either a security risk or a future danger to either BOP staff, other inmates, or the public.

15

*   *   *

24.     These strict conditions are not solely the province of ADX and are nothing unusual or novel in the BOP.  Every prison in the federal system has the ability, policies, and procedures to guard against future acts of violence by prisoners confined in BOP prisons, including, as discussed further below, imposing restrictions on contact with people on the outside by telephone and mail.

25.     For example, USP-Marion had what it termed the "K-Unit" from at least the mid-1980s through the mid-1990s.  The K-Unit held inmates who posed a high security risk and housed them under extremely strict conditions of confinement.  These inmates were held in single cells, recreated by themselves, and had no contact with other inmates.  There was one officer assigned for every six inmates (a very low guard-to-inmate ratio).  Additionally, K-Unit inmates conducted their work (electronic cable assembly) in their cells instead of reporting to a workshop within the prison.  Inmates housed in the K-Unit due to security and/or future-dangerousness concerns included convicted spies John Walker and Jonathan Pollard and former CIA operatives Ed Wilson and Christopher Boyce.  These inmates were held in the K-Unit for as long as was deemed necessary by the BOP in order to alleviate the risk that the inmate would constitute either a security risk or a future danger to either BOP staff, other inmates, or the public.

26.     Furthermore, USP-Marion maintained an inmate housing unit called the "I-Up Unit."  David Sahakian, an inmate affiliated with Aryan Brotherhood, who was accused of serious crimes, including ordering the murders of others, was held in the I-Up Unit during his pretrial detention in the mid-2000s in order to protect others and ensure that he did not commit, order, or direct any additional criminal activity.  Sahakian and another Aryan Brotherhood member were separated from the rest of the prison population (they were held on the top floor of the prison hospital) and were continuously monitored by an officer.  The conditions of confinement created by the BOP for Sahakian were certainly available at the time of Mr. Johnson's trial in 1997.

27.     Thus, Dr. Vanyur's assertion that it would be "extremely difficult, at best" for officials at a BOP facility such as USP-Marion to separate Mr. Johnson from other Gangster Disciples is simply false.  At USP-Marion, we frequently and successfully separated inmates like Sahakian, Pollard, Walker, and others from the rest of the prison population.

16

\*   \*   \*

29.     There are numerous other examples of individuals who have been subject to special security measures due to the special challenges that they present. Rodney Hamrick, a convicted bomber, was housed at the USP-Marion when I worked there. I recall that all of Hamrick's mail was specially monitored by the BOP in order to reduce or eliminate his future dangerousness. Former Panamanian leader Manuel Noriega was also held under very strict conditions of confinement by the BOP because of the risk that he would order crimes or violence while incarcerated. Other inmates that have been, or continue to be, housed under very strict conditions of confinement due to security concerns include T.D. Bingham, Terry Mills, Thomas Silverstein, Clayton Fountain, Eric Rudolph, Ramzi Yousef, Anthony Ayeni Jones, Terry Nichols, and Theodore Kaczynski. Silverstein has been held in conditions at various prisons – including USP-Atlanta, USP-Leavenworth, USP-Marion, and ADX – where he has had virtually no human contact since the 1980's. Unlike Mr. Johnson, many of these individuals have shown an inability to positively adjust to incarceration in the federal prison system. However, to my knowledge, the strict conditions of confinement detailed above have very successfully alleviated the risk that these inmates might pose a future danger to individuals inside or outside the prisons in which they are housed.

\*   \*   \*

32.     Moreover, most maximum-security federal prisons contain a Special Housing Unit ("SHU") where inmates can be placed when they have violated (or are suspected of violating) prison rules. A SHU is, in essence, a prison within a prison where security and conditions of confinement are stricter than those imposed on the general population within the maximum-security facility generally. Each BOP warden has the authority to place any inmate into a SHU if the inmate is under investigation for a serious violation of prison rules. Inmates can be housed in a SHU for a variety of reasons, including concerns about security and/or an inmate's future dangerousness. Inmates may be placed in the SHU for extended periods of time, with the only limitation being that facility administrators must periodically review placement to determine continued appropriateness.

33.     Special Administrative Measures ("SAM's") also allow the BOP to construct individualized conditions of confinement as are "reasonably necessary to protect persons against the risk of acts of violence or terrorism." See 28 CFR §501.3(a). Each SAM's order is

totally unique and is nearly limitless in terms of the conditions of confinement available to be imposed by BOP personnel (subject to the constraints of the United States Constitution, of course). ***Although SAM's orders are required to be periodically reviewed, they may be extended for as long as conditions persist (i.e., indefinitely).*** A number of inmates have been held under SAM orders for more than a dozen years. SAM's orders were available to the BOP and the Department of Justice at the time of Mr. Johnson's trial in 1997 had officials been concerned that Mr. Johnson presented a risk of violence while incarcerated.

34.      Again, contrary to Dr. Vanyur's assertions at Mr. Johnson's trial, these strict conditions of confinement were (and are, to my knowledge) routinely imposed on high-risk inmates by the BOP for as long as it deems those conditions necessary to ensure the security and safety of BOP staff, other inmates, and the public (*i.e.* to reduce or eliminate the inmate's future dangerousness).

35.      Generally speaking, federal prison inmates do not have unlimited rights to visitation, correspondence, use of telephones, or contact with other inmates. As a matter of policy, the BOP grants access to these privileges consistent with the requirement of sound correctional management. These privileges can be revoked if they are abused or are deemed to constitute a threat to the security of the institution or the safety of individuals, whether inside or outside the prison. As Dr. Vanyur correctly stated in Beckford, inmates can have their phone privileges revoked for up to a year at a time in the case of significant misuse. Beckford T. at 27.[7] ***There is no limit on the number of consecutive year-long revocations that can be imposed on a prisoner if it is deemed to be warranted.***

*   *   *

39.      Given facts underlying Mr. Johnson's convictions, including the use of telephones to commit crimes, intensive monitoring of and restrictions on his communications, whether they be in person or by telephone or mail, were clearly available to the BOP in 1997 (and are today) – no matter where his placement.

---

[7] Warden Vanyur's testimony in *United States v. Beckford* is attached hereto as Exhibit E. The jury verdict forms in Beckford's case are attached as Exhibit H.

40.  Notably, it is my knowledge and understanding that during the term of his federal incarceration (more than 13 years at this point) the BOP has <u>not</u> deemed it necessary or appropriate to house Darryl Johnson under the strict conditions of confinement available to it as described above (*e.g.*, intensive restriction and/or supervision of communications by mail, phone, or in-person visitation; or segregation from staff and other inmates) whether based on any perceived "future dangerousness" or otherwise.  In addition, the information available to me clearly suggests that Mr. Johnson has been housed by the BOP under conditions that have, in fact, negated any potential "future dangerousness," and he has demonstrated that he is a well-adjusted inmate, as evidenced, for example, by the affidavit of BOP Case Manager B. English previously submitted to the Court in this case which states, "I consider [Darryl] Johnson to be a well-adjusted inmate without any out of the ordinary management concerns. …  Overall, Johnson is a quiet and civil individual."  ([Ex. G,] BOP Case Manager B. English Affidavit 8/25/08).

(Ex. D, Supplemental Affidavit of Mark Bezy dated Dec. 14, 2009) (emphasis added).

Based on the admissions of the government that Warden Vanyur's testimony was incomplete and misleading, and the powerful testimony of former Warden Bezy in his affidavits, there can be no doubt that Darryl Johnson was sentenced to death by a jury that heard, and was then urged to rely on, evidence that now has been shown definitively to be inaccurate, if not outright false.  These facts, under any circumstances, require reversal of his death sentence.  *Johnson v. Mississippi*, 486 U.S. at 590 (reversing death sentence where "the jury was allowed to consider evidence that has been revealed to be materially inaccurate"); *United States v. Fields*, 483 F.3d 313, 337 (5th Cir. 2007) ("A defendant may not be sentenced on the basis of 'misinformation of constitutional magnitude.'").

Yet further support for a finding of prejudice is contained in the relatively recent statements and  admissions of the government in this case.  For example, on August 26, 2008, the government provided a letter written by Ann H. Zgrodnik, Senior Counsel of the Litigation Branch of the Federal Bureau of Prisons ("BOP"), within the U.S. Department of Justice ("DOJ").  Ms. Zgrodnik's letter details her contact with various employees of the Department of Justice and the Bureau of Prisons,

and indicates that there were several inmates housed under strict conditions of confinement due to

security concerns and/or because of their future dangerousness, including inmates Thomas Silverstein

and Clayton Fountain.  As for inmates subjected to strict conditions of confinement pursuant to

Special Administrative Measures ("SAMS"), the government provided an e-mail from Dominique

Raia of the BOP to AUSA Bindi stating,

> As per our conversation this afternoon, I am providing the following
> information regarding the number of SAMs in BOP prior to 11/17/97:
>
> Five SAMs pursuant to 28 CFR 501.3 (terrorism); one SAM pursuant
> to 28 CFR 501.2 (espionage).  Four of the terrorism SAMs were
> imposed in 8/96 and one in 3/97; the espionage SAM was imposed in
> 3/96.  All of the aforementioned SAMs have been extended in
> accordance with the regulations and are currently still in place.

(Ex. F).  As for inmates subjected to such strict conditions of confinement specifically by Court order

under 18 U.S.C. §3582(d) and prior to November 1997, Ms. Zgrodnik reports that other than inmate

Luis Felipe, the people she contacted within the BOP do not recall any inmates subjected to formal,

court-ordered restrictions on communication and association under 18 U.S.C. §3582(d) prior to

November 1997.  Notably, Ms. Zgrodnik makes clear that there may well be other inmates who were

subjected to such conditions of confinement in the relevant time period (Ex. F at ¶6 ("Thus, it is

entirely probably that other inmates may be or have been in Bureau of Prisons custody with court

imposed communication restrictions that [BOP staff] are not aware of."); *id*. at ¶10 (similar)) – and

Mr. Bezy's two affidavits would seem to provide solid confirmation of her suspicions in that regard.

     C.      The Facts of Record And the Controlling Law Clearly Establish
            Prejudice to Johnson Under *Strickland*

     Based on the facts of record – including (a) the admissions of the government that Warden

Vanyur's testimony was inaccurate; (b) the two detailed affidavits of former Warden Mark Bezy (Exs.

C and D); (c) the further admissions of the government contained in the Ann Zgrodnik letter which impeach Warden Vanyur's testimony (Ex. F); (d) the pointed and chilling argument made to the jury by the government based on Warden Vanyur's inaccurate, misleading, and false testimony; (e) the fact that Warden Vanyur's inaccurate, misleading and false testimony went to the heart of the case (*i.e.* future dangerousness); and (f) the fact that it only takes a single juror to stop the death penalty from being imposed – there can be little doubt that Darryl Johnson has established a "reasonable probability" that a different outcome may have ensued absent the now admitted ineffective assistance of his counsel on these issues. *Strickland*, 466 U.S. 668; *Strickler*, 527 U.S. 263; *Williams*, 529 U.S. 362; *Wiggins*, 539 U.S. 510 and *Rompilla*, 545 U.S. 374.

1.    *United States v. Anthony Jones* Demonstrates The Prejudice

Further compelling support for a finding of prejudice in Johnson's case is the result in a similar case – indeed a factually more severe case than Darryl Johnson's – in which the jury was given full and accurate information regarding the options of the sentencing court and the BOP to eliminate the defendant's potential future dangerousness. *United States v. Anthony Jones,* No. WMN-96-0458 (D. Md) is a federal death penalty case that was tried to a jury shortly after Darryl Johnson's case. In *Jones*, similar to Johnson's case, the defendant was convicted of ordering the murders of federal witnesses. In addition, Jones was also convicted of ordering a murder *while he was incarcerated in a federal prison*.

In their special verdict forms, just as in Johnson's case, Jones' jury found several threshold eligibility factors and statutory aggravating factors including:

1.    "Anthony Ayeni Jones intentionally participated in an act, contemplating that the life of a person would be taken or intending that lethal force would be used in connection with a person * * * and [the victims] died as a result of the act."  ([Docket No. 4], Init. Memo in Support of §2255 Pet., Ex. D, Jones

21

Special Verdict forms at 1-2 (threshold eligibility factor)).  *Compare with id.*, Ex. C, Johnson Special Verdict forms at Part I);

2. "Defendant Anthony Ayeni Jones committed the offense after substantial planning and premeditation to cause the death of Keith Westmoreland." ([Docket No. 4], Init. Memo in Support of §2255 Pet., Ex. D, Jones Special Verdict forms at 3 (statutory aggravator).  *Compare with id.*, Ex. C, Johnson Special Verdict forms at Part II, ques. 2);

3. "Defendant Anthony Ayeni Jones caused the death of Derrick Rivers after substantial planning and premeditation."  ([Docket No. 4], Init. Memo in Support of §2255 Pet., Ex. D, Jones Special Verdict forms at 3 (statutory aggravator).  *Compare with id.*, Ex. C, Johnson Special Verdict forms at Part II, ques. 2);

4. "Defendant Anthony Ayeni Jones committed the offense after substantial planning and premeditation to cause the death of John Jones."  ([Docket No. 4], Init. Memo in Support of §2255 Pet., Ex. D, Jones Special Verdict forms at 3 (statutory aggravator)).  *Compare with id.*, Ex. C, Johnson Special Verdict forms at Part II, ques. 2).[8]

In addition, the Jones jury -- just like Johnson's jury -- also unanimously found beyond a reasonable doubt that Jones was a "future danger."  Thus, the jury unanimously answered "yes" to the non-statutory aggravator regarding the murders of Keith Westmoreland and Derrick Rivers stating:

"Defendant Anthony Ayeni Jones is a violent individual who constitutes a future danger to our community."

([Docket No. 4], Init. Memo in Support of §2255 Pet., Ex. D, Jones Special Verdict forms at 5 (non-statutory aggravator)).  *Compare with id.*, Ex. C, Johnson Special Verdict forms at Part III, ques. 1)

---

[8] In addition, the Jones jury also found that additional aggravating factor that Jones had "procured the commission of the offense by payment, or promise of payment, of anything of pecuniary value."  ([Docket No. 4], Init. Memo in Support of §2255 Pet., Ex. D, Jones Special Verdict forms at 3).  This factor was not found in Johnson's case, although it was presented and argued by the government.  ([Docket No. 4], Init. Memo in Support of §2255 Pet., Ex. C, Johnson Special Verdict forms at Part II, question 1).

("Darryl Lamont Johnson would commit serious acts of violence in the future which would be a continuing and serious threat to society."). Likewise, with respect to Anthony Jones' murder of John Jones, the jury also unanimously found:

> "Defendant Anthony Ayeni Jones is likely to commit criminal acts of violence in the future which would be a continuing and serious threat to society."

(*Id*. Ex. D, Jones Special Verdict forms at 6 (non-statutory aggravator)).  *Compare with id*., Ex. C, Johnson Special Verdict forms at Part III, ques. 1.

Notwithstanding these facts and special findings, the jury in *Jones* spared the defendant's life after hearing about the conditions that had been imposed in *Felipe* and could be imposed on Jones.[9] The lone significant difference between the findings of the jury in Jones' case versus that of the jury in Johnson's case was that, after hearing accurate and complete information about the available conditions of confinement, seven jurors in *Jones* found that:

---

[9] In the aftermath of that verdict by the jury sparing Jones' life, consistent with its position in *Felipe*, the DOJ took the position that the court possessed the authority, under 18 U.S.C. §3582(d), to order:

> (1) that Jones be permanently "housed in solitary confinement, without contact with other prisoners;"
>
> (2) that he be "prohibited from corresponding with, or receiving visits from anyone except his attorney and close family members approved by the district court with notice to the United States Attorney's Office;"
>
> (3) that "all correspondence and visits with persons approved by the district court, with the exception of attorney visits and correspondence, be monitored;" and
>
> (4) that he be prohibited from telephone contact with anyone other than his court-appointed attorneys.

([Docket No. 4], Init. Memo in Support of §2255 Pet., Ex. E).  In support of these proposals, the government relied extensively upon the *Felipe* decision.

> *Any concern respecting future dangerousness of Anthony Jones is significantly reduced since the federal [BOP] is empowered to classify a prisoner serving a life sentence without possibility of release to the highest security level federal prison, under conditions of confinement that eliminate any reasonable probability that the prisoner will be a continuing and serious threat to society*.

([Docket No. 4], Init. Memo in Support of §2255 Pet., Ex. D, Jones Verdict forms at 7, (mitigating factor #3) (emphasis added)).  By contrast, after hearing Warden Vanyur's testimony, *zero jurors in Johnson's case found this mitigating factor*, and consequently he was sentenced to death.  (*Id*., Ex. C, Johnson Special Verdict forms at Part IV, ques. 4 (Blunt Johnson murder); Part IV, ques. 5 (Charles Banks murder)).

The import of the evidence regarding the conditions of confinement available to the BOP and ordered in *Felipe* to the Jones verdict was apparent to all.  The United States Attorneys in *Jones* acknowledged that "it is clear that at least a majority of the jury believed that he no longer would be a danger because they believed defense counsel arguments that Jones would be held at ADX Florence in the equivalent of solitary confinement."[10]   ([Docket No. 4], Init. Memo in Support of §2255 Pet., Ex. E at 8, "Government's Motion to Restrict Conditions of Confinement").  Jones' counsel, as well, has no doubt about the import and effect that the evidence regarding the BOP's ability and practice of housing dangerous inmates in strict conditions of confinement had on the jury's decision to spare Jones' life.  Attorneys Harry J. Trainor and William C. Brennan who represented Anthony Jones have stated under oath that "It is our firm belief that the evidence about the BOP's ability to house Mr. Jones at ADX Florence, or to otherwise restrict or prohibit outside communications, was extremely

---

[10] Notably, the Court followed the government's recommendations and sentenced Jones to confinement under the requested strict conditions *for an indefinite period of time*.  ([Docket No. 4], Init. Memo in Support of §2255 Pet., Ex. F, Sentencing Order in Jones).

24

powerful evidence that had a major impact on the jury's inability to unanimously recommend a sentence of death."  ([Docket No. 4], Init. Memo in Support of §2255 Pet., Ex. G, Affidavit of Attorneys Harry J. Trainor and William C. Brennan).  The Anthony Ayeni Jones case is perhaps the clearest and most direct proof of prejudice based on trial counsel's failure to effectively research, challenge, and refute Warden Vanyur's testimony in this case.

### 2.   Other Cases Finding Prejudice Under *Strickland*

While the facts of record and the "on all fours" example of the Anthony Ayeni Jones case make clear the prejudice prong of *Strickland* has been satisfied, a brief review of some cases discussing what is sufficient to show prejudice further confirms the conclusion – particularly in the context of a failure to properly investigate the relevant facts and law, as is the case here.  Indeed, the importance of adequate research and investigation of mitigation evidence by defense counsel in preparation for capital sentencing hearings – indeed the constitutional requirement for such research and investigation – has been further emphasized and explained by the Supreme Court's decisions in *Wiggins* 539 U.S. 510, and *Rompilla*, 545 U.S. 374, both of which granted habeas relief based on trial counsel's inadequate research and investigation into mitigation.[11]

In *Wiggins*, the Supreme Court held that defense counsel rendered constitutionally ineffective assistance under *Strickland* by failing to properly research and present evidence in mitigation in that capital case.  On the issue of "prejudice," the Court found that, ***"[h]ad the jury been able to place [the evidence omitted by defense counsel] on the mitigating side of the scale, there is a reasonable probability that at least one juror would have struck a different balance."***  *Wiggins*, 539 U.S. at

---

[11] Indeed, in both *Wiggins* and *Rompilla*, the Supreme Court found prejudicial ineffective assistance even under the stricter standard of review applicable to §2254 actions.

537 (emphasis added, citation omitted).  In finding counsel's performance constitutionally deficient,

the Court relied, in part, on the facts that "[t]he ABA Guidelines provide that investigations into

mitigating evidence 'should comprise efforts to discover *all reasonably available* mitigating evidence

and evidence to rebut any aggravating evidence that may be introduced by the prosecutor,'" and that

counsel had failed to live up to those standards.  *Id*. at 524 (emphasis in original), citing ABA

Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 11.4.1(C), p.

93 (1989).  And importantly, the Court noted that in making this determination of potential prejudice,

the Court must "evaluate the totality of the evidence – 'both that adduced at trial, *and the evidence*

*adduced in the habeas proceeding[s]*.'" *Wiggins*, 539 U.S. at 536, citing *Williams v. Taylor*, 529

U.S. at 397-98 (emphasis added by *Wiggins* Court).  In Johnson's case, precisely the same analysis

demands relief.

Notably, the issue of whether trial counsel's decision not to present and argue the omitted

evidence was a "tactical decision" was hotly debated in *Wiggins*.  *In Johnson's case, there is no such*

*debate*.  As Johnson's trial counsel has stated under oath:

> "There was no tactical or strategic decision by me not to elicit testimony ...
> about the BOP regulation contained in 28 C.F.R. 501.3, or about the
> conditions of confinement which could be and had in fact been imposed by
> federal courts under 18 U.S.C. Sec. 3582(d), or about the Luis Felipe case.
> Quite the opposite, had I known about the conditions of confinement and
> terms thereof which are permitted and/or had been imposed under 28 C.F.R.
> 501.3 and/or 18 U.S.C. Sec. 3582(d), or about the conditions of
> confinement imposed and implemented on Luis Felipe, for an indefinite
> period of time, I would have elicited that information ... because that
> information was crucially important to support our argument that the BOP
> had both the power, ability and practices in place to house Darryl Johnson
> for an indefinite period of time in a manner that would virtually eliminate any
> future dangerousness of Darryl Johnson."

([Docket No. 4], Init. Memo in Support of §2255 Pet., Ex. B, Atty Urdangen Affidavit at para. 6).

26

In light of the facts now of record, Mr. Urdangen's affidavit, and the standards set forth in *Wiggins* – including under the various ABA standards referenced in the *Wiggins* decision – there can be no doubt now that the performance of Johnson's counsel on this aspect of the case fell below *Strickland*'s "objective standard of reasonableness," and that that failure was prejudicial to Johnson. *Strickland*, 466 U.S. at 688.

In *Rompilla v. Beard*, the Supreme Court similarly held that trial counsel's failure to examine readily available public records that contained either mitigating evidence and/or evidence that would rebut aggravating evidence offered by the prosecution constituted ineffective assistance requiring relief on habeas (*i.e.* §2254). Specifically, in *Rompilla*, trial counsel failed to review a readily and publicly available file on the defendant's prior conviction, portions of which the prosecution presented in aggravation in seeking the death penalty. *Rompilla*, 545 U.S. 374. In the instant case, Johnson's trial counsel failed to review and research readily and publicly available BOP regulations, caselaw, statutory authority, and publicly available information on actual BOP practices relating to the primary contested issue at the penalty phase. Had they done that simple research, it would have shown plainly and unequivocally that the BOP had – and had exercised on multiple occasions – the authority to do exactly what government witness Warden John Vanyur declared to the jury it could not, would not, and did not do.

One need only substitute the phrase "BOP regulations, statutes, caselaw, and publicly-available information about BOP practices" for the word "transcript" or "file on the prior conviction" in the relevant portion of the *Rompilla* decision to see the striking similarity in counsel's failure here.

> With every effort to view the facts as a defense lawyer would have done
> at the time, it is difficult to see how counsel could have failed to realize
> that without examining the readily available [BOP regulations, statutes,
> caselaw, and publicly-available information about BOP practices] they

27

were seriously compromising their opportunity to respond to a case for aggravation. The prosecution was going to use the dramatic facts of a similar prior offense, and Rompilla's counsel had a duty to make all reasonable efforts to learn what they could about the offense. Reasonable efforts certainly included obtaining the Commonwealth's own readily available [BOP regulations, statutes, caselaw, and publicly-available information about BOP practices] to learn what the Commonwealth knew about the [BOP regulations, statutes, caselaw, and publicly-available information about BOP practices], to discovery any mitigating evidence the Commonwealth would downplay and to anticipate the details of the aggravating evidence the Commonwealth would emphasize. Without making reasonable efforts to review the [BOP regulations, statutes, caselaw, and publicly-available information about BOP practices], defense counsel could have had no hope of knowing whether the prosecution was quoting selectively from the [BOP regulations, statutes, caselaw, and publicly-available information about BOP practices] ... Without making efforts to learn the details and rebut the relevance of the [Commonwealth's evidence in aggravation], a convincing argument [by the defense] was certainly beyond any hope.

*Rompilla*, 545 U.S. at 385-86 (with bracketed phrase substituted for emphasis). *See also*, *Crisp v. Duckworth*, 743 F.2d 580, 583 (7th Cir. 1984) ("Effective representation hinges on adequate investigation and pretrial preparation."); *United States v. Williamson,* 183 F.3d 458, 462-63 (5th Cir. 1999) ("[A] reasonable attorney has an obligation to research relevant facts and law.").

Later in its *Rompilla* opinion, the Court continued: "It flouts prudence to deny that a defense lawyer should try to look at a file he knows the prosecution will cull for aggravating evidence, let alone when the file is sitting in the trial courthouse, open for the asking." *Id*. at 389. Precisely the same analysis applies here where Johnson's counsel admittedly failed to conduct any research regarding the applicable BOP regulations, statutes, caselaw, and publicly-available information about BOP practices which were absolutely critical to a fair and effective presentation of the defense's mitigation case, as well as to directly rebut and disprove the government's case in aggravation.

In discussing its holding, the Court in *Rompilla* stated:

> The notion that defense counsel must obtain information that the State has and
> will use against the defendant is not simply a matter of common sense.  As the District
> Court points out, the American Bar Association Standards for Criminal Justice in
> circulation at the time of Rompilla's trial describes the obligation in terms no one
> could misunderstand in the circumstances of a case like this one:
>
>> "It is the duty of the lawyer to conduct a prompt investigation of
>> the circumstances of the case and to explore all avenues leading
>> to facts relevant to the merits of the case and the penalty in the
>> event of conviction.  The investigation should always include
>> efforts to secure information in the possession of the prosecution
>> and law enforcement authorities.  The duty to investigate exists
>> regardless of the accused's admissions or statements to the
>> lawyer of facts constituting guilt or the accused's stated desire to
>> plead guilty."

*Rompilla*, 545 U.S. at 387, citing 1 ABA Standards for Criminal Justice 4-4.1 (2d ed. 1982 Supp.).

The Court noted that "we long have referred to these ABA Standards as 'guides to determining what

is reasonable,'" in finding counsel's performance constitutionally ineffective.  *Id.* at 387, quoting

*Wiggins*, 539 U.S. at 524 and *Strickland*, 466 U.S. at 688.

In previous filings, we have cited a plethora of additional cases in which relief was granted

based on a finding of ineffective assistance based on a failure to competently investigate, research,

or present material facts or controlling legal authority – and most of those cases involve facts less

severe, and issues less central to the defense, than the facts and issues presented here.  For example,

the Court in *United States v. Williamson* expressly held,

> [*A] reasonable attorney has an obligation to research relevant facts and
> law*, or make an informed decision that certain avenues will not prove
> fruitful. [citations omitted]  * * *
>
> Williamson's [] counsel did not provide objectively reasonable
> assistance.  An objectively reasonable attorney, keeping abreast of legal
> developments related to his case, as he should, would have discovered
> *Bellazerius* and would have noticed that we had applied *Bellazerius* in

29

another case decided before Williamson's brief was submitted. [citation omitted] The cases squarely addressed an issue exactly on point for Williamson's appeal. *Regardless of the standard of review we wold have employed, Williamson's counsel, by failing to cite directly controlling precedent, rendered deficient assistance*

183 F.3d 458, 462-63 (5th Cir. 1999) (emphasis added). *See also*, *Dixon v. Snyder*, 266 F.3d 693, 703-05 (7th Cir. 2001) (discussed below); *United States v. Franks*, 230 F.3d 811, 814-15 (5th Cir. 2000) (counsel's failure to object to sentence enhancement in face of three court of appeals cases holding that enhancement was improper in similar circumstances was ineffective assistance); *Baker v. Barbo*, 177 F.3d 149, 154 (3d Cir. 1999) (counsel's ignorance of applicable sentencing law during plea negotiations was objectively unreasonable); *Trass v. Maggio*, 731 F.2d 288, 293 (5th Cir. 1984) (finding ineffective assistance where counsel's "grave lapse in failing to move for severance appears to have been due to an erroneous understanding of the law of severance, rather than to any conceivable 'strategic choice.'"); *Rios-Delgado v. United States*, 117 F.Supp.2d 581, 588-89 (W.D. Texas 2000) (counsel's failure to object to sentencing enhancement "reflect[ed] a failure to investigate the case * * *").

In *Dixon v. Snyder*, the Seventh Circuit granted habeas relief where the defendant's counsel was unaware of the controlling law on a mere evidentiary issue. The Court stated:

> It seems very likely that the district court was correct in finding that counsel was not aware of section 115-10.1. Indeed, the appellant has conceded that counsel was unaware of it. If counsel was unaware of the statute, then his decision not to cross-examine Carlisle cannot be accorded the same presumption of reasonableness as is accorded most strategic decisions because it was not based on strategy but rather on a "startling ignorance of the law."

*Dixon*, 266 F.3d at 703, quoting *Kimmelman*, 477 U.S. at 385. *See also*, *Pavel v. Hollins*, 261 F.3d 210, 218 n.11 (2d Cir. 2001) (collecting cases and discussing how decisions made in ignorance of

relevant facts and law cannot be characterized as strategic under *Strickland*); *Horne v. Trickey,* 895 F.2d 497, 500 (8th Cir.1990) (counsel must make "strategic choices * * * after thorough investigation of [the] law and facts relevant to plausible options") (quoting *Strickland,* 466 U.S. at 690). *See also Emerson v. Gramley*, 91 F.3d 898, 906 (7th Cir. 1996) (counsel's failure to investigate and present certain mitigation evidence at capital sentencing was ineffective assistance); *Bean v. Calderon*, 163 F.3d 1073, 1079-81 (9th Cir. 1998) (counsel's failure to investigate and present mitigating evidence was ineffective assistance); *Holsomback v. White*, 13 F.3d 1382 (11th Cir. 1998) (counsel's failure to investigate medical evidence constituted ineffective assistance requiring reversal); *Bryan v. Gibson,* 276 F.3d 1163, 1183 (10th Cir.2001) (*reh'g en banc granted,* April 26, 2002) (Henry, J., concurring part and dissenting in part) (arguing that counsel's decision not to present certain mitigation evidence could not be considered strategic because the defense attorney "did not even realize that he could present" the evidence at issue).

Any number of recent cases reaffirm the principles underlying these cases, even in the more strict context of Section 2254 cases. For example, last year, the Sixth Circuit in *Johnson v. Bagley* held the defendant had sufficiently proven the prejudice prong of *Strickland*, finding "[t]he errors of Johnson's attorneys, particularly their lack of investigation, had a serious impact on the mitigation theory presented to the jury. Competent counsel could have put on evidence that 'differed in a substantial way – in strength and subject matter – from the evidence actually presented at sentencing." 544 F.3d 592, 603 (6th Cir. 2008) (citation omitted). Exactly the same rationale applies to the errors in the instant case. Had Darryl Johnson's counsel properly investigated the mitigation evidence regarding "future dangerousness," there is no doubt that the penalty phase evidence would have "differed in a substantial way – in strength and subject matter – from the evidence actually presented

at sentencing." Similarly, the court in *Libberton v. Ryan*, recently held that "[e]vidence [counsel] could have discovered in the course of a proper investigation would have dramatically transformed the case for mitigation," and had that evidence been presented, "there is a reasonable probability that [the sentencing judge] would have imposed a different sentence." 583 F.3d 1147, 1171 (9th Cir. 2009). Again, the same reasoning holds true in this case, and similarly requires relief be granted.

The rationale underlying all of these cases squarely supports a finding that Darryl Johnson has established the necessary prejudice under *Strickland* and its progeny. Relief is warranted.

Finally, we also believe that *Strickland* prejudice has been established by the prior concessions of the government. For example, as discussed above, in its brief before the Supreme Court, the government acknowledged that several highly significant aspects of Warden Vanyur's testimony were inaccurate and misleading as to the material issue of future dangerousness and the authority, abilities, and practices of the BOP in housing inmates under strict conditions of confinement. Just as these stipulated facts regarding Warden Vanyur's testimony establish deficient performance, they likewise establish prejudice. It is simply not plausible to acknowledge, on the one hand, that material testimony on the central issue at the penalty-phase trial was demonstrably inaccurate, and that the jury was likely misled by that testimony, but then, on the other hand, to maintain that there is not even a reasonable probability that a different result would have enured had accurate information been given to the jury. The position is even more bereft of merit in the context of a death penalty case, where it takes just one juror to stop the death penalty from being imposed.

D.     Conclusion Regarding Ineffective Assistance of Counsel Claim

We respectfully submit that a "reasonable probability" of a different result is plainly, indeed overwhelmingly, established by the facts and legal authority already of record in this proceeding based

on trial counsel's now stipulated ineffective assistance.  This conclusion becomes undoubtable when the demonstrated failures of counsel are viewed in light of the fact that ***the death penalty would have been avoided had the defense been able to "convince only one of twelve jurors to refuse to go along with a death sentence."***  *Emerson*, 91 F.3d at 907(emphasis added).

As Justice Stewart wrote for a plurality of the Court in *Woodson v. North Carolina*:

> [T]he penalty of death is qualitatively different from a sentence of imprisonment, however long.  Death, in its finality, differs more from life imprisonment than a 100-year prison term differs from one of only a year or two.  Because of that qualitative difference, there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case.

428 U.S. 280, 305 (1976).

Albeit without any bad intent, Johnson's trial counsel failed to live up to the standards required to render effective assistance at Johnson's penalty phase.  Just as relief was ordered in *Wiggins*, *Rompilla*, and the many other cases cited by Petitioner above and in his prior pleadings based on trial counsel's failures, it is required here.

If the Court has any doubt that Petitioner has met his burden in proving his ineffective assistance claim, we respectfully request an evidentiary hearing be held on the issues.  28 U.S.C. §2255; *Massaro v. United States*, 538 U.S. 500, 504-506 (2003).

V.      JOHNSON HAS PROVEN THAT HE IS NOT, IN FACT, A "FUTURE DANGER"

One final point bears mention at this point in the proceedings.  The evidence of record before the Court clearly establishes that Darryl Johnson has proven over the past 13 years in the custody of the BOP that he is, in fact, *not* a danger to engage in future acts of violence.  As stated in the affidavit from BOP Case Manager B. English, previously submitted to the Court by the government, "I consider [Darryl] Johnson to be a well-adjusted inmate without any out of the ordinary management

33

concerns. … Overall, Johnson is a quiet and civil individual." (Ex. G, 8/25/08 Affidavit of BOP Case

Manager B. English).  While admittedly not dispositive of the issues addressed in this brief, in light

of his record of conduct over the past decade-plus, reference to the dissent to the denial of a stay by

Justice Marshall in *Evans v. Muncy*, 111 S.Ct. 309 (1990) is appropriate, at least with respect to

Johnson's claim under the Eighth Amendment:

> Evans was convicted of capital murder and sentenced to death. At the sentencing phase, the jury's verdict was predicated on a *single* aggravating circumstance: that if allowed to live Evans would pose a serious threat of future danger to society.  See Va. Code § 19.2-264.4(C) (1990).  Without this finding, Evans could not have been sentenced to death.  *See e.g., Furman v. Georgia,* 408 U.S. 238, 313, 92 S.Ct. 2726, 2764, 33 L.Ed.2d 346 (1972) (WHITE, J., concurring) (existence of aggravating circumstance "distinguishing the few cases in which [the death penalty] is imposed" from those in which it is not is a constitutional prerequisite to death sentence); *Gregg v. Georgia, supra,* 428 U.S., at 188-189, 96 S.Ct., at 2932 (same).

> *      *      *

> Evans filed a writ of habeas corpus and application for a stay of his execution before the United States District Court for the Eastern District of Virginia.  He urged that the jury's prediction of his future dangerousness be reexamined in light of his conduct during the Mecklenberg uprising.  Evans proffered that these events would prove that the jury's prediction was unsound and thereby invalidate the sole aggravating circumstance on which the jury based its death sentence.  For this reason, Evans argued that his death sentence must be vacated.  The District Court stayed the execution and ordered a hearing.  Civ. No. 90-00559-R (ED Va. Oct. 13, 1990). The Court of Appeals reversed and vacated the stay.  No. 90-4007 (CA 4, Oct. 16, 1990) (*per curiam*).

> Remarkably, the State of Virginia's opposition to Evans' application to stay the execution barely contests either Evans' depiction of the relevant events or Evans' conclusion that these events reveal the clear error of the jury's prediction of Evans' future dangerousness.  In other words, the State concedes that the sole basis for Evans' death sentence – future dangerousness – in fact *does not exist.* [Emphasis in original].

\*       \*       \*

In my view, the Court's decision to let Wilbert Evans be put to death is a compelling statement of the failure of this Court's capital jurisprudence. This Court's approach since *Gregg v. Georgia* has blithely assumed that strict procedures will satisfy the dictates of the Eighth Amendment's ban on cruel and unusual punishment. As Wilbert Evans' claim makes crystal clear, even the most exacting procedures are fallible. Just as the jury occasionally "gets it wrong" about whether a defendant charged with murder is innocent or guilty, so, too, can the jury "get it wrong" about whether a defendant convicted of murder is deserving of death, notwithstanding the exacting procedures imposed by the Eighth Amendment. The only difference between Wilbert Evans' case and that of many other capital defendants is that the defect in Evans' sentence has been made unmistakably clear for us even before his execution is to be carried out.

111 S.Ct. at 310-12.

## **CONCLUSION**

For all the reasons set forth above, as well as those contained in our prior pleadings with the Court, Petitioner Darryl Lamont Johnson respectfully requests that the Court grant Johnson's §2255 petition based on a finding of ineffective assistance of counsel (as well as on the other grounds raised in his Petition), vacate his sentence, order a new sentencing hearing, and grant whatever other relief it deems just and proper.

Respectfully submitted,

/s/ Terence H. Campbell
An attorney for Defendant Darryl Johnson

Terence H. Campbell
Cotsirilos, Tighe & Streicker, Ltd.
33 North Dearborn Street, Suite 600
Chicago, Illinois  60602
(312) 263-0345

Lorinda Meier Youngcourt
Post Office Box 206
Huron, IN 47437-0206
(812)849-9852

35

## <u>CERTIFICATE OF SERVICE</u>

Terence H. Campbell, an attorney, hereby certifies that in accordance with hereby certifies that

in accordance with Fed.R.Crim.P. 49, LR 5.5, and the General Order on Electronic Case Filing

(ECF), the following document:

1.      Petitioner's Supplemental Brief in Support of His Ineffective Assistance of Counsel
        Claim

was served pursuant to the District Court's ECF system as to ECF filers, including the United States

Attorney's Office.


                                        /s/  Terence H. Campbell
                                        Terence H. Campbell

# EXHIBIT A

Vanyur - direct by Crowl                                          2462

yesterday, could not appear today because of a scheduling conflict.

Would the new witness please stand to be sworn.

THE CLERK:  Raise your right hand.

(Witness duly sworn.)

THE CLERK:  Please be seated.

JOHN VANYUR, GOVERNMENT REBUTTAL WITNESS, SWORN

DIRECT EXAMINATION

BY MR. CROWL:

Q      Tell us your name, please.

A      My name is John Vanyur, V-a-n-y-u-r.

Q      How are you employed?

A      I am a warden of the low security correctional institution in Butler, North Carolina with the Federal Bureau of Prisons.

Q      How long have you been a warden at that prison in North Carolina?

A      Since May of 1996.

Q      Before May of 1996, tell the members of the jury what your job was.

A      I was the associate warden of operations at the United States penitentiary administrative maximum facility in Florence, Colorado also called the ADX Florence.

Q      How many years altogether have you worked for the

Vanyur - direct by Crowl                                    2463

Federal Bureau of Prisons?

A      18 years.

Q      Now, can you tell us, Warden Vanyur, what your responsibilities were in Florence, Colorado at the ADX, or the administrative maximum penitentiary?

A      While I was the associate warden of operations, I was responsible for the entire physical plant of the facility.  All the communications systems; physical security systems; the hiring training and evaluation of staff; all financial management matters; the delivery of services to inmates, such as health care delivery, food service delivery.  I was also the Chief spokesman for the institution.  I did more than thirty interviews on national television and newspapers.

Q      Who did you report to directly?

A      I reported directly to the warden of the facility.

Q      And how long were you the associate warden at the ADX?

A      From March of 1994 to May of 1996.

Q      When was the ADX opened?

A      In November of 1994.

Q      So were you part of the team that literally started the operations of the ADX?

A      Yes, I activated the facility.

Q      What is your educational background, Warden?

Vanyur - direct by Crowl                                    2464

A        I've a bachelor's degree in psychology and a

masters and doctorate degree in social psychology.

Q        So when you say "a doctorate," do you have a Ph.D.

in social psychology?

A        That's correct.

Q        What is the mission of the ADX, or the

administrative maximum facility?

A        The mission of ADX is to house inmates that require

a greater level of security and control because they

proved from their behavior that they cannot function in

an open prison environment, either through escape

attempts, assaulted behavior, or other disruptive

behavior.

Q        What is the capacity of the ADX facility in

Florence?

A        484.

Q        Are you currently at capacity?

A        No, they are not.  There are 408.

Q        Why don't you have all of your 484 beds filled at

ADX?

A        Well, we only put inmates in the ADX that require

that level of security and control.  We don't just fill

the beds to keep them filled.  In fact, Marion, United

States Penitentiary at Marion, which was the Super-Max,

if you will, before ADX, never operated at capacity

Blanca I. Lara - Official Court Reporter - (312) 435-5895

Case 1:02-cv-06998   Document 85-2   Filed 12/17/09   Page 5 of 48   PageID 751
Case: 11-1326   Document: 8-4   Filed: 03/04/2011   Pages: 369

because the Bureau of Prisons only puts select inmates into that facility, inmates that require that level of security and control.

Q    And is it important to the Bureau of Prisons to keep some beds open and available?

MR. URDANGEN:  Objection to the leading, your Honor.

THE COURT:  Overruled.

BY THE WITNESS:

A    Yes, it is.

BY MR. CROWL:

Q    And can you explain to the members of the jury why.

A    Sure.  Well, first of all, in a correctional environment, we need some flexibility that if we have inmates that are involved in violence or escapes once they're in the system, that we have the capacity to accommodate those inmates when those events occur.  Also, if we put inappropriate inmates or inmates that don't require that level of security and control into the ADX, it disrupts the mission and really detracts fro what the your of the facility is, in items of management correctional environment.

Q    Why is that?

A    Well, the ADX, what it does is, it takes the most disruptive violent inmates from all over the country and

Case 1:02-cv-06998 Document 85-2 Filed 12/17/09 Page 6 of 48 PageID 752
Case: 11-1326 Document: 8-4 Filed: 03/04/2011 Pages: 369
Vanyur - direct by Crowl                                         2466

congregates them in one facility. And what that does is, it reduces the amount of tension and violence in all the other prisons throughout the system, because we've taken the troublemakers, if you will, and consolidated them in one facility. And some of the studies have shown when Marion went to a Super-Max lock-down, that not only did the amount of violence drop inside Marion, but it dropped throughout the entire prison system.

So ADX serves as both a consolidation of the troublemakers and also as a deterrent to all the inmates, all 101,000 inmates we have in our system, that if they don't follow the rules, if they are disruptive, violent or escape-prone, they will be dealt with in a severe manner, and that is placement in ADX.

Q     So if there are 101,000 federal inmates in the system, what percentage of those inmates could possibly be housed at the ADX in Florence?

A     Less than one half of 1 percent.

Q     Can you tell the members of the jury the percentage of those inmates who come not directly from a conviction in court, but come from another institution.

A     Greater than 90 percent are from within the system.

Q     And the greater than 90 percent within the system, how have they arrived or what have they done to get themselves to ADX?

Case 1:02-cv-06998   Document 85-2   Filed 12/17/09   Page 7 of 48   PageID 753
Case: 11-1326   Document: 8-4   Filed: 03/04/2011   Pages: 369
Vanyur - direct by Crowl                                    2467

A     That vast majority has shown by their behavior, once they've entered the prison system, that they can't function in a normal prison environment and they've been involved in one of several areas: escape or attempted escape, serious assault of staff or inmates, murder of staff or inmates, or leaders of a disruptive or a riotous event; those are the primary reasons that an inmate is placed at ADX.

Q     And what determines that policy?

A     The Bureau of Prisons sets that out as the mission and goals of ADX.

Q     Now, were you in court yesterday when Dr. Cunningham told us that 3.1 percent of inmates at the ADX came directly from a court conviction to ADX?

A     Yes, I was.

Q     Tell the members of the jury what that 3.1 percent represent, what kind of inmates they are.

A     The small number of inmates that come directly into ADX from the street, if you will, are inmates that require such a high degree of security because of the complex nature of the crimes they've been involved in. And those are typically one of three types of individuals: very high-ranking organized crime figures, such as Nikadema Scarfo as the head of the Philadelphia mafia; international and domestic terrorists; and then

Vanyur - direct by Crowl                          2468

high-ranking drug cartel members.

Q    Were you also present when Dr. Cunningham indicated

that the United State's Attorney's Office somehow could

play a role in getting somebody to the ADX?

A    Yes, I was.

Q    Could you explain to the members of the jury how

that works.

A    Well, the United States Attorney's Office can make

a recommendation to the Bureau of Prisons as to where to

house a particular individual, but that final call, the

authority to place an individual in a specific facility,

rests solely with the Bureau of Prisons.

Q    The entire time that you were the associate warden

of the ADX, did you have any gang leaders who were

directly committed to the ADX?

A    No.  We housed a number of very high-ranking gang

members: the head of the Mexican mafia; the head of the

Mexicana Mi, a Texas-Mexican gang; or the head of the

Aryan Brotherhood.  But those individuals were not at ADX

solely because they were gang leaders, they were at ADX

because once they were in our system, they committed

either violent or escape-prone behavior and that's why

they were placed at ADX.

Q    Can you tell the members of the jury how many gang

members or suspected gang members or associates are

Vanyur - direct by Crowl                                        2469

currently a part of this 101,000 federal inmates in your system.

A      I believe we track more than 9,000 gang members in our Bureau of Prisons.

Q      Would it be possible for you simply to place gang members or gang leaders, as a matter of course, in the ADX without compromising the mission of the facility?

A      No, and obviously we don't have the capacity.  You are talking over 9,000 versus 484.

The Bureau of Prisons is a little different than a lot of state systems.  We don't lock inmates into a more secured facility just because they are a gang member.  We deal with the behaviors that they exhibit inside the system.  So you could be a gang member, but as long as you're not trying to be disruptive, as long as you're not violent, you can go on and stay in an open prison population.  It's when your behavior indicates that you are a problem or a troublemaker, that is when you move into a more secured environment.

Q      Why don't you simply lock up gang members in segregation or in the ADX simply because they are gang members?

A      Well, for a variety of reasons.  Our ultimate goal, and I think it's what the public would expect of us, is that we would like an inmate to eventually withdraw from

his gang, if you will, or decline to be a member of that gang in the future. And so we try to reinforce positive behavior in that individual in the hopes that he will renounce gang membership at sometime. We see that as a very positive goal. And if you continually lock up and don't offer programming and positive reinforcement to gang members, you are never going to get that declination in the long-term.

Q     Now, yesterday were you also present when Dr. Cunningham put a chart, which I think they have marked as Defendant's Exhibit 149, up on the overhead that was called custody options?

A     Yes, I was.

Q     I want to show you a photocopy I made of that particular chart. I'd like to ask you about the options that Dr. Cunningham said would be the defendant's options, Darryl Johnson's options upon conviction in Federal Bureau of Prisons.

First of all, are you familiar with the Bureau of Prisons designation system?

A     Yes, I am.

Q     Tell us what it is.

A     Well, the Bureau of Prisons has a security classification and designation system where we look at an inmate's behavior while in prison and also his previous

Vanyur - direct by Crowl                                    2471

offenses and we literally calculate a point score for that inmate, and then that point score tells us what level of security that inmate needs to be housed in.

Q    And you say what level of security, what are the different levels of security in the Federal Bureau of Prisons?

A    We have five levels of security.  The lowest is a minimum security prison camp; then a low security institution; medium; high, which is a penitentiary level such as Leavenworth or Atlanta; and then a maximum security prison, and the only one of those is ADX Florence.

Q    And that is the one with the 484 beds?

A    That's correct.

Q    Now, based on this point system, just because someone happens to be a street gang member, would that be a reason why they would automatically be in a high level facility such as a penitentiary?

A    Not necessarily.  We only have nine penitentiaries throughout the entire system and you got more than 9,000 gang members to track.  So they're spread out throughout the entire Bureau of Prisons.  In fact, in my low security correctional institution Butler, I have a number of gang members.

Q    How about the fact that you are convicted of

Vanyur - direct by Crowl                    2472

murder, would that assure, given that you are convicted

of murder, that you would placed and remain in a

penitentiary which is the high level facility in a Bureau

of Prisons?

A       No, it would not.  I look at the data of June of

this year, the Bureau of Prisons has 1,257 inmates that

have been convicted of murder, 158 of those are in ADX,

579 of those are in open population United States

penitentiaries, and 520 of them are spread out in

facilities other than high security facilities or

Super-Max.

Q       Can you tell the members of the jury, when you say

that 579 are in open population penitentiaries, what kind

of contact do those inmates have with other inmates and

with staff?

A       Well, in open population penitentiary, you have

constant contact, unrestrained with other staff and

inmates.  You have a job that you are assigned to,

whether it's in a factory or food service; you are out

working typically during the day; you have education

programs and access to the libraries and so forth; you

are out and about in large recreation areas; you have

movement unrestrained to and from the dining hall; there

is virtually unlimited access to telephones and a great

deal of open visiting contact.

Blanca I. Lara - Official Court Reporter - (312) 435-5895

Vanyur - direct by Crowl                                    2473

Q      You just mentioned that 520 of the murderers in the system aren't even in the penitentiaries, is that right?

A      That's correct.

Q      They are in the low to medium facility prisons?

A      That's correct.

Q      How many do you have at your low facility prison in Butler, North Carolina?

A      I have nine inmates with a history of murder.

Q      Explain to the members of the jury what kind of contact you would have with other inmates and with staff in the low to medium facility institutions.

A      It would be similar to the open population high security institutions even with greater contact with establish.  For example, in low security facility, I have cubicle housing for the inmates, open bay cubicles.  So they're not even locked down in the evenings, they are locked in the housing unit but they have access to about 150 other inmates virtually all night with one officer in each housing unit.  And they have constant movement during the day, in terms of moving to job assignments, moving to food service, moving to recreation.

Q      And that is for the 1200 or so of people convicted of murder in the system, is that right?

A      That's correct.

Q      Are you also familiar with the number of people in

Blanca I. Lara - Official Court Reporter - (312) 435-5895

Vanyur - **direct by Crowl**                    2474

the Federal Bureau of Prisons who have life sentences?

A      Yes, I am.

Q      How many of those are in the system?

A      We have 3,181 inmates that are serving life sentences.

Q      So is it possible to concentrate all those individuals in the ADX?

A      Obviously not, there's only 484 beds.  In fact, there is only 94 inmates serving life in ADX currently, the rest are in open population facilities.

Q      So getting back to the chart that Dr. Cunningham put together on custody options, the first thing that he listed on the custody options was the United States penitentiary, which is the highest level of security, is that right?

A      No, it would be -- the highest would be the ADX, this would be the second highest.  This would be Leavenworth, Atlanta, Terre Haute, open population penitentiary.

Q      Now, based upon what you know about the Bureau of Prisons' assignment system or scoring system and also the defendant's background, what is your understanding of where he would be assigned?

A      It's my opinion looking, at the things that he has been convicted of, his prior violence in terms of

Blanca I. Lara - Official Court Reporter - (312) 435-5895

Vanyur - direct by Crowl                                    2475

manslaughter conviction, his involvement in a drug

conspiracy, continuing criminal enterprise, that he would

probably fall into that first option, which is a United

States penitentiary general population.

Q      And by "general population" you mean what?

A      That he would have open and frequent contact

unrestrained with staff and inmates.

Q      Dr. Cunningham then listed that this penitentiary

assignment could be a separatee from other Gangster

Disciple inmates.  Could you tell the members of the jury

what a separatee is.

A      A separatee is when we try to house an inmate in a

facility where he has no contact with other inmates that

he may have a problem with.  The most common example is,

I may testify against you in a court and now we are both

being locked up in the Bureau of Prisons.  Well,

obviously, you and I can't be in the same facility or

we're going to have a problem.  So we'll make sure that

the two separatees are housed in totally different

correctional facilities.

Q      Is it a realistic option to have the defendant as a

separatee from other Gangster Disciples in a federal

penitentiary?

A      It would be virtually impossible.  We have over 500

Black Gangster Disciples in the federal system.  And I

Blanca I. Lara - Official Court Reporter - (312) 435-5895

Case 1:02-cv-06998 Document 85-2 Filed 12/17/09 Page 16 of 48 PageID 762
Case: 11-1326 Document: 8-4 Filed: 03/04/2011 Pages: 369
Vanyur - direct by Crowl 2476

have looked at recent studies and statistics that we have that show that every single penitentiary in the system has some Black Gangster Disciples already in it.

Q    Now, are there are two penitentiaries that do not have Gangster Disciples in them?

A    No, I looked at that.  Even the ones that we run as gang-free have some Black Gangster Disciples or former Black Gangster Disciples members in there.

Q    There is also a listing on here as U.S. Penitentiary Separatee And Graphically Remote.  What do you understand that to mean?

A    I am unsure.  Again, it's an option where he would have to be separated from other Gangster Disciples.  And with the high number of Black Gangster Disciples that we have in the system, that would be virtually impossible to do.

Q    Now, the prisons, in the Federal Bureau of Prisons, are there some that are geographically remote from the City of Chicago?

A    It depends on how you define "geographically remote."  We have institutions in California, basically all over the country, except for Alaska and Hawaii, so there would be some that would be removed from Chicago by 1500 or 2000 miles.

Q    And at those institutions, what visitation phone

Blanca I. Lara - Official Court Reporter - (312) 435-5895

2477

privileges do inmates have?

A     In an open population penitentiary, let's say Lompoc, California which would be about as far removed from Chicago as you could get, the inmate would have a great deal of open contact visiting with his family, probably in excess of twelve visits a month.  He would have as many phone calls as he could pay for or get someone to accept them as collect charges, so he would have virtually unlimited phone access if he had the time to make the phone calls.  And he would have unlimited correspondence privileges.

Q     Why not just cut off those privileges, that contact with the outside world with regard to convicted gang leaders?

A     Well, one philosophy in the Bureau of Prisons is we try to keep the inmate in touch with his family for a variety of reasons.  It provides a support system for the inmate in order to help them do their time and allows the inmate to try and keep community contact and some normalization, if you will, to the best extent possible, of family and outside life.

Q     Have there been instances when you have tried to limit the contact, for instance at the ADX, limit the contact that an inmate, who is a gang leader, would directly have with other visitors and on the telephone?

Blanca I. Lara - Official Court Reporter - (312) 435-5895

2478

A     The only time we would limit his telephone access or his visiting privileges is if the inmate actually tried to violate the rules in the process of a visit or in the process of a phone call.  In other words, if we picked up, through phone monitoring, that he was trying the make a drug deal over the phone, we would give that inmate an incident report and begin to restrict his telephone privileges.

Q     And what difficulties, if any, do you have with gang leaders in the Bureau of Prisons in terms of trying to monitor their telephone or their in-person visits?

A     Well, one of the problems we have with gang leaders and other sophisticated inmates in the prison system is, even though we monitor, to a large degree, their mail and their telephones, they are ingenious about developing code systems and crypt systems to try to beat us in terms of our monitoring.  And some of them are just old army-type incription systems.  We picked up at ADX one time where they were trying to learn an ancient alphabet so the inmates would send their correspondence out so that we would not be able to translate or interpret. They will use a variety of ways and code words to still communicate their messages outside the facility.

Q     Is there something known as drop-calling that you are familiar with?

2479

A       Yes, a lot of the inmates when they are trying to communicate to a inmate in a different facility, they will actually communicate to someone on the street, and that someone on the street will be the drop and they'll communicate to the other inmate in the other facility. So they'll get their message to different prisons throughout the country by using a go-between out in the community.

Q       And has that happened at the ADX even though you are monitoring the telephone calls that they place?

A       Yes, it has.

Q       Can you give us an example of that.

A       Well, unfortunately we had an incident this year where intelligence has shown us that the head of the Aryan Brotherhood from inside the ADX Florence ordered the murder of two African-American inmates in Louisberg, Pennsylvania, and those inmates were brutally murdered by two Aryan Brotherhood members.

Q       Now, how does the leader of the Aryan Brotherhood from inside the ADX be able to give such orders?

A       He communicated to an individual in California through code words.  It appeared from the intelligence that he was going to have a baby, is what he was saying. If it was a girl there was not going to be a murder, if it was a boy, then the murders were to occur.  And

2480

through the letters and monitoring, we found out that he declared that he had a prince, and shortly thereafter these two inmates were murdered.

Q     And who did he communicate that to ultimately?

A     He communicated to an inmate by the name of Benton in Louisberg and also an inmate by the name of John Campbell in Louisberg.

Q     Now, Louisberg is what level facility?

A     It is a high security penitentiary.

Q     And when Benton --

      And what was the other individual?

A     Campbell.

Q     When Benton and Campbell, when they received the message, not directly from him but on the street, what happened?

A     They stabbed two inmates to death.

Q     Inside the --

A     Inside the federal prison in Louisberg.

Q     Were you familiar with either of those two inmates in Louisberg at the time that the other Aryan Brotherhood leader was in Colorado?

A     I personally know John Campbell.

Q     And where had John Campbell been in the Federal Bureau of Prisons?

A     He had been in ADX.

Blanca I. Lara - Official Court Reporter - (312) 435-5895

2481

Q      Why wasn't he still in ADX?

A      He worked his way through the program.

ADX is not meant to house inmates on a permanent basis.  It's a program where we put you in there and we expect you to, through good behavior, modify your disruptive behavior, modify your violence, and over several years you will work your way out and back into an open prison population.

Q      In fact, what is the average time span that an inmate stays at ADX Florence, Colorado?

A      Just over 3 years.

Q      Now, another thing on Dr. Cunningham's custody options chart was United States Penitentiary Marion High Security Separatee.  Can you tell us what that is and whether or not that is a viable option for the defendant.

A      Well, Marion has changed its mission and is closer to an open population penitentiary now, sort of in between -- I think Dr. Cunningham accurately portrayed this -- in between the ADX and a typical penitentiary. The problem will be at United States penitentiary at Marion, there are already 7 Black Gangster Disciples being housed in Marion.

Q      So would it be possible to have a separatee status for any Gangster Disciple at Marion?

A      It would be extremely difficult, at best.

Blanca I. Lara - Official Court Reporter - (312) 435-5895

Vanyur - direct by Crowl                                    2482

Q      He then lists a penitentiary in administrative segregation.  Can you tell us what that is.

A      Well, administrative segregation is a misnomer. Every prison has what is called a special housing unit, including my prison.  It's a jail within a prison.  And inmates can be in that jail within a prison for two reasons: they are either in disciplinary segregation, and that means they committed an infraction inside the prison, they've gone through a discipline hearing officer and they've received so many days of segregation.  If you want to use the Hollywood term "the hole," they go into the hole for thirty days, whatever it may be.  So they are at disciplinary status for a temporary period.

The other status, which would be I think probably where Dr. Cunningham is coming from, is what is called administrative detention.  And we place inmates temporarily into this jail within a prison, whether they are pending an investigation of a charge, whether they are pending a transfer or we think they need to be reclassified to a higher level, we'll lock them up in this temporary holding facility inside the prison until we sort out the investigation of a transfer.

But in either case, administrative detention or administrative segregation, those are both temporary holding patterns, those are not permanent statuses for

Vanyur - direct by Crowl                                    2483

inmates.

Q    Why not a permanent status?  Why isn't it an option for you simply to place the defendant in administrative detention or segregation for the rest of his life?

A    Because the litigation would more than likely show that it would be considered cruel and unusual punishment.

When you are in this special housing unit, you don't have the same access as the rest of the inmate population to programs, educational opportunities, and so forth.  There is definitely a degree of deprivation inside there.  And so it is not permissible, by the Bureau of Prisons policy, to keep an inmate in that status indefinitely.

Q    The last three options on Dr. Cunningham's custody options table are all the ADX in Florence, Colorado, is that correct?

A    That's correct.

Q    And you've already indicated that the defendant does not fit the profile for a person to be assigned to the ADX, is that correct?

A    That's correct.

Q    Can you tell us a little bit, though, about the ADX so that the jury can understand the different levels that an inmate will cycle through in the approximately 3 years that he stays there.

Blanca I. Lara - Official Court Reporter - (312) 435-5895

Case 1:02-cv-06998 Document 85-2 Filed 12/17/09 Page 24 of 48 PageID 770
Case: 11-1326 Document: 8-4 Filed: 03/04/2011 Pages: 369

A     Okay.  Well, there is sort of two tracks inside the ADX.  The most secured track is the control unit, that was discussed a little bit yesterday.  That is a 68-bed unit.  That's the most secured unit in the entire federal system.  An inmate can be placed in a control unit primarily because of what he did since he's been in the prison system.  And, in fact, the code of federal regulations is quite clear that an inmate cannot be placed in a control unit simply because of the offenses they committed out in the community.

Q     So if there is any suggestion that the defendant could be placed in this control unit, where I believe -- were you here when Dr. Cunningham said that he found it inconceivable that any organized gang activity could take place from that control unit, did you hear him make that comment?

A     Yes.

Q     Is it, under the law, even a possibility to place Darryl Johnson directly into that 68-bed control unit?

          MR. URDANGEN:  Your Honor, I object this witness interpreting the law.

          THE COURT:  Overruled.

BY THE WITNESS:

A     It is not.  28 CFR Section 541 is very clear that inmates cannot be placed in a control unit solely on the

Vanyur - direct by Crowl                                    2485

basis of the offenses they committed in the community.

Q     Can you go ahead and continue to explain the levels
in the ADX.

A     Let me just make one other comment about the
control unit because one of the options is permanent
control unit status.  Inmates are never placed in a
control unit on a permanent status.  They are given a
determinate sentence based on what they committed inside
the system.  4 years or 6 years is usually the longest
sentence given as a determinate sentence.  And then once
the inmate completes his determinate sentence he is taken
out of the control unit.

Q     And even if you are in the control unit, do you
have any access to staff or to telephone calls or visits?

A     Yes, you have one fifteen-minute phone call per
month.  Of course, that phone call is monitored and
tape-recorded.  You have up to five visits per month.
The visits are non-contact.  And you have virtually
unlimited correspondence with the outside world.

Q     And to what extent in the control unit or any other
lock-down units in Florence do inmates have contact with
staff?

A     Inmates have contact with staff on a frequent and
daily basis.  They're constantly coming in contact with
staff.  And I think you got a good depiction, the jury

Blanca I. Lara - Official Court Reporter - (312) 435-5895

Vanyur - direct by Crowl                                   2486

got a good depiction yesterday of what these cells look like.

If you notice in the cell, there is a solid outer door, then a small vestibule, and then an inner grill or open bar door, I don't know if you recall what that looked like. Any of the staff that have contact with the inmate, whether it's delivering the inmate's food, delivering the inmate's laundry, delivering any services, psychological health services, even services when I was the associate warden I would have to go down and speak with inmates, the staff have to step into that vestibule and see the inmate through that open bar grill. And that open grill provides the opportunity for the inmate to potentially assault staff.

Q    Have you ever had incidents where inmates even at the ADX in Florence, Colorado in his cell has nonetheless tried to assault staff?

A    Oh, yes. We have frequent assaults.

Q    And can you give us examples of how that could happen when someone is in their cell?

A    Well, a very common one is for the inmate to save up their fecal matter and their urine, and when the officer walks into the vestibule, it would be thrown in the officer's face.

We had a serious assault earlier this year,

Blanca I. Lara - Official Court Reporter - (312) 435-5895

Vanyur - direct by Crowl                                    2487

potentially serious assault where an inmate took a steel bar out of the typewriter. We are required by law to give access to law libraries to inmates. He took the steel bar out of the typewriter, sharpened it, made a handle out of several magazines, and when the officer stepped into the vestibule to give him his food tray, he tried to stab the officer in the neck with that piece of steel. Fortunately he did not succeed.

Q     There was also discussion yesterday by Dr. Cunningham about how each inmate is in a separate cell which limits communication between inmates. Nonetheless, in your experience as the associate warden, do inmates still communicate with each other even though they are in separate cells?

A     Yes, they do.

Q     How do they do that?

A     Oh, they yell through the vents, they fish notes through the toilets, through the plumbing systems. We have a lot of inmates that started learning sign language, because many of the cells look onto recreation yards through a window. And so when another inmate was out on the recreation yard, the inmate inside the cell was communicating to them through sign language. So they will find ingenious ways to communicate with each other.

Q     Apart from this 68-bed control unit, what are your

Blanca I. Lara - Official Court Reporter - (312) 435-5895

Vanyur - direct by Crowl                                    2488

other levels at ADX?

A       The next level most common is the general
population.  And there are four units that operate as the
general population.

Q       And in the general population, do they have
increased contact with staff or other inmates?

A       They have increased contact with inmates.  When
they leave their cells in the general population, they
are still cuffed from behind and escorted by two staff.
But in the general population, they recreate -- and
Dr. Cunningham I think mentioned this -- in groups of 8
to 12 in a small rec yard.

Q       And has this recreation in groups of 8 to 12 in the
rec yard, does that limitation prevent assault among
inmates?

A       Unfortunately it does not.

Q       In fact, have you observed one of those assaults?

A       Unfortunately I saw a very serious assault in one
of those rec yards.

Q       Can you tell us what happened.

A       I happened to be in the unit at the time the
inmates were out on the rec yard and witnessed three
inmates push a fourth inmate to the ground and then they
commenced to stomp him on his head with their sneakers,
and in fact continued to stomp him on his head so much

Case 1:02-cv-06998  Document 85-2  Filed 12/17/09  Page 29 of 48  PageID 775
Case: 11-1326  Document: 8-4  Filed: 03/04/2011  Pages: 369
Vanyur - direct by Crowl  2489

that their sneakers were basically covered with blood by the time the assault was over.

Q    Why didn't you use your weapon to stop that assault?

A    We have no weapons inside any federal facility.

Q    What did you do while this is happening?

A    Unfortunately, we can't enter a recreation yard until we have at least 3 staff members for every inmate in that yard.  Because if we go rushing out to a rec yard outnumbered or even equally numbered, there is a great likelihood that the inmates would assault the staff or would try to take staff hostages.  So we could not go into that rec yard until enough staff responded, that we had a 3 to 1 ratio, before we could open that door and go in and save that inmate.

Q    So you have to have 24 staff members before you could even go in the yard?

A    That's correct.

Q    What are the lower levels of security beyond the general population.

A    The general population is really the beginning of the ADX program.  An inmate has to spend a minimum of one year there.  Then he moves down to an intermediate unit where he has to spend a minimum of 8 months.  At that level, he would have a lot of contact with inmates in

Vanyur - direct by Crowl                                          2490

terms of eating and recreating, still limited contact

with staff without being restrained.  Then in the next

phase, the transitional phase, which is a four month

minimum, he would have unrestrained contact with staff on

a daily basis.  And then in the final phase, which is the

last year of the program, the pre-transfer phase, it

would be very similar to an open population penitentiary.

The inmate would go to a work detail in a factory, would

eat in a dining hall and would have frequent and constant

contact with staff unrestrained.

Q      Even though the ADX is the highest level facility

for these 400 some inmates, are you familiar with the

fact that there is still an assault rate even at the ADX?

A      Yes.

Q      And can you tell us how the assault rate, without

weapons, compares to the assault rate in a penitentiary,

the high level security?

A      The assault rates have consistently, over the last

couple of years at ADX, been about double that in terms

of assaults on staff without weapons than those that

exist in high security penitentiaries.

Q      Have you even had, apart from the typewriter that

was used as a kind of knife, have you had other instances

where there have been weapons in the ADX?

A      Yes, they tried to fashion weapons with pieces of

Blanca I. Lara - Official Court Reporter - (312) 435-5895

Vanyur - direct by Crowl                    2491

staplers that are in the law library.  We had an inmate

that introduced a wooden shank or knife, we never figured

out where he got that piece of wood.  The problem with a

wooden knife is that it is not picked up on a metal

detector, so the inmate was able to get out on a

recreation yard and pull that shank.

Q     What happened when he pulled that shank in the rec

yard?

A     Well, unfortunately for him, the individual he

assaulted took the shank away from him and then used it

to assault him back and stab him several times.

Q     And, Doctor, finally, there was a chart that was

placed up by Dr. Cunningham yesterday, which was defense

Exhibit 150, and in that he talked about how you

can manage prison groups like gangs.  Do you recall him

putting that up on the overhead?

A     Yes.

Q     And in that exhibit, he listed several methods that

might help manage prison gangs.  I'd like to ask you

about those methods and find out from you whether or not

those methods are in use and whether or not you found

them effective to stop gang leadership within the Bureau

of Prisons.  The first one was strip-search.

A     Well, we strip-search every inmate that comes into

a facility and goes out of a facility, even a low

Blanca I. Lara - Official Court Reporter - (312) 435-5895

Vanyur - direct by Crowl                                    2492

security facility.  And, yes, strip-searches is a sound method.  I'm sure the marshals use it here on prisoners that they bring in and out.  But inmates can introduce items even when they are strip searched.  We had an inmate that came into ADX that had a cuff key, and he had it in his stomach.  What he had been doing is defecating the cuff key and then swallowing it again over several weeks until he entered the ADX.  And the only reason we caught it is because we x-rayed him coming into the control unit and saw it in his digestive system.  So inmates will swallow things, they will introduce them into their nasal cavities.  They will, even with strip-searching, beat you.

Q    How about shaking down the cells, that was the second thing he mentioned.  What is that?

A    Again, that is not a procedure that is to be used specifically for gang members.  That is a shakedown of a cell, a very thorough search of the cell.  You go through everything that is in that cell, look up in every crevice and corner.  And we do that as a matter of routine in every prison facility.

Q    How about no contact visits, that was one thing that he had in his chart.

A    I think no contact visits are very effective.  The only place we have no contact visits is at ADX Florence,

Vanyur - direct by Crowl                                2493

and they may still have some no contact visits at Marion.

Q    And did that solve your gang problems at the ADX by having no contact visits?

A    No, it did not.  They just don't use visiting at the ADX to pass messages and so forth, they come up with other systems that can beat the system.

Q    He also listed monitoring inmate's accounts.  What is that?

A    Inmates have a bank account or a commissary account where someone in your family could send money that could be added to their account and they can purchase hygiene items and so forth through a commissary, similar to a PX, if you will; they could purchase phone call credits, and things like that.  So we monitor their accounts to see if you have huge influxes of money or if spending has gone up.  It indicates to the correctional manager some potential trends.  But again, that is a tool that would be used for every inmate, not just gang members.

Q    Of all the things that you listed, have you found that any of those have been able to stop the gang activity in the Federal Bureau of Prisons?

A    Unfortunately it has not, because we still have a large degree of gang activity.  It helps, but it is not 100 percent full proof, by any means.

MR. CROWL:  Can I have a moment, your Honor?

Blanca I. Lara - Official Court Reporter - (312) 435-5895

Vanyur - cross by Urdangen                    2494

THE COURT:  Yes.

(Brief pause.)

MR. CROWL:  No further questions, Judge.

THE COURT:  Cross-examination.

CROSS EXAMINATION

BY MR. URDANGEN:

Q    Good morning, Mr. Vanyur.

A    Good morning.

Q    As a high official in the Bureau of Prisons, I assume you got a great deal of confidence in the way that your Bureau decides on the classification of prisoners.

A    Yes, I do.

Q    I mean, that involves, I'm sure, statistical analysis, extensive history, comparative numbers, consultation with prosecutors and the like, right?

A    Primarily it is a manual-driven system, as I have discussed, where there is a number of factors that are scored on an inmate, looking at their PSI, their presentence investigation, and other things.

Q    So when evaluating a prisoner or an inmate who has just been convicted and placement is being determined, you carefully consider all of those factors right, in the manual?

A    Yes, sir.

Q    And you brought up Darryl Johnson.  You have

Blanca I. Lara - Official Court Reporter - (312) 435-5895

Vanyur - cross by Urdangen                                   2495

reviewed his background, right?

A     I'm aware of the convictions that he has as far as his prior history.

Q     All right.  And you have discussed with prosecutors some of the history in the indictment?

A     Yes, sir.

Q     And you are familiar with his record at the MCC?

A     Yes, I am.

Q     And any other state penitentiary he's been in, right?

A     I'm not familiar with his disciplinary record in the state penitentiary.

Q     You're not.

       There was a great deal of discussion, much of the cross-examination was about assaultive behavior, right?

A     Correct.

Q     And you gave us a bunch of examples of how people have been assaulted, right?

A     Yes, sir.

Q     Now, Darryl Johnson, as you know, has no history of assaultive behavior while incarcerated, isn't that correct?

A     Not to my knowledge.

Q     I'm correct, right?

Blanca I. Lara - Official Court Reporter - (312) 435-5895

Vanyur - cross by Urdangen                              2496

A      I'm not familiar with his disciplinary record in the state penitentiary, as you mentioned, so I would not know if he had anything while there.

Q      But didn't you give us an assessment of where you think he would go, didn't you tell that to the jury?

A      Yes, because I'm aware of the inmates that we house at ADX.

Q      But to really make that assessment, you want to know as much information as possible, right?

A      Yes, I would prefer to look at his PSI.

Q      I mean, you are not satisfied that the amount of research you have done in this case gives you confidence in a prediction of where he is going to go as you sit there, are you?

A      I'm not 100 percent confident, no.

Q      I'm not saying 100 percent.  You need a great deal more information and study, don't you?

A      Yes, but I'm aware of the typical inmates that have been housed over the years at ADX.  He does not fit that model.

Q      And the reason he wouldn't fit that model is because, based on the extensive research and your manual, all the consultations that you do, he would not pose the kind of threat that an inmate who goes to ADX would pose, isn't that right?

Blanca I. Lara - Official Court Reporter - (312) 435-5895

Vanyur - cross by Urdangen                    2497

A       He would not fit the mission of the facility.

Q       And the mission is to control dangerous inmates, right?

A       The mission is to control inmates who have not functioned inside other open population penitentiaries.

Q       So you're saying, then, that an assessment of an inmate after conviction who is thought to be dangerous, notwithstanding that assessment, you would send him to general population, is that what you are saying?

A       I'm saying that our penitentiaries, open population penitentiaries, are full of extremely dangerous individuals.

Q       And if there is ever an incident in a federal maximum security penitentiary that increases the likelihood of danger, where does that individual go?

A       If he commits some act inside an open population penitentiary?

Q       Right.

A       He would more than likely go to ADX or possibly Marion.

Q       By the way, are you aware that from the moment Darryl Johnson was arrested in this case, in July of 1995, he was placed in administrative segregation at the MCC?

A       Yeah, administrative detention.

Blanca I. Lara - Official Court Reporter - (312) 435-5895

Vanyur - cross by Urdangen                          2498

Q     Detention.  The most restrictive and severe type of detention offered at the MCC, right?

A     That's correct.

Q     And you're also aware that he's been there consistently for the last two years and five months, correct?

A     Yes.

Q     And you're aware that there has been no assaultive behavior, right?

A     That's correct.

Q     With his background and what you know and your assessment of when he is placed, you would consider this an inmate likely not to engage in assaultive behavior, isn't that fair?

A     No, I wouldn't say that is fair.

Q     All right.  So what -- if that is not fair, then why would he go to a general population?

A     Because he hasn't done anything in the system yet. We believe he is going to assault an inmate or we believe that he is a dangerous inmate or we wouldn't even put him in a high security penitentiary, we would put him in a medium security or lower.  The fact that he goes to a high security penitentiary implies that you are a dangerous inmate.

Q     Right.  And that's where you would go if you were

Blanca I. Lara - Official Court Reporter - (312) 435-5895

Vanyur - cross by Urdangen                              2499

considered to be a dangerous inmate, right?

A      Correct, an open population penitentiary.

Q      Sorry?

A      An open population penitentiary.

Q      Now, did you say that 9 percent of prisoners who go
to ADX are direct referrals?

A      That was the number I am familiar with.
Dr. Cunningham presented a figure of 4 percent.

Q      So actually your percentage is much higher than
his, isn't it?

A      Yes.

Q      And it would suggest that there is a greater
likelihood that somebody after conviction would go
straight to Florence, isn't' that right?

A      If they fit those three categories that we
discussed.

Q      Right.

A      Yes.

Q      And there is a greater likelihood, is what you are
saying by your figures than Dr. Cunningham, that an
inmate would go directly to Florence?

A      Yes.

Q      So you would only go to ADX or a high security
system setting, once you're in the system, if your Bureau
determined that there was a need for the inmate to go

Blanca I. Lara - Official Court Reporter - (312) 435-5895

Vanyur - cross by Urdangen                                    2500

there, right?

A       That's correct.

Q       If it was determined that the inmate's activities did not suggest a danger to anybody on the inside or the outside, then that inmate would not go to a high security setting, isn't that right?

A       You're confusing terms, sir.  You've got a maximum security setting and a high security setting; two distinct settings.

Q       Well, let's talk about maximum, then.

        If it was determined that an inmate posed a danger, he would go to a maximum security setting, correct?

A       Not necessarily.  As I say, high security penitentiaries -- and if you've ever been to Leavenworth or Atlanta you can see what they look like, there's 40 foot walls around them -- are full of murderers, drug conspirators, high-ranking gang members; very dangerous people.

Q       Isn't it true that 61 percent of the inmates at Florence are serving 21 years to life?

A       Yes, I believe that's correct.

Q       All phone calls are monitored in high security penitentiaries, aren't they?

A       No, all phone calls are taped, only a percentage of

Blanca I. Lara - Official Court Reporter - (312) 435-5895

Vanyur - cross by Urdangen                                    2501

them are monitored.

Q    I see.  But if it becomes necessary, they are monitored, isn't that right?

A    That's correct, each institution maintains a list of high profile inmates that they monitor and would record all phone calls.

Q    Right.  And that is based on a careful assessment of their background, right?

A    Yes.

Q    Now, you talked about, you said, gang leaders and other sophisticated inmates.  Now, I think Mr. Crowl said something like "have you ever been beaten," do you remember him saying that, in a sense that they got away with something?

A    Yes.

Q    Now, you told us about one incident at Florence where someone got away with something, right?

A    Uh-huh.  Right.

Q    This murder on the outside, correct?

A    Murder in another prison.

Q    Now, how long has Florence been open?

A    Since November of 1994.

Q    So it's been open for 3 years?

A    Yes.

Q    And what's been the typical population of Florence

Blanca I. Lara - Official Court Reporter - (312) 435-5895

Vanyur - cross by Urdangen                    2502

during those 3 years, if you can give us that estimate?

A        Between 3- and 400.

Q        So for 3- to 400 inmates, 365 days a year, for 3 years, can you tell us where there's been any other incident other than the one incident you told us about where someone was murdered as a result of communication through Florence?

A        Yes, we had a number of incidents.  Every week at Florence we have what is called an intelligence briefing where the executives in the institution, along with the investigative staff, go over phone calls, go over correspondence, and we're constantly trying to piece together the intelligence to figure out what is going on in the gang activity, what is going on in the community.

Q        Maybe I didn't make my question clear enough.  Tell us how many murders, other than the one you've told about since Florence has been open, are directly attributable from communication of an inmate from Florence?

A        None that I'm aware of, though I would argue that one is quite sufficient.

Q        Yes, it's a bad situation, wasn't it.

A        Yes.

Q        If there are disruptive prisoners, they can be spread out to other institutions with high security administrative segregation, isn't that correct?

Blanca I. Lara - Official Court Reporter - (312) 435-5895

Vanyur - cross by Urdangen                    2503

A    They could be spread out to other high security prisons?

Q    Yes.

A    Yes, we can disperse inmates.

Q    Aren't there eight separate administrative detention facilities spread out throughout the federal system?

A    No.

Q    How many are there?

A    There is an administrative detention facility in every single prison.

Q    All right.

A    You are talking about high security penitentiaries, I assume, and there are nine.

Q    All right.  There are nine security penitentiaries?

A    Correct.

Q    And each in those penitentiaries, what is the typical population of them?  Can you just give us a rough range of the population of each of the high security.

A    Some of the older ones are much larger. Leavenworth is probably close to 2,000 inmates; Atlanta is very large, 1800; and then they go down to the smaller ones that may be 1500.

Q    And so many of those have separate wings on them, correct?

Blanca I. Lara - Official Court Reporter - (312) 435-5895

Vanyur - cross by Urdangen                                    2504

A     That's correct.

Q     So there is ample opportunity to separate so-called dangerous prisoners at various high security penitentiaries, isn't that right?

A     No, because the wings may recreate together or have other contact with each other.  Just because they are housed in a different wing, when there is open recreation moves or open recreation yard, those inmates within those units would commingle.

Q     Right.  But then, again, actually, that type of consideration is only important if you are talking about an inmate who's considered assaultive, right?

A     What type of consideration?

Q     It's only -- when I talk about danger, we are talking about assaulting another inmate, right?

A     No, when I talk about danger, I'm talking about inciting a riot, assaulting an inmate or staff, attempting to escape; there's a lot of dangerous --

Q     How many attempts to escape does Darryl Johnson have in his penal history?

A     None that I'm aware of.

Q     How many examples of assault does Darryl Johnson have in his entire penal history?

A     I believe he was convicted of manslaughter.

Q     Sir, I'm talking about while incarcerated.  And so

Blanca I. Lara - Official Court Reporter - (312) 435-5895

Vanyur - cross by Urdangen                                    2505

are you, isn't that right?

Incidents of assault in his penal history while incarcerated.

A      I'm not aware he has any.

Q      And how many incidents in his penal history does he have of inciting a riot?

A      None that I'm aware of.  That's probably why he would go to an open population penitentiary.

Q      Because he is not considered a risk to do these things, right?

A      At this point.

Q      And you have a great deal of confidence in your risk assessment procedures, don't you?

A      We don't call them that.

Q      Well, do you have confidence in your decision-making process?

A      Yes.

Q      At ADX all correspondence, except for legal mail, is opened and read, isn't that right?

A      That's correct.

Q      And I assume that when there are any kind of incidents that you've told us about, that you learn from those incidents, don't you?

A      I would hope so.

Q      You meet together and you have these procedures in

Blanca I. Lara - Official Court Reporter - (312) 435-5895

Vanyur - cross by Urdangen                                    2506

place to rectify those types of problems, right?

A     That's correct.  But for every solution that we

find, the inmates seem to find another method to use.

Q     It's true, is it not, that it is entirely up to the

Bureau of Prisons' internal decision-making as to where a

prisoner will be assigned?

A     With the exception of control unit placement, yes.

Q     And you do accept input from United State's

Attorney's Office and the Justice Department, right?

A     Recommendations yes.

Q     And you do factor that in, correct?

A     Yes.

Q     You don't factor in recommendations from, say, for

example, the inmate's lawyer, do you?

A     I would think not.

        MR. URDANGEN:  If I may have a moment, please,

Judge?

        THE COURT:  Yes.

        MR. URDANGEN:  Thank you.

    (Brief pause.)

BY MR. URDANGEN:

Q     Now, the Gangster Disciple membership in the

federal prisons -- let me back pick up for a minute.

        There is only about 7 or 8 percent of the

federal prison population are categorized by your Bureau

Vanyur - cross by Urdangen                              2507

as gangs, right?

A      A little over 9,000, that's my understanding.

Q      Is that about 7 or 8 percent?

A      Under -- yes, under 1001 inmates.

Q      And when you compile that number, you consider not only members that you can identify, but suspected members, right?

A      That's not included in that number.  You have associates and suspects also.  And I think that a later witness will be able to provide much greater detail in that area.

Q      Okay.  Then we'll save that for him.  Thank you.

It's a policy of the Bureau of Prisons to remove gang leaders from general population as a strategy to weaken the gang structure, isn't that right?

A      When they have been involved in behavior that indicates.

Q      Right.  And this would send a message to the gangs that proliferation of their activity will not be tolerated, correct?

A      That's correct.

Q      And you implement that policy, do you not?

A      Yes; if we find a gang member that is involved in disruptive activity, we will take appropriate action.

Q      You're aware that about 30 to 40 percent of the

Vanyur - cross by Urdangen                                    2508

Illinois population is gangs, Illinois state system, aren't you?

A        I'm not familiar with the Illinois state system at all.

Q        You haven't looked at documents from the Justice Department which discuss that?

A        No, I have not.

Q        Okay.  You're not telling us -- let me strike that, please.

          This is true, isn't it, that prison gangs and gang members do not have a higher rate of disciplinary incidents and violence than unaffiliated inmates, isn't that true?

A        No, I don't believe it is true.

Q        You don't believe that is true?

A        I believe that -- and I believe that there will be a later witness that will show you the degree -- that gangs are involved in activities.

Q        All right.  Then we will wait for him.

          So you are not familiar with the figures as the later witness who has more handle on the statistics?

A        I'm not an intelligence expert.  I'm just a prison warden.

Q        All right.

          MR. URDANGEN:  That's all I have, Judge.

Blanca I. Lara - Official Court Reporter - (312) 435-5895

# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA,                )
                                         )
            Plaintiff-Respondent         )
                                         )        No. 02 C 6998
            v.                           )
                                         )        The Honorable William J. Hibbler
                                         )
DARRYL LAMONT JOHNSON,                   )
                                         )
            Defendant-Movant.            )
                                         )

## MEMORANDUM OPINION AND ORDER

A jury convicted Darryl Lamont Johnson for ordering the murder of a person assisting in a federal criminal investigation and ordering the murder of that person and another in furtherance of a continuing criminal enterprise, among 41 other counts. The jury later concluded that death was the appropriate sentence. The Seventh Circuit denied Johnson's appeal and the Supreme Court denied his petition for a writ of *certiorari*. *United States v. Johnson*, 223 F.3d 665 (7th Cir. 2000); *Johnson v. United States*, 534 U.S. 829, 122 S.Ct. 71, 151 L.Ed.2d 37 (2001).

Johnson then sought to set aside his sentence pursuant to 28 U.S.C. § 2255, raising among other claims an ineffective assistance of counsel claim and a claim that the government withheld exculpatory evidence in violation of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The Court denied Johnson's § 2255 motion, holding that he procedurally defaulted both his ineffective assistance of counsel claim and his *Brady* violation claim because he failed to raise those claims in his direct appeal.

1

A few years after the initial ruling on Johnson's § 2255 motion, the Supreme Court announced its decision in *Massaro v. United States*. 538 U.S. 500, 509, 123 S.Ct. 1690, 155 L.Ed.2d 714 (2003). In *Massaro*, the Supreme Court held that a petitioner may bring an ineffective assistance of counsel in a collateral proceeding whether or not the petitioner could have raised the claim on direct appeal. *Id.* Consequentially, the Court vacated the portion of its ruling concerning Johnson's ineffective assistance of counsel claim. The Court, however, did not reopen Johnson's *Brady* claim. Though Johnson's *Brady* claim is intertwined with his ineffective assistance of counsel claim, he has not formally moved the Court to reconsider the decision regarding the *Brady* claim and that claim is not currently pending.[1]

Johnson's ineffective assistance claim centers on trial counsel's efforts to convince the jury to impose a sentence of life imprisonment rather than one of death. At Johnson's sentencing, counsel presented evidence about the custodial options for housing him. In particular, Johnson presented evidence to suggest that if he were placed permanently in the control unit in ADX-Florence, where inmates are confined to their cells 23 hours per day and not allowed contact with other inmates, he would have no opportunity to carry out a continuing criminal enterprise and his dangerousness to society would be mitigated.

In rebuttal, the government called an expert, a former Bureau of Prisons (BOP) warden, who testified generally about what BOP placement was likely in Johnson's case. The expert testified that typically gang leaders like Johnson do not get directly assigned to ADX-Florence but instead go to the general prison population. The expert also testified that even prisoners in strictly controlled

---

[1] Another judge in this district initially ruled on Johnson's § 2255 motion and the motion to reconsider pursuant to *Massaro*. The executive committee has since reassigned the case.

environments had managed to commit crimes, including ordering the killing of other inmates. The expert also testified that the BOP could not house prisoners in such strict conditions indefinitely.

The jury rejected Johnson's proposed finding that he would not be "a serious and continuing danger to the society because the government has the power to imprison him for the rest of his life in a maximum security federal prison designed to control and monitor his behavior." The jury also found other aggravating factors, both statutory and non-statutory. In particular, the jury found that Johnson caused the killing after substantial planning and premeditation in the course of a continuing criminal enterprise that involved distribution of drugs to persons under the age of 21. It also found that he ordered the murder to obstruct justice by preventing the victim from testimony and also caused harm to the victim's family. As a result of its deliberation, the jury sentenced Johnson to death.

In Johnson's § 2255 motion, he argues that he was prejudiced by his trial counsel's failure to investigate the law and facts necessary to subject the government's case on future dangerousness to meaningful adversarial testing. In short, Johnson suggests that trial counsel was ineffective in allowing the government expert's testimony to go unrebutted.

Johnson argues that, contrary to the government expert's testimony, the BOP could employ strict conditions of confinement indefinitely to alleviate the risk a particular inmate poses to society. After sentencing, Johnson learned of several procedures that the BOP utilized to control the conditions of confinement of inmates deemed to be dangerous. First, the BOP could control the conditions of confinement by employing Special Administrative Measures (SAMS) authorized by 28 C.F.R. § 501.3(a). Second, courts could order restrictions on communication and association pursuant to 18 U.S.C. § 3582(d). Johnson also learned of specific inmates subjected to such controls.

3

Johnson's trial counsel presented none of this evidence to the jury, and had he done so, the jury might not have rejected Johnson's proposed finding on future dangerousness. Now Johnson moves for discovery from the government, hoping to uncover more evidence that contradicts or impeaches the government's expert. Specifically, Johnson seeks substantial BOP records involving prisoners kept under strict conditions of confinement[2] for more than 60 days, including the Disciplinary Hearing Officer (DHO) record and the Special Investigation Supervisor (SIS) Files. Johnson also seeks the DHO and SIS files for all inmates in the "K-Unit" at USP Marion , inmates in a "side pocket" or "special cell" at Florence-ADX, inmates in the Control Unit at USP Marion, any BOP inmates in a Special Housing Unit in a maximum or high security facility, and any memoranda written by a warden, Department of Justice staff, or Attorney General staff ordering an inmate held under strict conditions of confinement.

The discovery rules applicable to other civil cases do not apply to petitions for writs of *habeas corpus*, and a petitioner is not entitled to discovery as a matter of course. *Bracy v. Gramley*, 520 U.S. 899, 904, 117 S.Ct. 1793, 138 L.Ed.2d 97 (1977). Under Rule 6 of the rules governing *habeas corpus* proceedings, a judge *may* allow discovery upon a petitioner's showing of "good cause." Rule 6 of the Rules Governing § 2255 Cases. To satisfy good cause, Johnson must put forward specific allegations that show reason to believe that he may be able to demonstrate a constitutional violation if the facts were fully developed. *Bracy*, 520 U.S. at 908-09, 117 S.Ct. 1793. The information must be essential

---

[2] Johnson does not limit these conditions to inmates subject to SAMS or orders pursuant to § 3582(d). Instead, he defines a "strict condition of confinement" as any strict limitation upon or monitoring of communication with people outside the prison whether by phone, mail or visits based on concerns regarding dangerousness or security.

4

to an adequate factual development of the record. *Id.* The Court, however, retains the discretion to limit the extent of discovery.

To start, the parties spend much of their respective briefs arguing about whether the U.S. Attorney's office should be charged with the knowledge of BOP wardens. This argument is misplaced, and the Court need address it only briefly. First, as noted earlier, the only claim that the Court has reopened in Johnson's ineffective assistance of counsel claim. Second, the information he characterizes as suppressed is actually scattered throughout the BOP records. Johnson admits that the BOP record keeping procedures do not even allow for a computer-generated search to locate the records he claims the government suppressed; rather, some BOP official would have to sort through individual records by hand to determine whether they fit the profile of Johnson's current request. This is not a case where, prior to trial or sentencing, Johnson made a request that the government ignored. Nor is it a case where a particular individual had specific knowledge of specific records that might have been exculpatory. Instead, Johnson seeks to charge the entire BOP with perfect knowledge of its voluminous records and impute this knowledge to all of its agents. The Court will thus limit its inquiry to whether the records Johnson seeks are essential to develop an adequate factual record with regards to his ineffective assistance of counsel claim.

Rule 6 grants the judge discretion to authorize a party to conduct discovery pursuant to the Federal Rules of Criminal or Civil Procedure. Under both the Criminal and Civil discovery rules, courts maintain the discretion to limit discovery where the evidence sought is unreasonably cumulative or unduly burdensome. *See Sizemore v. Miller*, No. 92-2098, 1994 WL 123901, * 4 (7th Cir. Apr. 7, 1994); *United States v. Reed*, 2 F.3d 1441, 1447 (7th Cir. 1994) (noting that discovery under Rule 16

5

is not without limit); *United States v. Garza*, 664 F.2d 135, 141 (7th Cir. 1981) (affirming court's denial of subpoena for witnesses whose testimony would be cumulative).

In this case, the Court finds that the discovery Johnson requests is both cumulative and unduly burdensome. The parties agree that Johnson's trial counsel was ineffective in failing to impeach the testimony of the government's expert regarding Johnson's future dangerousness and dispute only whether this failure prejudiced Johnson. In order to succeed on this claim, Johnson must establish that but for counsel's failure, there is a reasonable probability that a jury may have declined to reject Johnson's proposed finding on future dangerousness and reached a different outcome in its decision to sentence him to death. *Eckstein v. Kingston*, 460 F.3d 844, 848-50 (7th Cir. 2006). And because "it takes only one juror to nix a death sentence," *United States v. Johnson*, 223 F.3d at 670, that threshold is even lower here.

Johnson points to the affidavit of former a BOP Warden that contradicts much of the testimony provided by the government's expert to support his request for further discovery. The affidavit outlines a pattern of evidence that appears to contradict much of what the government's expert testified to. For example, Johnson's expert points to conditions in the Control Unit at USP Marion, where the conditions of confinement were imposed to ensure security and reduce or eliminate the inmate's risk for violence of future dangerous. Johnson's expert also points to other units, such as the I-Up Unit and the K-Unit where inmate mail might be screened or copied and telephone calls recorded. The warden avers to many examples of inmates housed under these and other conditions, all for the purpose of reducing the potential that the inmate could cause harm to BOP staff, other inmates, or the general public. The thrust of the affidavit thus paints a very different portrait of the potential to house Johnson safely upon his conviction.

6

The affidavit of the BOP Warden provides a factual foundation for Johnson's claim that the government expert's testimony misled the jury regarding the BOP's ability to confine him immediately and indefinitely while at the same time minimizing the risk that Johnson would continue to be a danger to society. Moreover, the government has produced some information regarding other inmates held in strict conditions of confinement, also which seems to contradict the testimony of the government's expert and which could lend credibility to the testimony Johnson's expert might provide. Johnson, however, wants a more exhaustive list of each and every inmate held under any sort of strict condition of confinement.

It matters little whether more than ten inmates were confined in this manner, for at some point, the information Johnson might present to impeach or rebut the government's expert becomes cumulative. *See United States v. Jackson*, 51 F.3d 646, 652 (acknowledging the Sixth Amendment leaves courts broad discretion in limiting the extent and scope of cross-examination); *Garza*, 664 F.2d at 141 (limiting the number of witnesses a defendant may call where their testimony would be cumulative). Given the information contained in Johnson's expert's affidavit and in the discovery already provided, the Court finds that further discovery is unnecessary to develop an adequate factual record to determine whether Johnson's trial counsel's deficiency prejudiced him.

Moreover, the government points out that the records sought by Johnson are not capable of being located by means of a simple computer search. Instead, the government would have to sort through the records of inmates by hand to determine whether a particular inmate's DHO or SIS file fit the profile of what Johnson seeks. The BOP houses over 200,000 inmates. Bureau of Justice Statistics (2008), *at* http://www.ojp.usdoj.gov/bjs/pub/pdf/pim08st.pdf. While excluding from the search any inmates housed in low security penitentiaries might reduce the number of files that needed to be

7

reviewed by hand, Johnson's request more than probably would require the government to sort through tens of thousands of files. Where a defendant already has evidence to provide an adequate factual background to present his claim, such a gargantuan task is overly burdensome.

The Court believes that Johnson possesses sufficient information to argue that his trial counsel's failure to present evidence in rebuttal of the government's expert prejudiced him. It therefore DENIES his request for further discovery.

IT IS SO ORDERED.

5/15/09

Dated

Hon. William J. Hibbler
United States District Court

# EXHIBIT C

STATE OF ARIZONA      )
                            ) ss
COUNTY OF PINAL      )

## <u>AFFIDAVIT OF MARK A. BEZY</u>

MARK BEZY, after being duly sworn, deposes and states under oath as follows:

1. I am over the age of 18, and I am competent to testify to the matters stated herein. I make the statements in this affidavit based upon my personal knowledge.

2. I worked for the United States Bureau of Prisons ("BOP") for 28 years, from 1978 to 2006, starting my career as a Correctional Officer and working my way up. During that time, I held a number of positions, including: (a) Warden of the Federal Correctional Complex at Terre Haute, Indiana from August, 2004 through October, 2006; (b) Warden of the Federal Correctional Institution in Elkton, Ohio from December, 2002 through August 2004; (c) Associate Warden at the United States Penitentiary in Leavenworth, Kansas, a high security facility, from July, 1999 through November, 2002; (d) Correctional Services Administrator of the North Central Regional Office of the BOP in Kansas City, Kansas from May, 1995 through July, 1999; and (e) Captain at the maximum security U.S. Penitentiary in Marion, Illinois ("USP Marion") from February, 1992 through May, 1995.

3. I received a number of awards during my service with the Bureau of Prisons, including being named a Member of the Senior Executive Services; being named Associate Warden of the Year for the North Central Region; and receiving a Director's Award in 1997.

4. While I was Warden at Terre Haute, I was responsible for the operation of, among others, the high security penitentiary and the Federal Death Row which is located at the FCC in Terre Haute. As Warden at Terre Haute, I oversaw 1,500 adult male high security offenders, as well as 37 inmates who were under death sentences. I managed several emergency situations that

occurred while I was Warden at Terre Haute, including a homicide, and numerous inmate assaults and emergency lockdowns.

5.      As Correctional Services Administrator for the North Central Regional Office of the BOP, my duties included providing consultation, advice and on-site assistance to 18 federal correctional institutions within the North Central region of the United States, which included at the time the states of Illinois, Wisconsin, Minnesota, Missouri, South Dakota, Kansas, and Colorado. I also oversaw the regional disciplinary transfer program for the North Central Region, and the Control Unit Hearing Program for the entire BOP.

6.      When I worked at USP Marion, that facility was the highest security prison in the United States.  USP Marion housed the "worst of the worst" of federal prisoners in its general population, and did so under highly secure and restrictive conditions of confinement, including, for example, restrictions on telephone communications, all of which were recorded and monitored, and restrictions on visitation, including no contact visits of any sort.  While the hope of the BOP was that inmates sent to the general population at USP Marion would modify their behavior and return to a mainstream maximum security facility after two to three years, there were many inmates who were housed at USP Marion for many years, including some who were housed at USP Marion for years and then transferred directly to the Administrative Maximum ("Super-Max" or "ADX") facility in Florence, Colorado when that facility opened.  In addition, there were some inmates who were assigned directly to USP Marion from the sentencing court.  For example, John Gotti was an inmate sent directly to USP Marion from the sentencing court.

7.      While I worked there, USP Marion had units within the facility where the most dangerous and/or high security risk inmates were housed under even more strict conditions of

confinement than those imposed on USP Marion's general population.  These even more strict conditions of confinement were imposed for as long as the BOP and/or the Warden deemed necessary to ensure security and to reduce or eliminate the inmate's risk of violence or future dangerousness.  For example, USP Marion had a Control Unit within the prison where the most violent offenders, including particularly those who were deemed to pose a future danger of violence and/or criminal activity, were housed prior to the opening of the Super-Max ADX facility in Florence, Colorado.  Typically, inmates could be assigned to the Control Unit at USP Marion for a specific amount of time, up to five years, based on their offense.  The specific amount of time that an inmate was committed to the Control Unit was determined by the BOP.  Moreover, if an inmate engaged in additional criminal or violent activity, they could be re-committed to the Control Unit for additional time beyond the five years.  Inmates assigned to the Control Unit were housed in that Unit for as long as was deemed necessary by the BOP in order to alleviate the risk that the inmate would constitute either a security risk or a future danger to either BOP staff, other inmates, or the public.

8.      The Super-Max ADX facility in Florence, Colorado opened in approximately 1994. I know that a number of inmates who, due to security and/or "future dangerousness" concerns, had been housed at Marion under very strict conditions of confinement for years prior to the opening of the ADX facility in Colorado, were then transferred to the ADX facility where they continued to be held under very strict conditions of confinement due to the same long-standing security and/or future danger concerns.  Inmates who fit this description that I can recall at this time include Barry Mills, and T.D. Bingham, high ranking members of the Aryan Brotherhood gang, as well as leaders of other gangs and disruptive groups.  In addition, shortly after ADX was opened, a number of other

-3-

violent inmates, including gang members, domestic terrorists, and organized crime figures, were also were transferred directly from USP Marion to the ADX facility. At ADX, both before and after 1998, these types of inmates were housed in conditions that were even more restrictive than the conditions had been at USP Marion in terms of their ability to interact or communicate with staff, other inmates, or persons outside the facility.

9.      USP Marion also had what was called the "K-Unit" from at least the mid-1980's through the mid-1990's in which inmates who were a security risk were housed under extremely strict conditions of confinement. Inmates housed in the K-Unit due to security and/or future dangerousness concerns that I can recall included John Walker, a convicted spy, Ed Wilson, a former CIA operative, Jonathan Pollard, a convicted spy, and Christopher Boyce, a former CIA operative. These inmates were held in K-Unit because of security and/or future danger concerns, and were held there for as long as the BOP deemed it necessary to ensure security and that these individuals did not constitute a future danger. Inmates housed in K-Unit were housed in single cells and had no physical interaction with other inmates. All their mail was screened by BOP officers, all telephone calls had to be arranged through BOP officers who would bring the phone to the inmate in his cell. Those calls could only be made to people who were on an approved phone list, and all such calls were recorded and monitored by the BOP. All visitors to any inmates on K-Unit had to go through a somewhat intensive background screening process, and had to be pre-approved by the BOP before they could visit.

10.      Also at the USP Marion, there is an inmate housing unit above the hospital called the "I-Up Unit". Similar to the K-Unit, in the I-Up Unit, all inmate mail was screened and/or copied, and all telephone calls were recorded and monitored. I know, for example, that gang leader David

Sahakian, whose crimes included ordering the murders of others, was held in the I-Up Unit during his pre-trial detention in order to protect others and ensure that he did not commit, order or direct any additional criminal activity. I believe this was after 1998, but inmate Sahakian was held under conditions of confinement that were available to the BOP at USP Marion in and prior to 1998.

11.     The Super-Max facility in Florence, Colorado, was designed to hold the most dangerous inmates under extremely strict conditions of confinement, including with strict limitations on any communications with people outside the prison, whether by phone, mail, or visits, whenever deemed necessary by the BOP. It is my understanding that inmates were in 1998 and prior thereto (and have been from 1998 through the present) held at the ADX facility under strict conditions of confinement, including severe restrictions on their communications, whether by mail, phone or visitation, whenever that was deemed necessary by the BOP or the ADX Warden, and for as long as necessary to deal with the security or future danger concern raised by a particular inmate. I also know that some inmates have been assigned to the ADX facility directly from the sentencing court, when the circumstances warranted. The ADX facility also has areas within the prison that are referred to as "side pockets" or "special cells," which are used to hold prisoners who are deemed to be exceptionally dangerous. For example, inmate Luis Felipe was assigned to ADX directly from the sentencing court and inmate Felipe was held in one of these "side pockets" after being sentenced in 1997 due to concerns about security and/or his future dangerousness as set forth by the sentencing court. It is my belief that other inmates, too, were housed in these "side pockets" in order to address concerns about security and/or future dangerousness in and before 1998.

12.     I know of some other examples of inmates who, in 1998 and prior, were housed under strict conditions of confinement specifically in order to reduce or eliminate their potential future

-5-

dangerousness. For example, Federal inmate Rodney Hamrick, a convicted bomber, was housed at USP Marion when I worked there. All of Hamrick's mail, including his legal mail, was specially monitored by the BOP in order to reduce or eliminate his future dangerousness. Inmate Manuel Noriega was also held under very strict conditions of confinement by the BOP because of the assessed risk that he posed to be a future danger by ordering crimes or violence while incarcerated. Other inmates that I can recall who, in 1998 and prior, were housed under very strict conditions of confinement due to security concerns include Thomas Silverstein and Clayton Fountain. Again, these strict conditions of confinement were (and are, to my knowledge) imposed on high security inmates by the Bureau of Prisons for as long as the BOP deems those conditions necessary to ensure the security and safety of BOP staff, other inmates, and the public (*i.e.* to reduce or eliminate the inmate's future dangerousness). In the years after 1998, there have been a great many more federal inmates housed under such strict conditions of confinement in order to address security and/or future dangerousness concerns.

13.     All maximum security BOP facilities also have what is called a Special Housing Unit ("SHU") within the facility. SHU's are, in essence, a prison within a prison where security and conditions of confinement are more strict than those imposed on the general population within the maximum security facility generally. Both before and after 1998, inmates could be and were housed in a SHU for a variety of reasons, including because of concerns about security and/or an inmate's "future dangerousness."

14.     Based on my experience at the BOP, including the orders I gave and the conditions of confinement I observed, administered, and/or imposed both prior to 1998 and after, there is no doubt that the Bureau of Prisons had, at all times, the authority and ability to house inmates in the

most restrictive conditions of confinement necessary to ensure security and/or to reduce or eliminate an inmate's "future dangerousness." This included, but was not limited to, housing inmates in conditions of confinement where they did not have the ability to freely communicate with anyone from outside the prison, whether by phone, in person, or mail. The BOP could, and did, take away prisoners' ability to have visitors, to have mail privileges, and to make or receive phone calls whenever the BOP deemed it necessary to do so for the security of either prison staff, other inmates, or the public. Under the BOP regulations, these are considered "privileges" and not "rights," so they could be taken away whenever it was deemed necessary. Moreover, these strict conditions of confinement could be, and were, imposed for as long as the BOP deemed it necessary to ensure the security and safety of either prison staff, other inmates, or the public (*i.e.* to reduce or eliminate the inmate's future dangerousness).

15.     When strict conditions of confinement, such as being sent to the Control Unit or a SHU, or having mail, visiting and/or phone privileges taken away, were imposed on federal inmates for security reasons or concerns about violence, documentation of that action would normally be created and maintained in one or more places within the BOP. Information about both the restrictive conditions imposed and the reason(s) for imposing those conditions could be contained in one or more of the following: (a) in the DHO (Disciplinary Hearing Officer) record which is kept at the individual BOP facilities; (b) in the SIS (Special Investigation Supervisor) Files, which are kept at all high and maximum security BOP facilities; and (c) when the Warden imposed such conditions, s/he would write a memo which should be contained both in the inmate's file and the files of the BOP facility where the conditions were imposed. In order to ascertain all the inmates on whom these types of restrictive conditions were imposed based on security and/or "future dangerousness"

-7-

concerns, at a minimum, one would need to review the above files at each of the high and maximum security BOP facilities.

16.     While restrictive conditions of confinement, including taking away communication privileges such as mail, phone and correspondence, could be imposed for a variety of reasons, I know that, in 1998 and prior thereto, those conditions were imposed on a number of inmates specifically in order to address security and violence/future danger concerns, and that those strict conditions of confinement were maintained for as long as the BOP deemed necessary to address the security of violence concerns regarding the particular inmate. I do not know the names of all the inmates who had strict conditions of confinement imposed on them in order to address security and/or future dangerousness concerns, but believe that, in 1998 and prior, there were a number more such inmates beyond those that I have recalled and described in this affidavit.


Further, Affiant sayeth not.


Mark A. Bezy


Subscribed and sworn to
before me this 21st day
of November, 2008.


Notary Public

AARON HALLSTROM
Notary Public - Arizona
MARICOPA COUNTY
My Comm. Exp. 04-30-2011


-8-

# EXHIBIT D

STATE OF ARIZONA     )
                        ) ss

COUNTY OF PINAL     )

### SUPPLEMENTAL AFFIDAVIT OF MARK A. BEZY

MARK A. BEZY, after being duly sworn deposes and states under oath as follows:

1.    I am over the age of eighteen, and I am competent to testify to the matters stated herein. The statements in this affidavit are based upon my personal knowledge.

2.    I am the principal/owner of Mark A. Bezy and Associates, LLC, a consulting firm specializing in corrections management; conditions of confinement; correctional facility activation, operation, and management; inmate transportation; correctional work programs; prison gangs and security threat groups; and institutional disturbances and crisis management. Additionally, I worked as a consultant to Creative Corrections, LLC, a company charged with inspecting state and local correctional facilities housing detainees under the auspices of the federal Department of Homeland Security and Bureau of Immigration and Customs Enforcement.

3.    Prior to these positions, I was employed by the United States Bureau of Prisons ("BOP") for 28 years, from 1978 to 2006. I began my BOP career as a correctional officer at the Federal Correctional Institution in Oxford, Wisconsin. Three years later, I was promoted to the rank of lieutenant and served in that capacity at the Federal Prison Camp in Duluth, Minnesota and the Federal Correctional Institution in Phoenix, Arizona. In 1988, I was promoted to the rank of captain and served in that capacity at the Federal Correctional Institution in Ray Brook, New York, the Federal Medical Center in Lexington, Kentucky, and the United States Penitentiary in Marion, Illinois ("USP-Marion").

1

4.      At the time I served as a captain at USP-Marion, that facility was the highest-security federal correctional facility in the country and housed many of what were considered the most incorrigible and difficult inmates in the BOP, and did so under highly secure and restrictive conditions of confinement.   This included, for example, restrictions on telephone communications, all of which were recorded and monitored, and restrictions on visitation, including no contact visits of any sort.   At USP-Marion, I was a member of the review and classification committee for the movement of high-security inmates through the facility's step-down process.

5.      While the hope of the BOP was that inmates sent to the general population at USP-Marion would modify their behavior and cycle out of USP-Marion to a mainstream maximum-security facility after two to three years, there were many inmates who were housed at USP-Marion for much longer than three years and were unable to cycle out of the program.   The BOP recognized that a small percentage of individuals would most likely require such restrictive security measures during the entire term of their incarceration because of the potential future dangerousness posed by those inmates.   These inmates, such as T.D. Bingham, Barry Mills, and Jeff Fort, were later transferred directly to the United States Penitentiary Administrative Maximum Facility in Florence, Colorado ("ADX" or "SuperMax") when that facility opened in 1994, and they remain housed at ADX today.   Although many inmates came to USP-Marion as a result of a demonstrated inability to function properly in other, less-restrictive environments, a number, such as John Gotti, were assigned directly to USP-Marion from the sentencing court.

6.      From 1995 to 1999, I served as correctional services administrator for the BOP North Central Regional Office in Kansas City, Kansas.   In that management position, I provided

2

on-site advice and consultation to 18 BOP facilities in that region. I also created and implemented the tactical inmate movement plan for "Flo-Max II," the final movement of high-security offenders from USP-Marion to ADX. In this position, I administered the disciplinary transfer program and was responsible for evaluating and classifying all disciplinary transfers and close supervision and protective custody cases – some 4,000 cases in all.

7.    In 1999, I was named associate warden at the United States Penitentiary in Leavenworth, Kansas, an institution housing up to 2,500 inmates. At USP-Leavenworth, I directed the "KC Model Program" which effectively managed disruptive and violent inmates within the general population through identification, classification, and housing changes. The KC Model Program has since been successfully implemented in other penitentiaries.

8.    In 2002, I was named the chief executive officer (warden) of the Federal Correctional Institution in Elkton. There, I managed the safe and secure operation of this low-security facility and was responsible for providing programs and services to 2,300 adult male offenders. I supervised a staff of 300 and managed an annual budget of $42 million.

9.    In August 2004, I became chief executive officer (Warden) of the Federal Correctional Complex at Terre Haute, Indiana ("FCC-Terre Haute"). At FCC-Terre Haute, I managed programs and services provided to 1,500 adult male high-security offenders at the U.S. Penitentiary ("USP-Terre Haute"), 1,200 adult male medium-security offenders at the Federal Correctional Institution, 450 minimum-security adult male offenders at the Federal Prison Camp and 37 adult offenders under death sentences, including Darryl Lamont Johnson. I oversaw 675 personnel and managed an annual budget of $64 million. At FCC–Terre Haute, I implemented a number of security enhancements that have now been adopted throughout the BOP. Moreover, I

3

managed several emergency situations that occurred while I was warden at FCC-Terre Haute, including a homicide, and numerous inmate assaults and emergency lockdowns.  As warden, I received top-secret clearance in order to review classified documents relating to particular inmates.  I retired from the BOP in October 2006.

10.     I received a number of awards during my service with the BOP, including being selected for the Senior Executive Services, a merit-based special compensation program; being named Associate Warden of the Year for the North Central Region in 2001; and receiving the Director's Award in 1997 for my contributions to security technology.   As that honor demonstrates, I am very familiar with the security capacity of BOP facilities and have in fact pioneered the use of some of the security protocols and equipment that the BOP employs to this day.

11.     For example, when I activated the current USP-Terre Haute in March 2005, that facility was the first in the nation to deploy a wireless microwave camera system.  That system was part of my changes in the deployment and accessibility of emergency response equipment which were designed to allow the facility to deal better with serious disturbances.  Subsequently, other BOP facilities adopted the use of wireless microwave camera systems.   In fact, the equipment at USP-Terre Haute was transferred to and installed at ADX after I retired from BOP.

12.     After my retirement from the BOP in 2006, I served as the warden of Central Arizona Correctional Facility, a private prison for sex offenders in Florence, Arizona.

13.     I previously have been certified as an expert in BOP policies and procedures by the United States District Court for the Eastern District of Missouri and as an expert in prison

4

adjustment by the United States District Courts for the Central District of California and the Eastern District of Pennsylvania.

14. In the instant case, I have been retained by counsel for Darryl Lamont Johnson and have been asked to provide my opinion and evaluation, based on my thirty-year history in corrections, regarding the following matter:

A. The ability of the Bureau of Prisons to neutralize inmates deemed to be a threat to institutional security and/or to alleviate the threat to the safety and well-being of other individuals, whether inside or outside prison walls, at the time of Mr. Johnson's 1997 trial (*i.e.* future dangerousness).

15. In the course of my evaluation, I have reviewed the following materials:

a. Portions of the trial record, including the opening and closing statements of the government and the defense and the testimony of John Vanyur, Ph.D. and Mark Cunningham, Ph.D.;

b. July 21, 1997 Testimony of John Vanyur, Ph.D. in United States v. Dean Beckford et al, Case No. 3:96CR66 (E.D. Va.);

c. The direct appeal opinion affirming Mr. Johnson's convictions and sentences;

d. The Affidavit of BOP Case Manager B. English, filed in Mr. Johnson's current case;

e. Various BOP regulations and Program Statements.

16. The BOP's primary mission is to safely and securely house individuals accused and/or convicted of federal criminal offenses, ranging from nonviolent drug and fraud-related offenses to more serious offenses, such as treason, acts of terrorism, racketeering, and murder.

5

The 200,000 inmates in federal custody are classified according to their criminal history; history and circumstances of incarceration; the circumstances of the current offense(s); affiliations with gangs, militant organizations, or other security threat groups; medical and mental health needs; and length of sentence(s) for the current offenses. The stated purpose of the BOP's classification system is to "place each inmate in the most appropriate security level institution that also meets their program needs and is consistent with the Bureau's mission to protect society." Program Statement 5100.08, p. 1.

17. As Dr. Vanyur correctly noted during his testimony in Mr. Johnson's case, prior convictions and prison behavior are part of the BOP's classification calculus. Johnson Trial Transcript at 2470-2471 (hereinafter "Johnson T. at __"). As it did during my entire tenure, the BOP retains a great deal of discretion to fashion conditions of confinement and classify inmates to meet its penological objectives and mission, including to ensure the safety and security of BOP facilities and people both inside and outside such facilities. The BOP's discretion is not absolute – it must comply with the United States Constitution as well as those mandates handed down by Congress, the courts, and the Department of Justice. In keeping with these principles, the BOP has many tools in its arsenal that it may use to deal with inmates presenting both commonplace and extraordinary threats to the security of prison staff, other inmates, and those in society at large.

18. Based on my experience at the BOP, including the orders I gave and the conditions of confinement I observed, administered, and imposed, there is no doubt that the BOP had, at all times, the authority and ability to house inmates in severely restrictive conditions of confinement necessary to ensure security and/or to reduce or eliminate an inmate's future

6

dangerousness.    This includes, but is not limited to, housing inmates in conditions of confinement where they do not have the ability to freely communicate with anyone from outside the prison, whether by phone, in person, or by mail.  The BOP can, does, and did at the time of Mr. Johnson's trial in 1997, take away prisoners' ability to have visitors, to have mail privileges, and to make or receive phone calls whenever the BOP deems it necessary to do so for the security of prison staff, other inmates, or the public.  Under the BOP regulations, these are considered "privileges" – not "rights" – so they can, and could at the time of Mr. Johnson's trial in 1997, be taken away whenever it is deemed necessary by the BOP.  Moreover, these strict conditions of confinement can be, and were at the time of Mr. Johnson's trial in 1997, imposed for as long as the BOP deems it necessary to ensure the security and safety of either prison staff, other inmates, or the public (*i.e.* to reduce or eliminate the inmate's future dangerousness).

## I.    Inmate Classification and Placement and Facilities

19.    One way in which the BOP can deal with the dangers posed by prisoners at the outset is through the initial classification process.  At the time of Mr. Johnson's trial in 1997 (the same is true today), inmates convicted of federal offenses could, generally speaking, be sent to four types of federal institutions (in increasing order of security):  (1) Federal Prison Camps (minimum security); (2) Federal Correctional Institutions (low/medium security); and (3) United States Penitentiaries (high security); and (4) ADX (high security/control unit).[1]  Due to the circumstances of Mr. Johnson's offenses, he would not have been eligible for placement anywhere besides a United States Penitentiary (high security) or ADX (the SuperMax facility),

---

[1] There are a number of other specialty prisons, such as medical and reception centers, but the vast majority of federal inmates have no contact with these specialty institutions.

7

despite Mr. Vanyur's suggestion that an individual with Mr. Johnson's history could be sent to a medium- or low-security facility. Johnson T. at 2471-2473. As described further below, in my professional opinion, ADX is a facility that maintains security protocols capable of neutralizing the threats of future danger that the Government alleged warranted Mr. Johnson's death sentence, and placement at that facility could have effectively limited or eliminated his contact with any individual, both within and outside the confines of the prison, absent consent from the BOP (*i.e.* for mail, telephone or correspondence privileges with particular individuals). Indeed, given the circumstances of his current convictions, his history and his status as a high-ranking gang leader, Darryl Johnson was one of those "very special cases" (a phrase used by Dr. Vanyur in his Beckford testimony) eligible for direct ADX placement if deemed necessary and appropriate by the BOP.

20. Although direct court commitments to ADX are not the norm, they are neither prohibited nor unheard of. The vast majority of ADX inmates come directly from other institutions. However, at the time of Mr. Johnson's trial, approximately ten percent of ADX inmates were direct commitments from the sentencing courts. In a capital trial that occurred a few months before Mr. Johnson's (United States v. Dean Beckford, et al.), former ADX Associate Warden Vanyur testified that some nine percent of ADX's 388 inmates were direct court commitments. According to Dr. Vanyur, that nine percent was composed of "very special cases, typically, high ranking organized crime figures, high ranking drug cartel individuals or international terrorists." Beckford T. at 5. Dr. Vanyur's testimony on this point in Beckford was accurate and consistent with my knowledge and experience. Similarly, his affirmative response to the question, "So you don't mean to tell this jury that someone cannot be committed [to ADX]

8

immediately if the United States is of the opinion that they're dangerous?" was also accurate and consistent with my knowledge and experience. Beckford T. at 19. Accordingly, the suggestion that Mr. Johnson was not eligible for placement at ADX immediately after sentencing, if deemed necessary and appropriate, is false and is belied by ADX's history. Similarly, the notion that the BOP is somehow powerless to prohibit specific inmates from committing serious crimes while incarcerated is also false.

21.    In the <u>Beckford</u> case, Dr. Vanyur correctly testified that ADX is "the most secure facility" in the federal prison system. Beckford T. at 4. All the cells at that facility – whether they are in the general-population area of the prison or in the control unit – hold a single inmate. Generally speaking, in 1997, inmates in general population had the opportunity to recreate with other inmates, but there was no requirement that they be allowed to do so and, as discussed below, there are a multitude of examples where inmates are prohibited from congregating or having any contact whatsoever with other inmates. Indeed, now, inmates in the general population at ADX do <u>not</u> have the privilege of recreating with other inmates; rather, they recreate individually. Moreover, those in the control unit have no opportunity to recreate or otherwise have any contact whatsoever with other inmates and have no interactive human contact with anyone except guards during cell extractions or staff rounds. Given the nature of Mr. Johnson's convictions, and if the BOP determined it was warranted based on his behavioral history and perceived "future dangerousness," he could have been placed in the control unit at ADX.

22.    Regardless of whether Mr. Johnson was eligible for direct placement in ADX's general-population unit or its control unit, the BOP had both the authority and the ability to craft

conditions of confinement that would alleviate any risk presented by Mr. Johnson that he would constitute either a security risk or a future danger to either BOP staff, other inmates, or the public. Indeed, the BOP individualizes conditions of confinement on a regular basis. The either/or proposition that an inmate receives a great deal of freedom if not incarcerated at ADX advanced in Mr. Johnson's trial by Dr. Vanyur (see Johnson T. at 2475 (general population means that an inmate would have "open and frequent contact unrestrained with staff and inmates"); Johnson T. at 2472 (inmates have "virtually unlimited access to telephones and a great deal of open visiting contact"); Johnson T. at 2477 (an inmate at high-security facilities has "a great deal of open contact visiting," "virtually unlimited phone access," and "unlimited correspondence privileges"); Johnson T. at 2485 (even in a control unit, inmates have "virtually unlimited correspondence with the outside world"); Johnson T. at 2504 (dangerous inmates cannot be separated at high-security institutions)) are at best serious misstatements and are at worst gross distortions and mischaracterizations of the BOP's role, function, authorities, and abilities, at the time of Mr. Johnson's trial and presently, to house prisoners under secure and restrictive conditions of confinement for as long as deemed necessary by the BOP in order to alleviate the risk that the inmate would constitute either a security risk or a future danger to either BOP staff, other inmates, or the public.

23.     For many years, the BOP has maintained and set aside facilities, units, and cells for difficult and dangerous inmates. For example, ADX and numerous other prisons have cells that are termed "side pockets." These side pockets, which operate separate from the general population housing, provide for the holding of inmates under highly-secure control-unit type conditions. For example, Luis Felipe – considered by the BOP to be exceptionally dangerous

10

and sent to ADX directly by the sentencing court – was held in a side pocket at ADX immediately upon his arrival there. In the side pocket, Felipe was kept in total isolation from other inmates and all of his communications were both severely restricted and strictly monitored. Similarly, ADX has a wing known as "bombers' row" where those inmates (such as Theodore Kaczynski) convicted of using bombs and other explosive devices to commit their crimes are held under strict, individualized conditions.

24. These strict conditions are not solely the province of ADX and are nothing unusual or novel in the BOP. Every prison in the federal system has the ability, policies, and procedures to guard against future acts of violence by prisoners confined in BOP prisons, including, as discussed further below, imposing restrictions on contact with people on the outside by telephone and mail.

25. For example, USP-Marion had what it termed the "K-Unit" from at least the mid-1980s through the mid-1990s. The K-Unit held inmates who posed a high security risk and housed them under extremely strict conditions of confinement. These inmates were held in single cells, recreated by themselves, and had no contact with other inmates. There was one officer assigned for every six inmates (a very low guard-to-inmate ratio). Additionally, K-Unit inmates conducted their work (electronic cable assembly) in their cells instead of reporting to a workshop within the prison. Inmates housed in the K-Unit due to security and/or future-dangerousness concerns included convicted spies John Walker and Jonathan Pollard and former CIA operatives Ed Wilson and Christopher Boyce. These inmates were held in the K-Unit 1for as long as was deemed necessary by the BOP in order to alleviate the risk that the inmate would constitute either a security risk or a future danger to either BOP staff, other inmates, or the

11

public.

26.     Furthermore, USP-Marion maintained an inmate housing unit called the "I-Up Unit." David Sahakian, an inmate affiliated with Aryan Brotherhood, who was accused of serious crimes, including ordering the murders of others, was held in the I-Up Unit during his pretrial detention in the mid-2000s in order to protect others and ensure that he did not commit, order, or direct any additional criminal activity.   Sahakian and another Aryan Brotherhood member were separated from the rest of the prison population (they were held on the top floor of the prison hospital) and were continuously monitored by an officer.   The conditions of confinement created by the BOP for Sahakian were certainly available at the time of Mr. Johnson's trial in 1997.

27.     Thus, Dr. Vanyur's assertion that it would be "extremely difficult, at best" for officials at a BOP facility such as USP-Marion to separate Mr. Johnson from other Gangster Disciples is simply false.   At USP-Marion, we frequently and successfully separated inmates like Sahakian, Pollard, Walker, and others from the rest of the prison population.

28.     The BOP has likewise used other facilities within the system to hold pretrial defendants with special security needs.   For example, Timothy McVeigh and Terry Nichols were held at the Federal Correctional Institution at Englewood, Colorado prior to their trials on charges stemming from the 1995 bombing of the federal building in Oklahoma City, Oklahoma. An entire wing of the facility was cleared out to accommodate the two defendants.

29.     There are numerous other examples of individuals who have been subject to special security measures due to the special challenges that they present.   Rodney Hamrick, a convicted bomber, was housed at the USP-Marion when I worked there.   I recall that all of

12

Hamrick's mail was specially monitored by the BOP in order to reduce or eliminate his future dangerousness. Former Panamanian leader Manuel Noriega was also held under very strict conditions of confinement by the BOP because of the risk that he would order crimes or violence while incarcerated. Other inmates that have been, or continue to be, housed under very strict conditions of confinement due to security concerns include T.D. Bingham, Terry Mills, Thomas Silverstein, Clayton Fountain, Eric Rudolph, Ramzi Yousef, Anthony Ayeni Jones, Terry Nichols, and Theodore Kaczynski. Silverstein has been held in conditions at various prisons – including USP-Atlanta, USP-Leavenworth, USP-Marion, and ADX – where he has had virtually no human contact since the 1980's. Unlike Mr. Johnson, many of these individuals have shown an inability to positively adjust to incarceration in the federal prison system. However, to my knowledge, the strict conditions of confinement detailed above have very successfully alleviated the risk that these inmates might pose a future danger to individuals inside or outside the prisons in which they are housed.

30.    Additionally, the BOP maintains specialty units at various prisons that are designed to deal with problematic inmates. The Special Management Unit at the United States Penitentiary in Lewisburg, Pennsylvania has controls similar to those found at ADX and is designed to house inmates who have had difficulty abiding by the rules and regulations of other institutions.

31.    USP-Terre Haute's Communications Management Unit ("CMU") isolates inmates away from the general population and is designed to monitor any and all inmate communication. That prison also maintains a Special Confinement Unit ("SCU"). Although the SCU is home to the federal government's death row, the BOP may also place non-condemned

13

inmates with disciplinary problems in that unit if deemed necessary and appropriate given the facts. Indeed, as FCC-Terre Haute warden, I housed individuals in the SCU who had previously been involved in an incident at another prison. For example, Hakeem Shaheed and Tyrone Davis were involved in a major disturbance at USP-Marion in 2005 and were immediately transferred to USP-Terre Haute, where I was warden at the time. My superiors at the BOP instructed me to put Shaheed and Davis into the SCU indefinitely so that they could be closely monitored. I followed these instructions, and these two men were not involved in any incidents, violent or otherwise, while they were in the SCU.

32.     Moreover, most maximum-security federal prisons contain a Special Housing Unit ("SHU") where inmates can be placed when they have violated (or are suspected of violating) prison rules. A SHU is, in essence, a prison within a prison where security and conditions of confinement are stricter than those imposed on the general population within the maximum-security facility generally. Each BOP warden has the authority to place any inmate into a SHU if the inmate is under investigation for a serious violation of prison rules. Inmates can be housed in a SHU for a variety of reasons, including concerns about security and/or an inmate's future dangerousness. Inmates may be placed in the SHU for extended periods of time, with the only limitation being that facility administrators must periodically review placement to determine continued appropriateness.

33.     Special Administrative Measures ("SAM's") also allow the BOP to construct individualized conditions of confinement as are "reasonably necessary to protect persons against the risk of acts of violence or terrorism." See 28 CFR §501.3(a). Each SAM's order is totally unique and is nearly limitless in terms of the conditions of confinement available to be imposed

14

by BOP personnel (subject to the constraints of the United States Constitution, of course). Although SAM's orders are required to be periodically reviewed, they may be extended for as long as conditions persist (*i.e.*, indefinitely). A number of inmates have been held under SAM orders for more than a dozen years. SAM's orders were available to the BOP and the Department of Justice at the time of Mr. Johnson's trial in 1997 had officials been concerned that Mr. Johnson presented a risk of violence while incarcerated.

34.     Again, contrary to Dr. Vanyur's assertions at Mr. Johnson's trial, these strict conditions of confinement were (and are, to my knowledge) routinely imposed on high-risk inmates by the BOP for as long as it deems those conditions necessary to ensure the security and safety of BOP staff, other inmates, and the public (*i.e.* to reduce or eliminate the inmate's future dangerousness).

## II.     Telephone, Visitation, and Correspondence Restrictions

35.     Generally speaking, federal prison inmates do not have unlimited rights to visitation, correspondence, use of telephones, or contact with other inmates. As a matter of policy, the BOP grants access to these <u>privileges</u> consistent with the requirement of sound correctional management. These privileges can be revoked if they are abused or are deemed to constitute a threat to the security of the institution or the safety of individuals, whether inside or outside the prison. As Dr. Vanyur correctly stated in <u>Beckford</u>, inmates can have their phone privileges revoked for up to a year at a time in the case of significant misuse. Beckford T. at 27. There is no limit on the number of consecutive year-long revocations that can be imposed on a prisoner if it is deemed to be warranted.

15

36.    Misuse of telephone, mail, and visitation privileges are of particular concern to

BOP personnel because of the possibility that a federal inmate will facilitate the commission of a

crime through communications with other inmates or associates in society at large.  The BOP

retains a large amount of flexibility in dealing with this potential threat, as well.  As the Justice

Department's Inspector General found in a 1999 report:

> According to the BOP's program statement "Telephone
> Regulations for Inmates," conditions and limitations may be
> imposed on an inmate's telephone use to ensure that it is consistent
> with the BOP's correctional management responsibilities.
> Additionally, *inmate telephone use is subject to any limitations*
> *that individual wardens determine are necessary to ensure the*
> *security or good order of the institution or to protect the public*.
> Restrictions on inmate telephone use may also be imposed as a
> disciplinary sanction.
>
> BOP regulations direct wardens to refer incidents of unlawful
> inmate telephone use to law enforcement authorities.  According to
> BOP regulations, telephone "misuse" refers to such things as using
> the telephone to intimidate a potential witness or for other criminal
> purposes.  Using another inmate's phone access code (PAC) or
> providing a PAC to another inmate is considered "misuse" and is
> subject to discipline.  *Inmates who violate the telephone rules*
> *may have their privileges restricted or revoked*.
>
> Each warden is required by BOP's program statement to establish
> procedures to enable monitoring of inmate telephone conversations
> on any telephone located within the institution.   The term
> "monitoring" is not defined in the BOP program statement, so it is
> not clear whether this means recording of calls or live-monitoring
> by the BOP staff.  According to the BOP's program statement, the
> purpose of monitoring is to preserve the security and orderly
> management of the institution and to protect the public.
>
> In all BOP facilities, a notice is placed on inmate telephones
> advising the user that all conversations are subject to monitoring.
> Use of the telephones by inmates, therefore, constitutes their
> consent to this monitoring.  Inmate calls to attorneys are an
> exception to this rule and will not be monitored by BOP staff if the

16

inmate follows proper procedures, established by the warden at each institution, to arrange and place attorney calls.

BOP Headquarters has not issued any policy detailing how much "live monitoring" or review of recorded calls staff at each institution should conduct. Rather, determinations about the amount and methods of monitoring are left to individual wardens. Some institutions have remote monitoring locations. At these locations, officers randomly listen to some calls as they are occurring. This monitoring is in addition to their regular duties. Most of these institutions require the officers to monitor a minimum number – usually five – telephone calls during their shift. The officers are required to fill out a form describing the content of each monitored call and submit these reports to the institution's SIS office. The SIS offices are supposed to review the reports and decide if any further action is required.

Most institutions without remote monitoring locations have established a fixed listening post where a staff member assigned as the telephone monitor listens to inmate calls in addition to other duties, such as reviewing inmate mail. This telephone monitor normally works only during the day shift. However, wardens at several institutions have assigned a telephone monitor to the evening shift as well.

In its "Special Investigative Supervisors Manual" (SIS Manual), the BOP encourages a proactive approach to deterring criminal conduct by inmates. The SIS Manual directs SIS staff to use threat analysis, risk assessment, analysis of connections between inmates, and intelligence sources to prevent illegal conduct by inmates while still in the planning stage. The manual also states that the SIS should determine which inmates are engaged in activities that pose a threat to the welfare of the community. The SIS Manual provides examples of how the current version of ITS can assist staff in this task.

In August 1997, the Intelligence Section at BOP Headquarters issued an Inmate Telephone Monitoring field guide for wardens and SIS staff. The guide states that one of the BOP's primary concerns is to ensure that inmates who were convicted for playing leadership roles in major drug trafficking organizations do not continue their criminal operations using prison telephones. The guide stresses that

17

inmates should not be permitted to talk on the telephone when they should be at their job or educational assignments. The guide notes that some inmates may require reassignment from orderly jobs or similar positions that provide them a great deal of flexibility and autonomy so that their time is more fully engaged. The guide also cautions against permitting a small number of inmates to dominate the telephones.

In addition, the guide suggests that "population profiling" should be a major component of an institution's monitoring operations. For example, the guide acknowledges that it is not possible for staff to consistently listen to 100 percent of inmate calls. For this reason, the guide states that any inmate telephone monitoring should place the highest priority on identifying and tracking inmates with the greatest likelihood of using their telephone privileges to engage in criminal or illicit activity. Inmates identified as having a high likelihood of engaging in crime while incarcerated, such as drug dealing and escape plots, should be targeted and their telephone conversations subject to intense review.

See USDOJ/OIG Special Report: A Review of the Bureau of Prisons' Management of Inmate Telephone Privileges, August, 1999 (Found online at: http://justice.gov/oig/special/9908/) (emphasis added).

37.     As a captain, associate warden, and warden at numerous federal correctional facilities, I recall numerous instances where prison management (myself included) completely suspended or otherwise severely restricted telephone privileges because of concern that an inmate was abusing the privilege. While no system is 100 percent foolproof, we were successful in curbing inmate abuse of telephones in the overwhelming majority of cases where the issue arose through the use of targeted and contemporaneous monitoring and severe restrictions on numbers of calls and to whom inmate calls could be made.

38.     The same can be said for inmate abuse of correspondence and visitation privileges. In his testimony in the Beckford case, Dr. Vanyur correctly noted that mail, phone,

18

and visitation privileges can be severely restricted. Beckford T. at 22-24. He did not testify similarly in Mr. Johnson's case. Indeed, as a senior manager or head of numerous correctional facilities, I was involved in countless decisions to closely monitor visitation of, and correspondence to and from, specific individuals where there was a concern about institutional or individual safety. Actions taken to deter or detect unlawful conduct included, among other things, real-time monitoring and recording of visitation, review of correspondence, and the interception and translation of letters written in foreign languages or code. For example, at USP-Marion, Yu Kikumura, a member of the Japanese Red Army, a terrorist organization, had all incoming and outgoing mail inspected and translated. It was not uncommon for prison officials to inspect every piece of incoming and outgoing mail pertaining to a targeted inmate. Gotti and Felipe are additional examples of inmates who received this sort of treatment.

39. Given facts underlying Mr. Johnson's convictions, including the use of telephones to commit crimes, intensive monitoring of and restrictions on his communications, whether they be in person or by telephone or mail, were clearly available to the BOP in 1997 (and are today) – no matter where his placement.

40. Notably, it is my knowledge and understanding that during the term of his federal incarceration (more than 13 years at this point) the BOP has not deemed it necessary or appropriate to house Darryl Johnson under the strict conditions of confinement available to it as described above (*e.g.*, intensive restriction and/or supervision of communications by mail, phone, or in-person visitation; or segregation from staff and other inmates) whether based on any perceived "future dangerousness" or otherwise. In addition, the information available to me clearly suggests that Mr. Johnson has been housed by the BOP under conditions that have, in

19

fact, negated any potential "future dangerousness," and he has demonstrated that he is a well-adjusted inmate, as evidenced, for example, by the affidavit of BOP Case Manager B. English previously submitted to the Court in this case which states, "I consider [Darryl] Johnson to be a well-adjusted inmate without any out of the ordinary management concerns. ... Overall, Johnson is a quiet and civil individual." (BOP Case Manager B. English Affidavit 8/25/08).

Further affiant sayeth naught.

Mark A. Bezy

Subscribed and sworn to
before me this __14__ day
of December, 2009.

Notary Public

OFFICIAL SEAL
TERESA SEVERSON
NOTARY PUBLIC - State of Arizona
MARICOPA COUNTY
My Comm. Expires Oct. 2, 2011

20

# EXHIBIT E

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION


- - - - - - - - - - - - - - - - - - - -

UNITED STATES OF AMERICA,          :

                                   :

                                   :

-vs-                               : CRIMINAL ACTION
                                   : NO. 3:96CR66

DEAN ANTHONY BECKFORD, et al.,     :

                                   : July 21, 1997

                Defendants         :

- - - - - - - - - - - - - - - - - - - -


TRANSCRIPT OF JURY TRIAL
BEFORE THE HONORABLE ROBERT E. PAYNE
UNITED STATES DISTRICT JUDGE


APPEARANCES:

DAVID J. NOVAK, Assistant United States Attorney
ANDREW G. McBRIDE, Assistant United States Attorney
STEPHEN W. MILLER, Assistant United States Attorney
Richmond, Virginia

        Counsel on behalf of the United States

GERALD T. ZERKIN, ESQ.
Richmond Virginia

WAGNER & WAGNER, ESQS.
Richmond, Virginia
BY:  ROBERT J. WAGNER, ESQ.

        Counsel on behalf of the Defendant Beckford

JOHN C. JONES, ESQ.
Providence Forge, Virginia

SCOTT BRETTSCHNEIDER, ESQ.
Kew Gardens, New York

        Counsel on behalf of the Defendant Dennis

SANDRA M. BEVERLY, RPR
OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT

REGINALD M. BARLEY, ESQ.
Richmond, Virginia

BOWEN & BOWEN, ESQS.
Richmond, Virginia
BY:  CARY B. BOWEN, ESQ.

      Counsel on behalf of the Defendant Cazaco

MORCHOWER, LUXTON & WHALEY, ESQS.
Richmond, Virginia
BY:  ELIZABETH D. SCHER, ESQ.

DAVID P. BAUGH, ESQ.
Richmond, Virgninia

      Counsel on behalf of the Defendant Thomas

RICE, EVERHART & BABER, ESQS.
Richmond, Virginia
JEFFREY EVERHART, ESQ.

      Counsel on behalf of the Defendant Smith


I N D E X

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---------|--------|-------|----------|---------|
| John Vanyur | 2 | 19 | 36 | 41 |


SANDRA M. BEVERLY, RPR
OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT

(The following is an excerpt from trial day 7-21-97)

MR. McBRIDE:  Call Mr. John Vanyur.

JOHN VANYUR, having first been duly sworn, was examined and testified as follows:

DIRECT EXAMINATION BY MR. McBRIDE:

Q. Good afternoon, sir.  State your full name for the record, please.

A. My name is John Martin Vanyur.

Q. How are you presently employed?

A. I'm employed by the Federal Bureau of Prisons.

Q. What is your present duty assignment?

A. I'm the warden of the low security federal prison in Butner, North Carolina.

Q. Mr. Vanyur, how long have you been with the Bureau of Prisons?

A. Over seventeen years.

Q. Could you briefly list the facilities that you have been at for the jury?

A. Prior to my current assignment, which I have been in one year, I was the associate warden of operations for the United States Penitentiary Administrative Maximum in Florence,

Colorado, and I opened that facility and been there for two and a half years. I have also worked in a medium security federal correctional institution and a number of other posts at headquarters at the Bureau of Prisons.

Q. Now, you indicated the Ad-Max facility, when did that open?

A. We took our first inmates in November 1994.

Q. And prior to joining BOP or during the time at BOP, just summarize, if you would, your educational background for the jury.

A. I've got a bachelor's degree in psychology and a master's and doctorate degree in social psychology from the University of Maryland.

Q. And have you also taken the basic officer correctional course for BOP?

A. I have.

Q. Let's talk about Ad-Max if we could. You were the first deputy warden at Ad-Max; is that correct?

A. That's correct.

Q. And could you tell the jury how many inmates is Ad-Max capable of housing?

A. Our capacity was 484.

Q. How many inmates are there now?

A. 388.

Q. And do you know, out of that 388. How many inmates have homicides in their background?

A.   Just over 150.

Q.   Now, Ad-Max is a maximum security facility in BOP; is that correct?

A.   That's correct.   It's the most secure facility in the system.

Q.   Then there are also a number of United States penitentiaries that are labeled high security; is that correct?

A.   That's correct.

Q.   How many of those are there?

A.   There are eight others, in addition to Ad-Max.

Q.   Could you tell us what those are?

A.   I can try.   United States penitentiaries in Lewisburg, Leavenworth, Atlanta, Lompoc, Marion, Terre Haute, Allenwood, I believe, and Beaumont.

Q.   You got it.   At what is the total population that BOP has under its control right now?

A.   Roughly 110,000 inmates.

Q.   Do you know how many of that group have homicide in their background?

A.   Just over 1,200, but that's a slight underestimate because that only includes inmates that are doing time for federal crimes of murder.   If an inmate has state murder charges somewhere in their past, that doesn't show up in that listing; so over 1,200.

Q.   Now, how many inmates are presently at the Ad-Max facility?

A.   388.

Q.   And could you tell us what is the purpose of the Ad-Max facility?

A.   The purpose of the Administrative Maximum is to house inmates that are not functioning properly inside the federal prison system.  Either they have attempted escape or escaped from secured prisons or they have seriously assaulted inmates or staff or they have murdered inmates or staff.  And because they cannot function in a normal, open population environment, we move them for a temporary basis to a more restrictive environment.

Q.   What percentage of inmates at Ad-Max come from other institutions?

A.   Over 91 percent.

Q.   And where do the other 9 percent come from?

A.   The other 9 percent are direct court commitments.  They are very special cases, typically, high ranking organized crime figures, high ranking drug cartel individuals or international terrorists, people that would have the potential to have resources enough to garner an outside assisted escape.

Q.   Now, for instance, is John Gotti at Ad-Max?

A.   No, but he's at Marion, which is a similar program.

Q.   Now, is the purpose of Ad-Max for people to go there and remain there?

A.   No, it's not.  Ad-Max is a correctional program.  It's meant

to bring an inmate into a more restrictive environment, and then over several years, three years, four years, depending on the individual, allow them to work their way out of that prison and into an open population penitentiary.

Q.  What is the goal time frame to move them from the highest level of security, Ad-Max, out to another institution?

MR. BAUGH:  Objection to the goal, Your Honor.  That's speculative, has no relevance to this case.

THE COURT:  Overruled.

BY MR. McBRIDE:

Q.  What is the time frame that the Bureau of Prisons has set as its goal?

A.  To move from general population to outside the Ad-Max, three years is our goal.

Q.  And within Ad-Max, there are different levels of security; is that correct?

A.  That's correct.

Q.  And the highest level of security is the controlled area for those who have violated the rules at Ad-Max; is that correct?

A.  The control unit -- or committed murder, serious assault or escape inside BOP facilities.

Q.  If I could have the assistance -- we saw some pictures before, Mr. Vanyur.  The jury has already seen these photographs.  They have been admitted.  Since you have been at Ad-Max, maybe you could describe what we are seeing there.

Could you tell the jury what that is?

A. That is a typical cell inside Ad-Max. There are 500 or 602 cells. Over 400 resemble this type of cell. You are looking from the back of the cell out towards the front door, out towards the range or hallway.

Q. Is that, in fact, one of the control area cells for people who have violated the rules within Ad-Max?

A. It's a similar cell. A control unit cell would have a 12 inch black and white television. This cell has a radio. So it's the administrative detention part of the special housing unit.

Q. That's for the worst of the worst?

A. This is the most secure cells, yes.

Q. And what percentage of the cells at Ad-Max are designed like this?

A. Over two-thirds.

Q. What are the other cells like? How do they differ?

A. Well, they are just not as self-contained. They don't have a shower facility inside them, and they are slightly smaller. Other than that, they still have a poured concrete cell. Some of them just have one steel door, instead of two steel doors, but they are not all that dissimilar.

Q. Now, let's take the most secured area, the area you have described with the control area. Even in that area, are inmates allowed to recreate?

Case 1:02-cv-06998  Document 85-6  Filed 12/17/09  Page 10 of 46  PageID 843
Case: 11-1326      Document: 8-4        Filed: 03/04/2011    Pages: 369

8

A.  Yes.  Every inmate is required to recreate by law.

Q.  And, also, do they have access to a law library?

A.  Yes.  We operate nineteen law libraries inside the institution.  We are required to provide access.

Q.  Now, when the inmates, even in the most secured area, recreate, where do they do that?

A.  In the control unit, they recreate by themselves, and we have both indoor and outdoor recreation yards.  The indoor room is probably about 15 by 20 feet.  And the outdoor room is probably 20 by 15.  It's a triangular shape with two story walls around it.

Q.  In the general population at Ad-Max, how long are the inmates allowed to recreate each day?

A.  Two to two and a half hours a day.

Q.  How do they recreate?

A.  They recreate in small groups of eight to twelve in a larger rec area, probably about the size of this courtroom.

Q.  Entire courtroom?

A.  Yes.

Q.  And what sports are they allowed to play?

A.  They have a basketball and a hand ball.

Q.  How many inmates are allowed out there at one time?

A.  At the most twelve.

Q.  Now, is there a metal detector that's used prior to inmates going out there to recreate?

A.  Yes, there is.  There is a hand-held metal detector.

Q.  Even with that, have you had incidents of shivs, knives, homemade knives being used in the recreation area?

A.  We had an incident where an inmate introduced a wooden shank, which, of course, the metal detector did not pick up, and he assaulted another inmate with that shank.  Unfortunately for him, the individual he assaulted took that shank away from him and then used it on him.

Q.  And have you also had violence occur in that recreation area without weapons involved?

A.  Yes.

Q.  Have you witnessed that yourself, sir?

A.  Yes.  I witnessed a very serious assault where three inmates literally stomped on the head of an inmate for several minutes.

Q.  You mentioned the law library.  Have you had occasion to view homemade knives or instruments that inmates at Ad-Max have manufactured from items in law libraries?

A.  Yes.  I have seen one.  It was a flat piece of steel that came out of the inside of a stapler.  There is a sort of U-shaped piece of steel in a stapler.  The inmate removed it and then got it back to his cell and then flattened it out into a shank.

Q.  What did the inmate do with that?

A.  That particular shank we found in his property before he got to use it.

Q.   And was there another shank that was made from a typewriter piece?

A.   Yes.   After I left, they discovered the steel rod from a typewriter had been taken out, and the inmate did attempt to stab an officer with that weapon.

Q.   Now, are you generally familiar with the assignment procedures for BOP, the program statement in the various prisons where people would go?

A.   Yes, I am.

Q.   Now, if I could put up the program statement.   As to assignment to ADX Florence, where you worked, if that comes up on your screen, the criteria for assignment to U.S.P. Marion and ADX Florence -- I don't know if you are going to be able to do that, if it's going to work.   I will just hand it to the witness, if I could.

MR. BAUGH:   I have no objection to counsel reading it if it would help.

BY MR. McBRIDE:

Q.   I will read this and ask you if this is a correct statement of BOP policy.   ADX Florence:   ADX Florence general population units are used for those inmates who have demonstrated an inability to function in a less restrictive environment, without being a threat to others, or to the secure and orderly operation of the institution.   Is that the general criteria for assignment to ADX?

A.   Yes.

Q.   So, essentially, to put it colloquially, you have to mess up, have some kind of incident in some other institution before you'd even get to ADX; is that correct?

A.   That's correct, the vast majority of cases.

Q.   Is that also true of Marion?

A.   That's correct.

Q.   So, for instance, take someone who is convicted of homicide in furtherance of a drug enterprise and has a significant violence -- excuse me, significant background of dealing drugs and firearm violence.  In your opinion, where would that person go to start out their incarceration at BOP?

A.   Probably to an open population United States penitentiary.

Q.   Of which there are how many, you indicate before?

A.   Not including ADX, there would be eight others.

Q.   Now, let's talk about those high security facilities.  Do they have recreation where they recreate with other inmates?

A.   Oh, yes.  They would have open access to large recreation yards, similar to what you would see on television, and a full recreation program.

Q.   Would they have double bunking?

A.   Probably.

Q.   Two inmates to a cell?

A.   Yes, probably.

Q.   And would feeding be done in a dormitory fashion at a high

security facility?

A. They would eat in a dining hall, similar to a military style dining hall.

Q. So there would be access to utensils then?

A. That's correct.

Q. Would they also have an opportunity to work in uniform?

A. Yes. They would be required to work at some job.

Q. So there would be access to tools as well?

A. That's correct.

Q. Now, even at Ad-Max, once you have advanced in the program, you do receive certain liberties; is that correct?

A. That's correct.

Q. And so are there inmates at Ad-Max who are allowed to eat in a dormitory type fashion with other inmates?

A. Yes, and there are also inmates that work in a factory setting.

Q. So even during the three year program at Ad-Max, the liberties increase over time; is that correct?

A. That's correct.

Q. Now, let me ask you, have you had a look at the statistics on the rates of violence in the high security facilities at BOP?

A. I have.

Q. If I could put up the first chart. If you would look at your screen, is that the BOP statistics for high security facilities for the period from May '95 to May '97, a two year

period?

A.   Yes, it is.

Q.   Now, does that population include Ad-Max?

A.   Yes, it would.

Q.   And it includes Marion as well?

A.   That's correct.

Q.   And then the other less restrictive high security facilities, correct?

A.   Yes.

Q.   What was the average daily population in those high security facilities for that two year period?

A.   I cannot read it, 9,981.

Q.   Almost 10,000 inmates; is that correct?

A.   That's correct.

Q.   And how many total assaults occurred in that two year period?

A.   I did some tallying.  If I could pull my --

Q.   Sure.  How many total assaults out of almost 10,000 inmates?

A.   1,462.

Q.   So assuming that no inmate committed more than one assault, what percentage of inmates committed assaults in the high security facilities?

A.   Roughly 14 percent.

Q.   And of those assaults, those 1,500 assaults, how many involved a weapon of some kind?

A.   384.

Q.   What percentage is that of the total assaults?

A.   26 percent.

Q.   And how many of those assaults were on staff?

A.   800, both with and without weapon.

Q.   And that was one two-year period in the high security facilities; is that correct?

A.   That's correct.

Q.   If we could go to the next one.  If we could go back to that one.  How many homicides were there in high security facilities for that two year period?

A.   Nine.

Q.   How many of those involved staff?

A.   One.

Q.   If we could go to the next one then.  Now, this is for the period 1993 through 1995, same statistics.  How are those statistics generated by the Bureau of Prisons?

A.   Any time an incident occurs within a facility, we generate something similar to a police report, whether there was an assault or any kind of serious misconduct.  So those are automated, and then they are fed into a computer system and tallied.

Q.   For this period 1993 through 1995, for most of that period, or some of that period, Ad-Max was not operating; is that correct?

A.   That's correct.

Q.   So this would include Marion and then the other high security prisons?

A.   Except for Beaumont, which is also brand new.

Q.   Except Beaumont?

A.   That's correct.

Q.   What was the average daily population of inmates during this two year period?

A.   7,912.

Q.   And how many total assaults occurred among that group?

A.   1,572.

Q.   And, again, assuming that no inmate was charged with more than one assault, what percentage of inmates committed assaults in the BOP high security prisons?

A.   19 percent.

Q.   And how many of those assaults were with a weapon?

A.   420.

Q.   What percent of that is of the total assaults?

A.   26 percent again.

Q.   How many assaults were committed on staff members in that two year period?

A.   921.

Q.   Now, how many murders were committed in that two year period in your high security facilities?

A.   Sixteen.

Q.   And how many of those homicides involved corrections officers?

A.   One.

Q.   If we could go to the last statistics.  Have you also reviewed the statistics for the years 1991 through 1993 for high security facilities?

A.   Yes, I have.

Q.   And that would not include Ad-Max at all; is that correct?

A.   That's correct.

Q.   It was not even open at that point.  What was the average daily population of the Bureau of Prisons high security level institutions for that two year period.

A.   7,274.

Q.   And, again, how many total assaults occurred in that population?

A.   586.

Q.   Assuming that only one assault per inmate, what percentage of inmates committed some kind of assault?

A.   8 percent of them.

Q.   And what percentage of those assaults involved a weapon of some kind?

A.   Over one third.

Q.   And how many deaths, homicidal deaths, occurred in BOP high security facilities in that period of time?

A.   Ten.

Q. Did you also keep statistics regarding drug use in high security federal prisons?

A. Yes, we do.

Q. In your experience, sir, is the distribution and use of drugs in federal prisons associated with violence in those prisons?

A. Yes, it is.

Q. Could you tell the jury why that is?

A. Well, you sort of have the direct effect of the inmate who is using drugs, if he's using amphetamines or another drug that would get him hyped up, you've got to deal with that individual in a confined setting. So you have the immediate violence.

But probably more important to that is the secondary violence that you get. You have turf wars with gangs over who is going to distribute the drugs inside the institution, just as you would have on the street. And then people sometimes don't pay their debts for drugs they bought or they made promises they couldn't keep. So there is retribution based on that failure to pay debts or failure to follow through on distribution promises.

Q. Now, let me ask you to look, if you could, at the 1993 to 1995 statistics on your drug testing program and how many -- what was the average daily population in that period?

A. Again, 7,912.

Q. And how many total positive tests did you have?

A. 1,980.

Q.   Now, a lot of those are repeat offenders; is that correct?

A.   That's correct.

Q.   So what percentage of positive tests for controlled substances did you have in random testing of this population?

A.   About 3 percent of the random tests were positive.

Q.   So 3 percent of the people in your high security prisons test positive for drugs?

A.   Randomly, yes.

        MR. McBRIDE:   If I could have Exhibit DAB-11, that's been admitted into evidence.

BY MR. McBRIDE:

Q.   Mr. Vanyur, take a look at that item.   In your experience, in your seventeen years with the Bureau of Prisons, have you ever seen an item like that before?

A.   Similar.

Q.   Many times, in fact?

A.   Yes, usually with a tooth brush handle is the most common.

Q.   In other words, the razor welded onto the toothbrush?

A.   Yes.   A toothbrush handle is typically longer, and you get more leverage with it.

Q.   How do people shave at Ad-Max?

A.   With a disposal razor.

Q.   Similar to that one right there?

A.   Yes.

        MR. McBRIDE:   Thank you.   I have nothing further.

CROSS EXAMINATION BY MR. BAUGH:

Q.  Mr. Vanyur, all the statistics you gave us have to do with all of the inmates in the maximum security prison; am I correct?

A.  High security prisons.

Q.  High security.  How many homicides have there been in your Florence ultra security section?

A.  None so far.

Q.  None so far.  Are you expecting any?

A.  With the type of population we have, one never knows.

Q.  Also, you told this jury that usually people are sent there after they misbehave in another facility; am I correct?

A.  That's correct.

Q.  Do you mean to tell me that if the Bureau of Prisons decides that someone is so dangerous that they should either be executed or sentenced to a cell, you people wouldn't stick him in there immediately?

A.  As I said, about 9 percent of the inmates are direct court commitments.

Q.  So you don't mean to tell this jury that someone cannot be committed there immediately if the United States is of the opinion they are that dangerous?

A.  That's correct.

Q.  Now, concerning inmate violence at Ad-Max, am I correct, sir, that not in your open population -- well, strike that.  In

your high security jails, Beaumont, Marion and all those, they have a section that's just open, like on television, a yard, right?

A.   That's correct.

Q.   And people can mingle?

A.   That's correct.

Q.   And they can have visitors?

A.   Contact visiting.

Q.   Contact visiting.  They can actually meet with loved ones and friends in a room and pass things back and forth sometimes?

A.   That's a fact.

Q.   Now, when someone is in Ad-Max security, that doesn't happen, does it?

A.   No.  The visiting is noncontact.

Q.   In fact, not only is it noncontact, but you people, meaning BOP people, had the kind of glass you can't even break through with a hammer hitting on it for two hours.

A.   That's a fact.

Q.   They must speak over the telephone?

A.   Correct.

Q.   And the cells at Ad-Max, am I correct, they are approximately, what, 6 feet 6 inches by 9 feet 6 inches?

A.   The controlled units are 90 square feet.  The general population area is 85 square feet.

Q.   And in that 90 square feet, you got your bunk?

A.  Correct.

Q.  Your toilet?

A.  Yes.

Q.  And your shower?

A.  Correct.

Q.  You have one window, 5 inches by 24 inches, looking outside?

A.  That would be about right.

Q.  Then you got a set of bars?

A.  Correct.

Q.  And then you got a solid metal door with another small window about the same size?

A.  Yes, with a small vestibule in between the bars and the solid door.

Q.  And am I correct that the vestibule is there so that the inmate can be fed in their cell?

A.  That's correct.  The staff steps into the vestibule.

Q.  So the staff can't even -- I mean, there is a row of bars between the staff when they feed them.

A.  That's a fact.

Q.  In fact, because of the lessons that were learned at other facilities, when Ad-Max was designed, you can even change the light bulb without going inside the cell through a little --

A.  Through a pipe chase.

Q.  So it is possible that if someone is particularly dangerous, it is possible that that person could live, breathe, shower, eat

and never have direct contact with another human being in the Bureau of Prisons.

A.   That's not possible.

Q.   Well, am I correct that the only time you take them out would be for recreation, right?

A.   For recreation, medical examinations, visiting.

Q.   Well, am I correct that if someone doesn't play by the rules, they lose visitation rights?

A.   That's a fact.

Q.   And if it's a medical necessity, the doctors can go to them, right?

A.   For very limited care.  If they need an x-ray or dental care, obviously, they have to come out.

Q.   If someone had appendicitis, you might want to move them.  I mean, if someone has complaints, to determine if the complaint is valid, the doctor can actually go look at them, right?

A.   They have to go into an open area to see the inmate.

Q.   And, further, when Ad-Max was designed, wasn't it originally designed that there wouldn't even be bar soap?  Didn't they originally decide to use powder soap?

A.   That's correct.

Q.   Do you all still do that?

A.   Yes, we do.

Q.   There is not even a little roller for the toilet paper to go on; is that correct?

A.   That's correct.

Q.   Because that might turn into a weapon?

A.   That's correct.

Q.   And, further, if someone -- you get fifteen minutes on the phone per month?

A.   That's correct.

Q.   And if you don't play by the rules, that can be cut back too, can't it?

A.   That's correct.

Q.   All your mail is opened?

A.   Correct.

Q.   Any pictures that you might receive from loved ones that are viewed to be suggestive or racy are confiscated?

A.   That's true bureau-wide.

Q.   All mail has to be read, coming in and going, except for legal mail?

A.   That's a fact.

Q.   Even a letter from a lawyer though has to be opened in the presence of the inmate?

A.   Correct.

Q.   By a guard.  The officer opens it, makes sure there is nothing in it and then hands it to them?

A.   That's bureau-wide also.

Q.   So all these statistics you were talking about with homicides and stuff, those include those facilities that have a

yard where people mingle and have contact with others and all that?

A. That's correct.

Q. Now, of the 9,000 -- I'm sorry, 10,000 inmates who are in high security, how many of them are in segregation?

A. I don't know that. It would vary from day to day. I would say a safe estimate would probably be 10 percent.

Q. About a thousand. And of the thousand, about 400 of them are at Florence?

A. That would be in addition. Florence is not segregation.

Q. When I say segregation, for instance, at Marion there was a bank of cells that are very small and people aren't let out of very often; am I correct?

A. If it's disciplinary segregation, they are let out one hour five days a week.

Q. And in Florence, how often are the inmates let out of the Ad-Max security area? How long are they let out?

A. It depends on the unit. In the control unit, the most secure unit, one hour a day, seven days a week.

Q. And if they are good, they get to go to the outside room. If they are not so good, they go to the inside room?

A. No. They rotate.

Q. When the cell is opened to let them go to the recreation room and they are in maximum security, they recreate by themselves, don't they?

A. That's correct.

Q. And when the cell door is opened, they are shackled, right?

A. That is correct.

Q. And for people who don't know what shackling is, it's like handcuffs on the ankles, right, with a long chain?

A. In the control unit, they have leg irons and they are cuffed from behind.

Q. And they are cuffed from behind. Is there a belly chain?

A. No, not on recreation escort.

Q. When they get to the recreation room, they are put inside the door. And then the little doors open up, and they put their hands through the locked door, and they are uncuffed from the outside of the locked door?

A. That's correct.

Q. And then they are allowed to sit there in that room. And then when it comes time for them to remove, they come back, put their hands back through the hole in the door and are handcuffed before the doors is ever opened.

A. That's correct.

Q. And then somebody escorts them back to their cell?

A. Correct.

Q. And, further, only one of those metal doors at a time is opened as the inmates are let out, am I correct, to go to the recreation area?

A. Only one inmate would go out to recreation, be escorted at a

time.

Q.   Plus, the inmates at Florence in the high security area, they are kind of shuffled periodically, am I correct, so that they can't communicate possibly with people next door to them?

A.   We have mandatory cell rotation.

Q.   How often do you rotate?

A.   Fourteen days typically.

Q.   So every two weeks everybody gets moved?

A.   Right, but on the same range, they just rotate the cells in that range.

THE COURT:   Mr. Baugh, didn't we cover most of this with Doctor Cunningham?   It seems to me like I have heard a good deal of this before recently.

MR. BAUGH:   Forgive me.

BY MR. BAUGH:

Q.   Am I correct, sir, that the cell walls at Florence are 5,000 test concrete, reinforcing bar every 6 inches?

A.   Class A wall, what the prisons defines as a Class A wall, precast concrete, 8 inch rebar.

Q.   So that nobody can get through them.

A.   Well, we've only been open two years.   So we don't know all the possibilities that can happen over the course of history.

Q.   The doors, not the bar door, but the metal door, that's electronic, isn't it?

A.   That's correct.

Q. And in the time that it has been open, has anyone gotten out?

A. No.

Q. If an inmate does not abide by the rules, other than cutting off his visits or limiting his visits, can they also limit his telephone time?

A. Yes, if the offense is related to misuse of the telephone.

Q. And what is the -- can you cut off the telephone completely to him?

A. Probably for a year, if the misuse was significant.

Q. What would be a misuse on the telephone?

A. Conducting business on the telephone, discussing escape plots or introduction of contraband.

Q. Telephone calls are monitored?

A. That's correct.

Q. In the language of the person speaking?

A. Generally. You mean if it's a foreign language?

Q. Yes.

A. We try to have people on the monitors that can speak foreign languages.

Q. Am I correct that if inmates want to use the telephone, he must file a written request identifying the person to whom he's going to speak?

A. That's correct.

Q. So that everyone knows ahead of time when it's going to

happen so it can be approved?

A. Yes.

Q. And the reason for Florence is not only to protect officers but, am I correct, also to protect inmates from each other?

A. Yes.

Q. Because inmates have been known to hurt each other?

A. That's a fact.

Q. Would you say that, in the world, based upon your knowledge, that there is a safer facility for an inmate than Florence?

A. There are similar facilities, about twenty-seven states operate super maximum facilities that are similar. So we are on par, I think, with where technology is heading.

Q. Would you say that those are the safest institutions there can be?

A. As far as I can tell.

Q. And Beaumont is how old?

A. Brand new.

Q. Beaumont, Texas?

A. Yes, within the last couple months.

Q. And does it have a segregation unit, like we are talking about here, where single cells exist?

A. Yes. Every penitentiary -- my prison, current prison, will have a segregation unit.

Q. So we are building more of these?

A. We are not building Florences.

Q. But Florence has a capacity of 484. So you have empty bunks in Florence.

THE COURT: Segregation is different than maximum.

BY MR. BAUGH:

Q. They call them different things in different facilities. So there is still room in Florence. There are empty bunks.

A. Yes. We only use Florence for people that require that level. We don't just fill it up to fill it up.

Q. Now, you say there are 150 people at Florence with homicides in their background. Are they there for murder or are they there for other crimes and they have committed murders in the past?

A. They are there primarily for what they have done inside the prison system. Some of them have committed murder once they have entered the prison system.

Q. And others --

A. Others, it's just part of their history. They are there for other reasons, whether they tried to riot or --

Q. What percentage of the inmates at Florence are in Florence because they committed a homicide while a prisoner?

A. I don't know that number.

Q. Could you estimate it less than ten?

A. No. I would say it's higher than that. I would say it's probably thirty or forty.

Q. Of those thirty or forty, some of them come from high

security facilities, right?

A. That's correct.

Q. Others come from medium security or low security facilities?

A. If they were involved in types of behavior that would place them in Florence, they could come from any other facility.

Q. So, hypothetically, if someone were sentenced to prison in a minimum security facility for some significant felony, but nothing involving violence, and they defended themselves and hurt someone, they could get sent to Florence?

A. They defended myself --

Q. If they defended themselves from assault from other inmates.

A. Then they would not have been charged with assault, and they would not end up in Florence.

Q. They wouldn't be charged with assault?

A. Not if we can prove that they were -- or they can prove that they were defending themselves.

Q. Oh, I'm sorry, if they can prove that they were the victims, they don't get sent, right?

A. Right.

Q. But if they were the victims and they can't prove it, they go, right?

A. Well, you are twisting my words. What I'm saying is that if the individual is found guilty of a serious assault, then he is punished like anyone else would be punished when they are

involved in that type of behavior.

Q. Would spitting on an officer be an assault?

A. To be put in Florence?

Q. Is it classified as a serious assault and be in that stat you just read?

A. On occasion.

Q. Yes. Would pushing an officer out of the way, would that be considered an assault?

A. Yes.

Q. Would that be considered in your statistics?

A. Yes.

Q. So any misdemeanor touching would be classified as an assault and would fit in those statistics you just went over with Mr. McBride, right?

A. Any physical use of force against an individual would be considered an assault.

Q. Would you consider spitting at someone use of force?

A. I consider it an assault, yes.

Q. Okay. So that could get you -- you could get on that statistical pool that Mr. McBride just read from?

A. Right.

Q. Is there any rule that prohibits a new inmate who has been classified as dangerous from being sent to Ad-Max in Florence?

A. No, but that's not the Bureau's goal in Ad-Max.

Q. Okay. This will got faster if you answer my question. Is

there any rule that says they can't go there?

A.   No.

          MR. BAUGH:   Thank you.   Pass the witness.

          CROSS EXAMINATION BY MR. ZERKIN:

Q.   Good afternoon.   When you talk about turf wars against gangs, the gangs you are talking about in the federal prison system are things like the Hells Angels, Pagans, Arian Nation; am I correct?

A.   Not necessarily.   The broader group is actually what we call disruptive groups, and sometimes they are street gangs as you mentioned.   Other times they are just loosely geographic gangs. African American inmates from Washington, D.C., if they are in one facility, may get together to run turf issues.

Q.   And you have the ability in your classification system to determine who might align themselves with other inmates; is that correct?

A.   We attempt to.

Q.   And you attempt to disassociate people who were involved in crime on the outside from being with each other on the inside; is that right?

A.   That's correct.

Q.   In fact, that would be one of your clear criteria you would rely upon when you are making assignments?

A.   Yes, codefendants.   We usually try to separate codefendants.

Q.   And what information -- when you determine what level of security is necessary for an inmate coming into the system, what sources of information do you have?

A.   We have the presentence investigation report.   We rely heavily on that.

Q.   That's done by a probation officer and the court; is that correct?

A.   That's correct.

Q.   What else do you have?

A.   Their instant offense.   Those are the primary sources.

Q.   Do you do a psychological assessment?

A.   We do a screening.   And if that screening indicates that the individual may have some issues, then we do further assessment.

Q.   When you say screening, what are you talking about?

A.   It's both a written tool, and then we do a brief diagnostic with a psychologist, a brief interview.

Q.   And that's a psychological profile to determine whether the person would be at high risk for committing violence in the institution; is that correct?

A.   That would be putting it too strongly.   Mainly, we're looking at tendencies toward suicide and then whether the individual has some severe mental functioning.   That's about it at that point.

Q.   If the gentlemen to my right, the United States Attorneys in

this case, thought that a particular defendant posed a high risk of danger in the prison system, do they have a means of communicating that to the prison system for classification purposes?

A.   Yes, they do.

Q.   I assume that you would willingly accept such information from them; is that correct?

A.   We'll accept the information, yes.

Q.   Is there, in fact, a form for that purpose?

A.   I'm unsure, but given that it's the Government, I would believe there probably is a form.

Q.   Touche.  These programs, like Florence, and which I guess is in similar form at Marion; is that correct?

A.   We took all the inmates out of Marion, most of them, and moved them to Florence.  So Marion's program is very different than it was several years ago.

Q.   But the basic concept existed at Marion before Florence?

A.   That's correct.

Q.   And that program, in fact, with this goal of thirty-six months being able to release them back to the population, has been quite successful, hasn't it?

A.   It has been very successful.

Q.   In fact, you only have a return rate, once they are released, of about 15 percent?

A.   That's correct.

Q.   Isn't it also true that most murderers in the system are not classified as -- when I say murderers in the system, I mean people convicted of murder, serving terms for murder -- are not classified as appropriate for settings such as Ad-Max and Florence or at Marion; is that correct?

A.   That's correct.  The vast majority of them are in open population facilities.

Q.   In fact, if I got your numbers -- do you know what the percentage would be?

A.   Well, there is roughly just over 1,250 inmates in our system that have a current offense of murder, and only 158 of those are in ADX.

Q.   So it comes out to about 12 and a half percent; does that look about right?

A.   Yes.

Q.   Mr. Baugh asked you about the definition of assault.  What's the definition of weapon in those statistics you showed us?

A.   It would require some piece of hardware that's actually used on an individual.

Q.   I mean, anything other than your fist; is that right?

A.   That's correct.

        MR. ZERKIN:  That's all I have, Judge.

        THE COURT:  Any other questions?

REDIRECT EXAMINATION BY MR. McBRIDE:

Q.   Now, Mr. Vanyur, you mentioned that you HAD taken soap, hard soap away at Ad-Max, and you have taken the rollers for the toilet paper out of the cells; is that correct?

A.   That's correct.

Q.   Do you think you've thought of all the things that an inmate could make a weapon out of?

A.   Not at all.

Q.   Now, by law, these inmates have to go to the law library; is that correct?

A.   That's correct.

Q.   And by law, they have to recreate?

A.   That's correct.

Q.   Now, Mr. Baugh indicated that in the high security part of Ad-Max, people are cuffed behind their back, and they have these leg irons on; is that correct?

A.   That's correct.

Q.   But there are inmates at Ad-Max who are not moved around in that fashion; is that correct?

A.   That's correct.

Q.   In fact, at the latter stages of the program, they are allowed to move about freely to some extent; is that correct?

A.   Yes.   They move about unrestrained.

Q.   And receive cable television and other privileges at that

point; is that correct?

A.    Well, they see that in even the most secure units.

Q.    Cable television?

A.    That's correct.

Q.    Now, let me ask you this.  There was a lot of questioning about Ad-Max and Marion and high security.  Based upon the crime of homicide, is there any limit as to how low an inmate could work himself in the BOP system over the years if they were incarcerated for a long period of time?

A.    If it's just homicide?

Q.    Just homicide.

A.    I have nine in my low security facility.  So I would assume a low security facility would probably be as low as they could go.

Q.    And you're at a low security facility?

A.    That's correct.

Q.    How many inmates in total are at your facility?

A.    1,160.

Q.    And nine of them --

A.    Have homicide in their background.

Q.    How about someone who is sentenced to prison for life without parole, what is the lowest they could work themselves in the system?

A.    They could work themselves down to a medium security facility.

Q.   Then by rule they could go no further; is that correct?

A.   That's correct.

Q.   What is the difference between a medium security facility and a high security like the U.S.P.

A.   More the level of control of movement and the perimeter security.  But in terms of open movement to recreation areas, access to education programs, access to open feeding, they are going to be very similar.

Q.   Now, BOP has to house international terrorists and leaders of drug cartels from South America; is that correct?

A.   That's correct.

Q.   And those people pose a threat from the outside as well as the inside; is that correct?

A.   That's correct.

Q.   Now, these four defendants here who have been convicted of serious crimes, drug murder and participation in a continuing criminal enterprise, in your opinion, with your seventeen years experience in BOP, where are they going to be sent if they are sentenced?

          MR. BAUGH:  Objection, Your Honor, irrelevant.

          MR. ZERKIN:  It's way beyond -- I think way beyond the cross.

          MR. McBRIDE:  I don't think it is at all, Your Honor.

          MR. ZERKIN:  It's certainly beyond mine.

          MR. BAUGH:  It's speculative, Your Honor, in that Mr.

Vanyur --

THE COURT:  Come up here.

BENCH CONFERENCE:

MR. ZERKIN:  I just think it was beyond cross, that's all, Judge.

MR. BAUGH:  Mine is, Your Honor, that Mr. Vanyur has indicated that the criteria for the determination of that placement, all of which involved, he mentioned input from the United States Attorney's Office, presentence report, all those things, without that information, that is a pure guess he's been asked to give.

THE COURT:  Also, I haven't heard anything about them being involved in the decisional process.  Maybe I missed it. Is there anything in his background that had him involved in placement?

MR. McBRIDE:  Well, he's familiar with the regulations.  Those are what he quoted about Ad-Max and Florence.  And I think Mr. Baugh certainly suggested that all these guys are going to Florence, based upon a number of criteria.  Mr. Zerkin's cross suggested that the U.S. Attorney's Office would have some influence on that.  I think I'm entitled to ask him, as a BOP professional, where do you think these guys are going to go.

MR. BAUGH:  If I might, Your Honor, the purpose of my questioning was not to show that they would go there, but the purpose of my questioning was to show, if the Bureau of Prisons deemed them dangerous enough, they could.  That is all.  I don't think anyone can say they are going there.

THE COURT:  I don't think direct assignment is appropriate.  So I will sustain the objection.  You are not going to argue anything beyond what you just said.

MR. BAUGH:  Yes, sir.

END BENCH CONFERENCE

BY MR. McBRIDE:

Q.  Out of your total population of 110,000, how many inmates have homicide in their background?

A.  Roughly 1,250.

Q.  And the vast majority of those are in high security facilities?

A.  579 are at the highest.

Q.  And where are the rest of them?

A.  They are spread out in the system.  As I said, I have nine in my low security.  We have eighty-five facilities.  So I'm sure they are spread out, medium, low and high.

Q.  Now, that razor item that I showed you earlier, would you classify that as a weapon?

A.  Definitely.

Q.  Have you ever seen anyone do arts and crafts with an item like that?

THE COURT:  All right, let's go.

MR. McBRIDE:  I have no further questions.

MR. BAUGH:  I have very few, Your Honor, if I may.

RECROSS CROSS EXAMINATION BY MR. BAUGH:

Q.  Just so people in the audience don't misunderstand, when you say cable television, am I correct that at Florence each inmate gets a 12 inch black and white television and religious services and education channels and some entertainment are broadcast over those?

A.  That's correct.

Q.  They are not getting HBO or CSPAN or anything like that?

A.  Well, they have ESPN and several other channels similar to that.

Q.  In black and white?

A.  In black and white.

THE COURT:  ESPN?

THE WITNESS:  Yes, sir.

MR. BAUGH:  That's what he said.

By MR. BAUGH:

Q.  Is one thing, can you cut off their television?

A.   Yes.   We have had some destroy their televisions.

MR. BAUGH:   Thank you, sir.

THE COURT:   All right.

MR. JONES:   Your Honor, a couple questions if I might.

RECROSS EXAMINATION BY MR. JONES:

Q.   Mr. Vanyur, you indicate that you have nine prisoners who have been charged with murder, or is that in their history or is that a federal charge of murder?

A.   That's in their history.

THE COURT:   Are you talking about in his facility?

BY MR. JONES:

Q.   At your facility.

A.   It's somewhere along their criminal --

Q.   Okay.   So they are not in the federal system for murder?

A.   Not necessarily, no.

Q.   And do you know individually how long they have been in the system before they got to the security level that you are at?

A.   No.   They have to have generally less than seventeen years left to serve to get down to a low security.

Q.   Do you know the average age of the individuals that -- these nine individuals that are in your facility?

A.   I do not.   The average age of my total inmate population is around thirty-seven or thirty-eight.

Q.  Okay.  But your total inmate population -- Butner has a special treatment program; is that correct?

A.  That is the facility next door to mine.  There are two facilities at Butner.

Q.  Okay.  But we don't consider that program as part of your inmates?

A.  No, I do not.

MR. BAUGH:  In light of that, may I?

RECROSS EXAMINATION BY MR. BAUGH:

Q.  Sir, when you talk about these gangs, does the occurrence of gang violence drop off --

THE COURT:  He didn't talk about gangs.  Mr. Jones didn't ask --

BY MR. BAUGH:

Q.  Sir, do you find older inmates involved in gang activity, like fifties and sixties?

A.  Yes.  Most of the gang leaders typically are older.  It takes them a few years to work their way up.

MR. BAUGH:  Thank you, sir.

THE COURT:  Can he be excused?

MR. McBRIDE:  Yes, Your Honor.

THE COURT:  Thank you for being with us and giving us your evidence.  You are excused from your subpoena.

(The witness was excused from the witness stand.)

I, Sandra M. Beverly, certify that the foregoing transcript is a correct record of the proceedings taken and transcribed by me to the best of my ability.

_____     _____
SANDRA M. BEVERLY, RPR              Date

# EXHIBIT F

U. S. Department of Justice

Federal Bureau of Prisons

_Washington, DC 20534_

August 25, 2008

David E. Bindi
Assistant U.S. Attorney
United States Attorney's Office
for the Northern District of Illinois
219 South Dearborn Street
Chicago, Illinois 60604

      Re:    United States v. Darryl Johnson, N.D. Ill., No. 02 C 6998

Dear Mr. Bindi:

      This letter is written in response to your request for a response from the BOP to a court order in the above-referenced matter. Specifically, Judge Hibbler has ordered the government to turn over to Mr. Johnson's attorneys information believed to be maintained in the records of the Bureau of Prisons (BOP) regarding instances of _formal restrictions_ being placed on the communications privileges of BOP inmates. As outlined in your letter dated June 18, 2008, the order is limited to instances of formal restrictions on communications imposed prior to Mr. Johnson's sentencing hearing, which began on November 6, 1997, and concluded on November 17, 1997. In responding to the court's order, I have taken the following actions.

      (1)    On June 27, 2008, your letter and court order were forwarded to Dominique Raia, Senior Counsel in the Legislative and Correctional Issues (LCI) Branch, to determine whether she had any responsive information. On July 10, 2008, Ms. Raia provided you with an e-mail regarding the number of special administrative matters (SAMs) in the BOP prior to November 17, 1997.

      (2)    Soon thereafter, I discussed with Ms. Raia ideas for obtaining information about communication restrictions ordered by the district courts pursuant to 18 U.S.C. §3582, or any other similar statutory or other regulatory measures. She suggested that I speak to a Research Analyst for the BOP and our Correctional Programs Division to see if they have this information. She also recommended that I speak with Chris Synsvoll, Supervisory Attorney at the Consolidated Legal Center, Florence, Colorado, and to Linda Thomas, Administrator of the Correctional Services Branch with regard to the request pertaining to how many BOP inmates were housed under no-human-contact conditions, not including normal

disciplinary segregation.

(3)     I initially spoke with Randy Eternick, Administrator of the Correctional Programs Branch, with regard to any information he may have concerning the court order. He did not have any responsive information, and referred me to Linda Thomas of the Correctional Services Branch.

(4)     On August 18, 2008, I e-mailed Ms. Linda Thomas, Administrator of the Correctional Services Branch requesting information on whether she was aware of any BOP inmates other than Thomas Silverstein and Clayton Fountain who were subject to similar restrictions. Ms. Thomas stated that the Correctional Services Branch does not have any information that would be responsive to this request. Ms. Thomas had no additional recommendations from what I had already.

(5)     I contacted Jennifer Batchelder, Research Analyst for the BOP in order for her to determine whether these type of restrictions had been tracked by the BOP. She suggested that I speak to Ron Riker at the Designation Sentence Computation Center (DSCC), located in Grand Prarie, Texas, to find out if there are any codes in our BOP database that are used for tracking these restrictions. Mr. Riker identifed several basis of change codes which I provided to Ms. Batchelder. Ms. Batchelder then provided this information to William Saylor, the Director of Research and Evaluation for his opinion. Mr. Saylor agreed that the codes identified by Mr. Riker are not relevant to obtaining information on communication restrictions as they are applied when an inmate's sentence is changed. Based on the input she received from Mr. Saylor, Ms. Batchelder recommended that we speak to Mr. Rowles from the Correctional Services Branch for his input.

(6)     On August 4, 2008, I met with Mr. Rowles the Administrator of the Central Office Intelligence Section with regard to any inmates who were placed on court imposed communication restrictions prior to November 17, 1997.  Beginning in January, 2002, the Central Office Intelligence Section began compiling a monthly report identifying, by facility and category of restriction, inmates who have SAMs, court imposed restrictions, or restrictions agreed to during plea negotiations. The first report shows two inmates as having court ordered restrictions. Inmate Luis Felipe, Register Number 14067-074, was the only inmate listed in this report in which the court imposed restrictions prior to November 17, 1997. All of the other reports that were provided to me listed inmates names whose restrictions were imposed by the court after November 17, 1997.  In compiling these reports, the intelligence section relies upon the SENTRY assignment loaded by field or other Central Office staff and does not verify the court order, request copies of any court documents, or verify the assignment in SENTRY. Thus, it is entirely probable that other inmates may be or have been in Bureau of Prisons custody with court

2

imposed communication restrictions that they are not aware of. Additionally, Kevin Schwinn, Chief of Intelligence Section at Central Office indicated that his office does not track those individuals with similar restrictions to inmates Silverstein and Fountain. Mr. Schwinn was unaware of anyone having this information.

(7)     Mr. Schwinn also provided me with the SENTRY assignment for inmates with court ordered communication restrictions. He was unaware of when this SENTRY assignment was created. I provided this information to Ms. Batchelder. She ran a search and provided me with a list of inmates who are subject to court ordered communication restrictions. This list included seven inmates names. Inmate Luis Felipe, Register Number 14067-074, was the only inmate listed in this report in which the court imposed restrictions prior to November 17, 1997.

(8)     Based on Ms. Raia's recommendation, I contacted Chris Synsvoll, Supervisory Attorney for the Consolidated Legal Center, located in Florence, Colorado, to determine whether he had any responsive information. He indicated that Luis Felipe is the only inmate who is currently housed at the Administrative Maximum, Florence, Colorado (ADX) whose restrictions were imposed prior to November 17, 2007.

(9)     Mr. Synsvoll also indicated that he is not aware of any inmate being housed under a no-human-contact status. Rather, inmates such as Thomas Silverstein and Clayton Fountain were housed under restrictive conditions of confinement to minimize their impact on security and orderly running of the institution. Even with that assignment, their access to programs and communication (telephone, correspondence, and visitation) was handled in accordance with BOP program statements.

(10)    Since Mr. Synsvoll was doubtful that his list was exhaustive, he suggested that I contact the DSCC to see if they have a mechanism for tracking these type of restrictions. Based on Mr. Synsvoll's recommendation, I contacted Sonya Cole who is the Assistant General Counsel assigned to the DSCC. She indicated that the DSCC has no responsive materials prior to November 6, 1997 because it came into existence in 2005, and records of such communication restrictions are not and have never been maintained at the DSCC. Ms. Cole suggested that I contact each Regional Counsel and Regional Correctional Programs Administrator to see if they may still have any responsive documents.

(11)    On August 5, 2008, I e-mailed all six Regional Counsels requesting responsive documents and provided them with a copy of your letter and the court order. I asked them to check with their Regional Correctional Programs Administrator for responsive documents. All six Regional Counsels did not have any responsive documents. In fact, Hank Sadowski, Regional Counsel for the Northeast Region,

3

recalled involvement in the § 3582 (d) order and the appeal of that order in the case of United States v. Felipe, 148 F.3d 101 (2nd Cir.), cert. denied, 525 U.S. 907 (1998).  At that time, he remembers, to the best of his recollection, that this was the first time a court utilized 18 U.S.C. § 3582(d).  Mr. Sadowski recommended that I speak to Daryl Kosiak, former Regional Counsel for the North Central Region, regarding his recollection.  On August 20, 2008, I spoke with Mr. Kosiak who explained to me that to his knowledge inmate Felipe's case was the first time a court had utilized 18 U.S.C. § 3582 (d).

Based on the above steps that I have taken in response to the court order and your letter, aside from inmate Luis Felipe, no other inmates have been identified prior to November 17, 1997, who are or were subject to formal restrictions in their ability to communicate and associate with others, based on § 3582(d), or any similar statutory or regulatory provision addressing long-term security problems, not including normal disciplinary segregation.  As discussed above, inmates Thomas Silverstein and Clayton Fountain did receive visits, and had mail and telephone access.

I trust this has been responsive.  If you have any questions, or need additional information, please contact me at (202) 616-7706.

Sincerely,

Ann H. Zgrodnik
Senior Counsel
Litigation Branch

4

# EXHIBIT G

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA

UNITED STATES OF AMERICA     )
            )
            )
        vs.          )    Case No.  02 C 6998
            )
JOHNSON, et al.         )
            )
            )
_____)

DECLARATION OF B. ENGLISH

I, B. English, do hereby declare as follows:

1.     I am a Case Manager, employed at the United States Department of Justice, Federal Bureau of Prisons (BOP), Federal Correctional Complex, (FCC Terre Haute). I have been employed in this capacity since February, 2005. I have been employed by the BOP since 1994.

2.     I am assigned to the Special Confinement Unit (SCU), USP Terre Haute. Plaintiff was assigned to my case load from March, 2005, through present. My job duties as Case Manager include preparation of progress reports for consideration of parole, transfer, restoration of forfeited good conduct time, and to make appropriate recommendations. I prepare correspondence regarding inmates to attorneys, judges, probation/parole officers and other individuals. Further, I make recommendations regarding programming for inmates and conduct program reviews of inmates. Other duties include classification of inmate security levels, tracking of Central Inmate Monitoring cases, Victim/Witness cases, coordinating the inmate's court ordered financial obligations, organize Parole Review Panels, serve on Unit Discipline Committees, conduct

Protective Custody Investigations, and other various issues that pertain to inmates assigned to my case load. I have access to inmates central file, SENTRY records, and other records maintained by the Bureau of Prisons.

3.      This Declaration is provided in regard to Darryl Johnson, Reg. No. 06710-424, as a progress update. Johnson has been assigned to the SCU at USP Terre Haute, IN, since July 13, 1999.

4.      I consider Johnson to be a well adjusted inmate without any out of the ordinary management concerns. He has a work assignment as a SCU orderly and performs his assigned duties in a satisfactory manner. Johnson does not have any recent disciplinary issues. He receives regular social visits and participates in recreational opportunities regularly. Johnson does not have an assignment as a Special Administrative Measures ("SAMS") inmate. Johnson has participated in the GED self study program but has discontinued participating without completion. He has not participated in any other educational programming since his confinement. Overall, Johnson is a quiet and civil individual. Input from the Psychology Department indicates he has not presented any mental health concerns since his arrival to this facility.

        I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.

Executed this _____25_____ day of August, 2008.

                                                          _____
                                                          B. English, Case Manager
                                                          Federal Correctional Complex
                                                          Terre Haute, Indiana

# EXHIBIT H

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Richmond Division


UNITED STATES OF AMERICA


v.                                      Criminal No. 3:96-CR-66-01

DEAN ANTHONY BECKFORD,
    a/k/a "Smiles"
    a/k/a "Smiley"
    a/k/a "Daniel Davis"
    a/k/a "Milo"


## SPECIAL VERDICT FORM

### I.   CATEGORY ONE STATUTORY AGGRAVATING FACTORS

Instructions:  For the following four statutory aggravating factors in Category One, you may find only one factor present as to the defendant and any count for which you have convicted the defendant for killing a particular victim.  If you unanimously find that one of these four factors has been proved beyond a reasonable doubt place an "X" next to "YES" as to that factor and move on to the Category Two factors for that particular count.


### COUNT FIVE -- KILLING OF DASMOND MILLER


1.   DEAN ANTHONY BECKFORD intentionally killed Dasmond Miller.

                                    ✓ YES      X
                                      NO     _____


2.   DEAN ANTHONY BECKFORD intentionally inflicted serious bodily injury which resulted in the death of the Dasmond Miller.


                                      YES    _____
                                      NO     _____

3.    DEAN ANTHONY BECKFORD intentionally engaged in conduct intending that Dasmond Miller be killed and/or that lethal force be employed against Dasmond Miller which resulted in the death of Dasmond Miller.

YES _____

NO _____

4.    DEAN ANTHONY BECKFORD intentionally engaged in conduct which he knew would create a grave risk of death to a person, other than one of the participants in the offense, and which resulted in the death of Dasmond Miller.

YES _____

NO _____

## COUNT SIX -- KILLING OF SHERMAN AMBROSE

1.    DEAN ANTHONY BECKFORD intentionally killed Sherman Ambrose.

YES __X__

NO _____

2.    DEAN ANTHONY BECKFORD intentionally inflicted serious bodily injury which resulted in the death of the Sherman Ambrose.

YES _____

NO _____

3.    DEAN ANTHONY BECKFORD intentionally engaged in conduct intending that Sherman Ambrose be killed and/or that lethal force be employed against Sherman Ambrose which resulted in the death of Sherman Ambrose.

YES _____

NO _____

4.    DEAN ANTHONY BECKFORD intentionally engaged in conduct which he knew would create a grave risk of death to a person, other

2

than one of the participants in the offense, and which resulted in the death of Sherman Ambrose.

YES _____

NO _____

Instructions:  If you answered "NO" with respect to all four of the Category One Statutory Aggravating Factors in Section I above as to either Count Five or Count Six, then that ends your consideration of the death penalty as to that Count.  Accordingly, you must stop your deliberations and complete Section A of the Decision Form for defendant DEAN ANTHONY BECKFORD which relates to that count.

If you answered "NO" with respect to all four Category One Statutory Aggravating Factors as to both Counts Five and Six, then that ends your consideration of the death penalty as to this defendant.  You must stop your deliberations and complete Section A of the Decision Form that relates to Count Five and Count Six for DEAN ANTHONY BECKFORD.  You should then sign the Certification Form and advise the Court that you have reached a decision respecting DEAN ANTHONY BECKFORD.

If you answered "YES" with respect to one of the Category One Statutory Aggravating Factors in Section I above as to Count Five and/or Count Six, then continue your deliberations as to that count or counts in accordance with the Court's instructions and proceed to Section II which follows.

II.  CATEGORY TWO STATUTORY AGGRAVATING FACTORS

Instructions: Please answer "YES" or "NO" as to whether you, the jury, unanimously find that the government has established the existence of any of the following Category Two statutory aggravating factors beyond a reasonable doubt as to each of Counts Five and Six.  You may find more than one of the following factors for each of Counts Five and Six.

3

## COUNT FIVE -- KILLING OF DASMOND MILLER

1.   DEAN ANTHONY BECKFORD committed the offense described in Count Five of the Superseding Indictment in the expectation of the receipt of something of pecuniary value, to wit: control over the location and contents of 1514 Tifton Court and the profits from the sale of cocaine base, commonly known as "crack" cocaine, associated with that location.

YES _____

NO ___X_____

2.   DEAN ANTHONY BECKFORD committed the offense described in Count Five of the Superseding Indictment after substantial planning and premeditation.

YES ___X_____

NO _____

## COUNT SIX -- KILLING OF SHERMAN AMBROSE

1.   DEAN ANTHONY BECKFORD committed the offense described in Count Six of the Superseding Indictment in the expectation of the receipt of something of pecuniary value, to wit: control over the location and contents of 1514 Tifton Court and the profits from the sale of cocaine base, commonly known as "crack" cocaine, associated with that location.

YES _____

NO ___X_____

2.   DEAN ANTHONY BECKFORD committed the offense described in Count Six of the Superseding Indictment after substantial planning and premeditation.

YES ___X_____

NO _____

4

Instructions: If you answered "NO" with respect to all of the Category Two Statutory Aggravating Factors in Section II above as to either Count Five or Count Six, then that ends your consideration of the death penalty as to that Count. Accordingly, you must stop your deliberations, and complete Section A of the Decision Form for DEAN ANTHONY BECKFORD which relates to that count.

If you answered "YES" with respect to any one or more of the Category Two Statutory Aggravating Factors alleged as to Count Five or Count Six, or both, for the defendant DEAN ANTHONY BECKFORD in Section II above, then you may continue your deliberations in accordance with the Court's instructions only if you also found a Category One Statutory Aggravating Factor in Section I as to that particular count. If you have so found, please proceed to Section III which follows.

In short, you must have unanimously found one Aggravating Factor from Section I and at least one Aggravating Factor from Section II proven beyond a reasonable doubt as to the same count. Otherwise, stop your deliberations and complete Section A of the appropriate Decision Form. If you have signed Section A as to both Count Five and Count Six, then you should also sign the Certification Form and advise the Court that you have reached a decision respecting DEAN ANTHONY BECKFORD.

## III.   NON-STATUTORY AGGRAVATING FACTORS

Instructions: Please answer "YES" or "NO" as to whether you, the jury, unanimously find that the government has established the following non-statutory aggravating factors beyond a reasonable doubt. You may find more than one of the following factors for each of Counts Five and Six.

### COUNT FIVE -- KILLING OF DASMOND MILLER

1.   The defendant DEAN ANTHONY BECKFORD poses a future danger to the community in that there is a high probability that the

5

defendant would commit criminal acts of violence constituting a continuing threat to society

YES _____

NO ___X_____

2.   The defendant DEAN ANTHONY BECKFORD conceived of the plan to intentionally kill Dasmond Miller and Sherman Ambrose and recruited the defendant CLAUDE GERALD DENNIS to assist him in that plan.

YES _____

NO ___X_____

3.   The defendant DEAN ANTHONY BECKFORD intentionally killed and aided and abetted in the intentional killing of more than one person in a single criminal episode, to wit:  Dasmond Miller and Sherman Ambrose.

YES ___X_____

NO _____

## COUNT SIX -- KILLING OF SHERMAN AMBROSE

1.   The defendant DEAN ANTHONY BECKFORD poses a future danger to the community in that there is a high probability that the defendant would commit criminal acts of violence constituting a continuing threat to society

YES _____

NO ___X_____

2.   The defendant DEAN ANTHONY BECKFORD conceived of the plan to intentionally kill Dasmond Miller and Sherman Ambrose and recruited the defendant CLAUDE GERALD DENNIS to assist him in that plan.

YES _____

NO ___X_____

6

3.   The defendant DEAN ANTHONY BECKFORD intentionally killed and aided and abetted in the intentional killing of more than one person in a single criminal episode, to wit:  Dasmond Miller and Sherman Ambrose.

YES   __X__

NO    _____

Instructions:   Regardless of whether you answered "YES" or "NO" with respect to the Non-Statutory Aggravating Factors in Section III above, continue your deliberations in accordance with the Court's instructions and proceed to Section IV which follows.

## IV.  MITIGATING FACTORS

Instructions:  Please answer each of the following questions, respecting the mitigating factors alleged by the defendant, "YES" or "NO."  A "YES" answer must be recorded if one juror believes the mitigating factor to have been established by the defendant by a preponderance of the evidence.  For each of the following, you also must indicate, in the space provided, the number of jurors who have found the existence of that mitigating factor to be proven by a preponderance of the evidence.

A finding with respect to a mitigating factor may be made by one or more of the members of the jury.  Any member of the jury who finds a mitigating factor proven by a preponderance of the evidence, whether or not specifically argued by defense counsel, may consider such a factor in determining whether a sentence of death shall be imposed.   This is true even if no other juror concurs that the factor has been proved.  Any juror may find more than one mitigating factor.

## MITIGATING FACTORS AS TO THE KILLING OF DASMOND MILLER
### (COUNT FIVE)

1.  As of the date of the offense, DEAN ANTHONY BECKFORD, had no criminal convictions.

YES   __X__

NO    _____

Number of jurors who so find:  __7__.

2. As of this date, DEAN ANTHONY BECKFORD has no prior criminal convictions.

YES _____

NO __X__

Number of jurors who so find: __0__ .

3. DEAN ANTHONY BECKFORD did not commit any violent acts after 1989.

YES __X__

NO _____

Number of jurors who so find: __8__ .

4. As of the date of the offense, DEAN ANTHONY BECKFORD was youthful, although not under the age of 18.

YES __X__

NO _____

Number of jurors who so find: __1__ .

5. If incarcerated, DEAN ANTHONY BECKFORD will not represent a continuing danger to society.

YES __X__

NO _____

Number of jurors who so find: __7__ .

6. At the time of the offense, DEAN ANTHONY BECKFORD believed that Dasmond Miller, Sherman Ambrose and/or Delroy Smith posed a danger to his own life.

YES __X__

NO _____

Number of jurors who so find: __1__ .

7. DEAN ANTHONY BECKFORD felt and expressed remorse for the killing of Sherman Ambrose.

YES __X__

NO _____

Number of jurors who so find: __6__ .

8.    A series of abandonments by his parents and other parental figures at multiple, critical stages of development rendered DEAN ANTHONY BECKFORD vulnerable to the corrupting influences of older males and the culture of drug trafficking in his community.

YES ___X___

NO _____

Number of jurors who so find: __6___.

9.    DEAN ANTHONY BECKFORD's circumstances and environment were conducive to his becoming involved in the drug business as a seller, user, or both.

YES ___X___

NO _____

Number of jurors who so find: ___7___.

10.   DEAN ANTHONY BECKFORD has adjusted to incarceration.

YES ___X___

NO _____

Number of jurors who so find: ___1___.

11.   DEAN ANTHONY BECKFORD expressed remorse for shooting Tracy LaVache.

YES _____

NO ___X___

Number of jurors who so find: __0___.

12.   DEAN ANTHONY BECKFORD expressed remorse for the pain that he has brought to his mother by his criminal activity.

YES ___X___

NO _____

Number of jurors who so find: __6___.

9

13.  DEAN ANTHONY BECKFORD has been a good father to his child, Dean, Jr., a good father-figure to Dawan Corsett, his son's half-brother, and to his goddaughter, Christine O'Brien.

YES __X__

NO _____

Number of jurors who so find: __6__.

14.  DEAN ANTHONY BECKFORD has performed many acts of kindness and shown consideration for friends and families.

YES __X__

NO _____

Number of jurors who so find: __2__.

15.  Dasmond Miller and Sherman Ambrose consented to the criminal conduct that led to their deaths.

YES __X__

NO _____

Number of jurors who so find: __3__.

16.  Other persons who committed murders in furtherance of the continuing criminal enterprise or drug conspiracy alleged in this case, whether indicted or not, will not be punished by death.

YES __X__

NO _____

Number of jurors who so find: __4__.

17.  Another defendant or co-conspirator, equally culpable in the crime, will not be punished by death.

YES __X__

NO _____

Number of jurors who so find: __4__.

10

## MITIGATING FACTORS AS TO THE KILLING OF SHERMAN AMBROSE
### (COUNT SIX)

1.  As of the date of the offense, DEAN ANTHONY BECKFORD, had no criminal convictions.

YES ___X___

NO _____

Number of jurors who so find: ___7___.

2.  As of this date, DEAN ANTHONY BECKFORD has no prior criminal convictions.

YES _____

NO ___X___

Number of jurors who so find: ___0___.

3.  DEAN ANTHONY BECKFORD did not commit any violent acts after 1989.

YES ___X___

NO _____

Number of jurors who so find: ___8___.

4.  As of the date of the offense, DEAN ANTHONY BECKFORD was youthful, although not under the age of 18.

YES ___X___

NO _____

Number of jurors who so find: ___1___.

5.  If incarcerated, DEAN ANTHONY BECKFORD will not represent a continuing danger to society.

YES ___X___

NO _____

Number of jurors who so find: ___7___.

11

6.   At the time of the offense, DEAN ANTHONY BECKFORD believed that Dasmond Miller, Sherman Ambrose and/or Delroy Smith posed a danger to his own life.

YES __X__

NO _____

Number of jurors who so find: __1__.

7.   DEAN ANTHONY BECKFORD felt and expressed remorse for the killing of Sherman Ambrose.

YES __X__

NO _____

Number of jurors who so find: __6__.

8.   A series of abandonments by his parents and other parental figures at multiple, critical stages of development rendered DEAN ANTHONY BECKFORD vulnerable to the corrupting influences of older males and the culture of drug trafficking in his community.

YES __X__

NO _____

Number of jurors who so find: __6__.

9.   DEAN ANTHONY BECKFORD's circumstances and environment were conducive to his becoming involved in the drug business as a seller, user, or both.

YES __X__

NO _____

Number of jurors who so find: __7__.

10.   DEAN ANTHONY BECKFORD has adjusted to incarceration.

YES __X__

NO _____

Number of jurors who so find: __1__.

11.   DEAN ANTHONY BECKFORD expressed remorse for shooting Tracy LaVache.

YES _____

NO ___X_____

Number of jurors who so find: ___0_____ .

12.   DEAN ANTHONY BECKFORD expressed remorse for the pain that he has brought to his mother by his criminal activity.

YES ___X_____

NO _____

Number of jurors who so find: ___6_____ .

13.   DEAN ANTHONY BECKFORD has been a good father to his child, Dean, Jr., a good father-figure to Dawan Corsett, his son's half-brother, and to his goddaughter, Christine O'Brien.

YES ___X_____

NO _____

Number of jurors who so find: ___6_____ .

14.   DEAN ANTHONY BECKFORD has performed many acts of kindness and shown consideration for friends and families.

YES ___X_____

NO _____

Number of jurors who so find: ___2_____ .

15.   Dasmond Miller and Sherman Ambrose consented to the criminal conduct that led to their deaths.

YES ___X_____

NO _____

Number of jurors who so find: ___3_____ .

16.   Other persons who committed murders in furtherance of the continuing criminal enterprise or drug conspiracy alleged in this case, whether indicted or not, will not be punished by death.

YES ___X_____

13

NO _____

Number of jurors who so find: __4____.


17.  Another defendant or co-conspirator, equally culpable in the crime, will not be punished by death.

YES _X_____

NO _____

Number of jurors who so find: __4____.


### ADDITIONAL MITIGATING FACTORS

The following extra spaces are provided to write in additional mitigating factors, if any, found proven by a <u>preponderance of the evidence</u> by one or more jurors.  If none, write "NONE" and cross out the extra spaces with a large "X."  If more space is needed, write "CONTINUED" and use the reverse side of this page.


18.  _Less tendency towards violence in prison because of Age._

Number of jurors who so find __9___.


19.  _Questionable reliability of key inmate witnesses_

Number of jurors who so find __2___.


__. _____

Number of jurors who so find _____.


<u>Instructions</u>:  You have now completed your Special Findings respecting DEAN ANTHONY BECKFORD and must begin the process of weighing the aggravating and mitigating factors, in accordance with the Court's instructions, to determine if you will recommend a sentence of death.  Remember, you are now considering only those killings for which you have not already completed Section A of the Decision Form.  Upon completing your deliberations as to the

14

remaining killings for which you have convicted DEAN ANTHONY BECKFORD, complete Section B, C, or D of the Decision Form as appropriate for each crime.

The date and your foreperson's signature should appear below, certifying that these are your Special Findings respecting DEAN ANTHONY BECKFORD.

_____,_____          _____._____
        Date                                      Foreperson

15

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Richmond Division

UNITED STATES OF AMERICA

v.                                          Criminal No. 3:96-CR-66-01

DEAN ANTHONY BECKFORD,
     a/k/a "Smiles"
     a/k/a "Smiley"
     a/k/a "Daniel Davis"
     a/k/a "Milo"

DECISION FORM

As to the crime of killing SHERMAN AMBROSE while engaged in, or in furtherance of, a continuing criminal enterprise as set forth in Count Six of the Superseding Indictment:

A.   WE, THE JURY, do not unanimously find proven, beyond a reasonable doubt, the existence of the statutory aggravating factors required by law as prerequisites for the imposition of capital punishment, and therefore do not consider the death penalty as to the killing of SHERMAN AMBROSE for which defendant DEAN ANTHONY BECKFORD has been convicted.

_____          _____
        Date                              Foreperson

OR

B.   WE, THE JURY, unanimously find proven, that the aggravating factors required by law as prerequisites for the imposition of capital punishment have been proven by the government beyond a reasonable doubt as to Count Six and as to DEAN ANTHONY

17

BECKFORD.  We further unanimously find that the proven aggravating factors, as to this crime and this defendant, sufficiently outweigh any mitigating factors, and, in the absence of mitigating factors, we unanimously find that the proven aggravating factors are themselves sufficient to justify a sentence of death.  We vote unanimously that DEAN ANTHONY BECKFORD shall be sentenced to death for the killing of SHERMAN AMBROSE.

_____                _____
       Date                                   Foreperson

<u>OR</u>

C.   WE, THE JURY, <u>do</u> <u>not</u> unanimously find that the proven aggravating factors respecting Count Six and DEAN ANTHONY BECKFORD sufficiently outweigh the proven mitigating factors. We, therefore, return a decision that DEAN ANTHONY BECKFORD <u>not</u> be sentenced to death for the killing of SHERMAN AMBROSE.

_____  __        _____
       Date                                   Foreperson

<u>OR</u>

D.   WE, THE JURY, having considered and evaluated the evidence presented in light of the instructions of the Court, are not unanimously persuaded that a death sentence should be imposed upon DEAN ANTHONY BECKFORD for Count Six.  We, therefore, return a decision that DEAN ANTHONY BECKFORD <u>not</u> be sentenced to death for the killing of SHERMAN AMBROSE.

_____                _____
       Date                                   Foreperson

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Richmond Division

UNITED STATES OF AMERICA

v.                                            Criminal No. 3:96-CR-66-01

DEAN ANTHONY BECKFORD,
     a/k/a "Smiles"
     a/k/a "Smiley"
     a/k/a "Daniel Davis"
     a/k/a "Milo"

DECISION FORM

As to the crime of killing DASMOND MILLER while engaged in, or in furtherance of, a continuing criminal enterprise as set forth in Count Five of the Superseding Indictment:

A.   WE, THE JURY, <u>do</u> <u>not</u> unanimously find proven, beyond a reasonable doubt, the existence of the statutory aggravating factors required by law as prerequisites for the imposition of capital punishment, and therefore do not consider the death penalty as to the killing of DASMOND MILLER for which defendant DEAN ANTHONY BECKFORD has been convicted.


_____                  _____
        Date                                      Foreperson


OR


B.   WE, THE JURY, unanimously find proven, that the aggravating factors required by law as prerequisites for the imposition of capital punishment have been proven by the government beyond a reasonable doubt as to Count Five and as to DEAN ANTHONY BECKFORD.  We further unanimously find that the proven aggravating factors, as to this crime and this defendant,

15

sufficiently outweigh any mitigating factors, and, in the absence of mitigating factors, we unanimously find that the proven aggravating factors are themselves sufficient to justify a sentence of death. We vote unanimously that DEAN ANTHONY BECKFORD shall be sentenced to death for the killing of DASMOND MILLER.

_____          _____
Date                                    Foreperson

OR

C.   WE, THE JURY, <u>do</u> <u>not</u> unanimously find that the proven aggravating factors respecting Count Five and DEAN ANTHONY BECKFORD sufficiently outweigh the proven mitigating factors. We, therefore, return a decision that DEAN ANTHONY BECKFORD <u>not</u> be sentenced to death for the killing of DASMOND MILLER.

_____          _____
Date                                    Foreperson

OR

D.   WE, THE JURY, having considered and evaluated the evidence presented in light of the instructions of the Court, are not unanimously persuaded that a death sentence should be imposed upon DEAN ANTHONY BECKFORD for Count Five. We, therefore, return a decision that DEAN ANTHONY BECKFORD <u>not</u> be sentenced to death for the killing of DASMOND MILLER.

_____          _____
Date                                    Foreperson

16

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff – Appellee – Respondent, | ) | |
| | ) | No. 02 C 6998 |
| vs. | ) | |
| | ) | Hon. William J. Hibbler |
| DARRYL JOHNSON | ) | |
| | ) | Death Sentence Imposed |
| Defendant – Appellant – Petitioner. | ) | |

**DARRYL JOHNSON'S MOTION FOR CONSIDERATION OF HIS
*BRADY v. MARYLAND* AND *JOHNSON v. MISSISSIPPI* CLAIMS AND TO AMEND HIS
28 U.S.C. §2255 MOTION TO VACATE CONVICTION AND SENTENCE
and
SUPPLEMENTAL MEMORANDUM OF LAW IN SUPPORT**

Defendant Darryl Johnson, by his attorneys, Terence H. Campbell of Cotsirilos, Tighe &

Streicker, and Lorinda Meier Youngcourt, moves the Court for consideration of his *Brady v.*

*Maryland*[1] and *Johnson v. Mississippi*[2] claims and to amend his 28 U.S.C. §2255 Motion to

Vacate Conviction and Sentence. In support thereof, Mr. Johnson presents the following

supplemental memorandum of law.

**I.      Motion requesting the court to reconsider the *Brady* and *Johnson* claims.**

In its Memorandum Opinion and Order (Doc 71 filed 5/15/2009) ruling on Mr. Johnson's

renewed and amended motion for discovery, the Court stated that the reason it was denying the

discovery request with respect to Mr. Johnson's *Brady* claims was because "he has not formally

moved the Court to reconsider the decision regarding the *Brady* claim and that claim is not

---

[1] This argument was originally set out at pages 47-53 of his §2255 motion timely filed on
September 30, 2002.

[2] This claim was originally set out at pages 54-56 of his §2255 motion.

1

currently pending." Op. at 2. Pursuant to the Court's Order. Mr. Johnson formally requests that

the Court reopen and reconsider the *Brady* claim.

Both the legal and factual landscape of this case have changed markedly since Judge

Conlon issued her March 11, 2003 Memorandum Opinion and Order denying Mr. Johnson's

*Brady* claim, stating

> The materiality standard under *Brady* is the same as the prejudice standard for an
> ineffective assistance of counsel claim under *Strickland*. *See Id.* at 694 (the
> standard of materiality applicable to withheld impeachment evidence was adapted
> from the formulation of prejudice in *Strickland v. Washington*, 466 U.S. 688, 694
> (1984). For the same reasons Johnson failed to establish prejudice for his
> ineffective assistance of counsel claim, he fails to establish materiality for his
> *Brady* claim.

Op. at 13-14 (Doc 20).

The legal landscape changed when the United States Supreme Court issued its opinion in

*Massaro v. U.S.*, 538 U.S. 500, 123 S.Ct. 1690, 155 L.Ed.2d 714 (2003), holding that a federal

criminal defendant may properly bring an ineffective assistance claim for the first time in a

§2255 motion. "In most cases a motion brought under §2255 is preferable to direct appeal for

deciding claims of ineffective-assistance" because "[w]ithout additional factual development . . .

an appellate court may not be able to ascertain whether the alleged error was prejudicial." *Id.* at

504-505, 123 S.Ct. at 1694, 155 L.Ed.2d at 720-721.

Since the reopening of the ineffective-assistance claims, Mr. Johnson has established new

facts regarding information that was in the possession of the government at the time of his trial --

information the government did not disclose to the defense, and information which would have

significantly impeached, if not outright refuted, Warden Vanyur's testimony. *See, e.g.,*

Supplemental Brief in Support on Ineffective Assistance Claim (filed 12/17/2009). As this Court

remarked in its May 15, 2009 ruling on discovery:

> The affidavit of the BOP Warden [Mark A. Bezy] provides a factual foundation for Johnson's claim that the government expert's testimony misled the jury regarding the BOP's ability to confine him immediately and indefinitely while at the same time minimizing the risk that Johnson would continue to be a danger to society.  Moreover, the government has produced some information regarding other inmates held in strict conditions of confinement, also which seems to contradict the testimony of the government's expert and which could lend credibility to the testimony Johnson's expert might provide.

Op. at 7 (Doc 71).  These new facts warrant reconsideration of the *Brady* claim because they substantially undermine the two arguments that the March 2003 opinion relied upon in denying the claim: (1) that the government did not suppress evidence, and (2) that the evidence was not material.

Mr. Johnson has demonstrated that the government *was* in possession of significant impeachment evidence that it failed to turn over to the defense.  This includes the information which the government has belatedly disclosed regarding other inmates held in strict conditions of confinement, as well as all the extensive information contained in Warden Bezy's two affidavits regarding the policies and procedures in place at the time of Mr. Johnson's trial that were routinely used to neutralize the risk of future dangerousness posed by certain inmates, and a large and growing number of inmates who were, at the time of Mr. Johnson's trial, being held under those conditions.  EX C and EX D.  It is indisputable that the government failed to disclose this information to trial counsel.  Additionally, as this Court recognized, this information would have constituted relevant impeachment evidence with respect to Warden Vanyur's testimony.  As such, it was material to a central issue in the case – namely, the "future dangerousness" aggravating factor, and more specifically, the credibility of Warden Vanyur's testimony regarding the BOP's inability to impose strict conditions of confinement as long as was necessary to alleviate a risk of future danger posed by an inmate.

The government would not be unduly prejudiced by Mr. Johnson's request to reopen the *Brady* claim. As this Court acknowledged in its May 15, 2009 order on the discovery motion, the IAC claim and the Brady claim are "intertwined," Op. at 2, and in light of the significant factual overlap with respect to these claims, reopening the *Brady* claim would not burden the government's ability to litigate its interests in this §2255 proceeding. Indeed, the legal analysis with respect to the materiality of the *Brady* claim is essentially identical to the prejudice analysis of the ineffective assistance of counsel claim. *See United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481, 494 (1985) (opinion of Blackmun, J.) (the standard of materiality applicable to withheld impeachment evidence was adapted from the formulation of "prejudice" in *Strickland v. Washington*, 466 U.S. 668, 694 (1984)). Given the significant similarity in both the underlying facts and the applicable legal test dispositive of these two claims, Petitioner respectfully requests that the Court reopen and reconsider the *Brady* claim.

For the same reasons as those articulated above, we also respectfully request that the Court reopen and reconsider Johnson's claim under *Johnson v. Mississippi*, 486 U.S. 578 (1988). *See* Initial Memorandum in Support of §2255 Motion, 54-56 (Doc 4, filed 9/30/02). As with the IAC and *Brady* claims, this issue relies on the same operative facts regarding Warden Vanyur's false and misleading testimony. Moreover, resolution of this claim will necessarily rely on similar legal analysis to that involved in determining *Strickland* prejudice – namely, whether there is a reasonable probability that the incorrect and misleading testimony provided by Warden Vanyur affected the outcome of the sentencing proceedings.

Finally, it should be noted that despite the March 2003 ruling on the *Brady* and *Johnson* claims, a final judgment pursuant to Rule 58 of the Federal Rules of Civil Procedure was never entered in Mr. Johnson's case. In other words, the judgment technically need not be "reopened"

4

because it was never final to begin with.  This Court has maintained jurisdiction over all the claims in this proceeding since inception, and it maintains the inherent authority to reconsider any and all rulings in this matter until a final judgment is entered.  *See Ruehman v. Village of Palos Park*, 842 F. Supp. 1043, 1062-63 (N.D. Ill. 1994); Rule 54(b), Federal Rules of Civil Procedure ("any order or other decision, however designated, that adjudicates fewer than all the claims or rights and liabilities . . . does not end the action as to any of the claims . . . and may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities.").

## II.    The Government Violated *Brady* by failing to turn over evidence concerning inmates housed under special conditions of confinement

### A.    Applicable Law

Due process requires that the prosecution disclose any evidence favorable to the accused where the evidence is "material either to guilt *or to punishment"*. *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 1197, 10 L.Ed.2d 215, 218 (1963) (emphasis added).   The *Brady* disclosure requirement extends to evidence that impeaches the credibility of prosecution witnesses. *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972).

In short, a defendant is entitled to relief under *Brady* when he establishes that "1) the prosecution suppressed evidence; (2) that the evidence was favorable to the defense; and 3) that the evidence was material to an issue at trial." *United States v. Earnest*, 129 F.3d 906, 910 (7th Cir. 1997).

### B.    Mr. Johnson was established the government violated *Brady v. Maryland*

The government, whether through its prosecutors or the Department of Justice, suppressed evidence.  The record clearly shows that at the time of Mr. Johnson's penalty phase

5

trial, a number of inmates were housed by the BOP under conditions that virtually eliminated any contact with other inmates, prison staff, and particularly the outside world.

In the mid-1980's through the mid-1990's, USP-Marion had what it termed the "K-Unit" where inmates who posed a high security risk were housed under extremely strict conditions of confinement. They were single celled, recreated alone, and had no contact with other inmates. EX D at 13.

Eight months prior to Mr. Johnson's sentencing hearing, the defendant in *United States v. Luis Felipe*, (Case No. S16-94CR395 (S.D.N.Y.)) was sentenced in a conspiracy case involving murders and drug trafficking similar to that alleged in Mr. Johnson's case. At the sentencing hearing, the district court noted that based on the record developed at trial, it found that there was a great danger that the defendant might attempt to order additional murders of others unless necessary conditions of confinement were imposed to limit his contact and communication with other individuals. For that reason, the district court issued a special direction to the BOP that the defendant be confined so that:(1) he could not have any contact with other prisoners; (2) he could only correspond with and have visits from family members that were approved by the district court; (3) any and all correspondence and visits, other than with counsel, were to be monitored and copies of each piece of correspondence were to be sent to the United States Attorney's Office for the Southern District of New York; and (4) the defendant was not permitted to have telephone contact with anyone. Luis Felipe was sent directly to ADX by the sentencing court and housed in a side pocket cell in total isolation from other inmates. EX D at 12.

In *United States v. Anthony Jones*, (Case Nos. WMN-96-0458 and WMN-97-0355 (D. Md.)), the district court, pursuant to 18 U.S.C. § 3582(d), imposed special conditions of confinement on the defendant at his sentencing. These conditions included: (1) no contact with

6

other inmates; (2) no telephone privileges other than with counsel, and only at times and under conditions to be set by the BOP; (3) no visiting privileges other than legal visits with counsel, and supervised visits with his mother to the extent approved by the BOP, and only at times and under conditions to be set by the BOP; (4) all ingoing and ongoing mail is to be reviewed by the BOP.

In *United States v. Peter Rollack*, (Case No. 97CR1293 (S.D.N.Y.)), the court entered a sentencing order pursuant to a plea agreement that included the following conditions of confinement: (1) no communication with any co-defendants or any member of the racketeering enterprise (i.e., gang) charged in the indictment; (2) outside of counsel, no correspondence or visits with anyone other than family members and significant others approved by the court and the BOP, and that any such correspondence and visits will be subject to monitoring; (3) the prosecution will be given notice of any family members or significant others the defendant seeks to place on his visiting list and will have the right to file objections with the court as to those visitors being approved. Rollack was also sent directly to a "special housing unit" (i.e., a control unit) from his sentencing for a minimum of 18 months, after which his housing designation could be reviewed by BOP.

In *United States v. Ramzi Yousef*, (Case No. S12-93 CR 180 (S.D.N.Y.)), the district court stated that there was an identifiable risk that the defendant might try to order additional acts of violence from prison, and therefore imposed special conditions of confinement to neutralize that risk. Those conditions included: (1) that the defendant be incarcerated in an administrative detention facility (i.e., control unit); and (2) outside of counsel, the defendant was only allowed to visit with family members that could positively proof they were related to the defendant.

For more than 20 years, Thomas Silverstein was incarcerated at USP-Leavenworth in solitary confinement under a "no human contact" order.  EX D at 15.  He was housed in a cell underground, where his cell lights were kept on 24 hours of the day, and was constantly monitored by correctional officers.  In 2005, when USP-Leavenworth was downgraded to a medium-security facility, Silverstein was transferred to ADX Florence, where he continues to be housed – indefinitely -- under the strictest conditions of confinement in an area of the facility known as "Range 13." *See* Deposition of John Vanyur, *Silverstein v. Federal Bureau of Prisons*, Case No. 07-CV-2471 (D.Colo. February 27, 2009) at 58 (Attached as Exhibit A).  Indeed, even Warden Vanyur admits that Silverstein, one of the most notorious inmates in the federal prison system, has had a clean conduct record due to controls placed on him by the BOP.  *Id.* at 57-58.

In addition to the aforementioned individuals, there are other BOP inmates who have been incarcerated under strict conditions of confinement for indefinite periods of time, in excess of 12 to 15 years, including Clayton Fountain, Barry Mills, Norman Matthews, Adolph Reynoso, and T.D. Bingham.  Contrary to Warden Vanyur's testimony, it is not only legal for the BOP to impose such conditions on inmates indefinitely, it is – and was at the time of Johnson's trial -- a well-established practice.  Notably, these conditions – such as no telephone use and severely limited visitation and correspondence privileges – are precisely the measures which Warden Vanyur testified would be illegal and unavailable to the BOP in the imposition of Mr. Johnson's sentence.

The conditions of confinement created for Aryan Brotherhood inmate David Sahakian were available at the time of Mr. Johnson's trial.  During his pre-trial detention, Sahakian was held in the USP-Marion I-Up Unit where he was separated from the rest of the prison population and continuously monitored by an officer.  EX D at 13-14.

Whether it come as an order of the sentencing court or is constructed by the BOP under

Special Administrative Measures ("SAM's"), federal inmates were being held at the time of Mr.

Johnson's trial and continue to be held today under conditions which either severely or totally

restrict their communication with other inmates and the outside world.  EX D.

As set out in the March 2003 Order and Opinion, the government has never contested that

evidence relating to BOP practices was favorable to the defense.  Op. at 13.

The materiality standard under *Brady* is the same as the prejudice standard for an

ineffective assistance of counsel claim under *Strickland*.  *See United States. v. Bagley*, 473 U.S.

667, 693(1984) (Evidence is material under *Brady* if there is a reasonable probability that the

result of the proceedings would have different had the evidence been disclosed).

While there were a number of aggravating and mitigating circumstances raised by the

parties, the most powerful penalty phase evidence was devoted to Mr. Johnson's potential for

future dangerousness and whether a sentence less than death could prevent that potential danger.

In the government's opening statement to the penalty phase, the prosecutor argued to the jury

that Mr. Johnson had to be executed in order to keep others safe:

> You will hear that simply by uttering the words, the defendant will have ended the lives of three people.  You've already heard how he can order brutal beatings, in addition to these murders, simply by saying so.  Tr. 1772.
>
> [T]hese threats and orders did not stop once the defendant was jailed on this charge.  Tr. 1774.
>
> Richie Wash told [Delano Finch] that the [Mr. Johnson] wants you to find someone to knock off somebody in Roger Stewart's family so that they know that we're serious, and he wants to you have somebody knock off Lance Cleaton because he saw who killed Blunt and he saw who killed Jello. Tr. 1775.
>
> That, ladies and gentlemen, will be the evidence regarding the defendant's future dangerousness. Tr. 1776.

During the defense penalty case, Mr. Johnson presented the testimony of Dr. Mark Cunningham to testify that Mr. Johnson could be housed by the BOP in such a manner as to virtually eliminate the potential for future acts of violence. Tr. 2248-2332. Anticipating this evidence, the government had Warden Vanyur present in the courtroom to hear Dr. Cunningham's testimony. *E.g.*, Tr 2467, 2468, 2475, 2482. The next day, Vanyur testified as an expert rebuttal witness for the prosecution. Tr. 2462-2509. As set out in detail in Johnson's Reply in Support of his His §2255 Motion (Doc 19, filed 3/6/2003), Vanyur testified: that the BOP could not hold any prisoner indefinitely without telephone and correspondence privileges, Tr. 2482-83; that even inmates at ADX Florence had " a lot of contact with inmates", "frequent and constant contact with staff unrestrained", TR 2489-90, and "one fifteen-minute phone call per month" as well as "five visits per month" and "virtually unlimited correspondence with the outside world" Tr. 2485; that even the most dangerous inmate would eventually end up in general population with "in excess of twelve visits a month", "as many phone calls as he could pay for or get someone to accept as collect charges", and "unlimited correspondence privileges", Tr, 2472, 2477.

In its closing, the government painted a terrifying future in the event the jurors returned a verdict for anything other than the death penalty.

> [L]adies and gentlemen, as long as the defendant has the ability to convey his orders to his followers, either on the street or in prison with him, nobody is safe; no witness, no witness's family, anybody who stands in his way, they are not safe. It doesn't matter where he is locked up.
> * * *
> [I]nmates with no out-dates, those inmates that are facing life, like the defendant, they are the most dangerous, they have nothing to lose. And that's why people like Mr. Johnson poses {sic} this threat. Tr. 2593
>
> Now, couple that with his background that you've heard about of all the other orders he gave, he truly poses a future dangerousness. . . . There is no way to completely shut somebody off in the prison with communicating with somebody

10

on the outside.  And as you heard, there is very ingenious ways that they even communicate among one another in prison.  That is why Mr. Johnson, no matter where he is, no matter when he is, is a future danger, he poses it to society as a whole, because through his own actions, his own words, and use your common sense, that no one is safe from the defendant.  Tr. 2594.

[A]fter he is locked up when we as a society should feel safe, he is out there ordering more people killed.  That is the type of evidence that is here.  And that is why no one is safe as long as the defendant, Darryl Lamont Johnson, is allowed to live.  Tr. 2598.

In its rebuttal closing argument, the government continued to bang the drum and openly stated that in order to insure everyone's safety, Mr. Johnson had to be executed.

[T]he federal regulations do not allow somebody to go directly to the control unit. That's what they're describing. That's what those pictures were.  The control unit at ADX Florence, you know he will not be going there.  Tr. 2646.

And is there any system, any prison system under the laws of our Nation that can stop the violence when your weapon is only one thing, your voice?  That is the weapon that the defendant uses.  Tr. 2647.

The evidence in this case shows beyond any reasonable doubt that there is a substantial danger that another witness or a witness's family member will be dead, because the defendant is a danger in prison. As long as he is alive he cannot be stopped from communicating, and that is all he needs.  He does not need a weapon . . . all he needs is a telephone.

* * *

[T]here is no innocent bystander who is safe as long as the defendant can communicate with the outside world.  No prison system can stop him.  Tr. 2647-48.

Given all this focus on future dangerousness by the Government, it is clear they knew the evidence regarding supposed "future dangerousness" was the key to winning a death verdict.  As amply demonstrated by the special findings at the conclusion of the sentencing phase, the jury found the government's future dangerousness arguments – based on the now discredited testimony of Warden Vanyur -- to be extremely persuasive.  On each count the jury unanimously found, beyond a reasonable doubt, that Mr. Johnson "would commit serious acts of violence in the future which would be a continuing and serious threat to society."  Conversely, not a single

juror found that that Mr. Johnson "will not be a serious and continuing danger to society because the government has the power to imprison him for the rest of his life in a maximum security federal prison designed to control and monitor his behavior."  Thus, it is abundantly clear that the jury rejected the testimony of Dr. Cunningham, and fully credited the testimony of Warden Vanyur on the issue of the BOP's ability to impose strict conditions of confinement on "dangerous" inmates.

Numerous social science and empirical studies of juror attitudes in capital cases highlight the importance future dangerousness plays in a jury's deliberations and return of a death sentence.  *See*, *e.g.*, John H. Blume, Stephen P. Garvey & Sheri Lynn Johnson, *Future Dangerousness in Capital Cases: Always At Issue*, 86 CORNELL L. REV. 397, 398 (2001) (noting that future dangerousness is on the minds of most jurors in most cases and this is true regardless of whether the prosecutor argues future dangerousness explicitly).  Indeed, the more likely that jurors believe that the defendant will be a future danger, the more likely the jury is to impose a death sentence.  *See*, *e.g.*, Eisenberg & Wells, Deadly *Confusion: Juror Instructions in Capital Cases*, 79 CORNELL L. REV. 1, 7 (1992). ("[O]ver three-quarters of the jurors believe that the evidence in their case established that the defendant would be dangerous in the future. And the more the jurors agree on this fact, the more likely they are to impose a death sentence."); Constanzo & Constanzo, *Life or Death Decision: An Analysis of Capital Jury Decision Making Under the Special Issues Sentencing Framework*, 18 LAW & HUM. BEHAV. 151, 160 (1992) ("[N]early all [Oregon] jurors also offered the observation that the penalty decision hinged on the issue of whether the defendant will pose a continuing threat to society."); *id*. at 168 ("[F]uture dangerousness plays a prominent, if not central role. . . . Jurors clearly perceived the penalty as hinging on this issue."); John Blume, Theodore Eisenberg, Stephen P. Garvey, *Lessons from the*

*Capital Jury Project*, in BEYOND REPAIR? AMERICA'S DEATH PENALTY 144 (2003) (32% of jurors believed that the law required them to impose the death penalty if they believed the defendant would be dangerous in the future); Stephen P. Garvey, *Aggravation and Mitigation in Capital Cases: What do jurors think?* 98 COLUM. L. REV. 1538, 1542 (1998) (many jurors wrongly think they must return a death sentence if they find the defendant is especially likely to present a risk of future danger); *id.* at 1559 (noting that future dangerousness evidence is highly aggravating and that 60% of jurors interviewed were more likely to vote for death if they believed that the defendant might be dangerous in the future); Theodore Eisenberg, Stephen P. Garvey & Martin T. Wells, *Jury Responsibility in Capital Sentencing: An Empirical Study*, 44 BUFF. L. REV. 339, 360 (1996).  ("Nearly one-third of the jurors were under the mistaken impression that the law required a death sentence if they found heinousness or dangerousness, a result replicated in the multi-state study of the interview data.").

As stated by this Court in its March 2003 opinion, had Mr. Johnson's trial counsel presented evidence that, in direct contradiction to Warden Vanyur's testimony, other BOP inmates were, in fact, being subject to severe restrictions on communication and contact "the jury might not have rejected Johnson's proposed finding on future dangerousness."  Op. at 3.  In fact, it would have taken only one juror to find that a death sentence was not the only way to keep everyone safe from Mr. Johnson, and vote for a life sentence.  *See United States v. Johnson*, 223 F.3d 666, 670 (7th Cir. 2000) (the threshold for establishing a reasonable probability that the jury would not return a death verdict is lower because "it takes only one juror to nix a death sentence.").

**C. Mr. Johnson was also denied a fair trial when the government presented misleading, inaccurate and prejudicial testimony which was not corrected**

Darryl Johnson was denied due process because the government presented misleading, inaccurate and prejudicial testimony at his capital sentencing hearing. As set out above, the government presented evidence through its expert witness Warden John Vanyur on the issue of "future dangerousness" that created the false impression that no legal authority existed to allow the Bureau of Prisons ("BOP") to limit Mr. Johnson's communications and contacts while in prison in order to curtail his alleged future dangerousness. The government then relied on this evidence throughout its closing argument to convince the jury that unless it sentenced Mr. Johnson to death, "no one is safe," (Tr. 2598), because, argued the government, as long as Mr. Johnson had access to a telephone, correspondence, or visitors while in prison, he would be able to order others to commit acts of violence "simply by uttering the words." Tr. 1772.

However, after the Seventh Circuit Court of Appeals affirmed Mr. Johnson's convictions and death sentences, the government conceded that Warden Vanyur's testimony was "incomplete" and that based on the evidence it heard during the sentencing proceedings, "the jury may have held the mistaken impression that no legal authority existed to limit [defendant's] communications and contacts while in prison in order to curtail his future dangerousness." Gov't. Opp. to Cert. at 21 (attached as Exhibit A to Johnson's Initial Memorandum in support of his §2255 Motion). As explained in more detail below, there is no question that the government presented materially inaccurate testimony that created a false impression on the most critical issue in the jury's sentencing deliberation – namely, whether the only way to prevent Mr. Johnson from committing future violence was to execute him. In light of these facts, Mr. Johnson is entitled to a new sentencing hearing.

14

**1.  Warden Vanyur's Testimony was Substantially Misleading and Created a
False Impression Regarding BOP's Ability to Limit Mr. Johnson's
Communications and Contacts While Incarcerated**

There is no question that Warden Vanyur's testimony regarding BOP's ability to limit
Mr. Johnson's communications and contacts while in prison was substantially misleading and
created a false impression.  Contrary to the testimony elicited by the government, the BOP has
both the legal ability and prison facilities to house inmates under strict conditions of confinement
***for as long as necessary*** in order to protect against any reasonable possibility of "future danger."
Indeed, even the government has now conceded this point.

In its opposition to Mr. Johnson's Petition for a Writ of Certiorari to the Supreme Court,
the government admitted that Warden Vanyur's testimony was "incomplete" with respect to the
authority of the BOP to house inmates under strict conditions of confinement, Gov't. Opp. to
Cert. at 20, and "that § 3582(d) and the SAMs regulation were relevant, and that without them,
'the jury may have held the mistaken impression that no legal authority existed to limit
[defendant's] communications and contacts while in prison in order to curtail his future
dangerousness.'"  Gov't. Resp. to § 2255 Motion at 21.  *See also* Govt. Opp. to Cert. at 21 ("As
we have acknowledged, there is in fact such authority [to limit petitioner's communications and
contacts while in prison in order to curtail his future dangerousness].");  *id.* at 14 ("the jury may
have held the mistaken impression that no such legal authority existed.");  *id.* at 28-29 (the
prosecutor's closing argument "could have left the impression that, absent the death penalty,
there was no legal authority to limit the defendant's communications.").  As set forth in various
of Petitioner's pleadings, Warden Vanyur's testimony was substantially misleading in a number
of material respects and undoubtedly created a false impression for the jury about the BOP's

15

ability to effectively neutralize any risk of "future dangerousness" posed by Mr. Johnson while incarcerated.

To the extent the government is tempted to argue that Warden Vanyur's testimony was merely "incomplete" and therefore "technically true," such an argument is unavailing. As one circuit court has explained, the government's duty to correct false testimony is not limited to situations where a witness commits perjury, but extends to testimony that is "substantially misleading:"

> We do not believe, however, that the prosecution's duty to disclose false testimony by one of its witnesses is to be narrowly and technically limited to those situations where the prosecutor knows that the witness is guilty of the crime of perjury. Regardless of the lack of intent to lie on the part of the witness, *Giglio* and *Napue* require that the prosecutor apprise the court when he knows that his witness is giving testimony that is *substantially misleading.* This is not to say that the prosecutor must play the role of defense counsel, and ferret out ambiguities in his witness' responses on cross examination. However, when it should be obvious to the government that the witness' answer, although made in good faith, is untrue, the government's obligation to correct that statement is as compelling as it is in a situation when the government knows that the witness is intentionally committing perjury.

*United States v. Harris*, 498 F.2d 1164, 1169 n.14 (3d Cir. 1974). Indeed, there is a long line of Supreme Court cases that deal with due process violations centered on testimony that creates false impressions or that is misleading. *See*, *e.g*., *Mooney v. Holohan*, 294 U.S. 103, 112 (1935); *Napue v. Illinois*, 360 U.S. 264, 269 (1959); *Miller v. Pate*, 386 U.S. 1 (1967) (due process is violated not only where the prosecution uses perjured testimony to support its case, but also where it uses evidence which it knows creates a false impression of a material fact); *Donnelly v. DeChristoforo*, 416 U.S. 637, 647 (1974) (*Napue* doctrine applies to "misleading evidence important to the prosecution's case in chief" as well as to evidence that is simply false); *Alcorta*

16

*v. Texas*, 355 U.S. 28, 31 (1957) (finding a due process violation where witness testimony "taken as a whole" gave a "false impression").

Similarly, there is a long line of circuit precedent that establishes that the government violates due process when it presents material testimony which is either misleading or creates a false impression. *See Drake v. Portuondo*, 553 F.3d 230, 243 (2d Cir. 2009) (*Napue* violation found where prosecution's question elicited "literal accuracy while conveying [a] false impression" about witness's qualifications); *Jenkins v. Artuz*, 294 F.3d 284, 294 (2d Cir. 2002) (finding *Napue* violation where prosecution elicited "technically accurate testimony" that was "probably true but surely misleading" and the jury was left with "mistaken impression"); *United States v. Sutton*, 542 F.2d 1239, 1243 (4th Cir. 1976) (*Napue* violation found where prosecution "allowed a false impression to be created at trial when the truth would have directly impugned the veracity of its key witness."); *Hamric v. Bailey*, 386 F.2d 390, 394 (4th Cir. 1967) ("Evidence may be false either because it is perjured, or, though not itself factually inaccurate, because it creates a false impression of facts which are known not to be true."); *United States v. Barham*, 595 F.2d 231, 242 (5th Cir. 1979) ("under the Constitution, the defendant is entitled to a jury that is not laboring under a Government-sanctioned false impression of material evidence when it decides the question of guilt or innocence with all its ramifications."); *United States v. Anderson*, 574 F.2d 1347, 1355 (5th Cir. 1978) ("The long-settled rule has been that the knowing use by the prosecution of false evidence or perjured testimony which is material to the issues in a criminal trial is a denial of due process. A conviction obtained by the use of such evidence cannot be permitted to stand. The same rule applies if the prosecution, although not actively soliciting false evidence, passively but knowingly allows it to go uncorrected or allows the jury to be presented with a materially false impression.") (internal citations omitted); *United States v.*

17

*Boyd*, 55 F.3d 239, 243 (7th Cir. 1995) (due process violation does not require finding that witness committed perjury; "It is enough that the jury was likely to understand the witness to have said something that was, as the prosecution knew, false."); *United States v. Iverson*, 637 F.2d 799, 805 n.19 (D.C. Cir. 1980) ("[I]t makes no difference whether the testimony is technically perjurious or merely misleading."). *See also Blanton v. Blackburn,* 494 F.Supp. 895, 899 (M.D. La. 1980), *aff'd* 654 F.2d 719 (5th Cir. 1981) ("The fact that the answer given [by the witness] may have been technically correct is not sufficient where the answer is incomplete.").

Warden Vanyur's testimony regarding the BOP's ability to impose strict conditions of confinement to neutralize the alleged risk of "future danger" posed by Mr. Johnson was substantially misleading and presented a false impression to the jury. Not only did the BOP's own regulations and sections of the United States Code authorize the BOP to impose the very kinds of strict conditions of confinement that Warden Vanyur testified were illegal and unavailable, the BOP routinely imposed such conditions on inmates at the time of Mr. Johnson's sentencing hearing. Moreover, a former warden and 28-year BOP veteran, Mark A. Bezy, has reviewed Warden Vanyur's testimony on this matter and detailed the manner in which that testimony was substantially misleading and false with respect to BOP practices and procedures. Taken together, this information clearly establishes that Warden Vanyur's testimony was false within the meaning of *Napue* and its progeny.

### 2. Both the BOP's own regulations and the U.S. Code permitted the BOP to implement strict conditions of confinement.

The government's admission in its Brief in Opposition to Certiorari identifies two sources of authority that existed at the time of Mr. Johnson's sentencing hearing that expressly would have allowed the BOP to implement and administer exactly the kinds of strict conditions of confinement which Warden Vanyur told the jury were impermissible under BOP policy,

impossible to maintain for any extended time, and illegal under the law: (1) the Special

Administrative Measures ("SAMs") regulation, codified at 28 C.F.R. §501.3, and (2) 18 U.S.C.

§3582(d).   A plain reading of these two provisions plainly contradicts Warden Vanyur's

testimony to the jury about the BOP's ability to neutralize the threat posed by an inmate

misusing phone and correspondence privileges to commit future acts of violence.

The SAMs regulation provides in pertinent part:

(a) Upon direction of the Attorney General, the Director, Bureau of Prisons, may authorize the Warden to implement special administrative measures that are reasonably necessary to protect persons against the risk of death or serious bodily injury. *These procedures may be implemented upon written notification* to the Director, Bureau of Prisons, by the Attorney General or, at the Attorney General's direction, by the head of a federal law enforcement agency, or the head of a member agency of the United States intelligence community, *that there is a substantial risk that a prisoner's communications or contacts with persons could result in death or serious bodily injury to persons*, or substantial damage to property that would entail the risk of death or serious bodily injury to persons. *These special administrative measures ordinarily may include housing the inmate in administrative detention and/or limiting certain privileges, including, but not limited to, correspondence, visiting, interviews with representatives of the news media, and use of the telephone, as is reasonably necessary to protect persons against the risk of acts of violence or terrorism.*

28 C.F.R. § 501.3 (emphasis added).   As the above provision makes clear, BOP Warden

Vanyur's testimony to the jury that the BOP lacked the authority to prospectively limit an

inmate's telephone, visiting and correspondence privileges was false and misleading.  The same

is true of Warden Vanyur's testimony that the BOP could only limit those privileges if it caught

an inmate misusing those lines of communication.  The SAMs regulation explicitly provides that

the BOP is authorized to implement any procedures that are "reasonably necessary to protect

persons against the risk of acts of violence," including "limiting certain privileges" such as

"correspondence, visiting, … and use of the telephones," and that the implementation of such

19

procedures is not contingent on the inmate getting caught misusing these privileges. Rather, such "procedures may be implemented upon written notification" to the BOP by the Justice Department or any other federal law enforcement agency "that there is a substantial risk that a prisoner's communications or contacts with persons could result in death or serious bodily injury to persons."

Contrary to Warden Vanyur's testimony that the BOP could do nothing to limit an inmate's use of the phones or other correspondence or visiting privileges until after an inmate had already committed an improper act, the BOP's regulations, not surprisingly, do not require it to sit idly by until that time. If the jury had been properly informed about the BOP's regulations, it would have learned that, in fact, the BOP was authorized to use any and all "reasonably necessary" measures to curtail Mr. Johnson's "communications or contacts with persons could [that] result in death or serious bodily injury to persons," and that these measures could be implemented immediately, upon written notification by the appropriate governmental authorities. In other words, under 28 C.F.R. § 501.3, the BOP was authorized to do exactly what Warden Vanyur testified it could not do: eliminate the risk of acts of violence by prospectively limiting Mr. Johnson's ability to communicate with others, whenever and for as long as deemed necessary.

Warden Vanyur's testimony was particularly pernicious because in the course of his testimony, he specifically referenced the Code of Federal Regulations for the purpose of arguing that these regulations *constrained* the BOP's ability to implement strict conditions of confinement prospectively. Specifically, Warden Vanyur cited to 28 C.F.R. § 541 in his testimony that this regulation prohibits the BOP from prospectively assigning an inmate to a control unit based on dangerous behavior the inmate exhibited prior to being incarcerated. See

Tr. 2484-85 ("28 CFR Section 541 is very clear that inmates cannot be placed in a control unit solely on the basis of the offenses they committed in the community.")  However, as noted in section 541.41(b)(2), a defendant may be placed in a control unit if he "expressed threats to the life or well-being of other persons," regardless of whether such threats occurred prior to his imprisonment.  Moreover, the BOP itself recognizes that under Section 541,

> This placement is ordinarily recommended only for an inmate already in a federal institution; *however, there may be occasion where an inmate recommended for federal custody requires placement in a control unit.*  In *Bono v. Saxbe*, 620 F.2d 609, at 611 (7th Cir. 1980), the United States Court of Appeals opinion recognized that "Prisoners may be placed in the Marion Control Unit *directly from the federal courts,* from the general population at Marion or from other federal and state prisons."

49 Fed. Reg. 32990 (1984) (emphasis added).  In other words, Warden Vanyur's testimony that the BOP was prohibited from directly assigning Mr. Johnson to a control unit as a means to neutralize the possibility of "future dangerousness" was contrary to what the law actually states on this matter, and undoubtedly created a false impression for the jury in this regard.

The source of authority mentioned in the government's admission is 18 U.S.C. § 3582(d), which authorizes a district court to impose strict conditions of confinement as part of a defendant's sentence.  It provides, in pertinent part:

> The court, in imposing a sentence to a term of imprisonment upon a defendant convicted of a felony set forth in chapter 95 (racketeering) or 96 (racketeer influenced and corrupt organizations) of this title or in the Comprehensive Drug Abuse Prevention and Control Act of 1970 (21 U.S.C. 801 et seq.), or at any time thereafter *upon motion by the Director of the Bureau of Prisons or a United States attorney, may include as a part of the sentence an order that requires that the defendant not associate or communicate with a specified person, other than his attorney, upon a showing of probable cause to believe that association or communication with such person is for the purpose of enabling the defendant to control, manage, direct, finance, or otherwise participate in an illegal enterprise.*

21

18 U.S.C. §3582(d) (emphasis added).  As this provision makes clear, both the BOP and a United States Attorney's Office are authorized to request that the sentencing court impose strict conditions of confinement prospectively to limit an inmate's ability to communicate with others. The government's elicitation of testimony from Warden Vanyur that suggested otherwise was thus grossly misleading and unmistakably created a false impression for the jury about the BOP's authority to limit Mr. Johnson's communications while incarcerated.

**3.     The BOP had a practice of imposing precisely the kind of strict conditions of confinement that Warden Vanyur testifies were not available or otherwise allowed.**

As has now been extensively documented in Mr. Johnson's Initial Memorandum in support of his § 2255 Motion ("Init. Memo."), and in his Initial Reply in support of his § 2255 Motion ("Init. Rep."), and in the two Affidavits of former BOP Warden Mark Bezy, the BOP routinely imposes strict conditions of confinement on inmates for as long as it deems necessary – and did so at the time of Petitioner's penalty-phase hearing.  Moreover, these measures have been implemented pursuant to BOP regulations and statutory law that were in existence and operative at the time of Mr. Johnson's sentencing hearing.  See Init. Memo. at 17-20, 49; Init. Rep. at 21-23.  See section II(b)(i) above, and the two Bezy Affidavits (Exs. C and D, hereto) for a recitation of individuals held under strict conditions of confinement at the time of Mr. Johnson's trial.

**4.     The Government Knew of Should Have Known that Warden Vanyur's Testimony was Misleading and Created a False Impression, But Failed to Correct the Testimony.**

In *United States v. Augurs*, 427 U.S. 97, 103 (1976), the Supreme Court held that in cases where the government "knew *or should have known*" of false testimony, a conviction obtained with such testimony is "fundamentally unfair, and must be set aside if there is any reasonable

22

likelihood that the false testimony could have affected the judgment of the jury." *Id*. at 103 (emphasis added, footnotes omitted). *See also United States v. Kaufmann*, 803 F.2d 289, 291 (7th Cir. 1986) (adopting "knew or should have known" standard). That standard is easily met here.

First, the government has already conceded that the SAMs procedures and 18 U.S.C. § 3582(d) were relevant to Mr. Johnson's sentencing hearing. The government's acknowledgment of these regulatory and statutory provisions demonstrates that the government knew or should have known Warden Vanyur's testimony regarding the BOP's inability to impose necessary conditions of confinement to limit Mr. Johnson's communications and contacts while incarcerated was misleading and created a false impression for the jury. Indeed, both the SAMs procedures and § 3582(d) articulate the authority the Justice Department has in pursuing special conditions of confinement against inmates. Under 28 C.F.R. § 501.3(a), the Attorney General is authorized to direct the BOP to implement special administrative procedures, including limiting an inmate's phone, visiting and correspondence privileges, against inmates that it believes pose a "substantial risk" of misusing those privileges to seriously injure or kill others. Under § 3582(d), a United States attorney is authorized to move the sentencing court for an order imposing special conditions of confinement, including specifying the only persons with whom the defendant will be allowed to communicate, outside of counsel, if the United States attorney has "probable cause" to believe that the defendant's communications with a particular person is for the purpose of managing, directing or controlling an illegal activity. Indeed, under § 3582(d), even the BOP can file such a motion with the sentencing court. Given that the government is charged with executing these laws and regulations, it is reasonable to assume that the government is aware of them. The government cannot credibly disclaim knowledge of regulations and statutes that

authorize it to impose exactly the conditions of confinement which it presented to the jury as unavailable or illegal in Mr. Johnson's case.

Second, Warden Vanyur was presented as an expert witness on BOP policies and procedures with respect to conditions of confinement.  Having cited to the Code of Federal Regulations in his own testimony, it strains credulity to believe that Warden Vanyur was not aware of the BOP's regulation codified at 28 C.F.R. § 501.3.  This is particularly so given Warden Vanyur's position at ADX, where many of the inmates were (and are) held under SAMs orders pursuant that very regulation.  Similarly, one would reasonably expect that Warden Vanyur would similarly be aware of § 3582(d), precisely because it specifically mentions the BOP's authority to file a motion in federal court demonstrating probable cause to impose necessary conditions of confinement to prevent an inmate from manipulating communications privileges to direct or manage illegal activities.  Likewise, considering Warden Vanyur's role in making ADX operational – a facility that was, by design, intended to impose the strictest conditions of confinement to neutralize the risk of danger imposed by inmates who are adept at abusing communications privileges – it seems quite unlikely that Warden Vanyur would not know about BOP's regular practice of imposing strict conditions of confinement on dangerous inmates, as detailed by Warden Bezy and as articulated in the specific cases noted above.

Indeed, just prior to testifying at Mr. Johnson's sentencing hearing, Warden Vanyur was called as an expert BOP witness at the capital sentencing hearing in *United States v. Dean Anthony Beckford*, No. 3:96CR66 (E.D. Va.) on July 21, 1997.  At that hearing, Warden Vanyur gave testimony under cross-examination that was at odds with his testimony in Mr. Johnson's case.  For example, Warden Vanyur conceded at the Beckford trial that an individual who has been identified as posing a danger can be sent to the control unit at ADX immediately:

24

Q:      So you don't mean to tell this jury that someone cannot be committed there [the "Florence ultra security section"] immediately if the United States is of the opinion they are that dangerous.

A:      That's correct.

EX B at 19.

Q:      Is there any rule that prohibits a new inmate who has been classified as dangerous from being sent to Ad-Max in Florence?

A:      No, but that's not the Bureau's goal in Ad-Max.

Q:      Okay.  This will got (sic) faster if you answer my question.  Is there any rule that says they can't go there?

A:      No.

*Id*. at 31-32.  Warden Vanyur's testimony is directly contrary to the testimony he gave at Mr. Johnson's trial that "under the law, [it is not] even a possibility to place Darryl Johnson directly into that 68-bed control unit [at ADX]."  Tr. 2484.  Given that Warden Vanyur was the government's own expert witness, it knew or should have known that his testimony at Mr. Johnson's trial was substantially misleading, if not outright false, given that he had just testified on the very same topic only months before as a government expert.  The prosecutors in this case were employees of the Department of Justice, and they are imputed with knowledge in the possession of other employees of that same agency.  *See United States v. Kattar*, 840 F.2d 118, 127 (1st Cir. 1988) ("The Justice Department's various offices ordinarily should be treated as an entity, the left hand of which is presumed to know what the right hand is doing."); *United States v. Barkett*, 530 F.2d 189 (8th Cir. 1976) ("[O]ne office within a single federal agency must know what another office of the same agency is doing. … This is no more than to hold the Government

25

to the same standard of conduct as governs private individuals in transmitting notice from agent to principal.").

Moreover, any knowledge which Warden Vanyur possessed should be imputed to the prosecution.  *See Kyles v. Whitley*, 514 U.S. 419, 437 (1995) ("the individual prosecutor has a duty to learn of any favorable evidence known to others acting on the government's behalf in the case.").  Indeed, it is a well-settled principle of law that the government is responsible for the knowledge of a government agent who actually testifies as a witness.  *See*, *e.g.*, *Schneider v. Estelle*, 552 F.2d 593 (5th Cir. 1977); *Wedra v. Thomas*, 671 F.2d 713, 717 n.1 (2d Cir.), *cert. denied*, 458 U.S. 1109 (1982); *United States v. Rosner*, 516 F.2d 269 (2d Cir. 1975); *United States v. Deutsch*, 475 F.2d 55, 57 (5th Cir. 1973); *Curran v. State of Delaware*, 259 F.2d 707, 712-13 (3d Cir. 1958); *United States v. Wood*, 57 F.3d 733, 737 (9th Cir. 1995); *United States ex rel. Kowal v. Attorney General of Illinois*, 550 F. Supp. 447, 451 (N.D. Ill. 1982); *United States v. Andrews*, 824 F. Supp. 1273, 1289 (N.D. Ill. 1993).  *See also United States v. Auten*, 632 F.2d 478, 481 (5th Cir. 1980) ("If disclosure were excused in instances where the prosecution has not sought out information readily available to it, we would be inviting and placing a premium on conduct unworthy of representatives of the United States Government. This we decline to do.").

Finally, under the law, Mr. Johnson need not demonstrate that the prosecutors who tried his case were personally aware of the falsity of Warden Vanyur's testimony.  The Supreme Court has held that the presentation of false evidence against a defendant violates due process even if the falsity was unknown to the prosecutor. *See Giglio v. United States*, 405 U.S. 150, 154 (1972). This is because the underlying purpose of *Napue* and *Giglio* is not to punish prosecutor for the misdeeds of a witness, but rather to ensure that jury is not misled by any falsehoods.  *See*, *e.g.*, *United States v. Meinster*, 619 F.2d 1041, 1044 (4th Cir. 1980).  Nevertheless, in light of the fact

that the basis for determining the falsity of Warden Vanyur's testimony was extant regulatory and statutory law within the purview of the United States Attorney's Office, as well as ongoing practices and procedures within the institutional knowledge of the BOP and the Justice Department, it is clear that the government knew or should have known that Warden Vanyur's testimony was substantially misleading and created a false impression for the jury.

**5.      Warden Vanyur's Testimony was Material and Prejudicial.**

In order to establish materiality under *Napue*, one must demonstrate "*any* reasonable likelihood that the false testimony *could* have affected the judgment of the jury." *United States v. Agurs*, 427 U.S. 97, 103, (1976).  That standard is easily met here.  The central argument upon which the government relied in arguing to the jury that it should sentence Mr. Johnson to death was his alleged "future dangerousness."  It was the centerpiece of the government's argument in closing at the sentencing phase of the trial, and as reflected in the special findings of the jury, it was an argument that the jury found to be exceedingly persuasive.  The government's ability to make that argument rested almost exclusively on the testimony it elicited from Warden Vanyur. There is simply no question, therefore, that his misleading testimony was highly material and prejudicial.  The arguments set out above in section III(b)(iii) further demonstrates the material and prejudicial nature of Warden Vanyur's testimony.

**III.    Johnson's death sentence violates the 8th Amendment as it is Based upon Materially Incomplete, False and Inaccurate Information**

The Eighth Amendment forbids basing a death sentence on materially false or inaccurate information. The Supreme Court has held that "[t]he fundamental respect for humanity underlying the Eighth Amendment's prohibition against cruel and unusual punishment gives rise to a *special need for reliability* in the determination that death is the appropriate punishment in

27

any capital case." *Johnson v. Mississippi*, 486 U.S. 578, 584 (1988) (citations and internal quotations omitted; emphasis added). Accordingly, while there is no "perfect procedure for deciding in which cases governmental authority should be used to impose death," the Court "[has] made it clear that such decisions cannot be predicated [on] factors that are constitutionally impermissible or totally irrelevant to the sentencing process." *Id.* (emphasis added).

In *Johnson*, the Court reiterated that one such "constitutionally impermissible" factor is materially false or inaccurate information. *Johnson*, 486 U.S. at 586. In finding the materially inaccurate information required reversal of the death sentence, the Court noted that "the prosecutor repeatedly urged the jury to give [the materially inaccurate information] weight in connection with its assigned task of balancing aggravating and mitigating circumstances 'one against the other.'" *Id.* "Even without that express argument," the Court continued, there would be a possibility that the jury's belief in the inaccurate information "would be 'decisive' in the 'choice between a life sentence and a death sentence.'" *Id.* (citing *Gardner v. Florida*, 430 U.S. 349, 359 (1977).

This recognition of prejudice by the *Johnson* Court reflected a principle established in the law at least since *Townsend v. Burke*, 334 U.S. 736 (1948) (due process requires resentencing where "materially untrue" allegations form part of the basis for the defendant's sentence), and which had been forcefully restated on numerous occasions since *Townsend. See*, *e.g.*, *United States v. Tucker*, 404 U.S. 443 (1972). *See also*, *e.g.*, *Roussell v. Jeane*, 842 F.2d 1512, 1524 (5th Cir. 1988), citing *Tucker* (where "the sentencing authority relies on incorrect or unsupported assumptions [and] such reliance is manifest in the record due process requires that the defendant be resentenced"); *Bourgeois v. Whitley*, 784 F.2d 718, 721 (5th Cir. 1986) (due process entitles

28

defendant to resentencing if court is "unable to find that the invalid [prior] convictions did not influence" the sentence imposed for a subsequent offense, citing *Tucker*).

Due process is violated, even in a non-capital case, where "the sentence rests on a foundation of confusion, misinformation, and ignorance of facts * * *" *United States v. Espinoza*, 481 F.2d 553,556-557 (5th Cir. 1973), quoting *United States v. Malcolm*, 432 F.2d 809, 816 (2nd Cir. 1970). "If justice is to be done, [the sentencer] should know all the material facts," because the "[f]air administration of justice demands that the sentencing judge will not act on surmise, misinformation and suspicion * * *" *Id.* The *Malcolm* court put it succinctly: "[M]aterial false assumptions as to any facts relevant to sentencing, renders the entire sentencing procedure invalid as a violation of due process." *Malcolm*, 432 F.2d at 816, citing *Townsend v. Burke*.

As Mr. Johnson has demonstrated throughout these proceedings and specifically in this memorandum and in his Supplemental Memorandum In Support of His Ineffective Assistance of Counsel claim (filed 12/17/2009), material portions of the testimony of Government witness Warden John Vanyur were inaccurate, incomplete and/or materially misleading. As set forth above, Warden Vanyur's testimony was the centerpiece of the government's case regarding Mr. Johnson's "future dangerousness" and was forcefully argued to the jury as a primary reason to impose the death penalty. Johnson's death sentence, because it is based in whole or in part on Vanyur's inaccurate, incomplete, materially misleading, and/or fundamentally unreliable testimony, violates the Eighth Amendment.

VI.   **Conclusion and Prayer for Relief**

For all the reasons set out herein as well as in the previously filed motions and pleadings in support of the claims for relief, Mr. Johnson respectfully requests the Court (1) reconsider his

29

*Brady v. Maryland* claim and grant relief on the same, ordering his sentence vacated and a new jury penalty trial and (2) reconsider his *Johnson v. Mississippi* claim and grant relief on the same. If the Court has any doubt that Mr. Johnson has met his burden in proving any of the claims set out herein, Mr. Johnson respectfully requests an evidentiary hearing be held on the issues.  28 U.S.C. §2255; *Massaro v. United States*, 538 U.S. 500, 504-506 (2003).

Respectfully submitted,


/s/ Terence H. Campbell_____         /s/ Lorinda M Youngcourt_____

Terence H. Campbell                              Lorinda Meier Youngcourt
Cotsirilos, Tighe & Streicker, Ltd.             Youngcourt Law Office
33 North Dearboen Street, Suite 600             P.O. Box 206
Chicago, Illinois 60602                         Huron, Indiana 47437-0206
(312) 263-0345                                  (866) 274-3218

Counsel for Darryl Lamont Johnson

### Certificate of Service

Terence H. Campbell, an attorney, hereby certifies that in accordance with Fed.R.Crim.P. 49, LR 5.5, and the General Order on Electronic Case Filing (ECF), the following document:

1. Darryl Johnson's Motion for Consideration of His *Brandy v. Maryland* and *Johnson v. Mississippi* claims and to amend his 28 U.S.C. §2255 Motion To Vacate Conviction And Sentence and Supplemental Memorandum of Law in Support

was served pursuant to the District Court's ECF system as to ECF filers, including the United States Attorney's Office.


/s/ Terence H. Campbell_____
Terence H. Campbell

# EXHIBIT A

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 07-CV-02471-PAB-KMT

_____

VIDEOCONFERENCED DEPOSITION OF JOHN MARTIN VANYUR
February 27, 2009

_____

THOMAS SILVERSTEIN,
Plaintiff,
v.
FEDERAL BUREAU OF PRISONS, et al.,
Defendants.

_____

APPEARANCES

For the Plaintiff:   LAURA ROVNER, ESQ.
          Nicole Godfrey, Student Attorney
          Steve Baum, Student Attorney
          2255 East Evans Avenue
          Suite 335
          Denver, Colorado  80208
For the Defendants:   MARCY E. COOK, ESQ.
          U.S. Attorney's Office
          1225 17th Street
          Suite 700
          Denver, Colorado  80202
Also Present:      Christopher Synsvoll, Esq.
          Rachel Proctor
          Katie Stevens

Page 2

Videoconferenced deposition of JOHN MARTIN VANYUR, the Witness herein, called by the Plaintiff in the above-entitled matter on Friday, the 27th day of February, 2009, commencing at the hour of 8:34 a.m., at 901 19th Street, Courtroom 201, Denver, Colorado, before Wendy Evangelista, Registered Professional Reporter and Notary Public within and for the State of Colorado, said videoconferenced deposition being taken pursuant to Notice and the Federal Rules of Civil Procedure.

_____

INDEX
Page Number

Examination by Ms. Godfrey                3

EXHIBITS

Exhibit Letter                Initial Reference

9*  Memorandum to File from Gomez, 6/20/06        70

23*  Memorandum to Executive Staff from Nalley,    37
     10/15/04
39  A Summary of Interactions Between Thomas      47
    Silverstein and Staff at USP Leavenworth
    (FY'03)
40  Program Statement 5180.05, Central Inmate     51
    Monitoring System, 12/31/07

*Exhibit marked in a previous deposition; no photocopy substituted

Page 3

PROCEEDINGS

MS. GODFREY:  Hi, Mr. Vanyur.  My name is Nicole Godfrey, and I will be deposing you today.

Marcy, did you show him the protective orders and sign the affirmations already?

MS. COOK:  Yes, we have.

MS. GODFREY:  Okay.  Thank you.

Mr. Vanyur, if you could just state your name for the record.

MS. COOK:  Before we start, could you just identify who all you have with you there?  I've just got Mr. Synsvoll on my left here off camera.

MS. ROVNER:  Hi, Chris.

MR. SYNSVOLL:  Good morning.

MS. GODFREY:  Yes, of course.  It's myself, Nicole Godfrey and my supervising attorney, Laura Rovner; and my other case partners:  Katie Stevens, Rachel Proctor, and Steve Baum; and then the court reporter.

MS. COOK:  Thank you.

JOHN MARTIN VANYUR,
the Witness herein, having been first duly sworn, was examined and testified on his oath as follows:

EXAMINATION

Q  (By Ms. Godfrey)  Mr. Vanyur, could you

Page 4

please state your name for the record.

A  Sure.  My name is John, J-O-H-N, M for Martin, and the last name is Vanyur, V-A-N-Y-U-R.

Q  Thank you.  Because we're taking this deposition via video, it might be a bit awkward.  I'm sure you've noticed there seems to be a little bit of a time delay.  Given that, I'll do my best not to speak over you, and I would ask that you do the same.

You were just sworn in by the court reporter, so you're giving sworn testimony, and you're obligated to give full and complete testimony.  If you could, answer all questions unless you're instructed by Marcy not to.  If you don't understand the question, please tell me; otherwise, I'm going to assume that you do.

I have two preliminary questions:  Are you under the influence of any drugs or medication?

A  No.

Q  And have you consumed alcohol in the last eight hours?

A  No.

Q  Okay.  Thank you.  Do you understand that you are here today to give testimony in a civil case regarding the conditions of confinement of Tom Silverstein?

A  Yes.

Page 5

Q  Have you ever given a deposition before?

A  Yes.

Q  Do you know how often -- how many?  I'm sorry.

A  I do not know the exact number.  I would guess, if you include EEO cases and other administrative cases, probably 12, 14 times.

Q  Okay.  Thank you.  What was the most recent deposition you've given?

A  The most recent deposition I gave was in a case in New York.  One of the inmate's names was Icbaum (phonetic).  And it dealt with detainees.

Q  Okay.  Thank you.  And have you ever testified in court before?

A  I have.

Q  Do you know how often?

A  In two cases.

Q  Do you remember the case names?

A  Actually, three cases that I can recall.  One case was with an individual named Darrell Johnson.  And then the other two cases -- I don't know the name of the defendants.  One was a death penalty case out of Richmond for multiple defendants.  And the other one dealt with Washington, DC, inmates.

Q  Okay.  Thank you.  Who have you spoken to

Page 6

about your testimony today?

A  Just to counsel, to Chris and Marcy.

Q  Okay.  Thank you.  And what documents have you reviewed in preparation for your testimony today?

MS. COOK:  Objection, foundation.

Q  (By Ms. Godfrey)  Have you reviewed any documents in preparation for your testimony today?

A  I have.

Q  And what documents are those?

A  A number of documents.  I reviewed two depositions, one by Mr. Nalley in this case.  The other one -- it was my deposition from a prior case unrelated to this case.  I also reviewed an information paper from 2004 and then a number of memorandum from ADX staff and others and a number of Sentry transaction sheets and probably a few other miscellaneous documents.

Q  Okay.  Thank you.  For the -- your deposition in the prior unrelated case, do you know what the issues in that case were?

A  Yes.  These -- the case involved individuals who were convicted primarily of terrorism offenses prior to 9/11.  And it dealt with their conditions of confinement and their transfer to ADX Florence, among other things.

Q  Do you know who those inmates were?

Page 7

A  There were three, I believe.  I want to say it was Nosair and Salameh (sic).  But I may be -- the case was being deposed by UD law students, so it's -- you're probably more familiar with it than I am.

Q  Okay.  Thank you.  Can you please describe your educational background since high school?

A  Sure.  I graduated college in 1973 from the University of Scranton with a Bachelor of Science Degree in psychology and sociology, then received a master's degree in psychology from the University of Maryland in 1980 -- I'm sorry, I graduated from college in 1977.  I received my master's degree from the University of Maryland in 1980 and then received my doctorate in psychology from the University of Maryland in 1985.

Q  Okay.  Thank you.  Are you currently employed?

A  I am.

Q  Where?

A  I am employed with a company called Management and Training Corporation, MTC.

Q  And what do you do for that company?

A  I'm the senior director of federal customer relations.

Q  And what are your duties in that position?

A  My duties are to help them manage current

Page 8

customers, federal customers, in the private detention business -- they run contract confinement prisons -- and also to help them out with some state contracts they have and to see if I can get them more business in that arena.

Q  And how long have you been in this position?

A  Just under two years; about 21 months, roughly.

Q  And what was your job prior to this?

A  Prior to that, I was the assistant director of the Correctional Programs Division for the Federal Bureau of Prisons.

Q  And when did you first become the assistant director of the Correctional Programs Division of the BOP?

A  In June 2004.

Q  Did you have any positions with the BOP prior to that?

A  I did.

Q  Can you tell me what they were?

A  Sure.  Prior to that position, I was the deputy assistant director of the Correctional Programs Division.  Prior to that, I was the warden of the federal detention center in Philadelphia, Pennsylvania.  Prior to that, I was the warden at the low-security

2 (Pages 5 to 8)

Page 9

correctional institution in Butner, North Carolina. Prior to that, I was the deputy assistant -- I'm sorry. Prior to that, I was the associate warden of the administrative maximum facility in Florence, Colorado.

Prior to that, I was the deputy assistant director of human resources for the Bureau. Prior to that, I was the personnel director for the agency. Prior to that, I was the chief of management development. Prior to that, I was the executive assistant to the warden at the federal correctional institution in Terminal Island, California. Prior to that, I was the chief of personnel policy and analysis for the Bureau. Prior to that, I was a science research analyst for the Bureau.

Q   Okay. Thank you. You said that you -- prior to becoming assistant director, you were the deputy assistant director. Do you recall the dates that you were the deputy assistant director?

A   Yes, from January 2001 to when I became the assistant director.

Q   Okay. And you also said you were the associate warden at the ADX at some point. Do you recall the years that you were there?

A   Yes, 1994, which is the year it opened, through 1996.

Page 10

Q   Okay. Thank you. When you were associate warden of the ADX, what were your job duties?

A   I was the associate warden of operations. So I had personnel, financial management, facilities management, safety, food service, and that's probably it; mainly the logistics and services piece of the facility.

Q   Okay. Thank you. During this time when you were associate warden, was there a special housing unit at the ADX?

A   There was.

Q   And at that time was there an area in the special housing unit known as Range 13?

A   Yes.

Q   And how was Range 13 -- was Range 13 different than the rest of the special housing unit?

A   Yes.

Q   How so?

A   It -- the cells on that particular range were -- had their own recreation areas and visiting areas built actually into the cells, which was different from the rest of the institution.

Q   Different from the entirety of the rest of the institution?

A   Yes.

Page 11

Q   Okay. Would you say that an inmate housed on Range 13 is completely isolated from all other prisoners?

A   No.

Q   Why not?

A   Well, there's four adjoining cells on Range 13. So to the degree that there were other inmates on that range, they could converse with each other. They couldn't have physical contact, but they could certainly have verbal contact.

Q   Would they ever see one another?

A   Not normally. If an individual was being moved down the range, they could see each other. But other than that, I would think that their sight would be very limited in terms of seeing other inmates.

Q   Okay. Why was Range 13 built?

A   I don't know. I was not involved in the design of the facility.

Q   Do you know what its purpose was when you were associate warden?

A   We didn't have anybody on that range during the time I was the associate warden.

Q   Okay. Do you know why an inmate would have been confined on that range?

A   Not without knowing a specific inmate, why

Page 12

the decision would be made to put him on that range.

Q   Okay. Do you know, in your time with the BOP, how many inmates have ever been confined on Range 13?

A   There's two that I'm aware of -- three that I'm aware of, but there could have been additional ones, since I didn't work at the facility for those years, between '96 and now.

Q   And of those three, do you know how long they were confined there?

A   I don't.

Q   Okay. What were your job duties as deputy assistant director of the Correctional Programs Division?

A   I had oversight over a number of departments in the division, including correctional services, correctional programs, religious programs, psychology services, inmate systems management.

Q   Okay. And what were your job duties as assistant director of the Correctional Programs Division?

A   Well, I had oversight over those same departments, in addition to privatization management, and community corrections, and detention, were the other departments. And then I had policy control, if you

3 (Pages 9 to 12)

Page 13

will, or policy oversight over any of those different functional areas.

Q   Can you explain to me a little more what you mean by "policy oversight"?

A   Well, my job was to make sure that the policies that were under the span of control of my division were up to date. If they needed to be modified, we were the ones that wrote the modifications. We were the ones who would provide input to the program review division on how our policies should be audited or reviewed out in the field. And some of my staff would negotiate with the union when we made policy changes that were under our span of control.

Q   Okay. Thank you. You had said some of your job duties included correctional services. Can you expand on what that means more, please?

A   Meaning -- is your question: What does correctional services include?

Q   Yes.

A   Okay. Correctional services is basically the same as the security of the Bureau of Prisons. It includes policies related to tool and key control, inmate accountability, special housing operations, inmate transportation and movement, emergency planning, and intelligence gathering, among other things.

Page 14

Q   Okay. And for this intelligence gathering, does this include intelligence about gang-related activities?

A   Yes.

Q   Does the BOP receive intelligence from any other law enforcement agencies regarding gang-related activities within the prison system?

A   Yes.

Q   What other law enforcement agencies?

A   Well, I mean, dozens and dozens. I mean, we get information from other state systems, other state departments of corrections, and from the Federal Bureau of Investigation, Drug Enforcement Authority -- Administration, Alcohol Tobacco & Firearms. We'll take intelligence from basically anyone that will give us information. So as I said, it's dozens and dozens of states and just about every federal law enforcement agency that's out there.

Q   And how does the BOP receive this intelligence from those agencies?

A   Well, it would vary agency by agency. Sometimes we receive, for lack of a better word, bulletins over whether there is a particular gang problem at a state system that may bleed into our system. Sometimes we get specific intelligence about a

Page 15

specific individual. And that can come through different reporting systems; from the FBI and others.

The Bureau has a liaison in the National Gang Intelligence Center at the FBI and also at the National Joint Terrorism Task Force and also has representation on a lot of local task forces throughout the country. So we're constantly liaisoning with other law enforcement agencies to share information.

Q   Okay. You said some of this information comes in the form of bulletins. What happens to those bulletins?

A   They would be received by staff that work for the intelligence office and then they would be analyzed. This is what analysts do. They look at that information, try to determine how credible it is, and then try to determine its relevance to the Bureau of Prisons.

Q   And then after those bulletins are received, are they filed somewhere within the BOP?

A   I'm not sure. You would have to ask the intelligence staff that, as to how actually that piece of paper is handled and managed.

Q   Okay. You had mentioned the National Joint Terrorism Task Force. Is there a law enforcement entity for gangs that would be equivalent to that?

Page 16

A   There are several that are not the same size and scope but have similar functions. The National Gang Intelligence Center, NGIC, in the FBI of fairly recent creation, probably four years old -- three or four years old -- that's becoming more like the JTTF in terms of structure. There's also in many cities what are called Safe Streets Task Forces that deal a lot with gang issues in addition to violent crimes and other things of which the Bureau is involved in. So there's similar structures out there.

Q   Okay. For the National Gang -- I'm sorry. I just wrote down an acronym, NGIC, and I don't recall exactly what you said that stands for. What is the purpose of that entity?

A   The purpose is to try to enhance systems to share intelligence across different agencies and between states, local jurisdictions and federal jurisdiction.

Q   And how would that entity inform intelligence decisions within the BOP?

A   Could you repeat your question, please?

Q   Sure. How would the NGIC inform intelligence decisions within the BOP?

A   Well, they wouldn't inform decisions. They would provide intelligence. And then decisions based on intelligence would be done by the Bureau. The Bureau of

4 (Pages 13 to 16)

Page 17

Prisons has a staff member that's stationed inside the National Gang Intelligence Center as the liaison full time.

Q   Okay.  What other agencies are involved in this entity?

A   There's dozens.  I don't even know them all. I mean, there's dozens of states, and a lot of other federal agencies have staff assigned to the NGIC.  I don't know the complete menu of who is there.

Q   Okay.  Thank you.  Does the BOP ever use intelligence received from entities such as this to make conditions of confinement decisions?

A   We'll use intelligence as part of an assessment of an individual inmate's threat and risk to the safety and security of an institution.  It would be one piece of information that we may use.  And then manager's -- correctional managers would use that threat assessment, that information, to make decisions regarding where the inmate should be housed, how they should be classified and so forth.

Q   Okay.  Can you tell me what types of intelligence would guide these sort of decisions?

MS. COOK:  Objection, vague.

Q   (By Ms. Godfrey)  You can answer.

A   I mean, any type of intelligence, whether

Page 18

it's the person's criminal activity, whether it's who they're communicating with, whether it's who their affiliations and associations are -- I mean, there's dozens and dozens of types of intelligence that could be gathered.

Q   Okay.  Are you familiar with the Aryan Brotherhood?

A   Yes.

Q   What is the Aryan Brotherhood?

A   The Aryan Brotherhood is a security threat group, which is really what the prison terminology is now, rather than "gangs."  You'll hear that term.  These are groups that are a threat to the safety and security of the institution.  The Bureau has a higher level beyond security threat groups for a very small number of groups that are particularly disruptive, and they call them "disruptive groups."

The Aryan Brotherhood is a disruptive group. And in most analyses that you'll see, the Bureau creates a threat index for each security threat group.  The Aryan Brotherhood is consistently at the top of that threat index as the most violent and disruptive group in the federal prison system.

The Aryan Brotherhood started in California. There's multiple Aryan Brotherhoods throughout the

Page 19

country, in Texas and Arizona.  The one in the federal system that we call the Aryan Brotherhood is a California product that originated back -- you probably could trace it back to the late '60s, early '70s.

Q   Okay.  Thank you.  Do you believe that Mr. Silverstein has an association with the Aryan Brotherhood?

A   I believe he has more than an association.

Q   What do you mean by "more than an association"?

A   He's a validated member of the Aryan Brotherhood, so he has gone through an extensive objective validation process and literally been scored to determine whether he is a certified member of the disruptive group.  And he is a certified member of the Aryan Brotherhood.

Q   Okay.  You said something about an objective validation process.  Can you just expand on that a little bit more?  What does that mean?

A   Sure.  Most prison systems now -- and the Bureau is one of the leaders in this -- have devised scoring systems where you look at a number of criteria to determine whether an individual is a validated member of a group so that they're not just a look-alike or a wannabe.  And those criteria are published.

Page 20

They look at things such as affiliations, tattoos, photographs of individuals, and different pieces of intelligence that can be looked at.  And then based on that validation score, the individual is determined to be a member or not a member.

Q   Okay.  Are you aware of any evidence that Mr. Silverstein has had any contact with members of the Aryan Brotherhood in the past 25 years?

A   I have no evidence of that.  I don't -- I only see what the scoring that was produced for him shows.

Q   When was that scoring done for Mr. Silverstein?

A   I don't know.

Q   Okay.  Do you know if it was done before 1990?

A   I do not.

Q   Once an individual is determined to have an affiliation with a group like the Aryan Brotherhood, is that -- are they always -- will they always be determined to have that affiliation?

A   No.  There are inmates that sometimes separate themselves from security threat groups or disruptive groups.

Q   And how do they do that?

5 (Pages 17 to 20)

Page 21

A    There's multiple ways of doing that. Typically, or many times, inmates will what we call debrief, and that is that they will give up large amounts of information about the gang that proves to be credible. They renounce any membership and affiliation with it. But typically the way we do that is to not only listen to what the inmate says, but observe their behavior over a lengthy period of time to make a determination as to whether they should not be a validated member anymore. It's -- the number of people that are invalidated is probably not a large number.

Q    Okay. Has Mr. Silverstein's association with the Aryan Brotherhood factored into the BOP's decision on his conditions of confinement over the past 25 years?

A    Yes. If you are a disruptive group -- a validated disruptive group member, regardless of Silverstein or others, that will impact how you're classified and what security level of institution you're going to be placed at.

Q    Okay. When we were talking about -- you were talking before about how some inmates can invalidate themselves. What would the BOP look for behavior-wise in determining if they are no longer a validated member?

A    Well, I'm not an intelligence expert. But we would closely watch who they communicate with, possibly

Page 22

who they are assaulted by is an indication, unfortunately, who they associate with, whether they're still involved in drugs and other activity inside the prison that's associated with the gang. You know, we're going to watch and see how the person does.

Q    If the inmate doesn't debrief or renounce the organization, can they be invalidated?

A    I'm not sure. That's a question that's really better answered by an intelligence guy who has actually been through the process of devalidating somebody.

Q    And who would that be?

A    Either someone from the central office intelligence or a special investigative agent at a facility.

Q    Would invalidation occur at the institutional level or at the national level?

A    It would be initiated at the local level. But for a disruptive group member, it's going to have to be reviewed at higher levels because it's -- each of these security threat groups is very different in how they're structured and how organized and committed the members are. So if you're in a loosely structured group like a Surreno, it's going to be easier to drop out.

If you're in a group like the Aryan

Page 23

Brotherhood, which is an extremely structured group and one that is punitive to anyone who tries to drop out, then it's going to be -- the bar is going to be significantly higher for that type of group to prove that you're no longer a member. So it's -- but a disruptive group would have to be reviewed at a higher level in the institution.

Q    Okay. Thank you. Earlier when we were talking about your job duties, you also mentioned psychology services as one of your job duties. What exactly does this entail?

A    That entails the provision of mental health services in each of the institutions, with the exception of psychiatry. Psychiatry is done through the medical department of a prison. But the rest of the mental health care -- whether it's treatment, psychological assessments, suicide assessment and prevention, and some group counseling and therapy -- would fit under the mental health care that I had oversight for.

Q    Okay. How much, if any, would this job duty require interaction with inmates?

A    Which job are you speaking about?

Q    When you are providing oversight for psychology services.

A    You mean my job when I was the assistant

Page 24

director?

Q    Yes.

A    Okay. Well, I mean, I was based in the headquarters in Washington, DC, but I visited facilities frequently. And as I walked through facilities, I interacted with staff and inmates.

Q    Would you interact with them specifically about the provision of psychology services?

A    No. I would just interact with them in terms of how things were going in the institution. And if someone raised a concern to me about psychology services, obviously, I would speak to them about that. But I did not seek them out specifically for that issue.

Q    Okay. During the time that you worked for the BOP, did you ever receive any training regarding the psychological effects of incarceration?

A    Yes.

Q    What did that training entail?

A    Well, I mean, we -- I went through the basic correctional officer academy in Glynco, Georgia. And it started there and then carried on every year, going to annual training with the Bureau where we would teach staff to observe inmate behavior and interpret how they were behaving and speaking and interacting to see if an individual was having problems with decompensating, was

6 (Pages 21 to 24)

Page 25

not dealing with stress, was -- looking for depression issues or suicidal issues.

That was drummed into us, to pay attention to that. And then if we became aware that an individual was having difficulties with their confinement, to notify mental health providers specifically. And then in my background as a social psychologist, I also have a fair knowledge of the issues of mental health and conditions of confinement.

Q Okay. During the time that you worked for the BOP, did you ever receive any training regarding the psychological effects of isolation?

A No, because there's nobody in the Bureau that's isolated, so it's not really an issue.

Q Can you define for me what you would determine to be "isolated"?

A "Isolated," to me, means that there is no human contact, no social interaction at all with people, no communication with the outside world. That would be my definition of "isolation."

Q Okay. Do you have an understanding of the term "solitary confinement"?

A I do not.

Q Okay. Have you ever used the term "solitary confinement"?

Page 26

A Not that I'm aware of.

Q Okay. Earlier when we were talking about your job duties, you also mentioned case management. What exactly does that entail?

A Case management -- the Bureau has a case manager assigned to each inmate. The case manager is the one that initially determines the best housing placement, job assignments and programs that the inmate should be involved in, and then follows up with the inmate periodically to make sure that the programming and the jobs and the assignments are working properly. And then as the inmate gets towards the end of his sentence, the case manager would work with the individual on discharge planning, at least to the community, sort of future steps, if you will.

Q And what type of oversight would you, in particular, as assistant director of correctional programs, provide with regard to case management?

A My oversight would be primarily from a policy perspective at the national level.

Q Are there any inmates for whom you would be more involved with case management?

A There are inmates that I would be more involved -- there would be a very small number of inmates where I may get involved in their classification

Page 27

and designation.

Q Why would you be involved?

A Typically those inmates would be either high profile inmates, inmates that may be in the media frequently, or inmates that present very unique security issues or threats to the safety and security of a facility.

Q Can you explain to me a little more what you mean by "high profile inmates"?

A Most high profile inmates are people that are media people. You know, let's say, Martha Stewart; I was involved in her designation. You'll also get cases of former law enforcement people or congressmen who are incarcerated. They present very unique challenges. And then, as I said, you had certain individuals who, because of the nature of their threat assessment or the nature of their crime, present very challenging security and safety issues.

Q Would Mr. Silverstein have been one of those inmates who, through the nature of his threat assessment or the nature of his crime, you would have been more involved in?

A Yes.

Q Can you elaborate on more specifically what you mean by the nature of his particular threat

Page 28

assessment?

A Well, of course, his threat is fairly well documented as a matter of record. First, he's a validated Aryan Brotherhood member, attempted escape from a federal correctional institution on Terminal Island, California. He's an escape threat. Extensive armed robbery, bank robbery cases. And then most particular, convicted of three murders while incarcerated in the federal prison system, two of which occurred in the control unit at Marion, which at the time was the most secure unit in the entire Bureau of Prisons, one of those murders involving a horrendous murder of a staff member in the control unit.

Q Okay. So how, in particular to Mr. Silverstein, were you more involved in his case management?

A Well, I was involved in discussions as to where he should be designated once we were going to move him from Leavenworth, and then I was involved in periodic reviews of him while he was in ADX Florence.

Q Okay. Thank you. Is there any classification assignment within the BOP that is a no-human-contact assignment?

A Not that I'm aware of.

MS. GODFREY: Okay. I would like to take a

7 (Pages 25 to 28)

Page 29

five-minute break, if we could.

MS. COOK: That's fine.

MS. GODFREY: Thank you.

(A recess was taken from 9:20 a.m. until 9:32 a.m.)

Q   (By Ms. Godfrey) Okay. Does the BOP have an executive staff?

A   Yes.

Q   What is the executive staff?

A   It is made up of the director, the assistant directors, the regional directors, and then the senior deputy assistant director of the program review division, and the director of the National Institute of Corrections.

Q   Okay. Were you ever a member of the executive staff?

A   I was.

Q   When?

A   From June 2004 through May 2007.

Q   Okay. And does the BOP have an executive panel?

A   Yes.

Q   What is the executive panel?

A   That's a panel to review control unit inmates on a periodic basis. The panel is the assistant

Page 30

director of the Correctional Programs Division, the regional director of the north central region -- it's really a two-person panel -- and then the warden of the control unit. I don't know if he's officially a member of the panel or not. But that's basically it.

Q   Okay. And as assistant director of correctional programs, you were a member of the executive panel, then?

A   Yes.

Q   Okay. And then does the BOP have an executive committee?

A   I don't -- I'm not familiar with that term.

Q   Okay. I want to talk a little bit more about the executive staff. Does the executive staff ever meet?

A   Yes.

Q   How often do they meet?

A   It varies year to year, but typically three to four times a year. Then they occasionally have teleconferences at interim times and as needed.

Q   Okay. What is the purpose of these meetings?

A   Well, the purpose of the meetings is for the director to give an update on what's going on in the Bureau and to have each assistant regional director give an update on what's going on in their -- under their

Page 31

particular span of control. The exec staff will also review a number of papers that vary on all sorts of topics but could deal with major policy changes or programmatic changes that the agency is considering, and they'll have discussions about that. The group will also make selections or recommendations to the director for selections of high ranking positions throughout the agency.

Q   Okay. And then you also said that the executive staff will have teleconferences as needed. What would require a teleconference?

A   Well, it could be, for lack of a better word, sort of crisis situations -- not particularly crisis, but let's say there's -- the federal budget has come out and there's going to be a lot of major changes that need to happen or we're going to make a major policy change or programmatic change and we don't -- we need to get that implemented before our next scheduled meeting, or the director really feels the need to keep everybody up to date on a particular issue or concern, so he will have a teleconference.

Q   Okay. Thank you. And then at the scheduled meetings, is there a general procedure that's followed at those meetings?

A   Yes. There's an agenda, a structured agenda.

Page 32

Q   And who determines that agenda?

A   It's determined -- the senior deputy assistant director of the program review division is really the coordinator of the meeting. They put the agenda together. I would assume at some point they go to the director and he approves the agenda, although I don't know that. But it's the director's meeting, but it's really logistically run by the program review guy.

Q   Okay. And are members of the executive staff provided with a copy of the agenda prior to the meeting?

A   Yes.

Q   And will that agenda include all the topics that will be discussed at the meeting?

A   No. It's a -- the topics that are on the agenda will likely be discussed. But there are many other topics that come up. And there's a variety of ways that the topics can come up, either that -- the conversation on one topic, just like anything other thing, leads to another topic.

Each member, at some point, that goes to the meeting, as I mentioned, gets to sort of give an update or tell people what's going on in their area. At that time, they could raise a particular issue or even bring in a brief memorandum or paper about an issue that they wanted to share. So the agenda would certainly not be

8 (Pages 29 to 32)

Page 33

all-inclusive.

Q   Okay.  You had said earlier that the executive staff reviews a number of papers that deal with a number of different topics at these meetings. Can you -- would these papers be disseminated to the executive staff before -- prior to the meeting?

A   Most are, but there are some papers that are hand delivered at the meeting.

Q   Is there a reason that a particular paper would be hand delivered at the meeting?

A   There's a variety of reasons, some of which is, the deadline to get the paper submitted is several weeks prior to the meeting.  So it may be that you didn't get your paper in on time or that the particular topic occurred in the interim before the due date.  And then there's some issues that are more sensitive that they may not want to disseminate in advance.  Most regional and assistant directors let their staff review the papers that are sent out in advance to get their feedback on them.  And so there may be papers or issues that you don't want disseminated like that.

Q   Can you give me an example of a topic that you wouldn't want disseminated like that?

A   Yeah.  I mean, I'll give you a perfect example.  We were -- because of budget situations, we're

Page 34

actually going to eliminate hundreds of positions in the Bureau, and it would force people out of their jobs and to take jobs outside of their current assignment.  That is not the kind of paper you want floating around or out in the public domain, if you will, or have other employees be aware of until you've made a decision and communicated it.

Q   Okay.  Are these papers called information papers?

A   They're different types of papers.  There's some papers that are called decision papers, there are some papers called concept papers, there are some that are called information papers, and then sometimes they just come in as memorandum that may not even have that type of title at the top of them.

Q   Is there a reason that a particular paper would be called a decision paper?

A   Yes.  Usually you're talking about a major policy change where there's multiple options that the Bureau is going to look at.  And so the paper will lay out the various options and the cost benefit of each option and then look for a decision as to which option we were going to pursue in that policy area.  So it's very structured.

Q   And how is a concept paper different?

Page 35

A   A concept paper is more of an idea paper. Let me give you a perfect example.  The Bureau, years ago, was looking into creating faith-based units.  And so the initial paper that went in was to sort of lay out what that unit might look like and determine whether there was interest in that concept.  And then if you had an interest in that concept, you would probably come back later, the next meeting or two, with a decision paper that now begins to lay out, We buy into the concept of a faith-based unit.  Where is it going to be? How is it going to be structured?  How is it going to be funded?  How is it going to be operated?  So you sort of move into a decision paper.

Q   Okay.  And how would an information paper differ from those?

A   An information paper usually is what it sounds like.  It's informing someone of the status of a particular project or a particular issue.  It may or may not -- sometimes it doesn't ask for any response back from the executive staff.  It may have a brief recommendation or suggestion at the end of it.  But it wouldn't be as detailed in terms of options and cost benefit analysis as a decision paper.

Q   Okay.  I'm going to introduce -- actually, first, have you ever heard of anything called an

Page 36

executive staff paper?

A   I mean, all the papers I'm talking about would be executive staff papers.

Q   Okay.  So as assistant director of correctional programs, did you ever attend the meetings of the executive staff of the BOP?

A   I did.

Q   And at any of those meetings, did the executive staff discuss the conditions of confinement of Mr. Silverstein?

A   Yes.

Q   Were the conditions of confinement of any other inmates ever discussed at those meetings?

A   Yes.

Q   How many other inmates?

A   Oh, I don't know.  But specifically -- I mean, we had discussions regarding a lot of the inmates and detainees related to terrorism cases.  We had discussions on inmates that were high ranking drug cartel and security threat group members.  I mean, there were discussions on occasion about -- sometimes specific inmates; sometimes, for lack of a better word, sort of groups of inmates.

Q   Okay.  And at those meetings where you would discuss the conditions of confinement of

9 (Pages 33 to 36)

Mr. Silverstein, what was the purpose of that discussion?

MS. COOK: Objection, foundation and misstates prior testimony as to "meetings."

Q   (By Ms. Godfrey) You can answer.

A   I don't recall that there were multiple meetings involved in that. I can't recall one meeting. What was the rest of your question?

Q   You had said earlier you discussed the conditions of confinement of Mr. Silverstein at an executive staff meeting. What was the purpose of that discussion?

A   The purpose was to review his current status at the time there that dates far before my placement on the executive staff. There was an annual review of his status. And there was a paper -- an information paper related to that review.

MS. GODFREY: Okay. I'm going to introduce an exhibit. It was previously marked as Plaintiff's Exhibit Number 23. The Bates numbers are US 16364 to US 16366.

Marcy, it was Exhibit I in the e-mail.

MS. COOK: Okay.

MS. GODFREY: Okay. This portion of the deposition should be "Confidential for Attorney's Eyes

Page 38

Only."

I want to introduce a new exhibit. The Bates number is 2402. Marcy, it was marked as Exhibit D in the e-mail I sent to you.

MS. COOK: Okay.

(Exhibit Number 39 was marked for identification.)

Q   (By Ms. Godfrey) Mr. Vanyur, do you recognize that document?

A   I don't. I've never seen it before yesterday.

Q   Okay. So this document was not used in the executive staff reviews of Mr. Silverstein?

A   I've never seen it.

Q   Okay. Thank you. Have you ever seen a document like it?

A   No.

Q   Okay. Do you know if Mr. Silverstein ever knew that these executive staff reviews were conducted?

A   I don't know.

Q   Do you know if Mr. Silverstein was ever

Page 48

notified of the results of this review?

A   I do not.

Q   At these executive staff reviews -- or at the one that you attended, what role did Director Lappin play?

A   I don't recall him serving in any other role than the rest of the members; to listen to the paper and then concur with the recommendation.

Q   How are decisions made to accept or reject a recommendation by the executive staff?

A   It is usually done through concurrence, not through any type of vote. Depending on how complicated the issue or how contentious the issue is, sometimes the discussions will go on for lengthy periods of time; sometimes they won't. Usually we're looking for concurrence. And if the director believes there is concurrence and he agrees, then the issue moves on.

Q   So would the director be determining if the concurrence was there?

A   Yes. Typically he's trying to get a feel for where the group is headed on a particular issue.

MS. GODFREY: Okay. All right. I would like to take another five-minute break, if we could.

MS. COOK: That's fine.

MS. GODFREY: Thank you.

12 (Pages 45 to 48)

Javernick & Stenstrom, LLC
3131 South Vaughn Way, Suite 224, Aurora, Colorado  80014   (720) 449-0329   FAX (720) 449-0334

Page 49

(A recess was taken from 10:09 a.m. until 10:16 a.m.)

Q   (By Ms. Godfrey) Okay. Mr. Vanyur, have you ever heard of the term "regional director special interest case"?

A   Not before yesterday, no.

Q   Okay. Do you know if there are particular inmates for which a regional director will, for lack of a better term, take a special interest in?

A   Yes. I believe that there are certain inmates that the regional director will want to be notified about if the person is leaving the institution or has a medical emergency or has a significant event.

Q   And why would the regional director need to know about those particular inmates?

A   Well, I mean, either they're -- similar to the group we talked about before, that they're either high-profile people that are likely to be in the media or they're complicated security cases -- maybe witness security cases -- where the regional director just wants to be sure that he's in the loop of what's going on with that particular inmate.

Q   Do you know if Mr. Silverstein would have been one of those inmates?

A   I don't know that, other than when I was

Page 50

prepping yesterday for this.

Q   Okay. Thank you. Can you tell me what a CIM assignment is?

A   It's Central Inmate Monitoring assignment. It is an information tool that allows us to track inmates with special security issues so that when we move them somewhere or we assign them to a facility or we take them out for a medical emergency, we have to clear that person to make sure we don't make a mistake and that we're managing their security properly.

I'll give you an example. You can have seperatees in Central Inmate Monitoring; there are certain inmates that cannot mix with certain other inmates. And so if you were going to transfer that person to another prison, you're going to need to check Central Inmate Monitoring that one of their separatees is not in the facility that you're trying to transfer them to, as an example.

Q   Okay. Thank you. Have you heard of the CIM assignment "special supervision"?

A   Yes.

Q   Can you tell me what is it?

A   Special supervision is a category of inmates that require special security needs, complicated security needs, such as an ex-law enforcement officer is

Page 51

maybe someone who is under special supervision. There's probably a number of people. And again, it's an information tool so that before we do anything with that individual, we're going to make sure we know they have some special supervision issues and then make our plans appropriately based on that assignment.

MS. GODFREY: Okay. I'm going to introduce a new exhibit. Marcy, it was Exhibit V in the e-mail I sent to you.

MS. COOK: V, as in Victor?

MS. GODFREY: Yes.

(Exhibit Number 40 was marked for identification.)

MS. COOK: Okay. Just write a number 40 on this.

MS. GODFREY: Marcy, you got that it's Exhibit 40, right?

MS. COOK: Yes.

Q   (By Ms. Godfrey) Mr. Vanyur, do you recognize this document?

A   Yes. It's the program statement on Central Inmate Monitoring system.

Q   Okay. I would like to turn your attention to the fourth page -- I actually think it's the fifth page of the document. It just says page 4 at the top.

Page 52

A   Yes.

Q   The second paragraph says, "Special supervision." Do you see that?

A   Yes.

Q   It says, "Inmates who require special management attention."

A   Uh-huh.

Q   Can you --

A   Yes.

Q   Okay. Can you tell me what is meant by "special management attention"?

A   Well, I mean, it's the correctional management, so it has anything to do with how the inmate is housed and where he's housed, how he's transported, how he's escorted around the institution, how his movement in an emergent -- medical emergency would be done. Anything that deals with how that inmate is housed, transported, and escorted would fit into his correctional management.

Q   Okay. Thank you. Once an inmate is designated as "special supervision," how long does that inmate have that designation?

A   He has it until the assignment is removed.

Q   And how would the assignment be removed?

A   Well, I think it's laid out specifically on

13 (Pages 49 to 52)

Page 53

page 6 in the program statement that talks about removal.

Q   Okay.  Do you know if Mr. Silverstein had the CIM assignment of "special supervision"?

A   I did as of yesterday, yes.

Q   But you -- did you know that when you were assistant director?

A   I don't know that he had that specific Central Inmate Monitoring assignment.  I knew he was a Central Inmate Monitoring case, but what his specific assignments were, I did not know.

Q   Okay.  I want to turn back to page 5 of this where it says page 5 at the top.

A   Yes.

Q   Number 3, "Special Supervision," it says, "Placement in this assignment may be made only upon the authorization of a Regional Director or the Assistant Director, Correctional Programs Division."  Do you see that?

A   Yes.

Q   So if Mr. Silverstein had received this assignment while you were assistant director, would you have known?

A   Not necessarily because it's an either/or.  It's the regional director or the assistant director.

Page 54

Q   Okay.  So if the regional director put this assignment onto an inmate, he wouldn't necessarily have to notify the assistant director?

A   That's correct.

Q   Okay.  Are you familiar with security threat group assignments?

A   Yes, in broad terms.

Q   Can you tell me how security threat group assignments are determined?

A   As I mentioned earlier when we discussed the validation process, if there is any indication or intelligence that an individual may be a member of a security threat group, then the special investigative supervisor or special investigative agent at a facility will begin to do a validation process on the individual to determine if they're a member; and if they're a member, a member of what particular group.

Q   Okay.  Have you heard of the security threat group assignment of "BOP Top 40"?

A   Not prior to yesterday, no.

Q   Okay.  When you were assistant director of the Correctional Programs Division, would you have known if there was a security threat group assignment of "BOP Top 40"?

A   I'd never heard the term in my life prior to

Page 55

yesterday.

Q   Right.  But would you have known in your position if it existed?

A   I can't speculate whether I would or should have known.  One would think I would know, but I can't say that I should have or I would absolutely know.

Q   Okay.  Thank you.  Mr. Vanyur, I want to talk about Mr. Silverstein's confinement at Leavenworth.  Did you ever see the areas where Mr. Silverstein was confined while he was confined at USP Leavenworth?

A   I did not.

Q   Did you ever see those areas of confinement after Mr. Silverstein was transferred from Leavenworth?

A   No.

Q   Okay.  I want to talk about Mr. Silverstein's transfer from Leavenworth to ADX.  And you had said earlier that you were involved in that decision.  How were you involved?

A   I spoke with Mr. Nalley about where the proper place would be to house him.

Q   Okay.  So Mr. Nalley was also involved in that decision.  Was anyone else involved?

A   No.  It was really -- other than, I'm assuming, members of Mr. Nalley's staff and other people under his chain of command -- no, it was really him and

Page 56

I that reviewed the options.

Q   Okay.  And when you say "reviewed the options," what were the options?

A   Well, I mean, one option would have been to leave him at Leavenworth, which we felt was inappropriate because Leavenworth was changing missions to a medium-security prison, and their perimeter security was going to decrease significantly.  One of the other options would be to retrofit another facility with the type of cell that Mr. Silverstein required.  And then the option which we agreed on was to move him to the administrative maximum penitentiary in Florence, Colorado.

Q   Okay.  You said "the type of cell that Mr. Silverstein required."  What type of cell is that?

A   Structurally it's the type of cell that requires us to have the least amount physical contact between him and staff in terms of movement and escort around the facility.

Q   Okay.  And you said you determined that the ADX would be able to meet his security needs.  Were there -- are there any other areas of confinement in BOP facilities that would have met those needs?

A   Not really, because the administrative maximum penitentiary is the -- their mission is to

14 (Pages 53 to 56)

Page 57

manage maximum-custody inmates and inmates that are particularly threatening to the safety and security of institutions; so ADX's sole mission is that. And it was really the ideal place to move him to.

Q   Okay. When this decision was being made, was it ever contemplated that Mr. Silverstein no longer required these type of security controls?

A   I think that's fair. As part of the review in terms of moving him to ADX, did he still require that type of structural cell design that minimized staff physical contact? And our belief at that time was that he still required that type of structural cell design.

Q   What was that belief based on?

A   That belief was based on his prior pattern of behavior in terms of the murders, particularly the murders that occurred while in the control unit in the most secure unit in the Bureau of Prisons.

Q   Was Mr. Silverstein's clear conduct while confined at Leavenworth considered at all?

A   Yes, to some degree.

Q   In what way?

A   Well, he has maintained clear conduct. But as a correctional manager, you can't look at that in the vacuum of a file. You have to also look at that he has not been given the opportunity or we've minimized, to

Page 58

the extent possible under current policies and regulations, to minimize the opportunity for him to assault or murder other people. So one has to look at the clear conduct in the context of how he's being managed and also the historical context of his prior behavior.

Q   Okay. If UPS Leavenworth had not changed from a high to a medium security, would Mr. Silverstein still be confined at Leavenworth?

A   I don't know that. That's an interesting question. I don't know.

Q   Do you know if any inmates have been confined in areas where Mr. Silverstein was confined at Leavenworth since his transfer?

A   I don't know.

Q   Okay. Who made the decision to house Mr. Silverstein on Range 13 once he was transferred to ADX?

A   That decision was made by Mr. Nalley and with my concurrence.

Q   Was Director Lappin involved in that decision at all?

A   Director Lappin was informed that it was our plan to move Silverstein to ADX Florence and where we would house him. And he raised no objection to that

Page 59

plan, so we moved ahead with it.

Q   If he had raised objections to that plan, would the decision have changed?

A   I mean, it could have. He's the director of the Bureau of Prisons and we are his subordinates. So certainly at the end of the day, if he disagrees with a decision or raises objections, we're going to have to respond to that.

Q   Okay. Was it ever considered that Mr. Silverstein be placed in a general population unit at ADX rather than Range 13?

A   I don't recall a specific discussion of that. Mr. Nalley and I spoke about that in more hypothetical terms. And one of the advantages to sending him to ADX Florence is that if he adjusted well in Range 13, that we do have the option at ADX, which we wouldn't have at any other facility, really, to move him into general population. So we -- I think, as part of our decision making, saw that down the road as a potential change.

Q   Just so I'm clear, that possibility was contemplated when you were deciding where to transfer Mr. Silverstein from USP Leavenworth?

A   I believe so. I believe that we saw down the road that at some point, he may be able to move off of Range 13.

Page 60

Q   Okay. What in particular were you looking for to determine that he could be moved off of Range 13?

A   The same things we would look at for any inmate; again, how he adjusts to his new environment, whether he continues to be behaved properly, how he interacts with staff. Again, we're going to defer a lot of this to the people who deal with him every day and make a individualized judgment as to whether we may be able to house him somewhere else and give him a little more opportunity to see if he still does present a threat.

MS. GODFREY: Okay. Thank you, Mr. Vanyur. Would you guys be okay with breaking for lunch now?

MS. COOK: How long do you want to take?

MS. GODFREY: Forty-five minutes.

MS. COOK: We can do that.

MS. GODFREY: Okay. Thank you.

(A recess was taken from 10:38 a.m. until 11:26 a.m.)

Q   (By Ms. Godfrey) Okay. I want to go back to a few things we discussed before lunch. First, you talked about -- that you had testified in a number of different depositions. And I was wondering if you could remember any of the issues or inmates involved in the cases that were not involving the EEO issues?

15 (Pages 57 to 60)

**Page 61**

A   Well, it's the case that I'm sure your familiar with, Nosair -- is it Saleh or Salameh? I always get confused. And Elgabrowny, I guess, is the third. Those guys were convicted of terrorist-type activities prior to 9/11. We moved them to ADX Florence after 9/11, so there was issues there; why they were moved to ADX and so forth.

The other case was on 9/11 detainees. These were not convicted fellows. These were people that were detained mainly for immigration charges after 9/11. And they were detained at some Bureau of Prisons facilities. And there was questions as to how they were detained, why they were detained in a special housing unit, and a bunch of very complicated issues as to whether they were cleared from any concern and being related to terrorist organizations.

Prior to that -- I'm trying to remember prior depositions. The testimony in court cases, two of them were in the penalty phase of death penalty cases where I was an expert witness. The other one was a case involving a haircutting policy imposed on DC inmates housed at a Virginia contract prison. Those are the ones that come to mind. I'm sure if you LexisNexis me, you'll be able to dig up a few cases.

Q   Okay. Thank you. Do you recall if you gave

**Page 62**

depositions when you were the associate warden at the ADX?

A   Not that I recall.

Q   Okay. Thank you. And then I want to talk -- I have one more question about the executive staff review that we talked about of Mr. Silverstein. And could any changes to Mr. Silverstein's conditions of confinement have been made without the executive staff approving?

A   Yes. I mean, the warden has discretion over a lot of different conditions on the day-to-day level. I think it's fair to say that movement to a different type of cell or different unit in the facility would have required certainly the regional director's concurrence.

Q   Okay. So if Mr. Silverstein would have been moved to a different area of confinement, would that have been at the regional director's discretion or at the executive staff's discretion?

A   It's really the regional director's call. You know, he would inform people. He would probably seek my concurrence on it when I was the assistant director, and inform the director. But it's really the regional director who has authority over his confinement.

**Page 63**

Q   Okay. Thank you. And then I just want to clarify: With the transfer to ADX, the decision was made to transfer Mr. Silverstein from Leavenworth to ADX because ADX had Range 13?

A   Well, yeah, because ADX had the physical structure that I was told was similar to Leavenworth in terms of his being able to access recreation, visitation, and other services without requiring the physical escort by staff. And also, ADX is really the appropriate place for a maximum-custody guy like Silverstein. I mean, that's the mission of that facility, is to house the most dangerous inmates inside the Federal Bureau of Prisons. And he certainly fits into that category. So it's both the structural issues in Range 13 and also the mission and security provided by ADX in general.

Q   Okay. Why if the mission -- if Mr. Silverstein's security needs to fit into the mission of ADX, was he not moved prior to 2005?

A   I don't know. Because it's -- that's a good question. I don't know why he -- once we opened ADX, why he would not have been moved there. And I don't have an answer for that.

Q   Okay. And when this decision was being made to transfer Mr. Silverstein from Leavenworth to ADX, you

**Page 64**

had said that you were involved in the decision with Mr. Nalley. When you were making this decision, was this a meeting in person that you had with Mr. Nalley?

A   No. I think most of it was done by -- via telephone.

Q   Okay. And is there -- aside from what we've discussed already, is there anything else that you remember about that conversation with regard to Mr. Silverstein?

A   No.

Q   Did you take any notes during that conversation?

A   Not that I recall.

Q   Okay. Now I want to talk about Mr. Silverstein's reviews at ADX. Did you attend any reviews of Mr. Silverstein at ADX?

A   I did.

Q   How many?

A   I don't know exactly. I would -- if I were to guess, I would say at least two and probably three, that I was actually at ADX. Sometimes we did the reviews for the control unit in general via picture-tel like we're doing now. But I definitely had in-person interactions with him at least twice and possibly three times.

16 (Pages 61 to 64)

Page 65

Q   Okay.  And how often did these reviews of Mr. Silverstein occur?

A   I believe they were every six months.

Q   And was this different than the process for reviewing Mr. Silverstein when he was confined at USP Leavenworth?

A   Yes.  I believe that his in-person reviews were done just by someone from the regional office and other staff and not necessarily by the -- by the regional director and the assistant director of correctional programs.

Q   Do you know why that changed?

A   I don't recall exactly.  It made his reviews more consistent with a control unit level of review.  It also really gave him greater access -- in-person access to higher ranking officials in the BOP, which I think is a positive.  And that's really the primary reasons.

Q   Do you know who decided to change this review process?

A   I think Mr. Nalley proposed that; that when we moved him, we could build into that move this type of review process that, again, is more similar to a control unit type of review.  So I think it was part of that decision-making process.

Q   Okay.  And after Mr. Silverstein was

Page 66

transferred to ADX, did his conditions of confinement continue to be reviewed annually by the executive staff?

A   I don't recall.  I don't specifically remember that paper coming up again, but I could be mistaken.

Q   Okay.  But if it had been reviewed by the executive staff, you would have continued to be a part of that review process also?

A   I would have.  And let me backtrack a little bit.  I don't believe that it -- I don't believe that the -- I believe the reviews stopped by the exec staff at some point.  I don't know what the timing was in relation to his movement to ADX, how soon thereafter we stopped doing the full executive staff reviews.

Q   Do you --

A   But there did come a point when we did not review him at the full exec staff.

Q   Okay.  And do you know why he was no longer reviewed with the full exec staff -- executive staff?

A   We just felt that with the higher level of review, in-person, by two members of the executive staff, there really was no need to involve 16 other people in this discussion who really don't have any direct contact or review with the individual.  So it just made sense to us to manage it, just as we manage

Page 67

other high profile inmates that -- such as those that are in the control unit that would be more consistent.

Q   Okay.  And for the reviews at ADX, what was your role in those reviews of Mr. Silverstein?

A   My role was to sit on a review board with Mr. Nalley and usually the warden of the facility next to us.  We would be briefed by the staff at ADX in terms of Mr. Silverstein's progress and behavior, any psychological issues or any other issues that might be raised.  And then he was brought into the review panel room, given an opportunity to discuss or raise any issues or questions that he had that we would then respond to.  And then we would make a decision after he left the room as to whether we were going to continue his current conditions or make a move to change him significantly.

Q   Okay.  And earlier you said that you stopped working for the Bureau of Prisons in, I believe you said, May 2007; is that correct?

A   That's correct.

Q   And who was your successor as the assistant director of correctional programs?

A   Joyce Conley.

Q   Do you know if she is still in this position?

A   She is.

Page 68

Q   Okay.  And would Ms. Conley have continued to play the same type of role that you did in these reviews?

A   I wouldn't know that, as a matter of fact.  I would assume so.

Q   Okay.  You also said when you were talking about the reviews that the warden of ADX was next to you.  Do you know who this was during that time period?

A   It was definitely Warden Wiley.  I'm trying to remember if he was there the entire time.  That's going back.  But Warden Wiley -- I don't remember, going back.  I can't quite remember, going back to 2004.

Q   And what -- does the warden play any role in these review processes?

A   Yes.  I mean, the warden gives input because he's the most familiar with the inmate.  He basically briefs the regional director and assistant director on issues that the inmate's raised, how those issues have been resolved or not resolved, what's the status of the inmate, what's their current progress.  So he performs a critical role.

Q   Okay.  And then when it comes time to make the decision whether or not for Mr. Silverstein you would change the conditions, did Warden Wiley play a role in that?

17 (Pages 65 to 68)

Page 69

A    Yes. We would ask for his recommendation.

Q    And then would you follow his recommendation?

A    We would not be bound to follow his recommendation. But when you look across all the inmates in the control unit, I would venture to say we followed his recommendation the majority of the times.

Q    Do you know if you followed his recommendation with regard to Mr. Silverstein?

A    I believe we did.

Q    Okay. Did you take any notes during these reviews of Mr. Silverstein?

A    No, I did not take any notes.

Q    And did you review anything in advance of the reviews of Mr. Silverstein?

A    Yes.

Q    What would you review?

A    For each inmate that was being reviewed, we got a summary document that basically gave their background, their reason for placement at ADX, their progress to that time; you know, in essence a thumbnail sketch and an update of how the inmate was doing.

Q    Okay. Do you know if these reviews of Mr. Silverstein were recorded in any manner?

A    I do not believe there was any type of audio or video recording. There are summary minutes or

Page 70

summary -- a summary of the review and the recommendation of the panel.

Q    Okay. Did Director Lappin ever attend these reviews?

A    Not while I was doing them.

Q    Okay. Do you know of any time that he attended them when you were not doing them?

A    I don't know of any time.

Q    Okay. You had said that these would be done in conjunction with the control unit reviews. Are there any -- aside from the inmates in the control unit and Mr. Silverstein, were there any other inmates that would be given these six-month reviews in front of the executive panel?

A    No, not that I'm aware of.

Q    Why Mr. Silverstein, then?

A    Well, because as I've articulated, he presents very special security needs. He's housed in a unique portion of the institution, certainly, that we just felt that we could review him, we could be more familiar with his case, more familiar with his progress, and give him greater opportunity and access to in-person hearings with top executives in the agency.

MS. GODFREY: Okay. I want to introduce an exhibit. It was previously introduced as Plaintiff's

Page 71

Exhibit Number 9. The Bates number is US02306. Marcy, it was Exhibit G.

Q    (By Ms. Godfrey) Mr. Vanyur, do you recognize this document?

A    Only from seeing it yesterday.

Q    Can you tell me what it is?

A    It appears to be a file or a memo by Thomas Gomez, the unit manager of the control unit.

Q    Okay. If you look at the first paragraph, the last sentence, it says, "John Vanyur, assistant director, was present at the review." Do you recall being present at this review?

A    In general terms, yes.

Q    Okay. I want to direct your attention to the third paragraph where it says, "Inmate Silverstein was assured that he was not transferred to ADX Florence as punishment." Do you see that?

A    Yes.

Q    Do you recall Mr. Silverstein asking you about this?

A    Yes.

Q    Do you recall why Mr. Silverstein thought that he was transferred to ADX Florence as punishment?

A    Yes. He felt that he had more privileges and less restrictions while he was at Leavenworth.

Page 72

Q    Okay. You had said earlier that you -- after Mr. Silverstein was brought into the review and he raised issues, you would then make a decision to change the -- whether or not to change his conditions of confinement. Do you recall that?

A    Yes.

Q    Okay. Do you know what you would consider in making this determination?

A    Well, we would consider the legitimacy of the inmate's issues that he's raising. For example, some inmates will raise issues that -- Hey, I've had a dental problem and the dentist has had me on a waiting list for three months. And we would investigate whether that's the case. And if the inmate needs dental care, we would basically tell the warden to get him some dental care.

So we would look at each individual who comes in and the issues they raise to determine their legitimacy, first of all; and second, determine what the appropriate action needs to be made on that issue that he raised.

Q    Okay. Do you recall during these reviews of Mr. Silverstein if Mr. Silverstein ever raised any issues about his continued confinement on Range 13?

A    Yes.

Q    Do you recall what he said?

18 (Pages 69 to 72)

Case 1:02-cv-06998   Document 86-2   Filed 12/17/09   Page 20 of 23   PageID 958
Case: 11-1326   Document: 8-4   Filed: 03/04/2011   Pages: 369

Page 73

Page 75

A   He said in general terms that he believed he didn't require that kind of security anymore, that he'd had clear conduct for a long period of time, and that he had interest in moving out to the general population and through the step-down program.

Q   And do you recall whether or not you considered whether or not to move him into the step-down program at these reviews?

A   We did.  We considered whether he should continue where he was at and -- or whether we should make a move.  And we told Silverstein several times that we are open to looking at where he should be placed in the future and that if he would demonstrate continued compliance with institutional rules and programs, that the panel would be open to looking at changes in his placement in the facility.

Q   How long would Mr. Silverstein need to demonstrate continued compliance with the institutional programs in order for the panel to determine he was ready to be moved?

A   Well, as I mentioned before, there's no fixed time period on that.  We've got to make a judgment, based on our correctional management experience, when the best time is.  It's my understanding that he has since been moved from Range 13.  But that was after my

follows the institution rules and programs for periods of time, he can be moved into another unit, stepped down to another unit where he has greater access to privileges, such as recreation, and greater access to communal activities, recreation with small groups of others and so forth.

And then as they move down each step, greater privileges, less restrictions on movement, greater access to communal activities, to see if the inmate is able to adjust to that.  If they violate the institution rules, have other problems at any phase of the step-down, then they can be stepped back up into prior units.

Q   Okay.  If Mr. Silverstein -- if Mr. Silverstein was meeting all of those institutional guidelines, do you know of any reason that he wouldn't be able to move through the step-down program at ADX?

A   Yeah.  There are some inmates -- and I think if you look at the institution supplement, from my recollection, there are some inmates that present such significant security threats that it may be that they end up at some phase of the program that they may not be able to work their way to a lower phase.

Q   And do you think Mr. Silverstein possesses those security threats?

Page 74

Page 76

time.

Q   When you stopped working for the Bureau of Prisons in 2007, did you think that Mr. Silverstein would be moved from Range 13 in the near future?

A   I never really thought about it.

Q   Okay.  You had just said that you know that Mr. Silverstein is now in the general population unit -- in a general population unit at ADX.  Do you think that Mr. Silverstein should remain in the general population at ADX indefinitely?

A   Well, I can't make that judgment.  I don't have the information or access to any issues of his progress or how he's doing at ADX.  So it would not be fair for me to answer -- that's a hypothetical question to me since I'm really not involved in his case anymore.

Q   Okay.  Do you know anything about the step-down program at ADX?

A   I do.

Q   What do you know?

A   Well, I know that it's clearly laid out -- or at least it was in the '90s when we first opened the place.  The criteria for inmates who can work their way from general population eventually, hopefully, out to an open-population penitentiary down the road, it's a program based on incentives.  The more the inmate

A   I think he did at the time I retired from the Bureau.

Q   Do you know of a way that Mr. Silverstein could show that he no longer has those security threats?

A   Again, as I mentioned before, if he complies, if his interactions with staff are positive, if he continues to program, then they'll make decisions of whether he can change into a different unit, as they already have, apparently.  So I would expect that that same process will continue.

MS. GODFREY:  Okay.  I would like to take a five-minute break, please.

MS. COOK:  That's fine.

(A recess was taken from 11:57 a.m. until 12:07 p.m.)

Q   (By Ms. Godfrey)  I just have a couple more questions for you.  Earlier I had asked you about whether or not you took notes of the reviews, and you said that there was a summary created.  Do you know if the exhibit I had you look at, Exhibit 9, is that the summary that's created from those reviews?

A   Now, I seem to recall -- and again, I can't recall specifically for Silverstein -- but for the other guys in the control unit, there was a shorter sort of summary statement made at the end of this profile that I

19 (Pages 73 to 76)

Page 77

sort of laid out before. Remember, I told you we sort of had the picture of the inmate, his background, his current progress. My recollection is they later went in and put a paragraph or two summary in that. But content-wise, it's not going to differ substantially from what this looks like. But I remember a different format.

Q   Okay. Just so I'm clear, you would receive, before the reviews a, like, profile summary of the inmates to be reviewed; and then you think after the reviews, they would put something in about those inmates?

A   That's my recollection, yes.

Q   Okay.

A   Now, I'm speaking in broader terms about control unit reviews.

Q   Right.

A   I don't remember if Silverstein's looked like that or not.

MS. GODFREY: Okay. Marcy, I think we have the profile for Tommy. I'm not sure if -- for Mr. Silverstein. I'm not sure if we have anything after the review. So if those exist, we would like them.

MS. COOK: Right. And as Mr. Vanyur has indicated, he doesn't remember if that existed for

Page 78

Mr. Silverstein. We'll look to see if it does. And if it does, we'll produce it.

MS. GODFREY: Okay. Thank you.

Q   (By Ms. Godfrey) And then I just have one other question. You were saying that Mr. Silverstein would need to maintain clear conduct and continue programming in order to show that he no longer needs the security controls. What about Mr. Silverstein's complying with the programming would show that he was no longer a security threat?

A   Well, I mean, we -- the programming, his interactions with staff, his clear conduct -- I mean, it's all sort of part of the profile of the picture of the individual and how he's adapting to the institution rules and regulations. So in the programming piece, if his case manager is recommending he needs anger management or whatever other type of programming, we expect him to comply and be active in that program. We expect him to be active in betterness of and keeping himself busy while he's -- not just him, but all these guys -- while they're incarcerated. So we look at that.

MS. GODFREY: Okay. Thank you, Mr. Vanyur. That's all I have for right now. We would like to reserve the rest of our time, though.

MS. COOK: For what purpose?

Page 79

MS. GODFREY: In the event that more documents are produced that we would like to ask him about.

MS. COOK: Have you asked for any, other than those -- so you mean the limited documents that you just recently identified at the end of the deposition?

MS. ROVNER: Well, documents continue to trickle in. We just received some yesterday. So to the extent that any of those are relevant to the testimony that Mr. Vanyur has given today or to his knowledge about the events related to this case, we're leaving it open to be able to inquire about those.

MS. COOK: Right. But you designated those documents you received yesterday as potential exhibits for this deposition. So I'm just asking you to identify what you want to leave the deposition open for, with some specificity.

MS. GODFREY: Well, Mr. Vanyur referenced, when he was deputy assistant director, seeing other information papers that we have yet to see. So, something like that.

MS. COOK: All right. That's fine. I would like five minutes to determine if I will ask any follow-up questions.

MS. GODFREY: Okay.

Page 80

(A recess was taken from 12:12 p.m. until 12:15 p.m.)

MS. COOK: We're ready if you guys are.

MS. GODFREY: We are.

MS. COOK: Okay. I don't have any follow-up questions for Mr. Vanyur.

MS. GODFREY: Okay. Thank you, Mr. Vanyur.

THE WITNESS: Okay. Thank you very much.

MS. ROVNER: Mr. Vanyur, thank you for your assistance with the service of the subpoena. We appreciate your cooperation with that.

THE WITNESS: Oh, not a problem at all. Thanks. I'm getting to know the server now by name.

MS. ROVNER: Thanks again.

MS. COOK: Thank you.

(The videoconferenced deposition was concluded at 12:16 p.m., on Friday, January 27, 2009.)

20 (Pages 77 to 80)

I, JOHN MARTIN VANYUR, do hereby certify that I have read the above and foregoing videoconferenced deposition, and that the above and foregoing transcript and accompanying Amendment sheet(s), if any, constitute a true and complete record of my testimony.

Amendment sheet(s) attached [ ]
No changes, therefore no Amendment sheet(s) attached [ ]

_____
JOHN MARTIN VANYUR

Subscribed and sworn to before me this
_____ day of _____, 2009.
My commission expires: _____.

_____
Notary Public

_____

_____

Page 82

VIDEOCONFERENCED DEPOSITION OF
JOHN MARTIN VANYUR

REPORTER'S CERTIFICATE
I, Wendy Evangelista, Registered Professional Reporter and Notary Public in and for the State of Colorado, do hereby certify that prior to the commencement of the examination the Witness was by me first duly sworn to testify the truth; that said videoconferenced deposition was taken in shorthand by me at the time and place hereinabove set forth and was thereafter reduced to typewritten form under my supervision, as per the foregoing transcript; that the same is a full, true, and correct transcription of my shorthand notes then and there taken.
I further certify that I am not related to, employed by, nor counsel for any of the parties or attorneys herein, nor otherwise interested in the event of the within action.
My commission expires August 12, 2012; and I have hereunto set my hand March 11, 2009.

_____
Registered Professional Reporter
and
Notary Public

21 (Pages 81 to 82)

# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION


- - - - - - - - - - - - - - - - - - - -

UNITED STATES OF AMERICA,              :

                                       :

                                       :

-vs-                                   : CRIMINAL ACTION
                                       : NO. 3:96CR66
DEAN ANTHONY BECKFORD, et al.,         :

                                       : July 21, 1997
                    Defendants         :
- - - - - - - - - - - - - - - - - - - -

TRANSCRIPT OF JURY TRIAL
BEFORE THE HONORABLE ROBERT E. PAYNE
UNITED STATES DISTRICT JUDGE


APPEARANCES:

DAVID J. NOVAK, Assistant United States Attorney
ANDREW G. McBRIDE, Assistant United States Attorney
STEPHEN W. MILLER, Assistant United States Attorney
Richmond, Virginia

        Counsel on behalf of the United States

GERALD T. ZERKIN, ESQ.
Richmond Virginia

WAGNER & WAGNER, ESQS.
Richmond, Virginia
BY:  ROBERT J. WAGNER, ESQ.

        Counsel on behalf of the Defendant Beckford

JOHN C. JONES, ESQ.
Providence Forge, Virginia

SCOTT BRETTSCHNEIDER, ESQ.
Kew Gardens, New York

        Counsel on behalf of the Defendant Dennis

SANDRA M. BEVERLY, RPR
OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT

REGINALD M. BARLEY, ESQ.
Richmond, Virginia

BOWEN & BOWEN, ESQS.
Richmond, Virginia
BY:  CARY B. BOWEN, ESQ.

   Counsel on behalf of the Defendant Cazaco

MORCHOWER, LUXTON & WHALEY, ESQS.
Richmond, Virginia
BY:  ELIZABETH D. SCHER, ESQ.

DAVID P. BAUGH, ESQ.
Richmond, Virgninia

   Counsel on behalf of the Defendant Thomas

RICE, EVERHART & BABER, ESQS.
Richmond, Virginia
JEFFREY EVERHART, ESQ.

   Counsel on behalf of the Defendant Smith


I N D E X

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| John Vanyur | 2 | 19 | 36 | 41 |


SANDRA M. BEVERLY, RPR
OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT

(The following is an excerpt from trial day 7-21-97)

MR. McBRIDE:  Call Mr. John Vanyur.

JOHN VANYUR, having first been duly sworn, was examined and testified as follows:

DIRECT EXAMINATION BY MR. McBRIDE:

Q.  Good afternoon, sir.  State your full name for the record, please.

A.  My name is John Martin Vanyur.

Q.  How are you presently employed?

A.  I'm employed by the Federal Bureau of Prisons.

Q.  What is your present duty assignment?

A.  I'm the warden of the low security federal prison in Butner, North Carolina.

Q.  Mr. Vanyur, how long have you been with the Bureau of Prisons?

A.  Over seventeen years.

Q.  Could you briefly list the facilities that you have been at for the jury?

A.  Prior to my current assignment, which I have been in one year, I was the associate warden of operations for the United States Penitentiary Administrative Maximum in Florence,

Colorado, and I opened that facility and been there for two and a half years.  I have also worked in a medium security federal correctional institution and a number of other posts at headquarters at the Bureau of Prisons.

Q.  Now, you indicated the Ad-Max facility, when did that open?

A.  We took our first inmates in November 1994.

Q.  And prior to joining BOP or during the time at BOP, just summarize, if you would, your educational background for the jury.

A.  I've got a bachelor's degree in psychology and a master's and doctorate degree in social psychology from the University of Maryland.

Q.  And have you also taken the basic officer correctional course for BOP?

A.  I have.

Q.  Let's talk about Ad-Max if we could.  You were the first deputy warden at Ad-Max; is that correct?

A.  That's correct.

Q.  And could you tell the jury how many inmates is Ad-Max capable of housing?

A.  Our capacity was 484.

Q.  How many inmates are there now?

A.  388.

Q.  And do you know, out of that 388.  How many inmates have homicides in their background?

A.   Just over 150.

Q.   Now, Ad-Max is a maximum security facility in BOP; is that correct?

A.   That's correct.  It's the most secure facility in the system.

Q.   Then there are also a number of United States penitentiaries that are labeled high security; is that correct?

A.   That's correct.

Q.   How many of those are there?

A.   There are eight others, in addition to Ad-Max.

Q.   Could you tell us what those are?

A.   I can try.  United States penitentiaries in Lewisburg, Leavenworth, Atlanta, Lompoc, Marion, Terre Haute, Allenwood, I believe, and Beaumont.

Q.   You got it.  At what is the total population that BOP has under its control right now?

A.   Roughly 110,000 inmates.

Q.   Do you know how many of that group have homicide in their background?

A.   Just over 1,200, but that's a slight underestimate because that only includes inmates that are doing time for federal crimes of murder.  If an inmate has state murder charges somewhere in their past, that doesn't show up in that listing; so over 1,200.

Q.   Now, how many inmates are presently at the Ad-Max facility?

A.   388.

Q.   And could you tell us what is the purpose of the Ad-Max facility?

A.   The purpose of the Administrative Maximum is to house inmates that are not functioning properly inside the federal prison system.  Either they have attempted escape or escaped from secured prisons or they have seriously assaulted inmates or staff or they have murdered inmates or staff.  And because they cannot function in a normal, open population environment, we move them for a temporary basis to a more restrictive environment.

Q.   What percentage of inmates at Ad-Max come from other institutions?

A.   Over 91 percent.

Q.   And where do the other 9 percent come from?

A.   The other 9 percent are direct court commitments.  They are very special cases, typically, high ranking organized crime figures, high ranking drug cartel individuals or international terrorists, people that would have the potential to have resources enough to garner an outside assisted escape.

Q.   Now, for instance, is John Gotti at Ad-Max?

A.   No, but he's at Marion, which is a similar program.

Q.   Now, is the purpose of Ad-Max for people to go there and remain there?

A.   No, it's not.  Ad-Max is a correctional program.  It's meant

to bring an inmate into a more restrictive environment, and then over several years, three years, four years, depending on the individual, allow them to work their way out of that prison and into an open population penitentiary.

Q.  What is the goal time frame to move them from the highest level of security, Ad-Max, out to another institution?

MR. BAUGH:  Objection to the goal, Your Honor.  That's speculative, has no relevance to this case.

THE COURT:  Overruled.

BY MR. McBRIDE:

Q.  What is the time frame that the Bureau of Prisons has set as its goal?

A.  To move from general population to outside the Ad-Max, three years is our goal.

Q.  And within Ad-Max, there are different levels of security; is that correct?

A.  That's correct.

Q.  And the highest level of security is the controlled area for those who have violated the rules at Ad-Max; is that correct?

A.  The control unit -- or committed murder, serious assault or escape inside BOP facilities.

Q.  If I could have the assistance -- we saw some pictures before, Mr. Vanyur.  The jury has already seen these photographs.  They have been admitted.  Since you have been at Ad-Max, maybe you could describe what we are seeing there.

Could you tell the jury what that is?

A. That is a typical cell inside Ad-Max. There are 500 or 602 cells. Over 400 resemble this type of cell. You are looking from the back of the cell out towards the front door, out towards the range or hallway.

Q. Is that, in fact, one of the control area cells for people who have violated the rules within Ad-Max?

A. It's a similar cell. A control unit cell would have a 12 inch black and white television. This cell has a radio. So it's the administrative detention part of the special housing unit.

Q. That's for the worst of the worst?

A. This is the most secure cells, yes.

Q. And what percentage of the cells at Ad-Max are designed like this?

A. Over two-thirds.

Q. What are the other cells like? How do they differ?

A. Well, they are just not as self-contained. They don't have a shower facility inside them, and they are slightly smaller. Other than that, they still have a poured concrete cell. Some of them just have one steel door, instead of two steel doors, but they are not all that dissimilar.

Q. Now, let's take the most secured area, the area you have described with the control area. Even in that area, are inmates allowed to recreate?

Case 1:02-cv-06998   Document 86-3   Filed 12/17/09   Page 10 of 46   PageID 971
Case: 11-1326      Document: 8-4      Filed: 03/04/2011      Pages: 369

8

A.   Yes.   Every inmate is required to recreate by law.

Q.   And, also, do they have access to a law library?

A.   Yes.   We operate nineteen law libraries inside the institution.   We are required to provide access.

Q.   Now, when the inmates, even in the most secured area, recreate, where do they do that?

A.   In the control unit, they recreate by themselves, and we have both indoor and outdoor recreation yards.   The indoor room is probably about 15 by 20 feet.   And the outdoor room is probably 20 by 15.   It's a triangular shape with two story walls around it.

Q.   In the general population at Ad-Max, how long are the inmates allowed to recreate each day?

A.   Two to two and a half hours a day.

Q.   How do they recreate?

A.   They recreate in small groups of eight to twelve in a larger rec area, probably about the size of this courtroom.

Q.   Entire courtroom?

A.   Yes.

Q.   And what sports are they allowed to play?

A.   They have a basketball and a hand ball.

Q.   How many inmates are allowed out there at one time?

A.   At the most twelve.

Q.   Now, is there a metal detector that's used prior to inmates going out there to recreate?

A.   Yes, there is.  There is a hand-held metal detector.

Q.   Even with that, have you had incidents of shivs, knives, homemade knives being used in the recreation area?

A.   We had an incident where an inmate introduced a wooden shank, which, of course, the metal detector did not pick up, and he assaulted another inmate with that shank.  Unfortunately for him, the individual he assaulted took that shank away from him and then used it on him.

Q.   And have you also had violence occur in that recreation area without weapons involved?

A.   Yes.

Q.   Have you witnessed that yourself, sir?

A.   Yes.  I witnessed a very serious assault where three inmates literally stomped on the head of an inmate for several minutes.

Q.   You mentioned the law library.  Have you had occasion to view homemade knives or instruments that inmates at Ad-Max have manufactured from items in law libraries?

A.   Yes.  I have seen one.  It was a flat piece of steel that came out of the inside of a stapler.  There is a sort of U-shaped piece of steel in a stapler.  The inmate removed it and then got it back to his cell and then flattened it out into a shank.

Q.   What did the inmate do with that?

A.   That particular shank we found in his property before he got to use it.

Q.  And was there another shank that was made from a typewriter piece?

A.  Yes.  After I left, they discovered the steel rod from a typewriter had been taken out, and the inmate did attempt to stab an officer with that weapon.

Q.  Now, are you generally familiar with the assignment procedures for BOP, the program statement in the various prisons where people would go?

A.  Yes, I am.

Q.  Now, if I could put up the program statement.  As to assignment to ADX Florence, where you worked, if that comes up on your screen, the criteria for assignment to U.S.P. Marion and ADX Florence -- I don't know if you are going to be able to do that, if it's going to work.  I will just hand it to the witness, if I could.

MR. BAUGH:  I have no objection to counsel reading it if it would help.

BY MR. McBRIDE:

Q.  I will read this and ask you if this is a correct statement of BOP policy.  ADX Florence:  ADX Florence general population units are used for those inmates who have demonstrated an inability to function in a less restrictive environment, without being a threat to others, or to the secure and orderly operation of the institution.  Is that the general criteria for assignment to ADX?

A. Yes.

Q. So, essentially, to put it colloquially, you have to mess up, have some kind of incident in some other institution before you'd even get to ADX; is that correct?

A. That's correct, the vast majority of cases.

Q. Is that also true of Marion?

A. That's correct.

Q. So, for instance, take someone who is convicted of homicide in furtherance of a drug enterprise and has a significant violence -- excuse me, significant background of dealing drugs and firearm violence. In your opinion, where would that person go to start out their incarceration at BOP?

A. Probably to an open population United States penitentiary.

Q. Of which there are how many, you indicate before?

A. Not including ADX, there would be eight others.

Q. Now, let's talk about those high security facilities. Do they have recreation where they recreate with other inmates?

A. Oh, yes. They would have open access to large recreation yards, similar to what you would see on television, and a full recreation program.

Q. Would they have double bunking?

A. Probably.

Q. Two inmates to a cell?

A. Yes, probably.

Q. And would feeding be done in a dormitory fashion at a high

security facility?

A. They would eat in a dining hall, similar to a military style dining hall.

Q. So there would be access to utensils then?

A. That's correct.

Q. Would they also have an opportunity to work in uniform?

A. Yes. They would be required to work at some job.

Q. So there would be access to tools as well?

A. That's correct.

Q. Now, even at Ad-Max, once you have advanced in the program, you do receive certain liberties; is that correct?

A. That's correct.

Q. And so are there inmates at Ad-Max who are allowed to eat in a dormitory type fashion with other inmates?

A. Yes, and there are also inmates that work in a factory setting.

Q. So even during the three year program at Ad-Max, the liberties increase over time; is that correct?

A. That's correct.

Q. Now, let me ask you, have you had a look at the statistics on the rates of violence in the high security facilities at BOP?

A. I have.

Q. If I could put up the first chart. If you would look at your screen, is that the BOP statistics for high security facilities for the period from May '95 to May '97, a two year

period?

A.  Yes, it is.

Q.  Now, does that population include Ad-Max?

A.  Yes, it would.

Q.  And it includes Marion as well?

A.  That's correct.

Q.  And then the other less restrictive high security facilities, correct?

A.  Yes.

Q.  What was the average daily population in those high security facilities for that two year period?

A.  I cannot read it, 9,981.

Q.  Almost 10,000 inmates; is that correct?

A.  That's correct.

Q.  And how many total assaults occurred in that two year period?

A.  I did some tallying.  If I could pull my --

Q.  Sure.  How many total assaults out of almost 10,000 inmates?

A.  1,462.

Q.  So assuming that no inmate committed more than one assault, what percentage of inmates committed assaults in the high security facilities?

A.  Roughly 14 percent.

Q.  And of those assaults, those 1,500 assaults, how many involved a weapon of some kind?

A.   384.

Q.   What percentage is that of the total assaults?

A.   26 percent.

Q.   And how many of those assaults were on staff?

A.   800, both with and without weapon.

Q.   And that was one two-year period in the high security facilities; is that correct?

A.   That's correct.

Q.   If we could go to the next one.  If we could go back to that one.  How many homicides were there in high security facilities for that two year period?

A.   Nine.

Q.   How many of those involved staff?

A.   One.

Q.   If we could go to the next one then.  Now, this is for the period 1993 through 1995, same statistics.  How are those statistics generated by the Bureau of Prisons?

A.   Any time an incident occurs within a facility, we generate something similar to a police report, whether there was an assault or any kind of serious misconduct.  So those are automated, and then they are fed into a computer system and tallied.

Q.   For this period 1993 through 1995, for most of that period, or some of that period, Ad-Max was not operating; is that correct?

A.   That's correct.

Q.   So this would include Marion and then the other high security prisons?

A.   Except for Beaumont, which is also brand new.

Q.   Except Beaumont?

A.   That's correct.

Q.   What was the average daily population of inmates during this two year period?

A.   7,912.

Q.   And how many total assaults occurred among that group?

A.   1,572.

Q.   And, again, assuming that no inmate was charged with more than one assault, what percentage of inmates committed assaults in the BOP high security prisons?

A.   19 percent.

Q.   And how many of those assaults were with a weapon?

A.   420.

Q.   What percent of that is of the total assaults?

A.   26 percent again.

Q.   How many assaults were committed on staff members in that two year period?

A.   921.

Q.   Now, how many murders were committed in that two year period in your high security facilities?

A.   Sixteen.

Q. And how many of those homicides involved corrections officers?

A. One.

Q. If we could go to the last statistics. Have you also reviewed the statistics for the years 1991 through 1993 for high security facilities?

A. Yes, I have.

Q. And that would not include Ad-Max at all; is that correct?

A. That's correct.

Q. It was not even open at that point. What was the average daily population of the Bureau of Prisons high security level institutions for that two year period.

A. 7,274.

Q. And, again, how many total assaults occurred in that population?

A. 586.

Q. Assuming that only one assault per inmate, what percentage of inmates committed some kind of assault?

A. 8 percent of them.

Q. And what percentage of those assaults involved a weapon of some kind?

A. Over one third.

Q. And how many deaths, homicidal deaths, occurred in BOP high security facilities in that period of time?

A. Ten.

Q.   Did you also keep statistics regarding drug use in high security federal prisons?

A.   Yes, we do.

Q.   In your experience, sir, is the distribution and use of drugs in federal prisons associated with violence in those prisons?

A.   Yes, it is.

Q.   Could you tell the jury why that is?

A.   Well, you sort of have the direct effect of the inmate who is using drugs, if he's using amphetamines or another drug that would get him hyped up, you've got to deal with that individual in a confined setting.  So you have the immediate violence.

But probably more important to that is the secondary violence that you get.  You have turf wars with gangs over who is going to distribute the drugs inside the institution, just as you would have on the street.  And then people sometimes don't pay their debts for drugs they bought or they made promises they couldn't keep.  So there is retribution based on that failure to pay debts or failure to follow through on distribution promises.

Q.   Now, let me ask you to look, if you could, at the 1993 to 1995 statistics on your drug testing program and how many -- what was the average daily population in that period?

A.   Again, 7,912.

Q.   And how many total positive tests did you have?

A.   1,980.

Q.   Now, a lot of those are repeat offenders; is that correct?

A.   That's correct.

Q.   So what percentage of positive tests for controlled substances did you have in random testing of this population?

A.   About 3 percent of the random tests were positive.

Q.   So 3 percent of the people in your high security prisons test positive for drugs?

A.   Randomly, yes.

     MR. McBRIDE:   If I could have Exhibit DAB-11, that's been admitted into evidence.

BY MR. McBRIDE:

Q.   Mr. Vanyur, take a look at that item.   In your experience, in your seventeen years with the Bureau of Prisons, have you ever seen an item like that before?

A.   Similar.

Q.   Many times, in fact?

A.   Yes, usually with a tooth brush handle is the most common.

Q.   In other words, the razor welded onto the toothbrush?

A.   Yes.   A toothbrush handle is typically longer, and you get more leverage with it.

Q.   How do people shave at Ad-Max?

A.   With a disposal razor.

Q.   Similar to that one right there?

A.   Yes.

     MR. McBRIDE:   Thank you.   I have nothing further.

CROSS EXAMINATION BY MR. BAUGH:

Q.  Mr. Vanyur, all the statistics you gave us have to do with all of the inmates in the maximum security prison; am I correct?

A.  High security prisons.

Q.  High security.  How many homicides have there been in your Florence ultra security section?

A.  None so far.

Q.  None so far.  Are you expecting any?

A.  With the type of population we have, one never knows.

Q.  Also, you told this jury that usually people are sent there after they misbehave in another facility; am I correct?

A.  That's correct.

Q.  Do you mean to tell me that if the Bureau of Prisons decides that someone is so dangerous that they should either be executed or sentenced to a cell, you people wouldn't stick him in there immediately?

A.  As I said, about 9 percent of the inmates are direct court commitments.

Q.  So you don't mean to tell this jury that someone cannot be committed there immediately if the United States is of the opinion they are that dangerous?

A.  That's correct.

Q.  Now, concerning inmate violence at Ad-Max, am I correct, sir, that not in your open population -- well, strike that.  In

your high security jails, Beaumont, Marion and all those, they have a section that's just open, like on television, a yard, right?

A.   That's correct.

Q.   And people can mingle?

A.   That's correct.

Q.   And they can have visitors?

A.   Contact visiting.

Q.   Contact visiting.  They can actually meet with loved ones and friends in a room and pass things back and forth sometimes?

A.   That's a fact.

Q.   Now, when someone is in Ad-Max security, that doesn't happen, does it?

A.   No.  The visiting is noncontact.

Q.   In fact, not only is it noncontact, but you people, meaning BOP people, had the kind of glass you can't even break through with a hammer hitting on it for two hours.

A.   That's a fact.

Q.   They must speak over the telephone?

A.   Correct.

Q.   And the cells at Ad-Max, am I correct, they are approximately, what, 6 feet 6 inches by 9 feet 6 inches?

A.   The controlled units are 90 square feet.  The general population area is 85 square feet.

Q.   And in that 90 square feet, you got your bunk?

A.   Correct.

Q.   Your toilet?

A.   Yes.

Q.   And your shower?

A.   Correct.

Q.   You have one window, 5 inches by 24 inches, looking outside?

A.   That would be about right.

Q.   Then you got a set of bars?

A.   Correct.

Q.   And then you got a solid metal door with another small window about the same size?

A.   Yes, with a small vestibule in between the bars and the solid door.

Q.   And am I correct that the vestibule is there so that the inmate can be fed in their cell?

A.   That's correct.  The staff steps into the vestibule.

Q.   So the staff can't even -- I mean, there is a row of bars between the staff when they feed them.

A.   That's a fact.

Q.   In fact, because of the lessons that were learned at other facilities, when Ad-Max was designed, you can even change the light bulb without going inside the cell through a little --

A.   Through a pipe chase.

Q.   So it is possible that if someone is particularly dangerous, it is possible that that person could live, breathe, shower, eat

and never have direct contact with another human being in the Bureau of Prisons.

A.   That's not possible.

Q.   Well, am I correct that the only time you take them out would be for recreation, right?

A.   For recreation, medical examinations, visiting.

Q.   Well, am I correct that if someone doesn't play by the rules, they lose visitation rights?

A.   That's a fact.

Q.   And if it's a medical necessity, the doctors can go to them, right?

A.   For very limited care.   If they need an x-ray or dental care, obviously, they have to come out.

Q.   If someone had appendicitis, you might want to move them.   I mean, if someone has complaints, to determine if the complaint is valid, the doctor can actually go look at them, right?

A.   They have to go into an open area to see the inmate.

Q.   And, further, when Ad-Max was designed, wasn't it originally designed that there wouldn't even be bar soap?   Didn't they originally decide to use powder soap?

A.   That's correct.

Q.   Do you all still do that?

A.   Yes, we do.

Q.   There is not even a little roller for the toilet paper to go on; is that correct?

A.   That's correct.

Q.   Because that might turn into a weapon?

A.   That's correct.

Q.   And, further, if someone -- you get fifteen minutes on the phone per month?

A.   That's correct.

Q.   And if you don't play by the rules, that can be cut back too, can't it?

A.   That's correct.

Q.   All your mail is opened?

A.   Correct.

Q.   Any pictures that you might receive from loved ones that are viewed to be suggestive or racy are confiscated?

A.   That's true bureau-wide.

Q.   All mail has to be read, coming in and going, except for legal mail?

A.   That's a fact.

Q.   Even a letter from a lawyer though has to be opened in the presence of the inmate?

A.   Correct.

Q.   By a guard.  The officer opens it, makes sure there is nothing in it and then hands it to them?

A.   That's bureau-wide also.

Q.   So all these statistics you were talking about with homicides and stuff, those include those facilities that have a

yard where people mingle and have contact with others and all that?

A.   That's correct.

Q.   Now, of the 9,000 -- I'm sorry, 10,000 inmates who are in high security, how many of them are in segregation?

A.   I don't know that.  It would vary from day to day.  I would say a safe estimate would probably be 10 percent.

Q.   About a thousand.  And of the thousand, about 400 of them are at Florence?

A.   That would be in addition.  Florence is not segregation.

Q.   When I say segregation, for instance, at Marion there was a bank of cells that are very small and people aren't let out of very often; am I correct?

A.   If it's disciplinary segregation, they are let out one hour five days a week.

Q.   And in Florence, how often are the inmates let out of the Ad-Max security area?  How long are they let out?

A.   It depends on the unit.  In the control unit, the most secure unit, one hour a day, seven days a week.

Q.   And if they are good, they get to go to the outside room.  If they are not so good, they go to the inside room?

A.   No.  They rotate.

Q.   When the cell is opened to let them go to the recreation room and they are in maximum security, they recreate by themselves, don't they?

A. That's correct.

Q. And when the cell door is opened, they are shackled, right?

A. That is correct.

Q. And for people who don't know what shackling is, it's like handcuffs on the ankles, right, with a long chain?

A. In the control unit, they have leg irons and they are cuffed from behind.

Q. And they are cuffed from behind. Is there a belly chain?

A. No, not on recreation escort.

Q. When they get to the recreation room, they are put inside the door. And then the little doors open up, and they put their hands through the locked door, and they are uncuffed from the outside of the locked door?

A. That's correct.

Q. And then they are allowed to sit there in that room. And then when it comes time for them to remove, they come back, put their hands back through the hole in the door and are handcuffed before the doors is ever opened.

A. That's correct.

Q. And then somebody escorts them back to their cell?

A. Correct.

Q. And, further, only one of those metal doors at a time is opened as the inmates are let out, am I correct, to go to the recreation area?

A. Only one inmate would go out to recreation, be escorted at a

time.

Q.   Plus, the inmates at Florence in the high security area, they are kind of shuffled periodically, am I correct, so that they can't communicate possibly with people next door to them?

A.   We have mandatory cell rotation.

Q.   How often do you rotate?

A.   Fourteen days typically.

Q.   So every two weeks everybody gets moved?

A.   Right, but on the same range, they just rotate the cells in that range.

THE COURT:   Mr. Baugh, didn't we cover most of this with Doctor Cunningham?   It seems to me like I have heard a good deal of this before recently.

MR. BAUGH:   Forgive me.

BY MR. BAUGH:

Q.   Am I correct, sir, that the cell walls at Florence are 5,000 test concrete, reinforcing bar every 6 inches?

A.   Class A wall, what the prisons defines as a Class A wall, precast concrete, 8 inch rebar.

Q.   So that nobody can get through them.

A.   Well, we've only been open two years.   So we don't know all the possibilities that can happen over the course of history.

Q.   The doors, not the bar door, but the metal door, that's electronic, isn't it?

A.   That's correct.

Q.   And in the time that it has been open, has anyone gotten out?

A.   No.

Q.   If an inmate does not abide by the rules, other than cutting off his visits or limiting his visits, can they also limit his telephone time?

A.   Yes, if the offense is related to misuse of the telephone.

Q.   And what is the -- can you cut off the telephone completely to him?

A.   Probably for a year, if the misuse was significant.

Q.   What would be a misuse on the telephone?

A.   Conducting business on the telephone, discussing escape plots or introduction of contraband.

Q.   Telephone calls are monitored?

A.   That's correct.

Q.   In the language of the person speaking?

A.   Generally.  You mean if it's a foreign language?

Q.   Yes.

A.   We try to have people on the monitors that can speak foreign languages.

Q.   Am I correct that if inmates want to use the telephone, he must file a written request identifying the person to whom he's going to speak?

A.   That's correct.

Q.   So that everyone knows ahead of time when it's going to

happen so it can be approved?

A.   Yes.

Q.   And the reason for Florence is not only to protect officers but, am I correct, also to protect inmates from each other?

A.   Yes.

Q.   Because inmates have been known to hurt each other?

A.   That's a fact.

Q.   Would you say that, in the world, based upon your knowledge, that there is a safer facility for an inmate than Florence?

A.   There are similar facilities, about twenty-seven states operate super maximum facilities that are similar.  So we are on par, I think, with where technology is heading.

Q.   Would you say that those are the safest institutions there can be?

A.   As far as I can tell.

Q.   And Beaumont is how old?

A.   Brand new.

Q.   Beaumont, Texas?

A.   Yes, within the last couple months.

Q.   And does it have a segregation unit, like we are talking about here, where single cells exist?

A.   Yes.  Every penitentiary -- my prison, current prison, will have a segregation unit.

Q.   So we are building more of these?

A.   We are not building Florences.

Q.  But Florence has a capacity of 484.  So you have empty bunks in Florence.

THE COURT:  Segregation is different than maximum.

BY MR. BAUGH:

Q.  They call them different things in different facilities.  So there is still room in Florence.  There are empty bunks.

A.  Yes.  We only use Florence for people that require that level.  We don't just fill it up to fill it up.

Q.  Now, you say there are 150 people at Florence with homicides in their background.  Are they there for murder or are they there for other crimes and they have committed murders in the past?

A.  They are there primarily for what they have done inside the prison system.  Some of them have committed murder once they have entered the prison system.

Q.  And others --

A.  Others, it's just part of their history.  They are there for other reasons, whether they tried to riot or --

Q.  What percentage of the inmates at Florence are in Florence because they committed a homicide while a prisoner?

A.  I don't know that number.

Q.  Could you estimate it less than ten?

A.  No.  I would say it's higher than that.  I would say it's probably thirty or forty.

Q.  Of those thirty or forty, some of them come from high

security facilities, right?

A.   That's correct.

Q.   Others come from medium security or low security facilities?

A.   If they were involved in types of behavior that would place them in Florence, they could come from any other facility.

Q.   So, hypothetically, if someone were sentenced to prison in a minimum security facility for some significant felony, but nothing involving violence, and they defended themselves and hurt someone, they could get sent to Florence?

A.   They defended myself --

Q.   If they defended themselves from assault from other inmates.

A.   Then they would not have been charged with assault, and they would not end up in Florence.

Q.   They wouldn't be charged with assault?

A.   Not if we can prove that they were -- or they can prove that they were defending themselves.

Q.   Oh, I'm sorry, if they can prove that they were the victims, they don't get sent, right?

A.   Right.

Q.   But if they were the victims and they can't prove it, they go, right?

A.   Well, you are twisting my words.  What I'm saying is that if the individual is found guilty of a serious assault, then he is punished like anyone else would be punished when they are

involved in that type of behavior.

Q.   Would spitting on an officer be an assault?

A.   To be put in Florence?

Q.   Is it classified as a serious assault and be in that stat you just read?

A.   On occasion.

Q.   Yes.   Would pushing an officer out of the way, would that be considered an assault?

A.   Yes.

Q.   Would that be considered in your statistics?

A.   Yes.

Q.   So any misdemeanor touching would be classified as an assault and would fit in those statistics you just went over with Mr. McBride, right?

A.   Any physical use of force against an individual would be considered an assault.

Q.   Would you consider spitting at someone use of force?

A.   I consider it an assault, yes.

Q.   Okay.   So that could get you -- you could get on that statistical pool that Mr. McBride just read from?

A.   Right.

Q.   Is there any rule that prohibits a new inmate who has been classified as dangerous from being sent to Ad-Max in Florence?

A.   No, but that's not the Bureau's goal in Ad-Max.

Q.   Okay.   This will got faster if you answer my question.   Is

there any rule that says they can't go there?

A. No.

MR. BAUGH: Thank you. Pass the witness.

CROSS EXAMINATION BY MR. ZERKIN:

Q. Good afternoon. When you talk about turf wars against gangs, the gangs you are talking about in the federal prison system are things like the Hells Angels, Pagans, Arian Nation; am I correct?

A. Not necessarily. The broader group is actually what we call disruptive groups, and sometimes they are street gangs as you mentioned. Other times they are just loosely geographic gangs. African American inmates from Washington, D.C., if they are in one facility, may get together to run turf issues.

Q. And you have the ability in your classification system to determine who might align themselves with other inmates; is that correct?

A. We attempt to.

Q. And you attempt to disassociate people who were involved in crime on the outside from being with each other on the inside; is that right?

A. That's correct.

Q. In fact, that would be one of your clear criteria you would rely upon when you are making assignments?

A.   Yes, codefendants.  We usually try to separate codefendants.

Q.   And what information -- when you determine what level of security is necessary for an inmate coming into the system, what sources of information do you have?

A.   We have the presentence investigation report.  We rely heavily on that.

Q.   That's done by a probation officer and the court; is that correct?

A.   That's correct.

Q.   What else do you have?

A.   Their instant offense.  Those are the primary sources.

Q.   Do you do a psychological assessment?

A.   We do a screening.  And if that screening indicates that the individual may have some issues, then we do further assessment.

Q.   When you say screening, what are you talking about?

A.   It's both a written tool, and then we do a brief diagnostic with a psychologist, a brief interview.

Q.   And that's a psychological profile to determine whether the person would be at high risk for committing violence in the institution; is that correct?

A.   That would be putting it too strongly.  Mainly, we're looking at tendencies toward suicide and then whether the individual has some severe mental functioning.  That's about it at that point.

Q.   If the gentlemen to my right, the United States Attorneys in

this case, thought that a particular defendant posed a high risk of danger in the prison system, do they have a means of communicating that to the prison system for classification purposes?

A.   Yes, they do.

Q.   I assume that you would willingly accept such information from them; is that correct?

A.   We'll accept the information, yes.

Q.   Is there, in fact, a form for that purpose?

A.   I'm unsure, but given that it's the Government, I would believe there probably is a form.

Q.   Touche.  These programs, like Florence, and which I guess is in similar form at Marion; is that correct?

A.   We took all the inmates out of Marion, most of them, and moved them to Florence.  So Marion's program is very different than it was several years ago.

Q.   But the basic concept existed at Marion before Florence?

A.   That's correct.

Q.   And that program, in fact, with this goal of thirty-six months being able to release them back to the population, has been quite successful, hasn't it?

A.   It has been very successful.

Q.   In fact, you only have a return rate, once they are released, of about 15 percent?

A.   That's correct.

Q. Isn't it also true that most murderers in the system are not classified as -- when I say murderers in the system, I mean people convicted of murder, serving terms for murder -- are not classified as appropriate for settings such as Ad-Max and Florence or at Marion; is that correct?

A. That's correct. The vast majority of them are in open population facilities.

Q. In fact, if I got your numbers -- do you know what the percentage would be?

A. Well, there is roughly just over 1,250 inmates in our system that have a current offense of murder, and only 158 of those are in ADX.

Q. So it comes out to about 12 and a half percent; does that look about right?

A. Yes.

Q. Mr. Baugh asked you about the definition of assault. What's the definition of weapon in those statistics you showed us?

A. It would require some piece of hardware that's actually used on an individual.

Q. I mean, anything other than your fist; is that right?

A. That's correct.

          MR. ZERKIN:  That's all I have, Judge.

          THE COURT:  Any other questions?

REDIRECT EXAMINATION BY MR. McBRIDE:

Q. Now, Mr. Vanyur, you mentioned that you HAD taken soap, hard soap away at Ad-Max, and you have taken the rollers for the toilet paper out of the cells; is that correct?

A. That's correct.

Q. Do you think you've thought of all the things that an inmate could make a weapon out of?

A. Not at all.

Q. Now, by law, these inmates have to go to the law library; is that correct?

A. That's correct.

Q. And by law, they have to recreate?

A. That's correct.

Q. Now, Mr. Baugh indicated that in the high security part of Ad-Max, people are cuffed behind their back, and they have these leg irons on; is that correct?

A. That's correct.

Q. But there are inmates at Ad-Max who are not moved around in that fashion; is that correct?

A. That's correct.

Q. In fact, at the latter stages of the program, they are allowed to move about freely to some extent; is that correct?

A. Yes.  They move about unrestrained.

Q. And receive cable television and other privileges at that

point; is that correct?

A.   Well, they see that in even the most secure units.

Q.   Cable television?

A.   That's correct.

Q.   Now, let me ask you this.   There was a lot of questioning about Ad-Max and Marion and high security.   Based upon the crime of homicide, is there any limit as to how low an inmate could work himself in the BOP system over the years if they were incarcerated for a long period of time?

A.   If it's just homicide?

Q.   Just homicide.

A.   I have nine in my low security facility.   So I would assume a low security facility would probably be as low as they could go.

Q.   And you're at a low security facility?

A.   That's correct.

Q.   How many inmates in total are at your facility?

A.   1,160.

Q.   And nine of them --

A.   Have homicide in their background.

Q.   How about someone who is sentenced to prison for life without parole, what is the lowest they could work themselves in the system?

A.   They could work themselves down to a medium security facility.

Q.   Then by rule they could go no further; is that correct?

A.   That's correct.

Q.   What is the difference between a medium security facility and a high security like the U.S.P.

A.   More the level of control of movement and the perimeter security.  But in terms of open movement to recreation areas, access to education programs, access to open feeding, they are going to be very similar.

Q.   Now, BOP has to house international terrorists and leaders of drug cartels from South America; is that correct?

A.   That's correct.

Q.   And those people pose a threat from the outside as well as the inside; is that correct?

A.   That's correct.

Q.   Now, these four defendants here who have been convicted of serious crimes, drug murder and participation in a continuing criminal enterprise, in your opinion, with your seventeen years experience in BOP, where are they going to be sent if they are sentenced?

         MR. BAUGH:   Objection, Your Honor, irrelevant.

         MR. ZERKIN:   It's way beyond -- I think way beyond the cross.

         MR. McBRIDE:   I don't think it is at all, Your Honor.

         MR. ZERKIN:   It's certainly beyond mine.

         MR. BAUGH:   It's speculative, Your Honor, in that Mr.

Vanyur --

THE COURT:   Come up here.


BENCH CONFERENCE:


MR. ZERKIN:   I just think it was beyond cross, that's all, Judge.

MR. BAUGH:   Mine is, Your Honor, that Mr. Vanyur has indicated that the criteria for the determination of that placement, all of which involved, he mentioned input from the United States Attorney's Office, presentence report, all those things, without that information, that is a pure guess he's been asked to give.

THE COURT:   Also, I haven't heard anything about them being involved in the decisional process.   Maybe I missed it. Is there anything in his background that had him involved in placement?

MR. McBRIDE:   Well, he's familiar with the regulations.   Those are what he quoted about Ad-Max and Florence.   And I think Mr. Baugh certainly suggested that all these guys are going to Florence, based upon a number of criteria.   Mr. Zerkin's cross suggested that the U.S. Attorney's Office would have some influence on that.   I think I'm entitled to ask him, as a BOP professional, where do you think these guys are going to go.

MR. BAUGH:  If I might, Your Honor, the purpose of my questioning was not to show that they would go there, but the purpose of my questioning was to show, if the Bureau of Prisons deemed them dangerous enough, they could.  That is all.  I don't think anyone can say they are going there.

THE COURT:  I don't think direct assignment is appropriate.  So I will sustain the objection.  You are not going to argue anything beyond what you just said.

MR. BAUGH:  Yes, sir.


END BENCH CONFERENCE


BY MR. McBRIDE:

Q.  Out of your total population of 110,000, how many inmates have homicide in their background?

A.  Roughly 1,250.

Q.  And the vast majority of those are in high security facilities?

A.  579 are at the highest.

Q.  And where are the rest of them?

A.  They are spread out in the system.  As I said, I have nine in my low security.  We have eighty-five facilities.  So I'm sure they are spread out, medium, low and high.

Q.  Now, that razor item that I showed you earlier, would you classify that as a weapon?

A.  Definitely.

Q.  Have you ever seen anyone do arts and crafts with an item like that?

THE COURT:  All right, let's go.

MR. McBRIDE:  I have no further questions.

MR. BAUGH:  I have very few, Your Honor, if I may.

RECROSS CROSS EXAMINATION BY MR. BAUGH:

Q.  Just so people in the audience don't misunderstand, when you say cable television, am I correct that at Florence each inmate gets a 12 inch black and white television and religious services and education channels and some entertainment are broadcast over those?

A.  That's correct.

Q.  They are not getting HBO or CSPAN or anything like that?

A.  Well, they have ESPN and several other channels similar to that.

Q.  In black and white?

A.  In black and white.

THE COURT:  ESPN?

THE WITNESS:  Yes, sir.

MR. BAUGH:  That's what he said.

By MR. BAUGH:

Q.  Is one thing, can you cut off their television?

A.   Yes.   We have had some destroy their televisions.

MR. BAUGH:   Thank you, sir.

THE COURT:   All right.

MR. JONES:   Your Honor, a couple questions if I might.

RECROSS EXAMINATION BY MR. JONES:

Q.   Mr. Vanyur, you indicate that you have nine prisoners who have been charged with murder, or is that in their history or is that a federal charge of murder?

A.   That's in their history.

THE COURT:   Are you talking about in his facility?

BY MR. JONES:

Q.   At your facility.

A.   It's somewhere along their criminal --

Q.   Okay.   So they are not in the federal system for murder?

A.   Not necessarily, no.

Q.   And do you know individually how long they have been in the system before they got to the security level that you are at?

A.   No.   They have to have generally less than seventeen years left to serve to get down to a low security.

Q.   Do you know the average age of the individuals that -- these nine individuals that are in your facility?

A.   I do not.   The average age of my total inmate population is around thirty-seven or thirty-eight.

Q.  Okay.  But your total inmate population -- Butner has a special treatment program; is that correct?

A.  That is the facility next door to mine.  There are two facilities at Butner.

Q.  Okay.  But we don't consider that program as part of your inmates?

A.  No, I do not.

MR. BAUGH:  In light of that, may I?

RECROSS EXAMINATION BY MR. BAUGH:

Q.  Sir, when you talk about these gangs, does the occurrence of gang violence drop off --

THE COURT:  He didn't talk about gangs.  Mr. Jones didn't ask --

BY MR. BAUGH:

Q.  Sir, do you find older inmates involved in gang activity, like fifties and sixties?

A.  Yes.  Most of the gang leaders typically are older.  It takes them a few years to work their way up.

MR. BAUGH:  Thank you, sir.

THE COURT:  Can he be excused?

MR. McBRIDE:  Yes, Your Honor.

THE COURT:  Thank you for being with us and giving us your evidence.  You are excused from your subpoena.

(The witness was excused from the witness stand.)

I, Sandra M. Beverly, certify that the foregoing transcript is a correct record of the proceedings taken and transcribed by me to the best of my ability.

_____     _____
SANDRA M. BEVERLY, RPR          Date

# EXHIBIT C

STATE OF ARIZONA        )
                        ) ss
COUNTY OF PINAL         )

## AFFIDAVIT OF MARK A. BEZY

MARK BEZY, after being duly sworn, deposes and states under oath as follows:

1.      I am over the age of 18, and I am competent to testify to the matters stated herein. I make the statements in this affidavit based upon my personal knowledge.

2.      I worked for the United States Bureau of Prisons ("BOP") for 28 years, from 1978 to 2006, starting my career as a Correctional Officer and working my way up.  During that time, I held a number of positions, including:  (a) Warden of the Federal Correctional Complex at Terre Haute, Indiana from August, 2004 through October, 2006; (b) Warden of the Federal Correctional Institution in Elkton, Ohio from December, 2002 through August 2004; (c) Associate Warden at the United States Penitentiary in Leavenworth, Kansas, a high security facility, from July, 1999 through November, 2002; (d) Correctional Services Administrator of the North Central Regional Office of the BOP in Kansas City, Kansas from May, 1995 through July, 1999; and (e) Captain at the maximum security U.S. Penitentiary in Marion, Illinois ("USP Marion") from February, 1992 through May, 1995.

3.      I received a number of awards during my service with the Bureau of Prisons, including being named a Member of the Senior Executive Services; being named Associate Warden of the Year for the North Central Region; and receiving a Director's Award in 1997.

4.      While I was Warden at Terre Haute, I was responsible for the operation of, among others, the high security penitentiary and the Federal Death Row which is located at the FCC in Terre Haute.  As Warden at Terre Haute, I oversaw 1,500 adult male high security offenders, as well as 37 inmates who were under death sentences.  I managed several emergency situations that

occurred while I was Warden at Terre Haute, including a homicide, and numerous inmate assaults and emergency lockdowns.

5.    As Correctional Services Administrator for the North Central Regional Office of the BOP, my duties included providing consultation, advice and on-site assistance to 18 federal correctional institutions within the North Central region of the United States, which included at the time the states of Illinois, Wisconsin, Minnesota, Missouri, South Dakota, Kansas, and Colorado. I also oversaw the regional disciplinary transfer program for the North Central Region, and the Control Unit Hearing Program for the entire BOP.

6.    When I worked at USP Marion, that facility was the highest security prison in the United States.  USP Marion housed the "worst of the worst" of federal prisoners in its general population, and did so under highly secure and restrictive conditions of confinement, including, for example, restrictions on telephone communications, all of which were recorded and monitored, and restrictions on visitation, including no contact visits of any sort.  While the hope of the BOP was that inmates sent to the general population at USP Marion would modify their behavior and return to a mainstream maximum security facility after two to three years, there were many inmates who were housed at USP Marion for many years, including some who were housed at USP Marion for years and then transferred directly to the Administrative Maximum ("Super-Max" or "ADX") facility in Florence, Colorado when that facility opened.  In addition, there were some inmates who were assigned directly to USP Marion from the sentencing court.  For example, John Gotti was an inmate sent directly to USP Marion from the sentencing court.

7.    While I worked there, USP Marion had units within the facility where the most dangerous and/or high security risk inmates were housed under even more strict conditions of

confinement than those imposed on USP Marion's general population.  These even more strict conditions of confinement were imposed for as long as the BOP and/or the Warden deemed necessary to ensure security and to reduce or eliminate the inmate's risk of violence or future dangerousness.  For example, USP Marion had a Control Unit within the prison where the most violent offenders, including particularly those who were deemed to pose a future danger of violence and/or criminal activity, were housed prior to the opening of the Super-Max ADX facility in Florence, Colorado.  Typically, inmates could be assigned to the Control Unit at USP Marion for a specific amount of time, up to five years, based on their offense.  The specific amount of time that an inmate was committed to the Control Unit was determined by the BOP.  Moreover, if an inmate engaged in additional criminal or violent activity, they could be re-committed to the Control Unit for additional time beyond the five years.  Inmates assigned to the Control Unit were housed in that Unit for as long as was deemed necessary by the BOP in order to alleviate the risk that the inmate would constitute either a security risk or a future danger to either BOP staff, other inmates, or the public.

8.      The Super-Max ADX facility in Florence, Colorado opened in approximately 1994.  I know that a number of inmates who, due to security and/or "future dangerousness" concerns, had been housed at Marion under very strict conditions of confinement for years prior to the opening of the ADX facility in Colorado, were then transferred to the ADX facility where they continued to be held under very strict conditions of confinement due to the same long-standing security and/or future danger concerns.  Inmates who fit this description that I can recall at this time include Barry Mills, and T.D. Bingham, high ranking members of the Aryan Brotherhood gang, as well as leaders of other gangs and disruptive groups.  In addition, shortly after ADX was opened, a number of other

-3-

violent inmates, including gang members, domestic terrorists, and organized crime figures, were also

were transferred directly from USP Marion to the ADX facility.  At ADX, both before and after

1998, these types of inmates were housed in conditions that were even more restrictive than the

conditions had been at USP Marion in terms of their ability to interact or communicate with staff,

other inmates, or persons outside the facility.

9.      USP Marion also had what was called the "K-Unit" from at least the mid-1980's

through the mid-1990's in which inmates who were a security risk were housed under extremely

strict conditions of confinement.  Inmates housed in the K-Unit due to security and/or future

dangerousness concerns that I can recall included John Walker, a convicted spy, Ed Wilson, a

former CIA operative, Jonathan Pollard, a convicted spy, and Christopher Boyce, a former CIA

operative.  These inmates were held in K-Unit because of security and/or future danger concerns,

and were held there for as long as the BOP deemed it necessary to ensure security and that these

individuals did not constitute a future danger.  Inmates housed in K-Unit were housed in single cells

and had no physical interaction with other inmates.  All their mail was screened by BOP officers,

all telephone calls had to be arranged through BOP officers who would bring the phone to the inmate

in his cell.  Those calls could only be made to people who were on an approved phone list, and all

such calls were recorded and monitored by the BOP.  All visitors to any inmates on K-Unit had to

go through a somewhat intensive background screening process, and had to be pre-approved by the

BOP before they could visit.

10.     Also at the USP Marion, there is an inmate housing unit above the hospital called the

"I-Up Unit".  Similar to the K-Unit, in the I-Up Unit, all inmate mail was screened and/or copied,

and all telephone calls were recorded and monitored.  I know, for example, that gang leader David

-4-

Sahakian, whose crimes included ordering the murders of others, was held in the I-Up Unit during his pre-trial detention in order to protect others and ensure that he did not commit, order or direct any additional criminal activity. I believe this was after 1998, but inmate Sahakian was held under conditions of confinement that were available to the BOP at USP Marion in and prior to 1998.

11.     The Super-Max facility in Florence, Colorado, was designed to hold the most dangerous inmates under extremely strict conditions of confinement, including with strict limitations on any communications with people outside the prison, whether by phone, mail, or visits, whenever deemed necessary by the BOP. It is my understanding that inmates were in 1998 and prior thereto (and have been from 1998 through the present) held at the ADX facility under strict conditions of confinement, including severe restrictions on their communications, whether by mail, phone or visitation, whenever that was deemed necessary by the BOP or the ADX Warden, and for as long as necessary to deal with the security or future danger concern raised by a particular inmate. I also know that some inmates have been assigned to the ADX facility directly from the sentencing court, when the circumstances warranted. The ADX facility also has areas within the prison that are referred to as "side pockets" or "special cells," which are used to hold prisoners who are deemed to be exceptionally dangerous. For example, inmate Luis Felipe was assigned to ADX directly from the sentencing court and inmate Felipe was held in one of these "side pockets" after being sentenced in 1997 due to concerns about security and/or his future dangerousness as set forth by the sentencing court. It is my belief that other inmates, too, were housed in these "side pockets" in order to address concerns about security and/or future dangerousness in and before 1998.

12.     I know of some other examples of inmates who, in 1998 and prior, were housed under strict conditions of confinement specifically in order to reduce or eliminate their potential future

-5-

dangerousness. For example, Federal inmate Rodney Hamrick, a convicted bomber, was housed at USP Marion when I worked there. All of Hamrick's mail, including his legal mail, was specially monitored by the BOP in order to reduce or eliminate his future dangerousness. Inmate Manuel Noriega was also held under very strict conditions of confinement by the BOP because of the assessed risk that he posed to be a future danger by ordering crimes or violence while incarcerated. Other inmates that I can recall who, in 1998 and prior, were housed under very strict conditions of confinement due to security concerns include Thomas Silverstein and Clayton Fountain. Again, these strict conditions of confinement were (and are, to my knowledge) imposed on high security inmates by the Bureau of Prisons for as long as the BOP deems those conditions necessary to ensure the security and safety of BOP staff, other inmates, and the public (*i.e.* to reduce or eliminate the inmate's future dangerousness). In the years after 1998, there have been a great many more federal inmates housed under such strict conditions of confinement in order to address security and/or future dangerousness concerns.

13.     All maximum security BOP facilities also have what is called a Special Housing Unit ("SHU") within the facility. SHU's are, in essence, a prison within a prison where security and conditions of confinement are more strict than those imposed on the general population within the maximum security facility generally. Both before and after 1998, inmates could be and were housed in a SHU for a variety of reasons, including because of concerns about security and/or an inmate's "future dangerousness."

14.     Based on my experience at the BOP, including the orders I gave and the conditions of confinement I observed, administered, and/or imposed both prior to 1998 and after, there is no doubt that the Bureau of Prisons had, at all times, the authority and ability to house inmates in the

-6-

most restrictive conditions of confinement necessary to ensure security and/or to reduce or eliminate an inmate's "future dangerousness." This included, but was not limited to, housing inmates in conditions of confinement where they did not have the ability to freely communicate with anyone from outside the prison, whether by phone, in person, or mail. The BOP could, and did, take away prisoners' ability to have visitors, to have mail privileges, and to make or receive phone calls whenever the BOP deemed it necessary to do so for the security of either prison staff, other inmates, or the public. Under the BOP regulations, these are considered "privileges" and not "rights," so they could be taken away whenever it was deemed necessary. Moreover, these strict conditions of confinement could be, and were, imposed for as long as the BOP deemed it necessary to ensure the security and safety of either prison staff, other inmates, or the public (*i.e.* to reduce or eliminate the inmate's future dangerousness).

15.    When strict conditions of confinement, such as being sent to the Control Unit or a SHU, or having mail, visiting and/or phone privileges taken away, were imposed on federal inmates for security reasons or concerns about violence, documentation of that action would normally be created and maintained in one or more places within the BOP. Information about both the restrictive conditions imposed and the reason(s) for imposing those conditions could be contained in one or more of the following: (a) in the DHO (Disciplinary Hearing Officer) record which is kept at the individual BOP facilities; (b) in the SIS (Special Investigation Supervisor) Files, which are kept at all high and maximum security BOP facilities; and (c) when the Warden imposed such conditions, s/he would write a memo which should be contained both in the inmate's file and the files of the BOP facility where the conditions were imposed. In order to ascertain all the inmates on whom these types of restrictive conditions were imposed based on security and/or "future dangerousness"

-7-

concerns, at a minimum, one would need to review the above files at each of the high and maximum security BOP facilities.

16.     While restrictive conditions of confinement, including taking away communication privileges such as mail, phone and correspondence, could be imposed for a variety of reasons, I know that, in 1998 and prior thereto, those conditions were imposed on a number of inmates specifically in order to address security and violence/future danger concerns, and that those strict conditions of confinement were maintained for as long as the BOP deemed necessary to address the security of violence concerns regarding the particular inmate. I do not know the names of all the inmates who had strict conditions of confinement imposed on them in order to address security and/or future dangerousness concerns, but believe that, in 1998 and prior, there were a number more such inmates beyond those that I have recalled and described in this affidavit.


Further, Affiant sayeth not.


_Mark A. Bezy_

Mark A. Bezy


Subscribed and sworn to
before me this _21st_ day
of November, 2008.

_____

Notary Public

AARON HALLSTROM
Notary Public - Arizona
MARICOPA COUNTY
My Comm. Exp. 04-30-2011


-8-

# EXHIBIT D

STATE OF ARIZONA      )
                        ) ss

COUNTY OF PINAL      )

## SUPPLEMENTAL AFFIDAVIT OF MARK A. BEZY

MARK A. BEZY, after being duly sworn deposes and states under oath as follows:

1.     I am over the age of eighteen, and I am competent to testify to the matters stated herein. The statements in this affidavit are based upon my personal knowledge.

2.     I am the principal/owner of Mark A. Bezy and Associates, LLC, a consulting firm specializing in corrections management; conditions of confinement; correctional facility activation, operation, and management; inmate transportation; correctional work programs; prison gangs and security threat groups; and institutional disturbances and crisis management. Additionally, I worked as a consultant to Creative Corrections, LLC, a company charged with inspecting state and local correctional facilities housing detainees under the auspices of the federal Department of Homeland Security and Bureau of Immigration and Customs Enforcement.

3.     Prior to these positions, I was employed by the United States Bureau of Prisons ("BOP") for 28 years, from 1978 to 2006. I began my BOP career as a correctional officer at the Federal Correctional Institution in Oxford, Wisconsin. Three years later, I was promoted to the rank of lieutenant and served in that capacity at the Federal Prison Camp in Duluth, Minnesota and the Federal Correctional Institution in Phoenix, Arizona. In 1988, I was promoted to the rank of captain and served in that capacity at the Federal Correctional Institution in Ray Brook, New York, the Federal Medical Center in Lexington, Kentucky, and the United States Penitentiary in Marion, Illinois ("USP-Marion").

1

4. At the time I served as a captain at USP-Marion, that facility was the highest-security federal correctional facility in the country and housed many of what were considered the most incorrigible and difficult inmates in the BOP, and did so under highly secure and restrictive conditions of confinement. This included, for example, restrictions on telephone communications, all of which were recorded and monitored, and restrictions on visitation, including no contact visits of any sort. At USP-Marion, I was a member of the review and classification committee for the movement of high-security inmates through the facility's step-down process.

5. While the hope of the BOP was that inmates sent to the general population at USP-Marion would modify their behavior and cycle out of USP-Marion to a mainstream maximum-security facility after two to three years, there were many inmates who were housed at USP-Marion for much longer than three years and were unable to cycle out of the program. The BOP recognized that a small percentage of individuals would most likely require such restrictive security measures during the entire term of their incarceration because of the potential future dangerousness posed by those inmates. These inmates, such as T.D. Bingham, Barry Mills, and Jeff Fort, were later transferred directly to the United States Penitentiary Administrative Maximum Facility in Florence, Colorado ("ADX" or "SuperMax") when that facility opened in 1994, and they remain housed at ADX today. Although many inmates came to USP-Marion as a result of a demonstrated inability to function properly in other, less-restrictive environments, a number, such as John Gotti, were assigned directly to USP-Marion from the sentencing court.

6. From 1995 to 1999, I served as correctional services administrator for the BOP North Central Regional Office in Kansas City, Kansas. In that management position, I provided

2

on-site advice and consultation to 18 BOP facilities in that region. I also created and implemented the tactical inmate movement plan for "Flo-Max II," the final movement of high-security offenders from USP-Marion to ADX. In this position, I administered the disciplinary transfer program and was responsible for evaluating and classifying all disciplinary transfers and close supervision and protective custody cases – some 4,000 cases in all.

7.      In 1999, I was named associate warden at the United States Penitentiary in Leavenworth, Kansas, an institution housing up to 2,500 inmates. At USP-Leavenworth, I directed the "KC Model Program" which effectively managed disruptive and violent inmates within the general population through identification, classification, and housing changes. The KC Model Program has since been successfully implemented in other penitentiaries.

8.      In 2002, I was named the chief executive officer (warden) of the Federal Correctional Institution in Elkton. There, I managed the safe and secure operation of this low-security facility and was responsible for providing programs and services to 2,300 adult male offenders. I supervised a staff of 300 and managed an annual budget of $42 million.

9.      In August 2004, I became chief executive officer (Warden) of the Federal Correctional Complex at Terre Haute, Indiana ("FCC-Terre Haute"). At FCC-Terre Haute, I managed programs and services provided to 1,500 adult male high-security offenders at the U.S. Penitentiary ("USP-Terre Haute"), 1,200 adult male medium-security offenders at the Federal Correctional Institution, 450 minimum-security adult male offenders at the Federal Prison Camp and 37 adult offenders under death sentences, including Darryl Lamont Johnson. I oversaw 675 personnel and managed an annual budget of $64 million. At FCC–Terre Haute, I implemented a number of security enhancements that have now been adopted throughout the BOP. Moreover, I

3

managed several emergency situations that occurred while I was warden at FCC-Terre Haute, including a homicide, and numerous inmate assaults and emergency lockdowns. As warden, I received top-secret clearance in order to review classified documents relating to particular inmates. I retired from the BOP in October 2006.

10. I received a number of awards during my service with the BOP, including being selected for the Senior Executive Services, a merit-based special compensation program; being named Associate Warden of the Year for the North Central Region in 2001; and receiving the Director's Award in 1997 for my contributions to security technology. As that honor demonstrates, I am very familiar with the security capacity of BOP facilities and have in fact pioneered the use of some of the security protocols and equipment that the BOP employs to this day.

11. For example, when I activated the current USP-Terre Haute in March 2005, that facility was the first in the nation to deploy a wireless microwave camera system. That system was part of my changes in the deployment and accessibility of emergency response equipment which were designed to allow the facility to deal better with serious disturbances. Subsequently, other BOP facilities adopted the use of wireless microwave camera systems. In fact, the equipment at USP-Terre Haute was transferred to and installed at ADX after I retired from BOP.

12. After my retirement from the BOP in 2006, I served as the warden of Central Arizona Correctional Facility, a private prison for sex offenders in Florence, Arizona.

13. I previously have been certified as an expert in BOP policies and procedures by the United States District Court for the Eastern District of Missouri and as an expert in prison

4

adjustment by the United States District Courts for the Central District of California and the Eastern District of Pennsylvania.

14. In the instant case, I have been retained by counsel for Darryl Lamont Johnson and have been asked to provide my opinion and evaluation, based on my thirty-year history in corrections, regarding the following matter:

A. The ability of the Bureau of Prisons to neutralize inmates deemed to be a threat to institutional security and/or to alleviate the threat to the safety and well-being of other individuals, whether inside or outside prison walls, at the time of Mr. Johnson's 1997 trial (*i.e.* future dangerousness).

15. In the course of my evaluation, I have reviewed the following materials:

a. Portions of the trial record, including the opening and closing statements of the government and the defense and the testimony of John Vanyur, Ph.D. and Mark Cunningham, Ph.D.;

b. July 21, 1997 Testimony of John Vanyur, Ph.D. in United States v. Dean Beckford et al, Case No. 3:96CR66 (E.D. Va.);

c. The direct appeal opinion affirming Mr. Johnson's convictions and sentences;

d. The Affidavit of BOP Case Manager B. English, filed in Mr. Johnson's current case;

e. Various BOP regulations and Program Statements.

16. The BOP's primary mission is to safely and securely house individuals accused and/or convicted of federal criminal offenses, ranging from nonviolent drug and fraud-related offenses to more serious offenses, such as treason, acts of terrorism, racketeering, and murder.

5

The 200,000 inmates in federal custody are classified according to their criminal history; history and circumstances of incarceration; the circumstances of the current offense(s); affiliations with gangs, militant organizations, or other security threat groups; medical and mental health needs; and length of sentence(s) for the current offenses. The stated purpose of the BOP's classification system is to "place each inmate in the most appropriate security level institution that also meets their program needs and is consistent with the Bureau's mission to protect society." Program Statement 5100.08, p. 1.

17. As Dr. Vanyur correctly noted during his testimony in Mr. Johnson's case, prior convictions and prison behavior are part of the BOP's classification calculus. Johnson Trial Transcript at 2470-2471 (hereinafter "Johnson T. at __"). As it did during my entire tenure, the BOP retains a great deal of discretion to fashion conditions of confinement and classify inmates to meet its penological objectives and mission, including to ensure the safety and security of BOP facilities and people both inside and outside such facilities. The BOP's discretion is not absolute – it must comply with the United States Constitution as well as those mandates handed down by Congress, the courts, and the Department of Justice. In keeping with these principles, the BOP has many tools in its arsenal that it may use to deal with inmates presenting both commonplace and extraordinary threats to the security of prison staff, other inmates, and those in society at large.

18. Based on my experience at the BOP, including the orders I gave and the conditions of confinement I observed, administered, and imposed, there is no doubt that the BOP had, at all times, the authority and ability to house inmates in severely restrictive conditions of confinement necessary to ensure security and/or to reduce or eliminate an inmate's future

6

dangerousness. This includes, but is not limited to, housing inmates in conditions of confinement where they do not have the ability to freely communicate with anyone from outside the prison, whether by phone, in person, or by mail. The BOP can, does, and did at the time of Mr. Johnson's trial in 1997, take away prisoners' ability to have visitors, to have mail privileges, and to make or receive phone calls whenever the BOP deems it necessary to do so for the security of prison staff, other inmates, or the public. Under the BOP regulations, these are considered "privileges" – not "rights" – so they can, and could at the time of Mr. Johnson's trial in 1997, be taken away whenever it is deemed necessary by the BOP. Moreover, these strict conditions of confinement can be, and were at the time of Mr. Johnson's trial in 1997, imposed for as long as the BOP deems it necessary to ensure the security and safety of either prison staff, other inmates, or the public (*i.e.* to reduce or eliminate the inmate's future dangerousness).

## I.    Inmate Classification and Placement and Facilities

19.    One way in which the BOP can deal with the dangers posed by prisoners at the outset is through the initial classification process. At the time of Mr. Johnson's trial in 1997 (the same is true today), inmates convicted of federal offenses could, generally speaking, be sent to four types of federal institutions (in increasing order of security): (1) Federal Prison Camps (minimum security); (2) Federal Correctional Institutions (low/medium security); and (3) United States Penitentiaries (high security); and (4) ADX (high security/control unit).[1] Due to the circumstances of Mr. Johnson's offenses, he would not have been eligible for placement anywhere besides a United States Penitentiary (high security) or ADX (the SuperMax facility),

---

[1] There are a number of other specialty prisons, such as medical and reception centers, but the vast majority of federal inmates have no contact with these specialty institutions.

7

despite Mr. Vanyur's suggestion that an individual with Mr. Johnson's history could be sent to a medium- or low-security facility. Johnson T. at 2471-2473. As described further below, in my professional opinion, ADX is a facility that maintains security protocols capable of neutralizing the threats of future danger that the Government alleged warranted Mr. Johnson's death sentence, and placement at that facility could have effectively limited or eliminated his contact with any individual, both within and outside the confines of the prison, absent consent from the BOP (*i.e.* for mail, telephone or correspondence privileges with particular individuals). Indeed, given the circumstances of his current convictions, his history and his status as a high-ranking gang leader, Darryl Johnson was one of those "very special cases" (a phrase used by Dr. Vanyur in his Beckford testimony) eligible for direct ADX placement if deemed necessary and appropriate by the BOP.

20.     Although direct court commitments to ADX are not the norm, they are neither prohibited nor unheard of. The vast majority of ADX inmates come directly from other institutions. However, at the time of Mr. Johnson's trial, approximately ten percent of ADX inmates were direct commitments from the sentencing courts. In a capital trial that occurred a few months before Mr. Johnson's (United States v. Dean Beckford, et al.), former ADX Associate Warden Vanyur testified that some nine percent of ADX's 388 inmates were direct court commitments. According to Dr. Vanyur, that nine percent was composed of "very special cases, typically, high ranking organized crime figures, high ranking drug cartel individuals or international terrorists." Beckford T. at 5. Dr. Vanyur's testimony on this point in Beckford was accurate and consistent with my knowledge and experience. Similarly, his affirmative response to the question, "So you don't mean to tell this jury that someone cannot be committed [to ADX]

8

immediately if the United States is of the opinion that they're dangerous?" was also accurate and consistent with my knowledge and experience. Beckford T. at 19. Accordingly, the suggestion that Mr. Johnson was not eligible for placement at ADX immediately after sentencing, if deemed necessary and appropriate, is false and is belied by ADX's history. Similarly, the notion that the BOP is somehow powerless to prohibit specific inmates from committing serious crimes while incarcerated is also false.

21. In the Beckford case, Dr. Vanyur correctly testified that ADX is "the most secure facility" in the federal prison system. Beckford T. at 4. All the cells at that facility – whether they are in the general-population area of the prison or in the control unit – hold a single inmate. Generally speaking, in 1997, inmates in general population had the opportunity to recreate with other inmates, but there was no requirement that they be allowed to do so and, as discussed below, there are a multitude of examples where inmates are prohibited from congregating or having any contact whatsoever with other inmates. Indeed, now, inmates in the general population at ADX do not have the privilege of recreating with other inmates; rather, they recreate individually. Moreover, those in the control unit have no opportunity to recreate or otherwise have any contact whatsoever with other inmates and have no interactive human contact with anyone except guards during cell extractions or staff rounds. Given the nature of Mr. Johnson's convictions, and if the BOP determined it was warranted based on his behavioral history and perceived "future dangerousness," he could have been placed in the control unit at ADX.

22. Regardless of whether Mr. Johnson was eligible for direct placement in ADX's general-population unit or its control unit, the BOP had both the authority and the ability to craft

9

conditions of confinement that would alleviate any risk presented by Mr. Johnson that he would constitute either a security risk or a future danger to either BOP staff, other inmates, or the public. Indeed, the BOP individualizes conditions of confinement on a regular basis. The either/or proposition that an inmate receives a great deal of freedom if not incarcerated at ADX advanced in Mr. Johnson's trial by Dr. Vanyur (see Johnson T. at 2475 (general population means that an inmate would have "open and frequent contact unrestrained with staff and inmates"); Johnson T. at 2472 (inmates have "virtually unlimited access to telephones and a great deal of open visiting contact"); Johnson T. at 2477 (an inmate at high-security facilities has "a great deal of open contact visiting," "virtually unlimited phone access," and "unlimited correspondence privileges"); Johnson T. at 2485 (even in a control unit, inmates have "virtually unlimited correspondence with the outside world"); Johnson T. at 2504 (dangerous inmates cannot be separated at high-security institutions)) are at best serious misstatements and are at worst gross distortions and mischaracterizations of the BOP's role, function, authorities, and abilities, at the time of Mr. Johnson's trial and presently, to house prisoners under secure and restrictive conditions of confinement for as long as deemed necessary by the BOP in order to alleviate the risk that the inmate would constitute either a security risk or a future danger to either BOP staff, other inmates, or the public.

23. For many years, the BOP has maintained and set aside facilities, units, and cells for difficult and dangerous inmates. For example, ADX and numerous other prisons have cells that are termed "side pockets." These side pockets, which operate separate from the general population housing, provide for the holding of inmates under highly-secure control-unit type conditions. For example, Luis Felipe – considered by the BOP to be exceptionally dangerous

10

and sent to ADX directly by the sentencing court – was held in a side pocket at ADX immediately upon his arrival there. In the side pocket, Felipe was kept in total isolation from other inmates and all of his communications were both severely restricted and strictly monitored. Similarly, ADX has a wing known as "bombers' row" where those inmates (such as Theodore Kaczynski) convicted of using bombs and other explosive devices to commit their crimes are held under strict, individualized conditions.

24. These strict conditions are not solely the province of ADX and are nothing unusual or novel in the BOP. Every prison in the federal system has the ability, policies, and procedures to guard against future acts of violence by prisoners confined in BOP prisons, including, as discussed further below, imposing restrictions on contact with people on the outside by telephone and mail.

25. For example, USP-Marion had what it termed the "K-Unit" from at least the mid-1980s through the mid-1990s. The K-Unit held inmates who posed a high security risk and housed them under extremely strict conditions of confinement. These inmates were held in single cells, recreated by themselves, and had no contact with other inmates. There was one officer assigned for every six inmates (a very low guard-to-inmate ratio). Additionally, K-Unit inmates conducted their work (electronic cable assembly) in their cells instead of reporting to a workshop within the prison. Inmates housed in the K-Unit due to security and/or future-dangerousness concerns included convicted spies John Walker and Jonathan Pollard and former CIA operatives Ed Wilson and Christopher Boyce. These inmates were held in the K-Unit 1for as long as was deemed necessary by the BOP in order to alleviate the risk that the inmate would constitute either a security risk or a future danger to either BOP staff, other inmates, or the

11

public.

26.     Furthermore, USP-Marion maintained an inmate housing unit called the "I-Up Unit." David Sahakian, an inmate affiliated with Aryan Brotherhood, who was accused of serious crimes, including ordering the murders of others, was held in the I-Up Unit during his pretrial detention in the mid-2000s in order to protect others and ensure that he did not commit, order, or direct any additional criminal activity.   Sahakian and another Aryan Brotherhood member were separated from the rest of the prison population (they were held on the top floor of the prison hospital) and were continuously monitored by an officer.   The conditions of confinement created by the BOP for Sahakian were certainly available at the time of Mr. Johnson's trial in 1997.

27.     Thus, Dr. Vanyur's assertion that it would be "extremely difficult, at best" for officials at a BOP facility such as USP-Marion to separate Mr. Johnson from other Gangster Disciples is simply false.   At USP-Marion, we frequently and successfully separated inmates like Sahakian, Pollard, Walker, and others from the rest of the prison population.

28.     The BOP has likewise used other facilities within the system to hold pretrial defendants with special security needs.   For example, Timothy McVeigh and Terry Nichols were held at the Federal Correctional Institution at Englewood, Colorado prior to their trials on charges stemming from the 1995 bombing of the federal building in Oklahoma City, Oklahoma. An entire wing of the facility was cleared out to accommodate the two defendants.

29.     There are numerous other examples of individuals who have been subject to special security measures due to the special challenges that they present.   Rodney Hamrick, a convicted bomber, was housed at the USP-Marion when I worked there.   I recall that all of

12

Hamrick's mail was specially monitored by the BOP in order to reduce or eliminate his future dangerousness. Former Panamanian leader Manuel Noriega was also held under very strict conditions of confinement by the BOP because of the risk that he would order crimes or violence while incarcerated. Other inmates that have been, or continue to be, housed under very strict conditions of confinement due to security concerns include T.D. Bingham, Terry Mills, Thomas Silverstein, Clayton Fountain, Eric Rudolph, Ramzi Yousef, Anthony Ayeni Jones, Terry Nichols, and Theodore Kaczynski. Silverstein has been held in conditions at various prisons – including USP-Atlanta, USP-Leavenworth, USP-Marion, and ADX – where he has had virtually no human contact since the 1980's. Unlike Mr. Johnson, many of these individuals have shown an inability to positively adjust to incarceration in the federal prison system. However, to my knowledge, the strict conditions of confinement detailed above have very successfully alleviated the risk that these inmates might pose a future danger to individuals inside or outside the prisons in which they are housed.

30.    Additionally, the BOP maintains specialty units at various prisons that are designed to deal with problematic inmates. The Special Management Unit at the United States Penitentiary in Lewisburg, Pennsylvania has controls similar to those found at ADX and is designed to house inmates who have had difficulty abiding by the rules and regulations of other institutions.

31.    USP-Terre Haute's Communications Management Unit ("CMU") isolates inmates away from the general population and is designed to monitor any and all inmate communication. That prison also maintains a Special Confinement Unit ("SCU"). Although the SCU is home to the federal government's death row, the BOP may also place non-condemned

13

inmates with disciplinary problems in that unit if deemed necessary and appropriate given the facts. Indeed, as FCC-Terre Haute warden, I housed individuals in the SCU who had previously been involved in an incident at another prison. For example, Hakeem Shaheed and Tyrone Davis were involved in a major disturbance at USP-Marion in 2005 and were immediately transferred to USP-Terre Haute, where I was warden at the time. My superiors at the BOP instructed me to put Shaheed and Davis into the SCU indefinitely so that they could be closely monitored. I followed these instructions, and these two men were not involved in any incidents, violent or otherwise, while they were in the SCU.

32.     Moreover, most maximum-security federal prisons contain a Special Housing Unit ("SHU") where inmates can be placed when they have violated (or are suspected of violating) prison rules. A SHU is, in essence, a prison within a prison where security and conditions of confinement are stricter than those imposed on the general population within the maximum-security facility generally. Each BOP warden has the authority to place any inmate into a SHU if the inmate is under investigation for a serious violation of prison rules. Inmates can be housed in a SHU for a variety of reasons, including concerns about security and/or an inmate's future dangerousness. Inmates may be placed in the SHU for extended periods of time, with the only limitation being that facility administrators must periodically review placement to determine continued appropriateness.

33.     Special Administrative Measures ("SAM's") also allow the BOP to construct individualized conditions of confinement as are "reasonably necessary to protect persons against the risk of acts of violence or terrorism." See 28 CFR §501.3(a). Each SAM's order is totally unique and is nearly limitless in terms of the conditions of confinement available to be imposed

by BOP personnel (subject to the constraints of the United States Constitution, of course). Although SAM's orders are required to be periodically reviewed, they may be extended for as long as conditions persist (*i.e.*, indefinitely). A number of inmates have been held under SAM orders for more than a dozen years. SAM's orders were available to the BOP and the Department of Justice at the time of Mr. Johnson's trial in 1997 had officials been concerned that Mr. Johnson presented a risk of violence while incarcerated.

34.    Again, contrary to Dr. Vanyur's assertions at Mr. Johnson's trial, these strict conditions of confinement were (and are, to my knowledge) routinely imposed on high-risk inmates by the BOP for as long as it deems those conditions necessary to ensure the security and safety of BOP staff, other inmates, and the public (*i.e.* to reduce or eliminate the inmate's future dangerousness).

## II.    Telephone, Visitation, and Correspondence Restrictions

35.    Generally speaking, federal prison inmates do not have unlimited rights to visitation, correspondence, use of telephones, or contact with other inmates. As a matter of policy, the BOP grants access to these privileges consistent with the requirement of sound correctional management. These privileges can be revoked if they are abused or are deemed to constitute a threat to the security of the institution or the safety of individuals, whether inside or outside the prison. As Dr. Vanyur correctly stated in Beckford, inmates can have their phone privileges revoked for up to a year at a time in the case of significant misuse. Beckford T. at 27. There is no limit on the number of consecutive year-long revocations that can be imposed on a prisoner if it is deemed to be warranted.

15

36.     Misuse of telephone, mail, and visitation privileges are of particular concern to BOP personnel because of the possibility that a federal inmate will facilitate the commission of a crime through communications with other inmates or associates in society at large.  The BOP retains a large amount of flexibility in dealing with this potential threat, as well.  As the Justice Department's Inspector General found in a 1999 report:

> According to the BOP's program statement "Telephone Regulations for Inmates," conditions and limitations may be imposed on an inmate's telephone use to ensure that it is consistent with the BOP's correctional management responsibilities. Additionally, *inmate telephone use is subject to any limitations that individual wardens determine are necessary to ensure the security or good order of the institution or to protect the public*. Restrictions on inmate telephone use may also be imposed as a disciplinary sanction.
>
> BOP regulations direct wardens to refer incidents of unlawful inmate telephone use to law enforcement authorities. According to BOP regulations, telephone "misuse" refers to such things as using the telephone to intimidate a potential witness or for other criminal purposes.  Using another inmate's phone access code (PAC) or providing a PAC to another inmate is considered "misuse" and is subject to discipline. *Inmates who violate the telephone rules may have their privileges restricted or revoked*.
>
> Each warden is required by BOP's program statement to establish procedures to enable monitoring of inmate telephone conversations on any telephone located within the institution.  The term "monitoring" is not defined in the BOP program statement, so it is not clear whether this means recording of calls or live-monitoring by the BOP staff.  According to the BOP's program statement, the purpose of monitoring is to preserve the security and orderly management of the institution and to protect the public.
>
> In all BOP facilities, a notice is placed on inmate telephones advising the user that all conversations are subject to monitoring. Use of the telephones by inmates, therefore, constitutes their consent to this monitoring.  Inmate calls to attorneys are an exception to this rule and will not be monitored by BOP staff if the

16

inmate follows proper procedures, established by the warden at each institution, to arrange and place attorney calls.

BOP Headquarters has not issued any policy detailing how much "live monitoring" or review of recorded calls staff at each institution should conduct. Rather, determinations about the amount and methods of monitoring are left to individual wardens. Some institutions have remote monitoring locations. At these locations, officers randomly listen to some calls as they are occurring. This monitoring is in addition to their regular duties. Most of these institutions require the officers to monitor a minimum number – usually five – telephone calls during their shift. The officers are required to fill out a form describing the content of each monitored call and submit these reports to the institution's SIS office. The SIS offices are supposed to review the reports and decide if any further action is required.

Most institutions without remote monitoring locations have established a fixed listening post where a staff member assigned as the telephone monitor listens to inmate calls in addition to other duties, such as reviewing inmate mail. This telephone monitor normally works only during the day shift. However, wardens at several institutions have assigned a telephone monitor to the evening shift as well.

In its "Special Investigative Supervisors Manual" (SIS Manual), the BOP encourages a proactive approach to deterring criminal conduct by inmates. The SIS Manual directs SIS staff to use threat analysis, risk assessment, analysis of connections between inmates, and intelligence sources to prevent illegal conduct by inmates while still in the planning stage. The manual also states that the SIS should determine which inmates are engaged in activities that pose a threat to the welfare of the community. The SIS Manual provides examples of how the current version of ITS can assist staff in this task.

In August 1997, the Intelligence Section at BOP Headquarters issued an Inmate Telephone Monitoring field guide for wardens and SIS staff. The guide states that one of the BOP's primary concerns is to ensure that inmates who were convicted for playing leadership roles in major drug trafficking organizations do not continue their criminal operations using prison telephones. The guide stresses that

17

inmates should not be permitted to talk on the telephone when they should be at their job or educational assignments. The guide notes that some inmates may require reassignment from orderly jobs or similar positions that provide them a great deal of flexibility and autonomy so that their time is more fully engaged. The guide also cautions against permitting a small number of inmates to dominate the telephones.

In addition, the guide suggests that "population profiling" should be a major component of an institution's monitoring operations. For example, the guide acknowledges that it is not possible for staff to consistently listen to 100 percent of inmate calls. For this reason, the guide states that any inmate telephone monitoring should place the highest priority on identifying and tracking inmates with the greatest likelihood of using their telephone privileges to engage in criminal or illicit activity. Inmates identified as having a high likelihood of engaging in crime while incarcerated, such as drug dealing and escape plots, should be targeted and their telephone conversations subject to intense review.

See USDOJ/OIG Special Report: A Review of the Bureau of Prisons' Management of Inmate Telephone Privileges, August, 1999 (Found online at: http://justice.gov/oig/special/9908/) (emphasis added).

37.    As a captain, associate warden, and warden at numerous federal correctional facilities, I recall numerous instances where prison management (myself included) completely suspended or otherwise severely restricted telephone privileges because of concern that an inmate was abusing the privilege. While no system is 100 percent foolproof, we were successful in curbing inmate abuse of telephones in the overwhelming majority of cases where the issue arose through the use of targeted and contemporaneous monitoring and severe restrictions on numbers of calls and to whom inmate calls could be made.

38.    The same can be said for inmate abuse of correspondence and visitation privileges. In his testimony in the Beckford case, Dr. Vanyur correctly noted that mail, phone,

18

and visitation privileges can be severely restricted. Beckford T. at 22-24. He did not testify similarly in Mr. Johnson's case. Indeed, as a senior manager or head of numerous correctional facilities, I was involved in countless decisions to closely monitor visitation of, and correspondence to and from, specific individuals where there was a concern about institutional or individual safety. Actions taken to deter or detect unlawful conduct included, among other things, real-time monitoring and recording of visitation, review of correspondence, and the interception and translation of letters written in foreign languages or code. For example, at USP-Marion, Yu Kikumura, a member of the Japanese Red Army, a terrorist organization, had all incoming and outgoing mail inspected and translated. It was not uncommon for prison officials to inspect every piece of incoming and outgoing mail pertaining to a targeted inmate. Gotti and Felipe are additional examples of inmates who received this sort of treatment.

39.    Given facts underlying Mr. Johnson's convictions, including the use of telephones to commit crimes, intensive monitoring of and restrictions on his communications, whether they be in person or by telephone or mail, were clearly available to the BOP in 1997 (and are today) – no matter where his placement.

40.    Notably, it is my knowledge and understanding that during the term of his federal incarceration (more than 13 years at this point) the BOP has not deemed it necessary or appropriate to house Darryl Johnson under the strict conditions of confinement available to it as described above (e.g., intensive restriction and/or supervision of communications by mail, phone, or in-person visitation; or segregation from staff and other inmates) whether based on any perceived "future dangerousness" or otherwise. In addition, the information available to me clearly suggests that Mr. Johnson has been housed by the BOP under conditions that have, in

19

fact, negated any potential "future dangerousness," and he has demonstrated that he is a well-adjusted inmate, as evidenced, for example, by the affidavit of BOP Case Manager B. English previously submitted to the Court in this case which states, "I consider [Darryl] Johnson to be a well-adjusted inmate without any out of the ordinary management concerns. ...   Overall, Johnson is a quiet and civil individual." (BOP Case Manager B. English Affidavit 8/25/08).

Further affiant sayeth naught.

Mark A. Bezy

Subscribed and sworn to
before me this _14_ day
of December, 2009.

Notary Public

OFFICIAL SEAL
TERESA SEVERSON
NOTARY PUBLIC · State of Arizona
MARICOPA COUNTY
My Comm. Expires Oct. 2, 2011

20